**POMERANTZ LLP**
Joshua B. Silverman
Brian P. O'Connell
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

-and-

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171

*Co-Lead Counsel for Co-Lead Plaintiffs and the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE GRAB HOLDINGS LIMITED SECURITIES LITIGATION | Case No. 1:22-cv-02189-VM<br><br>Hon. Victor Marrero<br><br>JURY TRIAL DEMANDED |

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATION OF FEDERAL SECURITIES LAWS**

Lead Plaintiffs Si Fan, Amit Batra, and SLG Cloudbank Holdings ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for Plaintiffs' amended complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of Defendants' public documents; conference calls and announcements made by Defendants; United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Grab Holdings, Limited ("Grab" or the "Company") and Altimeter Growth Corp. ("Altimeter" or "AGC"); analysts' reports and advisories about the Company; information obtained from interviews with knowledgeable individuals; and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of the following three classes:

  a.   <u>Securities Act Class</u>: a class consisting of all persons who purchased or otherwise acquired public shares in Grab (including by way of exchange of publicly-listed AGC shares) pursuant to or traceable to the defective proxy/registration statement that Defendants filed with the SEC on Form F-4 on August 2, 2021, and that was thereafter amended on Forms F-4/A on September 13, 2021, October 18, 2021, November 12, 2021, November 17, 2021, and November 19, 2021, and the body of which was incorporated into the final prospectus on Form 424(b)(3) filed on November 19, 2021, as amended, the "Defective Proxy/Registration Statement." The Securities Act Class asserts claims under Sections 11 and 15 of the Securities Act.  These claims arise from Defendants' negligence, and do not assert that

Defendants acted with scienter.

b.  14(a) Class: a class consisting of all persons who were solicited to approve the merger and who exchanged publicly-listed AGC shares for Grab Class A Ordinary shares rather than redeeming the same pursuant to the Defective Proxy/Registration Statement.  The 14(a) Class asserts claims pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

c.  10(b) Class: a class consisting of all persons who purchased or otherwise acquired public Grab Class A Ordinary Shares or other public Grab securities between December 2, 2021 and March 3, 2022, both dates inclusive (the "10(b) Class Period").  The 10(b) Class asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

Excluded from all Classes are: (a) Defendants and their immediate families; (b) current and former directors or officers of Grab or AGC; (c) any entity that has entered into a stockholder agreement or co-venture agreement with Grab, or was a Private Investment in Public Equities ("PIPE") investor in Grab; (d) any entity controlled, majority-owned or wholly owned, or affiliated with any of the above.

2.    Grab went public on December 2, 2021 via a multi-billion dollar merger with AGC, a special purpose acquisition company ("SPAC").   The merger was effected through a defective and negligently prepared proxy and registration statement registered with the SEC pursuant to the Securities Act on Form F-4.

3.    Structurally, every public shareholder of the AGC SPAC was impacted by the Defective Proxy/Registration Statement in three ways:

    a.  <u>Redemption</u>: public shareholders were provided the right to redeem AGC shares for $10, if they preferred to receive their money back rather than obtain Grab shares in the merger.

    b.  <u>Merger Vote</u>: whether or not they redeemed shares, the Defective Proxy/Registration Statement called for AGC public shareholders to vote to approve or reject the merger between AGC and Grab.

    c.  <u>Replacement Share Issuance</u>:  AGC shareholders who did not redeem shares had their AGC shares "cancelled in exchange for the right to receive one [Grab] Class A Ordinary Share."  These shares comprised the entire public market for Grab Class A Ordinary Shares, as all other shareholders (as admitted in the Defective Proxy/Registration Statement) were required to "wait[] until one year after [Grab's] filing with the SEC of a Form 20-F transition report reflecting the Business Combination" before selling.  For this reason, and because of the redemption and merger vote, all Grab Class A Ordinary Shares publicly traded on or after December 2, 2021 (and until at least the effective date of a subsequent registration statement) are traceable to the Defective Proxy/Registration Statement.

4.     Founded in 2012, Grab primarily offers ride hailing and food delivery services similar to Uber in over 400 cities in eight countries in Southeast Asia—Cambodia, Indonesia, Malaysia, Myanmar, the Philippines, Singapore, Thailand and Vietnam.  Grab also offers digital financial services via its "superapp," but that business is far less significant than its driver-based services.

5.     The Defective Proxy/Registration Statement describes Grab's business model as follows: "our platform connects millions of consumers with millions of driver- and merchant-

partners to facilitate interaction and trade between these stakeholders.  We generate the majority of our revenue from service fees and commissions paid by driver- and merchant-partners for use of the Grab superapp to connect them with consumers and facilitate transactions.  Based on service agreements with driver- and merchant-partners, we retain the applicable fee or commission from the fare or order and related charges that we collect on behalf of the driver- and merchant-partners."

6.    For its core ride hailing and food delivery businesses, Grab offers both consumer and driver incentives which can dramatically impact whether a transaction is profitable or unprofitable.  Grab's app tabulates a gross merchandise value ("GMV"), which includes the cost of the service to the consumer (before any discounts), and applicable taxes, tolls, tips and fees.  Grab's revenue from a given transaction is a set commission of the GMV, *less* the amount of incentives it offers to consumers and to drivers.  The following graphic describes the economics of a typical transaction to the consumer, the driver and to Grab:



The graphic below illustrates the economics of a typical ride:

**Consumer**

| | |
|---|---|
| Cost of Ride | $13.00 |
| Tolls and Other Fees | $0.80 |
| Grab Platform Fee | $0.20 |
| **GMV (Total before incentives)** | **$14.00** |
| Consumer Incentives | $(1.00) |
| **Consumer pays** | **$13.00** |

**Driver-Partner**

| | |
|---|---|
| **GMV (Total before incentives)** | **$14.00** |
| *including Grab Platform Fee* | *$0.20* |
| *including Consumer Incentives* | *$1.00* |
| **Commissions** | **$(2.60)** |
| Driver-Partner Incentives | $1.00 |
| **Driver-Partner Receives** | **$12.40** |

**Grab**

| | |
|---|---|
| **GMV (Total before incentives)** | **$14.00** |
| **Commissions** | **$2.60** |
| Driver-Partner Incentives | $(1.00) |
| Consumer Incentives | $(1.00) |
| **Revenue** | **$0.60** |

279

7.     As explained in the Defective Proxy/Registration Statement, incentives in a transaction can exceed the amount of Grab's commissions and fees, resulting in negative revenue to Grab: "[w]e offer various incentives to our driver- and merchant-partners, which are deducted from the fees normally received from driver- or merchant-partners (typically being a percentage of the fare paid by the consumer to the driver- or merchant-partner) and such incentives may sometimes exceed Grab's fee from a particular transaction.  Excess incentives refer to payments made to driver- and merchant-partners that exceed the amount of commissions and fees earned by Grab from those driver- and merchant-partners."  Thus, it was vital for investors to be accurately informed about the status of, and trends in, Grab's incentive programs.

8.     Without the benefit of accurate disclosure in the Defective Proxy/Registration Statement, AGC investors overwhelmingly approved the merger with Grab, and less than one

percent redeemed shares.  On December 1, 2021, the merger closed, effecting Grab's initial public offering via one of the largest SPAC transactions ever.

9. Because the Defective Proxy/Registration Statement was negligently prepared, it did not accurately inform investors of critical information.  Specifically, it did not accurately disclose that Grab was experiencing a severe driver shortage, forcing it to significantly increase driver incentives in order to hire and retain drivers, and that in Q4 2021 Grab significantly increased its consumer incentives, including large discounts for ride hailing consumers to offset increased pricing stemming from the lack of drivers and a "blockbuster" incentive providing massive discounts to food delivery customers.  Together, these undisclosed changes made the economics of Grab's core driver-based services significantly less profitable for Grab.

10. Certain Defendants also made additional false and misleading statements regarding incentives and Grab's performance in violation of Section 10(b) throughout the 10(b) Class Period.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act (15 U.S.C. §§77k, 77l and 77o) and §§10(b), 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78n and 78t(a)) and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC (17 C.F.R. §§240.10b-5, 240.14a-9).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act, and §27 of the Exchange Act.

13. Venue is proper in this Judicial District pursuant to §22 of the Securities Act, (15 U.S.C. §77v), §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

15.     Lead Plaintiffs Si Fan, Amit Batra, and SLG Cloudbank Holdings purchased or otherwise acquired Grab securities traceable to the Defective Proxy/Registration Statement, elected to exchange rather than redeem shares pursuant to the Defective Proxy/Registration Statement, and/or purchased or otherwise acquired Grab Class A Common Stock during the 10(b) Class Period, as described in their Certifications previously filed with this Court, *see* ECF Nos. 22, 31, and suffered damages as a result of Defendants' violations of federal securities laws alleged herein.

