UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| IN RE GRAB HOLDINGS LIMITED SECURITIES LITIGATION |

Case No. 1:22-cv-02189-JLR

<u>Oral Argument Requested</u>

**JOINT MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

I. PRELIMINARY STATEMENT ........................................................................................1

II. STATEMENT OF FACTS................................................................................................3

    A.    The Parties .............................................................................................................3

    B.    The Business Combination .....................................................................................4

    C.    Grab's Business ......................................................................................................4

    D.    The P/R Statement Contained Robust Disclosures Concerning  Grab's Use
           of Incentives and the Associated Risks..................................................................5

    E.    The P/R Statement Accurately Disclosed Historical Incentive Metrics .................6

    F.    The P/R Statement Warned that COVID-19 Had Impacted Grab's
           Business and Could Continue to Impact Its Business Unpredictably.....................8

    G.    Grab's Fourth Quarter (and Full Year 2021) Results ..............................................9

III. ARGUMENT ...............................................................................................................10

    A.    Applicable Pleading Standard ...............................................................................10

    B.    The Section 11 Claim Fails...................................................................................10

           1.    The Actual Disclosures Contained in the P/R Statement...........................10

           2.    There Is No Material Misstatement ..........................................................11

           3.    There is No Material Omission..................................................................16

                    (a)    No Obligation To Disclose Additional Information .....................16

                    (b)    No Material Information Was Omitted.........................................19

    C.    The Section 14(a) Claim Fails ..............................................................................21

    D.    The Section 10(b) Claim Fails ..............................................................................22

           1.    The Complaint Fails to Plead a Material Misstatement or Omission ........22

           2.    The Complaint Fails to Plead Scienter With Particularity........................23

3.   The Complaint Fails to Plead Loss Causation ...........................................25

E.   The Control Person Claims (Counts II and V) Fail ................................................25

IV. CONCLUSION.....................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Altayyar v. Etsy, Inc.*,
242 F. Supp. 3d 161 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018)............11, 15

*Arfa v. Mecox Lane Ltd.*,
No. 10 CIV. 9053, 2012 WL 697155 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F.
App'x 14 (2d Cir. 2012)............................................................................................17

*Asay v. Pinduoduo*,
No 18-cv-7625 (PKC), 2020 WL 1530745 (S.D.N.Y. Mar. 3, 2020), *aff'd*, 2021
WL 3871269 (2d Cir. Aug. 31, 2021)....................................................................17, 21

*In re Barrick Gold Corp. Securities Litigation*,
341 F. Supp. 3d 358 (S.D.N.Y. 2018)...........................................................................25

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................................10

*Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*,
No. 07 CIV. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010).....................................18

*Bond Opportunity Fund v. Unilab, Corp.*,
No. 99 Civ. 11074(JSM), 2003 WL 21058251 (S.D.N.Y. May 9, 2003).........................22

*Born v. Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021)...........................................................................10

*C.D.T.S. v. UBS AG*,
No. 12 Civ. 4924(KBF), 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013), *aff'd sub
nom. Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir.
2015) .......................................................................................................................21, 22

*In re Chembio Diagnostics, Inc. Securities Litigation*,
No. 20CV2706ARRPK, 2022 WL 2872671 (E.D.N.Y. July 21, 2022) ..........................16

*Cheng v. Canada Goose Holdings Inc.*,
No. 19-CV-8204 (VSB), 2021 WL 3077469 (S.D.N.Y. July 19, 2021).....................23, 24

*City of Birmingham Firemen's & Policemen's Supplemental Pension System v. Ryanair
Holdings plc*,
No. 18-CV-10330 (JPO), 2020 WL 2834857 (S.D.N.Y. June 1, 2020)...........................24

*City of Warren Police & Fire Retirement System v. Foot Locker, Inc.*,
    412 F. Supp. 3d 206 (E.D.N.Y. 2019) ..............................................................22

*Coronel v. Quanta Capital Holdings Ltd.*,
    No. 07 Civ. 1405 (RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ..............13

*In re Coty Inc. Securities Litigation*,
    No. 14-CV-919 (RJS), 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ........17, 20

*Das v. Rio Tinto plc*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) ..........................................................24, 25

*Francisco v. Abengoa, S.A.*,
    No. 15 Civ. 6279 (ER), 2022 WL 3902852 (S.D.N.Y. Aug. 30, 2022) ............10

*Gagnon v. Alkermes PLC*,
    368 F. Supp. 3d 750 (S.D.N.Y. 2019) ..............................................................24

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009) ..............13

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ..............................................................24

*Gutman v. Lizhi*,
    No. 21-CV-317 (LDH) (PK), 2022 WL 4646471 (E.D.N.Y. Oct. 1, 2022) ....................25

*In re HEXO Corp. Securities Litigation*,
    524 F. Supp. 3d 283 (S.D.N.Y. 2021) ....................................................10, 15, 18, 19

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995) ..............................................................................8

*Holbrook v. Trivago N.V.*,
    No. 17 Civ. 8348 (NRB), 2019 WL 948809 (S.D.N.Y. Feb. 26 2019), *aff'd*, 796
    F. App'x 31 (2d Cir. 2019) ................................................................................25

*Jedrzejczyk v. Skillz Inc.*,
    No. 21-CV-03450-RS, 2022 WL 2441563 (N.D. Cal. July 5, 2022) ................15

*In re JP Morgan Chase Securities Litigation*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) ..........................................................21, 22

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ..............................................................................23

*Lasker v. N.Y. State Elec. & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996) ..............................................................................15, 22

iv

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)................................................................................25

*In re Livent, Inc. Noteholders Securities Litigation*,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001).................................................................25

*Moradpour v. Velodyne Lidar, Inc.*,
   No. 21-CV-01486-SI, 2022 WL 2391004 (N.D. Cal. July 1, 2022)...................15

*In re Nokia Corp. Securities Litigation*,
   Nos. 19-CV-3509, 19-CV-3982, 2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021) .............15

*Oklahoma Firefighters Pension & Retirement System v. Xerox Corp.*,
   300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Public Employees
   Retirement System v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) ...........16, 22

*In re Renewable Energy Group Securities Litigation*,
   No. 22-335, 2022 WL 14206678 (2d Cir. Oct. 25, 2022).....................................23

*Rubinstein v. Credit Suisse Group AG*,
   457 F. Supp. 3d 289 (S.D.N.Y. 2020).................................................................14

*Stadnick v. Vivint Solar, Inc.*,
   861 F.3d 31 (2d Cir. 2017).............................................................................16, 18

*Steamfitters' Industry Pension Fund v. Endo International PLC*,
   771 F. App'x 494 (2d Cir. 2019) .........................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..............................................................................................23

*United States ex rel. Foreman v. AECOM*,
   19 F.4th 85 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2679 (2022).......................1

*Willard v. UP Fintech Holding Ltd.*,
   527 F. Supp. 3d 609 (S.D.N.Y. 2021)...............................................17, 19, 20, 21

*Yaroni v. Pintec Technology Holdings Ltd.*,
   No. 20-CV-8062 (JMF), 2022 WL 1215450 (S.D.N.Y. Apr. 25, 2022) ...........12

## STATUTES

15 U.S.C § 77o ......................................................................................................25

15 U.S.C. § 78u-4 .................................................................................................10

15 U.S.C. § 78u-5 .................................................................................................15

15 U.S.C. § 77z-2 ..................................................................................................15

# REGULATIONS

17 C.F.R. § 210.3-12 ..................................................................................................17

17 C.F.R. § 230.419 ...................................................................................................15

Special Purpose Acquisition Companies, Shell Companies, and Projections,
    87 Fed. Reg. 29458 (proposed May 13, 2022) .................................................15