16.     Defendant Grab is incorporated under the laws of the Cayman Islands with its principal executive offices located in Singapore.  Since December 2, 2021, Grab's Class A common stock trades on the NASDAQ exchange under the symbol "GRAB," and its warrants trade under the symbol "GRABW."  Grab went public at that time via a merger with Altimeter Growth Corp.  Prior to that time, Altimeter Growth Corp existed as a blank check SPAC and traded on the NASDAQ under the ticker symbol "AGC."

17.     Defendant Brad Gerstner ("Gerstner") was the Chairman, Chief Executive Officer, and President of Altimeter, and served on the board of directors of AGC.  Gerstner consented to being listed as a director in the Defective Proxy/Registration Statement.

18.     Defendant Hab Siam ("Siam") was the General Counsel of AGC, and served on its board of directors.  Siam consented to being listed as a director in the Defective Proxy/Registration

7

Statement.

19.     Defendant Richard N. Barton ("Barton") served on the board of directors of AGC. Barton consented to being listed as a director in the Defective Proxy/Registration Statement.

20.     Defendant Aishetu Fatima Dozie ("Dozie") served on the board of directors of AGC.  Dozie consented to being listed as a director in the Defective Proxy/Registration Statement.

21.     Defendant Dev Ittycheria ("Ittycheria") served on the board of directors of AGC. Ittycheria consented to being listed as a director in the Defective Proxy/Registration Statement.

22.     Defendant Anthony Tan ("Tan") was Grab's Chief Executive Officer ("CEO") and Chairman at all relevant times and one of Grab's founders.   Tan was a director of Grab at all times relevant hereto and a director of the Company following the merger.  Tan gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.  Tan also made statements in the Forms 425 filed on September 14, 2021 and November 12, 2021.

23.     Defendant Peter Oey ("Oey") was Grab's Chief Financial Officer ("CFO") at all relevant times, and was involved with the day-to-day operations of the Company prior to the merger and was involved in reviewing and providing the descriptions of Grab's operations and incentive payments in the Defective Proxy/Registration Statement.  Oey also made statements in the Form 425 filed on September 14, 2021.

24.     Defendant Tan Hooi Ling ("Ling") was Grab's Chief Operating Officer at all relevant times and has served as a director of Grab since December 1, 2021.  Ling is one of Grab's founders.  Ling gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

25.     Defendant Maa Ming-Hokng ("Maa") was Grab's President at all relevant times. Maa also made the materially misleading statement identified in Paragraph 100.

26.     Defendant John Rogers ("Rogers") has served as a director of Grab since December 1, 2021.  Rogers gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

27.     Defendant Dara Khosrowshahi ("Khosrowshahi") was a director of Grab at all times relevant hereto and a director of the Company following the merger.  Khosrowshahi gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

28.     Defendant Ng Shin Ein ("Ein") was a director of Grab at all times relevant hereto and a director of the Company following the merger.  Ein gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

29.     Defendant Oliver Jay ("Jay") was a director of Grab at all times relevant hereto and a director of the Company following the merger.  Jay gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

**FACTS COMMON TO ALL CLAIMS**

**I.       AGC forms as a SPAC to acquire a company with high growth potential**

30.     AGC was a blank check company incorporated on August 25, 2020, as a Cayman Islands exempted company for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or entities.  From its earliest SEC filings, AGC described itself as a "blank check company." *See, e.g.*, AGC Form 424(b)(4), filed on October 1, 2020.

31.     John Coates, speaking as Acting Director of the SEC's Division of Corporate Finance, described the SPAC structure as follows:

> The basics of a typical SPAC are complex, but can be simplified as follows. A SPAC is a shell company with no operations. It proceeds in two stages. In the first

stage, it registers the offer and sale of redeemable securities for cash through a conventional underwriting, sells them primarily to hedge funds and other institutions, and places the proceeds in a trust for a future acquisition of a private operating company. Initial investors also commonly obtain warrants to buy additional stock as at a fixed price, and sponsors of the SPAC obtain a "promote" – greater equity than their cash contribution or commitment would otherwise imply – and their promote is at risk. If the SPAC fails to find and acquire a target within a period of two years, the promote is forfeited and the SPAC liquidates. About ten percent of SPACs have liquidated between 2009 and now.

But most SPACs since 2009 have gone on to identify acquisition candidates. In their second stage, SPACs complete a business combination transaction, in which the SPAC, the target (i.e., the private company to be acquired), or a new shell "holdco" issues equity to target owners, and sometimes to other investors. SPAC shareholders typically have a vote on the so-called "de-SPAC" transaction, and many investors who purchased securities in the first stage SPAC either sell on the secondary market or have their shares redeemed before or shortly after the de-SPAC. After the de-SPAC, the entity carries on its operations as a public company. In this way, SPACs offer private companies an alternative pathway to "go public" and obtain a stock exchange listing, a broader shareholder base, status as a public company with Exchange Act registered securities, and a liquid market for its shares.

John Coates, "SPACS, IPOs and Liability Risk Under Securities Laws," https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (April 8, 2021) (footnotes omitted).

32.     The SPAC structure creates manager incentives to pursue a target that may not be in investors' best interest, and to avoid disclosures that may dissuade investors from exchanging shares in the merger.  If a merger is completed within the allocated time frame, founders and managers of the SPAC generally reap windfall profits from their ownership of SPAC securities they obtained cheaply prior to public offering, and enjoy considerable control such as the ability to nominate board members to the new company.  However, if an acquisition is not effectuated within that time frame, then the SPAC is dissolved and the money in the trust is returned to investors, with no compensation paid to the founders and managers of the SPAC.  Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition

within their deadline, even if the transaction may be to the detriment of the public shareholders.

33.     The SPAC structure does not require a shareholder to exchange pre-merger SPAC shares into shares of the merged company.  Instead, after what is supposed to be full disclosure of material information, such holders are afforded the opportunity to redeem shares prior to exchange. The redemption of shares directly impacts the working capital of the merged company, and indirectly impacts the economic interests of SPAC sponsors.  As a result, SPAC sponsors and merger targets are highly incentivized to minimize the number of redemptions by SPAC shareholders.

34.     Companies seeking to go public have increasingly turned to SPAC structures in recent years.  SPAC transactions are faster than traditional IPOs, the price is determined in advance instead of by the volatile market, and SPAC sponsors often have a network of contacts and management expertise they can offer to the new company.  However, SPAC mergers also have the potential to be rife with inaccurate disclosures, as the process allows companies to sidestep traditional underwriting and regulatory scrutiny.  SEC officials have also expressed concern over the recent surge in SPACS, in particular about the "baseless hype" by which many are sold.  *See* John Coates, "SPACS, IPOs and Liability Risk Under Securities Laws," https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (April 8, 2021).  As SEC Chair Gary Gensler testified in front of Congress, the "surge of SPACs raises a number of policy questions.  First and foremost, are SPAC investors being appropriately protected?"  *See* https://www.sec.gov/news/testimony/gensler-2021-05-26.

35.     From its earliest filings, AGC encouraged investors to set aside concerns about it being a "blank check company" by touting the business acumen of AGC's Board of Directors, and promising that it would focus on the "objective [] to identify, acquire, and operate a business in a

secular-growth area of the technology sector that will compound growth over the long-term for exponential value creation." *See, e.g.,* Form 424(b)(4) filed on October 1, 2020.

## II.   AGC claims extensive due diligence confirmed Grab's business operations and valuation

36.   On April 13, 2021, AGC announced that it had entered into a merger agreement with Grab.  The merger was intended to and did effect an initial public offering of Grab, which was previously a private company.  Upon approval and closing of the merger, AGC would cease to exist and Grab would become the surviving entity.

37.   As is customary in SPAC transactions, the merger was contingent upon approval by AGC shareholders, and regardless of the vote, AGC shareholders would be permitted to redeem shares at $10/share if they did not want to hold shares in Grab post-closing.

38.   In the Defective Proxy/Registration Statement, Defendants claimed to have conducted extensive due diligence of Grab, including that the AGC Board reviewed the results of due diligence regarding "investigations of Grab and the industries in which it operates, including the financial and other information provided by Grab."  In particular, the AGC Board represented that it considered, among other things, whether Grab satisfied the following factors: (i) operating in a large and growing total-addressable market, (ii) having potential to deliver sustainable top-line growth for the long-term, and (iii) providing an opportunity to partner with a world-class management team capable of scaling a business around the globe.  The AGC Board also stated that it considered Grab's future growth and financial performance, including (i) Grab's business, prospects, financial condition, operations, technology, products, offerings, management, competitive position, and strategic business goals and objectives, (ii) general economic, industry, regulatory, and financial market conditions, and (iii) opportunities and competitive factors within Grab's industry.