# OTHER AUTHORITIES

*Classification of Omicron (B.1.1.529): SARS-CoV-2 Variant of Concern*, World Health
    Org. (Nov. 26, 2021), https://www.who.int/news/item/26-11-2021-classification-
    of-omicron-(b.1.1.529)-sars-cov-2-variant-of-concern ......................................8

Jamie Payne, *Market Trends: De-SPAC Transactions*, Lexis Practical Guidance (Mar. 6,
    2022), https://www.lexisnexis.com/community/insights/legal/practical-guidance-
    journal/b/pa/posts/market-trends-de-spac-
    transactions#:~:text=Recent%20Trends%20in%20De%2DSPAC%20Transactions
    &text=One%20key%20trend%20seen%20in,75%25%20in%20the%20fourth%20
    quarter .................................................................................................................4

*WHO asks countries in South-East Asia Region to be vigilant as cases surge globally and
    new Variant of Concern is detected*, World Health Org.: South-East Asia (Nov.
    27, 2021), https://www.who.int/southeastasia/news/detail/27-11-2021-who-asks-
    countries-in-south-east-asia-region-to-be-vigilant-as-cases-surge-globally-and-
    new-variant-of-concern-is-detected ...................................................................8

Grab Holdings Limited ("Grab Limited"), Anthony Tan, Peter Oey, Tan Hooi Ling, Maa Ming-Hokng, John Rogers, Dara Khosrowshahi, Ng Shin Ein and Oliver Jay ("Grab Individuals"), Brad Gerstner, Hab Siam, Richard N. Barton, Aishetu Fatima Dozie and Dev Ittycheria ("Altimeter Individuals") (collectively, "Defendants"), respectfully submit this memorandum in support of their motion to dismiss the Amended Complaint (ECF No. 58) ("Complaint" or "AC") with prejudice pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

## I. PRELIMINARY STATEMENT

This is a case where the actual contents of the 400-plus-page Proxy/Registration Statement (the "P/R Statement")[1] and subsequent public disclosures compel dismissal. When read without the interruption of Plaintiffs' selective quotations and generous use of emphases, the story of Grab,[2] its business and risks are laid out fully and completely in order to allow investors to decide for themselves whether to purchase Grab's securities. So too with Grab's quarter-by-quarter disclosures, which reveal that Grab timely disclosed *actual* numbers in accordance with SEC rules governing the inclusion of financial information in registration statements. Plaintiffs' suggestion that Grab should have disclosed such figures earlier in the quarter is simply a plea to apply the rejected fraud-by-hindsight theory to this case. Length, selective quotation and bolding ought not replace a well-pled complaint.

Grab operates a "super app" in Southeast Asia, providing, among other things,

---

[1]     Excerpts from the P/R Statement ("P/R Stmt.") are attached as Exhibit A to the Declaration of Susan L. Saltzstein ("Saltzstein Decl."), which the Court may consider in connection with this motion to dismiss. *See, e.g.*, *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 107-08 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2679 (2022).

[2]     As used hereinafter, "Grab" refers to the private operating company Grab Holdings Inc. ("Grab Inc.") prior to the Business Combination and Grab Limited after the Business Combination.

ride hailing and food delivery services, by connecting customers with independent driver- and merchant-partners.  (AC ¶ 43.)  As disclosed throughout the P/R Statement, Grab calibrates incentives to attract and retain customers, drivers, and merchants based on local market conditions.  The Complaint's central tenet is that Grab should have been prescient and disclosed its Q4 2021 incentives in the P/R statement, notwithstanding that at the time of the P/R Statement's final issuance, the end of Q4 2021 was still six weeks away.

To support this flawed theory, the Complaint quotes a variety of disclosures, and follows each block quote with the conclusory refrain that the statements "were materially false and misleading" for reasons that disregard what the disclosures actually said.  (*See id.* ¶¶ 70-87.) Using this defective pleading technique, the Complaint ignores that the P/R Statement explained in painstaking detail that, among other things, (i) Grab (like many of its peers) historically has paid significant incentives to attract business and drivers; (ii) Grab's use of incentives would continue to fluctuate as market conditions dictated; and (iii) COVID-19 had significant impacts on Grab's business, including driver availability and customer usage, as the jurisdictions in which Grab operates entered and exited lockdowns in response to the pandemic.

Plaintiffs fail to plead a material misrepresentation.  Undeterred by the robust and accurate disclosures in the P/R Statement, Plaintiffs' misrepresentation claim rests on Grab's timely disclosure in 2022 that Grab's incentives in Q4 2021 (which closed on December 31, 2021, six weeks after the November 19, 2021 P/R Statement was filed) increased as compared to Q3 2021.  But the P/R Statement never indicated (much less guaranteed) that incentives would decrease every quarter, particularly as the pandemic continued to rage and new variants emerged (indeed, the World Health Organization ("WHO") named the Omicron variant one week after the P/R Statement was filed).  Nor did it provide any assurance that Grab would not experience

driver shortages as regions reopened.  Rather, it warned investors exactly to the contrary and disclosed the precise quantification of Q3 2021 incentives, none of which is alleged to be false.

Plaintiffs also have not identified any obligation to disclose additional information, let alone a material omission.  Plaintiffs' demand for further disclosure about incentives issued during Q4 2021 — which was only half-over when the P/R Statement was issued — would require a level of clairvoyance not required by law.  All of Plaintiffs' claims fail in the absence of an actionable misstatement or omission, none of which are present here.

Finally, Plaintiffs' Exchange Act claims fail because the Complaint does not plead scienter with particularity as required by Rule 9(b) and the PSLRA (*see* § III.D.2, *infra*) and fails to adequately allege loss causation (*see* § III.D.3, *infra*).  As there is no primary violation and Plaintiffs have not alleged culpable participation, the control person claims also fail.  (*See* § III.E, *infra*).  The Complaint should be dismissed in its entirety with prejudice.

## II.  STATEMENT OF FACTS

### A.  <u>The Parties</u>

Plaintiffs purportedly acquired "Grab" securities traceable to the P/R Statement.  (AC ¶ 15.)  Grab Limited, a Cayman Islands company with its principal place of business in Singapore, is a publicly listed company traded on the NASDAQ.  (*Id.* ¶ 16.)  Grab Limited became a publicly-traded company following a Business Combination with Altimeter.  The Altimeter Individuals allegedly were directors and/or officers of Altimeter and purportedly consented to being listed as directors in the P/R Statement.  (*Id.* ¶¶ 17-21.)  These individuals are not alleged to have played any role at Grab either before or after the Business Combination.  The Grab Individuals are alleged to have been directors and/or officers of Grab Limited.  (*Id.* ¶¶ 22-29.)  None of these individuals are alleged to have played any role at Altimeter.

B.       **The Business Combination**

Altimeter was incorporated as a SPAC in August 2020, and was publicly traded on the NASDAQ.  (*Id.* ¶¶ 16, 30.)  A SPAC is a publicly-traded company that raises a pool of funds and seeks to identify an acquisition target to complete a business combination.  (*Id.* ¶ 31.)  After the business combination, the formerly private "entity carries on its operations as a public company.  In this way, SPACs offer private companies an alternative pathway to 'go public' and obtain a stock exchange listing, a broader shareholder base, status as a public company with Exchange Act registered securities, and a liquid market for its shares."  (*Id.* (citation omitted).)  Hundreds of companies have completed similar transactions over the past few years.[3]

On April 13, 2021, Altimeter announced that it had entered into a Business Combination Agreement with Grab Inc., a privately-owned operating company.  (*See id.* ¶ 36; P/R Stmt. at 1.)  The P/R Statement recounts in detail the steps and processes undertaken by Altimeter and the Altimeter Individuals in connection with the proposed business combination, including running a competitive process, conducting extensive due diligence, and obtaining professional advice (in addition to relying on the Altimeter Individuals' own expertise).  (*See* P/R Stmt. at 155–69.)  Altimeter's shareholders "overwhelmingly approved the merger," resulting in the completion of the transaction, and the public listing of Grab Limited.  (AC ¶ 91.)