39.     In the Defective Proxy/Registration Statement, Defendants represented that the AGC Board was provided:

> (i) a comprehensive review of the materials provided in the virtual data room; requests for follow-up data and information from Grab, including Grab responses to due diligence questions; (ii) multiple meetings and calls with Grab regarding Grab's business and operations, projections and technical diligence matters, as well as financial, tax and legal matters, including those related to intellectual property and technology matters, regulatory matters, litigation matters, corporate matters (including material contracts, capitalization and other customary corporate matters), and labor and employment matters; and (iii) summaries provided to AGC of key findings with respect to business, operational and financial due diligence, which included a high-level summary of the financial, tax and legal due diligence findings by AGC's various tax and legal advisors engaged in connection with the transaction, including Ropes and other local counsel in the jurisdictions in which Grab operates (legal matters) and KPMG LLP (financial and tax diligence).

40.     Based upon their "experience in evaluating the operating and financial merits of companies similar to Grab" and "due diligence," the AGC Board claimed that Grab warranted a whopping valuation of $39.6 billion:

> The AGC Board did not obtain a third-party valuation or fairness opinion in connection with its determination to approve the Business Combination. However, AGC's management, the members of the AGC Board and the other representatives of AGC have substantial experience in evaluating the operating and financial merits of companies similar to Grab and reviewed certain financial information of Grab and other relevant financial information selected based on the experience and the professional judgment of AGC's management team, which enabled them to make the necessary analyses and determinations regarding the Business Combination. Accordingly, investors will be relying solely on the judgment of the AGC Board in valuing Grab's business and assume the risk that the AGC Board may not have properly valued such business.

41.     As a result of this due diligence and what they told investors was "careful consideration," the AGC Board told investors in the Defective Proxy/Registration Statement that they concluded merging with Grab at a $39.6 billion valuation for Grab was "in the best interests" of AGC shareholders, and "unanimously recommend[]" that investors "vote or give instruction to vote '**FOR**'" the proposal.  *See* Defective Proxy/Registration Statement (emphasis in original).

13

42.     The Defective Proxy/Registration Statement expressly directed investors **_to avoid doing their own due diligence_**, and instead to rely **_solely_** on the information they provided or incorporated into that document: "None of AGC, GHL or Grab has authorized anyone to give any information or make any representation about the Business Combination or their companies that is different from, or in addition to, that which is contained in this proxy statement/prospectus or in any of the materials that have been incorporated in this proxy statement/prospectus.  Therefore, **if anyone does give you information of this sort, you should not rely on it**."[1]

## III.    Grab offers app-based ride hailing and food delivery services in Southeast Asia

43.     Anthony Tan and Tan Hooi Ling co-founded Grab in 2012.  Its product, Grab, uses a mobile app to provide ride hailing and related services (its "mobility" segment), online food delivery ("deliveries" segment), a digital wallet ("e-wallet" segment) and business services ("enterprises" segment).  In 2018, Grab acquired Uber's business in Southeast Asia, in exchange for Uber receiving a 27.5% stake in Grab.  Uber's ride hailing and food delivery business in the region were then merged into Grab's operations.

44.     Although Grab nominally operates in many different businesses, two dominate: food delivery and ride hailing.  These segments collectively provided the overwhelming majority of revenue in both fiscal year 2020 and the first half of 2021:

---

[1] Except as otherwise stated, all emphasis is supplied.



45.     According to the Defective Proxy/Registration Statement, the mobility offerings connect consumers with rides provided by driver-partners across a wide variety of multi-modal mobility options including private cars, taxis, motorcycles (in certain countries), and shared mobility options, such as carpooling.

46.     The deliveries offerings available through the Grab platform include prepared meal, grocery and point-to-point delivery services ordered through its mobile application.

47.     According to the Defective Proxy/Registration Statement, the multiple offerings on the superapp create "significant synergistic benefits" and that Grab has created "ecosystem" that creates a "competitive advantage."  Tan has stated that its superapp ecosystem leads drivers to "remain loyal to the Grab platform" because it allows for multiple income opportunities.

## IV.    Grab's business model depends on its ability to reduce incentives

48.     As Grab stated in its Defective Proxy/Registration Statement under the section titled "Our Business Model," Grab offers various incentives to drivers, consumers, and merchants in order to generate business.  Key metrics that affect Grab's profits include: commissions to Grab, partner incentives provided by Grab, and consumer incentives such as discount coupons and

promotional offers.

49.     During the pandemic, Grab conducted flexible incentive plans to regain drivers. Financial data show that the high driver and consumer incentive strategy failed to revive financial performance.

50.     Each dollar spent on incentives reduces Grab's revenue by an equal amount.  In the example below, the dollar value of a ride for a consumer is $13.00, after tolls and other fees ($.80) and a platform fee ($.20), the total cost to the consumer is $14.00 before incentives.  If Grab offers an incentive of $1.00 to the consumer, the consumer pays $13.00 for the ride.  The driver-partner meanwhile, receives the $14.00 for the ride, minus a $2.60 commission to Grab.  In this example, Grab provides the driver with a $1.00 incentive, and therefore receives $12.40 ($14.00- $2.60+ $1.00).  Grab meanwhile, receives the $2.60 commission from the driver minus the $1.00 for consumer incentives and $1.00 for driver-partner incentives, to receive $.60 in revenue:



The graphic below illustrates the economics of a typical ride:

**Consumer**

| | |
|---|---:|
| Cost of Ride | $13.00 |
| Tolls and Other Fees | $0.80 |
| Grab Platform Fee | $0.20 |
| **GMV (Total before incentives)** | **$14.00** |
| Consumer Incentives | $(1.00) |
| **Consumer pays** | **$13.00** |

**Driver-Partner**

| | |
|---|---:|
| **GMV (Total before incentives)** | **$14.00** |
| *including Grab Platform Fee* | *$0.20* |
| *including Consumer Incentives* | *$1.00* |
| **Commissions** | **$(2.60)** |
| Driver-Partner Incentives | $1.00 |
| **Driver-Partner Receives** | **$12.40** |

**Grab**

| | |
|---|---:|
| **GMV (Total before incentives)** | **$14.00** |
| **Commissions** | **$2.60** |
| Driver-Partner Incentives | $(1.00) |
| Consumer Incentives | $(1.00) |
| **Revenue** | **$0.60** |

279

51.     Grab defines "excess incentives" as the undesirable situation where the "amount of payments made to driver and merchant partners exceed the amount of commission and fees earned by Grab from those driver- and merchant- partners."  Because the amount Grab pays in these cases exceeds its commissions and platform fees, Grab incurs negative revenue on these rides.  High incentives resulted in negative revenue for Grab in fiscal year 2019, but Grab had reduced incentives resulting in positive revenue for its key mobility and delivery segments for both fiscal year 2020 and the first half of 2021.

52.     The Defective Proxy/Registration Statement emphasized that during the preceding two years through H1 2021, Grab reduced incentives in both total amount as a percentage of GMV:



53.     The chart above, reproduced from the Defective Proxy/Registration Statement, purports to show that Grab spent 10% of GMV on incentives in the first half of 2021, down from 19% in 2019, when Grab reported negative revenues due to higher incentives.

54.     Grab aggressively marketed its partner incentive programs to drivers, to entice them to provide services for Grab rather than competitors like Gojek.  Grab sends weekly emails to its drivers offering that week's list of incentives.  *See* https://help.grab.com/driver/en-sg /360026765912-Trip-fares-and-incentives-guide.  Grab also aggressively markets its incentives over the social messaging platform Telegram.

55.     Grab's partner incentives include distance-based adjustments, which include extra payment for longer trips, group order incentives, and performance incentives as well as zone boosts, called gem incentives.  Grab also marketed incentives for new drivers during this period and referral bonuses.  For example, in Malaysia, Grab offered an additional bonus of up to RM 1,000 (USD 227) when a driver applicant activated and started to pick up orders.

56.     Grab also routinely offered bonus partner incentives on top of additional "gem incentives" by communicating over Telegram and over email.  For example, see the below Grab

Singapore announcement for $2 Singapore Dollar ("SGD," one SGD is roughly $.72 United States Dollar) bonuses for GrabFood and other deliveries:



57.     The frequency of announcements such as these increased dramatically in Q3 2021, and further escalated into Q4 2021.  For example, in Q4 2021, Grab Singapore sent out 86 such announcements via Telegram offering an extra $2 or $3 SGD bonus payments on deliveries, or nearly one for each day of the quarter, more than twice the amount announced in Q3 2021.

58.     Grab also initiated special incentive periods in which Grab would pay increasing bonuses per trip made.  For example:



59.    In the example above, Grab offered $1.00 SGD bonuses per trip for trips 1-3, $1.50 SGD per trip for trips 4-7, and $2.00 SGD per trip for trips 8 and above.