C.       **Grab's Business**

Founded in 2012, Grab operates a mobile app that provides ride-hailing services, food and grocery delivery services, and other business services in Southeast Asia.  (*Id.* ¶ 43.)  Of

---

[3]       Jamie Payne, *Market Trends: De-SPAC Transactions*, Lexis Practical Guidance (Mar. 6, 2022), https://www.lexisnexis.com/community/insights/legal/practical-guidance-journal/b/pa/posts/market-trends-de-spac-transactions#:~:text=Recent%20Trends%20in%20De%2DSPAC%20Transactions&text=One%20key%20trend%20seen%20in,75%25%20in%20the%20fourth%20quarter

these areas, food delivery and ride hailing constitute the largest portions of Grab's business.  (*Id.* ¶ 44.)  To recruit and retain drivers and to grow its business, "Grab offers various incentives to drivers, consumers, and merchants."  (*Id.* ¶ 48; *see also* P/R Stmt. at 276–77 (explaining that incentives are offered to partners and consumers, and are recorded as reductions in revenue).)

Prior to the Business Combination, Grab was not profitable.  (*See* P/R Stmt. at 58 (recounting Grab's net losses in 2019, 2020 and first half of 2021).)  The P/R Statement explained that "Grab's ability to decrease its net losses and achieve profitability is dependent on its ability to reduce the amount of partner and consumer incentives it pays relative to the commissions and fees it receives for its service."  (*Id.* at 59; *see also id.* at 55 (similar).)

**D.      The P/R Statement Contained Robust Disclosures Concerning
         <u>Grab's Use of Incentives and the Associated Risks</u>**

The P/R Statement clearly and robustly disclosed the manner in which Grab used and continues to use incentives as part of its normal business operations:

> Grab *has paid* significant amounts of incentives to attract new driver and merchant partners and consumers to its services in order to grow its business and generate new demand for its services *and may continue to do so in the future*. These incentives, which are typically in the form of additional payments made to partners and consumers, *have in the past* and *may in the future* exceed the amount of the commissions and fees that Grab receives for its services.

(AC ¶ 78 (emphasis added).)  The P/R Statement also disclosed the accompanying risks:

> Grab's ability to increase its revenues and, in turn, decrease its net losses and achieve profitability is therefore significantly dependent on its ability to effectively use incentives to encourage the use of its platform and over time to reduce the amount of incentives it pays to both its driver and merchant partners and consumers of its services relative to the amount of commissions and fees it receives for its services. If Grab is unable to reduce the amount of incentives it pays over time relative to the commissions and fees it receives, it will likely impact Grab's ability to increase its revenues, raise capital, reduce its net losses and achieve profitability and reduce its net cash outflows, any or all of which could prevent Grab from continuing as a going concern or achieving or maintaining profitability. In addition, given Grab's use of incentives to encourage use of its platform, future decreases in the use of incentives could also result in decreased growth in the number of users and driver- and merchant-partners or an overall decrease in users

and driver- and merchant-partners and decreases in its revenues, which could negatively impact its financial condition and results of operations.

(P/R Stmt. at 59.)  The P/R Statement also warned that, although Grab aimed to reduce incentives, there was no guarantee, and incentives could increase as dictated by the business environment:  "From time to time competitive factors have caused, and may continue to cause Grab to reduce prices or fees and commissions and *increase driver-partner, merchant-partner or consumer incentives and marketing expenses*, which *has impacted* and could *continue to impact* its revenues and costs."  *(Id.* at 56 (emphasis added); *see also id.* at 58 ("To be competitive in certain markets . . . from time to time Grab lowers fees and offers driver-partner, merchant-partner and consumer incentives, which also reduces its revenue."); AC ¶ 72 ("'To the extent that Grab experiences driver-partner supply constraints in a given market, Grab may need to increase, or may not be able to reduce, the driver-partner incentives that Grab offers.'" (citation omitted).)

The P/R Statement also disclosed that, even with increased incentives, results may disappoint — for example, the use of Grab's platform, as measured by monthly transacting users, had declined since 2019, in part due to the impact of COVID-19.  (*Id.* ¶ 78.)  Grab also disclosed that it "has experienced and expects to continue to experience driver-partner supply constraints or oversupply from time to time in certain areas."  (*Id.* ¶ 72 (citation omitted).)

E.      **The P/R Statement Accurately Disclosed Historical Incentive Metrics**

The P/R Statement provided specific quantification of incentives for 2019, 2020, and the first half of 2021 ("H1 2021"), both before and during the pandemic:

**Financial and Operational Highlights**

($ in millions, unless otherwise stated)

| | Six Months Ended June 30, | | 2021-2020 % Change | Year Ended December 31, | | 2020-2019 % Change |
|---|---|---|---|---|---|---|
| | **2021** | **2020** | **Change** | **2020** | **2019** | **Change** |
| **Financial Measures:** | | | | | | |
| Revenue | 396 | 78 | 406% | 469 | (845) | 155% |
| Loss for the period | (1,467) | (1,489) | 1% | (2,745) | (3,988) | 31% |
| Total Segment Adjusted EBITDA (Non-IFRS)(1) | 21 | (285) | NM | (226) | (1,554) | 85% |
| Adjusted EBITDA (Non-IFRS)(1) | (325) | (550) | 41% | (780) | (2,237) | 65% |
| **Operating Metrics:** | | | | | | |
| GMV(2) | 7,522 | 5,858 | 28% | 12,492 | 12,251 | 2% |
| MTU(3) (millions of users) | 24.3 | 24.5 | (1)% | 24.5 | 29.2 | (16)% |
| GMV per MTU ($) | 310 | 239 | 30% | 509 | 419 | 21% |
| Partner incentives(4) | (311) | (364) | (14)% | (621) | (1,234) | (50)% |
| Consumer incentives(5) | (429) | (322) | 33% | (616) | (1,117) | (45)% |

(P/R Stmt. at 340 (highlighting added).)  It further disclosed incentives issued during Q3 2021 —

the last completed quarter before the issuance of the P/R Statement:

($ in millions, unless otherwise stated)

| | Three Months Ended September 30, | | 2020-2021% Change |
|---|---|---|---|
| | **2021** | **2020** | **Change** |
| **Financial Measures:** | | | |
| Revenue | 157 | 172 | (9)% |
| Loss for the period | (988) | (621) | (59)% |
| Total Segment Adjusted EBITDA (Non-IFRS)(1) | (33) | 10 | NM |
| Adjusted EBITDA (Non-IFRS)(1) | (212) | (128) | (66)% |
| **Operating Metrics:** | | | |
| GMV(2) | 4,038 | 3,061 | 32% |
| MTU(3) (millions of users) | 22.1 | 23.9 | (8)% |
| GMV per MTU ($) | 183 | 128 | 43% |
| Partner incentives(4) | (187) | (132) | 42% |
| Consumer incentives(5) | (271) | (132) | 106% |

(P/R Stmt. at 338 (highlighting added).)  These figures show that, between Q3 2020 and Q3

2021, partner incentives (including driver and merchant incentives) *increased* 42% and consumer

incentives *increased* 106%.  Moreover, while incentives decreased between 2019 (pre-pandemic)

and 2020 (beginning of pandemic) and H1 2021, incentives increased in Q3 2021.  The ratio of

incentives to GMV[4] contained in the P/R Statement was 19% in 2019, 10% in 2020, 10% in the

first half of 2021 (*see* AC ¶ 52), and 11.34% in Q3 2021.[5]

---

[4]     "GMV" means gross merchandise value, an operating metric representing the sum total, in dollar value, of all transactions facilitated through the Grab app, including any applicable taxes, tips, tolls and fees, over the period of measurement. (P/R Stmt. at 10.)