60.    In summer 2020, Grab also initiated a Performance Rebate incentive plan, which offers quarterly commission rebates to Grab's top driver-partners who meet the eligibility criteria which are

- Driver-partners who opt to Auto-Accept Always On throughout the quarter and are of the top 18,000 driver-partners based on commissions;

- Quarterly Cancellation Rating (Below 10%);

- Driver Rating (Above 4.6).

61.    The Grab Performance Rebate was a 12% rebate of the commissions that Grab collected from the driver in the quarter.  Drivers who rent vehicles through Grab (GrabRentals) were eligible for an additional 8% rebate:



62.     Market analysts understood the importance of Grab's incentives to its business.  As a UBS analyst report dated December 9, 2021 explained, "[d]river incentive is primarily a tool to increase and maintain the size of its online driver pool, which is aimed at managing rider churn, improving efficiency and amplifying its networking effect.  The driver incentives can be further broken down into two categories: surge pricing per ride and monthly/weekly ride targets.  Surge

pricing is a mechanism to lure more drivers to be in an area where demand is high." The analyst emphasized the importance of limiting consumer and driver incentives, and based on the inaccurate information in the Defective Proxy/Registration Statement, described them as "in check": "the company has managed to keep incentives (for consumers and drivers) in check while sales & marketing costs have declined as % of GMV from 1.9% in 2019 to 1.2% in 2020. While sequential volatility in margins is possible, especially as economies reopen in 2022 and the company accelerates spending on marketing, we expect the two core segments to improve margins with economies of scale." As was later revealed, at the time Grab was actually increasing its incentives.

## V.   Grab dramatically shifts operating strategy from reducing incentives to massively boosting incentives just before IPO

63.     Grab reversed its incentive reduction strategy just before the IPO. Though not disclosed in the Defective Proxy/Registration Statement, by Q4 2021, Grab was paying quarterly incentives that were more than 90% higher year-over-year:



Sources: 2020 numbers derived from dividing annual figure from F-4 chart reproduced in Paragraph 52 and dividing by 4; Q1/Q2 2021 numbers derived from dividing H1 2021 figure from F-4 chart and dividing by 2; Q3 2021 numbers taken from earnings release published on November 11, 2021; Q4 2021 numbers figure taken from earnings release published March 3, 2022.

64.     The massive boost in incentives cannot be explained by increased business, because there was also a large rise in incentives paid as a percentage of GMV.  While, according to the F-4 chart reproduced in Paragraph 52, incentives as a percent of GMV held steady at 10% throughout 2020 and Q1/Q2 2021, by Q4 2021 they had risen to 13.38%, a 33.8% increase in just two quarters.



Sources: Grab Form F-4 (2020, and 2021 First Half), and earnings press releases (Q3 2021 and Q4 2021).

65.     On the partner incentive side, Grab later conceded that it "preemptively" ramped incentives in Q4 2021 (at the time Grab went public) in reaction to a decline in driver-partners it experienced in Q3 2021.  *See* Paragraph 93, *infra.*  Consumers also complained bitterly about driver shortages, and the resulting cancellations and surge pricing, just before Grab went public. *See, e.g.,* https://www.freemalaysiatoday.com/category/opinion/2021/11/24/where-have-all-the-grab-drivers-gone/ ("Of late, the message, 'Fares are higher due to higher demand', that customers are frequently bombarded with, even during off-peak hours, has become extremely annoying."); https://www.reddit.com/r/singapore/comments/qy3uby/grab_cancels_my_order_

and_immediately_raised_the/ ("Grab cancels my order and immediately raised the delivery fees, is this even ethical business practices?"); https://www.reddit.com/r/askSingapore/comments/ sf8e42/why_does_my_a_grab_app_always_say_its_peak_hour/ ("I work flexible hours so sometimes I start work at 8am, 10am, 12pm, 3pm, 4pm. But nowadays it always say that it is peak hour, no matter what time I'm grabbing. Lowest I could get these days was $20 because of peak hour.").

66.     Specifically, among other partner incentives, Grab offered incentives of up to $300 SGD for referrals of new drivers. *See, e.g.,* https://web.archive.org/web/20211130025749/ https://www.grab.com/sg/drd/. Plaintiffs are informed and believe that this and other increased partner incentives occurred in the beginning of Q4 2021, before Grab went public, because: (a) Grab conceded it was done "preemptively" in reaction to a Q3 driver decline rather than waiting until the end of Q4; and (b) as discussed below, Grab was also ramping consumer incentives in the beginning two months of Q4 2021, before the IPO.

67.     In the first two months of Q4, Grab also massively boosted its consumer incentives. On October 4-31, 2021, GrabFood (its food delivery business) offered what it called a "Blockbuster Sale," giving 30% off across the menu:



68.     While the GrabFood Blockbuster Sale was scheduled to end on October 31, 2021, it was brought back for an extended period with even bigger sales between November 25, 2021 and December 12, 2021, where some offers were as high as 50% off.  *See* https://www .misstamchiak.com/grabfood-blockbuster-sale/.

69.     Grab also offered large incentives in Q4 2021 to consumers on its ride hailing platform.  For example, from early October 2021 through December 31, 2021, it offered 50% off rides to or from some of the largest airports it serviced.  *See, e.g.,* https://mothership.sg/2021/10/ grab-changi-airport-promo-code/.

## VI.     False and misleading statements in the Defective Proxy/Registration Statement

70.     The Defective Proxy/Registration Statement contained untrue statements of material fact and omitted to state other facts necessary to make the statements not misleading under the circumstances in which they were made.  For example, in the Defective Proxy/Registration Statement, Grab made the following statement about its growth and profitability:

In addition, achieving profitability will require Grab, for example, **to continue to grow and scale its business, manage promotion and incentive spending, improve monetization, reduce marketing and other spending** and increase consumer spending. Grab's growth so far has been driven in part by incentives Grab offers driver-partners, merchant-partners and consumers. **As Grab has achieved greater scale, it has and may continue to seek to reduce incentives**, which can impact both profitability and growth.

71.     The statements identified in Paragraph 70 above were materially false and misleading when made because: (a) Grab was not reducing incentives, but instead, was increasing incentives especially in Q4 2021 as it would later admit on March 3, 2022, and, thus, Grab was not "manag[ing] promotion and incentive spending" towards profitability;  (b) Grab was not "continu[ing] to seek to reduce incentives" and was not reducing incentives as it "achieved greater scale," as demonstrated by the fact that incentives as a percentage of GMV increased by over 33.5% between 2020 and Q4 2021, even as scale grew; and (c) as a result, the Defective Proxy/Registration Statement did not accurately portray Grab's then-current financial situation or its business prospects.

72.     The Defective Proxy/Registration Statement made the following statements inaccurately characterizing supply constraints as hypothetical:

> *If Grab is unable to continue to grow its base of platform users, including driver- or merchant-partners and consumers accessing Grab's offerings, Grab's value proposition for each such constituent group could diminish, impacting its results of operations and prospects*.

> Grab's success in a given geographic market depends on its ability to increase the scale of its driver- and merchant-partner base and the number of consumers transacting through its platform as well as expand the deliveries, mobility and financial services offerings on its platform.

> *****

> • **If driver-partners are not attracted to the Grab platform or choose not to offer their services through its platform, or elect to offer them through a competitor's platform, Grab may lack a sufficient supply of driver-partners to attract and retain consumers and merchant partners to the Grab platform**. Driver-partners choose Grab based on many factors,

> including the opportunity to earn money, the flexibility and autonomy to choose where, when and how often to work, the tools and opportunities Grab provides to seek to maximize productivity and other benefits that Grab provides to them. It is also important that Grab maintains a balance between demand and supply for mobility services in any given area at any given time. Grab has experienced and expects to continue to experience driver-partner supply constraints or oversupply from time to time in certain areas (including certain areas or locations within cities). **To the extent that Grab experiences driver-partner supply constraints in a given market, Grab may need to increase, or may not be able to reduce, the driver-partner incentives that Grab offers**.

(Emphasis in the original in the first paragraph only).

73.     The statements identified in Paragraph 72 above were materially false and misleading when made because: (a) at the time Grab was *already* experiencing driver shortages in key markets; (b) these shortages were *already* negatively affecting operations at the time the statements were made;  (c) Grab at the time was *already* increasing partner incentives (including referral incentives) to combat the driver supply constraint; and (d) as a result, the Defective Proxy/Registration Statement did not accurately portray Grab's then-current financial situation or its business prospects.

74.     The Defective Proxy/Registration Statement also inaccurately characterized the role of high incentives within Grab's business model:

> We foster an ecosystem in which participants engage with each other through our platform. Consumers purchase goods and services from driver and merchant-partners, and driver- and merchant-partners interact with each other to fulfill delivery orders. Driver- and merchant-partners also purchase financial services directly through our platform and transact across verticals. We believe that this is a unique aspect of our platform, which underpins the strength of our competitive advantage.
>
> **During the initial stages of growth, we offered significant incentives and promotions to attract platform consumers as well as incentives to attract driver- and merchant-partners, and conducted advertising activities to enhance our brand awareness**. We also invested in research and development and other operating expenses to support the growth of our platform. Going forward, with increasing scale and synergies on our platform, we expect to enjoy economies of scale, which we expect will allow us to more efficiently and cost effectively

acquire new platform consumers and engage existing consumers.