[5]     Plaintiffs utilize 11.45% in their chart (AC ¶ 64), but the math yields 11.34% ($187 partner incentives, plus $271 consumer incentives, divided by $4,038 GMV).  (*See* P/R Stmt. at

*(cont'd)*

**F.      The P/R Statement Warned that COVID-19 Had Impacted Grab's
Business and Could Continue to Impact Its Business Unpredictably**

Given the nature of Grab's business, COVID-19 significantly impacted the

Company's operations — a fact also prominently disclosed in the P/R Statement:

> [S]ignificant uncertainty remains over the severity and duration of the COVID-19 pandemic, and as the pandemic continues, or if other public health threats arise in the future, Grab may need to continue to adapt to changing circumstances.  There can be no assurance that Grab will be successful in doing so, including by maintaining and optimizing utilization of its driver-partner base.

(P/R Stmt. at 64; *id.* at 96 ("health epidemics, pandemics or disease outbreaks (including

the COVID-19 outbreak) may affect Grab's operations and demand for its offerings[.]")).

As Grab disclosed during its Q2 2021 Earnings Call, as of September 2021,

"Southeast Asia . . . has the world's highest monthly mortality rate per capita, and lockdown

measures are still in place across major cities in the region."  (Saltzstein Decl. Ex. B at 3.)  The

WHO named the Omicron variant on November 26, 2021, one week after the P/R Statement was

filed, and the next day it "appealed to countries in [the] South-East Asia Region to scale up

surveillance, strengthen public health and social measures, and enhance vaccination coverage." [6]

---

338.)  The Court need not accept Plaintiffs' allegation in these circumstances.  *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).  Moreover, Paragraphs 63 and 64 of the Complaint purport to reveal the incentives Grab offered in every quarter since 2020.  But they show no such thing.  Instead of depicting the actual numbers by quarter, the Complaint takes the total incentives for the year, divides by four, and presents the quotient as the "quarterly" incentives.  By mathematically eliminating quarterly fluctuations, this methodology all but guarantees a false level of consistency for every quarter, except Q3 and Q4 2021 (reported on a quarterly basis).

[6]       World Health Org., *Classification of Omicron (B.1.1.529): SARS-CoV-2 Variant of Concern* (Nov. 26, 2021), https://www.who.int/news/item/26-11-2021-classification-of-omicron-(b.1.1.529)-sars-cov-2-variant-of-concern; World Health Org., *WHO asks countries in Southeast Asia Region to be vigilant as cases surge globally and new Variant of Concern is detected* (Nov. 27, 2021), https://www.who.int/southeastasia/news/detail/27-11-2021-who-asks-countries-in-south-east-asia-region-to-be-vigilant-as-cases-surge-globally-and-new-variant-of-concern-is-detected

**G.**     **Grab's Fourth Quarter (and Full Year 2021) Results**

On March 3, 2022, Grab disclosed its Q4 2021 and full year 2021 results.  The ratio of incentives to GMV increased from 11.34% in Q3 2021, to 12.95% in Q4 2021 — an increase of 1.61%.  However, calculating this metric on a yearly basis (thereby applying a consistent method of presentation (*see* n. 5, *supra*)), the ratio of incentives to GMV was 19% in 2019, 10% in 2020 and 11.10% in 2021. Expressed  as a ratio, 2020 incentives decreased significantly as compared to 2019, and increased by just over 1% between 2020 and 2021 on a full-year basis.  As Grab explained in its accompanying press release, with respect to Q4 2021: "Revenue was $122 million, a 44% decline YoY as Grab preemptively invested to grow driver supply to support strong recovery in mobility demand. Consumer incentives for mobility and deliveries also increased as Grab invested in its category share and [minimum transacting users] growth." (Saltzstein Decl. Ex. C at 6.)  For full year 2021, "[r]evenue *increased* by 44% YoY to $675 million off the back of strong growth in deliveries and financial services." (*Id.* (emphasis added).)  Grab further explained:

> We will continue to strive to mitigate the impact of COVID-19 on our overall business by adapting to changes in consumer demand and preferences. For example, as demand in our mobility segment decreased, we were able to utilize driver-partners providing mobility services to provide deliveries for our deliveries segment. In addition, stay-at-home or movement control orders and other COVID-19 measures may lead to a decrease in the number of active driver-partners, as it did in March and April 2020, with some recovery starting in May 2020. We also saw a decrease in the number of driver-partners in the third quarter of 2021 due to similar COVID-19 measures in response to a new wave of COVID-19, and we preemptively invested in driver incentives to grow the supply of active drivers on our platform in the fourth quarter of 2021.

(Saltzstein Decl. Ex. D at 120.)  Grab's Q4 2021 results were consistent with the disclosures contained in the P/R Statement and reflected Grab's ongoing efforts to adapt to changing market dynamics.

## III.  ARGUMENT

### A.    Applicable Pleading Standard

A complaint must contain "allegations plausibly suggesting (not merely consistent with)" an "entitle[ment] to relief," and that are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).  Plaintiffs' Exchange Act claims are also subject to the PSLRA, which require they "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).  Moreover, because all of Plaintiffs' claims sound in fraud, they are subject to the heightened pleading standards of Rule 9(b), which the Complaint plainly fails to satisfy.[7]  *See Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 477–78 (S.D.N.Y. 2021) (following lengthy block quotations with pro forma assertions of falsity is insufficient).  As explained below, Plaintiffs' claims fail regardless of the pleading standard applied.

### B.    The Section 11 Claim Fails

To state a claim under Section 11, Plaintiffs must plead "materially misleading statements or omissions in registration statements filed with the SEC."  *Francisco v. Abengoa, S.A.*, No. 15 Civ. 6279 (ER), 2022 WL 3902852, at *154 (S.D.N.Y. Aug. 30, 2022) (citation omitted).  Because the Complaint fails to identify any misstatement or omission in the P/R Statement, this claim, which is brought against all Defendants except Maa, should be dismissed.

#### 1.    The Actual Disclosures Contained in the P/R Statement

Although Plaintiffs' Section 11 claim focuses on Q4 2021 incentive spending and

---

[7]    Here, all of Plaintiffs' claims "rest on the same theory":  that Defendants misrepresented Grab's financials and business prospects by failing to disclose that it was currently increasing incentives for consumers and drivers.  *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300 n.17 (S.D.N.Y. 2021).  (AC ¶ 9.)  The only allegations conceivably touching on motive appear in a section entitled "Facts Common to *All* Claims." (AC ¶¶ 32–33 (emphasis added).)

driver supply (*see* AC ¶ 93), the Complaint elides the disclosures on these very topics, as well as those concerning COVID-19.  As explained above, the P/R Statement disclosed, among other things: (i) the variable nature of incentive spending, and that Grab may continue to pay significant incentives in the future (AC ¶ 78 (citation omitted); P/R Stmt. at 56); (ii) COVID-19 had "materially impacted" business and "Grab may need to continue to adapt to changing circumstances.  There can be no assurance that Grab will be successful in doing so, including by maintaining and optimizing utilization of its driver-partner base" (P/R Stmt. at 62–64); (iii) "Grab has experienced and expects to continue to experience driver-partner supply constraints or oversupply from time to time in certain areas (including certain areas or locations within cities).  To the extent that Grab experiences driver-partner supply constraints in a given market, Grab may need to increase, or may not be able to reduce, the driver-partner incentives that Grab offers" (AC ¶ 72) (citation omitted); and (iv) the actual incentive spending, including for Q3 2021, which represented 42% and 106% year-over-year ("YoY") increases in partner and consumer incentives, respectively.  (P/R Stmt. at 338.)  It is against these actual disclosures that Plaintiffs' claims of a misstatement or omission should be judged.  *See Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 176 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).