75.     The statements identified in Paragraph 74 above were materially false and misleading when made because they omitted to disclose that: (a) Grab's significant incentives were not simply "during the initial stages of growth" but were being re-implemented at the time even in markets where Grab's services were well-established; (b) Grab's "scale and synergies" were not at the time functioning as explained in these statements, because despite higher scale and synergies Grab did not experience an ability in Q3 2021 and Q4 2021 to "more efficiently and cost effectively acquire new platform consumers and engage existing consumers"; (c) high incentives were still needed to attract consumers and drivers; and (d) as a result, the Defective Proxy/Registration Statement did not accurately portray Grab's then-current financial situation or its business prospects.

76.     Other text in the Defective Proxy/Registration Statement also inaccurately characterized driver supply issues as hypothetical, when they were already being experienced and already adversely impacting Grab's revenue and profitability:

> ***Increases in fuel, food, labor, energy, and other costs could adversely affect Grab***.
>
> Factors such as inflation, increased fuel prices, and increased vehicle purchase, rental, or maintenance costs may increase the costs incurred by Grab's driver-partners when providing services on its platform.
>
> Similarly, factors such as inflation, increased food costs, increased labor and employee benefit costs, increased rental costs, and increased energy costs may increase merchant-partner operating costs. Many of the factors affecting driver- and merchant-partner costs are beyond the control of these parties. In many cases, these increased costs may cause driver-partners to spend less time providing services on the Grab platform or to seek alternative sources of income. Likewise, these increased costs may cause merchant-partners to pass costs on to consumers by increasing prices. **A decreased supply of consumers and driver- and merchant-partners on the Grab platform could harm its business, financial condition, results of operations and prospects**.

(Emphasis in the original in the first paragraph only).

77.     The statements identified in Paragraph 76 above were materially false and misleading when made because they omitted to disclose that: (a) at the time Grab was *already* experiencing driver shortages in key markets; (b) these shortages were *already* affecting operations at the time the statements were made; (c) Grab at the time was *already* increasing partner incentives to combat the driver supply constraint and increasing consumer incentives to maintain consumer usage; (d) Grab was *already* experiencing an increase in the costs of labor, as demonstrated by their increased incentives; and (e) as a result, the Defective Proxy/Registration Statement did not accurately portray Grab's then-current financial situation or its business prospects.

78.     Regarding Grab's revenue, the Defective Proxy/Registration Statement stated:

**Grab's ability to decrease its net losses and achieve profitability is dependent on its ability to reduce the amount of partner and consumer incentives it pays relative to the commissions and fees it receives for its service.**

Grab has paid significant amounts of incentives to attract new driver and merchant partners and consumers to its services in order to grow its business and generate new demand for its services and may continue to do so in the future. These incentives, which are typically in the form of additional payments made to partners and consumers, have in the past and may in the future exceed the amount of the commissions and fees that Grab receives for its services. Grab's revenues are reported net of partner and consumer incentives, so if incentives exceed Grab's commissions and fees received, it can result in Grab reporting negative revenue. For the years ended December 31, 2019 and 2020 and the six months ended June 30, 2021, Grab incurred incentives of $2,351 million, $1,237 million and $740 million, respectively (comprised of partner incentives of $1,234 million, $621 million, and $311 million, respectively, and consumer incentives of $1,117 million, $616 million and $429 million, respectively) resulting in reductions to Grab's reported revenues of the same amounts, which in the case of the year ended December 31, 2019 resulted in Grab reporting negative revenues of $(845) million. Notwithstanding Grab's use of significant incentive payments to encourage use of its platform, Grab's monthly transacting users nevertheless declined from approximately 29.2 million in the year ended December 31, 2019 to approximately 24.5 million for the year ended December 31, 2020, in part due to the impact of the COVID-19 pandemic on Grab's mobility segment, and thereafter remained relatively stagnant at approximately 24.3 million for the six months ended June 30, 2021.

**Grab's ability to increase its revenues and, in turn, decrease its net losses and achieve profitability is therefore significantly dependent on its ability to effectively use incentives to encourage the use of its platform and over time to reduce the amount of incentives it pays to both its driver and merchant partners and consumers of its services relative to the amount of commissions and fees it receives for its services. If Grab is unable to reduce the amount of incentives it pays over time relative to the commissions and fees it receives, it will likely impact Grab's ability to increase its revenues, raise capital, reduce its net losses and achieve profitability and reduce its net cash outflows, any or all of which could prevent Grab from continuing as a going concern or achieving or maintaining profitability**. In addition, given Grab's use of incentives to encourage use of its platform, future decreases in the use of incentives could also result in decreased growth in the number of users and driver- and merchant-partners or an overall decrease in users and driver and merchant-partners and decreases in its revenues, which could negatively impact its financial condition and results of operations.

(Emphasis in the original in the first paragraph only).

79.     The statements identified in Paragraph 78 above were materially false and misleading when made because they omitted to disclose that: (a) Grab's inability to increase its revenues was a realized harm at the time the statement was made, rather than a hypothetical risk; (b) Grab was not "maintaining profitability"; (c) Grab was already experiencing a shortage of drivers and "preemptively" ramping partner incentives to offset; (d) Grab was already increasing incentives to maintain its base of consumers, including with massive "blockbuster" incentives at GrabFood; (e) Grab was *then* paying an increased level of driver and consumer incentives that was *already* impacting Grab's "ability to increase its revenues" and "reduce its net losses and achieve profitability"; and (f) as a result, the Defective Proxy/Registration Statement did not accurately portray Grab's then-current financial situation or its business prospects.

80.     Other statements which were filed with the SEC on Form 425 incorporated into the Defective Proxy/Registration Statement were also materially false and misleading.  On August 2, 2021, Grab announced its quarterly earnings.  The announcement was filed on Form 425 that same day, and incorporated into the Defective Proxy/Registration Statement.  In that Press Release, Grab

touted that its "**merchant and consumer incentives … are expected to continue to decline over time as Grab's business matures**."  That statement was materially false and misleading when made because it omitted to disclose that Grab was actually then increasing both driver and consumer incentives, even though its business was maturing.

81.    On September 13, 2021, Defendants Grab, Tan and Oey held a conference call to discuss Grab's quarterly earnings.  The transcript of that call was filed on Form 425 that following day, on September 14, and was incorporated into the Defective Proxy/Registration Statement.  In that call, Defendants Grab and Tan made the following statements regarding Grab's consumer base:

> **Anthony Tan:**
> Allow me to explain with this slide that illustrates the flywheel effects underpinning our super app strategy. Each of our businesses helps the others scale. First, New services can be quickly launched by leveraging collective assets. Our pervasive mobility user base enabled us rapidly achieve category leadership in deliveries, and every transaction on our platform is an opportunity to offer a customized financial product, whether payments, lending, or insurance**. Then, Consumer spending grows in tandem with more services, thereby creating more income opportunities for our merchant and driver partners, who remain loyal to the platform**. This creates wider selection, faster delivery times, and improved consumer experience. Even amidst the pandemic, consumer demand for deliveries has helped to cushion the impact of softer mobility demand on driver-partner earnings. This has helped us sustain the supply network of our business in a truly cost-effective way. A core component of our success is our ability to tie all this together into an integrated superapp that seamlessly connects each of our stakeholders. Our superapp flywheel allows us to grow the ecosystem in a vastly accelerated manner, versus other single-vertical players. This is our Secret Sauce.

82.    The statements identified in Paragraph 81 above were materially false and misleading when made because: (a) Grab's consumer base and driver-partners were not "loyal" but in fact required increasing incentives, which Grab was actually increasing at the time, to keep them using the platform; (b) at the time Grab went public, consumer spending was not growing "in tandem" with the number of services offered; (c) at the time, Grab's "supply network" was not

31

being "sustain[ed] … in a truly cost-effective way"; and (d) Grab was already increasing partner incentives to offset a decline in drivers, including large referral bonuses.

83.    On that same call, Defendants Grab and Oey made the following statement about Grab's "strong trends in our path to profitability":

> **Peter Oey**:
> From a bottom-line perspective, **we continue to demonstrate strong trends in our path to profitability**. Our Total Segment Adjusted EBITDA of $14 million loss saw a marked improvement by $75million [sic], underpinned by the strong top-line growth and improving margins across our business segments. Group Adjusted EBITDA was $214 million loss for the quarter. This was a decline of $8 million year-on-year, as we invest further in product development. We saw our adjusted EBITDA margins as a percentage of GMV improved for the quarter to negative 5.5%, as compared to negative 9% in the same period last year. **We will continue to execute sustainable and improving margins despite challenges in the operating environment.**

84.    The statements identified in Paragraph 83 above were materially false and misleading when made because they omitted to disclose that: (a) Grab was not "continu[ing] to demonstrate strong trends in its path to profitability"; (b) Grab was then experiencing a severe driver shortage and was then increasing both partner and consumer incentives, which necessarily decreased margins and revenue; (c) Grab's margins were not "improving" or "sustainable"; and (d) the Company was not then "continu[ing] to execute sustainable and improving margins despite challenges in the operating environment."