### 2. There Is No Material Misstatement

As explained below, Plaintiffs' claims fail in the face of the above disclosures.

First, Plaintiffs fail to plead a material misstatement.  Instead, they rely on mere conclusions of falsity that are odds with the actual disclosures.  Plaintiffs repeatedly complain that certain statements were false because "Grab was not reducing incentives" despite Grab's growth, or that "high incentives were still needed to attract consumers and drivers" (or similar formulations).  (*See* AC ¶¶ 71, 75, 79, 80.)  But none of the statements claimed that Grab would continuously reduce incentives.  Nor did Grab ever state that the use of incentives was limited to

only "'initial stages of growth.'"  (*Id.* ¶¶ 74–75 (citation omitted).)  Rather, the P/R Statement

disclosed the opposite, explaining that Grab's use of incentives could and would fluctuate (and

increase when necessary) and that, while Grab had reduced incentives in 2020 relative to 2019,

incentives had ticked up in Q3 2021, as Grab continued to manage through the pandemic.  *See*

*Yaroni v. Pintec Tech. Holdings Ltd.*, No. 20-CV-8062 (JMF), 2022 WL 1215450, at *10

(S.D.N.Y. Apr. 25, 2022) (Section 11 claim cannot be based on implicit promises).

> Plaintiffs' assertions that "Grab was not 'manag[ing] promotion and incentive

spending' towards profitability" and "was not 'contin[uing] to seek to reduce incentives'" also

mischaracterize the actual disclosure.  (*Id.* ¶ 71 (citation omitted).)  The disclosure stated that

Grab "may continue to seek to reduce incentives" and that "achieving profitability will require

Grab, for example, to continue to grow and scale its business, manage promotion and incentive

spending."  (*Id.* ¶ 70 (citation omitted).)  That Grab later made the strategic decision to increase

incentives at a particular point in the pandemic does not nullify Grab's long-term, forward-

looking plan to attempt to reduce incentives.  (*See, e.g.*, *id.* ¶ 80 (incentives expected to

"'continue to decline over time as Grab's business matures.'") (citation omitted).)  Similarly,

Plaintiffs recast the disclosure that "'Grab's ability to increase its revenues'" required fulfillment

of goals into an assurance that Grab had achieved such goals, which is plainly unsupported by

the quoted language.  (*Compare id.* ¶ 78, *with id.* ¶ 79.)[8]

> Second, Plaintiffs complain that the P/R Statement disclosures were misleading

because Grab "already" was suffering from driver shortages in Q3, causing it to increase partner

incentives.  (*Id.* ¶¶ 73, 77, 79.)  Despite invoking the word "already" more than a dozen times,

---

[8]      As even the analyst cited by Plaintiffs recognized, "'sequential volatility in margins is
possible, especially as economies reopen in 2022 and the company accelerates spending on
marketing.'"  (*Id.* ¶ 62 (citation omitted).)

the Complaint lacks any coherent pleading that these alleged circumstances existed at the time of

the P/R Statement, or when or to what degree those circumstances affected Grab.  *See Garber v.*

*Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (mere assertion that company "was

'experiencing an increase'" is insufficient absent specific allegations showing an increase at the

time of the registration statement), *aff'd*, 347 F. App'x 665 (2d Cir. 2009); *Coronel v. Quanta*

*Cap. Holdings Ltd*., No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *13 (S.D.N.Y. Jan. 26, 2009)

(relevant inquiry turns on facts existing at the time the disclosures were filed).  Plaintiffs only

assert (on information and belief) that such conditions must have existed because Grab

supposedly "conceded" that the Q4 increases in incentives were made "'preemptively' in

reaction to a Q3 driver decline" and because "Grab was also ramping consumer incentives in the

beginning two months of Q4 2021."  (AC ¶ 66 (citation omitted).)  Neither allegation holds

water.  Once again, Plaintiffs' allegations are premised on a rewriting of the actual disclosures,

which do not reflect any "concession" that Grab experienced a "severe" driver constraint in Q3.

What Grab actually disclosed in its full year 2021 results was:  "We . . . saw a decrease in the

number of driver-partners in the third quarter of 2021 due to similar COVID-19 measures in

response to a new wave of  COVID-19, and we preemptively invested in driver incentives to

grow the supply of active drivers on our platform in the fourth quarter of 2021."  (Saltzstein

Decl. Ex. D at 120.)  That Grab made the strategic decision to "preemptively invest[] in driver

incentives" in Q4 does not reflect that there were "driver shortfalls" negatively impacting

performance in Q3.[9]  At the time, Grab "continue[d] to be impacted by" COVID-19 restrictions

"that reduce commuter traffic and demand for rides" (*i.e.*, demand for car rides).  (P/R Stmt. at

63.)  That the number of drivers fell as a result of pandemic restrictions does not translate to a

---

[9]      Q3 performance was disclosed fully in the P/R Statement.  (P/R Stmt. at 339.)

supply "constraint," as consumers' demand for rides also fell when COVID-19 restrictions were in force. *See Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 498 (2d Cir. 2019) (disclosure of internal business strategy not required).

Plaintiffs' "information and belief" that Grab was "ramping consumer incentives" at the beginning of Q4 consists of nothing more than their attempt to count the number of incentive announcements issued in one of Grab's regions on one platform, without any effort to quantify the financial impact of those incentives, or how they compared to incentives offered in other regions. (*See* AC ¶ 57.)  In this respect, Plaintiffs undermine their own allegations, citing to a "Performance Rebate" that was initiated in "summer 2020" (*id.* ¶¶ 60-61) — a period during which Plaintiffs acknowledge incentive spending declined. (*Id.* ¶ 64.)  Plaintiffs' haphazard attempt to count advertisements does not support the conclusions they seek to draw.

In any event, the P/R Statement disclosed that Grab had experienced driver supply constraints, that it may need to increase incentives to combat such constraints (AC ¶ 72), and that "[t]here can be no assurance that Grab will be successful" in "adapt[ing] to changing circumstances" relating to the impacts of COVID-19, "including by maintaining and optimizing utilization of its driver-partner base." (P/R Stmt. at 64.)  Grab's Q4 results (when they became known) were consistent with these disclosures. *See Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 296 (S.D.N.Y. 2020) ("A Section 11 claim fails as a matter of law when a registration statement 'warns of the exact risk that later materialized.'") (citation omitted).

Third, Plaintiffs stake their theory on certain statements concerning the use of incentives over the longer term. (*See* AC ¶¶ 70, 74, 80.)  Setting aside Plaintiffs' failure to identify anything false about these statements — *i.e.*, Grab "'may continue to seek to reduce incentives'" (*id.* ¶ 70) (citation omitted) due to, among other things, "'economies of scale,'" (*id.*

¶ 74) (citation omitted), and as "'Grab's business matures'" (*id.* ¶ 80) (citation omitted) — these statements, which were accompanied by meaningful cautionary disclosures (*see* § III.B.1, *supra*), are protected by the PSLRA's safe harbor provision, 15 U.S.C. § 77z–2(c).  *See Jedrzejczyk v. Skillz Inc.*, No. 21-CV-03450-RS, 2022 WL 2441563, at *5 (N.D. Cal. July 5, 2022) (applying safe harbor to de-SPAC transaction).[10]  In any event, these statements are equally protected under the common law bespeaks caution doctrine.  *HEXO*, 524 F. Supp. 3d at 303.