85.    On November 11, 2021, Grab announced its third quarter earnings in a Press Release filed on Form 425 on November 12, 2021, that was incorporated into the Defective Proxy/Registration Statement.  In that release, Defendants Grab and Tan stated:

> Revenue was $157 million, down 9% YoY, as a result of the expected decline in mobility due to the severe lockdowns in Vietnam. Grab's reported revenue is net of consumer,  merchant and driver-partner incentives.
>
> "Despite severe lockdowns in Vietnam and heightened restrictions across the region in the third quarter due to COVID-19, we executed well on our superapp

strategy and delivered strong growth,"- Anthony Tan

86.    The statements identified in Paragraph 85 above were materially false and misleading when made because they omitted to disclose that: (a) Grab's driver supply was *then* constrained; (b) Grab's declining mobility revenue was not limited to Vietnam, and was not caused exclusively by lockdowns and restrictions in that region; and (c)  Grab was rapidly increasing both consumer and partner incentives at the time, and thus eroding margins.

87.    Also on November 19, 2021, Grab filed its amended Defective Proxy/Registration statement.  The Defective Proxy/Registration Statement mirrored the inaccurate statements identified in Paragraph 85: "[r]evenue was $157 million for the three months ended September 30, 2021, down 9% year-over-year, as a result of the decline in mobility due to the severe lockdowns in Vietnam.  Revenue is net of consumer incentives and merchant- and driver-partner incentives." Those statements were materially misleading for the same reasons as identified in Paragraph 86.

88.    In addition to excluding information necessary to make the inaccurate statements provided not misleading under the circumstances in which they were made, the Defective Proxy/Registration Statement also omitted material information it was affirmatively required to include under Items 303 of SEC Regulation S-K (17 C.F.R. §§229.303, 229.503).   Item 303 requires the disclosure of commitments, demands, events, trends, or uncertainties reasonably likely to affect the registrant's financial condition.  SEC Regulation S-K required Defendants to disclose in the Defective Proxy/Registration Statement: "any known trends or any known demands, commitments, events, or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way"; "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and…the extent to which income was so affected";

33

and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." "Disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations." SEC Release Nos. 33-8056; 34-45321; FR-61.

89.     The SEC has emphasized that the disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17.

90.     In violation of Item 303 and Regulation S-K, the Defective Proxy/Registration Statement omitted the following known adverse trends that were not only "reasonably likely" but virtually certain to have a material adverse effect on Grab's financial condition or results: (a) a known decline in the supply of drivers; (b) a known material increase in partner incentives (both in the absolute and as a percentage of GMV); and (c) a known material increase in consumer incentives (both in the absolute and as a percentage of GMV).

## VII.   Shareholders approve the merger and Grab goes public via the Defective Proxy/ Registration Statement

91.     Having only available the materially inaccurate and misleading information contained in the Defective Proxy/Registration Statement, described above, shareholders overwhelmingly approved the merger, thereby effecting the IPO of Grab. Grab's December 1, 2021 press release described the transaction as "largest-ever U.S. public market debut by a Southeast Asian company."

92.     Although all public shareholders of AGC had the right to redeem shares for $10 whether or not the shareholder voted to approve the merger, as a result of the Defective Proxy/Registration Statement, less than one percent elected to redeem.  This was an exceptionally favorable result, as other SPAC transactions that closed at the same time experienced redemption rates averaging above 50%:



Source: https://everploeg.medium.com/tech-spac-redemption-rates-e8ff7d32633f.

93.     On March 3, 2022, Grab finally disclosed its incentive spending spree in Q4 2021, admitting that at the time of closing it was spending 94% more on total incentives compared to the average incentives per quarter in 2020, and 137% more in consumer incentives.  *See* March 3, 2022 Grab Holdings Press Release Details, https://investors.grab.com/news-releases/news-release-details/grab-reports-fourth-quarter-and-full-year-2021-results.   In another SEC filing thereafter, Grab conceded that preceding its public debut, it had ***already*** experienced "a decrease in the number of driver-partners in the third quarter of 2021," and at the time it went public it

"preemptively invested in driver incentives to grow the supply of active drivers on our platform in the fourth quarter of 2021." *See* April 28, 2022 Form 20-F.  None of this was accurately disclosed in the Defective Proxy/Registration Statement.

## VIII. None of the misrepresentations in the Defective Proxy/Registration Statement were shielded by the PSLRA's "safe harbor"

94.    None of the aforementioned misrepresentations and omissions were protected by the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), because they fell outside the scope of the safe harbor provision

95.    Alternately, even if otherwise within the scope of the safe harbor provision, the identified misrepresentations and omissions were subject to an exception of the safe harbor provision.  According to the PSLRA, the safe harbor does not apply to statements made "in connection with an offering of securities by a blank check company," *see* 15 U.S.C. §78u-5(b)(1)(B) or was "made in connection with an initial public offering," *see* 15 U.S.C. §78u-5(b)(2)(D).  At the time that the Defective Proxy/Prospectus was filed, the issuer (Altimeter Growth Corp.) was a blank check company.  Additionally, the statements were made in connection with the initial public offering of Grab, which was effected by the Form F-4 and de-SPAC transaction with Altimeter Growth Corp.

## ADDITIONAL FACTS ALLEGED ONLY WITH RESPECT TO COUNTS IV and V

## I. Section 10(b) Defendants make additional false and misleading statements leading to investor losses

96.    Unlike Counts I, II and III, which are premised only on negligence and/or strict liability, Counts IV and V allege that following the Defective Proxy/Registration Statement, Defendants Grab, Tan, and Maa ("Section 10(b) Defendants") made additional misstatements with scienter in violation of Section 10(b) and 20(a) of the Exchange Act.

97.     Section 10(b) Defendants possessed the power and authority to control the contents of the Company's Form 425 and other SEC filings, press releases, and other market communications. Each was provided with copies of Grab's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

98.     On December 2, 2021, the day of Grab's initial trading, Anthony Tan appeared on CNBC's Squawk Box. In the interview, Tan stated "[Our] mobility margins are strong. We're seeing in our deliveries business, break even, just after 3 years in the majority of our markets."

99.     The statement identified in Paragraph 98 above was false and misleading when made because: (a) the mobility margins were not then strong, and Grab was in fact then losing money and experiencing declining revenue and (b) it failed to disclose that Grab was then massively spending on consumer and partner incentives, including a large partner referral bonus and a delivery promotion so large that Grab's own advertisements called it a "blockbuster," which devastated Grab's margins and revenue.

100.    Also on December 2, 2021, Defendant Maa was interviewed by Fortune Magazine, during that interview, Maa touted Grab's "improving economics":

> **_Fortune_:**
> **Can you walk me through Grab's plans to become profitable? Grab's third quarter results last month showed losses of $988 million, despite steady growth in gross merchandise value (GMV), which ballooned to a record $4 billion in Q3. Market research firm Euromonitor said in a July report that a key weakness is Grab's big spending on advertising, promotions and incentives, and that a challenge going forward is whether the company can make money and maintain customer loyalty without such discounts.**
>
> **Maa**:
> We don't see profitability and growth as mutually exclusive. In Q3, we posted our third consecutive quarter of record GMV growth. **We've also made very good strides on improving our economics. Our mobility segment has been positive since Q4 2019 and our margins are industry-leading [in that sector]**.

Our deliveries business—which is much younger at three years old—is already breaking even in a majority of our markets.

Our key is driving our super app strategy, which allows us to cross-sell new services when we roll them out, while maintaining discipline around our marketing costs. [It] also allows [Grab] drivers to earn more via [new] income opportunities [when ride-hailing is down] and helps us maintain discipline around [spending on] driver incentives. So the super app is really key to driving the new economics of our business.

(emphasis in the original in the Fortune report's question paragraph, added elsewhere, brackets in the original transcript pulled from https://fortune.com/2021/12/02/grab-ipo-stock-shares-spac-price/).

101.    The statements identified in Paragraph 100 above were materially false and misleading when made because: (a) Grab was not then improving its economics, but was struggling to manage a consumer and partner decline by ramping large incentives; (b) they failed to disclose Grab's mobility and delivery services were then experiencing increasing losses due to increased incentives, and therefore lower revenue; and (c) Grab's "super app" was not "driving the new economics of [the] business."