   <u>Fourth</u>, statements describing the anticipated benefits of Grab's business strategy (AC ¶ 81) and future financial prospects (*id.* ¶¶ 74, 84) are "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable."  *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996); *see also In re Nokia Corp. Sec. Litig.*, No. 19-CV-3509, 2021 WL 1199030, at *17 (S.D.N.Y. Mar. 29, 2021).  Plaintiffs also fail to explain how Tan's discussion of the anticipated "flywheel effects" of Grab's business (AC ¶ 81) was false.[11]

   <u>Fifth</u>, to the extent Plaintiffs challenge disclosures of financial data (*id.* ¶¶ 83–87), the claim fails because there are no allegations that such disclosures were false, and "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data."  *Altayyar*, 242 F. Supp. 3d at 180.  Moreover, Oey's statement that "'we continue to

---

[10] Because SPACs do not issue penny stock, they do not fall under the definition of a "blank check company" as used in the exception to the PSLRA safe harbor.  *See* 15 U.S.C. § 78u-5(b)(1)(B), (C); 15 U.S.C. § 77z–2(b); 17 C.F.R. § 230.419 (a)(2).  And a de-SPAC transaction is not an IPO.  *See Moradpour v. Velodyne Lidar, Inc.*, No. 21-CV-01486-SI, 2022 WL 2391004, at *15 n.5 (N.D. Cal. July 1, 2022).  That the PSLRA safe harbor exclusions do not apply is evidenced by the SEC's recent proposal of *new* rules seeking to include SPACs within the "blank check company" definition.  Special Purpose Acquisition Companies, Shell Companies, and Projections, 87 Fed. Reg. 29458 (proposed May 13, 2022).

[11] Defendant Tan's statement is also forward-looking and protected by the PSLRA's safe harbor.  (AC ¶ 81.)  Immediately prior to the statement quoted in the Complaint, he said "[a]s we *continue to invest* into our deliveries business, our superapp strategy enables these investments to also contribute to sustaining our competitive advantages in mobility, positioning us well to capture the recovery in mobility demand once lockdowns ease."  (Saltzstein Decl. Ex. B at 4.)

demonstrate strong trends in our path to profitability,'" (*id.* ¶ 83) (citation omitted), is nothing more than a vague expression of "expectations of business success," and is also puffery. *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019).[12]

Sixth, because Plaintiffs' Section 11 claim sounds in fraud, (*see* § III.A, *supra*), it fails for the additional reason that it does not allege scienter as required under Rule 9(b). *See In re Chembio Diagnostics, Inc. Sec. Litig.*, No. 20CV2706ARRPK, 2022 WL 2872671, at *7 (E.D.N.Y. July 21, 2022). Indeed, the Complaint "expressly disclaim[s] all allegations of scienter" in connection with the Section 11 claim. *See id.*; (*see also* AC ¶¶ 1, 111, 120).

### 3.   There is No Material Omission

#### (a)   No Obligation To Disclose Additional Information

Plaintiffs' omission theory appears to be that metrics concerning the ongoing Q4 should have been disclosed in the P/R Statement, notwithstanding the fact that the quarter was only halfway through when the P/R Statement was issued. (*See* AC ¶ 93.) Section 11 claims can be premised on an alleged material omission only where the nondisclosure contravened a legal obligation to disclose or was "necessary to make the statements therein not misleading." *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 36 (2d Cir. 2017) (citation omitted). Plaintiffs have failed to plead an actionable material omission under either theory.

---

[12]     Relying on selective quotation, Plaintiffs claim that the disclosure that "'[r]evenue was $157 million, down 9% YoY, as a result of the expected decline in mobility due to the severe lockdowns in Vietnam'" in Q3 2021 was misleading, because "Grab's declining mobility revenue was not limited to Vietnam, and was not caused exclusively by lockdowns and restrictions in that region." (*Id.* ¶¶ 85–87 (citation omitted).) But the P/R Statement reported revenue for the entire segment, and disclosed the impacts of "heightened restrictions across the region." (*Id.* ¶ 85.)

Plaintiffs cannot establish a legal obligation to disclose such information.  SEC regulations only require a registration statement to include financial statements that are more than 135 days old.  *Id.* at 36 (citing 17 C.F.R. § 210.3-12(a), (g)).  "[C]ourts have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress," criticizing this proposed approach as "unworkable and potentially misleading," "since an 'immediate release of data' would likely be 'without the benefit of reflection or certainty provided by the traditionally recognized reporting periods.'"  *In re Coty Inc. Sec. Litig.*, No. 14-CV-919 (RJS), 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016) (citation omitted); *see also Arfa v. Mecox Lane Ltd.*, No. 10 CIV. 9053, 2012 WL 697155, at *9 n.1 (S.D.N.Y. Mar. 5, 2012) (rejecting "proposition that the Defendants were obligated to disclose the results of a quarter in progress"), *aff'd*, 504 F. App'x 14 (2d Cir. 2012).

Nor does Item 303 impose an obligation to disclose such intra-quarter financial data.  *See Willard v. UP Fintech Holding Ltd*., 527 F. Supp. 3d 609, 620 (S.D.N.Y. 2021) ( "Item 303 . . . does not require such real-time disclosures.").  Under Item 303, disclosure is required where the trend is both "[1] presently known to management *and* [2] reasonably likely to have material effects on the registrant's financial condition or results of operations."  *Id.* at 619.  *Actual knowledge* of the purported trend is required.  *See id.* at 620.  Plaintiffs fall far short of this standard.  (*See* AC ¶¶ 88–90.)  Although they vaguely assert that executives were provided with data, they do not allege how often and when such data were made available, and whether such data would have reflected, as of November 19, 2021, the increases ultimately reported after the end of the quarter.  (*Id.* ¶ 106.)  Such generic allegations are insufficient to establish the requisite actual knowledge.  *See Asay v. Pinduoduo Inc.*, No. 18-cv-7625 (PKC), 2020 WL 1530745, at *9 (S.D.N.Y. Mar. 3, 2020), *aff'd*, 2021 WL 3871269 (2d Cir. Aug. 31, 2021); *Coty*,

2016 WL 1271065, at *7.  Moreover, even if Plaintiffs had alleged that such facts were known

(they have not), the incentive increases in Q3 and Q4 2021 do not constitute a "trend."  *See*

*HEXO*, 524 F. Supp. 3d at 303 ("lack of demand in the first three months" is not a "trend");

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc*., No. 07 CIV. 10528, 2010 WL 148617, at *10

(S.D.N.Y. Jan. 14, 2010) ("As a matter of law, a two month period of time does not establish a

'trend' for purposes of the disclosures required by Item 303").  And, as explained, the P/R

Statement warned precisely of the risks Plaintiffs now seek to recast as a trend.  (*See* AC ¶ 90.)