102.    On March 3, 2022, before the market opened, Grab disclosed that it experienced adverse financial results as a direct result from the undisclosed increased in driver and consumer incentives.  Specifically, Grab announced that fourth quarter 2021 revenues had declined 44% from the previous quarter and reported a $1.1 billion loss for the quarter.  It issued a press release stating: "Revenue was $122 million, a 44% decline YoY as Grab preemptively invested to grow driver supply to support strong recovery in mobility demand.  Consumer incentives for mobility and deliveries also increased as Grab invested in its category share and MTU growth."  Grab also disclosed that it spent 74% more on incentives in the three months ending December 31, 2021 compared to the same period in 2020 and 126% more in ride-hailing in the three months ending

December 31, 2021  compared to the same period in 2020.

103.    During a conference call held in connection with the results on March 3, 2022, Defendant Tan also admitted that Grab had been experiencing a decline in driver supply: "we're preemptively investing to recalibrate driver supply to capture a strong recovery in mobility demand.  Similar to what was observed in other parts of the world, our driver supply base moderated down amid lower mobility demand in the third quarter."

104.    On this news, the Company's stock price fell $1.95, or 37.3%, to close at $3.28 per share on March 3, 2022, on unusually heavy trading volume.  Analysts lowered their price targets for Grab, noting higher than expected incentives to combat a driver shortage.

## II.    Section 10(b) Defendants acted with scienter in making the additional statements identified in this section

105.    With respect to the additional statements identified in this section, numerous facts establish that the Section 10(b) Defendants knew their statements were false when made, or were reckless to the likelihood of deceiving investors through unbalanced and misleading statements. First, Grab expressly admitted that it "saw a decrease in the number of driver *partners in the third quarter of 2021*."  *See* April 28, 2022, Form 20-F.  Specifically, in Grab Malaysia, Grab revealed that it had 70% fewer drivers than it had before the start of the pandemic.  *See* https://www.lowyat.net/2022/274430/grab-fare-structure-same-fewer-drivers./

106.    Second, Grab had previously admitted in the Defective Proxy/Registration Statement that it provides its executives (including the Section 10(b) Defendants) with tracking information, including current data regarding incentives and other key operating metrics: "Grab tracks certain key operating metrics, including, among others, its GMV, MTUs, partner incentives, consumer incentives, registered driver-partners and cohort data, with internal systems and tools." Thus, each had access to the actual performance data contradicting his public misrepresentations

at the time such misrepresentations were made.

107.    Third, each of the Section 10(b) Defendants held itself or himself out to investors both in the Defective Proxy/Registration Statements and in the quoted earnings reports as being knowledgeable about the Company's actual incentive payments, incentive trends, margins and revenue trends.   Thus, each either actually had the knowledge purported, or was reckless in holding himself or itself out as having such knowledge.

108.    Fourth, as Grab has conceded that the Company itself adjusted incentive levels and therefore margin as a mechanism to enhance either profitability (by reducing incentives) or consumer engagement/driver supply (by increasing incentives), and each of the Section 10(b) Defendants claimed to understand and be aware of those adjustments, they could not have executed this important function without gaining actual knowledge of the actual, current level of incentives.

109.    Fifth, as Grab published incentives to its driver-partners and via advertisements to consumers, the Company and its senior executives would have access to and knowledge of the incentive offers it was making at the time.

110.    Sixth, as the ride hailing and food delivery businesses were Grab's core operations, and the Section 10(b) Defendants spoke to investors about the trends and metrics in those businesses, it would be absurd for them to not have knowledge of those trends and metrics.

## CLASS ACTION ALLEGATIONS

111.    Plaintiffs bring these claims individually and on behalf of three Classes:

a.    <u>Securities Act Class</u>: all persons who purchased or otherwise acquired shares in Grab (including by way of exchange of AGC shares) pursuant to or traceable to the Defective Proxy/Registration Statement that Defendants filed with the SEC on Form F-4 on August 2, 2021, and amended on Forms F-4/A on September 13, 2021,

October 18, 2021, November 12, 2021, November 17, 2021, and November 19, 2021.  Securities Act Class asserts claims under Sections 11 and 15 of the Securities Act.  These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

b. <u>14(a) Class</u>: all persons who were solicited to approve the merger and who exchanged AGC shares for Grab Class A Ordinary shares rather than redeeming the same pursuant to the Defective Proxy/Registration Statement.  The 14(a) Class asserts claims pursuant to Section 14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder.  These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

c. <u>10(b) Class</u>: all persons who purchased or otherwise acquired Grab Class A Ordinary Shares between December 2, 2021 and March 3, 2022, both dates inclusive.  The 10(b) Class asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

Excluded from all Classes are: (a) Defendants and their immediate families; (b) current and former directors of Grab or AGC; (c) any entity that has entered into a stockholders agreement or co-venture agreement with Grab, or was a Private Investment in Public Equities ("PIPE") investor in Grab; and (d) any entity controlled, majority-owned or wholly owned, or affiliated with any of the above.

112.   The members of the Classes are so numerous that joinder of all members is impracticable.  The Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the

proposed Class.  Plaintiffs base this belief, in part, on the fact that Grab consistently traded tens of millions of shares per week.  Record owners and other members of the Class may be identified from records maintained by the Company, its transfer agent and brokers, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

113.    Common questions of law and fact exist as to all members of each Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Classes are:

a.   Whether Defendants made inaccurate statements and/or omitted material information to investors in the Defective Proxy/Registration Statement;

b.   Whether Defendants' misrepresentations and omissions violated federal securities laws;

c.   Whether Defendants' misrepresentations and omissions were material;

d.   [For the 10(b) Class only] Whether Section 10(b) Defendants made additional misrepresentations and omissions to investors outside the Defective Proxy/ Registration Statement, and whether those misrepresentations and omissions were material;

e.   [For the 10(b) Class only] Whether Section 10(b) Defendants acted with scienter;

f.   [For the 10(b) Class only] Whether the prices of Grab securities during the 10(b) Class Period were artificially inflated because of Section 10(b) Defendants' conduct complained of herein; and

g.   [For the 10(b) Class only] Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

114.     Plaintiffs' claims are typical of the claims of the members of the Classes as all members of each Class were similarly affected by Defendants' wrongful conduct in violation of federal law, and all assert the same legal claims arising out of the same conduct.

115.     Plaintiffs will fairly and adequately protect the interests of the members of the Classes.   Plaintiffs have no interests antagonistic to the Classes, and have retained highly experienced counsel specializing in securities litigation.

116.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all claims is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

117.     [Alleged only with respect to the 10(b) Class] For the 10(b) Class, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

   a.   During the 10(b) Class Period, Defendants made public misrepresentations of material facts and failed to disclose material facts necessary to make the statements they publicly made during the 10(b) Class Period not misleading under the circumstances in which they were made;

   b.   Company shares traded in an efficient market;

   c.   Company shares were liquid and traded with heavy volume during the 10(b) Class Period;

   d.   Company shares traded on the NASDAQ, and the Company was covered by multiple analysts, journalists, and industry commentators;

43

e. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

f. Plaintiffs and members of the 10(b) Class purchased, acquired and/or sold Company shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

g. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

118.   [Alleged only with respect to the 10(b) Class] Alternatively, Plaintiffs and the members of the 10(b) Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **COUNT I**

**Violation of Section 11 of the Securities Act of 1933**
**Against the Company and Defendants Gerstner,  Siam, Barton, Dozie, Ittycheria, Tan,**
**Oey, Ling, Ein,  Rogers,  Khosrowshahi, and Jay**

119.    Plaintiffs restate and reallege Paragraphs 1 through 95 and 111 through 116 as though fully set forth herein.

120.    This Count is based on negligence and strict liability and does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

121.    This count is asserted against the Company and each individual Defendant for violations of Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiffs, who

purchased and/or otherwise acquired Grab securities traceable to the Defective Proxy/Registration Statement, and all members of the Class who purchased or otherwise acquired Grab securities pursuant to or traceable to the Defective Proxy/Registration Statement.

122.     The Company is the issuer of the stock issued via the Defective Proxy/Registration Statement.  As such, the Company is strictly liable for each false and misleading statement contained therein, even for innocent misrepresentations.

123.     Defendants Gerstner,  Siam, Barton, Dozie, Ittycheria were directors of AGC at the time the Defective Proxy/Registration Statement was effected and each consented to be identified as a director in the Defective Proxy/Registration Statement.  Therefore, each had a duty to make a reasonable investigation into the statements contained in the Defective Proxy/Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, these Defendants should have known of the material misstatements and omissions contained in the Defective Proxy/Registration Statement.  As such, each of these Defendants is liable to Plaintiffs and the Securities Act Class.