        Finally, setting aside that Plaintiffs have not shown there were any metrics to

disclose at the time the P/R Statement was issued, even if there were, Plaintiffs fail to establish

that disclosure was required in order to make other statements not misleading.  As the Second

Circuit reiterated in *Stadnick*, the "long-standing test" for determining whether disclosure of

interim financial data was required under this theory is "whether there is 'a substantial likelihood

that the disclosure of the omitted [information] would have been viewed by the reasonable

investor as having significantly altered the "total mix" of information made available.'"  861

F.3d at 36–37 (alteration in original) (citation omitted).  Noting the importance of reviewing the

"total mix of information in the public domain," the court considered the alleged omission of Q3

data in light of the company's overall performance, which showed that the trend of increasing

total revenue had continued into Q3.  *Id.* at 38.  With respect to the metrics identified by plaintiff,

because the allegedly omitted Q3 data was "consistent with a pattern of fluctuation that began"

over a year prior, "[a] reasonable investor . . . would not have harbored any solid expectations

based on prior performance."  *Id.* at 38–39.  Finally, "and critically, [the] registration statement

contained ample warnings and disclosures" of quarter-to-quarter fluctuations.  *Id.* at 39.

        So, too, here.  The P/R Statement disclosed that Grab had increased partner and

consumer incentives by 42% and 106% YoY, respectively, in Q3 2021.  (P/R Stmt. at 339.)  It also disclosed that the total amount spent on incentives for the first three quarters of 2021 ($1,198 million) had almost reached the total amount for the full year 2020 ($1,237 million), confirming that Grab had increased overall incentive spending in 2021 relative to 2020.[13]  (*Id.*; AC ¶ 78.)  Moreover, as a percentage of GMV, the amount spent on incentives in Q3 2021 (11.34%) was 1.51% higher than Grab reported for H1 2021 (9.83%).  (P/R Stmt. at  339, 341; § II, *supra*.)  Hence, even assuming *arguendo* that the data available to Grab as of November 19, 2021 would have reflected similar data as later reported in its Q4 2021 Earnings Report (and no well-pled allegations exist to suggest that they did), they would have shown only that, as in Q3 2021, Grab increased incentives in Q4, and incentives as a percentage of GMV (12.95%), increased by 1.61% since Q3 2021 — not meaningfully different from the 1.51% increase from H1 2021 to Q3 2021.  *See Willard*, 527 F. Supp. 3d at 622 (no duty to disclose intra-quarter data as "Registration Statement disclosed a 24.4% drop in trading volume in Q2 2018—at that point, only three quarters earlier," which "is nearly identical to the 24.5% drop . . . that [defendant] ultimately experienced in Q1 2019").  Finally, as explained above, the P/R Statement contained extensive disclosures regarding the variable nature of incentives, and the need to continually adapt to changing circumstances in light of the ongoing pandemic.  (*See* § III.B.1, *supra*).

### (b)    No Material Information Was Omitted

Plaintiffs' claim fails for the additional reason that Plaintiffs have not alleged the omission of any material information that existed at the time of the P/R Statement.  To state a Section 11 claim based on a material omission, Plaintiffs must "at a minimum, plead facts to

---

[13]    Total incentives for Q3 2021 were $458 million.  (P/R Stmt. at 338.)  Total incentives for H1 2021 were $740 million ($311 million in partner incentives plus $429 million in consumer incentives).  (*Id.* at 341.)  Combined, the total amount for the first three quarters of 2021 was $1,198 million.  Total incentives for FY 2021 were $1,237 million.  (AC ¶ 78.)

demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." *HEXO*, 524 F. Supp. 3d at 300 (citation omitted). In short, Section 11 claims cannot be pled based on hindsight. *Id*. at 300–01. Here, the Complaint alleges no facts to show Defendants knew in late 2021 how the pandemic would progress, nor how Grab would later manage its incentive program and driver supply as the lockdown situation evolved.

At the time of the Business Combination, as disclosed in the P/R Statement, COVID-19 restrictions had "reduce[d] commuter traffic and demand for rides." (P/R Stmt. at 63.) Plaintiffs do not allege when Grab began to anticipate that mobility demand would start to increase, or when Grab believed such preemptive investments were necessary. *See Willard*, 527 F. Supp. 3d at 620 (plaintiffs "conspicuously fail to allege the existence of any causal event or moment in time that the declines allegedly began"). Their speculative "belie[f]" that driver incentives must have increased prior to the Business Combination because Grab later disclosed it increased incentives "'preemptively'" in Q4 adds nothing, (AC ¶ 66) (citation omitted), as such post-transaction statements "offer little guidance as to the information that was available at the time of the" Business Combination. *Coty*, 2016 WL 1271065, at *6. Their other assertion that "Grab was also ramping consumer incentives in the beginning two months of Q4 2021" fails as they do not allege whether and how partner and consumer incentive spending are related, if at all. (AC ¶ 66.) In any event, the scant examples of incentives do not establish that Grab "massively boosted" incentives prior to the issuance of the P/R Statement. (*Id.* ¶¶ 56-58, 67-69.)

Moreover, the Q3 2021 data disclosed in the P/R Statement was accompanied by numerous risk disclosures that made clear that the increase in incentive spending disclosed in Q3 2021 might reoccur. The P/R Statement explained that "Grab has paid significant amounts of incentives . . . and *may continue to do so in the future*." (AC ¶ 78 (emphasis added).) It also

20

disclosed that "'[n]otwithstanding Grab's use of significant incentive payments to encourage use of its platform, Grab's monthly transacting users nevertheless declined'" from 2019 through Q3 2021, and that "'[i]f Grab is unable to reduce the amount of incentives it pays over time relative to the commissions and fees it receives, it will likely impact Grab's ability to increase its revenues, raise capital, reduce its net losses and achieve profitability.'" (*Id.*; *see* P/R Stmt. at 339.) *See Asay*, 2020 WL 1530745, at *10 (disclosure was adequate given "warn[ing] that if the [company] 'continued to incur substantial marketing expenses' without corresponding growth, 'operating results may be materially and adversely affected'").  It also disclosed that Grab "continue[d] to be impacted by" COVID-19 restrictions, which had negatively impacted driver supply, and in turn, incentive spending.  (P/R Stmt. at 63, 68; AC ¶ 72.)  *Willard*, 527 F. Supp. 3d at 623 ("[D]ata were accompanied by fulsome warnings that figures . . . were highly volatile and subject to factors beyond UP Fintech's control.").

## C.      The Section 14(a) Claim Fails

To state a Section 14(a) claim, the Complaint must allege, among other things, that "the proxy statement contained a material misstatement or omission." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005).  As shown above, because Plaintiffs fail to plead a material misrepresentation, their Section 14(a) claim, which is asserted against Grab and the Altimeter Individuals, fails for the same reasons.  (*See* § III.B, *supra*).

Moreover, as the claim sounds in fraud, it also fails because the Complaint does not plead scienter with particularity as to the Altimeter Individuals.  "Scienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading." *C.D.T.S. v. UBS AG*, No. 12 Civ. 4924(KBF), 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015).  Plaintiffs' generic allegations of the Altimeter Individuals' status as board

21

members and consent to be listed as directors in the P/R Statement do not show "with any specificity conscious wrongdoing by any defendant." *Id.*[14]; (*see* AC ¶¶ 17-21.)

## D.   The Section 10(b) Claim Fails

Plaintiffs' Section 10(b) claim — asserted only against Grab, Tan and Maa (the "Section 10(b) Defendants") — fails because Plaintiffs have not alleged a misleading statement or omission, scienter, or loss causation.