124.     Defendants Tan, Ling, Ein, Rogers, Khosrowshahi, and Jay were named in the Defective Proxy/Registration Statement as persons who were about to become directors in the merged Company, and consented to being so named.  Therefore, each of these Defendants had a duty to make a reasonable investigation into the statements contained in the Defective Proxy/Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading.  In the exercise of reasonable care, these Defendants should have known of the material misstatements and omissions contained in the Defective Proxy/Registration

Statement.  As such, each of these Defendants is liable to Plaintiffs and the Securities Act Class.

125.    Defendant Oey was named as the person responsible for the statements attributed to him in the Form 425 referenced in Paragraph 83, and consented to those statements being incorporated thereby into the Defective Proxy/Registration Statement.  Therefore, he had a duty to make a reasonable investigation into those statements to ensure they were true and that there was no omission to state any material fact required to be stated in order to make the statements not misleading.  In the exercise of reasonable care, Oey should have known that these statements contained material misrepresentations and omissions.

126.    Plaintiffs and other members of the Securities Act Class acquired Grab securities without knowledge of the untruths and/or omissions alleged herein.  Plaintiffs and the other members of the Securities Act Class were thus damaged by Defendants' material misstatements and omissions.

127.    This action was brought within one year after the discovery of the untrue statements and omissions and within three years of the offering date.

## COUNT II

### Violation of Section 15 of the Securities Act of 1933
### Against Defendants Tan and Oey

128.    Plaintiffs restate and reallege Paragraphs 1 through 95, 111 through 116, and 119 through 127, as though fully set forth herein.

129.    This Count is asserted pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendants Tan and Oey.  These Defendants, in addition to their own primary liability under the Securities Act, are also secondarily liable for the primary violations of Grab.

130.    As the CEO and CFO of Grab, each was involved with the day-to-day operations of the Company prior to the merger and was involved in reviewing and providing the descriptions

of Grab's operations and incentive payments in the Defective Proxy/Registration Statement.  Each had the ability to control the contents thereof.

131.    Plaintiffs and other members of the Securities Act Class acquired Grab securities without knowledge of the untruths and/or omissions alleged herein.  Plaintiffs and the other members of the Securities Act Class were thus damaged by the primary violations of the Company.  By virtue of the conduct alleged herein, and their status as control persons of the Company, these Defendants are secondarily liable to Plaintiffs and the Securities Act Class for the primary violations of Grab.

## COUNT III

**Violation of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9
Against the Company and Defendants Gerstner,  Siam,  Barton,  Dozie, and Ittycheria**

132.    Plaintiffs restate and reallege Paragraphs 1 through 95 and 111 through 116 as though fully set forth herein.

133.     This Count is asserted pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. §78n, and Rule 14a-9 promulgated thereunder, against the Company and Defendants Gerstner, Siam,  Barton,  Dozie, and Ittycheria and does not sound in fraud.  Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent with respect to this Count as that intent is not an element of a Section 14(a) claim.

134.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any

statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

135.     These Defendants prepared, reviewed, and disseminated the Defective Proxy/Registration Statement, which as specified above made false statements, omitted material information that was required to be set forth therein, and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

136.     By virtue of their positions within the pre-merger Company and their due diligence regarding Grab and the merger, these Defendants were aware of the undisclosed or misrepresented information and of their duty to disclose this information in the Defective Proxy/Registration Statement.   The Defective Proxy/Registration Statement was prepared, reviewed, and/or disseminated by the Defendants named herein.   It misrepresented and/or omitted material facts, as detailed above.   Defendants were at least negligent in filing the Defective Proxy/Registration Statement with these materially false and misleading statements.

137.     As a direct result of these Defendants' negligent preparation, review and dissemination of the Defective Proxy/Registration Statement, members of the 14(a) Class were precluded from exercising their right to seek redemption of their AGC shares prior to the merger on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the merger.   The Defective Proxy/Registration Statement used to obtain shareholder approval of the merger deprived 14(a) Class members of their right to a fully informed shareholder vote in connection therewith, and deprived them of their right to the information necessary to make an informed redemption decision.   At all times relevant to the dissemination of

the Defective Proxy/Registration Statement, these Defendants were aware of and/or had access to the true facts concerning Grab.  Thus, as a direct and proximate result of the dissemination of the Defective Proxy/Registration Statement that Defendants used to obtain shareholder approval of and thereby consummate the merger, and to dissuade investors from redeeming AGC shares, the 14(a) Class suffered damages and actual economic losses in an amount to be determined at trial.

138.    The omissions and false and misleading statements in the Defective Proxy/Registration Statement were material in that a reasonable stockholder would have considered them important in deciding how to vote on the merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

139.    As stated herein, the Defective Proxy/Registration Statement contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  It was an essential link in the consummation of the Merger, and described itself as the sole source of information investors were to rely upon in making the Merger vote and redemption decisions.  These Defendants failed to correct the Defective Proxy/Registration Statement prior to the merger vote or redemption deadline, and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

140.    By reason of the foregoing, these Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

## COUNT IV

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against the Company, Tan, and Maa**

141.    Plaintiffs restate and reallege each and every Paragraph above as though fully set forth herein.

142.    During the 10(b) Class Period, the Company, and Defendants Tan and Maa, individually and in concert, directly or indirectly, (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

143.    These Defendants acted with scienter in that they knew or deliberately disregarded that the public statements made during the 10(b) Class Period; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements as primary violations of the securities laws.  These Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's materially misleading statements, and/or their associations with the Company, were privy to confidential proprietary information concerning the Company and participated in the fraudulent scheme alleged herein.

144.    Tan and Maa spearheaded the merger on behalf of Grab and had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and during the 10(b) Class Period intended to be deceitful, or, in the alternative, acted with reckless disregard

for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company personnel.

145.    As a result of the foregoing, the market price of Company securities was artificially inflated during the 10(b) Class Period.  Plaintiffs and the other members of the 10(b) Class relied on the statements described above and/or the integrity of the market price of Company securities during the 10(b) Class Period in purchasing Company securities at prices that were artificially inflated as a result of these Defendants' false and misleading statements.

146.    Had Plaintiffs and the other members of the 10(b) Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

147.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the 10(b) Class have suffered damages in an amount to be established at trial.

148.    By reason of the foregoing, these Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the 10(b) Class for substantial damages which they suffered in connection with their purchase of Company securities during the Class Period.

## <u>COUNT V</u>

**Violation of Section 20(a) of the Exchange Act
Against Defendants Tan and Maa**

149.    Plaintiffs restate and reallege each and every Paragraph above as though fully set forth herein.

150.    During the 10(b) Class Period, Defendants Tan and Maa as senior executives,

exercised control over the day-to-day activities of Grab, including the setting of incentive policy and the description to investors of Grab's operations, policies, material trends, and operating environment.  Because of their roles and responsibilities at Grab, Tan and Maa knew the adverse non-public information concealed by Grab's misstatements.   Both exercised authority and capability to control the contents of the misrepresentations made as alleged herein.

151.    Moreover, Tan was a director of Grab both before and after the merger.  Maa has served as Grab President since 2016.  Because of their roles and responsibilities at Grab, Tan and Maa knew the adverse non-public information concealed by the Company's misleading statements.  Each used his influence to control the day-to-day operations of Grab.

152.    Accordingly, Tan and Maa are secondarily liable as control persons for the primary §10(b) violations of Grab, as alleged herein.  By reason of their senior management positions and/or being a director of the Company, these Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  These Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

153.    Each also culpably participated in the misrepresentations to investors as alleged in Count IV.  Because of their positions of control and authority as senior officers, Tan and Maa were able to, and did, control the contents of Grab's direct communications with investors, which the Company disseminated in the marketplace during the 10(b) Class Period concerning the Company's operations.  Throughout the 10(b) Class Period, Tan and Maa exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in favor of Plaintiffs and each Class, and against Defendants as follows:

A.    Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives and Co-Lead Counsel as Class Counsel;

B.    Awarding Plaintiffs and each Class compensatory damages;

C.    Awarding Plaintiffs and each Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

E.    Awarding such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs and each Class demand a trial by jury.

Dated: August 22, 2022                Respectfully submitted,

**POMERANTZ LLP**

*/s/ Joshua B. Silverman*
Joshua B. Silverman
Brian P. O'Connell
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email: jbsilverman@pomlaw.com

boconnell@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com

**LEVI & KORSINSKY, LLP**

*/s/ Shannon L. Hopkins*

Shannon L. Hopkins
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com

*Co-Lead Counsel for Co-Lead Plaintiffs and
the Proposed Classes*

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**

Eitan Kimelman
60 E 42nd Street, Suite 4600, New York,
New York 10165
Phone: 212-697-6484
Fax:    212-697-7296
Email: eitank@bgandg.com

*Additional Counsel for Lead Plaintiffs and
the Proposed Classes*

54

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2022, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

Dated: August 22, 2022

POMERANTZ LLP

By: /s/ Joshua B. Silverman
Joshua B. Silverman

*Lead Counsel*