### 1.   The Complaint Fails to Plead a Material Misstatement or Omission

The two statements identified as the basis for Plaintiffs' Section 10(b) claim are insufficient to state a claim.  (AC ¶¶ 98, 100.)  Plaintiffs fail to explain (let alone with the particularity required by the PSLRA) why either of the challenged statements is false.  Moreover, Maa's statements that "'[w]e've also made very good strides on improving our economics'" and "'the super app is really key to driving the new economics of our business'" (*id.* ¶ 100) (citation omitted) are inactionable puffery.  *See Lasker*, 85 F.3d at 59 (statement that "business strategies [would] lead to continued prosperity" is puffery); (*see* § III.B.2*, supra*).  So, too, is Tan's statement that "'[our] mobility margins are strong.  We're seeing in our deliveries business, break even, just after 3 years in the majority of our markets.'"  (AC ¶ 98 (citation omitted).)  *See also Okla. Firefighters*, 300 F. Supp. 3d at 570 (description of team as "strong" is puffery); *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 221 (E.D.N.Y. 2019) (statement of "strong leadership position" is puffery).  Earlier in this interview, Tan also

---

[14]     "When plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements, even if they disclaim reliance on a fraud theory." *JP Morgan*, 363 F. Supp. at 636.  Even if this claim did not sound in fraud, the Complaint fails under the PSLRA pleading standard.  *See, e.g., Bond Opportunity Fund v. Unilab*, No. 99 Civ. 11074(JSM), 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003) ("Plaintiffs must plead with particularity facts that give rise to a strong inference of negligence on the part of all [d]efendants . . . [and] may not impute knowledge to the individual [d]efendants solely on the basis of the positions they held.").

explained the basis for his statement: "mobility margins for example, [were] 12% as of Q3 2021. These are industry leading, and have been relatively stable for several quarters."[15]  Plaintiffs do not allege that this statement, which correctly cited Grab's disclosed Segment Adjusted EBITDA margin for mobility, was false.  (*See* P/R Stmt. at 339.)

### 2.  The Complaint Fails to Plead Scienter With Particularity

Plaintiffs also fail to plead the requisite "strong inference" of scienter.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  Plaintiffs may establish scienter by alleging motive and opportunity, or strong circumstantial evidence of conscious misbehavior or recklessness.  *See In re Renewable Energy Grp. Sec. Litig.*, No. 22-335, 2022 WL 14206678, at *2 (2d Cir. Oct. 25, 2022).  An inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.

Because Plaintiffs do not attempt to plead motive or opportunity as to the Section 10(b) Defendants, "the strength of the circumstantial allegations must be correspondingly greater."[16]  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted).  (*See* AC ¶¶ 105-10.)  Conscious recklessness requires "a state of mind approximating actual intent, and not merely a heightened form of negligence."  *Cheng v. Canada Goose Holdings Inc.*, No. 19-CV-8204 (VSB), 2021 WL 3077469, at *9 (S.D.N.Y. July 19, 2021) (citation omitted).

Plaintiffs' attempt to conjure an "admi[ssion]" of knowledge out of the statement that "[w]e also saw a decrease in the number of driver-partners in the third quarter of 2021 due to similar COVID-19 measures in response to a new wave of  COVID-19, and we preemptively

---

[15]     *Grab CEO Tan: I'm confident we have a clear path to profitability*, CNBC Squawk Box (Dec. 2, 2021) at 2:00–2:08, https://www.cnbc.com/video/2021/12/02/grab-ceo-tan-im-confident-we-have-a-clear-path-to-profitability.html.

[16]     Although certain allegations erroneously suggest a motive relating to "manager incentives" (AC ¶¶ 32–35), they do not appear relevant to the Section 10(b) Defendants.

invested in driver incentives to grow the supply of active drivers on our platform in the fourth quarter of 2021" fails.  (AC ¶ 105; Saltzstein Decl. Ex. D at 120.)  That driver activity decreased in Q3 due to COVID-19 measures does not mean that these Defendants could have predicted the strategies that would later be undertaken in response to the fast-changing pandemic.

Plaintiffs also cite the Section 10(b) Defendants' positions and access to unspecified "tracking information," "data regarding incentives," and "other key operating metrics" to argue that they must have known the "true facts of the Company." (AC ¶¶ 106-108, 143.)  But to plead scienter, Plaintiffs must plead the specific contradictory information available to the defendants.  *See Cheng*, 2021 WL 3077469, at *11; *Glaser v. The9 Ltd.*, 772 F. Supp. 2d 573, 587–88 (S.D.N.Y. 2011); *see also Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 774 (S.D.N.Y. 2019).  Instead, Plaintiffs offer only conclusory assertions that are insufficient as a matter of law.  (AC ¶ 108.)  It is not enough to allege merely that these Defendants "held [themselves] out to investors . . . as being knowledgeable" about Grab's incentives and other metrics.  (AC ¶ 107); *see City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings plc*, No. 18-CV-10330 (JPO), 2020 WL 2834857, at *5 (S.D.N.Y. June 1, 2020).  Generic and speculative claims that "defendants 'were aware' of certain information, and . . . that defendants 'would have' or 'should have' had such knowledge [are] insufficient." *Glaser*, 772 F. Supp. 2d at 591; (*see* AC ¶¶ 106, 108-109).  And "[p]laintiffs cannot rely on information generally known or available to the public to support circumstantial scienter allegations." *See Glaser*, 772 F. Supp. 2d at 588; (AC ¶ 109).  Finally, the "core operations doctrine" (*see* AC ¶ 110) may not have survived the PSLRA and, in any event, cannot independently establish scienter.  *See Das v. Rio Tinto plc*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018); *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 373-74 (S.D.N.Y. 2018).

24

Here, the more compelling inference is that the Section 10(b) Defendants did not know how the pandemic would progress or what strategic decisions would be needed in the future.  *See Holbrook v. Trivago N.V.*, No. 17 Civ. 8348 (NRB), 2019 WL 948809, at \*22 (S.D.N.Y. Feb. 26 2019), *aff'd*, 796 F. App'x 31 (2d Cir. 2019).

### 3.   The Complaint Fails to Plead Loss Causation

Plaintiffs also fail to plead loss causation.  Grab's Q4 2021 results (AC ¶ 102) "do not amount to a corrective disclosure . . .  because they do not reveal to the market the falsity of the prior [statements]."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005).

### E.   The Control Person Claims (Counts II and V) Fail

Because Plaintiffs failed to plead a primary violation or culpable participation, their Section 15 and Section 20(a) control person claims also fail.  *Gutman v. Lizhi*, No. 21-CV-317 (LDH) (PK), 2022 WL 4646471, at \*7 (E.D.N.Y. Oct. 1, 2022); *see* 15 U.S.C § 77o.[17]

## IV.  CONCLUSION

The Amended Complaint should be dismissed its entirety with prejudice.

Dated:  New York, New York
        November 18, 2022

/s/ Susan L. Saltzstein                      /s/ David B. Hennes               
Susan L. Saltzstein                         David B. Hennes
Jeffrey S. Geier                             Amy Jane Longo
SKADDEN, ARPS, SLATE, MEAGHER      ROPES & GRAY LLP
  & FLOM LLP                        1211 Avenue of the Americas
One Manhattan West                      New York, New York 10036
New York, New York 10001               Telephone: (212) 596-9000
Telephone: (212) 735-3000              Facsimile: (212) 596-9090
Facsimile: (212) 735-2000               David.Hennes@ropesgray.com
Susan.Saltzstein@skadden.com         Amy.Longo@ropesgray.com
Jeffrey.Geier@skadden.com              *Attorneys for the Altimeter*
*Attorneys for Grab and the Grab Individuals*    *Individuals*

---

[17]   Courts in this District have reached varying conclusions as to whether "culpable participation" is an element of control person claims at the pleading stage.  *See, e.g.*, *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 413–14, 417 (S.D.N.Y. 2001).

25