# Exhibit A

**Filed Pursuant to Rule 424(b)(3)**
**Registration Statement No. 333-258349**

**PROXY STATEMENT FOR EXTRAORDINARY GENERAL MEETING OF SHAREHOLDERS OF**



## Altimeter Growth Corp.

and

**PROSPECTUS FOR UP TO 3,535,285,223 CLASS A ORDINARY SHARES, 10,000,000 WARRANTS AND**

**10,000,000 CLASS A ORDINARY SHARES ISSUABLE UPON EXERCISE OF WARRANTS**

OF



## Grab Holdings Limited

The board of directors of Altimeter Growth Corp., an exempted company limited by shares incorporated under the laws of the Cayman Islands ("AGC"), has unanimously approved the Business Combination Agreement, dated April 12, 2021 (as may be amended, supplemented, or otherwise modified from time to time, the "Business Combination Agreement"), by and among Grab Holdings Limited (formerly known as J1 Holdings Inc.), an exempted company limited by shares incorporated under the laws of the Cayman Islands ("GHL"), AGC, J2 Holdings Inc., an exempted company limited by shares incorporated under the laws of the Cayman Islands and a direct wholly-owned subsidiary of GHL ("AGC Merger Sub"), J3 Holdings Inc., an exempted company limited by shares incorporated under the laws of the Cayman Islands and a direct wholly-owned subsidiary of GHL ("Grab Merger Sub") and Grab Holdings Inc., an exempted company limited by shares incorporated under the laws of the Cayman Islands ("Grab"), pursuant to which (i) AGC shall merge with and into AGC Merger Sub, with AGC Merger Sub surviving and remaining as a wholly-owned subsidiary of GHL (the "Initial Merger") and (ii) following the Initial Merger, Grab Merger Sub shall merge with and into Grab, with Grab being the surviving entity and becoming a wholly-owned subsidiary of GHL (the "Acquisition Merger", and collectively with the Initial Merger and the other transactions contemplated by the Business Combination Agreement, the "Business Combination"). The Business Combination Agreement is attached to this proxy statement/prospectus as Annex A. At the consummation of the Business Combination, GHL's amended and restated memorandum and articles of association (the "Amended GHL Articles") shall be substantially in the form attached to this proxy statement/prospectus as Annex B.

AGC shareholders are being asked to consider a vote upon the Business Combination and certain proposals related thereto as described in this proxy statement/prospectus. As a result of, and upon consummation of, the Business Combination, each of AGC Merger Sub and Grab shall become a wholly-owned subsidiary of GHL, and GHL shall become a new public company owned by the prior shareholders of AGC (including certain directors of AGC being Richard N. Barton, Aishetu Fatima Dozie and Dev Ittycheria (collectively, "Certain AGC Directors") and Altimeter Growth Holdings (the "Sponsor")), the prior holders of Grab Shares, Grab Options,

**Table of Contents**

|  | Page |
|---|---|
| ADDITIONAL INFORMATION | 1 |
| ABOUT THIS PROXY STATEMENT/PROSPECTUS | 1 |
| INDUSTRY AND MARKET DATA | 2 |
| FINANCIAL STATEMENT PRESENTATION | 3 |
| FREQUENTLY USED TERMS | 4 |
| QUESTIONS AND ANSWERS ABOUT THE PROPOSALS | 12 |
| SUMMARY OF THE PROXY STATEMENT/PROSPECTUS | 28 |
| FORWARD-LOOKING STATEMENTS | 53 |
| RISK FACTORS | 55 |
| EXTRAORDINARY GENERAL MEETING OF AGC SHAREHOLDERS | 127 |
| THE BUSINESS COMBINATION PROPOSAL | 132 |
| THE INITIAL MERGER PROPOSAL | 186 |
| THE GOVERNING DOCUMENTS PROPOSAL | 187 |
| THE ADJOURNMENT PROPOSAL | 196 |
| MATERIAL TAX CONSIDERATIONS | 197 |
| INFORMATION RELATED TO GHL | 209 |
| INFORMATION RELATED TO AGC | 212 |
| AGC'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION | 228 |
| SELECTED HISTORICAL FINANCIAL DATA OF AGC | 233 |
| GRAB'S MARKET OPPORTUNITIES | 235 |
| GRAB'S BUSINESS | 251 |
| REGULATORY ENVIRONMENT | 306 |
| GRAB MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 336 |
| SELECTED HISTORICAL FINANCIAL DATA OF GRAB | 380 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 382 |
| COMPARATIVE PER SHARE DATA | 392 |
| EXECUTIVE OFFICERS AND MEMBERS OF THE BOARD OF DIRECTORS OF GHL FOLLOWING THE BUSINESS COMBINATION | 395 |
| BENEFICIAL OWNERSHIP OF SECURITIES | 408 |
| CERTAIN RELATIONSHIPS AND RELATED PERSON TRANSACTIONS | 411 |
| DESCRIPTION OF GHL SECURITIES | 415 |
| COMPARISON OF CORPORATE GOVERNANCE AND SHAREHOLDER RIGHTS | 421 |
| SHARES ELIGIBLE FOR FUTURE SALE | 428 |
| PRICE RANGE OF SECURITIES AND DIVIDEND INFORMATION | 431 |
| ANNUAL MEETING SHAREHOLDER PROPOSALS | 432 |
| OTHER SHAREHOLDER COMMUNICATIONS | 433 |
| LEGAL MATTERS | 434 |
| EXPERTS | 435 |
| DELIVERY OF DOCUMENTS TO SHAREHOLDERS | 436 |
| WHERE YOU CAN FIND MORE INFORMATION | 437 |
| INDEX OF FINANCIAL STATEMENTS | F-1 |

ANNEXES

Annex A: Business Combination Agreement (filed as Exhibit 2.1 to the proxy statement/prospectus)

Annex B: Amended and Restated Memorandum and Articles of Association of GHL (filed as Exhibit 3.1 to the proxy statement/prospectus)

**Table of Contents**

**FREQUENTLY USED TERMS**

*Key Business and Business Combination Related Terms*

Unless otherwise stated or unless the context otherwise requires in this document:

"Acquisition Merger" means the merger between Grab Merger Sub and Grab, with Grab being the surviving entity and becoming a wholly-owned subsidiary of GHL;

"AGC" means Altimeter Growth Corp., an exempted company limited by shares incorporated under the laws of the Cayman Islands;

"AGC Merger Sub" means J2 Holdings Inc., an exempted company limited by shares incorporated under the laws of the Cayman Islands and a direct wholly-owned subsidiary of GHL;

"AI" means artificial intelligence;

"Amended and Restated Forward Purchase Agreements" means (i) the Forward Purchase Agreement entered into at the time of AGC's initial public offering with JS Securities and amended and restated as of April 12, 2021 (pursuant to such amendment, JS Securities committed to subscribe for and purchase 2,500,000 GHL Class A Ordinary Shares and 500,000 GHL Warrants for an aggregate purchase price equal to $25 million) and (ii) the Forward Purchase Agreement entered into at the time of AGC's initial public offering with Sponsor Affiliate and amended and restated as of April 12, 2021 (pursuant to such amendment, Sponsor Affiliate committed to subscribe for and purchase 17,500,000 GHL Class A Ordinary Shares and 3,500,000 GHL Warrants for an aggregate purchase price equal to $175 million);

"Assignment, Assumption and Amendment Agreement" means the amendment, dated April 12, 2021, to that certain warrant agreement, dated September 30, 2020, by and between AGC and Continental pursuant to which, among other things, AGC assigned all of its right, title and interest in the Existing Warrant Agreement to GHL effective upon the Initial Closing;

"Backstop Subscription Agreement" means the backstop subscription agreement, dated April 12, 2021, by and among AGC, Sponsor Affiliate and GHL pursuant to which Sponsor Affiliate agreed to backstop SPAC Share Redemptions (as defined in the Business Combination Agreement), and to the extent such backstop is required will subscribe for and purchase that number of GHL Class A Ordinary Shares to be determined in accordance with the terms of the Backstop Subscription Agreement for $10 per share;

"base incentive(s)" means the amount of incentives to driver- and merchant-partners up to the amount of commissions and fees earned by Grab from those driver- and merchant-partners;

"Business Combination" means the Initial Merger, the Acquisition Merger and the other transactions contemplated by the Business Combination Agreement;

"Business Combination Agreement" means the business combination agreement, dated April 12, 2021 (as may be amended, supplemented, or otherwise modified from time to time), by and among GHL, AGC, AGC Merger Sub, Grab Merger Sub and Grab;

"Business Combination Transactions" means, collectively, the Initial Merger, the Acquisition Merger and each of the other transactions contemplated by the Business Combination Agreement, the Confidential Disclosure Agreement, dated as of February 8, 2021, between AGC and Grab, the PIPE Subscription Agreements, the Amended and Restated Forward Purchase Agreements, the Sponsor Support Agreement, the Grab Shareholder Support Agreements, the Registration Rights Agreement, the Shareholders' Deed, the

4

Table of Contents

Backstop Subscription Agreement, the Sponsor Subscription Agreement, the Assignment, Assumption and Amendment Agreement, the Initial Merger Filing Documents, the Acquisition Merger Filing Documents and any other related agreements, documents or certificates entered into or delivered pursuant thereto;

"CAGR" means compound annual growth rate;

"Closing" means the closing of the Acquisition Merger;

"Closing Date" means the date of the Closing;

"consumer" refers to an end-user who uses services offered through the Grab platform;

"Digital Banking JV" means GXS Bank Pte. Ltd., a private limited company incorporated under the laws of Singapore, which is the joint venture entity with a subsidiary of Grab and a subsidiary of Singapore Telecommunications Limited ("Singtel") as its shareholders and is the entity through which their joint application to the MAS for a digital full bank license in Singapore was made;

"digital lending" means lending through digital channels with no in-person interactions, which includes both corporate SME lending and consumer lending conducted through such channels;

"driver-partner" refers to an independent third-party contractor who provides mobility and/or deliveries services on the Grab platform;

"e-wallet" means a software-based system that allows individuals to perform digital and/or electronic payments to a business or individual for either goods or services. This includes proximity transactions in which the device must interact with the point of sale ("POS") terminal in some way in order to initiate the payment transaction and remote transactions in which the location of the device to the POS terminal is irrelevant. Both pass-through and staged e-wallets transactions are included. Peer to peer transfer transactions are excluded;

"excess incentive(s)" occurs when the amount of payments made to driver- and merchant-partners exceed the amount of commissions and fees earned by Grab from those driver- and merchant-partners;

"Exchange Ratio" means the quotient obtained by dividing $13.032888 by $10.00, which is 1.3032888;

"Existing Warrant Agreement" means the warrant agreement, dated September 30, 2020, by and between AGC and Continental;

"Extraordinary General Meeting" means an extraordinary general meeting of shareholders of AGC to be held at 12:00 PM, Eastern time, on November 30, 2021 at the offices of Ropes & Gray LLP located at 800 Boylston Street, Boston, Massachusetts 02199, and virtually at https://www.cstproxy.com/altimetergrowth/2021;

"GDP" means gross domestic product, which is the sum of gross value added by all resident producers in the economy plus any product taxes and minus any subsidies not included in the value of the products. It is calculated without making deductions for depreciation of fabricated assets or for depletion and degradation of natural resources. Current prices of goods and services were used in its calculation;

"GFG" means AA Holdings Inc., an exempted company limited by shares incorporated under the laws of the Cayman Islands and holding company for Grab's financial services businesses, including its equity interest in the Digital Banking JV;

"GHL" means Grab Holdings Limited (formerly known as J1 Holdings Inc.), an exempted company limited by shares incorporated under the laws of the Cayman Islands, or as the context requires, Grab Holdings Limited and its subsidiaries and consolidated affiliated entities;

5

"Grab" means Grab Holdings Inc., an exempted company limited by shares incorporated under the laws of the Cayman Islands, or as the context requires, Grab Holdings Inc. and its subsidiaries and consolidated affiliated entities;

"Grab Merger Sub" means J3 Holdings Inc., an exempted company limited by shares incorporated under the laws of the Cayman Islands and a direct wholly-owned subsidiary of GHL;

"Grab Shareholder Support Agreements" means the voting and support agreements, dated April 12, 2021, by and among AGC, GHL, Grab and certain of the shareholders of Grab pursuant to which certain shareholders who hold an aggregate of at least 67% of the outstanding Grab voting shares (on an as converted basis) have agreed, among other things: (a) to appear for purposes of constituting a quorum at any meeting of the shareholders of Grab called to seek approval of the transactions contemplated in the Business Combination Agreement and the other transaction proposals, (b) to vote in favor of the transactions contemplated by the Business Combination Agreement and other transaction proposals, (c) to vote against any proposals that would materially impede the transactions contemplated by the Business Combination Agreement or any other transaction proposal, (d) to not sell or transfer any of their shares prior to the Closing, (e) with respect to certain shareholders, to not transfer their shares during certain periods of time following the Closing, and (f) with respect to the Key Executives, not to transfer certain shares for three years following the closing, subject to certain exceptions;

"GrabBike" refers to Grab's ride-hailing booking service, which enables driver-partners to accept bookings for private hire motorcycle rides through Grab's driver-partner application;

"GrabCar" refers to Grab's ride-hailing booking service, which enables private hire driver-partners to accept bookings through Grab's driver-partner application, and includes various localized offerings including premium cars (GrabCar Premium), cars equipped to transport persons with mobility needs (GrabAssist), cars equipped with child seats (GrabFamily), large format vehicles or premium economy vehicles (GrabCar Plus) and luxury vans for airport or business travelers (GrabLux);

"GrabExpress" means Grab's package delivery booking service, which enables driver-partners to accept bookings for package delivery services through Grab's driver-partner application;

"GrabFood" means Grab's food ordering and delivery booking service, which enables merchant-partners to accept bookings for prepared meals from consumers (with options for on-demand deliveries, scheduled deliveries and pick-up orders) through Grab's merchant-partner application and it also enables driver-partners to accept bookings for prepared meal delivery services through Grab's driver-partner application;

"GrabForGood Fund" means Grab's proposed endowment fund that aims to introduce and support programs that empower Southeast Asian communities to improve socioeconomic mobility and quality of life;

"GrabHitch" refers to Grab's carpooling booking service, which enables drivers other than Grab's driver-partners, who sign up through the Grab platform, to accept bookings for carpool rides through the Grab platform;

"GrabInvest" refers to investment products offered through the Grab platform, including those based on money market and short-term fixed-income mutual funds, in which users can invest and grow their savings;

"GrabKios" refers to the services offered through the Grab platform in Indonesia, which allow GrabKios agents to act as distributors or resellers of digital goods including mobile airtime credits, bill payment services and e-commerce purchasing services;

"GrabKitchen" means Grab's centralized food preparation facilities, which are used by certain merchant-partners;

"GrabMart" means Grab's goods ordering and delivery booking service, which enables merchant-partners to accept bookings for goods from consumers (with options for on-demand deliveries, scheduled deliveries and pick-up orders) through Grab's merchant-partner application, and it also enables driver-partners to accept bookings for goods delivery services through Grab's driver-partner application;

"GrabMerchant" refers to the platform provided by Grab, which equips merchant-partners with tools to grow their business;

"GrabPay" means Grab's digital payments solution, which allows consumers to make online and offline electronic payments using their mobile wallet and also allows Grab's driver- and merchant-partners to receive digital payments for their services;

"GrabRentals" refers to Grab's offering which facilitates vehicle rental for Grab's driver-partners at competitive rates through Grab's rental fleet or third-party rental services, to allow driver-partners with limited vehicle access to offer services on the Grab platform;

"GrabRewards" means Grab's loyalty platform providing consumers that use services offered through the Grab platform with a large catalog of points redemption options, including offers from both popular merchant-partners and Grab;

"Initial Closing" means the closing of the Initial Merger;

"Initial Merger" means the merger between AGC and AGC Merger Sub, with AGC Merger Sub surviving and remaining as a wholly-owned subsidiary of GHL;

"JS Securities" means JS Capital LLC;

"JustGrab" refers to Grab's ride-hailing booking service, which enables driver-partners to accept bookings for private hire car rides or taxi rides, in both cases with upfront non-metered pricing;

"Key Executives" refers to Grab CEO and co-founder Anthony Tan, COO and co-founder Tan Hooi Ling and President Maa Ming-Hokng;

"MAS" means the Monetary Authority of Singapore;

"merchant-partner" refers to online and offline merchants, restaurants and food stalls, convenience stores or retail shops or shops that sell products or services on the Grab platform;

"MSMEs" means micro, small and medium sized businesses;

"NASDAQ" means the Nasdaq Stock Market;

"on-demand driver" refers to drivers (regardless of vehicle type) registered with an on-demand service provider, who can be deployed on demand to fulfil a variety of services such as services associated with ride-hailing, food delivery, and logistics;

"online food delivery" means prepared meals (food and drink) which are ordered online and delivered to the consumer. Only orders made by means of platforms are included and does not include takeaway sales, transported off premise by the consumer;

**Table of Contents**

"online investment" means investments through digital channels with no in-person interactions;

"OVO" refers to PT Visionet Internasional, a subsidiary of PT Bumi Cakrawala Perkasa and a digital platform service located in Indonesia that offers payments, customer incentives in the form of loyalty points and financial services;

"Passenger Cars in Use" means the total number of new and used passenger cars in the register of road transport vehicles. A passenger car is a road motor vehicle intended for the carriage of passengers and designed to seat no more than nine persons (including the driver). The term "passenger car" therefore covers microcars (need no permit to be driven), taxis and hired passenger cars, provided that they have fewer than ten seats. Electric cars are also included;

"PayLater" refers to the buy-now-pay-later products offered through the Grab platform that enables receivables factoring or digital lending service (in certain markets) and allow Grab's driver- and merchant-partners to offer their consumers the option to pay for goods and services either in one bill at the end of the month or such other predetermined period or on an installment basis;

"PDPC" means Personal Data Protection Commission, Singapore's main authority in matters relating to personal data protection;

"Permitted Entities" of a Key Executive means: (i) any person in respect of which the Key Executive has, directly or indirectly (A) control over the voting of GHL Class B Ordinary Shares held or to be transferred to that person, (B) the ability to direct or cause the direction of the management and policies of that person or any other person having authority referred to in the immediately foregoing, or (C) the operational or practical control of that person, including through the right to appoint, designate, remove or replace the person having the authority referred to in the foregoing; (ii) any trust the beneficiaries of which consist primarily of a Key Executive, his or her family members, and/or any person controlled by a trust, including, with respect to Mr. Tan, Hibiscus Worldwide Ltd.; or (iii) any person controlled by a trust described in the immediately foregoing;

"Permitted Transferee" of a holder of GHL Class B Ordinary Shares means: (i) any Key Executive; (ii) any Key Executive's Permitted Entities; (iii) the transferee or other recipient in any transfer of any GHL Class B Ordinary Shares by any holder of GHL Class B Ordinary Shares to (A) his or her family members, (B) any other relative or individual approved by the GHL board of directors, (C) any trust or estate planning entity primarily for the benefit of, or the ownership interest of which are controlled by, such holder of GHL Class B Ordinary Shares, his or her family members and/or other trusts or estate planning entities, or any entity controlled by such a trust or estate planning entity, or (D) occurring by operation of law, including in connection with divorce proceedings; (iv) any charitable organization, foundation or similar entity; (v) GrabForGood Fund; (vi) GHL or any of its subsidiaries; and (vii) in connection with a transfer as a result of, or in connection with, the death or incapacity of a Key Executive other than Mr. Tan, any Key Executive's family members, another holder of GHL Class B Ordinary Shares, or a designee approved by a majority of all members of GHL's board of directors (and Class B Directors shall form a majority of such majority of all directors); provided that (x) as a condition to the applicable transfer, any Permitted Transferee shall have adhered to the proxy to Mr. Tan; and (y) in case of any transfer of GHL Class B Ordinary Shares pursuant to clauses (ii)-(v) above to a person who later ceases to be a Permitted Transferee, GHL may refuse registration of any subsequent transfer except back to the transferor of such GHL Class B Ordinary Shares;

"PIPE Investors" means the third-party investors who entered into PIPE Subscription Agreements;

"PIPE Investment" means the commitment by the PIPE Investors to subscribe for and purchase, in the aggregate, 326,500,000 GHL Class A Ordinary Shares for $10 per share, or an aggregate purchase price equal to $3.265 billion pursuant to the PIPE Subscription Agreements;

8

"PIPE Subscription Agreements" means the share subscription agreements, dated April 12, 2021, by and among GHL, AGC and the PIPE Investors pursuant to which the PIPE Investors have committed to subscribe for and purchase, in the aggregate, 326,500,000 GHL Class A Ordinary Shares for $10 per share, or an aggregate purchase price equal to $3.265 billion;

"prepared meal" means food and drink served through channels such as cafés/bars, full-service restaurants, limited-service restaurants, self-service cafeterias and street stalls/kiosks;

"receivables factoring" means the purchasing from merchants or service providers of account payables to them by consumers to whom they have provided goods or services;

"regional corporate costs" means costs that are not attributed to any of the business segments, including certain regional research and development expenses, general and administrative expenses and marketing expenses. These regional research and development expenses also include mapping and payment technologies and support and development of the internal technology infrastructure. These general and administrative expenses also include certain shared costs such as finance, accounting, tax, human resources, technology and legal costs. Regional corporate costs exclude stock-based compensation expenses;

"Registration Rights Agreement" means the registration rights agreement, dated April 12, 2021, by and among AGC, GHL, Sponsor, the Sponsor Related Parties and certain of the shareholders of Grab to be effective upon Closing pursuant to which, among other things, GHL will agree to undertake certain resale shelf registration obligations in accordance with the Securities Act and Sponsor, the Sponsor Related Parties and the shareholders of Grab party thereto have been granted customary demand and piggyback registration rights;

"ride-hailing" means prearranged and on-demand transportation service for compensation in which drivers and passengers connect via digital applications or platforms;

"SEC" means the U.S. Securities and Exchange Commission;

"Shareholders' Deed" means the shareholders' deed, dated April 12, 2021, by and among GHL, Sponsor, Grab, the Key Executives and certain entities related to Mr. Tan, pursuant to which (i) the Covered Holders irrevocably appointed Mr. Tan attorney-in-fact and proxy to, among other things, vote such Covered Holder's GHL Class B Ordinary Shares on their behalf, and (ii) Sponsor agreed to gift or transfer for a nominal amount 1,227,500 GHL Class A Ordinary Shares to the GrabForGood Fund or another charitable organization, foundation, fund or similar entity as agreed between Sponsor and GHL;

"Southeast Asia" refers to Cambodia, Indonesia, Malaysia, Myanmar, the Philippines, Singapore, Thailand, and Vietnam, unless otherwise noted;

"Sponsor" means Altimeter Growth Holdings, a limited liability company incorporated under the laws of the Cayman Islands;

"Sponsor Affiliate" means Altimeter Partners Fund, L.P.;

"Sponsor Related Parties" means Sponsor Affiliate and JS Securities;

"Sponsor Subscription Agreement" means the subscription agreement, dated April 12, 2021, by and among AGC, Sponsor Affiliate and GHL pursuant to which Sponsor Affiliate has committed to subscribe for and purchase 57,500,000 GHL Class A Ordinary Shares for $10 per share for an aggregate purchase price equal to $575 million;

"Sponsor Support Agreement" means the voting support agreement, dated April 12, 2021, by and among AGC, Sponsor, GHL and Grab pursuant to which Sponsor has agreed, among other things and subject to the

**Table of Contents**

terms and conditions set forth therein: (a) to vote in favor of the transactions contemplated in the Business Combination Agreement and the other transaction proposals, (b) to waive the anti-dilution rights it held in respect of the AGC Shares under AGC's amended and restated memorandum and articles of association, (c) to appear at the Extraordinary General Meeting for purposes of constituting a quorum, (d) to vote against any proposals that would materially impede the transactions contemplated in the Business Combination Agreement and the other transaction proposals, (e) not to redeem any AGC Shares held by Sponsor, (f) not to amend that certain letter agreement between AGC, Sponsor and certain other parties thereto, dated as of September 30, 2020, (g) not to transfer any AGC Shares held by Sponsor, (h) to release AGC, GHL, Grab and its subsidiaries from all claims in respect of or relating to the period prior to the closing, subject to the exceptions set forth therein (with Grab agreeing to release the Sponsor and AGC on a reciprocal basis) and (i) to agree to a lock-up of its GHL Class A Ordinary Shares during the period of three years from the Closing;

"superapp" means an integrated mobile application of many applications that aims to provide a one-stop marketplace platform with multiple offerings delivered via a single technology platform and third-party integrations;

"Term Loan B Facility" means the $2 billion senior secured term loan B facility under the Credit and Guaranty Agreement, dated as of January 29, 2021 (as amended), by and among Grab, Grab Technology LLC, certain guarantors, certain lenders, JPMorgan Chase Bank, N.A., as administrative agent, and Wilmington Trust (London) Limited, as collateral agent;

"total insurance premium volume" means direct premium volumes of insurance companies. Premiums paid to state social insurers are not included, and life and non-life premium volume are included; and

"U.S. Dollars" and "$" means United States dollars, the legal currency of the United States.

*Non-IFRS Financial Measures*

Unless otherwise stated or unless the context otherwise requires in this document:

"Adjusted EBITDA" is a non-IFRS financial measure calculated as net loss adjusted to exclude: (i) net interest income (expenses), (ii) other income (expenses), (iii) income tax expenses, (iv) depreciation and amortization, (v) stock-based compensation expenses, (vi) costs related to mergers and acquisitions, (vii) unrealized foreign exchange gain (loss), (viii) impairment losses on goodwill and non-financial assets, (ix) fair value changes on investments, (x) restructuring costs and (xi) legal, tax and regulatory settlement provisions; and

"Segment Adjusted EBITDA" is a non-IFRS financial measure, representing the Adjusted EBITDA of each of our four business segments, excluding, in each case, regional corporate costs.

*Key Operating Metrics*

Unless otherwise stated or unless the context otherwise requires in this document:

"consumer incentives" represents the dollar value of discounts and promotions offered to consumers, the effect of which is to reduce revenue;

"GMV" means gross merchandise value, an operating metric representing the sum of the total dollar value of transactions from Grab's services, including any applicable taxes, tips, tolls and fees, over the period of measurement;

10

**Table of Contents**

"MTUs" means monthly transacting users, which is an operating metric defined as the monthly number of unique users who transact via Grab's products, where transact means to have successfully paid for any of Grab's products. MTUs over a quarterly or annual period are calculated based on the average of the MTUs for each month in the relevant period;

"partner incentives" represents the dollar value of incentives granted to driver- and merchant-partners, the effect of which is to reduce revenue. The incentives granted to driver- and merchant-partners include base incentives and excess incentives, with base incentives being the amount of incentives paid to driver- and merchant-partners up to the amount of commissions and fees earned by Grab from those driver- and merchant-partners, and excess incentives being the amount of payments made to driver- and merchant-partners that exceed the amount of commissions and fees earned by Grab from those driver- and merchant-partners; and

"TPV" means total payments volume received from consumers, which is an operating metric defined as the value of payments, net of payment reversals, successfully completed through Grab's platform.

11

**Table of Contents**

**SUMMARY OF THE PROXY STATEMENT/PROSPECTUS**

*This summary highlights selected information from this proxy statement/prospectus and does not contain all of the information that is important to you. To better understand the proposals to be submitted for a vote at the Extraordinary General Meeting, including the Business Combination, you should read this entire document carefully, including the Business Combination Agreement attached as Annex A to this proxy statement/prospectus. The Business Combination Agreement is the legal document that governs the Business Combination and the other transactions that shall be undertaken in connection with the Business Combination. It is also described in detail in this proxy statement/prospectus in the section entitled "The Business Combination Proposal—The Business Combination Agreement."*

**The Parties to the Business Combination**

*Grab*

Grab was the category leader in 2020 by GMV in each of food deliveries and mobility and by TPV in the e-wallets segment of financial services in Southeast Asia according to Euromonitor. Grab operates across the deliveries, mobility and digital financial services sectors in over 400 cities in eight countries in the Southeast Asia region—Cambodia, Indonesia, Malaysia, Myanmar, the Philippines, Singapore, Thailand and Vietnam. Grab provides a platform that enables millions of people each day to access services provided by its driver- and merchant-partners through Grab's superapp to order food or groceries, send packages, hail a ride or taxi, pay for online purchases or access services provided through Grab's platform such as lending, insurance, wealth management and telemedicine, all through a single "everyday everything" app. Grab was founded in 2012 with the mission to drive Southeast Asia forward by creating economic empowerment for everyone, and since then, the Grab app has been downloaded onto millions of mobile devices. Grab strives to serve a double bottom line: to simultaneously deliver financial performance for its shareholders and a positive social impact in Southeast Asia.

Grab's revenue was $396 million and $78 million in the six months ended June 30, 2021 and June 30, 2020, respectively, and $469 million and $(845) million in 2020 and 2019, respectively. Grab's deliveries, mobility, financial services and enterprise and new initiatives segments represented 24.8%, 66.4%, 3.5% and 5.3%, respectively, of its revenue in the six months ended June 30, 2021 and 1.2%, 93.3%, (2.2)% and 7.7%, respectively, of its revenue in the year ended December 31, 2020. In addition, Grab's revenue in Singapore, Malaysia, Vietnam and the rest of Southeast Asia was $246 million, $91 million, $76 million and $56 million in the year ended December 31, 2020, respectively and $(30) million, $92 million, $(26) million and $(881) million in the year ended December 31, 2019, respectively.

Grab is an exempted company limited by shares incorporated on July 25, 2017 under the laws of the Cayman Islands. The mailing address of Grab's principal executive office is 7 Straits View, Marina One East Tower, #18-01/06, Singapore 018936, and its phone number is +65-9684-1256. Grab's corporate website address is https://grab.com/sg/. Grab's website and the information contained on, or that can be accessed through, the website is not deemed to be incorporated by reference in, and is not considered part of, this proxy statement/prospectus. After the consummation of the Business Combination, Grab will become a wholly-owned subsidiary of GHL.

*AGC*

AGC is a blank check company incorporated on August 25, 2020, as a Cayman Islands exempted company for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or entities. Based on its business activities, AGC is a "shell company," as defined under the Exchange Act, because it has no operations and nominal assets consisting almost entirely of cash.

28

**Table of Contents**

Before the completion of an initial business combination, any vacancy on the board of directors of AGC may be filled by a nominee chosen by holders of a majority of its founder shares. In addition, before the completion of an initial business combination, holders of a majority of AGC's founder shares may remove a member of the board of directors for any reason.

On October 5, 2020, AGC consummated its initial public offering of 50,000,000 AGC Units, which included the full exercise by the underwriters of the over-allotment option to purchase an additional 5,000,000 AGC Units, at $10.00 per AGC Unit, and a private placement with Sponsor of 12,000,000 private placement AGC Warrants at a price of $1.00 per AGC Warrant. Each AGC Unit consists of one AGC Class A Ordinary Share and one-fifth of one AGC Warrant.

Following the closing of AGC's initial public offering, an amount equal to $500 million of the net proceeds from its initial public offering and the sale of the private placement warrants was placed in the trust account. The trust account may be invested only in U.S. government treasury bills with a maturity of 180 days or less or in money market funds investing solely in United States Treasuries and meeting certain conditions under Rule 2a-7 under the Investment Company Act of 1940, as amended, which invest only in direct U.S. government obligations. As of September 30, 2021, funds in the trust account totaled $500,021,794. Except with respect to interest earned on the funds in the trust account that may be released to pay income taxes, the funds held in the trust account will not be released from the trust account (1) to AGC, until the completion of its initial business combination, or (2) to public AGC shareholders, until the earliest of (a) the completion of AGC's initial business combination, and then only in connection with those AGC Class A Ordinary Shares that such shareholders properly elected to redeem, subject to the limitations described herein, (b) the redemption of any public shares properly tendered in connection with a shareholder vote to amend AGC's amended and restated memorandum and articles of association (A) to modify the substance or timing of AGC's obligation to provide holders of AGC Class A Ordinary Shares the right to have their shares redeemed in connection with AGC's initial business combination or to redeem 100% of AGC's public shares if AGC does not complete its initial business combination by October 5, 2022 (or January 5, 2023, if AGC has executed a letter of intent, agreement in principle or definitive agreement for its business combination by October 5, 2022, but has not completed the business combination by such date) (or such later date as may be approved by AGC shareholders) (such date the "Final Redemption Date") or (B) with respect to any other provision relating to the rights of holders of AGC Class A Ordinary Shares, and (c) the redemption of AGC's public shares if it has not consummated its business combination by the Final Redemption Date, subject to applicable law.

AGC Units, Class A Ordinary Shares and AGC Warrants are each traded on NASDAQ under the symbols "AGCUU," "AGC" and "AGCWW," respectively.

AGC's principal executive office is located at 2550 Sand Hill Road, Suite 150, Menlo Park, CA 94025, and its telephone number is (650) 549-9145. AGC's corporate website address is https://www.altimetergrowth.com/AGC.html. AGC's website and the information contained on, or that can be accessed through, the website is not deemed to be incorporated by reference in, and is not considered part of, this proxy statement/prospectus.

#### GHL

Immediately following the Business Combination, GHL will qualify as a foreign private issuer as defined in Rule 3b-4 under the Exchange Act. GHL was incorporated on March 12, 2021, solely for the purpose of effectuating the Business Combination described herein. GHL was incorporated under the laws of the Cayman Islands as an exempted company limited by shares. GHL does not own any material assets and does not operate any business.

As of the consummation of the Business Combination, the number of directors of GHL will be increased to six, four of whom shall be independent directors. The mailing address of GHL is Harbour Place, 2nd Floor,

29

103 South Church Street, P.O. Box 472, George Town, Cayman Islands, KY1-1106. Upon the consummation of the Business Combination, the principal executive office of GHL will be located at 3 Media Close, #01-03/06, Singapore 138498. After the consummation of the Business Combination, GHL will become the continuing public company.

**The Business Combination Proposal**

On April 12, 2021, AGC, GHL, AGC Merger Sub, Grab Merger Sub and Grab entered into the Business Combination Agreement, pursuant to which, subject to the terms and conditions set forth therein, (i) AGC shall merge with and into AGC Merger Sub, with AGC Merger Sub surviving and remaining as a wholly-owned subsidiary of GHL and (ii) following the Initial Merger, Grab Merger Sub shall merge with and into Grab, with Grab being the surviving entity and becoming a wholly-owned subsidiary of GHL. Capitalized terms in this summary of the Business Combination Proposal not otherwise defined in this proxy statement/prospectus shall have the meanings ascribed to them in the Business Combination Agreement.

*The Initial Merger*

As a result of the Initial Merger, at the Initial Merger Effective Time (i) all the property, rights, privileges, agreements, powers and franchises, liabilities and duties of AGC and AGC Merger Sub shall vest in and become the property, rights, privileges, agreements, powers and franchises, liabilities and duties of AGC Merger Sub as the surviving company, and AGC Merger Sub shall thereafter exist as a wholly-owned subsidiary of GHL, (ii) each issued and outstanding security of AGC immediately prior to the Initial Merger Effective Time shall be cancelled in exchange for or converted into securities of GHL as set out below, (iii) the board of directors and officers of AGC Merger Sub and AGC shall cease to hold office, and the board of directors and officers of AGC Merger Sub shall be as determined by Grab, (iv) AGC Merger Sub's memorandum and articles of association shall be amended and restated to read in their entirety in the form attached as Exhibit J to the Business Combination Agreement, and (v) GHL's memorandum and articles of association shall be amended and restated to read in their entirety in the form of the Amended GHL Articles attached as Exhibit L to the Business Combination Agreement.

Subject to the terms and conditions of the Business Combination Agreement, at the Initial Merger Effective Time:

- each AGC Unit issued and outstanding immediately prior to the Initial Merger Effective Time shall be automatically separated and the holder thereof shall be deemed to hold one AGC Class A Ordinary Share and one-fifth of an AGC Warrant;

- immediately following the separation of each AGC Unit, each (a) AGC Class A Ordinary Share issued and outstanding immediately prior to the Initial Merger Effective Time shall be cancelled in exchange for the right to receive one GHL Class A Ordinary Share, and (b) AGC Class B Ordinary Share issued and outstanding immediately prior to the Initial Merger Effective Time shall be cancelled in exchange for the right to receive one GHL Class A Ordinary Share;

- each AGC Warrant outstanding immediately prior to the Initial Merger Effective Time shall cease to be a warrant with respect to AGC Shares and be assumed by GHL and converted into a warrant to purchase one GHL Class A Ordinary Share, subject to substantially the same terms and conditions prior to the Initial Merger Effective Time in accordance with the provisions of the Assignment, Assumption and Amendment Agreement; and

- the single GHL Ordinary Share outstanding immediately prior to the Initial Merger Effective Time shall be cancelled for no consideration.

30

Table of Contents

For more information on the Initial Merger and the Initial Merger Proposal, see the sections titled "The Business Combination Proposal—The Initial Merger" and "The Initial Merger Proposal."

*The Acquisition Merger*

Following the Initial Merger and the satisfaction of the conditions with respect to the Acquisition Merger, as a result of the Acquisition Merger, at the Acquisition Effective Time (i) all the property, rights, privileges, agreements, powers and franchises, liabilities and duties of Grab Merger Sub and Grab shall vest in and become the assets and liabilities of Grab as the surviving company, and Grab shall thereafter exist as a wholly-owned subsidiary of GHL, (ii) each issued and outstanding security of Grab immediately prior to the Acquisition Effective Time shall be cancelled in exchange for or converted into securities of GHL as set out below, (iii) each share of Grab Merger Sub issued and outstanding immediately prior to the Acquisition Effective Time shall automatically be converted into one ordinary share of the surviving company, (iv) the board of directors and executive officers of Grab Merger Sub shall cease to hold office, and GHL will be the sole corporate director of Grab and (v) Grab's memorandum and articles of association shall be amended and restated to read in their entirety in the form attached as Exhibit K to the Business Combination Agreement.

Subject to the terms and conditions of the Business Combination Agreement, at the Acquisition Effective Time:

- each Grab Ordinary Share and Grab Preferred Share (other than Grab Key Executive Shares, Grab Restricted Stock, Grab Key Executive Restricted Stock, Grab Dissenting Shares and Grab Treasury Shares) issued and outstanding immediately prior to the Acquisition Effective Time shall be cancelled in exchange for the right to receive such fraction of a newly issued GHL Class A Ordinary Share that is equal to the Exchange Ratio, without interest, subject to rounding;

- each Grab Key Executive Share (other than Grab Key Executive Restricted Stock and Grab Dissenting Shares) issued and outstanding immediately prior to the Acquisition Effective Time shall be cancelled in exchange for the right to receive such fraction of a newly issued GHL Class B Ordinary Share that is equal to the Exchange Ratio, without interest, subject to rounding;

- each Grab Option outstanding immediately prior to the Acquisition Effective Time, whether vested or unvested, shall be automatically assumed by GHL and converted into an option to purchase the number of GHL Class A Ordinary Shares equal to (i) the number of Grab Ordinary Shares subject to such Grab Option immediately prior to the Acquisition Effective Time multiplied by (ii) the Exchange Ratio (such product rounded down to the nearest whole number), and otherwise, shall be subject to substantially the same terms and conditions as were applicable to such Grab Option immediately prior to the Acquisition Effective Time;

- each Grab Key Executive Option outstanding immediately prior to the Acquisition Effective Time, whether vested or unvested, shall be automatically assumed by GHL and converted into an option to purchase the number of GHL Class B Ordinary Shares equal to (i) the number of Grab Ordinary Shares subject to such Grab Key Executive Option immediately prior to the Acquisition Effective Time multiplied by (ii) the Exchange Ratio (such product rounded down to the nearest whole number), and otherwise, shall be subject to substantially the same terms and conditions as were applicable to such Grab Key Executive Option immediately prior to the Acquisition Effective Time;

- each award of Grab Restricted Stock outstanding immediately prior to the Acquisition Effective Time shall be automatically converted into an award of restricted GHL Class A Ordinary Shares equal to (i) the number of Grab Shares subject to the Grab Restricted Stock award immediately before the Acquisition Effective Time multiplied by (ii) the Exchange Ratio (such product rounded down to the nearest whole number), and otherwise, shall be subject to substantially the same terms and conditions

31

as were applicable to such award of Grab Restricted Stock immediately prior to the Acquisition Effective Time;

- each award of Grab Key Executive Restricted Stock outstanding immediately prior to the Acquisition Effective Time shall be automatically converted into an award of restricted GHL Class B Ordinary Shares equal to (i) the number of Grab Shares subject to the Grab Key Executive Restricted Stock award immediately before the Acquisition Effective Time multiplied by (ii) the Exchange Ratio (such product rounded down to the nearest whole number), and otherwise, shall be subject to substantially the same terms and conditions as were applicable to such award of Grab Key Executive Restricted Stock immediately prior to the Acquisition Effective Time;

- each Grab RSU outstanding immediately prior to the Acquisition Effective Time, whether vested or unvested, shall be automatically assumed by GHL and converted into an award of restricted share units representing the right to receive the number of GHL Class A Ordinary Shares equal to (i) the number of Grab Ordinary Shares subject to such Grab RSU immediately prior to the Acquisition Effective Time multiplied by (ii) the Exchange Ratio (such product rounded down to the nearest whole number), and otherwise, shall be subject to substantially the same terms and conditions as were applicable to such Grab RSU immediately prior to the Acquisition Effective Time; and

- each Grab Key Executive RSU outstanding immediately prior to the Acquisition Effective Time, whether vested or unvested, shall be automatically assumed by GHL and converted into an award of restricted share units representing the right to receive the number of GHL Class B Ordinary Shares equal to (i) the number of Grab Ordinary Shares subject to such Grab Key Executive RSU immediately prior to the Acquisition Effective Time multiplied by (ii) the Exchange Ratio (such product rounded down to the nearest whole number), and otherwise, shall be subject to substantially the same terms and conditions as were applicable to such Grab Key Executive RSU immediately prior to the Acquisition Effective Time.

For more information on the Acquisition Merger and the Business Combination Proposal, see the section titled "The Business Combination Proposal—The Acquisition Merger."

*Conditions to Closing*

In addition to the approval of the Business Combination Proposal and the Initial Merger Proposal, unless waived by the parties to the Business Combination Agreement, the closing of the Business Combination is subject to a number of conditions set forth in the Business Combination Agreement. For more information about the closing conditions to the Business Combination, see the section titled "The Business Combination Proposal—The Business Combination Agreement—Conditions to Closing."

*Organizational Structure*

Following the consummation of the Business Combination, the shareholders of AGC and Grab, PIPE Investors and Sponsor Related Parties will become shareholders of GHL. GHL is a limited liability company incorporated in the Cayman Islands that is a holding company and does not have substantive operations. Following the consummation of the Business Combination, GHL will conduct its businesses through subsidiaries and consolidated affiliated entities of Grab Holdings Inc. and their respective subsidiaries and may also own minority interests in certain businesses.

The laws and regulations in certain markets in which Grab operates, including Thailand, Vietnam, the Philippines and Indonesia place restrictions on foreign investment in and ownership of entities engaged in a number of business activities. As a result, in Thailand and with respect to certain businesses in Indonesia, the

**Table of Contents**

Philippines and Vietnam, Grab conducts its business through consolidated affiliated entities in which in addition to its ownership of equity interests, some of which may be minority interests, Grab has certain rights pursuant to contractual arrangements with other shareholders of the relevant entities that allow Grab to consolidate the results of such entities under IFRS.

In addition to directly or indirectly holding equity interests in such consolidated affiliated entities, Grab has entered into certain contractual arrangements, which provide Grab with control over the relevant entities, which consist of the following:

- In Thailand, Grab exercises control over relevant Thai operating entities as a result of a dual-class share and two-tiered corporate structure. Grab owns ordinary shares in the top level holding company, Thai Entity 2, that gives it control of Thai Entity 2 based on shareholder meeting quorum and voting requirements. Grab's Thai local partner, Mr. Vee Charununsiri ("Thai local partner"), holds preference shares in Thai Entity 2 which preference shares have limited rights to dividends and distributions. Such arrangements are reflected in the Articles of Association of Thai Entity 2. In addition to the Articles of Association which provide Grab with its control over Thai Entity 2, pursuant to a Call Option Agreement between Grab and our Thai local partner, Grab also has the right to acquire the Thai local partner's shares in Thai Entity 2 upon certain events occurring.

- In Indonesia, powers of attorney granted by (i) PT Ekanusa Yadhikarya Indah and PT Ekanusa Yudhakarya Indah (both of which are controlled by Grab's Indonesian local partner, Mr. Leo Mahamit) with respect to PT Solusi Pengiriman Indonesia and (ii) Grab's Indonesian local partner, Mr. Stephanus Ardianto, with respect to PT Teknologi Pengangkutan Indonesia provide Grab control over relevant Indonesian operating entities. PT Ekanusa Yadhikarya Indah, PT Ekanusa Yudhakarya Indah and Mr. Stephanus Ardianto agree thereunder to hold their shares in trust for the benefit of Grab and to exercise their voting rights as instructed by Grab. With respect to BCP, pursuant to a shareholders agreement entered into with PT Ide Teknologi Indonesia (which is controlled by Grab's Indonesian local partners, Mr. Agung Nugroho and Mr. Albert Lucius), PT Cakra Finansindo Investama (which is controlled by Grab's Indonesian local partner, Mr. Arsjad Rasjid) and PT Abhimata Anugrah Abadi (which is controlled by Grab's Indonesian local partner, Mr. Alvin Sariaatmadja), Grab has certain contractual rights, which include rights to (a) control the appointment of the Chief Executive Officer, and the Chief Financial Officer (including the right to nominate any such officers as directors or as president director), (b) approve the budget and business plan of BCP and its subsidiaries; and (c) approve future funding of BCP and its subsidiaries, whether through debt, equity or otherwise. In each case, in addition to the aforementioned contractual rights, Grab also has a call option that provides it the right to require the aforementioned local partners to transfer their shares in the aforementioned entities to another party and the local partners' shares in such entities are also pledged, which means the local partners can transfer their shares only upon receiving Grab's consent.

- In Vietnam, Grab exercises control over relevant Vietnam operating entities based on voting thresholds set forth in the Vietnam holding company's (GTVN) charter, pursuant to which resolutions are passed by way of written resolutions agreed by members holding at least 75% of the company's share capital or votes at a physical meeting where members holding at least 75% of the company's share capital vote in favor of the resolution. Since Grab holds 49% of the share capital of the Vietnam holding company, Grab's affirmative vote is required for passage of any resolution of the Vietnam holding company. In addition, pursuant to a Members' Agreement entered into by Grab with its Vietnamese local partner, Ms. Ly Thuy Bich Huyen ("Vietnamese local partner"), to the extent permitted by local law, certain reserved matters, including important matters that relate to businesses and operations of Grab Vietnam are subject to Grab's consent. In addition to the aforementioned charter and Members' Agreement which provide Grab with control over its Vietnam operating entities, Grab also has a call option that provides it with the right to acquire the Vietnamese local partner's shares in the Vietnam holding

33

Table of Contents

company, and this right is secured by a security arrangement over the Vietnamese local partner's shares. The Vietnamese local partner's shares in the Vietnam holding company are also pledged, which prevents the Vietnamese local partner from disposing of its shares without Grab's consent.

• In the Philippines, Grab exercises control over relevant Philippine operating entities pursuant to an Investment Agreement between Grab and its Philippine local partner, Mr. Jesse Stefan H. Maxwell, relating to Grab PH Holdings Inc. that gives Grab (A) the right to (i) appoint directors in proportion to its shareholding interest, (ii) exercise veto rights with respect to certain reserved matters that fundamentally affect the business of the company and (iii) receive the economic benefits and absorb losses of the Philippine entities in proportion to the amount and value of Grab's investment, and (B) an exclusive call option to purchase all or part of the equity interests in certain circumstances. In addition, the above-mentioned control-related rights under the Investment Agreement have been included in the agreed form of Amended Articles of Incorporation and By-Laws of Grab PH Holdings Inc., which are currently pending approval from the Philippines Securities and Exchange Commission. If the Amended Articles of Incorporation and By-Laws are approved by the Philippines Securities and Exchange Commission, the relevant terms of the Investment Agreement will be memorialized in the Amended Articles of Incorporation and By-Laws and become public records that are binding not only on Grab PH Holdings Inc. and the shareholders but also on third-parties in relation to the matters covered thereby. A breach of the Investment Agreement (including in respect of the above-mentioned control rights) would give rise to Grab's right to bring a claim for breach of contract thereunder. Additionally, any action that contravenes the Amended Articles of Incorporation and By-Laws would be invalid and unenforceable and thereby be incrementally beneficial to the party seeking to enforce its terms. There can be no assurance that such approval will be obtained in a timely manner or at all, and pending such approval Grab will continue to rely solely on its contractual rights in the Investment Agreement. While Grab believes the approval of the Philippines Securities and Exchange Commission to the Amended Articles of Incorporation will strengthen its ability to control Grab PH Holdings Inc. going forward, Grab does not believe the failure to obtain such approval will materially adversely affect its ability to continue to control Grab PH Holdings Inc and consolidate Grab PH Holdings Inc. under IFRS as currently in effect, given that the Investment Agreement provides sufficient control rights to Grab, and that the Investment Agreement also provides that in the event of a conflict between the organizational documents of Grab PH Holdings Inc. (such as the Amended Articles of Incorporation and By-Laws) and the Investment Agreement, the Investment Agreement will prevail and the shareholders of Grab PH Holdings Inc. agree to do all such acts and things and sign and execute all such documents and instruments as may be necessary, desirable or expedient to make the necessary changes in the organizational documents of Grab PH Holdings Inc. (such as the Amended Articles of Incorporation and By-Laws) to remove such inconsistency or otherwise give effect to the Investment Agreement.

Such arrangements involve risks that are greater than those involved in holding a direct equity interest, including, among others, risks related to regulatory actions or disputes with the aforementioned local partners, which could, among other things, adversely impact Grab's operations in the relevant jurisdictions and cause Grab to incur substantial costs in protecting its rights or result in Grab's inability to enforce its rights. For a discussion of the foregoing restrictions and certain risks related thereto, see "Regulatory Environment" and "Risk Factors—Risks Relating to Grab's Corporate Structure and Doing Business in Southeast Asia—In certain jurisdictions, Grab is subject to restrictions on foreign ownership."

The following summary diagram illustrates Grab's principal corporate structure as of the date of this proxy statement/prospectus (with reference to the country and date of formation):



___     Grab's equity ownership.
- - -     Grab's contractual rights. See footnotes below for information on Grab's contractual rights.

35

Table of Contents

(1)   *Indonesia:* In addition to Grab's ownership of 79.6% of the shares, which, due to a dual-class structure, represent a 30.2% voting interest, of PT Bumi Cakrawala Perkasa ("BCP") through which Grab owns OVO and conducts its financial services businesses in Indonesia, Grab has contractual rights to (a) control the appointment of the Chief Executive Officer, and the Chief Financial Officer (including the right to nominate any such officers as directors or as president director), (b) approve the budget and business plan of BCP and its subsidiaries; (c) approve future funding of BCP and its subsidiaries, whether through debt, equity or otherwise, and (d) certain economic rights with respect to the remaining shareholding of BCP. Grab conducts its point to point courier delivery business through PT Solusi Pengiriman Indonesia ("SPI"), in which a 94.12% owned subsidiary of Grab owns 49%, and Grab conducts its car rental (with driver-partners) business through PT Teknologi Pengangkutan Indonesia ("TPI"), in which a wholly-owned subsidiary of Grab owns 49%. Grab has entered into contractual arrangements with a third-party Indonesian shareholder (in the case of SPI) and a senior executive of Grab (in the case of TPI), each of which holds 51% of the shares of SPI and TPI, respectively, as a result of which Grab is able to control SPI and TPI and consolidate their financial results in Grab's consolidated financial statements in accordance with IFRS. The non-controlling interests of minority shareholders in BCP are accounted for in Grab's consolidated financial statements. See "Risk Factors—Risks Relating to Grab's Corporate Structure and Doing Business in Southeast Asia—In certain jurisdictions, Grab is subject to restrictions on foreign ownership—Indonesia."

(2)   *Vietnam:* In addition to Grab's ownership of 49% of the shares of Grab Company Limited through which Grab conducts its deliveries and mobility businesses in Vietnam, Grab has entered into contractual arrangements with the holder of the balance of the shares of Grab Company Limited, who is a Vietnamese national and senior executive of Grab, as a result of which Grab is able to control Grab Company Limited and consolidate its financial results in Grab's consolidated financial statements in accordance with IFRS. See "Risk Factors—Risks Relating to Grab's Corporate Structure and Doing Business in Southeast Asia—In certain jurisdictions, Grab is subject to restrictions on foreign ownership—Vietnam."

(3)   *Thailand:* Grab's deliveries, mobility and financial services businesses are each conducted through a Thai operating entity (including, in the case of mobility, Grabtaxi (Thailand) Co., Ltd) established using a tiered shareholding structure, so that each Thai entity (including Grabtaxi Holdings (Thailand) Co., Ltd) is more than 50% owned by a Thai person or entity. This tiered shareholding structure, together with certain rights attendant to the classes of shares Grab holds and as otherwise set forth in the organizational documents of the relevant entities within Grab's shareholding structure in Thailand, enables Grab to control these Thai operating entities and consolidate their financial results in Grab's consolidated financial statements in accordance with IFRS. The non-controlling interests of relevant Thai shareholders are accounted for in Grab's consolidated financial statements. See "Risk Factors—Risks Relating to Grab's Corporate Structure and Doing Business in Southeast Asia—In certain jurisdictions, Grab is subject to restrictions on foreign ownership—Thailand."

(4)   *Philippines:* Grab's four wheel-mobility and delivery businesses are each conducted through a Philippine operating entity (including, in the case of its four wheel-mobility business, MyTaxi.PH, Inc.), the shares of which are 40% owned by Grab, with the balance owned by a Philippine holding company. The shares of the Philippine holding company are owned 40% by Grab, with the balance 60% of the shares held by a Philippine national who is a director of certain of Grab's Philippine operating entities, including MyTaxi.PH, Inc. Through contractual rights with the Philippine shareholder together with certain other rights, Grab is able to consolidate their financial results in Grab's consolidated financial statements in accordance with IFRS. The non-controlling interest of the Philippine shareholder is accounted for in Grab's consolidated financial statements. See "Risk Factors—Risks Relating to Grab's Corporate Structure and Doing Business in Southeast Asia under—In certain jurisdictions, Grab is subject to restrictions on foreign ownership—Philippines."

36

**Table of Contents**

The following simplified diagram illustrates the ownership structure of Grab immediately prior to the consummation of the Acquisition Merger:



The following simplified diagram illustrates the ownership structure of AGC immediately prior to the consummation of the Initial Merger:



37

The following simplified diagram illustrates the ownership structure of GHL immediately following the consummation of the Business Combination, assuming: (i) the No Redemption Scenario; (ii) the Full Exercise Scenario; and (iii) that no Grab shareholder exercises its dissenters' rights.



Notes:
(1)   "Certain AGC Directors" refer to Richard N. Barton, Aishetu Fatima Dozie and Dev Ittycheria.
(2)   Sponsor Related Parties refer to Altimeter Partners Fund, L.P. and JS Capital LLC.

*Related Agreements*

*PIPE Financing (Private Placement)*

Substantially concurrently with the execution of the Business Combination Agreement, (i) GHL, AGC and the PIPE Investors entered into PIPE Subscription Agreements pursuant to which the PIPE Investors have committed to subscribe for and purchase, in the aggregate, 326,500,000 GHL Class A Ordinary Shares for $10 per share, for an aggregate purchase price equal to $3.265 billion; (ii) AGC, Sponsor Affiliate and GHL entered into a subscription agreement pursuant to which Sponsor Affiliate has committed to subscribe for and purchase 57,500,000 GHL Class A Ordinary Shares for $10 per share for an aggregate purchase price equal to $575 million; and (iii) AGC, Sponsor Affiliate and GHL entered into the Backstop Subscription Agreement pursuant to which Sponsor Affiliate agreed to backstop SPAC Share Redemptions (as defined in the Business Combination Agreement), and to the extent such backstop is required will subscribe for and purchase that number of GHL Class A Ordinary Shares to be determined in accordance with the terms of the Backstop Subscription Agreement for $10 per share. For more information, see the section titled "The Business Combination Proposal—Related Agreements."

*Grab Voting, Support and Lock-Up Agreements*

Concurrently with the execution of the Business Combination Agreement, AGC, GHL, Grab and certain shareholders of Grab entered into voting support and lock-up agreements (the "Grab Shareholder Support Agreements"). For more information, see the section titled "The Business Combination Proposal—Related Agreements."

***Sponsor Support and Lock-Up Agreement***

Concurrently with the execution of the Business Combination Agreement, AGC, Sponsor, GHL and Grab entered into a voting support agreement (the "Sponsor Support Agreement"). For more information, see the section titled "The Business Combination Proposal—Related Agreements."

***Shareholders' Deed***

Concurrently with the signing of the Business Combination Agreement, GHL entered into the Shareholders' Deed, with Sponsor, Grab and the Key Executives, pursuant to which Sponsor has agreed to gift or transfer for a nominal amount 1,227,500 GHL Class A Ordinary Shares to the GrabForGood Fund or another charitable organization, foundation, fund or similar entity as agreed between Sponsor and GHL.

In addition, certain Key Executives and other Covered Holders have appointed Mr. Tan attorney-in-fact and proxy for their GHL Class B Ordinary Shares. For more information, see the sections titled "The Business Combination Proposal—Related Agreements" and "Description of GHL Securities—Shareholders' Deed."

***Registration Rights Agreement***

Concurrently with the execution of the Business Combination Agreement, AGC, GHL, Sponsor, the Sponsor Related Parties and certain shareholders of Grab (the "Grab Holders") entered into a registration rights agreement (the "Registration Rights Agreement"), to be effective upon the Acquisition Closing. For more information, see the sections titled "The Business Combination Proposal—Related Agreements" and "Shares Eligible for Future Sale—Registration Rights."

***Assignment, Assumption and Amendment Agreement***

Concurrently with the execution of the Business Combination Agreement, AGC, GHL and Continental entered into the Assignment, Assumption and Amendment Agreement and amended the Existing Warrant Agreement, pursuant to which, among other things, AGC assigned all of its right, title and interest in the Existing Warrant Agreement to GHL effective upon the Initial Closing, and GHL assumed the warrants provided for under the Existing Warrant Agreement. For more information, see the section titled "The Business Combination Proposal—Related Agreements."

***Amended and Restated Forward Purchase Agreements***

Concurrently with the execution of the Business Combination Agreement, AGC, GHL and Sponsor Affiliate amended and restated that certain forward purchase agreement, dated September 16, 2020, by and between AGC and Sponsor Affiliate, pursuant to which, among other things, Sponsor Affiliate has agreed to purchase units consisting of 17,500,000 GHL Class A Ordinary Shares and 3,500,000 GHL Warrants for an aggregate price equal to $175,000,000 immediately prior to the Acquisition Closing. In addition, concurrently with the execution of the Business Combination Agreement, AGC, GHL and JS Securities amended and restated that certain forward purchase agreement, dated September 16, 2020, by and between AGC and JS Securities, pursuant to which, among other things, JS Securities has agreed to purchase units consisting of 2,500,000 GHL Class A Ordinary Shares and 500,000 GHL Warrants for an aggregate price equal to $25,000,000 immediately prior to the Acquisition Closing. For more information, see the section titled "The Business Combination Proposal—Related Agreements."

***AGC's Board of Directors' Reasons for the Approval of the Business Combination***

AGC was formed to complete a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more business entities. As described above, the AGC Board (the "AGC

Table of Contents

Board") sought to do so by using the networks and industry experience of both the Sponsor, the AGC Board, and AGC management to identify and acquire one or more businesses.

In evaluating the transaction with Grab, the AGC Board consulted with its legal counsel and accounting and other advisors and considered a number of factors. In particular, the AGC Board considered, among other things, the following factors, although not weighted or in any order of significance:

- *Grab satisfies a number of acquisition criteria that AGC had established to evaluate prospective business combination targets.* The AGC Board determined that Grab satisfies a number of the criteria and guidelines that AGC established at its initial public offering, including (i) operating in a large and growing total-addressable market, (ii) having potential to deliver sustainable top-line growth for the long-term, and (iii) providing an opportunity to partner with a world-class management team capable of scaling a business around the globe.

- *Favorable Prospects for Future Growth and Financial Performance.* Current information and forecast projections from AGC and Grab's management regarding (i) Grab's business, prospects, financial condition, operations, technology, products, offerings, management, competitive position, and strategic business goals and objectives, with specific reference to GMV, Adjusted Net Revenue, Contribution Profit and Adjusted EBITDA (PIPE) for the 2018, 2019 and 2020 fiscal years, as well as management's projections for such metrics as well as other financial information for the 2021, 2022 and 2023 fiscal years including the Projections included in this proxy statement/prospectus, which included certain of these metrics presented on a "Pre-Interco" basis, (ii) general economic, industry, regulatory, and financial market conditions, and (iii) opportunities and competitive factors within Grab's industry.

- *Super-App Ecosystem Creates Cross Vertical Synergies.* The opportunity to participate in a company that operates a highly synergistic, deeply integrated ecosystem that is designed to maximize usage and lower service costs, underpinned by proprietary technology and financial infrastructure.

- *Underpenetrated Market Opportunity.* Grab operates in Southeast Asia, a region still in a relatively early stage of online disruption and which represents an underpenetrated market in the online food delivery, ride-hailing, e-wallet payments and digital financial services verticals.

- *Large and Growing Total-Addressable Market.* Southeast Asia is one of the fastest growing digital economies in the world, with a population approximately twice the size of the United States. Across online food delivery, ride-hailing, e-wallet payments, and digital financial services, Grab expects its total addressable market to grow from approximately $52 billion in 2020 to more than $180 billion by 2025.

- *Category Leadership in Presence, Scale, and Diversity.* Grab was the category leader in 2020 by GMV in each of food deliveries and mobility and by TPV in the e-wallets segment of financial services in Southeast Asia according to Euromonitor. Grab has a consistent track record of revenue growth diversified across the eight countries in which it operates.

- *Hyperlocalized Approach.* Grab's hyperlocal execution enables localized experiences for its driver- and merchant-partners and consumers, promotes regular and transparent dialogue with local government agencies to allow Grab to navigate each market's unique complexities, and enables landmark partnerships with leading local corporates across various sectors.

- *Commitment to R&D Investments.* Grab's commitment to investing in research and development, which has created strong core technology and AI assets that allow Grab to build a trusted and customized platform.

- *Compelling Valuation.* The implied pro forma enterprise value in connection with the Business Combination of approximately $31.2 billion, which the AGC Board believes represents an attractive

valuation relative to selected comparable companies in analogous markets, including in respect of the deliveries segment, DoorDash Inc. and Meituan; in respect of the mobility segment, Uber Technologies, Inc. and Lyft; in respect of the financial services segment, Square and PayPal Holdings, Inc.; and as relevant global SuperApp comparable companies, MercadoLibre and Sea Limited. The public trading market valuations of these comparable companies implied 2022 projected multiples of enterprise value to sales of 10.1x (DoorDash Inc.); 6.3x (Meituan); 5.1x (Uber Technologies, Inc.); 4.5x (Lyft); 6.7x (Square); 9.4x (PayPal Holdings, Inc.); 9.5x (Sea Limited) and 9.1x (MercadoLibre), in all cases based on publicly available market data as of April 1, 2021. While there is no direct comparable company with leading market share across Southeast Asia, the AGC Board focused most closely on Sea Limited and MercardoLibre for the comparable companies analysis to the exclusion of the other companies which were comparable on a segment-only basis because Sea Limited and MercardoLibre are leading SuperApps with similar operating profiles within the global technology landscape. Given Grab's overall 2022 projected multiples of enterprise value to sales (9.6x) was in line with MercadoLibre (9.1x) and Sea Limited (9.5x) despite being projected to grow faster, the AGC Board believed the comparable companies analysis supported the valuation; however, given that none of the selected companies is exactly the same as Grab, the AGC Board believed that it was inappropriate to, and therefore did not, rely solely on the quantitative results of the comparable company analysis. Accordingly, the AGC Board also made qualitative judgments, based on its experience and judgment, concerning differences between the operational, business and/or financial characteristics of Grab and the selected companies that could affect the public trading values of each in order to provide a context in which to consider the results of the quantitative analysis.

• *Best Available Opportunity.* The AGC Board determined, after a thorough review of other business combination opportunities reasonably available to AGC, that the proposed Business Combination represents the best potential business combination for AGC based upon the process utilized to evaluate and assess other potential acquisition targets, and the AGC Board's belief that such processes had not presented a better alternative.

• *Experienced, Proven, and Committed Management Team.* The AGC Board considered the fact that GHL will be led by Grab's founders-led management team, which has a proven track record of operational excellence, financial performance, growth, and innovation.

• *Continued Significant Ownership by Grab.* The AGC Board considered that Grab's existing equity holders would be receiving a significant amount of GHL Ordinary Shares in the proposed Business Combination and that Grab's principal shareholders and Key Executives are "rolling over" their existing equity interests of Grab into equity interests in GHL and are also agreeing to be subject to a "lock-up" of up to three years in certain cases. The current Grab shareholders are expected to hold approximately 88.19% of the pro forma ownership of the combined company after Closing, assuming (i) the No Redemption Scenario; (ii) that all of Grab's outstanding stock options are exercised, all of Grab's outstanding restricted stock units vest, and all remaining Grab Ordinary Shares available for grant under the Grab 2018 Plan, which will have one vote per share when granted, are granted to employees other than the Key Executives; and (iii) that no Grab shareholder exercises its dissenters' rights. If the actual facts are different from these assumptions, the percentage ownership retained by Grab's existing shareholders in the combined company will be different.

• *Substantial Retained Proceeds.* A majority of the proceeds to be delivered to the combined company in connection with the Business Combination (including from AGC's trust account and from the PIPE financing), are expected to remain on the balance sheet of the combined company after Closing in order to fund Grab's existing operations and support new and existing growth initiatives. AGC's Board considered this as a strong sign of confidence in GHL following the Business Combination and the benefits to be realized as a result of the Business Combination.

- *PIPE Financing Success.* The success of the PIPE financing process, to which sophisticated third-party investors over-subscribed.

- *Likelihood of Closing the Business Combination.* The AGC Board's belief that an acquisition by AGC has a reasonable likelihood of closing without potential issues under applicable antitrust and competition laws and without potential issues from any regulatory authorities.

For a more complete description of AGC Board's reasons for approving the Business Combination, including other factors and risks considered by the AGC Board, see the section entitled "The Business Combination Proposal—AGC's Board of Directors' Reasons for the Approval of the Business Combination."

**The Initial Merger Proposal**

The shareholders of AGC will vote on a separate proposal to authorize the Initial Merger by way of a special resolution under the Cayman Islands Companies Act. Please see the section entitled "The Initial Merger Proposal."

**The Governing Documents Proposal**

The shareholders of AGC will vote on five separate proposals relating to the material differences between AGC's amended and restated memorandum and articles of association and GHL's amended and restated memorandum and articles of association. Please see the section entitled "The Governing Documents Proposal."

**The Adjournment Proposal**

If, based on the tabulated vote, there are insufficient votes at the time of the Extraordinary General Meeting to authorize AGC to consummate the Initial Merger or the Business Combination, AGC's board of directors may (and AGC is required under the Business Combination Agreement to) submit a proposal to adjourn the Extraordinary General Meeting to a later date or dates, if necessary, to permit further solicitation of proxies. Please see the section entitled "The Adjournment Proposal."

**Date, Time and Place of Extraordinary General Meeting of AGC shareholders**

The Extraordinary General Meeting of the shareholders of AGC shall be held at 12:00 PM, Eastern time, on November 30, 2021 at the offices of Ropes & Gray LLP located at 800 Boylston Street, Boston, Massachusetts 02199, and virtually via live webcast at https://www.cstproxy.com/altimetergrowth/2021 to consider and vote upon the Business Combination Proposal, the Initial Merger Proposal, the Governing Documents Proposal and if necessary, the Adjournment Proposal.

**Voting Power; Record Date**

Shareholders shall be entitled to vote or direct votes to be cast at the Extraordinary General Meeting if they owned AGC Shares at the close of business on November 5, 2021, which is the record date for the Extraordinary General Meeting. Shareholders shall have one vote for each AGC Share owned at the close of business on the record date. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker, bank or nominee to ensure that votes related to the shares you beneficially own are properly counted. Warrants do not have voting rights. On the record date, there were 62,500,000 AGC Shares outstanding, of which 12,500,000 were held by the Sponsor and certain directors of AGC.

**Quorum and Vote of AGC shareholders**

A quorum of AGC shareholders is necessary to hold a valid meeting. A quorum shall be present at the Extraordinary General Meeting if the holders of a majority of the outstanding shares entitled to vote at the

**Table of Contents**

Extraordinary General Meeting are present in person or by proxy. An abstention or broker non-vote will be counted towards the quorum requirement but will not count as a vote cast at the Extraordinary General Meeting. The proposals presented at the Extraordinary General Meeting shall require the following votes:

- Pursuant to AGC's amended and restated memorandum and articles of association and the Cayman Islands Companies Act, the approval of the Business Combination Proposal will require an ordinary resolution under the Cayman Islands Companies Act, being the affirmative vote of the holders of a majority of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting.

- Pursuant to the Cayman Islands Companies Act, the approval of the Initial Merger Proposal will require a special resolution under the Cayman Islands Companies Act, being the affirmative vote of the holders of at least two-thirds of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting.

- Pursuant to the Cayman Islands Companies Act, the approval of the Governing Documents Proposal will require a special resolution under the Cayman Islands Companies Act, being the affirmative vote of the holders of at least two-thirds of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting.

- The approval of the Adjournment Proposal if presented will require an ordinary resolution under the Cayman Islands Companies Act, being the affirmative vote of the holders of a majority of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting.

- An abstention or broker non-vote will be counted towards the quorum requirement but will not count as a vote cast at the Extraordinary General Meeting.

**Redemption Rights**

Pursuant to AGC's amended and restated memorandum and articles of association, a public AGC shareholder may request of AGC that AGC redeem all or a portion of its AGC Shares for cash if the Business Combination is consummated. As a holder of AGC Shares, you will be entitled to receive cash for any AGC Shares to be redeemed only if you:

(i) (a) hold AGC Shares, or (b) if you hold AGC Shares through AGC Units, elect to separate your AGC Units into the underlying AGC Shares and AGC Warrants prior to exercising your redemption rights with respect to AGC Shares;

(ii) submit a written request to Continental Stock Transfer & Trust Company ("Continental"), AGC's transfer agent, in which you (a) request that AGC redeem all or a portion of your AGC Shares for cash, and (b) identify yourself as the beneficial holder of the AGC Shares and provide your legal name, phone number and address; and

(iii) deliver share certificates (if any) and other redemption forms (as applicable) to Continental, AGC's transfer agent, physically or electronically through The Depository Trust Company.

**Holders of AGC Shares must complete the procedures for electing to redeem their public shares in the manner described above prior to 5:00 PM, Eastern time, on November 26, 2021 (two business days before the Extraordinary General Meeting) in order for their AGC Ordinary Shares to be redeemed.**

**Holders of AGC Units must elect to separate the AGC Units into the underlying shares and warrants prior to exercising redemption rights with respect to the shares. If holders hold their AGC Units in an**

43

**account at a brokerage firm or bank, holders must notify their broker or bank that they elect to separate the AGC Units into the underlying shares and warrants, or if a holder holds AGC Units registered in its own name, the holder must contact Continental, AGC's transfer agent, directly and instruct them to do so. The redemption rights include the requirement that a holder must identify itself in writing as a beneficial holder and provide its legal name, phone number and address to Continental in order to validly redeem its shares.**

To the extent a holder of AGC Units elects to separate such AGC Units into underlying AGC Shares and AGC Warrants prior to exercising redemption rights with respect to such AGC Shares, such holder's redemption rights would apply in respect of the underlying AGC Shares. With respect to the related AGC Warrants, the holder would retain such AGC Warrants, and each AGC Warrant outstanding immediately prior to the Initial Merger Effective Time shall cease to be a warrant with respect to AGC Shares and be assumed by GHL and converted into a warrant to purchase one GHL Class A Ordinary Share, subject to substantially the same terms and conditions prior to the Initial Merger Effective Time in accordance with the provisions of the Assignment, Assumption and Amendment Agreement.

If the Business Combination is not consummated, the public shares will be returned to the respective holder, broker or bank. If the Business Combination is consummated, and if a public AGC shareholder properly exercises its right to redeem all or a portion of the public shares that it holds and timely delivers its share certificates (if any) and other redemption forms (as applicable) to Continental, AGC will redeem such public shares for a per-share price, payable in cash, equal to the pro rata portion of the amount on deposit in the trust account as of two business days prior to the consummation of the Business Combination, including interest earned on the funds held in the trust account and not previously released to AGC. If a public AGC shareholder exercises its redemption rights in full, then it will be electing to exchange its public shares for cash and will no longer own public shares. See "Extraordinary General Meeting of AGC Shareholders—Redemption Rights" for a detailed description of the procedures to be followed if you wish to redeem your public shares for cash.

A holder of AGC Shares, together with any affiliate of such holder and any person with whom such holder is acting in concert or as a "group" (as defined under Section 13(d)(3) of the Exchange Act), may not seek to have more than 15% of the aggregate shares redeemed without the consent of AGC. Under AGC's amended and restated memorandum and articles of association, the Business Combination may not be consummated if AGC has net tangible assets of less than $5,000,001 either immediately prior to or upon consummation of the Business Combination after taking into account the redemption for cash of all public shares properly demanded to be redeemed by holders of AGC Shares.

Any request for redemption, once made by a holder of shares, may not be withdrawn once submitted to AGC unless the Board of Directors of AGC determines (in its sole discretion) to permit the withdrawal of such redemption request (which it may do in whole or in part).

**No Appraisal or Dissenters' Rights**

Neither AGC shareholders nor AGC Unit holders nor AGC warrant holders have appraisal or dissenters' rights in connection with the Business Combination under the laws of the Cayman Islands. Although under the Cayman Islands Companies Act, shareholders of a Cayman Islands company have dissenters' rights with respect to a merger, dissenters' rights are not considered to be available under the Cayman Islands Companies Act if the consideration under the proposed merger consists of shares listed on a national securities exchange. Therefore, no dissenters' rights are available under the Initial Merger in respect of the AGC Shares; however, holders have a redemption right as further described in this proxy statement/prospectus. See "Extraordinary General Meeting of AGC Shareholders—Redemption Rights" for a detailed description of the procedures to be followed if you wish to redeem your public shares for cash.

**Proxy Solicitation**

Proxies may be solicited by mail, telephone or in person. AGC has engaged Okapi Partners LLC to assist in the solicitation of proxies.

If a shareholder grants a proxy, it may still vote its shares at the Extraordinary General Meeting if it revokes its proxy before the Extraordinary General Meeting. A shareholder may also change its vote by submitting a later-dated proxy as described in the section entitled "Extraordinary General Meeting of AGC shareholders—Revoking Your Proxy."

**Interests of AGC's Directors and Officers in the Business Combination**

When considering the AGC Board's recommendation to vote in favor of approving the Business Combination Proposal, the Initial Merger Proposal and the Governing Documents Proposal, AGC shareholders should keep in mind that Sponsor, Sponsor Affiliate and AGC's directors and executive officers, have interests in such proposals that are different from, or in addition to (and which may conflict with), those of AGC shareholders and warrant holders generally. These interests include, among other things, the interests listed below:

- the fact that the Sponsor and AGC's directors have agreed not to redeem any AGC Class B Ordinary Shares held by them in connection with a shareholder vote to approve the proposed Business Combination;

- the fact that Sponsor paid an aggregate of $25,000 for the 12,500,000 AGC Class B Ordinary Shares currently owned by Sponsor and its directors and such securities will have a significantly higher value after the Business Combination. As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these shares, if unrestricted and freely tradable, would be $186,625,000, based upon a closing price of $14.93 per public share on NASDAQ (and will have zero value if neither this Business Combination nor any other business combination is completed on or before the Final Redemption Date);

- the fact that Sponsor paid $12,000,000 to purchase an aggregate of 12,000,000 private placement warrants, each exercisable to purchase one AGC Class A Ordinary Share at $11.50, subject to adjustment, at a price of $1.00 per warrant, and those warrants would be worthless—and the entire $12,000,000 warrant investment would be lost—if a Business Combination is not consummated by the Final Redemption Date.

- the fact that given the differential in the purchase price that Sponsor paid for the AGC Class B Ordinary Shares as compared to the price of the Units sold in AGC's IPO and the substantial number of shares of GHL Class A Ordinary Shares that Sponsor will receive upon conversion of the AGC Class B Ordinary Shares in connection with the Business Combination, the Sponsor and its affiliates may earn a positive rate of return on their investment even if the GHL Class A Ordinary Shares trade below the price initially paid for the Units in the AGC IPO and the AGC public shareholders experience a negative rate of return following the completion of the Business Combination;

- As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these warrants, if unrestricted and freely tradable, would be $56,400,000, based upon a closing price of $4.70 per AGC Warrant on NASDAQ;

- the fact that Sponsor and AGC's directors have agreed to waive their rights to liquidating distributions from the trust account with respect to any AGC Shares (other than public shares) held by them if AGC fails to complete an initial business combination by the Final Redemption Date;

45

Table of Contents

- the fact that pursuant to the Registration Rights Agreement, the Sponsor can demand that GHL register its registrable securities under certain circumstances and will also have piggyback registration rights for these securities in connection with certain registrations of securities that GHL undertakes;

- the fact that Sponsor Affiliate has agreed to purchase, pursuant to the Amended and Restated Forward Purchase Agreement with Sponsor Affiliate, 17,500,000 GHL Class A Ordinary Shares and 3,500,000 GHL Warrants for an aggregate purchase price equal to $175,000,000 immediately prior to the Closing. As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these shares and warrants, if unrestricted and freely tradable, would be $277,725,000, based upon a closing price of $14.93 per public share on NASDAQ (based upon the right to receive one GHL Class A Ordinary Share per AGC Class A Ordinary Share in connection with the Business Combination) and a closing price of $4.70 per AGC Warrant on NASDAQ (based upon the right to receive one GHL Warrant per AGC Warrant in connection with the Business Combination);

- the fact that Sponsor Affiliate has agreed, pursuant to the Sponsor Subscription Agreement, to purchase 575,000,000 GHL Class A Ordinary Shares for $10 per share for an aggregate purchase price equal to $575 million immediately prior to the Closing. As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these shares, if unrestricted and freely tradable, would be $8,584,750,000, based upon a closing price of $14.93 per public share on NASDAQ (based upon the right to receive one GHL Ordinary Share per AGC Share in connection with the Business Combination);

- the fact that Richard N. Barton, a current director of AGC, has agreed, pursuant to a PIPE Subscription Agreement, to purchase 300,000 GHL Class A Ordinary Shares for $10 per share for an aggregate purchase price equal to $3 million immediately prior to the Closing. As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these shares, if unrestricted and freely tradable, would be $4,479,000, based upon a closing price of $14.93 per public share on NASDAQ (based upon a right to receive one GHL Class A Ordinary Share per AGC Share in connection with the Business Combination);

- the fact that Sponsor Affiliate has agreed, pursuant to the Backstop Subscription Agreement, to backstop SPAC Share Redemptions (as defined in the Business Combination Agreement), and to the extent such backstop is required, will agree to subscribe for and purchase that number of GHL Class A Ordinary Shares to be determined in accordance with the terms of the Backstop Subscription Agreement, for $10 per share;

- the continued indemnification of AGC's directors and officers and the continuation of AGC's directors' and officers' liability insurance after the Business Combination (i.e. a "tail policy");

- the fact that Sponsor and AGC's officers and directors will lose their entire investment in AGC and will not be reimbursed for any out-of-pocket expenses if an initial business combination is not consummated by the Final Redemption Date;

- the fact that if the trust account is liquidated, including in the event AGC is unable to complete an initial business combination by the Final Redemption Date, the Sponsor has agreed to indemnify AGC to ensure that the proceeds in the trust account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the trust account on the liquidation date, by the claims of prospective target businesses with which AGC has discussed entering into a transaction agreement or claims of any third party for services rendered or products sold to AGC, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the trust account; and

- the fact that the Sponsor (including its representatives and affiliates) and AGC's directors and officers, are, or may in the future become, affiliated with entities that are engaged in a similar business to AGC.

46

For example, in January 2021, the Sponsor and AGC's officers launched AGC 2 for which Brad Gerstner serves as Chairman, Chief Executive Officer and President; Hab Siam serves as General Counsel and Richard N. Barton serves as a director. The Sponsor and AGC's directors and officers are not prohibited from sponsoring, or otherwise becoming involved with, any other blank check companies prior to completing the Business Combination. Accordingly, if any of AGC's officers or directors becomes aware of a business combination opportunity that is suitable for an entity to which he or she has then current fiduciary or contractual obligations (including AGC 2), he or she will honor his or her fiduciary or contractual obligations to present such Business Combination opportunity to such entity, subject to their fiduciary duties under Cayman Islands law.

The Sponsor and each AGC director have agreed to, among other things, vote all of their AGC Shares in favor of the proposals being presented at the Extraordinary General Meeting and waive their redemption rights with respect to their AGC Shares in connection with the consummation of the Business Combination. As of the date of this proxy statement/prospectus, on an as-converted basis, the Sponsor and certain AGC directors own, collectively, approximately 20% of the issued and outstanding AGC Shares.

At any time at or prior to the Business Combination, during a period when they are not then aware of any material nonpublic information regarding AGC or its securities, the Sponsor, Grab, and/or AGC's or Grab's directors, officers, advisors or respective affiliates (including separate accounts or other accounts, clients or pooled investment vehicles advised by, or affiliated with, Sponsor Affiliate or its affiliates) may purchase public shares from institutional and other investors who vote, or indicate an intention to vote, against the Business Combination Proposal, Initial Merger Proposal or the Governing Documents Proposal, or execute agreements to purchase such shares from such investors in the future, or they may enter into transactions with such investors and others to provide them with incentives to acquire public shares or vote their public shares in favor of the Business Combination Proposal, Initial Merger Proposal or Governing Documents Proposal. Such a purchase may include a contractual acknowledgement that such shareholder, although still the record or beneficial holder of AGC Shares, is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights.

If the Sponsor, Grab, and/or AGC's or Grab's directors, officers, advisors or respective affiliates (including separate accounts or other accounts, clients or pooled investment vehicles advised by, or affiliated with, Sponsor Affiliate or its affiliates) purchase shares in privately negotiated transactions from public AGC shareholders who have already elected to exercise their redemption rights, then such selling shareholder would be required to revoke their prior elections to redeem their shares. The Sponsor, Grab, and/or AGC's or Grab's directors, officers, advisors or respective affiliates (including separate accounts or other accounts, clients or pooled investment vehicles advised by, or affiliated with, Sponsor Affiliate or its affiliates) may also purchase public shares from institutional and other investors who indicate an intention to redeem AGC Shares, or, if the price per share of AGC Shares falls below $10.00 per share, then such parties may seek to enforce their redemption rights. The above-described activity could be especially prevalent in and around the time of Closing. The purpose of such share purchases and other transactions would be to increase the likelihood that the following requirements are satisfied: (i) the Business Combination Proposal is approved by the affirmative vote of the holders of a majority of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting; (ii) the Initial Merger Proposal is approved by the affirmative vote of at least two-thirds of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting; (iii) the Governing Documents Proposal is approved by the affirmative vote of at least two-thirds of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting; (iv) otherwise limit the number of public shares electing to redeem; and (v) GHL's net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) being at least $5,000,001 after giving effect to the transactions contemplated by the Business Combination Agreement and the PIPE financing. The Sponsor, Grab and/or AGC's

47

or Grab's directors, officers, advisors or respective affiliates (including separate accounts or other accounts, clients, or pooled investment vehicles advised by, or affiliated with, Sponsor Affiliate or its affiliates) may also purchase shares from institutional and other investors for investment purposes.

Entering into any such arrangements may have a depressive effect on the AGC Shares. For example, as a result of these arrangements, an investor or holder may have the ability to effectively purchase shares at a lower-than-market price and may therefore be more likely to sell the shares he, she, or they own, either at or before the Business Combination.

If such transactions are executed, then the Business Combination could be completed in circumstances where such consummation would not have otherwise occurred. Share purchases by the persons described above would allow them to exert more influence over approving the proposals to be presented at the Extraordinary General Meeting and would likely increase the chances that such proposals would be approved. AGC will file or submit a Current Report on Form 8-K to disclose any material arrangements entered into or significant purchases made by any of the aforementioned persons that would affect the vote on the proposals to be put to the Extraordinary General Meeting or the redemption threshold. Any such report will include descriptions of any arrangements entered into or significant purchases by any of the aforementioned persons.

The existence of financial and personal interests of one or more of AGC's directors results in conflicts of interest on the part of such director(s) between what he, she, or they may believe is in the best interests of AGC and what he, she, or they may believe is best for himself, herself, or themselves in determining to recommend that shareholders vote for the proposals. In addition, AGC's officers have interests in the Business Combination that may conflict with your interests as a shareholder.

Please see "The Business Combination Proposal—Interests of AGC's Directors and Officers in the Business Combination" for additional information on interests of AGC's directors and officers.

**Recommendation to Shareholders**

AGC's board of directors believes that each of the proposals to be presented at the Extraordinary General Meeting is fair to, and in the best interests of, AGC and unanimously recommends that its shareholders vote "FOR" the Business Combination Proposal, "FOR" the Initial Merger Proposal, "FOR" the Governing Documents Proposal and "FOR" the Adjournment Proposal, if presented.

**Certain Information Relating to GHL and AGC**

*GHL Listing*

GHL has applied for listing, to be effective at the time of the Closing of the Business Combination, of the GHL Class A Ordinary Shares and the GHL Warrants on NASDAQ and will obtain clearance by DTC as promptly as practicable following the issuance thereof, subject to official notice of issuance, prior to the Closing Date.

*Delisting and Deregistration of AGC*

If the Business Combination is completed, AGC Class A Ordinary Shares, AGC Warrants and AGC Units shall be delisted from NASDAQ and shall be deregistered under the Exchange Act.

**Emerging Growth Company**

Upon consummation of the Business Combination, GHL will be an "emerging growth company" as defined in the JOBS Act. GHL will remain an "emerging growth company" until the earliest to occur of (i) the last day of

48

the fiscal year (a) following the fifth anniversary of the closing of the Business Combination, (b) in which GHL has total annual gross revenue of at least $1.07 billion or (c) in which GHL is deemed to be a large accelerated filer, which means the market value of GHL Shares held by non-affiliates exceeds $700 million as of the last business day of GHL's prior second fiscal quarter, GHL has been subject to Exchange Act reporting requirements for at least 12 calendar months; and filed at least one annual report, and (ii) the date on which GHL issued more than $1.0 billion in non-convertible debt during the prior three-year period. GHL intends to take advantage of exemptions from various reporting requirements that are applicable to most other public companies, whether or not they are classified as "emerging growth companies," including, but not limited to, an exemption from the provisions of Section 404(b) of the Sarbanes-Oxley Act requiring that GHL's independent registered public accounting firm provide an attestation report on the effectiveness of its internal control over financial reporting and reduced disclosure obligations regarding executive compensation.

In addition, Section 102(b)(1) of the JOBS Act exempts "emerging growth companies" from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. GHL has elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, GHL, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of GHL's financial statements with certain other public companies difficult or impossible because of the potential differences in accounting standards used.

Furthermore, even after GHL no longer qualifies as an "emerging growth company," as long as GHL continues to qualify as a foreign private issuer under the Exchange Act, GHL will be exempt from certain provisions of the Exchange Act that are applicable to U.S. domestic public companies, including, but not limited to, the sections of the Exchange Act regulating the solicitation of proxies, consents or authorizations in respect of a security registered under the Exchange Act; the sections of the Exchange Act requiring insiders to file public reports of their stock ownership and trading activities and liability for insiders who profit from trades made in a short period of time; and the rules under the Exchange Act requiring the filing with the SEC of quarterly reports on Form 10-Q containing unaudited financial and other specified information, or current reports on Form 8-K, upon the occurrence of specified significant events. In addition, GHL will not be required to file annual reports and financial statements with the SEC as promptly as U.S. domestic companies whose securities are registered under the Exchange Act, and are not required to comply with Regulation FD, which restricts the selective disclosure of material information.

**Foreign Private Issuer**

As a "foreign private issuer," GHL will be subject to different U.S. securities laws than domestic U.S. issuers. The rules governing the information that GHL must disclose differ from those governing U.S. companies pursuant to the Exchange Act. GHL will be exempt from the rules under the Exchange Act prescribing the furnishing and content of proxy statements to shareholders. Those proxy statements are not expected to conform to Schedule 14A of the proxy rules promulgated under the Exchange Act.

In addition, as a "foreign private issuer," GHL's officers and directors and holders of more than 10% of the issued and outstanding GHL Ordinary Shares, will be exempt from the rules under the Exchange Act requiring insiders to report purchases and sales of ordinary shares as well as from Section 16 short swing profit reporting and liability. See "Risk Factors—Risks Related to GHL—GHL will qualify as a foreign private issuer within the meaning of the rules under the Exchange Act, and as such GHL is exempt from certain provisions applicable to

49

United States domestic public companies" and "Management of GHL Following the Business Combination—Foreign Private Issuer Status."

**Material Tax Consequences**

In the event that a U.S. Holder (as defined in "Material Tax Considerations – United States Federal Income Tax Considerations—General"), elects to redeem its AGC Class A Ordinary Shares for cash, the treatment of the transaction for U.S. federal income tax purposes will depend on whether the redemption qualifies as a sale or exchange of the AGC Class A Ordinary Shares under Section 302 of the Internal Revenue Code (the "Code"). If the redemption qualifies as a sale or exchange of the AGC Class A Ordinary Shares, the U.S. Holder will be treated as recognizing capital gain or loss equal to the difference between the amount realized on the redemption and such U.S. Holder's adjusted tax basis in the AGC Class A Ordinary Shares surrendered in such redemption transaction. There may be certain circumstances, however, in which the redemption may be treated as a distribution for U.S. federal income tax purposes depending on the amount of AGC Class A Ordinary Shares that such U.S. Holder owns or is deemed to own (including through the ownership of AGC warrants) after the redemption. See the section titled "Material Tax Considerations—United States Federal Income Tax Considerations—Redemption of AGC Class A Ordinary Shares."

Subject to the limitations and qualifications described in "Material Tax Considerations—United States Federal Income Tax Considerations—U.S. Federal Income Tax Consequences of the Business Combination to U.S. Holders," the Initial Merger should qualify as a "reorganization" within the meaning of Section 368(a)(1)(F) of the Code, and, as a result, a U.S. Holder should not recognize gain or loss on the exchange of AGC Class A Ordinary Shares (excluding any redeemed AGC Class A Ordinary Shares), and AGC Warrants (collectively, the "AGC Securities") for GHL Securities pursuant to the Initial Merger. The discussion in "Material Tax Considerations—United States Federal Income Tax Considerations" reflects the opinion of Ropes & Gray LLP as to the material U.S. federal income tax consequences of the Business Combination to U.S. Holders of AGC Securities, subject to the limitations, exceptions, beliefs, assumptions, and qualifications described therein and otherwise herein.

**Anticipated Accounting Treatment**

The Business Combination is made up of the series of transactions provided for in the Business Combination Agreement as described elsewhere within this proxy statement/prospectus. The transactions will be accounted for as a reverse acquisition under the acquisition method of accounting in accordance with IFRS 3, Business Combinations, whereby Grab will be considered the accounting acquirer and AGC will be treated as the acquired company. Under this method of accounting, the net assets of Grab will be stated at historical cost.

**Regulatory Matters**

The Business Combination Agreement and the transactions contemplated by the Business Combination Agreement are not subject as a closing condition to any additional federal, state or foreign regulatory requirement or approval, except for filings with the registrar of the Cayman Islands necessary to effectuate the transactions contemplated by the Business Combination Agreement.

**Risk Factor Summary**

In evaluating the proposals to be presented at the Extraordinary General Meeting of the shareholders of AGC, a shareholder should carefully read this proxy statement/prospectus and especially consider the factors discussed in the section titled "Risk Factors," a summary of which is set forth below. The occurrence of one or more of the events or circumstances described below, alone or in combination with other events or

50

Table of Contents

circumstances, may adversely affect AGC's ability to effect the Business Combination, and may have an adverse effect on the business, cash flows, financial condition and results of operations of AGC prior to the Business Combination and that of GHL subsequent to the Business Combination. Such risks include, but are not limited to:

- Grab's business is still in a relatively early stage of its growth, and if its business or superapp platform do not continue to grow, grow more slowly than Grab expects, fail to grow as large as Grab expects or fail to achieve profitability, Grab's business, financial condition, results of operations and prospects could be materially and adversely affected.

- Grab faces intense competition across the segments and markets it serves.

- Grab has incurred net losses in each year since inception and may not be able to continue to raise sufficient capital or achieve or sustain profitability.

- Grab's ability to decrease its net losses and achieve profitability is dependent on its ability to reduce the amount of partner and consumer incentives it pays relative to the commissions and fees it receives for its service.

- Grab's business is subject to numerous legal and regulatory risks that could have an adverse impact on Grab's business and prospects.

- Grab's brand and reputation are among its most important assets and are critical to the success of its business.

- The COVID-19 pandemic has materially impacted Grab's business, is still ongoing, and it or other pandemics or public health threats could adversely affect Grab's business, financial condition, results of operations and prospects.

- If Grab fails to manage its growth effectively, its business, financial condition, results of operations and prospects could be materially and adversely affected.

- Grab is subject to various laws with regard to anti-corruption, anti-bribery, anti-money laundering and countering the financing of terrorism and has operations in certain countries known to experience high levels of corruption. Grab's audit and risk committee led an investigation into potential violations of certain anti-corruption laws related to its operations in one of the countries in which it operates and has voluntarily self-reported the potential violations to the U.S. Department of Justice. There can be no assurance that failure to comply with any such laws would not have a material adverse effect on it.

- If Grab is required to reclassify drivers as employees or otherwise, or if driver-partners and/or employees unionize, there may be adverse business, financial, tax, legal and other consequences.

- If Grab is unable to continue to grow its base of platform users, including driver- or merchant-partners and consumers accessing Grab's offerings, Grab's value proposition for each such constituent group could diminish, impacting its results of operations and prospects.

- Security, privacy, or data breaches involving sensitive, personal, or confidential information could also expose Grab to liability under various laws and regulations across jurisdictions, decrease trust in the Grab platform, and increase the risk of litigation and governmental investigation.

- GHL will qualify as a foreign private issuer within the meaning of the rules under the Exchange Act, and as such GHL is exempt from certain provisions applicable to United States domestic public companies.

- Industry data, forecasts and estimates, including the Projections, contained in this proxy statement/prospectus are inherently uncertain and subject to interpretation, and may not be an indication of the actual results of the transaction or Grab's future results. Accordingly, you should not place undue reliance on such information.

51

Table of Contents

- AGC did not obtain an opinion from an independent investment banking or accounting firm, and consequently, you have no assurance from an independent source that the price AGC is paying in connection with the Business Combination is fair to AGC from a financial point of view.

- The COVID-19 pandemic triggered an economic crisis which may delay or prevent the consummation of the Business Combination.

- The Business Combination remains subject to conditions that AGC cannot control and if such conditions are not satisfied or waived, the Business Combination may not be consummated.

- The other risks and uncertainties discussed in "Risk Factors" elsewhere in this proxy statement/prospectus.

52

**FORWARD-LOOKING STATEMENTS**

This proxy statement/prospectus includes statements that express AGC's, GHL's and Grab's opinions, expectations, beliefs, plans, objectives, assumptions or projections regarding future events or future results of operations or financial condition and therefore are, or may be deemed to be, "forward-looking statements." These forward-looking statements can generally be identified by the use of forward-looking terminology, including the terms "believes," "estimates," "anticipates," "expects," "seeks," "projects," "intends," "plans," "may," "will" or "should" or, in each case, their negative or other variations or comparable terminology. These forward-looking statements include all matters that are not historical facts. They appear in a number of places throughout this proxy statement/prospectus and include statements regarding AGC's, GHL's and Grab's intentions, beliefs or current expectations concerning, among other things, the Business Combination, the benefits and synergies of the Business Combination, including anticipated cost savings, results of operations, financial condition, liquidity, prospects, growth, strategies, future market conditions or economic performance and developments in the capital and credit markets and expected future financial performance, the markets in which Grab operates as well as any information concerning possible or assumed future results of operations of the combined company after the consummation of the Business Combination. Such forward-looking statements are based on available current market material and management's expectations, beliefs and forecasts concerning future events impacting AGC, Grab and GHL. Factors that may impact such forward-looking statements include:

- Developments related to the COVID-19 pandemic, including, among others, with respect to stay-at-home orders, social distancing measures, the success of vaccine rollouts, numbers of COVID-19 cases and the occurrence of new COVID-19 strains;

- The regulatory environment and changes in laws, regulations or policies in the jurisdictions in which Grab operates;

- Grab's ability to successfully compete in highly competitive industries and markets;

- Grab's ability to continue to adjust its offerings to meet market demand, attract users to the Grab platform and grow its ecosystem;

- Political instability in the jurisdictions in which Grab operates;

- Breaches of laws or regulations in the operation and management of Grab's current and future businesses and assets;

- The overall economic environment and general market and economic conditions in the jurisdictions in which Grab operates;

- Grab's ability to execute its strategies, manage growth and maintain its corporate culture as it grows;

- Grab's anticipated investments in new products and offerings, and the effect of these investments on its results of operations;

- Changes in the need for capital and the availability of financing and capital to fund these needs;

- Anticipated technology trends and developments and Grab's ability to address those trends and developments with its products and offerings;

- The safety, affordability, convenience and breadth of the Grab platform and offerings;

- Man-made or natural disasters, including war, acts of international or domestic terrorism, civil disturbances, occurrences of catastrophic events and acts of God such as floods, earthquakes, wildfires, typhoons and other adverse weather and natural conditions that affect Grab's business or assets;

- The loss of key personnel and the inability to replace such personnel on a timely basis or on acceptable terms;

- Exchange rate fluctuations;

53

Table of Contents

- Changes in interest rates or rates of inflation;

- Legal, regulatory and other proceedings;

- Changes in applicable laws or regulations, or the application thereof on Grab;

- The number and percentage of AGC shareholders voting against the Business Combination Proposal, the Initial Merger Proposal, the Governing Documents Proposal and/or seeking redemption;

- The occurrence of any event, change or other circumstances that could give rise to the termination of the Business Combination Agreement;

- GHL's ability to initially list, and once listed, maintain the listing of its securities on NASDAQ following the Business Combination; and

- The results of future financing efforts.

The forward-looking statements contained in this proxy statement/prospectus are based on AGC's, Grab's and GHL's current expectations and beliefs concerning future developments and their potential effects on the Business Combination and GHL. There can be no assurance that future developments affecting AGC, GHL and/or Grab will be those that AGC, Grab or GHL has anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond either AGC's, GHL's or Grab's control) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described under the heading "Risk Factors." Should one or more of these risks or uncertainties materialize, or should any of the assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. AGC, Grab and GHL will not undertake any obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

Before a shareholder grants its proxy, instructs how its vote should be cast or votes on the Business Combination Proposal, the Initial Merger Proposal, the Governing Documents Proposal or the Adjournment Proposal, it should be aware that the occurrence of the events described in the "Risk Factors" section and elsewhere in this proxy statement/prospectus may adversely affect AGC, GHL and/or Grab.

54

**RISK FACTORS**

*You should carefully consider the following risk factors, together with all of the other information included in this proxy statement/prospectus, before you decide whether to vote or instruct your vote to be cast to approve the proposals described in this proxy statement/prospectus. Certain of the following risk factors apply to the business and operations of Grab and will also apply to the business and operations of GHL following the completion of the Business Combination. The occurrence of one or more of the events or circumstances described in these risk factors, alone or in combination with other events or circumstances, may adversely affect the ability to complete or realize the anticipated benefits of the Business Combination, and may have a material adverse effect on the business, financial condition, results of operations, prospects and trading price of GHL following the Business Combination. The risks discussed below may not prove to be exhaustive and are based on certain assumptions made by GHL, AGC and Grab, which later may prove to be incorrect or incomplete. GHL, AGC and Grab may face additional risks and uncertainties that are not presently known to them, or that are currently deemed immaterial, but which may also ultimately have an adverse effect on any such party.*

**Risks Relating to Grab's Business**

*Grab's business is still in a relatively early stage of its growth, and if its business or superapp platform do not continue to grow, grow more slowly than Grab expects, fail to grow as large as Grab expects or fail to achieve profitability, Grab's business, financial condition, results of operations and prospects could be materially and adversely affected.*

Although Grab's business has grown rapidly, Grab's businesses in Southeast Asia and in particular Grab's superapp platform are relatively new, and there is no assurance that Grab will be able to achieve and maintain growth and profitability across all of its business segments. There is also no assurance that market acceptance of Grab's offerings will continue to grow or that new offerings will be accepted. In addition, Grab's business could be impacted by macro-economic conditions and their effect on discretionary consumer spending, which in turn could impact consumer demand for offerings made available through the Grab platform.

Grab's management believes that Grab's growth depends on a number of factors, including its ability to:

- expand and diversify Grab's deliveries, mobility, financial services and other offerings, which include innovating in new areas such as financial services and often requires Grab to make long-term investments and absorb losses while it builds scale;

- maintain and/or increase the scale of Grab's driver- and merchant-partner base and increase consumer usage of the Grab platform and the synergies within Grab's ecosystem;

- optimize Grab's cost efficiency;

- reduce incentives paid to driver-partners, merchant-partners and consumers;

- enhance and develop Grab's superapp, the tools Grab provides its driver- and merchant-partners and payments network along with its other technology and infrastructure;

- recruit and retain high quality industry talent;

- expand Grab's business in the countries in which it operates, which requires managing varying infrastructure, regulations, systems and user expectations and implementing Grab's hyperlocal approach to operations;

- expand into business activities where Grab has limited experience, such as offline businesses, or no experience at all;

- manage price sensitivity and driver- and merchant-partner and consumer preferences by segment and geographic location, particularly as Grab aims to increase market penetration within its markets;

- maintain and enhance Grab's reputation and brand;

- ensure adequate safety and hygiene standards are established and maintained across its offerings;

55

**Table of Contents**

- continue to form strategic partnerships, including with leading multinationals and global brands;

- manage Grab's relationships with stakeholders and regulators in each of its markets, as well as the impact of existing and evolving regulations;

- obtain and maintain licenses and regulatory approvals that may be required for its financial services or other offerings;

- compete effectively with Grab's competitors; and

- manage the challenges associated with the COVID-19 pandemic.

Grab may not successfully accomplish any of these objectives.

In addition, achieving profitability will require Grab, for example, to continue to grow and scale its business, manage promotion and incentive spending, improve monetization, reduce marketing and other spending and increase consumer spending. Grab's growth so far has been driven in part by incentives Grab offers driver-partners, merchant-partners and consumers. As Grab has achieved greater scale, it has and may continue to seek to reduce incentives, which can impact both profitability and growth.

Grab cannot assure you that it will be able to continue to grow and manage each of its segments or its superapp platform or achieve or maintain profitability. Grab's success will depend to a substantial extent on its ability to develop appropriate strategies and plans, including Grab's sales and marketing efforts, and implement such plans effectively. If driver- and merchant-partners and consumers accessing offerings through the Grab platform do not perceive it as beneficial, or choose not to utilize it, then the market for Grab's business may not further develop, may develop more slowly than Grab expects, or may not achieve the growth potential or profitability Grab expects, any of which could materially and adversely affect Grab's business, financial condition, results of operations and prospects.

*Grab faces intense competition across the segments and markets it serves.*

Grab faces competition in each of its segments and markets. The segments and markets in which Grab operates are intensely competitive and characterized by shifting user preferences, fragmentation, and introductions of new services and offerings. Grab competes both for driver- and merchant-partners and for consumers accessing offerings through its platform.

Grab's competitors may operate in single or multiple segments and in a single market or regionally across multiple markets. These competitors may be well-established or new entrants and focused on providing low-cost alternatives or higher quality offerings, or any combination thereof. New competitors may include established players with existing businesses in other segments or markets that expand to compete in Grab's segments or markets. Competitors focused on a limited number of segments or markets may be better able to develop specialized expertise or employ resources in a more targeted manner than Grab does. Such competitors may also enjoy lower overhead costs by not operating across multiple segments and markets. Grab's competitors in certain geographic markets may enjoy competitive advantages such as reputational advantages, better brand recognition, longer operating histories, larger marketing budgets, better localized knowledge, and more supportive regulatory regimes and may also offer discounted services, driver- or merchant-partner incentives, consumer incentives, discounts or promotions, innovative products and offerings, or alternative pricing models. From time to time competitive factors have caused, and may continue to cause Grab to reduce prices or fees and commissions and increase driver-partner, merchant-partner or consumer incentives and marketing expenses, which has impacted and could continue to impact its revenues and costs. Furthermore, the rise of nationalism coupled with government policies favoring the creation or growth of local technology companies could favor Grab's competitors and impact Grab's position in Grab's markets. In addition, some of Grab's competitors may consolidate to expand their market position and capabilities. For example, in May 2021 there was a merger between Indonesia-based Gojek, which operates in the ride-hailing and deliveries business and Tokopedia, an e-commerce platform.

56

**Table of Contents**

In Grab's segments and markets, the barriers to entry are low and driver- and merchant-partners and consumers may choose alternative platforms or services. Grab's competitors may adopt certain of its product features, or may adopt innovations that consumers or driver- or merchant-partners value more highly than Grab's, which could render the offerings on the Grab platform less attractive or reduce Grab's ability to differentiate its offerings. Grab's driver-partners may shift to the platform with the highest earning potential or highest volume of work, and its merchant-partners may shift to the platform that provides the lowest fees and commissions or the highest volume of business or other opportunities to increase profitability. Driver- and merchant-partners and consumers may shift to the platform that otherwise provides them with the best opportunities. Consumers may access driver or merchant goods or services through the lowest-cost or highest-quality provider or platform or a provider or platform that provides better choices or a more convenient technology platform. With respect to the Grab platform, driver- and merchant-partners and consumers may shift to other platforms based on overall user experience and convenience, tools to enhance profitability, integration with mobile and networking applications, quality of mobile applications, and convenience of payment settlement services.

In Grab's deliveries segment, it faces competition from regional players such as Foodpanda and Gojek (primarily in Indonesia) and single market players in Southeast Asia, including Deliveroo in Singapore, Now and Baemin in Vietnam and Line Man Wongnai and Robinhood in Thailand. In addition, many chain merchants have their own online ordering platforms and pizza companies, such as Domino's and other merchants often own and operate their own delivery fleets. Consumers also have other options through offline channels such as in-restaurant and take-out dining, and buying directly from supermarkets, grocery and convenience stores, which may have their own delivery services. The Grab platform also competes with last-mile package delivery services including on-demand services such as Gojek and Lalamove, and single market players such as AhaMove in Vietnam.

In Grab's mobility segment, it faces competition from Gojek in Indonesia and certain other Southeast Asian countries, licensed taxi operators such as ComfortDelGro in Singapore and traditional ground transportation services, including taxi-hailing. In addition, consumers have other options including public transportation and personal vehicle ownership.

While Grab's payments and financial services offerings compete with offline options such as cash and credit and debit cards, interbank transfers, traditional banks and other financial institutions, as well as other electronic payment system operators, Grab's competitors in digital payment services also include ShopeePay, GoPay, and Google Pay and single market players such as Dana in Indonesia and Touch 'n Go in Malaysia.

In addition, while Grab has non-competition agreements which were put in place in connection with transactions with certain of its shareholders, namely Uber Technologies, Inc. ("Uber") and Didi Chuxing Technology Co. ("Didi") that contractually restrict them from competing with Grab in Southeast Asia, such agreements are subject to limited terms. Uber previously operated in the ride-hailing and food deliveries businesses in Southeast Asia prior to Grab's acquisition of Uber's business in Southeast Asia in 2018. The non-competition agreement with Uber expires on the later of March 25, 2023, or one year after Uber disposes of all shareholdings in Grab. The non-competition agreement with Didi was suspended in April 2021 and will formally expire upon the closing of the Business Combination. The non-competition agreement with Didi will be reinstated if the Business Combination does not close but will expire 12 months after Didi ceases to own any shares in Grab. Although the suspension of the non-competition agreement with Didi has not had any material impact on Grab's business to date, if Didi enters, or Uber re-enters, Grab's markets, Grab could face more intense competition, which could in turn materially impact Grab's ability to bring driver- and merchant-partners and consumers onto its platform, cause Grab to lose market share, impact its pricing and/or require Grab to increase its incentives in order to retain market share. Furthermore, both Uber and Didi could have certain competitive advantages compared to other new entrants into Grab's markets given their familiarity with the markets as shareholders of Grab, and in the case of Uber, due also to its previous operations in Southeast Asia prior to Grab's acquisition of Uber's business in Southeast Asia.

Any failure to successfully compete could materially and adversely affect Grab's business, financial condition, results of operations and prospects.

***Grab has incurred net losses in each year since inception and may not be able to continue to raise sufficient capital or achieve or sustain profitability.***

Grab incurred net losses of $1.5 billion, $2.7 billion and $4.0 billion, and had net cash outflows from operating activities of $303 million, $643 million and $2.1 billion, in the six months ended June 30, 2021 and the years ended December 31, 2020 and 2019, respectively. Grab invests significantly in its business, including, among others, (i) expanding the deliveries, mobility and financial services offerings on its platform; (ii) increasing the scale of its driver- and merchant-partner base and consumer base accessing offerings on its platform; (iii) developing and enhancing its superapp, (iv) enhancing the tools that it provides for its driver- and merchant-partners, its payments network and other technology and infrastructure and (v) recruiting of quality industry talent. Grab is also developing its business across more than 400 cities in Southeast Asia, where each country has different infrastructure, regulations, systems and user expectations, with a strategy that involves a hyperlocal approach to Grab's operations, all of which requires more investment than if it only operated in one country and a smaller number of cities. Grab's offerings such as GrabRentals and GrabKitchen, require Grab to make investments and develop scale in order to achieve profitability. To be competitive in certain markets, generate scale and increase liquidity, from time to time Grab lowers fees and offers driver-partner, merchant-partner and consumer incentives, which also reduces its revenue. The COVID-19 pandemic has also had a material adverse impact on certain parts of Grab's business in 2020 and 2021 and may continue to impact Grab's results. Grab will continue to require significant capital investment to support its business. Issuances of equity or convertible debt securities could cause existing shareholders to suffer significant dilution, and any new equity securities issued may have rights, preferences, and privileges superior to those of existing shareholders. Debt financing could contain restrictive covenants relating to financial and operational matters including restrictions on the ability to incur additional secured or unsecured indebtedness that may make it more difficult to obtain additional capital with which to pursue business opportunities. Grab may not be able to obtain additional financing on acceptable terms, if at all.

In addition, Grab's liabilities exceeded its assets by $7.0 billion, $6.3 billion and $4.2 billion as of June 30, 2021 and December 31, 2020 and 2019, respectively. Furthermore, Grab had accumulated losses of $11.9 billion, $10.5 billion as of June 30, 2021 and December 31, 2020, respectively. To support its business plans, Grab raises funding primarily through the issuance of convertible redeemable preference shares, and Grab raised $262 million, $1.4 billion and $1.9 billion of cash during the six months ended June 30, 2021 and the years ended December 31, 2020 and 2019, respectively, through the issuance of convertible redeemable preference shares. Such convertible redeemable preference shares will be cancelled and converted into the right to receive GHL Ordinary Shares upon completion of the Business Combination and as a result, following completion, Grab will no longer recognize any liability component nor any interest expense incurred with respect to such convertible redeemable preference shares. In addition, Grab secured $2.0 billion of financing under the Term Loan B Facility in the first half of 2021. As a result of the capital Grab has raised and the cash and cash equivalents it has had on hand, together with an assessment of its business plans, budgets and forecasts, Grab's management has been able to conclude that it is appropriate for Grab's consolidated financial statements to be prepared on a "going concern" basis.

Any failure to increase Grab's revenue, manage the increase in its operating expenses, continue to raise capital, manage its liquidity or otherwise manage the effects of net liabilities, net losses and net cash outflows, could prevent Grab from continuing as a going concern or achieving or maintaining profitability.

**Table of Contents**

**Grab's ability to decrease its net losses and achieve profitability is dependent on its ability to reduce the amount of partner and consumer incentives it pays relative to the commissions and fees it receives for its service.**

Grab has paid significant amounts of incentives to attract new driver and merchant partners and consumers to its services in order to grow its business and generate new demand for its services and may continue to do so in the future. These incentives, which are typically in the form of additional payments made to partners and consumers, have in the past and may in the future exceed the amount of the commissions and fees that Grab receives for its services. Grab's revenues are reported net of partner and consumer incentives, so if incentives exceed Grab's commissions and fees received, it can result in Grab reporting negative revenue. For the years ended December 31, 2019 and 2020 and the six months ended June 30, 2021, Grab incurred incentives of $2,351 million, $1,237 million and $740 million, respectively (comprised of partner incentives of $1,234 million, $621 million, and $311 million, respectively, and consumer incentives of $1,117 million, $616 million and $429 million, respectively) resulting in reductions to Grab's reported revenues of the same amounts, which in the case of the year ended December 31, 2019 resulted in Grab reporting negative revenues of $(845) million. Notwithstanding Grab's use of significant incentive payments to encourage use of its platform, Grab's monthly transacting users nevertheless declined from approximately 29.2 million in the year ended December 31, 2019 to approximately 24.5 million for the year ended December 31, 2020, in part due to the impact of the COVID-19 pandemic on Grab's mobility segment, and thereafter remained relatively stagnant at approximately 24.3 million for the six months ended June 30, 2021.

Grab's ability to increase its revenues and, in turn, decrease its net losses and achieve profitability is therefore significantly dependent on its ability to effectively use incentives to encourage the use of its platform and over time to reduce the amount of incentives it pays to both its driver and merchant partners and consumers of its services relative to the amount of commissions and fees it receives for its services. If Grab is unable to reduce the amount of incentives it pays over time relative to the commissions and fees it receives, it will likely impact Grab's ability to increase its revenues, raise capital, reduce its net losses and achieve profitability and reduce its net cash outflows, any or all of which could prevent Grab from continuing as a going concern or achieving or maintaining profitability. In addition, given Grab's use of incentives to encourage use of its platform, future decreases in the use of incentives could also result in decreased growth in the number of users and driver- and merchant-partners or an overall decrease in users and driver- and merchant-partners and decreases in its revenues, which could negatively impact its financial condition and results of operations.

***Grab's business is subject to numerous legal and regulatory risks that could have an adverse impact on Grab's business and prospects.***

Grab operates across the deliveries, mobility and financial services segments in over 400 cities in the large, diverse and complex Southeast Asian region. Each of Grab's segments is subject to various regulations in each of the jurisdictions in which Grab operates.

Focus areas of regulatory risk that Grab is exposed to include, among others: (i) evolution of laws and regulations applicable to deliveries, mobility and/or financial services offerings, (ii) various forms of data regulation such as data privacy, data localization, data portability, cybersecurity and advertising or marketing, (iii) gig economy regulations, (iv) anti-trust regulations, (v) economic regulations such as price, supply regulation, safety, health, environment regulations, (vi) foreign ownership restrictions, (vii) artificial intelligence regulation and (viii) regulations regarding the provision of online services, including with respect to the internet, mobile devices and e-commerce.

In addition, Grab may not be able to obtain all the licenses, permits and approvals that may be necessary to provide its offerings and those it plans to offer. Because the industries Grab operates in are relatively new and disruptive in Grab's markets, the relevant laws and regulations, as well as their interpretations, are often unclear and evolving in certain jurisdictions. This can make it difficult for Grab to assess which licenses and approvals are necessary for its business, or the processes for obtaining such licenses in certain jurisdictions. For these reasons, Grab also cannot be certain that Grab will be able to maintain the licenses and approvals that Grab has

59

**Table of Contents**

previously obtained, or that once they expire Grab will be able to renew them. Grab cannot be sure that its interpretations of the rules and their exemptions have always been or will be consistent with those of the local regulators. As Grab expands its businesses, and in particular its financial services business, Grab may be required to obtain new licenses and will be subject to additional laws and regulations in the markets Grab plans to operate in.

Grab's business is subject to regulations from various regulators within each jurisdiction it operates in, and such regulators may not always act in concert. As a result, Grab may be subject to requirements which separately may not be materially adverse to Grab but when taken together could have a material impact on Grab. In addition, Grab is subject to differing, and sometimes conflicting, laws and regulations in the markets in which it operates.

Segments of Grab's businesses that are currently unregulated could become regulated, or segments of Grab's businesses that are already regulated could be subject to new and changing regulatory requirements. Various proposals which may impact Grab's business are currently before various national, regional, and local legislative bodies and regulatory entities regarding issues related to Grab's business and business model. For example, in Thailand, there are regulations which regulate how Grab calculates fees and the transportation fares. Additionally, under new regulations in Vietnam, Grab may be required to obtain a transport license in each province or city where mobility services are provided through the Grab platform. Grab is currently engaging with national-level as well as provincial and city-level regulators on this requirement, which poses practical constraints for implementation, given that Grab believes these requirements are not appropriate or suited to a platform business such as Grab. Pending the outcome of these engagement efforts, including how this requirement may be addressed under the new regulations, Grab may be required to make operational adjustments to comply with the necessary regulatory requirements, in order to avoid incurring penalties or disruptions in operations, which could involve significant costs or may not be practicable.

Compliance with existing or new laws and regulations could expose Grab to liabilities or cause it to incur significant expenses or otherwise impact its offerings or prospects. For example, in Malaysia, in order for Grab to operate GrabExpress on a nationwide scale, Grab is required to obtain a Class B license. However, Grab's application for such license was rejected due to a moratorium on new applications. As a consequence, Grab is not allowed to deliver non-food items weighing less than two kilograms, although Grab is still allowed to deliver food and fresh produce and non-food items weighing more than two kilograms. In addition, any non-compliance resulting from Grab's consumers using GrabExpress to ship non-food items weighing less than two kilograms, over which Grab has no control, could subject Grab to a penalty of RM300,000 (approximately $73,000) and/or incarceration of no more than three years. In Thailand, the Royal Decree on the Supervision of Digital Platform Service Business (the "ETDA Law"), issued by the Electronic Transactions Development Agency (the "ETDA"), was approved on October 25, 2021 by the cabinet of Thailand and is expected to become effective by March 2022 (with a grace period of 210 days and a tentative plan to issue relevant implementation rules and regulations within 180 days of the publication of the ETDA Law). If Grab's business as a platform service provider or certain of Grab's businesses in Thailand are considered by the ETDA to be "digital service platform businesses" regulated under the ETDA Law, Grab's businesses in Thailand may be adversely affected because the ETDA Law gives the ETDA broad discretion to enforce the terms of the ETDA Law and to protect consumers of digital platform businesses. The ETDA's enforcement powers include the ability: (i) to order suspension and/or discontinuation of businesses if any breach of the ETDA Law is not remedied; (ii) to order digital platform services providers to share information including potentially commercially sensitive information with consumers and other government agencies; (iii) to impose additional obligations on digital service platform businesses; (iv) before any digital services platform business providers can exit the businesses that the ETDA has jurisdiction over, to take any action to protect or prevent any damage which may potentially incurred by consumers; and (v) to coordinate with the Office of Trade Competition Commission if there is any breach of the Trade Competition Act B.E. 2560. However, the exact impact the ETDA Law may have on Grab is unclear and will depend on the approach that the ETDA takes with respect to enforcing this law once it becomes effective in March 2022, and Grab intends to actively monitor and engage with the ETDA both prior to and after the law

60

becomes effective in order to manage the impact on Grab, if any. There also has been pressure on governments in Southeast Asia to increase or introduce new taxes on the technology sector as it becomes a more important and profitable portion of the economy. In addition, as Grab expands its offerings in new areas, such as financial services and mapping or geospatial technology, Grab may become subject to additional laws and regulations, which may require licenses to be obtained for Grab to provide new offerings or continue to provide existing offerings in the relevant jurisdictions. Further, developments in environmental regulations, such as those applicable to vehicles that run on fossil fuels and those limiting the use of single-use packaging and utensils, may adversely impact Grab's mobility and delivery businesses.

Grab is subject to laws and regulations that impose general requirements and provide regulators with broad discretion in determining compliance with such laws and regulations. Regulators may interpret laws and regulations in a manner differently than Grab and may have broad discretion in determining any sanctions or remedial measures. Many jurisdictions in which Grab operates currently do not require a commercial taxi license or delivery license for the driver-partners on its platform. However, local regulators may decide to enforce or enact local regulations requiring licenses, imposing caps on drivers or vehicles, mandating drivers to join a licensed entity or which impose other requirements, such as minimum age requirements for driver-partners. There are also regulations with respect to how fares are set between Grab and such special rental transportation companies and regulations requiring delivery driver-partners to join licensed courier companies prior to providing point-to-point delivery services through a platform such as the Grab platform. If regulations evolve or regulators change current policy or enforce local regulations, Grab may face added complexity and risks in providing deliveries and mobility offerings on its platform. In addition, regulators in some jurisdictions impose a cap on both the supply and fares applicable to Grab's operations, and although Grab has in the past been able to obtain approval to increase capacity when needed, there can be no assurance that Grab will continue to obtain approval to increase capacity to meet demand, which could impact its business and prospects. If Grab or drivers become subject to further caps, limitations, or licensing requirements, Grab's business, financial condition, results of operations and prospects would be adversely impacted. In certain jurisdictions, there has been public pressure to impose limits on the commissions payable by merchant partners to platforms such as Grab, which, if imposed, could impact Grab's deliveries business.

In addition, since Grab operates across eight countries, Grab is subject to the risk that regulatory scrutiny or actions in one country may lead to other regulators taking similar actions. Grab, with its significant and varied group of stakeholders, is highly visible to regulators across its markets. Dissatisfaction among stakeholder groups could trigger regulator intervention, impacting Grab.

Grab's actual or perceived failure to comply with applicable regulation could expose it to regulatory actions, including, but not limited to, potential fines, orders to temporarily or permanently cease all or some of its business activities, a prohibition on taking on new consumers, driver-partners or merchant-partners and the implementation of mandated remedial measures. Any such actions could materially and adversely affect Grab's business, financial condition, results of operations and prospects.

***Grab's brand and reputation are among its most important assets and are critical to the success of its business.***

Grab's brand and reputation are among its most important assets. "Grab" is a household name in the markets in which it operates that is synonymous with its offerings. Successfully maintaining, protecting, and enhancing Grab's brand and reputation are critical to the success of its business, including the ability to attract and maintain employees, driver- and merchant-partners and consumers accessing offerings available on the Grab platform, and otherwise expand its deliveries, mobility and financial services offerings. Grab's brand and reputation are also important to its ability to maintain its standing in the markets Grab serves, including with regulators and community leaders. Any harm to Grab's brand could lead to regulatory action, litigation and government investigations and weaken Grab's ability to effect legislative changes and obtain licenses. In addition, because Grab operates regionally across Southeast Asia and various segments, including deliveries, mobility and financial services, an adverse impact on Grab's brand or reputation in one market or segment can adversely affect other parts of Grab's business.

61

**Table of Contents**

A variety of factors and/or incidents, including those that are actual and within Grab's control, as well as those that are perceived, rumored, or outside of Grab's control or responsibility, can adversely impact Grab's brand and reputation, such as:

- complaints or negative publicity, including those related to personal injury or sexual assault cases involving consumers using Grab's mobility offerings or other third parties;

- issues with the choices and quality of Grab's products and offerings or trust in its offerings;

- illegal or inappropriate behavior by employees, consumers or driver-partners or merchant-partners or other third parties Grab works with, including relating to the safety of consumers and driver- and merchant-partners;

- improper, unauthorized, or illegal actions by third-parties who conduct fraudulent or other activities, such as phishing-attacks;

- the convenience and reliability of Grab's superapp and technology platform, as well as any cybersecurity incidents affecting, disruptions to the availability of or defects in its platform or superapp;

- issues with the pricing of Grab's offerings or the terms on which Grab does business with platform users including consumers and driver- and merchant-partners;

- service delays or failures, such as missing, incorrect or cancelled fulfillment of orders or rides, or issues with cleanliness, food tampering or inappropriate or unsanitary food preparation, handling or delivery;

- lack of community support, interest or involvement, including protests or other negative publicity that may stem from a variety of factors beyond Grab's control, such as the general political environment or a rise in nationalism in any of the markets where Grab operates;

- failing to act responsibly or in compliance with regulatory requirements, some of which may be evolving or ambiguous, in areas including labor, anti-corruption, anti-money laundering, safety and security, data security, privacy, provision of information about consumers and activities on the Grab platform, or environmental requirements in areas including emissions, sustainability, human rights, diversity, non-discrimination and support for employees, driver- and merchant-partners and local communities; and

- media or legislative scrutiny or litigation or investigations by regulators or other third parties.

Any harm to Grab's brand or reputation, including as a result of or related to any of the foregoing, could materially and adversely affect Grab's business, financial condition, results of operations and prospects.

***The COVID-19 pandemic has materially impacted Grab's business, is still ongoing, and it or other pandemics or public health threats could adversely affect Grab's business, financial condition, results of operations and prospects.***

The ongoing COVID-19 pandemic has globally resulted in loss of life, business closures, restrictions on travel, and widespread cancellation of social gatherings, has impacted and continues to impact Grab's business, and has impaired the fair value of certain of Grab's investments, goodwill and the recoverable value of its vehicles. In particular, Grab's business segments were impacted as follows:

- *Deliveries*: Grab's deliveries segment experienced significant year-on-year GMV and revenue growth from 2019 to 2020 as consumer adoption of deliveries offerings increased in light of the stay-at-home and movement control orders, work-from-home arrangements and social distancing measures imposed as a result of the COVID-19 pandemic. In light of growing demand, Grab invested in scaling up offerings, such as GrabMart and GrabExpress. However, as the pandemic subsides and governments ease COVID-19 measures, demand for deliveries offerings may decline or may not continue to grow at

similar levels. Furthermore, although Grab's deliveries segment experienced significant overall growth, the pandemic led to closures of many restaurants and merchant-partners, and many of Grab's partners are still struggling due to substantial declines in dine-in eating and demand in general. To the extent this impacts the breadth of options available to consumers through its platform, usage of the Grab platform could be impacted, which could in turn impact the attractiveness of and level of activity across Grab's ecosystem of consumers, and driver- and merchant-partners using the Grab platform.

•    *Mobility*: Grab experienced a year-on-year decline in GMV from 2019 to 2020 in its mobility segment resulting from a sharp decrease in rides booked through the Grab platform, although revenue increased year on year. Demand was particularly low during March and April 2020 as stay-at-home orders were imposed in Grab's key markets. Although demand for mobility offerings experienced some recovery in some of its key markets, such as Singapore and Vietnam, in the second half of 2020, this segment continues to be impacted by stay-at-home or movement control orders, work-from-home arrangements, travel restrictions and social distancing measures that reduce commuter traffic and demand for rides. In the first and second quarter of 2021, Grab's mobility business continued to be impacted by increases in COVID-19 cases in its markets, including due to the emergence of new COVID-19 variants and related reinstatement of movement control orders and other social distancing measures. In markets where stay-at-home or movement control orders have been lifted, demand has not yet returned to pre-pandemic levels. In addition, in order to comply with social distancing requirements and improve safety, Grab from time to time modifies or suspends certain offerings, such as its GrabShare and GrabHitch offerings, particularly as governments modify rules or guidelines in order to combat the pandemic. There can be no assurance that demand for Grab's mobility offerings will return to pre-pandemic levels or that Grab will resume all of its mobility offerings in the near future or at all in all of its markets.

•    *Financial Services*: Grab's financial services business was primarily impacted by the drop in demand for mobility offerings, a decrease in off-platform spending and other COVID-19 measures, which partially offset growth in deliveries-related payments, impacting growth in payment volume. In addition, its lending business was impacted by COVID-19, driven by closures of businesses, a decline in general consumer spending, and compulsory repayment holidays implemented by governments in certain of Grab's markets. Grab also took a more conservative approach to loan origination as Grab was mindful of the potential effect of COVID-19's economic impact on creditworthiness of consumers, and Grab delayed the marketing plans of certain insurance products such as travel insurance due to reduced travel.

The extent to which the COVID-19 pandemic will continue to impact Grab's business going forward depends on future developments, which are highly uncertain and cannot be predicted at this time, including:

•    the occurrence of new COVID-19 strains and other new developments that may emerge concerning the severity of the disease;

•    the efficacy of current and future vaccines and treatments and the speed of vaccine or treatment roll-outs;

•    the duration and nature of stay-at-home orders, social distancing measures, business closures or capacity limits, travel restrictions, and other measures implemented to combat the spread of the disease;

•    the economic impact of the pandemic in the markets in which Grab operates, which could impact demand for offerings or opportunities on the Grab platform by consumers and driver- and merchant-partners;

•    the continued provision of support and relief to small businesses, residents and economic activity by governments in the countries in which Grab operates, such as in Singapore and Malaysia where the government has implemented substantial and comprehensive support measures that have benefited the population, including consumers and driver- and merchant-partners;

**Table of Contents**

- government measures, intervention or subsidies, or increased government scrutiny with respect to Grab's business or industry, which could impact, among other things, the competitive landscape in Grab's markets and cause Grab to incur unforeseen expenses;

- other business disruptions that affect Grab's workforce;

- the impact on capital and financial markets;

- impairment charges associated with goodwill, long-lived assets, investments and other acquired intangible assets; and

- other unforeseen operating difficulties and expenditures.

Grab's ability to mitigate the impact of COVID-19 on its overall business has been partly driven by Grab's ability to adapt to changes in consumer demand and preferences and the versatility of its platform. For example, as demand in Grab's mobility segment decreased, Grab was able to utilize driver-partners providing mobility services to provide deliveries for its deliveries segment. In addition, stay-at-home or movement control orders and other COVID-19 measures led to a decrease in the number of driver-partners in March and April 2020, with some recovery starting in May 2020. However, significant uncertainty remains over the severity and duration of the COVID-19 pandemic, and as the pandemic continues, or if other public health threats arise in the future, Grab may need to continue to adapt to changing circumstances. There can be no assurance that Grab will be successful in doing so, including by maintaining and optimizing utilization of its driver-partner base.

In 2020, Grab also contributed to a special relief fund for driver-partners in Singapore to supplement driver income temporarily, which consisted of government-funded support and, during the initial phase of the fund, a weekly fixed payment from Grab. To the extent Grab deems it necessary in the future to take similar or other measures to assist its driver-partners or other partners in the future, Grab's financial results may be adversely impacted. Grab also undertook a reduction in its labor force in June 2020, which affected approximately 360 employees, in an effort to manage the effects of the COVID-19 pandemic on Grab's business.

In addition, Grab has taken and continues to take active measures to promote health and safety, including, among others, implementing GrabProtect, a suite of safety and hygiene measures for its mobility offerings, to protect its driver-partners and passengers, providing for no-contact deliveries, and working with driver-partners to take safety measures such as mask wearing, vehicle cleaning and disinfecting, temperature checks, and hand washing and sanitizing. However, Grab's efforts may not be successful and may not provide sufficient protection from COVID-19 or similar public health threats in the future, or such efforts may not continue to be enough to promote consumer and driver- and merchant-partner confidence. In connection with public health threats, Grab may also be required to temporarily close its corporate offices and have its employees work remotely, as Grab has done in connection with the COVID-19 pandemic, which may impact productivity and may otherwise disrupt its business operations. The current outbreak of COVID-19 has resulted in a widespread global health crisis and adversely affected global economies and financial markets, and similar public health threats could do so in the future. Such events have impacted, and could in the future impact, demand for Grab's offerings, which in turn, could materially and adversely affect Grab's business, financial condition, results of operations and prospects.

***If Grab fails to manage its growth effectively, its business, financial condition, results of operations and prospects could be materially and adversely affected.***

Since Grab's inception in 2012, Grab has experienced rapid growth in its employee headcount, the number of consumers and driver- and merchant-partners using its platform, Grab's offerings and the geographic reach and scale of its operations. Grab has also expanded both through acquisitions and strategic partnerships. This expansion increases the complexity of Grab's business and has placed, and will continue to place, significant strain on its management, personnel, operations, systems, technical performance, financial resources, and internal financial control and reporting functions. In certain jurisdictions, Grab's risk management function, particularly relating to enterprise-wide risk management and Sarbanes-Oxley compliance are in relatively early stages of

64

**Table of Contents**

development and therefore Grab may be unable to identify, mitigate and remediate risks as they develop. Grab may not be able to manage its growth effectively, which could damage its reputation and negatively affect its operating results. Properly managing Grab's growth will require Grab to establish consistent policies across regions and functions, as well as additional localized policies where necessary. A failure to effectively develop and implement any such policies could harm its business. In addition, as Grab expands, if Grab is unsuccessful in hiring, training, managing, and integrating new employees and staff to help manage and operate its businesses, or if Grab is not successful in retaining its existing employees and staff, its business may be harmed.

To manage the growth of Grab's operations and personnel and improve the technology that supports its business operations, its financial and management systems, disclosure controls and procedures, and its internal controls over financial reporting, Grab will be required to commit substantial financial, operational, and technical resources. In particular, upgrades to Grab's technology or network infrastructure are critical in supporting its growth, and without effective upgrades, Grab could experience unanticipated system disruptions, slow response times, or poor experiences for consumers, driver- and merchant-partners. Grab is in the process of putting in place a contract management system and does not yet have a central contract repository, which could lead to inefficient tracking of contractual obligations and spending. As Grab's operations continue to expand, its technology infrastructure systems will need to be scaled to support its operations. In addition, Grab's organizational structure is complex and will continue to grow as the Grab platform is used by additional consumers and driver- and merchant-partners, and as Grab adds employees, products and offerings, and technologies, and as it continues to expand, including through acquisitions and strategic partnerships, which may include expansion into business activities where Grab has limited experience, such as offline businesses, or no experience at all. If Grab does not manage the growth of its business and operations effectively, the quality of its platform and the efficiency of its operations could suffer, which could materially and adversely affect its brand and reputation and its business, financial condition, results of operations and prospects.

***Grab is subject to various laws with regard to anti-corruption, anti-bribery, anti-money laundering and countering the financing of terrorism and has operations in certain countries known to experience high levels of corruption. Grab's audit and risk committee led an investigation into potential violations of certain anti-corruption laws related to its operations in one of the countries in which it operates and has voluntarily self-reported the potential violations to the U.S. Department of Justice. There can be no assurance that failure to comply with any such laws would not have a material adverse effect on it.***

Grab is subject to anti-corruption, anti-bribery, and anti-money laundering and countering the financing of terrorism laws in the jurisdictions in which Grab does business and may also be subject to such laws in other jurisdictions under certain circumstances, including, for example, the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"). These laws generally prohibit Grab and its employees from improperly influencing government officials or commercial parties in order to, among other things, obtain or retain business, direct business to any person, or gain any improper advantage. Under applicable anti-bribery and anti-corruption laws, Grab could be held liable for acts of corruption and bribery committed by third-party business partners, representatives, and agents who acted on Grab's behalf. Grab has operations in, and has business relationships with, entities in countries known to experience high levels of corruption. Grab and its third-party business partners, representatives, and agents may have direct or indirect interactions with officials and employees of government agencies or state-owned or affiliated entities, and Grab is subject to the risk that it could be held liable for the corrupt or other illegal activities of these third-party business partners and intermediaries and its and their respective employees, representatives, contractors, and agents, even if Grab does not authorize such activities. Grab's employees frequently consult or engage in discussions with government officials in the markets where it operates with respect to potential changes in government policies or laws impacting its industries and have engaged in joint ventures and other partnerships with state-owned enterprises or government agencies, which potentially heighten such anti-corruption-related risks. In addition, Grab's activities in certain countries with high levels of corruption enhance the risk of unauthorized payments or offers of payments by driver-partners, consumers, merchant-partners, shippers or carriers, employees, consultants, or business partners in violation of various anti-corruption laws, including the FCPA, even though the actions of these parties are often

65

Table of Contents

outside Grab's control. While Grab has policies and procedures intended to address compliance with such laws, there is no guarantee that such policies and procedures are or will be fully effective at all times, and Grab's employees and agents may take actions in violation of Grab's policies and procedures or applicable laws, for which Grab may be ultimately held responsible. For example, Grab's audit and risk committee led an investigation into potential violations of certain anti-corruption laws related to its operations in one of the countries in which it operates and has voluntarily self-reported the potential violations to the U.S. Department of Justice. The country did not represent a material portion of Grab's revenue in 2020 and while no conclusion can be drawn as to the likely outcome of the U.S. Department of Justice matter, currently Grab is not aware of any other contemplated or pending investigations or litigation related to the potential violations that may have a material impact on it.

Additional compliance requirements may compel Grab to revise or expand its compliance program, including the procedures it uses to verify the identity of platform users and monitor international and domestic transactions. Any violation of applicable anti-bribery, anti-corruption, and anti-money laundering and countering the financing of terrorism laws could result in whistleblower complaints, adverse media coverage, harm to its reputation and brand, investigations, imposition of significant legal fees, severe criminal or civil sanctions, suspension or debarment from government licenses, permits and contracts, forced exit from an important market or business segment, substantial diversion of management's attention, a drop in its stock price, or other adverse consequences, any or all of which could have a material and adverse effect on its business, financial condition, results of operations and prospects.

### *If Grab is required to reclassify drivers as employees or otherwise, or if driver-partners and/or employees unionize, there may be adverse business, financial, tax, legal and other consequences.*

The independent contractor status of drivers is currently being challenged in courts, by government agencies, non-governmental organizations, groups of drivers, labor unions and trade associations all around the world. Driven in part by developments in the United States and Europe, there has been growing interest in this area recently from regulators in Southeast Asia, where Grab operates. The tests governing whether a driver is an independent contractor or an employee vary by governing law and are typically highly sensitive to certain factors including, among others, changes in public opinion and political conditions. Grab believes that Grab's driver-partners are independent contractors based on existing employment classification frameworks, because, among other things they: (i) can choose whether, when, where, and the manner and means to provide services on its platform; (ii) are able to provide services on its competitors' platforms; (iii) have each acknowledged and agreed when signing up to Grab's terms and conditions that its relationship with Grab does not constitute an employment relationship; (iv) may provide their own vehicles to perform services and, in some jurisdictions such as Indonesia, Singapore, Thailand and Malaysia, are also able to rent cars (as lessees) from any rental company or Grab, if needed; and (v) pay a commission for using the Grab platform. Changes to laws or regulations governing the definition or classification of independent contractors, or judicial decisions regarding independent contractor classification, could require reclassification of driver-partners as employees (or workers or quasi-employees where those statuses exist), and if so, Grab would be required to incur significant additional expenses for compensating driver-partners, potentially including expenses associated with the application of wage and hour laws (including minimum wage (which may include requirements to pay wages for periods when a driver-partner is offline or not driving through Grab's platform), overtime, and meal and rest period requirements), employee benefits (including requirements with respect to statutory contribution, compulsory insurance and trade union fees), taxes, and penalties. In addition, a determination that driver-partners are employees or ostensible agents could lead to claims, charges or other proceedings under laws and regulations applicable to employers and employees, such as claims of joint employer liability or agency liability, harassment and discrimination, and unionization. New employment classifications could be created and applied to Grab's driver-partners, with additional requirements imposed on Grab beyond current requirements. Any such reclassification or new classifications could have a significant impact on Grab's labor costs, business operations and employee relations, and an adverse effect on its business and financial condition.

66

**Table of Contents**

Although Grab's position with respect to the independent contractor status of driver-partners has generally been upheld in relevant jurisdictions, Grab continues to face challenges from driver-partners alleging employee status in certain jurisdictions. For example, a driver-partner has filed a judicial review in the High Court in Malaysia to quash the Minister of Human Resources' refusal to refer her unfair dismissal claim against a Grab subsidiary to the Industrial Court of Malaysia. Although the High Court has rejected the judicial review application, the driver-partner has filed an appeal to the Court of Appeal, and the appeal is pending. The final outcome of the case could set a precedent with respect to the classification of driver-partners for companies such as Grab. If the appeal is successful, the case will be heard by the Industrial Court and if the Industrial Court finds that driver-partners should be considered employees, Grab could be liable for various payroll-related obligations with respect to these employees, and could be subject to the unionization and other risks described below. Furthermore, Grab has historically strived to provide driver-partner benefits and privilege schemes including offering support to partners during the COVID-19 pandemic. Such benefits may in certain cases go beyond any statutory requirements and are used to both acquire and encourage the frequent use of Grab's platform by driver-partners as well as to demonstrate to stakeholders and regulators that Grab is a responsible and good partner to its platform users. However, despite such efforts, regulators may deem Grab's benefits and welfare schemes insufficient and impose additional requirements on companies such as Grab or change relevant laws or regulations. Policies could change due to, among others, driver welfare concerns with respect to matters such as income protection and certainty, long-term financial condition, professional development, the need for health or other insurance, retirement benefits, the need for fair working conditions and the desire to provide a forum to voice opinions and complaints, and Grab may not be successful in defending the independent contractor status of drivers in some or all jurisdictions in the future. The costs associated with defending, settling, or resolving pending and future lawsuits relating to the independent contractor status of its driver-partners could be material to Grab's business.

In addition, even if Grab is successful in defending such independent contractor status, governments may nevertheless impose additional requirements on Grab with respect to its independent contractors. For example, informal requests from government regulators to increase insurance coverage and to explore providing minimum wages for driver-partners in certain jurisdictions could increase costs. Although Grab is working closely with certain regulators to address these concerns, including discussing new categories of employment to cater for the needs of gig economy workers in a financially sustainable manner for platform companies such as Grab, it may not be successful in these efforts or be able to do so without impacting consumer experience. Grab may need to incur substantial additional expenses to provide additional benefits to its independent contractors if required or requested by regulators.

Furthermore, Grab's driver-partners and/or employees could unionize and unionization could lead to inefficiencies in implementing policy or other changes or otherwise cause Grab to incur increased costs, including legal and other associated costs and adversely impact consumer experience. If the driver-partners and/or employees unionize and invoke collective bargaining powers, the terms of collective bargaining agreements could materially adversely affect Grab's costs, efficiency, ability to generate acceptable returns on the affected operations, financial condition and results of operations. In addition, disputes with driver-partners and/or employees over union and collective bargaining issues could be disruptive and harm Grab's reputation.

*If Grab is unable to continue to grow its base of platform users, including driver- or merchant-partners and consumers accessing Grab's offerings, Grab's value proposition for each such constituent group could diminish, impacting its results of operations and prospects.*

Grab's success in a given geographic market depends on its ability to increase the scale of its driver- and merchant-partner base and the number of consumers transacting through its platform as well as expand the deliveries, mobility and financial services offerings on its platform. A key focus of its growth strategy has been to develop Grab's superapp to create an ecosystem with synergies driving more users on both the supply and demand sides to its platform. This ecosystem, and the synergies within Grab's ecosystem, take time to develop and grow, because doing so requires Grab to replicate its efforts in more than 400 cities in Southeast Asia, where each country has different infrastructure, regulations, systems and user expectations and preferences, as well as a

67

different approach to localizing Grab's operations. Although Grab believes there are strong synergies among its business segments that help increase the breadth, depth and interconnectedness of its overall ecosystem, there are a number of risks and uncertainties that may impact the attractiveness of its ecosystem, including the following:

- If consumers are not attracted to the Grab platform or choose deliveries, mobility or financial services providers outside of the Grab platform, Grab may be unable to attract driver- and merchant-partners to its platform, which in turn means consumers using its platform may have fewer choices and may not be able to obtain better value options thereby making its platform less attractive to consumers. Consumers choose the Grab platform based on many factors, including the convenience of its superapp, trust in the services offered through its platform as well as Grab's technology platform and the choices and quality of its products and offerings. A deterioration in any of these factors could result in a decline in the number of consumers using the offerings on the Grab platform, or the frequency with which they use such offerings.

- If driver-partners are not attracted to the Grab platform or choose not to offer their services through its platform, or elect to offer them through a competitor's platform, Grab may lack a sufficient supply of driver-partners to attract and retain consumers and merchant-partners to the Grab platform. Driver-partners choose Grab based on many factors, including the opportunity to earn money, the flexibility and autonomy to choose where, when and how often to work, the tools and opportunities Grab provides to seek to maximize productivity and other benefits that Grab provides to them. It is also important that Grab maintains a balance between demand and supply for mobility services in any given area at any given time. Grab has experienced and expects to continue to experience driver-partner supply constraints or oversupply from time to time in certain areas (including certain areas or locations within cities). To the extent that Grab experiences driver-partner supply constraints in a given market, Grab may need to increase, or may not be able to reduce, the driver-partner incentives that Grab offers.

- If merchant-partners, such as restaurants, convenience and grocery stores, multinational franchises and lifestyle service providers, are not attracted to the Grab platform or choose to partner with its competitors, Grab may lack a sufficient variety and supply of options, or lack access to the most popular merchant-partners, such that the offerings on the Grab platform will become less appealing to consumers and its driver-partners will have fewer opportunities to provide services. Grab's merchant-partners choose Grab based on many factors, including access to the consumer base and delivery and payment network available through the Grab platform, the tools and opportunities Grab provides to enhance their profitability and the opportunity to leverage Grab's data insights. Grab seeks to leverage off the strong consumer base using its platform in its deliveries and mobility segments to grow its financial services and other businesses.

The number of consumers using the Grab platform may decline or fluctuate as a result of many factors, including dissatisfaction with the operation and security of its superapp or consumer support, pricing levels, dissatisfaction with the deliveries, mobility, financial services or other offerings or quality of services provided by Grab's driver- and merchant-partners and negative publicity related to its brand or reputation, including as a result of safety incidents, driver or community protests or public perception of Grab's business. In April 2018, Grab experienced a platform-wide disruption that impacted the availability of Grab's deliveries and mobility offerings for several hours. This disruption was the result of a systems failure by a third-party service provider that impacted the Grab platform. Grab also experienced a similar disruption in December 2019. If similar incidents occur in the future, consumer satisfaction could be impacted, which in turn could impact the balance of Grab's ecosystem.

The number of driver- and merchant-partners on the Grab platform may decline or fluctuate as a result of a number of factors, including ceasing to provide services through its platform, passage or enforcement of local laws regulating, restricting, prohibiting or taxing the services and offerings of Grab's driver- and merchant-partners, the low costs of switching to alternative platforms, dissatisfaction with its brand or reputation, its pricing model (including potential reductions in incentives) or other aspects of Grab's business. In August 2019, personal information of some of Grab's driver-partners was exposed to other driver-partners. Additionally, driver or community protests, which have occurred in some of Grab's markets from time to time, could also negatively

68

impact driver perception of Grab or its industry and impact Grab's ability to recruit and maintain its base of driver- and/or merchant-partners.

In addition, the synergies Grab seeks to realize from having a superapp-led ecosystem may not materialize as Grab expects them to or in a cost-effective manner. For example, Grab expects its superapp strategy to benefit from developing and growing its financial services offerings, which Grab believes will be linked to lower driver- and merchant-partner and consumer acquisition costs and increased consumer engagement, retention and spending. Further, social engagement applications may encroach on the offerings of transactional applications such as Grab's.

Any inability to maintain or increase the number of consumers or driver- or merchant-partners that use the Grab platform or a failure to effectively develop Grab's superapp could have an adverse effect on Grab's ability to maintain and enhance its ecosystem, as well as the synergies within its ecosystem, and otherwise materially and adversely affect Grab's business, financial condition, results of operations and prospects.

### *Security, privacy, or data breaches involving sensitive, personal or confidential information could also expose Grab to liability under various laws and regulations across jurisdictions, decrease trust in the Grab platform, and increase the risk of litigation and governmental investigation.*

Grab's business involves the collection, storage, processing, and transmission of a significant amount of personal and sensitive data, such as that of driver- and merchant-partners, consumers, employees, job candidates and other third parties. From time to time, Grab may also engage third-party vendors to collect data and other insights that are then used by Grab in its business operations. Grab is subject to numerous laws and regulations designed to protect such data. Laws and regulations that impact Grab's business, and particularly laws, regulations and other measures governments may take based on privacy and data protection concerns, are increasingly strict and complex, change frequently and at times are in conflict among the various jurisdictions where Grab does business. For example, Thailand's new Personal Data Protection Act is expected to become fully enforceable in 2022 and new data privacy legislation has been discussed by governments in certain other jurisdictions where Grab operates. In certain jurisdictions there are laws and regulations that restrict the flow of data outside the country which may also constrain Grab's activities and require the use of local servers. Grab may also be required to disclose personal data about an individual to a public agency, where the disclosure is necessary in the public interest, or for the purposes of policy formulation or review. Some of these disclosures may put Grab in a disadvantaged position, especially if the provided data is repurposed for another intent, or adequate protection is not accorded to such data. As such laws increase in their complexity and impose new requirements, Grab may be required to incur increased costs to comply with data privacy laws and could incur penalties for any non-compliance or breaches. These laws may also limit how Grab is able to use data. For more information regarding relevant laws and regulations Grab is subject to, see "Regulatory Environment."

From time to time Grab implements measures in order to protect sensitive and personal data in accordance with its contracts, data protection laws and consumer laws. However, Grab may be subject to data breach incidents, including where data breach incidents are suffered by third parties that Grab contracts or interacts with, that often involve factors beyond its control. Grab has notified data protection authorities of data breaches and data protection authorities have also opened investigations involving or brought enforcement actions against Grab. For example, in March 2017, two GrabHitch driver-partners in Singapore separately posted the personal data of one of their passengers on a public Facebook page. The PDPC investigated the incident and found that Grab was in breach of the relevant data privacy obligations despite the fact that GrabHitch driver-partners provide the GrabHitch carpooling service in a personal capacity. The PDPC ordered Grab to provide detailed guidance for its GrabHitch driver-partners on the handling of personal data of their passengers and to communicate relevant policies to them, and Grab has since implemented remedial actions to educate them. The PDPC has issued other enforcement decisions as well as penalties against Grab for breaching its protection obligation under Singapore data protection law, and in the Philippines, the National Privacy Commission has taken action relating to some of Grab's data processing activities. Grab remains subject to the risk that further

69

Table of Contents

incidents of this type could occur in the future. Grab also relies on third-party service providers to host or otherwise process some of its platform users' data in certain jurisdictions and Grab may have limited control or influence over the security policies or measures adopted by such third-party service providers. Any failure by a third party to prevent or mitigate security breaches or improper access to, or disclosure of, such information could have adverse consequences for Grab.

Although Grab maintains, and is in the process of improving, internal access control mechanisms and other security measures to ensure secure and appropriate access to and storage and use of Grab's sensitive, business, personal, financial or confidential information by anyone including its employees, contractors and consultants, these mechanisms may not be entirely effective, or fully complied with internally. As part of periodic reviews carried out by Grab, Grab has identified, and in the future may identify, data protection issues requiring remediation with respect to such measures that require Grab to further update its compliance functions. In particular, Grab may still be at risk of unauthorized use or disclosure of such information. Any misappropriation of personal information, including credit card or banking information, could harm its relationship with consumers and driver- and merchant-partners and cause Grab to incur financial liability and reputational harm. If any person, including any of Grab's employees, improperly breaches Grab's network security or otherwise mismanages or misappropriates driver-partner, merchant-partner or consumer personal or sensitive data, Grab could be subject to regulatory actions and significant fines for violating privacy or data protection and consumer laws or lawsuits for breaching contractual confidentiality or data protection provisions which could result in negative publicity, legal liability, loss of consumers or driver- or merchant-partners and damage to its reputation. Grab is an attractive target of data security attacks by third parties that may attempt to fraudulently induce employees or platform users to disclose information to gain access to Grab's data or the data of platform users. A successful attempt could lead to the compromise of sensitive, business, personal, financial, credit card, banking or other confidential information, which could result in significant liability and a material loss of revenue resulting from the adverse impact on Grab's reputation and brand, a diminished ability to retain or attract new platform users and disruption to Grab's business.

Because the techniques used by an individual or a group to obtain unauthorized access, make unwarranted alteration to our data and source codes, disable or degrade services, or sabotage systems are often complex, not easily recognizable and evasive, Grab may not be able to anticipate these techniques and implement adequate preventative measures. Such individuals or groups may be able to circumvent Grab's security measures (including, but not limited to, via phishing attacks, malware infection, system intrusion, misuse of systems, website defacement, and DDoS attacks) and may improperly access or misappropriate confidential, proprietary, or personal information held by or on behalf of Grab, disrupt Grab's operations, damage Grab's computers, or otherwise damage Grab's business. Although Grab has developed, and continues to develop, systems and processes that are designed to protect its servers, platform and data, including personal and sensitive data of its driver-partners, merchant-partners, consumers, employees, job candidates and other third parties, Grab cannot guarantee that such measures will be effective at all times. Grab's efforts may be hindered due to, for example, government surveillance, regulatory requirements or other external events; software bugs or other technical errors or issues; or errors or misconduct of employees, contractors or others; a rapidly evolving threat landscape; and inadequate or failed internal processes or business practice. While Grab invests significant resources to protect against or remediate cybersecurity threats or breaches, or to mitigate the impact of any breaches or threats, it may still be subject to potential liability above the amounts covered by Grab's insurance.

Any of the foregoing could subject Grab to regulatory fines, scrutiny and actions, including, but not limited to, orders to temporarily or permanently cease all or some of its business activities, a prohibition on taking on new consumers, driver-partners or merchant-partners and the implementation of mandated remedial measures, which could materially and adversely affect Grab's business, financial condition, results of operations and prospects.

70

**Table of Contents**

***Grab's financial services business may not ultimately be successful and could subject Grab to additional requirements, risks and regulations.***

Grab has expanded, and plans to continue to expand, its financial services offerings and platform. These offerings include services such as digital banking, payments, lending, receivables factoring, insurance distribution and wealth management. For example, Grab now provides credit products, including financing for its driver- and merchant-partners, purchase financing, cash loans, a receivables factoring "PayLater" option for consumers through GrabFinance, and wealth management products through GrabInvest services. Expanding Grab's financial services offerings requires Grab to engage in activities such as education of driver- and merchant-partners, building awareness of its financial services offerings, attracting and retaining talent with relevant financial services skills, entering into arrangements with new partners, and also exposes Grab to risks including, among others, credit risk, counterparty risk, regulatory risk, compliance and reputational risks.

In addition, the intersection of finance and digital services is a relatively new phenomenon but one that has attracted significant regulatory attention. Grab's business is subject to laws that govern payment and financial services activities and Grab may face challenges in obtaining and maintaining licenses and regulatory approvals and in managing relationships with regulators. As Grab evolves its business, Grab may be subject to additional laws or requirements related to money transmission, lending, consumer protection, online payments, and financial regulation. These laws govern, among other things, money transmission, prepaid access instruments, electronic funds transfers, anti-money laundering, countering the financing of terrorism, lending, consumer protection, banking, systemic integrity risk assessments, cybersecurity of payment processes, and import and export restrictions. Additionally, Grab's "PayLater" offering, which allows consumers to pay for products or services within a certain period after the relevant transaction, involves the factoring of receivables of merchant-partners for their customers. Recently, regulators in certain jurisdictions, including Singapore and Malaysia, have been reviewing buy now, pay later offerings with a view toward limiting consumer overspending among other things. There can be no assurance that regulators will not impose requirements or curbs on such offerings and any such requirements or curbs could adversely impact Grab. Grab is subject to regulatory audits in all markets where it operates licensed financial services businesses and such audits carry the risk that regulators could allege violations or view Grab's continued participation in the market, as an overseas company, undesirable, and impose sanctions, penalties or withdraw licenses.

Further, Grab maintains licensing relationships with all major credit card providers, and any contractual disputes over fees or other violations may result in restrictions or withdrawal of one or more scheme's services. Furthermore, Grab's financial services business and the use of such services have historically relied significantly on Grab's deliveries and mobility segments, as consumers often use GrabPay to pay for deliveries and mobility services offered through the Grab platform. The expansion of Grab's financial services business will depend to a large extent upon Grab's ability to continue to grow the use of its financial services for uses outside of its deliveries and mobility segments and for off-platform usage.

As a new entrant in the financial services industry, Grab faces intense competition with existing banks and financial services providers that may have greater experience, better access to capital, a lower cost of capital and more resources than Grab has. Grab will also compete against other new entrants, which, in Singapore, include NYSE-listed Sea Ltd. (which was also selected for the award of a digital full bank license) and Ant Group Co. Ltd. and a consortium led by Greenland Financial Holdings Group Co. Ltd. that were selected for the award of digital wholesale bank licenses. Grab's ability to achieve or maintain market acceptance for its financial services and products are affected by a number of factors, such as the community's level of trust in digital financial services and products being provided by a company that is not a traditional financial institution, entrenched preferences in traditional payment methods, insufficient use cases for Grab's digital payment services and lack of infrastructure support locally. Moreover, even if there is adequate acceptance of Grab's digital financial services and products, Grab's business will continue to be subject to the changing needs and demands of users, which may change for a multitude of reasons such as availability of alternative payment methods that are more popular or widely accepted by the population.

71

**Table of Contents**

Any of the foregoing, including any failure to manage these risks, could materially and adversely affect Grab's business, financial condition, results of operations and prospects.

*Improper, dangerous, illegal or otherwise inappropriate activity by consumers or driver- or merchant-partners or other third parties could harm Grab's business and reputation and expose Grab to liability.*

Due to the breadth of Grab's operations that span across a wide variety of consumers, driver- and merchant-partners and other third parties in more than 400 cities in Southeast Asia, Grab is exposed to potential risks and liabilities arising from improper, dangerous, illegal or otherwise inappropriate actions by a wide variety of persons that Grab has no control over. Although Grab has implemented certain measures in order to ensure both partner and consumer safety, such measures may not be effective or adequate and any such actions may result in adverse consequences, such as nuisance, property damage, injuries, fatalities, business interruption, brand and reputational damage or significant liabilities for Grab.

Although there are generally certain qualification processes in place for Grab's driver- and merchant-partners, including background checks on driver-partners, these qualification processes may not bring to light all potentially relevant information and would not bring to light events occurring after the qualification process is complete. In certain jurisdictions, available information may be limited by applicable laws or limited generally, and Grab (or third-party service providers Grab uses to conduct background checks) also may fail to conduct qualification processes adequately. Furthermore, Grab does not independently test the driving skills of its driver-partners or other relevant skills of its other merchant-partners.

In Grab's mobility business, if Grab's driver-partners or consumers engage in improper, dangerous, illegal or otherwise inappropriate activities, driver-partners and/or consumers may not consider offerings on the Grab platform to be safe and Grab may otherwise suffer adverse consequences, such as liability due to bodily harm to other users of the Grab platform, and other brand and reputational damage. For example, in Cambodia, most of Grab's two-wheel and three-wheel driver-partners do not obtain (and in certain cases are not required to obtain) driver's licenses, which could subject them and Grab to potential risks. In addition, merchant-partners in some of the countries in which Grab operates are not required to obtain food hygiene certificates or may only be subject to limited regulatory guidelines with regard to food safety and hygiene. In Grab's financial services business, Grab may also be susceptible to potentially illegal or improper uses, which may include the use of Grab's payment services in connection with fraudulent sales of goods or services, software and other intellectual property piracy, money laundering, bank fraud and prohibited sales of restricted products. If consumers or third parties providing financial services in partnership with Grab engage in improper, illegal or otherwise inappropriate activities while using the Grab platform, other consumers and driver- and merchant-partners may also be unwilling to continue using the Grab platform. Despite measures that Grab has taken to detect and reduce the occurrence of fraudulent or other malicious activity on the Grab platform, Grab cannot guarantee that its measures will be effective.

Any of the foregoing activities, whether or not caused by or known to Grab, could harm Grab's brand and reputation, result in litigation or regulatory actions, and otherwise materially and adversely affect Grab's business, financial condition, results of operations and prospects.

*Grab is subject to risks associated with strategic alliances and partnerships.*

Grab has entered into strategic alliances and partnerships with third parties and may continue to do so in the future. Such alliances and partnerships have included, among others, joint ventures or minority equity investments, such as Grab's investments in the Digital Banking JV with Singtel and partnerships with strategic investors, including with Mitsubishi UFJ Financial Group Inc. ("MUFG") for certain digital financial services, such as payments and lending, and with Toyota in several areas related to supporting driver-based services. These alliances and partnerships subject Grab to a number of risks, including risks associated with the sharing of proprietary information between parties, non-performance by Grab or its partners of obligations under relevant

72

agreements, disputes with strategic partners over strategic or operational decisions or other matters, increased expenses in establishing new strategic alliances and non-compete provisions under some of such arrangements which limit Grab's ability to operate in certain market segments, the need to support or capitalize joint venture or associate entities and reputational risks from association with strategic partners, as well as litigation risks associated therewith. In addition, Singtel has the right to swap all (but not a portion) of its shares in the Digital Banking JV for shares of GFG if GFG pursues a public offering prior to an IPO of the Digital Banking JV, subject to the terms of the shareholders agreement for the Digital Banking JV. Accordingly, Grab will experience dilution of its ownership of GFG if Singtel exercises its right to swap its shares in the Digital Banking JV for GFG shares.

Furthermore, some of Grab's strategic alliances and partnership agreements contain exclusivity provisions restricting Grab from providing a particular service outside of the strategic alliance or partnership in a particular jurisdiction. For example, Grab and MUFG have entered into an agreement for strategic collaboration under which Grab has granted MUFG's affiliates in Thailand exclusivity with respect to the provision of certain financial products and services to the driver- and merchant-partners and consumers and Grab has also granted MUFG's affiliates a right of first offer with respect to certain financial products and services in its markets in which Grab operates. Subject to certain exceptions and carve-outs, the shareholders agreement with Singapore Telecommunications Limited ("Singtel") for the Digital Banking JV contains restrictions on investments in other digital banking and other financial services businesses as well as restrictions on operating certain banking and financial services businesses outside of the Digital Banking JV. The Digital Banking JV partners have agreed on a process for expanding digital banking and certain financial services into Southeast Asian jurisdictions beyond Singapore. Although Grab agrees to such restrictions because it believes that the overall strategic alliance or partnership is to its benefit, such restrictions could adversely impact Grab's growth prospects.

***Grab's entry into digital banking in Singapore through the Digital Banking JV is subject to risks.***

In December 2020, the MAS selected the Grab and Singtel consortium to be a potential recipient of a digital full bank license. In November 2021, MAS issued the banking license to the Digital Banking JV "GXS Bank" solely for the purpose of facilitating the necessary preparatory work. The Digital Banking JV is not allowed to commence any business activities, until it is operationally ready and has obtained MAS' approval to do so. However, there can be no assurance that the Digital Banking JV will be successful in obtaining MAS's approval to commence business activities, given that it is not yet in the final stages of the building phase in preparation for its operations. The Digital Banking JV must meet all relevant prudential requirements and licensing pre-conditions before the MAS grants the approval to commence business, and these requirements and pre-conditions require substantial capital commitments from its shareholders, or may impose additional challenges, and give rise to regulatory and credit risks. In addition, the Digital Banking JV must comply with relevant banking regulations and other requirements on an ongoing basis. In particular, maintaining compliance with the MAS requirement of being "anchored in Singapore, controlled by Singaporeans and headquartered in Singapore" for it to be able to maintain the digital full bank license is subject to continuous regulatory review as Grab's or GFG's ownership and management control may evolve. Details of GHL's corporate governance structures that will become effective immediately upon consummation of the Business Combination have been shared and aligned with MAS's expectations. However, the MAS, at its sole discretion, may determine that the Business Combination or other future events cause the Digital Banking JV to no longer meet such requirement, which could have adverse consequences. These consequences may include but are not limited to the Digital Banking JV having its bank license suspended or revoked, or failing to obtain MAS's approval to commence business. The MAS may take other actions to ensure that the Digital Banking JV is anchored in Singapore, controlled by Singaporeans and headquartered in Singapore. This could require Grab to sell or transfer existing shares in the Digital Banking JV to, or enter into proxy arrangements with, or could require the Digital Banking JV to issue new shares to, the joint venture partner, Singtel, or other Singapore citizens or entities. Furthermore, according to MAS's eligibility criteria, among other requirements, holders of the digital full bank licenses will need S$1.5 billion (approximately $1.1 billion) in minimum paid-up capital as well as additional capital to accommodate certain losses as determined by MAS. As such, the terms of the shareholders agreement with Singtel for the Digital

73

Banking JV includes the obligation for Grab and its joint venture partner to make capital contributions to the Digital Banking JV of S$1.93 billion total (approximately $1.44 billion), which includes provision for retained losses. Grab believes both it and its joint venture partner, Singtel, each have sufficient cash resources to satisfy their respective obligations when due, and both parties have demonstrated to MAS that they have sufficient corporate funds to meet their respective funding obligations. Grab also has the obligation to indemnify its joint venture partner Singtel from and against certain losses resulting from breaches by Grab of undertakings to make committed capital contributions, undertakings given to the MAS or revocation of the digital full bank license or material restrictions being imposed on Digital Bank JV on account of an action taken by Grab and to indemnify bank customers against any shortfall in non-bank deposits. In addition, upon certain events of default occurring, including a change of control of GFG before 2025, Grab's joint venture partner Singtel may, with regulatory approval, sell its Digital Banking JV shares to Grab at a 20% premium over fair market value, or purchase Grab's Digital Banking JV shares at a 20% discount to fair market value.

***Grab relies significantly on third-party cloud infrastructure services providers and any disruption of or interference with Grab's use of their services could adversely affect Grab's business, financial condition, results of operations and prospects.***

The Grab platform is currently hosted within data centers provided by third-party cloud infrastructure services providers. As the continuing and uninterrupted performance of the Grab platform is critical to Grab's success, any system failures of such third-party providers' services could reduce the attractiveness of the Grab platform and may adversely affect Grab's ability to meet the requirements of consumers and driver- and merchant-partners when they are using the Grab platform. Third-party cloud infrastructure services providers are vulnerable to damage or interruptions from factors beyond Grab's or their control, including but not limited to computer viruses and other malicious code, denial-of-service attacks, cyber and ransomware attacks, phishing attacks, break-ins, sabotage, vandalism, power loss or other telecommunications failure, fire, flood, hurricane, tornado or other natural disasters, software or hardware errors, failures or crashes and other similar disruptive problems. For example, one of Grab's third-party infrastructure services providers suffered technical failures in March 2018 that caused the loss of a significant number of transactions over a period of several hours. In addition, in February 2021, GrabExpress orders were impacted due to system delays from one of Grab's third-party infrastructure providers, affecting order fulfilment for GrabExpress deliveries for a period of approximately two hours. Grab expects that in certain jurisdictions, it may become increasingly difficult to ensure reliability of the Grab platform as Grab expands and the usage of its platform increases. Any future disruptions could adversely impact user experience, create negative publicity harming Grab's reputation, impact the quality, availability and speed of the services Grab provides as well as potentially violate regulatory requirements in relation to technology risk and business continuity risk management. Any of the foregoing could result in interruptions, delays, loss of data, cessations to Grab's operations or in the provision of offerings through its platform and compensation payments to Grab's partners and end consumers, and could adversely affect Grab's business, financial condition, results of operations and prospects.

Furthermore, under its agreements with its third-party cloud infrastructure services providers, Grab is required to meet certain minimum spending commitments. To the extent Grab falls short of meeting such commitments, it could be required by the relevant service provider to pay for the shortfall, which would cause Grab to incur additional expenses.

***Grab may continue to be blocked from, or limited in, providing its products and offerings in certain markets, may contravene applicable laws and regulations and may be required to modify its business model in order to manage its compliance with applicable laws and regulations.***

Many markets in Southeast Asia may have laws and regulations that do not sufficiently contemplate or cover all of Grab's business activities. As Grab's business, business model, products, offerings and operations may be relatively new in these markets, the relevant laws and regulations, as well as their interpretations, may be unclear and evolving. This may make it difficult for Grab to assess which licenses, permits and approvals are

74

**Table of Contents**

necessary for its business, or the processes for obtaining such licenses, permits and approvals. This mismatch between Grab's businesses and laws in the jurisdictions where it operates may also subject Grab to inconsistent, uncertain and arbitrary application of such laws and increased regulatory scrutiny. Grab may also proceed with business activities on a risk-weighted assumption that certain laws and regulations are invalid or inapplicable, which may not be the case. As part of Grab's decision making process in such circumstances, Grab has a cross functional team, which includes representatives from its governance, risk and compliance, legal, public affairs and public relations teams, that engages in considering such issues and making decisions that are consistent with the its corporate culture (which includes sustainable growth and a strong focus on compliance) and common sense. Grab also, as part of its decision-making process, typically seeks advice from local law firms with expertise on local regulatory considerations. In certain markets, Grab financed and provided offerings, either directly or through others with whom it had affiliations, while it was still assessing or considering the applicability of laws and regulations to those offerings or while it considered potential changes it may need to implement to comply with such laws and regulations. Grab's decision to continue operating in these instances has been subject to scrutiny by government authorities. There may have been instances where Grab was not in compliance with applicable laws and regulations or did not have all required licenses, permits and approvals needed to conduct the relevant business.

Grab also cannot be certain that it will be able to maintain licenses, permits and approvals that it has previously obtained, or that, once they expire, Grab will be able to renew them. Grab's interpretations of laws and regulations and relevant exemptions also may not be consistent with those of the regulators. As Grab expands its businesses, and in particular its financial services business, Grab may be required to obtain new licenses, permits and approvals and will be subject to additional laws and regulations and uncertainties in the markets Grab plans to operate in.

Many of the markets in Southeast Asia have not developed a fully integrated regulatory regime, and recently enacted laws and regulations may not sufficiently cover all aspects of economic activities in such markets, including, in particular, new or disruptive business models such as those in the technology sector. In Thailand, mobility services provided through online channels, including mobile applications such as the Grab platform, are governed by laws that are broad, and as a result, Grab's offerings could become subject to additional licensing or registration requirements at the discretion of relevant Thai regulators. On June 23, 2021, a Thai law governing ride-hailing became effective, and on September 30, 2021, additional legislation implementing such law was enacted, which covers (i) pricing, (ii) application and ride-hailing operator certification, (iii) the on-boarding process of driver-partners, (iv) required decals to be placed on a ride-hailing vehicle and (v) a determination of horsepower of vehicles used to provide ride-hailing services. Grab, Grab's platform and its driver-partners are now required to comply with such new legislation, though Grab believes it may take time for many of its driver-partners to fully comply with the requirements of the new legislation. Although we believe Thai regulators are aware that full compliance with the recently enacted legislation may take some time, if relevant Thai regulators begin to enforce such laws before we or our driver-partners are able to be in full compliance, Grab's supply of driver-partners in Thailand could be materially impacted, which could impact its ability to continue to operate its mobility segment in Thailand. In addition, a new Thai law became effective on July 1, 2021 that categorized GrabFood, GrabMart and GrabExpress as regulated online delivery services under the purview of the Thai Department of Control. This new law is expected to be supplemented by further implementing legislation that may implement pricing controls. Although Grab cannot currently assess the potential impact of such legislation until implementing legislation is in place, such legislation may result in restrictions on Grab's ability to introduce new fees and/or adjust existing fees to properly reflect supply and demand. Furthermore, Thai regulators are studying the potential for the enactment of laws related to the control of commissions chargeable to merchant-partners, and the impact of any such potential laws on Grab's business is uncertain. In Vietnam, Grab entered into a joint venture with a foreign partner to set up a company to operate a car rental and transportation services business but the government did not grant the relevant licenses to set up such a company due to an adverse interpretation of the foreign ownership limit of 49% for the transportation business. After unsuccessful attempts to obtain the relevant licenses, Grab decided to abandon its plans for this business. In Myanmar there are no specific regulations governing operators of ride-hailing booking platforms; and in Malaysia, there are no laws

**Table of Contents**

specifically governing operators of certain delivery service booking platforms such as GrabFood and GrabMart. Regulatory risks, including but not limited to the foregoing, could have a material and adverse effect on Grab's business, financial condition, results of operations and prospects.

In certain circumstances, Grab may not be aware of its violation of certain policies, laws and regulations until after the violation. Where regulators find that Grab has not obtained required licenses, permits and approvals, Grab may come under investigation or otherwise be subject to scrutiny by governmental authorities, may be subject to regulatory fines and penalties and, in certain cases, may be required to cease operations altogether, unless and until laws and regulations are reformed. The regulatory environment in Southeast Asia may also slow the growth of Grab's business. Grab has incurred, and expects that it will continue to incur, significant costs in managing its legal and regulatory matters, including the ability to operate its business in its markets.

***The proper uninterrupted functioning of Grab's highly complex technology platform is essential to Grab's business.***

Grab's business depends on the performance and reliability of Grab's system as well as the efficient and uninterrupted operation of mobile communications systems that are not under Grab's control. Grab's superapp platform is a complex system composed of many interoperating components and incorporates software that is highly complex, and therefore, many events that are beyond its control may cause service interruptions or degradations or other performance problems across the whole platform, including but not limited to computer viruses and other malicious code, denial-of-service attacks, cyber and ransomware attacks, phishing attacks, break-ins, sabotage, vandalism, power loss or other telecommunications failure, fire, flood, hurricane, tornado or other natural disasters, software or hardware errors, failures or crashes, and other similar disruptive problems. For example, in April 2018, Grab experienced a platform-wide disruption that impacted the availability of its deliveries and mobility offerings for several hours. Grab also experienced similar incidents in May and December in 2019 and experienced smaller scale disruptions or delays in 2020 and 2021. Grab may experience system failures and other events or conditions from time to time that interrupt the availability or reduce or affect the speed or functionality of its platform. Although Grab has certain disaster response procedures, Grab or its third-party service providers may not currently have a comprehensive business continuity framework in place in all instances. Grab is working with third-party consultants to develop a suitable business continuity framework, but there can be no assurance that such framework will be implemented in a cost-effective manner or at all, or that it will prove effective or meet all the expectations of Grab's stakeholders, including its consumers, partners and regulators, both current and in the future, in relation to cybersecurity risk, technology risk and business continuity management.

Grab's software, including third-party or open source software that is incorporated into Grab's software code, may now or in the future contain undetected errors, bugs, or vulnerabilities. Some errors in Grab's software code may only be discovered after the code has been released. Bugs in Grab's software, third-party software including open source software that is incorporated into Grab's code, misconfigurations of Grab's systems and unintended interactions between systems could result in Grab's failure to comply with certain regulatory reporting obligations or compliance requirements or the introduction of vulnerabilities into Grab's platform that may be exploited by cyber-attackers or third-parties engaging in fraudulent activities, or could cause downtime that would impact the availability of the Grab platform, which could reduce the attractiveness of the Grab platform to users, increase the likelihood of a successful cyber-attack or result in violations of regulators' expectations of prescribed technology risk management practices. Cyber-attackers and third-parties engaged in fraudulent activities have in the past exploited vulnerabilities in Grab's platform and may in the future continue to attempt to do so. If the measures Grab takes to prevent these incidents from occurring are unsuccessful, Grab may incur losses from these fraudulent activities.

Disruptions in internet infrastructure, the absence of available mobile data or global positioning system signals or the failure of telecommunications network operators to provide Grab with the necessary bandwidth for

76

**Table of Contents**

its products and offerings could also interfere with the speed and availability of the Grab platform. Grab's operations may also rely on virtual private network access in certain jurisdictions, such as China, where Grab has research and development operations. Furthermore, Grab has no control over the costs of the services provided by national telecommunications operators. If mobile internet access fees or other charges to internet users increase, consumer traffic may decrease, which may in turn cause Grab's revenue to significantly decrease. Grab's operations also rely on various other third-party software and applications, including with respect to intragroup communications and online word processing, and disruptions with respect to its usage of any such software could cause business interruption.

Furthermore, although Grab seeks to maintain and improve the availability of its platform and to enable rapid releases of new features and services, it may become increasingly difficult to maintain and improve the availability of its platform, especially during peak usage times and as its platform becomes more complex and more products and services are offered through its superapp and user traffic increases. If the Grab platform is unavailable when driver- and merchant-partners, consumers and/or platform users attempt to access it or it does not load as quickly as they expect or it experiences capacity constraints, users may seek other offerings including Grab's competitors' products or offerings, and may not return to the Grab platform as often in the future, or at all. This could adversely affect Grab's ability to maintain its ecosystem of driver- and merchant-partners and consumers and decrease the frequency with which they use the Grab platform. Grab may not effectively address capacity constraints, upgrade systems as needed, or develop technology and network architecture to accommodate actual and anticipated changes in technology.

Any of these events could significantly disrupt Grab's operations, impact user satisfaction and in turn Grab's reputation and subject Grab to liability, which could materially and adversely affect Grab's business, financial condition, results of operations and prospects.

***Grab's business depends upon the interoperability of Grab's superapp and platform with different devices, operating systems and third-party software that Grab does not control.***

One of the most important features of Grab's superapp and platform is their broad interoperability with a range of devices, operating systems, and third-party applications. Grab's superapp and platform are accessible from the web and from devices running various operating systems such as iOS and Android. Grab depends on the accessibility of Grab's superapp and platform across these third-party operating systems and applications that Grab does not control. Moreover, third-party services and products are constantly evolving, and Grab may not be able to modify the Grab platform to assure its compatibility with that of other third parties following development changes. The loss of interoperability, whether due to actions of third parties or otherwise, could materially and adversely affect Grab's business, financial condition, results of operations and prospects.

As new mobile devices and mobile platforms are released, there is no guarantee that certain mobile devices will continue to support the Grab platform or effectively roll out updates to Grab's applications. Additionally, in order to deliver high-quality applications, Grab needs to ensure that the Grab platform is designed to work effectively with a range of mobile technologies, systems, networks, and standards. Grab may not be successful in developing or maintaining relationships with key participants in the mobile industry that enhance users' experience. If consumers or driver- and merchant-partners that utilize the Grab platform encounter any difficulty accessing or using Grab's applications on their mobile devices or if Grab is unable to adapt to changes in popular mobile operating systems, platform growth and user engagement would be adversely affected.

Grab also depends on third parties maintaining open marketplaces, including the Apple App Store, Google Play and Huawei App Gallery, which make Grab's superapp available for download. Grab cannot assure you that the marketplaces, through which Grab distributes its superapp, will maintain their current structures or that such marketplaces will not charge Grab fees to list its applications for download. If any such marketplaces cease making its superapp available, this would have a material adverse effect on Grab's business.

77

Table of Contents

In addition, Grab relies upon certain third parties to provide software or application programming interfaces ("APIs") for its products and offerings, which are currently important to the functionality of the Grab platform. If such third parties cease to provide access to such third-party software or APIs on terms that Grab believes to be attractive or reasonable, or do not provide Grab with the most current version of such software, Grab may be required to seek comparable solutions from other sources, which may be more expensive or inferior and/or adversely impact user experience. In some cases, such third-party commercial software may be difficult to replace, or become unavailable to Grab on commercially reasonable terms. Any such changes to or unavailability of third-party software or APIs could materially and adversely affect Grab's business, financial condition, results of operations and prospects.

*If Grab does not adequately protect its intellectual property rights, or if third parties claim that Grab is misappropriating the intellectual property of others, Grab may incur significant costs and its business, financial condition, results of operations and prospects may be adversely affected.*

Grab's brand value and technology, including its intellectual property, are some of its core assets. Grab protects its proprietary rights through a combination of intellectual property and contractual rights. These include patents, registered designs, trademarks, copyright, trade secrets, license agreements, confidentiality and non-disclosure agreements with third parties, employee and contractor disclosure and invention assignment agreements, and other similar contractual rights. The efforts Grab has taken to protect its intellectual property may not be sufficient or effective. For instance, intellectual property laws, rules and regulations vary from jurisdiction to jurisdiction, and effective intellectual property protection may not be available in every country in which Grab currently operates. In addition, it may be possible for other parties to copy or reverse-engineer Grab's products and offerings or obtain and use the content of its website without authorization. Further, Grab may be unable to prevent competitors from acquiring domain names or trademarks that are similar to, infringe upon, or diminish the value of Grab's domain names, trademarks, service marks and other proprietary rights. In the event of any unauthorized use of Grab's intellectual property or other proprietary rights by third parties, legal and contractual remedies available to Grab may not adequately compensate Grab. Grab primarily relies on copyrights and confidential information (including source code, trade secrets, know-how and data) protections, for the purposes of protecting Grab's core technologies and proprietary databases, rather than registered rights such as patents. Further, the registration of intellectual property, especially across multiple jurisdictions, is costly, subject to complex laws, rules and regulations, and can be challenged by third parties, and Grab may choose to limit or not to pursue intellectual property registrations in the future. Grab's reliance on copyrights and confidential information protections, rather than registered intellectual property rights, may make it more difficult for Grab to protect some of its core technologies against third-party infringement and could increase the risk of third-party infringement actions against Grab.

Grab may also be unable to detect infringement of its intellectual property rights, and even if such violations are found, Grab may not be successful, and may incur significant expenses in protecting its rights. In addition, Grab's competitors may independently develop technology or services that are equivalent or superior to Grab's technology services. Any enforcement efforts may be time-consuming, costly and may divert management's attention. Any failure to protect or any loss or dissolution of Grab's intellectual property rights may have an adverse effect on Grab's ability to compete and may adversely affect its business, financial condition, results of operations and prospects.

Furthermore, as Grab faces increasing competition and as its business grows, it may in the future receive notices that claim Grab has misappropriated, misused, or infringed upon other parties' intellectual property rights. In addition, as Grab's strategic alliances and partnerships at times involve sharing of intellectual property, Grab is subject to the risk of its partners alleging Grab has misappropriated or misused such partner's intellectual property or its partners infringing Grab's intellectual property.

Any intellectual property claim against Grab, regardless of merit, could be time consuming and expensive to settle or litigate, could divert Grab's management's attention and other resources, and could hurt goodwill

78

associated with its brand. These claims may also subject Grab to significant liability for damages and may result in Grab having to stop using technology, content, branding, or business methods found to be in violation of another party's rights. Certain adverse outcomes of such proceedings could adversely affect its ability to compete effectively in existing or future businesses.

Grab may also be required or may opt to seek a license for the right to use intellectual property held by others, which may not be available on commercially reasonable terms, or at all. Even if a license is available, Grab may be required to pay significant royalties, which may increase its operating expenses. If alternative technology, content, branding, or business methods for any allegedly infringing aspect of its business are not available, Grab may be unable to compete effectively or Grab may be prevented from operating its business in certain jurisdictions. Any of these results could harm Grab's business.

***Grab may not be able to make acquisitions or investments, or successfully integrate them into Grab's business.***

As part of Grab's business strategy, Grab has entered into and regularly pursues a wide array of potential strategic transactions, including strategic investments, alliances, partnerships, joint ventures and acquisitions, in each case relating to businesses, technologies, services and other assets that Grab expects to complement its business or that Grab believes will help to grow its business. In particular, Grab has pursued and continues to consider strategic acquisitions to grow its financial services business. For example, in March 2018, Grab acquired Uber's Southeast Asian business and has made other acquisitions and investments which it believes will complement its business.

These types of transactions involve numerous risks, including, among others:

- intense competition for suitable targets and partners, which could increase prices and adversely affect Grab's ability to consummate deals on favorable or acceptable terms;

- complex technologies, terms and arrangements, which may be difficult to implement and manage;

- failures or delays in closing transactions;

- difficulties integrating brand identity, technologies, operations, existing contracts, and personnel;

- failure to realize the anticipated return on investment, benefits or synergies;

- exclusivity provisions which prevent Grab from providing a particular service outside of the strategic alliance or partnership in a particular jurisdiction which could serve to limit access to business opportunities;

- failure to identify the problems, liabilities, or other shortcomings or challenges of an acquired company, partner or technology, including but not limited to issues related to intellectual property, cybersecurity risks, regulatory compliance practices, litigation, security interests over assets, contractual issues, revenue recognition or other accounting practices, or employee or user issues;

- expanding into business activities where Grab has limited experience, such as offline businesses, or no experience at all;

- risks that regulatory bodies do not approve Grab's acquisitions or business combinations or delay such approvals or other adverse reactions from regulators;

- regulatory changes that require adjustments to Grab's business or shareholding or rights in relation to subsidiaries or joint ventures; and

- adverse reactions to acquisitions by investors and other stakeholders.

If Grab fails to address the risks or other problems encountered in connection with past or future transactions such as the foregoing, or if Grab fails to successfully integrate or manage such transactions, its business, financial condition, results of operations and prospects could be materially and adversely affected.

79

**Table of Contents**

***Any failure by Grab or its third-party service providers to comply with applicable anti-money laundering or other related laws and regulations could damage its business, reputation, financial condition, and results of operation, or subject it to other risks.***

Grab's payment and financial services related businesses, operations and systems may, in certain jurisdictions, be governed by laws and regulations related to payment and financial services activities, including, among other things, laws and regulations relating to banking, privacy, cross-border and domestic money transmission, anti-money laundering, counter-terrorist financing, electronic funds transfers, systemic integrity risk assessments, cybersecurity of payment processes, import and export restrictions and consumer protection. Grab's payment and financial services related activities may be susceptible to illegal and improper uses, including money laundering, terrorist financing, fraudulent sales of goods or services, and payments to sanctioned parties. These laws and regulations to which Grab is now, or in the future may be, subject are highly complex, may be vague, and could change and may be interpreted to make it difficult or impossible for Grab to comply with them. Moreover, activities in jurisdictions where Grab allows payments in cash may raise additional legal, regulatory, and operational concerns. Operating a business that uses cash may increase Grab's compliance risks with respect to a variety of laws and regulations, including those referred to above. In addition, Grab may in the future offer new payment options that may be subject to additional regulations and risks. If Grab fails to comply with applicable laws and regulations, it may be subject to civil or criminal penalties, fines, and higher transaction fees, and Grab may lose its ability to accept or process online payment, payment card or other related transactions, which could make offerings on its platform less convenient and attractive. In the event of any failure to comply with applicable laws and regulations, Grab's business, financial condition, results of operations and prospects could be adversely affected.

As its payments and financial services related businesses expand, Grab will need to continue to invest in compliance with applicable laws and regulations, and to conduct appropriate risk assessments and implement appropriate controls. Government authorities may scrutinize or seek to bring actions against Grab if its systems are used for improper or illegal purposes or if its risk management or controls are not adequately assessed, updated, or implemented, and the foregoing could result in financial or reputational harm to Grab's business.

In addition, laws and regulations related to payments and financial services are evolving, and changes in such laws and regulations could affect Grab's ability to provide services on its platform in the manner that it has done, expects to do, or at all. In addition, as Grab evolves its business or makes changes to its operations, it may be subject to additional laws and regulations. Historical or future non-compliance with these laws and regulations could result in significant criminal and civil lawsuits, penalties, forfeiture of significant assets, or other enforcement actions. Costs associated with fines and enforcement actions, as well as reputational harm, changes in compliance requirements, or limits on Grab's ability to expand its product offerings, could harm its business.

***Grab relies on its partnerships with financial institutions and other third parties for payment processing infrastructure and for the provision of services through its platform.***

The convenient payment mechanisms provided by Grab's superapp and platform are key factors contributing to the development of Grab's business. Grab relies on strategic partnerships with financial institutions such as Visa and Mastercard and third parties such as Adyen and Stripe for elements of Grab's payment-processing infrastructure to process and remit payments to and from consumers and driver- and merchant-partners using the Grab platform. Although Grab may develop in-house payment processing capabilities, Grab will likely need to continue to rely on these strategic partnerships and third-party services. If these companies become unwilling or unable to provide these services to Grab on acceptable terms or at all, Grab's business may be disrupted. For certain payment methods, including credit and debit cards, Grab generally pays interchange fees and other processing and gateway fees, and such fees result in significant costs.

In addition, online payment providers are under continued pressure to pay increased fees to banks to process funds, and there is no assurance that such online payment providers will not pass any increased costs. If these

80

fees increase over time, Grab's operating costs will increase, which could materially and adversely affect Grab's business, financial condition, results of operations and prospects.

Failures of the payment processing infrastructure underlying the Grab platform could cause driver- and merchant-partners to lose trust in Grab's payment operations and could cause them to instead use Grab's competitors' platforms. If the quality or convenience of Grab's payment processing infrastructure declines as a result of these limitations or for any other reason, the attractiveness of Grab's business to driver- and merchant-partners could be adversely affected. For example, on November 11, 2020, during the "11.11 Sales Day" promotional period, Grab was unable to process GrabPay transactions for approximately fifteen minutes primarily due to delays with one of Grab's payment processing partners. If Grab is forced to migrate to other third-party payment service providers for any reason, the transition would require significant time and management resources, and may not be as effective, efficient, or well-received by platform users.

Additionally, online payment providers require Grab to comply with payment card network operating rules, which are set and interpreted by the payment card networks. The payment card networks could adopt new operating rules or interpret or reinterpret existing rules in ways that might prohibit Grab from providing certain services to some users, be costly to implement, or be difficult to follow. If Grab fails to comply with these rules or regulations, Grab may be subject to fines and higher transaction fees and/or lose its ability to accept credit and debit card payments from consumers or facilitate other types of online payments. Grab has also agreed to reimburse Grab's third-party payment processor for any reversals, chargebacks, and fines that are assessed by payment card networks if Grab violates these rules. Any of the foregoing risks could adversely affect Grab's business, financial condition, results of operations and prospects.

In addition, as a platform business, Grab's business model generally provides a platform enabling driver- and merchant-partners and other third parties, such as insurance companies and financial institutions to reach a broad base of consumers through its platform. To the extent such third parties use other means to reach consumers instead of the Grab platform, Grab's business could be adversely impacted as Grab does not provide the services offered through its platform itself.

### *Changes in, or failure to comply with, competition laws could adversely affect Grab.*

Competition authorities closely scrutinize Grab. There has been increased scrutiny over the power and influence of big technology companies globally, and in particular, antitrust regulators in Southeast Asia have taken greater interest in potential abuses of market power or position by big technology companies. If one jurisdiction imposes or proposes to impose new requirements or restrictions on Grab's business, other jurisdictions may follow. Further, any new requirements or restrictions, or proposed requirements or restrictions, could result in adverse publicity or fines, whether or not valid or subject to appeal.

For example, in connection with Uber's sale of its Southeast Asian business to Grab in March 2018, Grab faced, among others, public scrutiny from antitrust authorities in Singapore, Malaysia, Vietnam and the Philippines. The Competition and Consumer Commission of Singapore ("CCCS") directed Grab, among other things, to remove exclusivity arrangements, lock-in periods and termination fees with Grab's Singapore driver-partners, to maintain its pre-acquisition fare algorithm and driver-partner commission rates and to pay a fine of S$6.42 million (approximately $4.8 million). In addition, there has been increased scrutiny from the CCCS in the online food ordering and deliveries sector, and if the CCCS assesses that any arrangements between Grab and its merchant-partners may be harmful to competition, the CCCS may take enforcement action against Grab that may adversely affect Grab's business, financial condition, results of operations and prospects. The Philippine Competition Commission ("PCC") required a series of voluntary commitments from Grab in clearing the Uber acquisition and imposed a fine of approximately 56.5 million Philippine Pesos (approximately $1.2 million) on Grab for violating some of its pricing and service quality commitments after the merger with Uber. In addition, the Malaysian Competition Commission ("MyCC") issued a proposed decision in October 2019 alleging that Grab had abused its dominant position in the ride-hailing booking and transit media advertising market through

81

**Table of Contents**

the imposition of a number of restrictive clauses on its driver-partners, including restrictions on driver-partners promoting competitors' products and providing advertising services to third-party enterprises. Pursuant to the proposed decision, MyCC proposed a fine of approximately RM86.8 million (approximately $21 million) and a daily fine of RM15,000 (approximately $3,600) for each day Grab fails to take the remedial actions as directed by MyCC. The penalty is imposed in the event of failure to comply with the interim directions ("Proposed Decision Directions"). Grab believes it has complied with the said Proposed Decision Directions and should not be subject to the daily fines of RM15,000. In addition, Grab submitted its written representation to MyCC in December 2019 and made its oral representation to MyCC in October 2020, challenging MyCC's proposed decision on several grounds. The matter is pending the issuance of a final decision by MyCC. Grab at the same time has initiated a judicial review application against MyCC. At first instance, Grab's leave application at the High Court for a judicial review of MyCC's proposed decision was dismissed. However, the Court of Appeal reversed the High Court's decision in denying Grab's leave application and has remitted the substantive hearing to be heard in the High Court. MyCC is applying for a 'Stay Order' to pause the substantive hearing in the High Court, as MyCC is appealing to the Federal Court against the Court of Appeal's decision. In Thailand, the Office of Trade Competition Commission ("OTCC") has placed increased scrutiny on the online food ordering and deliveries market and issued the Notification of the Trade Competition Commission in relation to Guidelines for consideration of unfair trade practices between food deliveries digital platform operators and restaurant operators effective from December 24, 2020. The notification provides certain guidelines that lay out practices of food deliveries platforms that may be considered as unfair trade practices and prohibits unfair fees, charges and trading conditions. The regulations provided in such notification are unclear, and their interpretation and implementation are subject to the sole discretion of the OTCC, which creates uncertainty.

In addition, governmental agencies and regulators may, among other things, prohibit future acquisitions, divestitures, or combinations that Grab plans to make or re-evaluate previous acquisitions, combinations, or restructuring completed by Grab in the past, impose significant fines or penalties, require divestiture of certain of its assets, or impose other restrictions that limit or require Grab to modify Grab's operations, including limitations on Grab's contractual relationships with platform users or restrictions on its pricing models. For example, although the COVID-19 pandemic has not resulted in any regulatory caps on pricing for Grab's businesses, Grab's pricing model, including dynamic pricing, could be challenged or limited in emergencies and capped in certain jurisdictions or become the subject of litigation and regulatory inquiries. As a result, Grab may be forced to change its pricing model in certain jurisdictions and in certain circumstances, which could harm Grab's revenue or result in a sub-optimal tax structure.

In addition, regulators in certain jurisdictions where Grab operates could scrutinize the Business Combination from a competition law perspective. In certain countries where Grab operates, competition laws may be new or relatively new, regulatory bodies may be new or have new mandates, and relevant laws and regulations, as well as their interpretations and application, may otherwise be unclear and evolving. This can make it difficult for Grab to assess (a) which notifications or approvals are required, or (b) the timing and processes for obtaining such approvals in light of the complex structure of the Business Combination. Grab could be subject to fines or penalties, lose credibility with regulators, be subject to other administrative sanctions or otherwise incur expenses and diversion of management attention or other resources, if any regulators choose to investigate Grab, or find that Grab has not made required notifications or filings in connection with the Business Combination.

***Unfavorable media coverage could harm Grab's business, financial condition, results of operations and prospects.***

Grab is the subject of regular media coverage. Unfavorable publicity regarding, among other things, Grab's business model or offerings, user support, technology, platform changes, platform quality, privacy or security practices, regulatory compliance, financial or operating performance, accounting judgments or management team could adversely affect Grab's reputation. Such negative publicity could also harm the size of Grab's network and the engagement and loyalty of consumers and driver- and merchant-partners that utilize the Grab platform, which

**Table of Contents**

could adversely affect Grab's business, financial condition, results of operations and prospects. Negative publicity could also draw regulator attention and lead to regulatory action or new laws or regulations impacting Grab's business. In addition, the foregoing risks are increased by the widespread use of social media and the increasing incidence of fake or unsubstantiated news, particularly on social media and other online platforms.

As the Grab platform continues to scale and public awareness of Grab's brand increases, any future issues that draw media coverage could have an amplified negative effect on Grab's reputation and brand. In addition, negative publicity related to key brands or influencers that Grab has partnered with may damage Grab's reputation, even if the publicity is not directly related to Grab.

***Grab relies on third-party background check providers to screen potential driver-partners and they may fail to provide accurate information.***

All potential driver-partners are required to go through Grab's security and safety screening background checks before being qualified as a driver-partner on the Grab platform. Grab relies on third-party background check providers to provide the criminal and/or driving records of potential driver-partners in most of its markets to help identify those that are not qualified to use its platform pursuant to applicable law or its internal standards, and its business may be adversely affected to the extent such providers do not meet their contractual obligations, Grab's expectations, or the requirements of applicable laws or regulations. If any of Grab's third-party background check providers terminates its relationship with Grab or refuses to renew its agreement with Grab on commercially reasonable terms, Grab may need to find an alternate provider, and may not be able to secure similar terms or replace such partners in an acceptable timeframe, which in turn could lead to difficulty in onboarding sufficient numbers of driver-partners to meet consumer or merchant-partner demand. Further, if the background checks conducted by its third-party background check providers are inaccurate or do not otherwise meet its expectations, unqualified drivers may be permitted to conduct passenger trips or make deliveries on its platform, and as a result, Grab may be unable to adequately protect or provide a safe environment for consumers and merchant-partners. Inaccurate background checks may also result in otherwise qualified drivers from being inadvertently excluded from the Grab platform. Grab's reputation and brand could be adversely affected and Grab could be subject to increased regulatory or litigation exposure. In addition, if the background checks conducted by Grab's third-party background check providers do not meet the requirements under applicable laws and regulations, Grab could face legal liability or negative publicity.

Grab is also subject to a number of laws and regulations applicable to background checks for potential and existing driver-partners that utilize the Grab platform. If Grab or its third-party background check providers fail to comply with applicable laws and regulations, its reputation, business, financial condition, results of operations and prospects could be adversely affected, and Grab could face legal action. In addition, background check qualification processes may be limited in certain jurisdictions based on national and local laws, and Grab's third-party service providers may fail to conduct such background checks adequately or disclose information that could be relevant to a determination of eligibility.

Any negative publicity related to any of Grab's third-party background check providers, including publicity related to safety incidents or actual or perceived privacy or data security breaches or other security incidents, could adversely affect Grab's reputation and brand, and could potentially lead to increased regulatory or litigation exposure. Any of the foregoing risks could adversely affect Grab's business, financial condition, results of operations and prospects.

***Grab's company culture has contributed to its success and if Grab cannot maintain and evolve Grab's culture as it grows, Grab's business could be materially and adversely affected.***

Grab believes that its company culture, which was founded on the principle of creating a double bottom line business by delivering financial performance and social impact at the same time and promoting the values of

83

heart, honor, humility and hunger, has been critical to Grab's success. Grab faces a number of challenges that may affect its ability to sustain Grab's corporate culture, including:

- staying true to Grab's values and withstanding competitive pressures to move in a direction that may divert Grab from doing so;

- maintaining appropriate alignment between Grab's values and the fiduciary duties that its directors have under Cayman Islands law to act in the best interests of the company;

- failure to identify, attract, reward, and retain people in leadership positions in Grab's organization who share Grab's values;

- negative perception of Grab's treatment of employees, consumers or driver- and merchant-partners; and

- maintaining Grab's culture while integrating new personnel and businesses as Grab grows.

If Grab is not able to maintain and evolve its culture, Grab may suffer consequences such as the inability to attract employees, consumers, driver- and merchant-partners and business partners and maintain and grow Grab's business, and as a result its financial condition, results of operations and prospects could be materially and adversely affected.

***Grab depends on talented, experienced and committed personnel, including engineers, to grow and operate Grab's business, and if Grab is unable to recruit, train, motivate and retain qualified personnel, particularly in the technology sector, Grab's business, financial condition, results of operations and prospects may be materially and adversely affected.***

A fundamental driver of Grab's ability to succeed is its ability to recruit, train and retain high-quality management, operations, engineering, and other personnel who are in high demand, are often subject to competing employment offers and are attractive recruiting targets for Grab's competitors. Grab's senior management, mid-level managers and technology sector employees, including engineers, data scientists and analysts, cybersecurity specialists, product managers and designers are instrumental in implementing Grab's business strategies, executing Grab's business plans and supporting Grab's business operations and growth. There is particularly acute competition for technology sector and research and development employees in some of Grab's markets. In addition, Grab depends on the continued services and performance of Grab's key personnel. Grab's CEO and co-founder Anthony Tan, COO and co-founder Tan Hooi Ling, President Maa Ming-Hokng, Chief Financial Officer Peter Oey and Chief People Officer Ong Chin Yin and their involvement in Grab's business are important to the success of Grab. The Key Executives play a central role in the development and implementation of Grab's business strategies and initiatives. Any decrease in the involvement of any of the Key Executives in Grab's business or loss of key personnel, particularly to competitors, could have an adverse effect on Grab's business, financial condition, results of operations and prospects. The unexpected or abrupt departure of one or more of Grab's key personnel and the failure to effectively transfer knowledge and effect smooth key personnel transitions has had and may in the future have an adverse effect on Grab's business resulting from the loss of such person's skills, knowledge of Grab's business, and years of industry experience. Although Grab's employment contracts contain non-compete clauses, there is the risk that such non-compete clauses may be deemed unenforceable under applicable law. In addition, OVO has experienced changes in its management and management attrition as certain senior executives have departed, and OVO may experience further changes to its management in the future, which could be disruptive to its business and impact its operating performance.

To attract and retain key personnel, Grab uses equity incentives, among other measures, which may not be sufficient to attract and retain the personnel Grab requires to operate its business effectively. As demand in the technology sector intensifies, Grab may be required to offer more in terms of cash or equity in order to attract and retain talent, which would increase its expenses. The equity incentives Grab uses to attract, retain, and motivate employees may not be effective, particularly if the value of the underlying stock does not increase commensurate with expectations or consistent with its historical growth. In addition, in certain countries, the grant of equity incentive may be restricted, preventing Grab from delivering such incentives to personnel in the

84

respective country. Grab may need to invest significant amounts of cash and equity to attract and retain new employees and expend significant time and resources to identify, recruit, train and integrate such employees, and Grab may never realize returns on these investments. If Grab is unable to attract and retain high-quality management and operating personnel, its business, financial condition, results of operations and prospects could be adversely affected.

Grab's ability to recruit and retain talent at desired compensation levels could also be limited by government attitudes and policies, which at times may favor nationals of the country in which Grab does business rather than hiring talent from abroad, which could impact Grab's talent pool and the costs associated with it. Travel and other restrictions imposed by governments to address COVID-19 transmission rates may also harm Grab's ability to recruit and retain nationals from outside Southeast Asia or the country where Grab is recruiting, and may require significant numbers of employees to work remotely, which may impact productivity. Grab's ability to recruit and retain talent and maintain good relations with its employees could also be impacted by employee activism over social, political other matters, which could impact its relations with its employees.

*Adverse litigation judgments or settlements resulting from legal proceedings in which Grab may be involved could expose Grab to monetary damages or limit the ability to operate its business.*

Grab has in the past been, is currently, and may in the future be, involved in private actions, collective actions, class actions, investigations, and various other legal proceedings by driver- and merchant-partners, consumers, employees, commercial partners, competitors, or government agencies, among others, relating to, for example, personal injury or property damage cases, wrongful act, subrogation, employment or labor-related disputes such as wrongful termination of employment, consumer complaints, disputes with driver-partners and merchant-partners, contractual disputes with consumers or suppliers, disputes with third parties and regulatory inquiries or proceedings relating to compliance with competition and data privacy regulations. The results of any such litigation, investigations, and legal proceedings are inherently unpredictable and may be expensive. Any claims against Grab, whether meritorious or not, could be time consuming, costly, and harmful to Grab's reputation, and could require significant amounts of management time and corporate resources. Furthermore, Grab may be held jointly responsible for claims against third parties offering their services through its platform, including driver- or merchant-partners. If any of these legal proceedings were to be determined adversely to Grab, or Grab were to enter into any settlement arrangement, Grab could be exposed to monetary damages or be forced to change the way in which Grab operates its business, which could have an adverse effect on Grab's business, financial condition, results of operations and prospects.

In addition, Grab regularly includes arbitration provisions in its terms of service with end-users and driver- and merchant-partners, and in certain markets includes other provisions such as mediation provisions or, in Singapore, for certain disputes to be referred to the Small Claims Tribunal. These provisions are intended to streamline the dispute resolution process for all parties involved, as arbitration or other methods of alternative dispute resolution can in some cases be faster and less costly than litigation in court. However, arbitration or other methods of alternative dispute resolution may become more costly for Grab, or the volume of cases may increase and become burdensome. Further, the use of arbitration or other alternative dispute resolution provisions may subject Grab to certain risks to its reputation and brand, as these provisions have been the subject of increasing public scrutiny. To minimize these risks, Grab may voluntarily limit its use of arbitration or other alternative dispute resolution provisions, or Grab may be required to do so, in any legal or regulatory proceeding, either of which could increase its litigation costs and exposure in respect of such proceedings.

In July 2020, the Indonesian Commission for the Supervision of Business Competition ("KPPU") imposed a financial penalty of approximately $3.5 million on Grab based on allegations by driver-partners that preferential treatment in respect of rides was given to driver-partners that utilized its car rental plans. Although Grab was successful in its appeal in the first instance and KPPU's subsequent appeal to the Indonesian Supreme Court was dismissed in April 2021, Grab may be subject to similar actions in the future. In December 2020, the Malaysian Association of Taxi, Rental Car, Limousine and Airport Taxi filed a claim against Grab alleging, among other things, certain violations of transport and competition laws, and is seeking damages of approximately $24 million. Grab's application to dismiss the claim was allowed but the plaintiffs have filed an appeal at the

85

Table of Contents

Court of Appeal. The appeal is pending. In December 2018, Grab was assessed approximately 1.4 billion Philippine Pesos (approximately $29 million) in the Philippines for an alleged deficiency in local business taxes. Grab is contesting this assessment and its case remains under review by the regional trial court. In late 2018, a taxi driver filed a claim against the Thai regulator alleging that the Thai regulator omitted and neglected to perform its duties by allowing Grabtaxi (Thailand) Co., Ltd. ("Grabtaxi Thailand") to operate GrabCar. Grabtaxi Thailand is a co-defendant in this case and Grab could be subject to potential liabilities as a result. The case is still pending. If Grabtaxi Thailand loses the case, it may be required to compensate the claimant taxi driver for loss of income, and although ride-hailing through online channels has recently been legalized in Thailand, there can be no assurance that there would be no wider impact to Grab's ride-hailing offering in Thailand from such case. In August 2020, Grabtaxi Thailand had its first meeting with the Thai Office of Trade Competition to discuss accusations that it had unfairly imposed exclusivity clauses on its merchant-partners. Although the case is still on-going, if there is an adverse decision by the Office of Trade Competition, Grab may be required to change its business practices and could face significant fines (potentially up to 10% of GrabFood's Thailand revenue), and Grabtaxi Thailand's directors, managers or any working team personnel involved could also be subject to fines. In addition, Grab may face additional litigation in civil lawsuits initiated by competitors and merchant-partners that rely on such decision as grounds to initiate litigation.

Any such disputes or future disputes could subject Grab to negative publicity, have an adverse impact on Grab's brand and reputation, divert management's time and attention, involve significant costs and otherwise materially and adversely affect its business, financial condition, results of operations and prospects.

***Grab has incurred a significant amount of indebtedness and may in the future incur additional indebtedness. Grab's payment obligations under such indebtedness may limit the funds available to Grab, and the terms of Grab's debt agreements may restrict its flexibility in operating its business.***

As of June 30, 2021, Grab had total outstanding indebtedness of $2.1 billion. Subject to the limitations in the terms of Grab's existing and future indebtedness, Grab may incur additional indebtedness, secure existing or future indebtedness, or refinance Grab's indebtedness. In particular, Grab may need to incur additional indebtedness to finance Grab's operations and such financing may not be available to Grab on attractive terms, or at all.

Grab may be required to use a substantial portion of its cash flows from operations to pay interest and principal on its indebtedness. Such payments will reduce the funds available to Grab for working capital, capital expenditures, and other corporate purposes and limit its ability to obtain additional financing for working capital, capital expenditures, expansion plans, and other investments, which may in turn limit its ability to implement Grab's business strategy, heighten its vulnerability to downturns in its business, the industry, or in the general economy, limit its flexibility in planning for, or reacting to, changes in its business and the industry, and prevent Grab from taking advantage of business opportunities as they arise. Grab cannot assure you that its business will generate sufficient cash flow from operations or that future financing will be available to Grab in amounts sufficient to enable Grab to make required and timely payments on its indebtedness, or to fund its operations. To date, Grab has used a substantial amount of cash for operating activities, and Grab cannot assure you when Grab will begin to generate cash from operating activities in amounts sufficient to cover its debt service obligations.

In addition, under Grab's Term Loan B Facility, Grab Holdings Inc. and certain of Grab Holdings Inc.'s subsidiaries are subject to limitations regarding Grab's business and operations, including limitations on incurring additional indebtedness and liens, limitations on certain consolidations, mergers, and sales of assets, and restrictions on the payment of dividends or distributions. Any debt financing secured by Grab in the future could involve additional restrictive covenants relating to its capital-raising activities and other financial and operational matters, which may make it more difficult for Grab to obtain additional capital to pursue business opportunities, including potential acquisitions or divestitures. Any default under Grab's debt arrangements could require that Grab repays its loans immediately and may limit Grab's ability to obtain additional financing, which in turn may have an adverse effect on its cash flows and liquidity.

**Table of Contents**

In addition, Grab is exposed to interest rate risk related to some of its indebtedness, which is discussed in greater detail under the section titled "Grab Management's Discussion and Analysis of Financial Condition and Results of Operations—Qualitative and Quantitative Factors about Market Risk—Interest Rate Risk."

### *Grab may experience fluctuations in its operating results.*

Grab's operating results are subject to seasonal fluctuations as a result of a variety of factors, some of which are beyond Grab's control. For example, prior to the COVID-19 pandemic, Grab's revenue was typically lower in the first quarter of each year as a result of regional holidays, including the lunar new year and T ế t holiday periods, during which demand for mobility offerings is typically lower. In addition, Grab's revenue is also impacted by other holidays such as Christmas and celebration of the new year as well as the fasting month of Ramadan, which impacts demand for deliveries and mobility offerings as well as driver-partner supply. Grab's operating results may also experience seasonal fluctuations due to weather conditions, such as flooding during the rainy season in certain markets, like Indonesia, the Philippines and Vietnam. In addition to seasonality, Grab's operating results may fluctuate as a result of factors including Grab's ability to attract and retain new platform users, increased competition in the markets in which Grab operates, its ability to expand Grab's operations in new and existing markets, its ability to maintain an adequate growth rate and effectively manage that growth, its ability to keep pace with technological changes in the industries in which Grab operates, changes in governmental or other regulations affecting Grab's business, harm to Grab's brand or reputation, and other risks described elsewhere in this proxy statement/prospectus. In addition, with the COVID-19 pandemic, Grab has experienced a significant increase in its business revenue and volume as well as accelerated growth in its deliveries segment. Such growth stemming from the effects of the COVID-19 pandemic may not continue in the future, and Grab expects the growth rates to decline in future periods. Furthermore, Grab's fast paced growth has made, and may in the future make, these fluctuations more pronounced and as a result, harder to predict. As such, Grab may not accurately forecast its operating results.

### *Grab is exposed to fluctuations in currency exchange rates.*

Grab operates in multiple jurisdictions, which exposes Grab to the effects of fluctuations in currency exchange rates. Grab earns revenue denominated in Singapore Dollars, Indonesian Rupiah, Thai Baht, Malaysian Ringgit, Vietnamese Dong and Philippine Pesos, among other currencies. Fluctuations in foreign currency exchange rates will affect its financial results, which Grab reports in U.S. Dollars. Grab has not but may in the future choose to enter into hedging arrangements to manage foreign currency translation, but such activity may not completely eliminate fluctuations in Grab's operating results due to currency exchange rate changes. Hedging arrangements are inherently risky, and could expose Grab to additional risks that could adversely affect Grab's business, financial condition, results of operations and prospects.

Grab cannot assure you that movements in foreign currency exchange rates will not have a material adverse effect on its results of operations in future periods. Furthermore, the substantial majority of its revenue is denominated in emerging markets currencies. Because fluctuations in the value of emerging markets currencies are not necessarily correlated, there can be no assurance that Grab's results of operations will not be adversely affected by such volatility.

### *Grab tracks certain operating metrics with internal systems and tools and does not independently verify such metrics. Certain of Grab's operating metrics are subject to inherent challenges in measurement, and any real or perceived inaccuracies in such metrics may adversely affect Grab's business and reputation.*

Grab tracks certain key operating metrics, including, among others, its GMV, MTUs, partner incentives, consumer incentives, registered driver-partners and cohort data, with internal systems and tools that are not independently verified by any third party and which may differ from estimates or similar metrics published by third parties due to differences in sources, methodologies, or the assumptions on which Grab relies. Grab's internal systems and tools have a number of limitations, and Grab's methodologies for tracking these metrics

87

may change over time, which could result in unexpected changes to Grab's metrics, including the metrics Grab publicly discloses. If the internal systems and tools Grab uses to track these metrics undercount or overcount performance or contain algorithmic or other technical errors, the data Grab reports may not be accurate. While these numbers are based on what Grab believes to be reasonable estimates of its metrics for the applicable period of measurement, there are inherent challenges in measuring how the Grab platform is used. For example, the accuracy of Grab's operating metrics could be impacted by fraudulent users of its platform, and further, Grab believes that there are consumers who have multiple accounts, even though this is prohibited in its Terms of Service and Grab implements measures to detect and prevent this behavior. Consumer usage of multiple accounts may cause Grab to overstate the number of consumers on its platform. In addition, limitations or errors with respect to how Grab measures data or with respect to the data that Grab measures may affect its understanding of certain details of its business, which could affect Grab's long-term strategies. If Grab's operating metrics are not accurate representations of its business, if investors do not perceive Grab's operating metrics to be accurate, or if Grab discovers material inaccuracies with respect to these figures, Grab expects that its business, financial condition, results of operations and prospects could be materially and adversely affected.

***Industry data, forecasts and estimates, including the Projections, contained in this proxy statement/prospectus are inherently uncertain and subject to interpretation, and may not be an indication of the actual results of the transaction or Grab's future results. Accordingly, you should not place undue reliance on such information.***

Industry data, forecasts and estimates, including the Projections, included in this proxy statement/prospectus are subject to inherent uncertainty as they necessarily require certain assumptions and judgments. Certain facts, forecasts and other statistics relating to the industries in which Grab competes have been derived from various public data sources, a commissioned third-party industry report and other third-party industry reports and surveys. In connection with this offering, Grab commissioned Euromonitor International Limited to conduct market research concerning the digital services, food deliveries and transportation markets in Southeast Asia. While Grab generally believes Euromonitor's Report to be reliable, Grab has not independently verified the accuracy or completeness of such information. Euromonitor's Report may not have been prepared on a comparable basis or may not be consistent with other sources. Moreover, geographic markets and the industries Grab operates in are not clearly defined or subject to standard definitions, and are the result of subjective interpretation. Accordingly, Grab's use of the terms referring to its geographic markets and industries such as, digital services, food deliveries and transportation markets may be subject to interpretation, and the resulting industry data, projections and estimates are inherently uncertain. You should not place undue reliance on such information. In addition, Grab's industry data and market share data should be interpreted in light of the defined geographic markets and defined industries in which Grab operates. Any discrepancy in the interpretation thereof could lead to varying industry data, measurements, forecasts and estimates. For these reasons and due to the nature of market research methodologies, you should not place undue reliance on such information as a basis for making, or refraining from making, your investment decision.

Furthermore, Grab does not, as a matter of general practice, publicly disclose long-term forecasts or internal projections of its future performance, revenue, financial condition or other results. None of the Projections or forecasts included in this proxy statement/prospectus have been prepared with a view toward public disclosure (other than to certain parties involved in the Business Combination) or complying with SEC guidelines or IFRS. The Projections are forward looking statements that are inherently subject to significant uncertainties and contingencies, many of which are beyond Grab's control. The Projections also reflect numerous estimates and assumptions, including, but not limited to, general business, economic, regulatory, market and financial conditions, as well as assumptions about competition, future industry performance and matters specific to Grab's business. Important factors that may affect actual results and results of Grab's operations following the Business Combination, or could lead to such projections and forecasts not being achieved include, but are not limited to: competition, Grab's ability to execute its growth strategies, regulatory factors, the impact of the ongoing COVID-19 pandemic and other factors discussed in this "Risk Factors" section.

**Table of Contents**

*Grab's use of "open source" software under restrictive licenses could: (i) adversely affect Grab's ability to license and commercialize certain elements of Grab's proprietary code base on the commercial terms of Grab's choosing; (ii) result in a loss of Grab's trade secrets or other intellectual property rights with respect to certain portions of Grab's proprietary code; and (iii) subject Grab to litigation and other disputes.*

Grab has incorporated certain third-party "open source" software ("OSS") or modified OSS into elements of its proprietary code base in connection with the development of the Grab platform. In general, this OSS has been incorporated and is used pursuant to 'permissive' OSS licenses, which are designed to be compatible with Grab's use and commercialization of its own proprietary code base. However, Grab has also incorporated and uses some OSS under restrictive OSS licenses. Under these restrictive OSS licenses, Grab could be required to release to the public the source code of certain elements of its proprietary software which: (i) incorporate OSS or modified OSS in a certain manner; and (ii) have been conveyed or distributed to the public, or which the public interacts with. In some cases, Grab may be required to ensure that such elements of its proprietary software are licensed to the public on the terms set out in the relevant OSS license or at no cost. This could allow competitors to use certain elements of Grab's proprietary software on a relatively unrestricted basis, or develop similar software at a lower cost. In addition, open source licensors generally do not provide warranties for their open source software, and the open source software may contain security vulnerabilities that Grab must actively manage or patch. It may be necessary for Grab to commit substantial resources to remediate its use of OSS under restrictive OSS licenses, for example by engineering alternative or work-around code.

There is an increasing number of open-source software license types, and the terms under many of these licenses are unclear or ambiguous, and have not been interpreted by U.S. or foreign courts, and therefore, the potential impact of such licenses on Grab's business is not fully known or predictable. As a result, these licenses could be construed in a way that could impose unanticipated conditions or restrictions on Grab's ability to commercialize its own proprietary code (and in particular the elements of its proprietary code which incorporates OSS or modified OSS). Furthermore, Grab could become subject to lawsuits or claims challenging its use of open source software or compliance with open source license terms. If unsuccessful in these lawsuits or claims, Grab may face IP infringement or other liabilities, be required to seek costly licenses from third parties for the continued use of third-party IP, be required to re-engineer elements of its proprietary code base (e.g. for the sake of avoiding third-party IP infringement), discontinue or delay the use of infringing aspects of its proprietary code base (such as if re-engineering is not feasible), or disclose and make generally available, in source code form, certain elements of its proprietary code.

More broadly, the use of OSS can give rise to greater risks than the use of commercially acquired software, since open source licensors usually limit their liability in respect of the use of the OSS, and do not provide support, warranties, indemnifications or other contractual protections regarding the use of the OSS which would ordinarily be provided in the context of commercially acquired software.

Any of the foregoing could adversely impact the value of certain elements of Grab's proprietary code base, and its ability to enforce its intellectual property rights in such code base against third parties. In turn, this could materially adversely affect Grab's business, financial condition, results of operations and prospects.

*Grab's business is subject to concentration risks.*

Grab's deliveries, mobility, financial services and enterprise and new initiatives segments represented 24.8%, 66.4%, 3.5% and 5.3%, respectively, of its revenue in the six months ended June 30, 2021 and 1.2%, 93.3%, (2.2)% and 7.7%, respectively, of its revenue in the year ended December 31, 2020. As more than 90% of Grab's revenue was derived from its deliveries and mobility segments in the six months ended June 30, 2021 and the year ended December 31, 2020, to the extent demand for deliveries and/or mobility offerings are impacted by adverse events, changes in laws or regulations, driver- and merchant-partner supply or consumer-demand based factors, a significant portion of Grab's business could be adversely impacted. As a result of Grab's business concentration in its deliveries and mobility segments, adverse developments with respect to such segments could adversely affect Grab's business, financial condition, results of operations and prospects.

89

**Table of Contents**

***Grab's business depends heavily on insurance coverage provided by third parties, and Grab is subject to the risk that this may be insufficient or that insurance providers may be unable to meet their obligations.***

Grab's business depends heavily on (i) insurance coverage for driver-partners and on other types of insurance for additional risks related to its business, and (ii) the driver-partners' ability to procure and maintain insurance required by law. Grab maintains a large number of insurance policies, including, but not limited to, general liability, workers' compensation, property, cybersecurity and information risk liability, errors and omissions liability and director and officers' liability. If Grab's insurance providers change the terms of Grab's policies in an adverse manner, Grab's insurance costs could increase, and if the insurance coverage Grab maintains is not adequate to cover losses that occur, Grab could be liable for additional costs. Additionally, if any of Grab's insurance providers becomes insolvent, it would be unable to pay any claim that Grab makes.

For example, Grab or the relevant regulator requires driver-partners to carry automobile insurance in most countries, and in many cases, Grab also maintains insurance on behalf of driver-partners. Grab relies on a limited number of insurance providers, and should such providers discontinue or increase the cost of coverage, Grab cannot guarantee that Grab, on behalf of driver-partners, would be able to secure replacement coverage on reasonable terms or at all. If Grab is required to purchase additional insurance for other aspects of its business, or if Grab fails to comply with regulations governing insurance coverage, its business could be harmed. Grab also faces risks with respect to its insurance coverage in countries where its business is not yet subject to specific regulations, such as Thailand, as insurance providers may choose to refuse coverage as a result of a lack of clear regulation of the relevant business.

Grab may also be subject to claims of significant liability based on traffic accidents, injuries, or other incidents that are claimed to have been caused by its driver- or merchant-partners. Even if these claims do not result in liability, Grab could incur significant costs in investigating and defending against them. If Grab is subject to claims of liability relating to the acts of driver- or merchant-partners or others using its platform, Grab may be subject to negative publicity and incur additional expenses, which could harm Grab's business, financial condition, results of operations and prospects.

***Increases in fuel, food, labor, energy, and other costs could adversely affect Grab.***

Factors such as inflation, increased fuel prices, and increased vehicle purchase, rental, or maintenance costs may increase the costs incurred by Grab's driver-partners when providing services on its platform. Similarly, factors such as inflation, increased food costs, increased labor and employee benefit costs, increased rental costs, and increased energy costs may increase merchant-partner operating costs. Many of the factors affecting driver- and merchant-partner costs are beyond the control of these parties. In many cases, these increased costs may cause driver-partners to spend less time providing services on the Grab platform or to seek alternative sources of income. Likewise, these increased costs may cause merchant-partners to pass costs on to consumers by increasing prices. A decreased supply of consumers and driver- and merchant-partners on the Grab platform could harm its business, financial condition, results of operations and prospects.

***An increase in the use of credit and debit cards may result in lower growth or a decline in the use of Grab's e-wallet.***

Due to the underdevelopment of the banking industry in Southeast Asia, a significant portion of the population in these markets do not have access to credit or debit cards. In addition, many may be unwilling to use debit or credit cards for online transactions due to security concerns. Through the GrabPay wallet, consumers can make payments through the Grab superapp. However, if the banking industry in Southeast Asia continues to develop and there is a significant increase in the availability, acceptance and use of credit cards or debit cards for online or offline payments by consumers in Southeast Asia, usage of Grab's e-wallet could decline.

***Grab's reported results of operations may be adversely affected by changes in accounting principles.***

The accounting for Grab's business is complicated, particularly in the area of revenue recognition, and is subject to change based on the evolution of its business model, interpretations of relevant accounting principles,

90

**Table of Contents**

enforcement of existing or new regulations, and changes in SEC or other agency policies, rules, regulations, and interpretations of accounting regulations. Changes to Grab's business model and accounting policies could result in changes to its financial statements, including changes in revenue and expenses in any period, or in certain categories of revenue and expenses moving to different periods, may result in materially different financial results, and may require that Grab change how Grab processes, analyzes and reports financial information and Grab's financial reporting controls.

*Grab allows consumers to pay for rides, deliveries and other offerings or services through its platform using cash, which raises numerous regulatory, operational, and safety concerns.*

Grab allows consumers to use cash to pay its driver-partners the entire fare of rides and cost of deliveries (including the service fee payable to Grab by driver-partners from such rides and deliveries). In 2020, cash-paid trips accounted for nearly 43% of Grab's transactions. The use of cash raises numerous regulatory, operational, and safety concerns. For example, cash collection in some jurisdictions may fall into an ambiguous area between regulated banking activity that requires licenses and activity that is unregulated by relevant law, which creates uncertainty. Failure to comply with regulations could result in the imposition of significant fines and penalties and could result in regulators requiring that Grab suspend operations in those jurisdictions. In addition to these regulatory concerns, the use of cash can increase safety and security risks for its driver-partners, including potential robbery, assault, violent or fatal attacks, and other criminal acts. In certain jurisdictions where Grab operates serious safety incidents, including robberies and violent attacks on driver-partners while they were using the Grab platform, have been reported. Grab has undertaken steps to minimize the use of cash by working with governments on initiatives to drive cashless penetration, providing consumer incentives such as coupons, vouchers or its rewards program to encourage use of GrabPay. In addition, in certain markets the use of cash has been limited due to government measures in light of the COVID-19 pandemic.

In addition, establishing the proper infrastructure to ensure that Grab receives the correct fee on cash trips is complex, and has in the past meant and may continue to mean that Grab cannot collect the entire fee for certain cash-based transactions. Grab has created systems for driver-partners to collect and deposit the cash received for cash-based trips and deliveries, as well as systems for Grab to collect, deposit, and properly account for the cash received, some of which are not always effective, convenient, or widely-adopted. Creating, maintaining, and improving these systems requires significant effort and resources, and Grab cannot guarantee these systems will be effective in collecting amounts due to Grab. Further, operating a business that uses cash raises compliance risks with respect to a variety of rules and regulations, including anti-money laundering laws. If driver-partners fail to pay Grab under the terms of its agreements or if its collection systems fail, Grab may be adversely affected by both the inability to collect amounts due and the cost of enforcing the terms of its contracts, including litigation. Such collection failure and enforcement costs, along with any costs associated with a failure to comply with applicable rules and regulations, could harm Grab's business, financial condition, results of operations and prospects.

*Grab may be affected by governmental economic and trade sanctions laws and regulations that apply to Myanmar.*

Grab may be affected by economic and trade sanctions administered by governments relating to Myanmar, including the U.S. government (including without limitation regulations administered and enforced by OFAC, the U.S. Department of Commerce's Bureau of Industry and Security ("BIS"), and the U.S. Department of State), the Council of the European Union, the Office of Financial Sanctions Implementation of Her Majesty's Treasury in the United Kingdom ("OFSI") and the United Nations Security Council. For example, on February 11, 2021, the U.S. government implemented new sanctions with respect to Myanmar in response to the February 1, 2021, military coup. These economic and trade sanctions currently prohibit or restrict transactions and dealings with certain individuals and entities in Myanmar, including with individuals and entities included on OFAC's List of Specially Designated Nationals (the "SDN List") and the Department of Commerce's Entity List, subject to EU or UK asset freezes, or other sanctions measures. On March 4, 2021, BIS added two military and security

91

**Table of Contents**

services entities it identified as responsible for the military coup and escalating violence in Myanmar to the Entity List, along with two commercial entities that are owned and operated by one of these entities, and implemented new restrictions on exports and reexports to Burma, and transfers (in-country) within Myanmar, of certain sensitive items subject to the U.S. Export Administration Regulations. On March 25, 2021, OFAC designated two military holding companies, Myanmar Economic Holdings Public Company Limited ("MEHL") and Myanmar Economic Corporation Limited ("MEC"). On April 8, 2021, OFAC designated Myanmar Gems Enterprise, on April 21, OFAC further designated Myanmar Timber Enterprise and Myanmar Pearl Enterprise, and on May 17, OFAC designated the State Administrative Council together with certain members of the military regime. On July 2, 2021, OFAC sanctioned additional senior officials of Myanmar's military and certain of their family members, and BIS added four entities that have provided support to Myanmar's military to the Department of Commerce's Entity List. Similarly, on February 18 and 25, 2021, the UK designated nine Myanmar military officers, announcing asset freezes and travel bans and on March 25 and April 1, 2021, the UK respectively sanctioned MEHL, MEC, and their subsidiaries. On March 22, the European Council designated 11 Myanmar government officials, and on April 19, 2021, further designated an additional ten Myanmar government officials, as well as MEHL and MEC. The EU has also announced that it is ready to withhold financial support from the development system to government reform programs. It is possible that the U.S. government, the EU or the UK may increase sanctions on Myanmar or specific individuals and entities in Myanmar in the future. Other jurisdictions may also introduce new sanctions on Myanmar or expand existing sanctions. Continued geopolitical tensions as well as existing and any additional sanctions could result in a material adverse impact on Myanmar's economy, and while Grab's operations in Myanmar represent less than one percent of its revenue, Grab's future prospects in Myanmar could be adversely affected. There is a risk that, despite the internal controls Grab has in place, Grab has engaged or could potentially engage in dealings with persons sanctioned under applicable sanctions laws. Any non-compliance with economic and trade sanctions laws and regulations or related investigations could result in claims or actions against Grab and materially adversely affect its business, financial condition, results of operations and prospects. As Grab's business continues to grow and regulations change, Grab may be required to make additional investments in its internal controls or modify its business.

***During the interim period prior to the consummation of the Business Combination, Grab is prohibited from entering into certain transactions that might otherwise be beneficial to Grab and its shareholders.***

Until the earlier of consummation of the Business Combination or termination of the Business Combination Agreement, Grab is subject to certain limitations on the operations of its business, as summarized under "The Business Combination Proposal—The Business Combination Agreement—Covenants of the Parties—Covenants of Grab." The limitations on Grab's conduct of its business during this period could have the effect of delaying or preventing other strategic transactions and may, in some cases, make it impossible to pursue business opportunities that are available only for a limited time.

***Grab is subject to certain risks in connection with the development of its new headquarters building.***

Grab is in the process of setting up a new headquarters building with 42,310 square meters at One-North business park in Singapore, which is expected to be completed and then ready for use by the fourth quarter of 2021. There can be no assurance that Grab's new headquarters will be completed on time, before Grab's current leases expire, within budget or at all, or that Grab will be able to transition into the new facilities seamlessly. If Grab's new headquarters is not completed on time or at all, Grab's business may suffer as it may incur substantial costs to identify alternative space to accommodate its employees and operations. Furthermore, there can be no assurance that the new headquarters building will adequately serve its intended purposes. Any of the foregoing could have a material and adverse effect on Grab's business, financial condition, results of operation and prospects.

92

*Grab's business could be impacted by environmental regulations and policies and related changes in consumer behavior.*

Governments in the jurisdictions in which Grab operates may implement regulations and policies aimed at addressing climate change or other environmental concerns including, among others, with respect to emission reduction and higher electrification of the automotive industry, as well as those limiting the use of single-use packaging and utensils. The cost of regulatory compliance for internal combustion engine vehicles could increase or governments may take action to reduce the number of internal combustion engine vehicles on the road. Although Grab has taken measures to increase the proportion of low emission vehicles in its fleet of rental vehicles, government policies or regulations may be implemented quickly. The foregoing could increase costs for Grab, including with respect to changes in regulations, policies and operations, require Grab to purchase new vehicles for or increase costs with respect to its rental fleet, and also create challenges for driver-partners as it could raise costs with respect to vehicle ownership or rental. In addition, Grab may have to incur additional cost for compliance with regulations with respect to, and operating, a fleet of electric vehicles. Furthermore, Grab's business could be impacted by increased environmental awareness among consumers, for example with respect to the usage of single-use packaging and utensils or mobility or deliveries services generally.

**Risks Relating to Grab's Corporate Structure and Doing Business in Southeast Asia**

*In certain jurisdictions, Grab is subject to restrictions on foreign ownership.*

The laws and regulations in many markets in Southeast Asia, including Thailand, Vietnam, Philippines and Indonesia where Grab conducts its business, place restrictions on foreign investment in, control over, management of, ownership of and ability to obtain licenses for entities engaged in a number of business activities. Set forth below is certain information with respect to foreign ownership restrictions relevant to Grab's businesses in these jurisdictions. For more information, see "Regulation" and "Corporate Structure."

*Thailand*

Pursuant to the Thai Foreign Business Act B.E. 2542 (1999) (the "FBA") a person or entity that is "Non-Thai" (as defined in the FBA and described in "Regulatory Environment – Thailand") cannot conduct certain restricted businesses in Thailand, including the businesses that Grab's entities in Thailand operate, unless an appropriate license is obtained. In addition, the Civil and Commercial Code of Thailand (as amended) requires a private company to have a minimum number of three shareholders. Grab's deliveries, mobility and financial services businesses are each conducted through a Thai operating entity established using a tiered shareholding structure, so that each Thai entity is more than 50% owned by a Thai person or entity. As Grab's entities in Thailand are more than 50% owned by Thai persons or entities and Thai laws only consider the immediate level of shareholding (and no cumulative or look-through calculation is applied to determine the foreign ownership status of a company when it has several levels of foreign shareholding), these Thai operating entities are considered Thai entities under the FBA and are not required under the FBA to obtain licenses prescribed thereunder. Under the FBA, it is also unlawful for a Thai national or entity to hold shares in a Thai company as a nominee for or on behalf of a foreigner in order to circumvent the foreign ownership restrictions. While there are no prescribed requirements or criteria under the FBA or promulgated by the Ministry of Commerce of Thailand for determining whether a Thai national or entity is holding shares in a Thai company with his or her own genuine investment intent or as a nominee for or on behalf of a foreigner, the relevant authorities may follow certain guidelines, but generally may exercise discretion in making such a determination.

Under this tiered shareholding structure, Grab's Thai operating entities are each owned by Grabtaxi Holdings (Thailand) Co., Ltd which owns 75% of the shares of Grab's Thai operating entities, with the balance owned by one of Grab's subsidiaries. Grabtaxi Holdings (Thailand) Co., Ltd is owned by a Thai entity ("Thai Entity 1") holding over half of the shares of Grabtaxi Holdings (Thailand) Co., Ltd (with the balance primarily owned by an affiliate of Grab's Thai business partner, the Central Group). Thai Entity 1 is in turn owned by another Thai entity ("Thai Entity 2") holding over half of the shares of Thai Entity 1 (with the balance primarily

93

owned by one of Grab's subsidiaries). Thai Entity 2 is held by a Thai national who is a senior executive of Grab Thailand holding preference shares equivalent to more than half of the total number of shares of Thai Entity 2 (with the balance primarily held by Grab's subsidiary holding ordinary shares equivalent to slightly less than half of the total number of shares of Thai Entity 2). For more information, see the section titled "Grab's Business— Corporate Structure." Pursuant to the organizational documents of Thai Entity 2, Grab's rights, which include the quorum for a shareholders meeting requiring Grab's attendance and all shareholder resolutions requiring Grab's affirmative vote, enable Grab to control its Thai operating entities and consolidate the financial results of these operating entities in its financial statements in accordance with IFRS. The preference shares of Thai Entity 2 have limited rights to dividends and distributions. The non-controlling interests of relevant Thai shareholders are accounted for in Grab's financial statements.

*Vietnam*

Pursuant to the Law on Investment No. 61/2020/QH14 passed by the National Assembly on June 17, 2020 (the "Investment Law 2020") and the Schedule of Specific Commitments in Services in Vietnam's Commitments to the WTO, Grab's four-wheeled mobility business is subject to a foreign ownership limit of 49%. Grab's deliveries and mobility businesses in Vietnam are conducted through a Vietnamese operating company, the shares of which are owned 49% by Grab, with the balance 51% held by a Vietnamese national who is a senior executive of Grab Vietnam. Through contractual arrangements with this Vietnamese shareholder, Grab is able to control its Vietnamese operating entity and consolidate its financial results in its financial statements in accordance with IFRS.

*Philippines*

Pursuant to the 1987 Constitution of the Republic of the Philippines, entities engaged in the operation of a public utility are required to be at least 60% owned by Philippine citizens. Grab's four wheel-deliveries and mobility businesses, which are subject to this restriction, are conducted through Philippine operating entities, the shares of which are each owned by a Philippine holding company, which owns 60% of the shares of the Philippine operating entities, with the balance owned by Grab's subsidiaries. The shares of the Philippine holding company are owned 40% by Grab, with the balance 60% of the shares held by an entity owned by a Philippine national who is a director of certain of Grab's operating entities in the Philippines, including MyTaxi.PH, Inc. (upon receipt of relevant Philippine regulatory approvals, the ordinary shares held by Grab and a special purpose vehicle owned by the Philippine shareholder will subscribe to preference shares that will give the Philippine shareholder a 60% voting interest in the Philippine shareholder will be acquired by the Philippine holding company but with limited rights to dividends). Through contractual arrangements with the Philippine shareholder (and, once the preferred shares are issued, together with certain rights attendant to the classes of shares in, and as otherwise set forth in the organizational documents of, the Philippine holding company), Grab is able to (i) appoint directors in proportion to its shareholding interest, (ii) exercise veto rights with respect to certain reserved matters that fundamentally affect the business of the company, (iii) receive the economic benefits and absorb losses of the Philippine entities in proportion to the amount and value of Grab's investment, (iv) have an exclusive call option to purchase all or part of the equity interests in the event of any change in Philippine law that results in non-Philippine nationals being allowed to hold more than 40% of the outstanding capital stock or shares entitled to vote in the election of directors of entities engaged in nationalized activities and (v) consolidate the financial results in Grab's consolidated financial statements in accordance with IFRS. The non-controlling interest of the Philippine shareholder is accounted for in Grab's consolidated financial statements.

*Indonesia*

Grab's payment system services business is conducted through PT Bumi Cakrawala Perkasa ("BCP"), an Indonesian entity which owns OVO. BCP is subject to an 85% foreign investment limit (based on ultimate beneficial ownership of shares) pursuant to a payment system regulation which took effect on July 1, 2021. Under this regulation, a voting power limitation of 49% applies to foreign shareholders, and foreign shareholders

94

**Table of Contents**

are prohibited from holding (A) the right to nominate the majority of directors and commissioners, and (B) veto rights with respect to certain strategic decisions that have a significant impact on the company to be adopted at a general meeting of shareholders. Grab owns 79.6% of BCP, which, due to a dual-class structure, represents a 30.2% voting interest, and Grab also has contractual rights to (a) control the appointment of the Chief Executive Officer, and the Chief Financial Officer (including the right to nominate any such officers as directors or as president director), (b) approve the budget and business plan of BCP and its subsidiaries; (c) approve future funding of BCP and its subsidiaries, whether through debt, equity or otherwise, and (d) certain economic rights with respect to the remaining shareholding of BCP. If the foregoing contractual rights are considered to be foreign controlled, BCP could be deemed to be in non-compliance with the foreign investment limit and, as a result, Bank Indonesia may impose administrative sanctions on OVO (including among others, warnings, temporary suspension or suspension of a part of or the entire business activity (including any cooperation) and, if OVO does not take any action with regard to these administrative sanctions, it may lead to revocation of the e-money license. If revocation of the e-money license happens, OVO's business, results of operations, financial condition and prospects could be materially and adversely impacted. Grab consolidates BCP's financial results in its financial statements in accordance with IFRS. If Grab is required to amend the shareholding, voting structure or other rights as a foreign shareholder with respect to BCP, Grab may be prevented from continuing to consolidate OVO in its consolidated financial statements. Furthermore, BCP may be limited in its ability to receive cash contributions for additional equity and Grab and other foreign shareholders may be limited in their ability to acquire shares in BCP and if Indonesian shareholders or parties are unwilling to make such contributions, OVO's business, results of operations, financial condition and prospects could be materially and adversely impacted.

In addition, Grab conducts its point to point courier delivery business through PT Solusi Pengiriman Indonesia ("SPI"), in which a 94.12% owned subsidiary of Grab owns 49%, and Grab conducts its car rental (with driver-partners) business through PT Teknologi Pengangkutan Indonesia ("TPI"), in which a wholly-owned subsidiary of Grab owns 49%. Grab has entered into contractual arrangements with a third-party Indonesian shareholder (in the case of SPI) and a senior executive of Grab (in the case of TPI), each of which holds 51% of the shares of SPI and TPI, respectively, as a result of which Grab is able to control SPI and TPI and consolidate their financial results in Grab's financial statements in accordance with IFRS.

Based on Grab's assessment as of the date of this proxy statement/prospectus and opinions of counsel from Baker & McKenzie Ltd. with respect to Thailand, SyCip Salazar Hernandez & Gatmaitan with respect to the Philippines, YKVN LLC with respect to Vietnam and Soewito Suhardiman Eddymurthy Kardono with respect to Indonesia, Grab believes its arrangements in Thailand, Vietnam, the Philippines and Indonesia (other than as set forth above) are in compliance with applicable local laws and regulations. However, local or national authorities or regulatory agencies in any of Thailand, Vietnam, the Philippines or Indonesia, may conclude that Grab's arrangements in their respective jurisdictions are in violation of local laws and regulations.

If authorities in any of Thailand, Vietnam, the Philippines or Indonesia believe that Grab's ownership of, or arrangements with respect to, relevant entities do not comply with applicable laws and regulations, including requirements, prohibitions or restrictions on foreign investment in Grab's lines of business or with respect to necessary registrations, permits or licenses to operate Grab's businesses in such jurisdictions, they would have broad discretion in dealing with such violations or failures, including imposing civil or criminal sanctions or financial penalties against Grab, deeming Grab's arrangements void by law and requiring Grab to restructure its ownership structure or operations, revoking Grab's business licenses and/or operating licenses, prohibiting payments from and funding to Grab's entities or ordering Grab to cease its operations in the relevant jurisdiction. The foregoing could also result in the inability to consolidate the financial results of relevant entities in Grab's financial statements in accordance with IFRS.

In addition, to the extent there are disagreements between Grab and its partners, counterparties or holders of equity or other interests, or any of their associated persons such as a holder's spouse or other family members, with respect to relevant entities, including the business and operation of these entities, Grab cannot assure you

95

**Table of Contents**

that it will be able to resolve such matters in a manner that will be in Grab's best interests or at all. These persons may be unable or unwilling to fulfill their obligations, whether of a financial nature or otherwise, have economic or business interests or goals that are inconsistent with Grab's, take actions contrary to Grab's instructions or requests, or contrary to Grab's policies and objectives, take actions that are not acceptable to regulatory authorities, or experience financial difficulties. Actions taken by governmental authorities or disputes between Grab and its partners, counterparties or holders of equity or other interests, or any of their associated persons could cause Grab to incur substantial costs in defending its rights.

***Grab is subject to risks associated with operating in the rapidly evolving Southeast Asia, and Grab is therefore exposed to various risks inherent in operating and investing in the region.***

Grab derives all of its revenue from its operations in countries located in Southeast Asia, and Grab intends to continue to develop and expand its business and penetration in the region. Grab's operations and investments in Southeast Asia are subject to various risks related to the economic, political and social conditions of the countries in which Grab operates, including risks related to the following:

- inconsistent and evolving regulations, licensing and legal requirements may increase Grab's operational risks and cost of operations among the countries in Southeast Asia in which Grab operates;

- currencies may be devalued or may depreciate or currency restrictions or other restraints on transfer of funds may be imposed;

- the effects of inflation within Southeast Asia generally and/or within any specific country in which Grab operates may increase Grab's cost of operations;

- governments or regulators may impose new or more burdensome regulations, taxes or tariffs;

- political changes may lead to changes in the business, legal and regulatory environments in which Grab operates;

- economic downturns, political instability, civil disturbances, war, military conflict, religious or ethnic strife, terrorism and general security concerns may negatively affect Grab's operations;

- enactment or any increase in the enforcement of regulations, including, but not limited to, those related to personal data protection and localization and cybersecurity, may incur compliance costs;

- health epidemics, pandemics or disease outbreaks (including the COVID-19 outbreak) may affect Grab's operations and demand for its offerings; and

- natural disasters like volcanic eruptions, floods, typhoons and earthquakes may impact Grab's operations severely.

For example, volatile political situations in certain Southeast Asian countries could impact Grab's business. In Myanmar, following the military taking power in February 2021, there have been and continue to be mass protests and instability disrupting business activities. In Thailand, anti-government protest movements demanding the dissolution of parliament and a new democratic constitution continue to take place on a consistent basis, and Vietnam is undergoing changes to its government leadership in 2021. In addition, presidential elections are due to take place in the Philippines in 2022 and Indonesia in 2024, where elections in the past have led to uncertainty, impacting markets and leading to unrest. In Malaysia, there have been several changes in the governing party in the past few years. Any disruptions in Grab's business activities or volatility or uncertainty in the economic, political or regulatory conditions in the markets Grab operates in, could adversely affect Grab's business, financial condition, results of operations and prospects.

Additionally, the laws in the countries in which Grab operates may change and their interpretation and enforcement may involve significant uncertainties that could limit the reliability of the legal protections available to Grab. Grab cannot predict the effects of future developments in the legal regimes in the countries in which Grab operates.

96

Any of the foregoing risks may adversely affect Grab's business, financial condition, results of operations and prospects.

***Grab's revenue and net income may be materially and adversely affected by any economic slowdown or developments in the social, political, regulatory and economic environments in any regions of Southeast Asia as well as globally.***

Grab may be adversely affected by social, political, regulatory and economic developments in countries in which Grab operates. Grab derives all of Grab's revenue from Southeast Asia and are exposed to political and economic uncertainties, including, but not limited to, the risks of war, terrorism, nationalism, nullification of contract, changes in interest rates, imposition of capital controls and methods of taxation that affect consumer confidence, consumer spending, consumer discretionary income or changes in consumer purchasing habits. As a result, Grab's revenue and net income could be impacted to a significant extent by economic conditions in Southeast Asia and globally.

Substantially all of Grab's assets and operations are located in Southeast Asia, and Grab's revenue in Singapore, Malaysia, Vietnam and the rest of Southeast Asia was $246 million, $91 million, $76 million and $56 million in the year ended December 31, 2020, respectively and $(30) million, $92 million, $(26) million and $(881) million in the year ended December 31, 2019, respectively. As more than half of Grab's revenue in 2020 was derived from its operations in Singapore, Grab's business, financial condition and results of operations may be influenced to a significant degree by political, economic and social conditions in Southeast Asia generally, and in particular, in Singapore. The economies in certain Southeast Asian countries differ from most developed markets in many respects, including the level of government involvement, level of development, growth rate, control of foreign exchange, government policy on public order and allocation of resources. In some of the Southeast Asia markets, governments continue to play a significant role in regulating industry development by imposing industrial policies. Moreover, some local governments also exercise significant control over the economic growth and public order in their respective jurisdictions through allocating resources, controlling payment of foreign currency-denominated obligations, setting monetary policies, and providing preferential treatment to particular industries or companies.

While the Southeast Asia economy, as a whole, has experienced significant growth over the past decades, growth has been uneven, both geographically and among various sectors of the economy. Any adverse changes in economic conditions in Southeast Asia or in other markets in neighboring regions (such as China and Japan), or in the policies of the governments or of the laws and regulations in each respective market could have a material adverse effect on the overall economic growth of Southeast Asia. Such developments could adversely affect Grab's business and operating results, lead to reduction in demand for Grab's offerings and adversely affect Grab's competitive position. Many of the governments in Southeast Asia have implemented various measures to encourage economic growth and guide the allocation of resources. Some of these measures may benefit the overall economy, but may have a negative effect on Grab. For example, Grab's financial condition and results of operations may be adversely affected by government control over foreign capital investments or changes in tax regulations. Some Southeast Asia markets have historically experienced low growth in their GDP, significant inflation and/or shortages of foreign exchange. Grab is exposed to the risk of rental and other cost increases due to potential inflation in the markets in which Grab operates. In the past, some of the governments in Southeast Asia have implemented certain measures, including interest rate adjustments, currency trading band adjustments and exchange rate controls, to control the pace of economic growth. These measures may cause decreased economic activity in Southeast Asia, which may adversely affect Grab's business, financial condition, results of operations and prospects.

In addition, some Southeast Asia markets have experienced, and may in the future experience, political instability, including strikes, demonstrations, protests, marches, coups d'état, guerilla activity or other types of civil disorder. These instabilities and any adverse changes in the political environment could increase Grab's costs, increase its exposure to legal and business risks, disrupt its office operations or affect its ability to expand Grab's user base.

Table of Contents

*Uncertainties with respect to the legal system in certain markets in Southeast Asia could adversely affect Grab.*

The interpretation and enforcement of laws and regulations involve uncertainties and inconsistencies. Since local administrative and court authorities and in certain cases, independent organizations, have significant discretion in interpreting and implementing statutory provisions and contractual terms, it may be difficult to evaluate the outcome of administrative and court proceedings and the level of legal protection Grab may enjoy in many of the localities that Grab operates in. Moreover, local courts may have broad discretion to reject enforcement of foreign awards. These uncertainties may affect Grab's judgment on the relevance of legal requirements and its ability to enforce Grab's contractual rights or tort claims. In addition, the regulatory uncertainties may be exploited through unmerited or frivolous legal actions or threats in attempts to extract payments or benefits from Grab.

It is possible that a number of laws and regulations may be adopted or construed to apply to Grab in Southeast Asia and elsewhere that could restrict Grab's business segments. Scrutiny and regulation of the business segments in which Grab operates may further increase, and Grab may be required to devote additional legal and other resources to addressing these regulations. Changes in current laws or regulations or the imposition of new laws and regulations in Southeast Asia or elsewhere regarding Grab's business segments may slow the growth of Grab's business segments and adversely affect its business, financial condition, results of operations and prospects.

*Grab could face uncertain tax liabilities in various jurisdictions where Grab operates, and suffer adverse financial consequences as a result.*

Grab's management believes Grab is in compliance with all applicable tax laws in the various jurisdictions where Grab is subject to tax, but its tax liabilities could be uncertain, and Grab could suffer adverse tax and other financial consequences if tax authorities do not agree with Grab's interpretation of the applicable tax laws.

Although Grab Holdings Inc. is incorporated in the Cayman Islands, Grab collectively operates in multiple tax jurisdictions and pays income taxes according to the tax laws of these jurisdictions. Various factors, some of which are beyond Grab's control, determine its effective tax rate and/or the amount Grab is required to pay, including changes in or interpretations of tax laws in any given jurisdiction and changes in geographical allocation of income. Grab accrues income tax liabilities and tax contingencies based upon its best estimate of the taxes ultimately expected to be paid after considering its knowledge of all relevant facts and circumstances, existing tax laws, its experience with previous audits and settlements, the status of current tax examinations and how the tax authorities view certain issues. Such amounts are included in income taxes payable or deferred income tax liabilities, as appropriate, and are updated over time as more information becomes available.

Grab's management believes that Grab is filing tax returns and paying taxes in each jurisdiction where Grab is required to do so under the laws of such jurisdiction. However, it is possible that the relevant tax authorities in the jurisdictions where Grab does not file returns may assert that Grab is required to file tax returns and pay taxes in such jurisdictions. There can be no assurance that the subsidiaries will not be taxed in multiple jurisdictions in the future, and any such taxation in multiple jurisdictions could adversely affect Grab's business, financial condition and results of operations.

In addition, Grab may, from time to time, be subject to inquiries or audits from tax authorities of the relevant jurisdictions on various tax matters, including challenges to positions asserted on income and withholding tax returns. Grab cannot be certain that the tax authorities will agree with its interpretations of the applicable tax laws, or that the tax authorities will resolve any inquiries in its favor. To the extent the relevant tax authorities do not agree with its interpretation, Grab may seek to enter into settlements with the tax authorities which may require significant payments and may adversely affect its results of operations or financial condition. Grab may also appeal against the tax authorities' determinations to the appropriate governmental authorities, but Grab cannot be sure Grab will prevail. If Grab's appeal does not prevail, it may have to make significant payments or otherwise record charges (or reduce tax assets) that could adversely affect its results of operations,

98

financial condition and cash flows. Similarly, any adverse or unfavorable determinations by tax authorities on pending inquiries could lead to increased taxation on Grab, that may adversely affect its business, financial condition and results of operations and may also impact its reputation, including but not limited to tax and other regulatory authorities in Southeast Asia. For example, in March 2021, as part of a routine tax audit in Indonesia which commenced in September 2020, the tax authority requested for information with respect to Grab's position on certain withholding tax matters relating to transactions in fiscal year 2018. Although Grab has not received any tax assessment with respect to any potential relevant tax liabilities, depending on the outcome of this tax audit, if the relevant tax authority makes an assessment that Grab owes additional taxes, Grab could be subject to material tax liabilities.

***Natural events, wars, terrorist attacks and other acts of violence involving any of the countries in which Grab has operations could adversely affect its operations.***

Natural disaster events (such as earthquakes, tsunamis, volcanic eruptions, floods, tropical weather conditions and landslides), terrorist attacks, civil unrest, protests and other acts of violence or war may adversely disrupt Grab's operations, lead to economic weakness in the countries in which they occur and affect worldwide financial markets, and could potentially lead to economic recession, which could have an adverse effect on Grab's business, financial condition and results of operations. These events could precipitate sudden significant changes in regional and global economic conditions and cycles. These events also pose significant risks to Grab's people and to its business operations. In particular, one of Grab's largest markets is Indonesia. Indonesia is located in a geologically active part of the world, and has been subject to various forms of natural disasters that have in the past resulted in major losses of life and property and could result in disruptions to Grab's business.

**Risks Relating to AGC and the Business Combination**

***AGC's current directors and executive officers and their affiliates have interests that are different than, or in addition to (and which may conflict with), the interests of its shareholders, and therefore potential conflicts of interest exist in recommending that shareholders vote in favor of approval of the Business Combination. Such conflicts of interests include that the Sponsor as well as AGC's executive officers and directors will lose their entire investment in AGC if the Business Combination is not completed.***

When considering the AGC Board's recommendation to vote in favor of approving the Business Combination Proposal, the Initial Merger Proposal and the Governing Documents Proposal, AGC shareholders should keep in mind that the Sponsor, Sponsor Affiliate and AGC's directors and executive officers, have interests in such proposals that are different from, or in addition to (and which may conflict with), those of AGC shareholders and warrant holders generally.

These interests include, among other things, the interests listed below:

- the fact that the Sponsor and AGC's directors have agreed not to redeem any AGC Class B Ordinary Shares held by them in connection with a shareholder vote to approve the proposed Business Combination;

- the fact that Sponsor paid an aggregate of $25,000 for the 12,500,000 AGC Class B Ordinary Shares currently owned by Sponsor and its directors and such securities will have a significantly higher value after the Business Combination. As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these shares, if unrestricted and freely tradable, would be $186,625,000, based upon a closing price of $14.93 per public share on NASDAQ (and will have zero value if neither this Business Combination nor any other business combination is completed on or before the Final Redemption Date);

- the fact that Sponsor paid $12,000,000 to purchase an aggregate of 12,000,000 private placement warrants, each exercisable to purchase one AGC Class A Ordinary Share at $11.50, subject to adjustment, at a price of $1.00 per warrant, and those warrants would be worthless – and the entire

99

Table of Contents

$12,000,000 warrant investment would be lost – if a Business Combination is not consummated by the Final Redemption Date. As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these warrants, if unrestricted and freely tradable, would be $56,400,000, based upon a closing price of $4.70 per AGC Warrant on NASDAQ;

• the fact that given the differential in the purchase price that Sponsor paid for the AGC Class B Ordinary Shares as compared to the price of the Units sold in AGC's IPO and the substantial number of shares of GHL Class A Ordinary Shares that Sponsor will receive upon conversion of the AGC Class B Ordinary Shares in connection with the Business Combination, the Sponsor and its affiliates may earn a positive rate of return on their investment even if the GHL Class A Ordinary Shares trade below the price initially paid for the Units in the AGC IPO and the AGC public shareholders experience a negative rate of return following the completion of the Business Combination;

• the fact that Sponsor and AGC's directors have agreed to waive their rights to liquidating distributions from the trust account with respect to any AGC Shares (other than public shares) held by them if AGC fails to complete an initial business combination by the Final Redemption Date;

• the fact that pursuant to the Registration Rights Agreement, the Sponsor can demand that GHL register its registrable securities under certain circumstances and will also have piggyback registration rights for these securities in connection with certain registrations of securities that GHL undertakes;

• the fact that Sponsor Affiliate has agreed to purchase, pursuant to the Amended and Restated Forward Purchase Agreement with Sponsor Affiliate, 17,500,000 GHL Class A Ordinary Shares and 3,500,000 GHL Warrants for an aggregate purchase price equal to $175,000,000 immediately prior to the Closing. As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these shares and warrants, if unrestricted and freely tradable, would be $277,725,000, based upon a closing price of $14.93 per public share on NASDAQ (based upon the right to receive one GHL Class A Ordinary Share per AGC Class A Ordinary Share in connection with the Business Combination) and a closing price of $4.70 per AGC Warrant on NASDAQ (based upon the right to receive one GHL Warrant per AGC Warrant in connection with the Business Combination);

• the fact that Sponsor Affiliate has agreed, pursuant to the Sponsor Subscription Agreement, to purchase 575,000,000 GHL Class A Ordinary Shares for $10.00 per share for an aggregate purchase price equal to $575 million immediately prior to the Closing. As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these shares, if unrestricted and freely tradable, would be $8,584,750,000, based upon a closing price of $14.93 per public share on NASDAQ (based upon the right to receive one GHL Class A Ordinary Share per AGC Share in connection with the Business Combination);

• the fact that Richard N. Barton, a current director of AGC, has agreed, pursuant to a PIPE Subscription Agreement, to purchase 300,000 GHL Class A Ordinary Shares for $10.00 per share for an aggregate purchase price equal to $3 million immediately prior to the Closing. As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these shares, if unrestricted and freely tradable, would be $4,479,000, based upon a closing price of $14.93 per public share on NASDAQ (based upon a right to receive one GHL Class A Ordinary Share per AGC Share in connection with the Business Combination);

• the fact that Sponsor Affiliate has agreed, pursuant to the Backstop Subscription Agreement, to backstop SPAC Share Redemptions (as defined in the Business Combination Agreement), and to the extent such backstop is required, will agree to subscribe for and purchase that number of GHL Class A Ordinary Shares to be determined in accordance with the terms of the Backstop Subscription Agreement, for $10.00 per share;

• the continued indemnification of AGC's directors and officers and the continuation of AGC's directors' and officers' liability insurance after the Business Combination (i.e. a "tail policy");

100

**Table of Contents**

- the fact that Sponsor and AGC's officers and directors will lose their entire investment in AGC and will not be reimbursed for any out-of-pocket expenses if an initial business combination is not consummated by the Final Redemption Date;

- the fact that if the trust account is liquidated, including in the event AGC is unable to complete an initial business combination by the Final Redemption Date, the Sponsor has agreed to indemnify AGC to ensure that the proceeds in the trust account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the trust account on the liquidation date, by the claims of prospective target businesses with which AGC has discussed entering into a transaction agreement or claims of any third party for services rendered or products sold to AGC, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the trust account; and

- the fact that the Sponsor (including its representatives and affiliates) and AGC's directors and officers, are, or may in the future become, affiliated with entities that are engaged in a similar business to AGC. For example, in January 2021, the Sponsor and AGC's officers launched another blank check company, AGC 2 for which Brad Gerstner serves as Chairman, Chief Executive Officer and President; Hab Siam serves as General Counsel and Richard N. Barton serves as a director. The Sponsor and AGC's directors and officers are not prohibited from sponsoring, or otherwise becoming involved with, any other blank check companies prior to completing the Business Combination. Accordingly, if any of AGC's officers or directors becomes aware of a business combination opportunity that is suitable for an entity to which he or she has then current fiduciary or contractual obligations (including AGC 2), he or she will honor his or her fiduciary or contractual obligations to present such Business Combination opportunity to such entity, subject to their fiduciary duties under Cayman Islands law.

See "The Business Combination Proposal—Interests of AGC's Directors and Officers in the Business Combination" for additional information on interests of AGC's directors and officers.

The personal and financial interests of AGC's initial shareholders as well as AGC's directors and officers may have influenced their motivation in identifying and selecting Grab as a business combination target, completing an initial business combination with Grab and influencing the operation of the business following the initial business combination. In considering the recommendations of the board of directors and officers of AGC to vote for the Business Combination and other proposals, you should consider these interests.

***The exercise of AGC's directors' and executive officers' discretion in agreeing to changes or waivers in the terms of the Business Combination may result in a conflict of interest when determining whether such changes to the terms of the Business Combination or waivers of conditions are appropriate and in AGC's best interest.***

In the period leading up to the Closing of the Business Combination, events may occur that, pursuant to the Business Combination Agreement, would require AGC to agree to amend the Business Combination Agreement, to consent to certain actions taken by Grab or GHL or to waive rights that AGC is entitled to under the Business Combination Agreement. Such events could arise because of changes in the course of Grab's business, a request by Grab to undertake actions that would otherwise be prohibited by the terms of the Business Combination Agreement or the occurrence of other events that would have a material adverse effect on Grab's business or could entitle AGC to terminate the Business Combination Agreement. In any of such circumstances, it would be at AGC's discretion, acting through its board of directors, to grant its consent or waive those rights; provided that under the terms of the Business Combination Agreement, such consent or waiver in certain cases is not to be unreasonably withheld. The existence of financial and personal interests of one or more of the directors results in conflicts of interest on the part of such director(s) between what he, she or they may believe is best for AGC and what he, she or they may believe is best for himself, herself or themselves in determining whether or not to take the requested action. As of the date of this proxy statement/prospectus, AGC does not believe there will be any changes or waivers that AGC's directors and executive officers would be likely to make after shareholder approval of the Business Combination Proposal, Initial Merger Proposal and the Governing Documents Proposal

101

have been obtained. While certain changes could be made without further shareholder approval, AGC will circulate a new or amended proxy statement/prospectus and resolicit AGC shareholders if changes to the terms of the transaction that would have a material impact on its shareholders are required prior to the vote on the Business Combination Proposal, Initial Merger Proposal and the Governing Documents Proposal. As a matter of Cayman Island law, the directors of AGC are under a fiduciary duty to act in the best interest of AGC.

*We may be forced to close the Business Combination even if we determine it is no longer in AGC shareholders' best interest.*

Public AGC shareholders are protected from a material adverse event of GHL or Grab arising between the date of the Business Combination Agreement and the Closing, primarily by the right to redeem their public shares for a pro rata portion of the funds held in the trust account, calculated as of two business days prior to the vote at the Extraordinary General Meeting. If a material adverse event were to occur after approval of the Business Combination Proposal, Initial Merger Proposal and the Governing Documents Proposal at the Extraordinary General Meeting, AGC may be forced to close the Business Combination even if it determines it is no longer in its shareholders' best interest to do so (as a result of such material adverse event), which could have a significant negative impact on AGC's business, financial condition or results of operations.

*Sponsor and AGC's directors and officers agreed to vote in favor of the Business Combination, regardless of how AGC's public shareholders vote.*

The Sponsor and each AGC director have agreed to vote all of their Class B Ordinary Shares and Class A Ordinary Shares in favor of all the proposals being presented at the Extraordinary General Meeting, including the Business Combination Proposal and the transactions contemplated thereby (including the Initial Merger). AGC's amended and restated memorandum and articles of association provide that it will complete the Business Combination only if it obtains the requisite votes as described under "Extraordinary General Meeting of AGC Shareholders." As a result, in addition to the Class B Ordinary Shares and Class A Ordinary Shares held by Sponsor and directors, AGC would need 18,500,001, or 37.00% (assuming all issued and outstanding shares are voted), or 2,875,002, or 5.75% (assuming only the minimum number of shares representing a quorum are voted), of the 50,000,000 public shares sold in the Initial Public Offering to be voted in favor of the Business Combination in order to have the Business Combination approved and 28,916,667, or 57.83% (assuming all issued and outstanding shares are voted), or 8,083,334, or 16.17% (assuming only the minimum number of shares representing a quorum are voted), of the 50,000,000 public shares sold in the Initial Public Offering to be voted in favor of the Initial Merger and the Governing Documents Proposal in order to have the Initial Merger and the Governing Documents Proposal approved. Accordingly, the agreement by Sponsor and each member of AGC's management team to vote in favor of the Business Combination Proposal, the Initial Merger Proposal and the Governing Documents Proposal will increase the likelihood that AGC will receive the requisite shareholder approval for such proposals.

*AGC is dependent upon its executive officers and directors and their loss could adversely affect AGC's ability to complete the Business Combination.*

AGC's operations are dependent upon a relatively small group of individuals and, in particular, its executive officers and directors. AGC's ability to complete its Business Combination depends on the continued service of its officers and directors. AGC does not have an employment agreement with, or key-person insurance on the life of, any of its directors or executive officers.

The unexpected loss of the services of one or more of its directors or executive officers could have a detrimental effect on AGC's ability to consummate the Business Combination.

**Table of Contents**

***AGC's officers and directors will allocate their time to other businesses, thereby causing conflicts of interest in their determination as to how much time to devote to AGC's affairs. This conflict of interest could have a negative impact on AGC's ability to complete the Business Combination.***

AGC's officers and directors are not required to, and will not, commit their full time to its affairs, which may result in conflict of interest in allocating their time between AGC's operations and the closing of the Business Combination, on the one hand, and their other business endeavors. Each of AGC's officers and directors is engaged in other businesses for which he or she may be entitled to significant compensation. Furthermore, AGC's officers and directors are not obligated to contribute any specific number of hours per week to AGC's affairs and may also serve as officers or board members for other entities. If its officers' and directors' other business affairs require them to devote time to such other affairs, this may have a negative impact on AGC's ability to complete the Business Combination.

***Past performance by Brad Gerstner or entities affiliated with AGC or its Sponsor, including its management team, may not be indicative of future performance of an investment in GHL.***

Past performance by Brad Gerstner or entities affiliated with AGC or its Sponsor, including its management team ("AGC Affiliated Persons") is not a guarantee of success with respect to the Business Combination. You should not rely on the historical record of AGC Affiliated Persons as indicative of the future performance of an investment in GHL or the returns GHL will, or is likely to, generate going forward.

***Sponsor, AGC's directors, officers, advisors and their affiliates may elect to purchase shares or public warrants from public shareholders, which may influence a vote on the Business Combination and reduce the public "float" of AGC Shares.***

Sponsor, AGC's directors, officers, advisors or any of their affiliates may purchase shares and/or warrants from investors, or they may enter into transactions with such investors and others to provide them with incentives to acquire public shares, vote their public shares in favor of the Business Combination Proposal, the Initial Merger Proposal and the Governing Documents Proposal or not redeem their public shares. The purpose of any such transaction could be to vote such shares in favor of the Business Combination and thereby increase the likelihood of obtaining shareholder approval of the Business Combination and/or decrease the number of redemptions. Any such stock purchases and other transactions may thereby increase the likelihood of obtaining shareholder approval of the Business Combination. This may result in the completion of the Business Combination in a way that may not otherwise have been possible. While the exact nature of any such incentives has not been determined as of the date of this proxy statement/prospectus, they might include, without limitation, arrangements to protect such investors or holders against potential loss in value of their shares, including the granting of put options and the transfer to such investors or holders of shares or rights owned by AGC's initial shareholders for nominal value. However, other than as expressly stated herein, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. None of the funds in the trust account will be used to purchase shares or public warrants in such transactions.

Entering into any such arrangements may have a depressive effect on public shares. For example, as a result of these arrangements, an investor or holder may have the ability to effectively purchase shares at a price lower than market and may therefore be more likely to sell the shares it owns, either prior to or immediately after the Extraordinary General Meeting.

If such transactions are effected, the consequence could be to cause the Business Combination to be approved in circumstances where such approval could not otherwise be obtained. Purchases of public shares by the persons described above would allow them to exert more influence over the approval of the proposals to be presented at the Extraordinary General Meeting and would likely increase the chances that such proposals would be approved. In addition, if such purchases are made, the public "float" of AGC Shares or AGC Warrants may be

reduced and the number of beneficial holders of its securities may be reduced, possibly making it difficult to maintain or obtain the quotation, listing or trading of its securities on a national securities exchange.

*AGC did not obtain an opinion from an independent investment banking or accounting firm, and consequently, you have no assurance from an independent source that the price AGC is paying in connection with the Business Combination is fair to AGC from a financial point of view.*

AGC is not required to obtain an opinion from an independent investment banking or accounting firm that the price AGC is paying in connection with the Business Combination is fair to AGC from a financial point of view. AGC's board of directors did not obtain a third-party valuation or fairness opinion in connection with its determination to approve the Business Combination. Accordingly, investors will be relying solely on the judgment of AGC's board of directors in valuing Grab's business, and assuming the risk that the board of directors may not have properly valued the Business Combination.

*Shareholder litigation could prevent or delay the closing of the Business Combination or otherwise negatively impact business, operating results and financial condition.*

AGC may incur additional costs in connection with the defense or settlement of any shareholder litigation in connection with the proposed Business Combination. Litigation may adversely affect AGC's ability to complete the proposed Business Combination. AGC could incur significant costs in connection with any such litigation lawsuits, including costs associated with the indemnification of obligations to AGC's directors. Consequently, if a plaintiff were to secure injunctive or other relief prohibiting, delaying or otherwise adversely affecting AGC's ability to complete the proposed Business Combination, then such injunctive or other relief may prevent the proposed Business Combination from becoming effective within the expected time frame or at all.

*The COVID-19 pandemic triggered an economic crisis which may delay or prevent the consummation of the Business Combination.*

The COVID-19 pandemic triggered an economic crisis which may delay or prevent the consummation of the Business Combination. In December 2019, a coronavirus (COVID-19) outbreak was reported in China, and, in March 2020, the World Health Organization declared it a pandemic. Since being initially reported in China, the coronavirus has spread throughout the world and has resulted in unprecedented restrictions and limitations on operations of many businesses, educational institutions and governmental entities. Given the ongoing and dynamic nature of the COVID-19 pandemic, it is difficult to predict the impact on the business of AGC and Grab, and there is no guarantee that efforts by AGC and Grab to address the adverse impact of the COVID-19 pandemic will be effective. If AGC or Grab are unable to recover from a business disruption on a timely basis, the Business Combination and Grab's business and financial conditions and results of operations following the completion of the Business Combination would be adversely affected. The Business Combination may also be delayed and adversely affected by the coronavirus pandemic, and become more costly. Each of AGC and Grab may also incur additional costs to remedy damages caused by such disruptions, which could adversely affect its financial condition and results of operations.

*Delays in completing the Business Combination may substantially reduce the expected benefits of the Business Combination.*

Satisfying the conditions to, and completion of, the Business Combination may take longer than, and could cost more than, AGC expects. Any delay in completing or any additional conditions imposed in order to complete the Business Combination may materially adversely affect the benefits that AGC expects to achieve from the Business Combination.

Table of Contents

*AGC may not have sufficient funds to consummate the Business Combination.*

As of September 30, 2021, AGC had approximately $57,423 of cash held outside the trust account. If AGC is required to seek additional capital, it may need to borrow funds from its Sponsor, initial shareholders, management team or other third parties to operate or may be forced to liquidate. AGC believes that the funds available to it outside of the trust account, together with funds available from loans from Sponsor, its affiliates or members of AGC's management team will be sufficient to allow it to operate for at least the period ending on the Final Redemption Date; however, AGC cannot assure you that its estimate is accurate, and Sponsor, its affiliates or members of AGC's management team are under no obligation to advance funds to AGC in such circumstances.

*If AGC is unable to complete this Business Combination, or another Business Combination, within the prescribed time frame, AGC would cease all operations except for the purpose of winding up and redeem its public shares and liquidate.*

AGC must complete its initial Business Combination by the Final Redemption Date. If AGC has not completed this Business Combination, or another Business Combination, within such time period, AGC will: (i) cease all operations except for the purpose of winding up; (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest earned on the funds held in the trust account and not previously released to us to pay its income taxes, if any (less up to $100,000 of interest to pay dissolution expenses), divided by the number of the then-outstanding public shares, which redemption will completely extinguish public shareholders' rights as shareholders (including the right to receive further liquidation distributions, if any); and (iii) as promptly as reasonably possible following such redemption, subject to the approval of its remaining shareholders and its board of directors, liquidate and dissolve, subject in the case of clauses (ii) and (iii), to its obligations under Cayman Islands law to provide for claims of creditors and the requirements of other applicable law. AGC's amended and restated memorandum and articles of association provide that, if AGC winds up for any other reason prior to the consummation of its initial Business Combination, it will follow the foregoing procedures with respect to the liquidation of the trust account as promptly as reasonably possible but not more than ten business days thereafter, subject to applicable Cayman Islands law. In either such case, AGC's public shareholders may receive only $10.00 per public share, or less than $10.00 per public share, on the redemption of their shares, and AGC warrants will expire worthless.

*If, before distributing the proceeds in the trust account to its public shareholders, AGC files a bankruptcy or insolvency petition or an involuntary bankruptcy or insolvency petition is filed against it that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of its shareholders and the per-share amount that would otherwise be received by its shareholders in connection with its liquidation may be reduced.*

If, before distributing the proceeds in the trust account to its public shareholders, AGC files a bankruptcy or insolvency petition or an involuntary bankruptcy or insolvency petition is filed against it that is not dismissed, the proceeds held in the trust account could be subject to applicable bankruptcy or insolvency law, and may be included in AGC's bankruptcy or insolvency estate and subject to the claims of third parties with priority over the claims of its shareholders. To the extent any bankruptcy or insolvency claims deplete the trust account, the per-share amount that would otherwise be received by shareholders in connection with AGC's liquidation may be reduced.

*If an Adjournment Proposal is not approved, and an insufficient number of votes have been obtained to authorize the consummation of the Business Combination, AGC's board of directors will not have the ability to adjourn the Extraordinary General Meeting to a later date in order to solicit further votes, and, therefore, the Business Combination will not be approved.*

AGC's board of directors is seeking approval to adjourn the Extraordinary General Meeting to a later date or dates if, at the Extraordinary General Meeting, based upon the tabulated votes, there are insufficient votes to

approve the consummation of the Business Combination. If the Adjournment Proposal is not approved, AGC's board will not have the ability to adjourn the Extraordinary General Meeting to a later date and, therefore, will not have more time to solicit votes to approve the consummation of the Business Combination. In such an event, the Business Combination would not be completed.

*Unanticipated losses, write-downs or write-offs, restructuring and impairment or other charges, taxes (direct or indirect), levies or other liabilities may be incurred or required subsequent to, or in connection with, the consummation of the Business Combination, which could have a significant negative effect on GHL's financial condition and results of operations and the price of GHL Class A Ordinary Shares, which in turn could cause you to lose some or all of your investment.*

Many of the countries in Southeast Asia, where Grab operates, are emerging markets involving additional or heightened operational and legal risks as compared to more developed markets. Even when these risks are identified, assessing the impact of those risks on Grab's business and the Business Combination is inherently uncertain. Previously assessed risks may materialize in a manner that is inconsistent with Grab's and/or AGC's original risk analysis or assessment, and there can be no assurance that the operations and businesses of Grab and GHL and the Business Combination will not be exposed to unexpected or unanticipated risks, losses, charges, taxes (direct or indirect), levies or liabilities.

If such risks were to materialize in connection with, or subsequent to, the consummation of the Business Combination, GHL and its shareholders, directly or indirectly, may incur losses and/or additional expenses, including corporate, income, capital gains (direct or indirect), transfer or other taxes, and penalties. As a result of these factors, GHL may be forced to later write-down or write-off assets, restructure its operations, or incur impairment or other charges, taxes (direct or indirect), levies, liabilities or other costs (including fines, penalties and interest) that could result in reporting losses or other liabilities, which could be material. Any of these factors could cause negative market perceptions of GHL and its securities, and materially and adversely impact GHL's business, results of operations, financial condition and prospects. Any shareholders of AGC who choose not to redeem their AGC Class A Ordinary Shares and, as a result, become shareholders of GHL following the consummation of the Business Combination could suffer a reduction in the value of their GHL Class A Ordinary Shares as a result of the foregoing factors and would be unlikely to have a remedy for such reduction in value. AGC shareholders should consult their own legal, tax and other advisors regarding the consequences of the Business Combination on shareholders of Grab, AGC and GHL.

*If third parties bring claims against AGC, the proceeds held in the trust account could be reduced and the per-share redemption amount received by shareholders may be less than $10.00 per share.*

AGC's placing of funds in the trust account may not protect those funds from third-party claims against it. Although it will seek to have all vendors, service providers, and other entities with which it does business execute agreements with it waiving any right, title, interest or claim of any kind in or to any monies held in the trust account for the benefit of AGC's public shareholders, such parties may not execute such agreements, or even if they execute such agreements, they may not be prevented from bringing claims against the trust account, including, but not limited to, fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain advantage with respect to a claim against AGC's assets, including the funds held in the trust account. If any third party refuses to execute an agreement waiving such claims to the monies held in the trust account, AGC's management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to us than any alternative.

Examples of possible instances where AGC may engage a third party that refuses to execute a waiver include the engagement of a third-party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in

106

Table of Contents

cases where management is unable to find a service provider willing to execute a waiver. In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against the trust account for any reason. Upon the exercise of a redemption right in connection with the Business Combination, AGC will be required to provide for payment of claims of creditors that were not waived that may be brought against AGC within the ten years following redemption. Accordingly, the per-share redemption amount received by public shareholders could be less than the $10.00 per public share initially held in the trust account, due to claims of such creditors. Pursuant to a letter agreement between AGC, Sponsor, and its directors and officers, Sponsor has agreed that it will be liable to AGC if and to the extent any claims by a third party (other than its independent auditors) for services rendered or products sold to it, reduce the amounts in the trust account to below the lesser of (i) $10.00 per public share and (ii) the actual amount per public share held in the trust account as of the date of the liquidation of the trust account if less than $10.00 per public share due to reductions in the value of the trust assets, in each case net of the interest that may be withdrawn to pay its tax obligations; *provided* that such liability will not apply to any claims by a third party that executed a waiver of any and all rights to seek access to the trust account nor will it apply to any claims under AGC's indemnity of the underwriters of its Initial Public Offering against certain liabilities, including liabilities under the Securities Act. Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, Sponsor will not be responsible to the extent of any liability for such third-party claims.

However, AGC has not asked Sponsor to reserve for such indemnification obligations, nor has AGC independently verified whether Sponsor has sufficient funds to satisfy its indemnity obligations and AGC believes that Sponsor's only assets are securities of AGC. Therefore, AGC cannot assure you that Sponsor would be able to satisfy those obligations. As a result, if any such claims were successfully made against the trust account, the funds available for the Business Combination and redemptions could be reduced to less than $10.00 per public share. In such event, AGC may not be able to complete the Business Combination, and you would receive such lesser amount per share in connection with any redemption of your public shares. None of AGC's officers or directors will indemnify AGC for claims by third parties including claims by vendors and prospective target businesses.

*If, after AGC distributes the proceeds in the trust account to its public shareholders, AGC files a bankruptcy or insolvency petition or an involuntary bankruptcy or insolvency petition is filed against it that is not dismissed, a bankruptcy or insolvency court may seek to recover such proceeds, and the members of AGC's board of directors may be viewed as having breached their fiduciary duties to its creditors, thereby exposing the members of its board of directors and AGC to claims of punitive damages.*

If, after AGC distributes the proceeds in the trust account to AGC's public shareholders, it files a bankruptcy or insolvency petition or an involuntary bankruptcy or insolvency petition is filed against it that is not dismissed, any distributions received by shareholders could be viewed under applicable debtor/creditor and/or bankruptcy or insolvency laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy or insolvency court could seek to recover some or all amounts received by AGC shareholders. In addition, AGC's board of directors may be viewed as having breached its fiduciary duty to its creditors and/or having acted in bad faith, thereby exposing itself and AGC to claims of punitive damages, by paying public shareholders from the trust account prior to addressing the claims of creditors.

*The Business Combination may be completed even though material adverse effects may result from the announcement of the Business Combination, industry-wide changes and other causes.*

In general, either AGC or Grab can refuse to complete the Business Combination if there is a material adverse effect affecting the other party between the signing date of the Business Combination Agreement and the planned closing. However, certain types of changes do not permit either party to refuse to complete the Business

107

Combination, even if such change could be said to have a material adverse effect on Grab, including, among others, the following events (except, in some cases, where the change has a disproportionate effect on a party):

(a)     any change in applicable laws or IFRS or any interpretation thereof following the date of the Business Combination Agreement;

(b)     any change in interest rates or economic, political, business or financial market conditions generally;

(c)     the taking of any action expressly required to be taken under the Business Combination Agreement;

(d)     any natural disaster (including hurricanes, storms, tornadoes, flooding, earthquakes, volcanic eruptions or similar occurrences), epidemic or pandemic (including any action taken or refrained from being taken in response to COVID-19 or any COVID-19 Measures or any change in such COVID-19 Measures or interpretations following the date of the Business Combination Agreement), acts of nature or change in climate (for purposes of which, the term "COVID-19 Measures" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, safety or similar law, directive, guidelines or recommendations promulgated by any governmental authority, in each case, in connection with or in response to COVID-19 for similarly situated companies);

(e)     any acts of terrorism or war, the outbreak or escalation of hostilities, geopolitical conditions, local, national or international political conditions, riots or insurrections;

(f)     any failure in and of itself of Grab and any of its subsidiaries to meet any projections or forecasts (provided that this exception shall not prevent or otherwise affect a determination that any change, effect or development underlying such change has resulted in or contributed to a Grab Material Adverse Effect as defined in the Business Combination Agreement);

(g)     any event, state of facts, development, change, circumstance, occurrence or effect generally applicable to the industries or markets in which Grab or any of its subsidiaries operate;

(h)     any matter disclosed in the Grab Disclosure Letter that, reasonably apparent on its face, is responsive to a Grab representation or warranty qualified by Grab Material Adverse Effect (this proxy statement/prospectus includes disclosure of all matters in the Grab Disclosure Letter that are material to investors);

(i)     any event, state of facts, development, change, circumstance, occurrence or effect that is cured by Grab prior to the Closing; or

(j)     any worsening of the event, state of facts, development, change, circumstance, occurrence or effect referred to in clauses (b), (d), (e), (g) or (h) to the extent existing as of the date of the Business Combination Agreement.

Furthermore, AGC or Grab may waive the occurrence of a material adverse effect affecting the other party. If a material adverse effect occurs and the parties still complete the Business Combination, AGC's share price may suffer.

***Becoming a public company through a merger rather than an underwritten offering presents risks to unaffiliated investors. Subsequent to the completion of the Business Combination, GHL may be required to subsequently take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on its financial condition, results of operations and the price of GHL Securities, which could cause GHL shareholders to lose some or all of their investment.***

Becoming a public company through a merger rather than an underwritten offering, as Grab is seeking to do, presents risks to unaffiliated investors. Such risks include the absence of a due diligence investigation conducted by an underwriter that would be subject to liability for any material misstatements or omissions in a registration statement. As a result, GHL may be forced to later write down or write off assets, restructure its operations, or incur impairment or other charges that could result in it reporting losses. Additionally, unexpected risks may

arise and previously known risks may materialize. Even though these charges may be non-cash items and not have an immediate impact on GHL's liquidity, the fact that GHL reports charges of this nature could contribute to negative market perceptions about the post-combination company or its securities. In addition, charges of this nature may cause GHL to be unable to obtain future financing on favorable terms or at all.

### *During the interim period, AGC is prohibited from entering into certain transactions that might otherwise be beneficial to AGC or its respective shareholders.*

Until the earlier of consummation of the Business Combination or termination of the Business Combination Agreement, AGC is subject to certain limitations on the operations of its business, including restrictions on its ability to merge, consolidate or amalgamate with or into, or acquire (by purchasing a substantial portion of the assets of or equity in, or by any other manner ) any entity other than Grab, as summarized under the "The Business Combination Proposal—The Business Combination Agreement—Covenants of the Parties—Covenants of AGC, GHL, AGC Merger Sub and Grab Merger Sub.*"* The limitations on AGC's conduct of its business during this period could have the effect of delaying or preventing other strategic transactions and may, in some cases, make it impossible to pursue business opportunities that are available only for a limited time.

### *The Business Combination remains subject to conditions that AGC cannot control and if such conditions are not satisfied or waived, the Business Combination may not be consummated.*

The Business Combination is subject to a number of conditions. There are no assurances that all conditions to the Business Combination will be satisfied or that the conditions will be satisfied in the time frame expected. If the conditions to the Business Combination are not met (and are not waived, to the extent waivable), then either AGC or Grab may, subject to the terms and conditions of the Business Combination Agreement, terminate the Business Combination Agreement or amend the Termination Date. See the section of this proxy statement/prospectus titled "The Business Combination Proposal."

### *AGC shareholders may have limited remedies if their shares suffer a reduction in value following the Business Combination, and because AGC (and also GHL, the surviving company) is incorporated under the laws of the Cayman Islands, shareholders may face difficulties in protecting their interests, and a shareholder's ability to protect its rights through the U.S. federal courts may be limited*

Any shareholders who choose to remain shareholders following the Business Combination could suffer a reduction in the value of their shares. Such shareholders are unlikely to have a remedy for such reduction in value, unless they are able to successfully claim that the reduction was due to the breach by AGC's officers or directors of a duty of care or other fiduciary duty, or if they are able to successfully bring a private claim under securities laws that the proxy/registration statement relating to the Business Combination contained an actionable material misstatement or material omission.

AGC and GHL are both incorporated under the law of the Cayman Islands. AGC and GHL's Cayman Islands counsel are not aware of any reported class action having been brought in a Cayman Islands court. Derivative actions have been brought in the Cayman Islands courts, and the Cayman Islands courts have confirmed the availability for such actions. In most cases, AGC or GHL, as applicable will be the proper plaintiff in any claim based on a breach of duty owed to AGC or GHL, as applicable, and a claim against (for example) AGC or GHL's officers or directors usually may not be brought by a shareholder. However, based on English authorities, which would in all likelihood be of persuasive authority and be applied by a court in the Cayman Islands, exceptions to the foregoing principle apply in circumstances in which:

- a company is acting, or proposing to act, illegally or beyond the scope of its authority;

- the act complained of, although not beyond the scope of the authority, could be effected if duly authorized by more than the number of votes which have actually been obtained; or

- those who control the company are perpetrating a "fraud on the minority."

109

**Table of Contents**

A shareholder may have a direct right of action against AGC or GHL where the individual rights of that shareholder have been infringed or are about to be infringed by such company.

***AGC has identified a material weakness in its internal control over financial reporting. This material weakness could continue to adversely affect its ability to report its results of operations and financial condition accurately and in a timely manner.***

AGC's management is responsible for establishing and maintaining adequate internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP. AGC's management is likewise required, on a quarterly basis, to evaluate the effectiveness of its internal controls and to disclose any changes and material weaknesses identified through such evaluation in those internal controls. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of AGC's annual or interim financial statements will not be prevented or detected on a timely basis.

As described elsewhere in this proxy statement/prospectus, AGC identified a material weakness in its internal control over financial reporting related to the accounting for the AGC Warrants. As a result of this material weakness, its management concluded that its internal control over financial reporting was not effective as of December 31, 2020. This material weakness resulted in a material misstatement of the liabilities relating to AGC Warrants and liabilities under the Amended and Restated Forward Purchase Agreements, change in fair value of AGC Warrants and liabilities under the Amended and Restated Forward Purchase Agreements, AGC Class A Ordinary Shares subject to possible redemption, additional paid-in capital, accumulated deficit and related financial disclosures for the affected periods. See "Note 2—Restatement of Previously Issued Financial Statements" in the accompanying financial statements" in the audited financial statements of AGC as of December 31, 2020 and for period from August 25, 2020 (inception) through December 31, 2020, included elsewhere in this proxy statement/prospectus.

Any failure to maintain internal control over AGC's financial reporting could adversely impact AGC's ability to report its financial position and results from operations on a timely and accurate basis, which could delay or disrupt its efforts to consummate an initial business combination. If AGC's financial statements are not accurate, investors may not have a complete understanding of its operations. Likewise, if AGC's financial statements are not filed on a timely basis, AGC could be subject to sanctions or investigations by the stock exchange on which its common stock is listed, the SEC or other regulatory authorities. In either case, this could result in a material adverse effect on AGC's ability to consummate an initial business combination.

AGC can give no assurance as to its ability to timely remediate the material weakness identified, if at all, or that any additional material weaknesses or restatements of financial results will not arise in the future due to a failure to implement and maintain adequate internal control over financial reporting or circumvention of these controls.

***AGC Warrants are accounted for as liabilities and the changes in value of AGC Warrants could have a material effect on AGC's financial results.***

On April 12, 2021, the Acting Director of the Division of Corporation Finance and Acting Chief Accountant of the SEC together issued a statement regarding the accounting and reporting considerations for warrants issued by special purpose acquisition companies entitled "Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs")" (the "SEC Statement"). Specifically, the SEC Statement focused on certain settlement terms and provisions related to certain tender offers following a business combination, which terms are similar to those contained in the Existing Warrant Agreement. As a result of the SEC Statement, AGC reevaluated the accounting treatment of its 11,000,000 public warrants and 12,000,000 private placement warrants, as well as the 20,000,000 units under the Amended and Restated

**Table of Contents**

Forward Purchase Agreements that include one-fifth of an AGC Warrant, and determined to classify these items as derivative liabilities measured at fair value, with changes in fair value each period reported in earnings.

As a result, included on AGC's balance sheet as of December 31, 2020 and September 30, 2021 contained elsewhere in this proxy statement/prospectus are derivative liabilities related to embedded features contained within AGC Warrants. Accounting Standards Codification 815, Derivatives and Hedging, provides for the remeasurement of the fair value of such derivatives at each balance sheet date, with a resulting non-cash gain or loss related to the change in the fair value being recognized in earnings in the statement of operations. As a result of the recurring fair value measurement, AGC's financial statements and results of operations may fluctuate quarterly, based on factors, which are outside of its control. Due to the recurring fair value measurement, AGC expects that it will recognize non-cash gains or losses on AGC Warrants each reporting period and that the amount of such gains or losses could be material.

**Risks Relating to GHL**

***GHL will issue GHL Class A Ordinary Shares, and GHL Class B Ordinary Shares convertible into GHL Class A Ordinary Shares, as consideration for the Business Combination and the PIPE Investment, and GHL may issue additional GHL Class A Ordinary Shares, GHL Class B Ordinary Shares or other equity or convertible debt securities without approval of the holders of GHL Class A Ordinary Shares, which would dilute existing ownership interests and may depress the market price of GHL Class A Ordinary Shares.***

It is anticipated that, following the Business Combination, (i) former Grab shareholders (other than the Key Executives and their respective Permitted Entities) are expected to own approximately 84.03% of the outstanding GHL Ordinary Shares, constituting 29.72% of the voting power of the GHL Ordinary Shares voting together as a single class, (ii) the Key Executives and their respective Permitted Entities are expected to own approximately 4.15% of the outstanding GHL Ordinary Shares, constituting 66.11% of the voting power of the GHL Ordinary Shares voting together as a single class, (iii) former AGC public shareholders are expected to own approximately 1.27% of the outstanding GHL Ordinary Shares, constituting 0.45% of the voting power of the GHL Ordinary Shares voting together as a single class, (iv) Sponsor and certain directors of AGC are expected to own approximately 0.32% of the outstanding GHL Ordinary Shares, constituting 0.11% of the voting power of the GHL Ordinary Shares voting together as a single class, (v) the Sponsor Related Parties are expected to collectively own approximately 1.96% of the outstanding GHL Ordinary Shares, constituting 0.69% of the voting power of the GHL Ordinary Shares voting together as a single class and (vi) the PIPE Investors are expected to own approximately 8.27% of the outstanding GHL Ordinary Shares, constituting 2.92% of the voting power of the GHL Ordinary Shares voting together as a single class. These percentages assume (i) that no Grab shareholder exercises its dissenters' rights, (ii) that all of Grab's outstanding stock options are exercised, all of Grab's outstanding restricted stock units vest, and all remaining Grab Ordinary Shares available for grant under the Grab 2018 Plan, which will have one vote per share when granted, are granted to employees other than the Key Executives; and (iii) the No Redemption Scenario. If the actual facts differ from these assumptions, these percentages will differ.

GHL will continue to require significant capital investment to support its business, and GHL may issue additional GHL Class A Ordinary Shares, GHL Class B Ordinary Shares convertible into GHL Class A Ordinary Shares or other equity or convertible debt securities of equal or senior rank in the future without approval of the holders of the GHL Class A Ordinary Shares in certain circumstances.

GHL's issuance of additional GHL Class A Ordinary Shares, GHL Class B Ordinary Shares convertible into GHL Class A Ordinary Shares, or other equity or convertible debt securities of equal or senior rank would have the following effects: (i) GHL's existing shareholders' proportionate ownership interest in GHL may decrease; (ii) the amount of cash available per share, including for payment of dividends in the future, may decrease; (iii) the relative voting power of each previously outstanding GHL Class A Ordinary Share may be diminished; and (iv) the market price of GHL Class A Ordinary Shares may decline. Under certain circumstances, each GHL Class B Ordinary Share will automatically convert into one GHL Class A Ordinary Share (as adjusted for share

111

Table of Contents

splits, share combination and similar transactions occurring), but as the conversion ratio is one-to-one, such mandatory conversion would not have a dilutive effect. See "Description of GHL Securities–Optional and Mandatory Conversion."

In addition, certain strategic partners of Grab have the right to swap the shares they hold in Grab subsidiaries for GHL Class A Ordinary Shares. Porto Worldwide Limited, an affiliate of Central Group which has invested an aggregate of $199,300,000 in, and holds 15,626,800 shares of, Grabtaxi Holdings (Thailand) Co., Ltd., has a one-time right to, beginning on the latter of (a) May 31, 2022 and (b) the first business day falling six months after the consummation of the Business Combination and valid for 60 days thereafter, swap some or all of such shares held by it for GHL Class A Ordinary Shares at a conversion price of $6.1629, subject to certain terms and conditions. Assuming Porto Worldwide Limited swapped their shares for GHL Class A Ordinary Shares immediately upon the closing of the Business Combination, it would hold approximately 1.06% of the outstanding GHL Ordinary Shares. PT Elang Mahkota Teknologi Tbk. ("Emtek"), which invested an aggregate of $375 million in, and holds 555,846,773 shares (5.88%) of PT Grab Teknologi Indonesia, has a one-time right to, which may be exercised at any time prior to June 30, 2022, swap all of such shares held by it for GHL Class A Ordinary Shares on June 30, 2024 at a conversion price of $6.1629, subject to certain terms and conditions. Assuming Emtek swapped their shares for GHL Class A Ordinary Shares immediately upon the closing of the Business Combination, it would hold approximately 1.97% of the outstanding GHL Ordinary Shares. You will experience additional dilution if such partners exercised their swap right for GHL Ordinary Shares.

Furthermore, Grab is exploring plans under which the shares that certain strategic partners and investors of Grab hold in certain subsidiaries or joint ventures of Grab would be transferred to Grab, through one or more transactions, such that these strategic partners and investors would ultimately receive GHL Class A Ordinary Shares as consideration for such transfers (which we refer to as the "Proposed Share Exchanges"). These subsidiaries and joint ventures include GFG, the Digital Banking JV, GrabPay Philippines, OVOInsure, GrabInsure and GrabLink. Grab expects that these strategic partners and investors would be granted registration rights with respect to any GHL Class A Ordinary Shares ultimately issued to such strategic partners and investors upon any such Proposed Share Exchanges. Grab has started discussions with, and exchanged draft documentation with, some of these strategic partners and investors, and has entered into non-binding term sheets for the Proposed Share Exchanges with respect to two of these investors. However, Grab has not finalized or committed to a plan for any of these Proposed Share Exchanges. If and when Grab agrees on the terms of any agreements relating to the Proposed Share Exchanges with these strategic partners and investors, which would be expected if at all to take place after the closing of the Business Combination, such agreements would then be reviewed by and subject to the approval of GHL's board of directors, whereupon binding documentation could be entered into with the relevant counterparty. The closing of a number of these Proposed Share Exchanges would also be subject to regulatory approvals. Accordingly, there can be no assurance that any of these Proposed Share Exchanges will occur. If any of the Proposed Share Exchanges take place, existing GHL shareholders will experience dilution. Grab currently estimates that if the Proposed Share Exchanges being discussed actually all occurred, the maximum amount of GHL Class A Ordinary Shares that would be issued (excluding the transaction being discussed with respect to the Digital Banking JV) would not exceed 82.3 million GHL Class A Ordinary Shares, which would be equivalent to 2.2% of GHL Ordinary Shares (based on the number of Ordinary Shares that are expected to be outstanding at the time of closing of the Business Combination). With respect to the Digital Banking JV, while no terms have been agreed, based upon the terms that are currently being discussed, Grab currently expects that its joint venture partner would not be entitled to exchange its shares in the Digital Banking JV for Grab shares under a Proposed Share Exchange until at least six years after the date of the closing of the Business Combination and that any such share exchange would be based upon a formula that considers the then prevailing valuation of the Digital Banking JV and the trading price of GHL Class A Ordinary Shares at the time of the exchange, both of which are not possible to predict with any degree of certainty at this time. For illustrative purposes, however, while there can be no assurance that any Proposed Share Exchange will be agreed with respect to the Digital Banking JV, in the event a Proposed Share Exchange were agreed upon where the number of GHL Class A Ordinary Shares to be received by the joint venture partner were determined by dividing the valuation of the joint venture partner's stake in the Digital Banking JV by the trading price of GHL Class A

112

Ordinary Shares and assuming a share price of $10 per GHL Class A Ordinary Shares at the time of closing of such transaction, the joint venture partner would, for every $1 billion of valuation of its stake in the Digital Banking JV (determined at the time of the closing of such transaction), be entitled to 100 million GHL Class A Ordinary Shares, which would be equivalent to 2.6% of GHL Ordinary Shares (based on the number of GHL Ordinary Shares expected to be outstanding at the time of closing of the Business Combination). Given that the terms of the foregoing Proposed Share Exchanges have not been determined and the value of the Digital Banking JV and any GHL Class A Ordinary Shares to be issued to Grab's joint venture partner in connection with the Digital Banking JV will not be determined for at least six years, the number of GHL Class A Ordinary Shares that may be issued to Grab's joint venture partner may differ materially from the foregoing and could be materially greater and could represent a significantly higher percentage than 2.6% of GHL Ordinary Shares for each $1 billion of valuation of such joint venture partner's stake in the Digital Banking JV, thereby resulting in materially greater dilution to Grab shareholders. Furthermore, there can be no assurance that any of the Proposed Share Exchanges will occur or be on the terms, or have the impact, described above, or that shareholders of Grab will not suffer greater dilution (which could be material) from the implementation of any Proposed Share Exchanges.

Employees, directors and consultants of GHL and its subsidiaries and affiliates hold, and after Business Combination, are expected to be granted equity awards under the 2021 Plan and purchase rights under the ESPP. You will experience additional dilution when those equity awards and purchase rights become vested and settled or exercised, as applicable, for GHL Ordinary Shares. See "Management of GHL Following the Business Combination —Compensation of Directors and Executive Officers—Share Incentive Plans."

***There will be material differences between your current rights as a holder of AGC public shares and the rights one will have as a holder of GHL Class A Ordinary Shares, some of which may adversely affect you.***

Upon completion of the Business Combination, AGC shareholders will no longer be shareholders of AGC, but will be shareholders of GHL. There will be material differences between the current rights of AGC shareholders and the rights you will have as a holder of the GHL Class A Ordinary Shares and GHL Warrants, some of which may adversely affect you. For a more detailed discussion of the differences in the rights of AGC shareholders and the GHL shareholders, see the section of this proxy statement/prospectus titled "Comparison of Corporate Governance and Shareholder Rights."

***Upon completion of the Business Combination, AGC shareholders will become GHL shareholders, AGC warrant holders will become holders of GHL Warrants and the market price for the GHL Class A Ordinary Shares may be affected by factors different from those that historically have affected AGC.***

Upon completion of the Business Combination, AGC shareholders will become GHL shareholders and AGC's warrant holders will become holders of GHL Warrants, which may be exercised to acquire GHL Class A Ordinary Shares. GHL's business differs from that of AGC, and, accordingly, the results of operations of GHL will be affected by some factors that are different from those currently affecting the results of operations of AGC. AGC is a special purpose acquisition company incorporated in the Cayman Islands that is not engaged in any operating activity, directly or indirectly. GHL is a holding company incorporated in the Cayman Islands and, after the consummation of the Business Combination its subsidiaries will be engaged in deliveries, mobility and financial services businesses in Southeast Asia. GHL's business and results of operations will be affected by regional, country, and industry risks and operating risks to which AGC was not exposed. For a discussion of the future business of GHL currently conducted and proposed to be conducted by Grab, see the section of this proxy statement/prospectus titled "Grab's Business."

***GHL Warrants will become exercisable for GHL Class A Ordinary Shares, which would increase the number of shares eligible for future resale in the public market and result in dilution to its shareholders.***

GHL Warrants to purchase an aggregate of 10,000,000 GHL Class A Ordinary Shares will become exercisable in accordance with the terms of the Assignment, Assumption and Amendment Agreement and the

113

Existing Warrant Agreement governing those securities. Assuming the Business Combination closes, these warrants will become exercisable 30 days after the completion of the Business Combination. The exercise price of these warrants will be $11.50 per share. To the extent such warrants are exercised, additional GHL Class A Ordinary Shares will be issued, which will result in dilution to the holders of GHL Class A Ordinary Share and increase the number of shares eligible for resale in the public market. Sales of substantial numbers of such shares in the public market or the fact that such warrants may be exercised could adversely affect the market price of GHL Class A Ordinary Shares. However, there is no guarantee that the public warrants will ever be in the money prior to their expiration, and as such, the warrants may expire worthless.

*If securities or industry analysts do not publish research, publish inaccurate or unfavorable research or cease publishing research about GHL, its share price and trading volume could decline significantly.*

The trading market for GHL Class A Ordinary Shares will depend, in part, on the research and reports that securities or industry analysts publish about GHL or its business. GHL may be unable to sustain coverage by well-regarded securities and industry analysts. If either none or only a limited number of securities or industry analysts maintain coverage of GHL, or if these securities or industry analysts are not widely respected within the general investment community, the demand for GHL Ordinary Shares could decrease, which might cause its share price and trading volume to decline significantly. In the event that GHL obtains securities or industry analyst coverage, if one or more of the analysts who cover GHL downgrade their assessment of GHL or publish inaccurate or unfavorable research about GHL's business, the market price and liquidity for GHL Ordinary Shares could be negatively impacted.

*Future resales of GHL Ordinary Shares issued to Grab shareholders and other significant shareholders may cause the market price of the GHL Class A Ordinary Shares to drop significantly, even if GHL's business is doing well.*

Under the Business Combination Agreement, the Grab shareholders will receive, among other things, 3,318,724,277 GHL Class A Ordinary Shares (approximately 20.97% of which will be eligible for sale immediately after the consummation of the Business Combination) or in the case of the Key Executives and their Permitted Entities, 164,060,946 GHL Class B Ordinary Shares convertible into GHL Class A Ordinary Shares. These percentages assume (i) that no Grab shareholder exercises its dissenters' rights, (ii) that all of Grab's outstanding stock options are exercised, all of Grab's outstanding restricted stock units vest and all remaining Grab Ordinary Shares available for grant under the Grab 2018 Plan, which will have one vote per share when granted, are granted to employees other than the Key Executives; and (iii) the No Redemption Scenario. Pursuant to the Grab Shareholder Support Agreements and Sponsor Support Agreement, certain GHL shareholders will be restricted, subject to certain exceptions, from selling certain GHL Securities that they receive as a result of the share exchange, which restrictions will expire and therefore additional GHL Securities will be eligible for resale as follows:

- Upon the earlier of (x) five days after the first earnings release of GHL after the consummation of the Business Combination if the closing price per share of GHL Class A Ordinary Shares exceeds $12.50 for any five trading days within the 10 consecutive trading day period preceding such earnings release, or (y) after the first earnings release of GHL after the consummation of the Business Combination if the closing price per share of GHL Class A Ordinary Shares exceeds $12.50 for any five trading days within any 10 consecutive trading day period, five days after such fifth trading day, up to 1,299,096,360 GHL Class A held by certain Grab shareholders;

- 180 days after the consummation of the Business Combination, up to 2,598,192,720 GHL Class A Ordinary Shares held by certain Grab shareholders to the extent that such shares have not previously become eligible pursuant to the above;

- One year after the consummation of the Business Combination, up to 2,867,235 GHL Class A Ordinary Shares received by certain Grab executives upon settlement of certain RSU awards granted with respect to the Business Combination;

114

- Three years after the consummation of the Business Combination, up to 32,451,891 GHL Ordinary Shares received by the Key Executives upon settlement of certain restricted stock awards granted with respect to the Business Combination; and

- Three years after the consummation of the Business Combination, up to 12,275,000 GHL Class A Ordinary Shares, or other securities convertible into or exercisable or exchangeable for GHL Class A Ordinary Shares, held by Sponsor.

See "Shares Eligible for Future Sale—Lock-up Agreements."

Subject to the Grab Shareholder Support Agreements, certain Grab shareholders party thereto may sell GHL Securities pursuant to Rule 144 under the Securities Act, if available. In these cases, the resales must meet the criteria and conform to the requirements of that rule, including, because AGC and GHL are currently shell companies, waiting until one year after GHL's filing with the SEC of a Form 20-F transition report reflecting the Business Combination.

Upon expiration or waiver of the applicable lock-up periods, and upon effectiveness of the registration statement GHL files pursuant to the Registration Rights Agreement and the PIPE Subscription Agreements or upon satisfaction of the requirements of Rule 144 under the Securities Act, certain Grab shareholders and certain other significant shareholders of GHL may sell large amounts of GHL Securities in the open market or in privately negotiated transactions, which could have the effect of increasing the volatility in GHL's share price or putting significant downward pressure on the price of the GHL Class A Ordinary Shares. See "Shares Eligible for Future Sale – Registration Rights and – Rule 144."

***A market for GHL's Class A Ordinary Shares may not develop, which would adversely affect the liquidity and price of GHL's Class A Ordinary Shares.***

An active trading market for GHL Class A Ordinary Shares may never develop or, if developed, it may not be sustained. You may be unable to sell your GHL Class A Ordinary Shares unless a market can be established and sustained. This risk will be exacerbated if there is a high level of redemptions of AGC public shares in connection with the Closing of the Business Combination.

***AGC's Existing Warrant Agreement, which is being assigned to GHL pursuant to the Assignment, Assumption and Amendment Agreement upon the Closing of the Business Combination and under which one AGC Warrant will become one GHL warrant upon such Closing, designates the courts of the State of New York or the United States District Court for the Southern District of New York as the sole and exclusive forum for certain types of actions and proceedings that may be initiated by holders of the warrants, which could limit the ability of warrant holders to obtain a favorable judicial forum for disputes with GHL in connection with such warrants.***

Under the terms of the Assignment, Assumption and Amendment Agreement, AGC's Existing Warrant Agreement is being assigned by AGC to GHL at the Closing of the Business Combination. In connection with this assignment, each AGC warrant will convert into a GHL warrant at such time and all of the terms of the Existing Warrant Agreement not amended by the Assignment, Assumption and Amendment Agreement will remain in effect and applicable to each warrant holder and to GHL after such Closing.

The Existing Warrant Agreement provides that, subject to applicable law, (i) any action, proceeding or claim against AGC arising out of or relating in any way to the warrant agreement, including under the Securities Act, will be brought and enforced in the courts of the State of New York or the United States District Court for the Southern District of New York, and (ii) that AGC irrevocably submit to such jurisdiction, which jurisdiction shall be the exclusive forum for any such action, proceeding or claim. Each of AGC and GHL has waived any objection to such exclusive jurisdiction and that such courts represent an inconvenient forum. Notwithstanding

115

the foregoing, these provisions of the Existing Warrant Agreement do not apply to suits brought to enforce any liability or duty created by the Exchange Act or any other claim for which the federal district courts of the United States of America are the sole and exclusive forum. Any person or entity purchasing or otherwise acquiring any interest in any of warrants under the Existing Warrant Agreement shall be deemed to have notice of and to have consented to the forum provisions of the Existing Warrant Agreement. If any action, the subject matter of which is within the scope the forum provisions of the Existing Warrant Agreement, is filed in a court other than a court of the State of New York or the United States District Court for the Southern District of New York (a "foreign action") in the name of any holder of the warrants, such holder shall be deemed to have consented to: (x) the personal jurisdiction of the state and federal courts located in the State of New York in connection with any action brought in any such court to enforce the forum provisions (an "enforcement action"), and (y) having service of process made upon such warrant holder in any such enforcement action by service upon such warrant holder's counsel in the foreign action as agent for such warrant holder.

Since the provisions of the Existing Warrant Agreement will continue to apply unless amended by the Assignment, Assumption and Amendment Agreement after the Closing of the Business Combination and the conversion of each warrant from a AGC warrant into a GHL warrant, and since the choice-of-forum and related provisions have not been amended by the Assignment, Assumption and Amendment Agreement, the choice-of-forum provision will continue to limit a warrant holder's ability after the Closing of the Business Combination to bring a claim in a judicial forum that it finds favorable for disputes with GHL, which may discourage such lawsuits. Alternatively, if a court were to find this provision of the Existing Warrant Agreement inapplicable or unenforceable with respect to one or more of the specified types of actions or proceedings, GHL may incur additional costs associated with resolving such matters in other jurisdictions, which could materially and adversely affect its business, financial condition and results of operations and result in a diversion of the time and resources of GHL's management and board of directors.

***The requirements of being a public company may strain GHL's resources, divert GHL management's attention and affect GHL's ability to attract and retain qualified board members.***

GHL will be subject to the reporting requirements of the Securities Exchange Act of 1934, the Sarbanes-Oxley Act, the Dodd-Frank Act, NASDAQ Global Select Market listing requirements and other applicable securities rules and regulations. As such, GHL will incur additional legal, accounting and other expenses following completion of the Business Combination. These expenses may increase even more if GHL no longer qualifies as an "emerging growth company," as defined in Section 2(a) of the Securities Act. The Exchange Act requires, among other things, that GHL file annual and current reports with respect to its business and operating results. The Sarbanes-Oxley Act requires, among other things, that GHL maintains effective disclosure controls and procedures and internal control over financial reporting. GHL may need to hire more employees post-Business Combination or engage outside consultants to comply with these requirements, which will increase its post-Business Combination costs and expenses.

Changing laws, regulations and standards relating to corporate governance and public disclosure are creating uncertainty for public companies, increasing legal and financial compliance costs and making some activities more time-consuming. These laws, regulations and standards are subject to varying interpretations, in many cases due to their lack of specificity, and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. GHL expects these laws and regulations to increase its legal and financial compliance costs after the Business Combination and to render some activities more time-consuming and costly, although GHL is currently unable to estimate these costs with any degree of certainty.

Many members of GHL's management team will have limited experience managing a publicly traded company, interacting with public company investors and complying with the increasingly complex laws pertaining to public companies. GHL's management team may not successfully or efficiently manage the

transition to being a public company subject to significant regulatory oversight and reporting obligations under the federal securities laws and regulations and the continuous scrutiny of securities analysts and investors. The need to establish the corporate infrastructure demanded of a public company may divert the management's attention from implementing its growth strategy, which could prevent GHL from improving its business, financial condition and results of operations. Furthermore, GHL expects these rules and regulations to make it more difficult and more expensive for GHL to obtain director and officer liability insurance, and consequently GHL may be required to incur substantial costs to maintain the same or similar coverage. These additional obligations could have a material adverse effect on its business, financial condition, results of operations and prospects. These factors could also make it more difficult for GHL to attract and retain qualified members of its board of directors, particularly to serve on GHL's audit committee, compensation committee and nominating committee, and qualified executive officers.

As a result of disclosure of information in this proxy statement/prospectus and in filings required of a public company, GHL's business and financial condition will become more visible, which GHL believes may result in threatened or actual litigation, including by competitors and other third parties. If such claims are successful, GHL's business and operating results could be adversely affected, and, even if the claims do not result in litigation or are resolved in GHL's favor, these claims, and the time and resources necessary to resolve them, could cause an adverse effect on its business, financial condition, results of operations, prospects and reputation.

***Any failure to maintain an effective system of disclosure controls and internal control over financial reporting, GHL may not be able to accurately report its financial results or prevent fraud. As a result, shareholders could lose confidence in GHL's financial and other public reporting, which is likely to negatively affect GHL's business and the market price of GHL Ordinary Shares.***

Prior to the Closing of the Business Combination, Grab has been a private company with limited accounting personnel and other resources with which to address Grab's internal controls and procedures. Grab's management has not completed an assessment of the effectiveness of Grab's internal control over financial reporting and Grab's independent registered public accounting firm has not conducted an audit of Grab's internal control over financial reporting.

In connection with the audit of Grab's consolidated financial statements as of and for the years ended December 31, 2020 and 2019 in accordance with the standards established by PCAOB, Grab and Grab's independent registered public accounting firm identified material weaknesses in Grab's internal control over financial reporting which related to (i) improper revenue recognition conclusions with respect to OVO that resulted in a material overstatement of revenue and expenses in Grab's consolidated financial statements that were previously audited under International Standards on Auditing as a private company; (ii) the review process over assumptions and inputs used in several key accounting estimates; (iii) not having a sufficient number of personnel with an appropriate level of IFRS accounting skills, SEC reporting knowledge and experience and training in internal controls over financial reporting. Grab is committed to remediating its material weaknesses as promptly as possible. However, there can be no assurance as to when these material weaknesses will be remediated or that additional material weaknesses will not arise in the future. Even effective internal control can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. Any failure to remediate the material weaknesses, or the development of new material weaknesses in Grab's internal control over financial reporting, could result in material misstatements in Grab's financial statements, which in turn could have a material adverse effect on Grab's financial condition and results of operations. In addition, GHL cannot assure you that GHL will not identify material weaknesses after the Business Combination.

Ineffective internal control over financial reporting could expose GHL to increased risk of fraud or misuse of corporate assets and subject GHL to potential delisting from the stock exchange on which GHL is listed, regulatory investigations and civil or criminal sanctions. GHL may also be required to restate its financial statements from prior periods. If GHL fails to achieve and maintain an effective internal control environment, it could suffer material misstatements in its financial statements and fail to meet its reporting obligations, which

117

**Table of Contents**

would likely cause investors to lose confidence in GHL's reported financial information. This could in turn limit GHL's access to capital markets, harm its financial condition and results of operations, and lead to a decline in the market price of GHL Class A Ordinary Shares.

***GHL will be an "emerging growth company," and it cannot be certain if the reduced SEC reporting requirements applicable to emerging growth companies will make GHL's Class A Ordinary Shares less attractive to investors, which could have a material and adverse effect on GHL, including its growth prospects.***

Upon consummation of the Business Combination, GHL will be an "emerging growth company" as defined in the JOBS Act. GHL will remain an "emerging growth company" until the earliest to occur of (i) the last day of the fiscal year (a) following the fifth anniversary of the closing of the Business Combination, (b) in which GHL has total annual gross revenue of at least $1.07 billion or (c) in which GHL is deemed to be a large accelerated filer, which means the market value of GHL Shares held by non-affiliates exceeds $700 million as of the last business day of GHL's prior second fiscal quarter, and (ii) the date on which GHL issued more than $1.0 billion in non-convertible debt during the prior three-year period. GHL intends to take advantage of exemptions from various reporting requirements that are applicable to most other public companies, whether or not they are classified as "emerging growth companies," including, but not limited to, an exemption from the provisions of Section 404(b) of the Sarbanes-Oxley Act requiring that GHL's independent registered public accounting firm provide an attestation report on the effectiveness of its internal control over financial reporting and reduced disclosure obligations regarding executive compensation.

In addition, Section 102(b)(1) of the JOBS Act exempts "emerging growth companies" from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. GHL has elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, GHL, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of GHL's financial statements with certain other public companies difficult or impossible because of the potential differences in accounting standards used.

Furthermore, even after GHL no longer qualifies as an "emerging growth company," as long as GHL continues to qualify as a foreign private issuer under the Exchange Act, GHL will be exempt from certain provisions of the Exchange Act that are applicable to U.S. domestic public companies, including, but not limited to, the sections of the Exchange Act regulating the solicitation of proxies, consents or authorizations in respect of a security registered under the Exchange Act; the sections of the Exchange Act requiring insiders to file public reports of their stock ownership and trading activities and liability for insiders who profit from trades made in a short period of time; and the rules under the Exchange Act requiring the filing with the SEC of quarterly reports on Form 10-Q containing unaudited financial and other specified information, or current reports on Form 8-K, upon the occurrence of specified significant events. In addition, GHL will not be required to file annual reports and financial statements with the SEC as promptly as U.S. domestic companies whose securities are registered under the Exchange Act, and are not required to comply with Regulation FD, which restricts the selective disclosure of material information.

As a result, GHL shareholders may not have access to certain information they deem important. GHL cannot predict if investors will find GHL Class A Ordinary Shares less attractive because it relies on these exemptions. If some investors find GHL Class A Ordinary Shares less attractive as a result, there may be a less active trading market and share price for GHL Class A Ordinary Shares may be more volatile.

***GHL will qualify as a foreign private issuer within the meaning of the rules under the Exchange Act, and as such GHL is exempt from certain provisions applicable to United States domestic public companies.***

Because GHL will qualify as a foreign private issuer under the Exchange Act immediately following the consummation of the Business Combination, GHL is exempt from certain provisions of the securities rules and regulations in the United States that are applicable to U.S. domestic issuers, including: (i) the rules under the Exchange Act requiring the filing of quarterly reports on Form 10-Q or current reports on Form 8-K with the SEC; (ii) the sections of the Exchange Act regulating the solicitation of proxies, consents, or authorizations in respect of a security registered under the Exchange Act; (iii) the sections of the Exchange Act requiring insiders to file public reports of their share ownership and trading activities and liability for insiders who profit from trades made in a short period of time; and (iv) the selective disclosure rules by issuers of material nonpublic information under Regulation FD.

GHL will be required to file an annual report on Form 20-F within four months of the end of each fiscal year. In addition, GHL intends to publish its results on a quarterly basis through press releases, distributed pursuant to the rules and regulations of NASDAQ. Press releases relating to financial results and material events will also be furnished to the SEC on Form 6-K. However, the information GHL is required to file with or furnish to the SEC will be less extensive and less timely compared to that required to be filed with the SEC by U.S. domestic issuers. Accordingly, after the Business Combination, if you continue to hold GHL's securities, you may receive less or different information about GHL than you currently receive about AGC or that you would receive about a U.S. domestic public company.

GHL could lose its status as a foreign private issuer under current SEC rules and regulations if more than 50% of GHL's outstanding voting securities become directly or indirectly held of record by U.S. holders and any one of the following is true: (i) the majority of GHL's directors or executive officers are U.S. citizens or residents; (ii) more than 50% of GHL's assets are located in the United States; or (iii) GHL's business is administered principally in the United States. If GHL loses its status as a foreign private issuer in the future, it will no longer be exempt from the rules described above and, among other things, will be required to file periodic reports and annual and quarterly financial statements as if it were a company incorporated in the United States. If this were to happen, GHL would likely incur substantial costs in fulfilling these additional regulatory requirements and members of GHL's management would likely have to divert time and resources from other responsibilities to ensuring these additional regulatory requirements are fulfilled. See "Management of GHL Following the Business Combination–Foreign Private Issuer Status."

***As a company incorporated in the Cayman Islands, GHL is permitted to adopt certain home country practices in relation to corporate governance matters that differ significantly from NASDAQ corporate governance listing standards applicable to domestic U.S. companies; these practices may afford less protection to shareholders than they would enjoy if GHL complied fully with NASDAQ corporate governance listing standards.***

GHL is a company incorporated in the Cayman Islands, and, after the consummation of the Business Combination, will be listed on NASDAQ. NASDAQ market rules permit a foreign private issuer like GHL to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is GHL's home country, may differ significantly from NASDAQ corporate governance listing standards applicable to domestic U.S. companies.

Among other things, GHL is not required to have: (i) a majority of the board of directors consist of independent directors; (ii) a compensation committee consisting of independent directors; (iii) a nominating committee consisting of independent directors; or (iv) regularly scheduled executive sessions with only independent directors each year.

Although not required and as may be changed from time to time, GHL intends to have, as of the consummation of the Business Combination, a majority-independent board of directors, a majority-independent

119

**Table of Contents**

compensation committee and a nominating committee. Subject to the foregoing, GHL intends to rely on the exemptions listed above. As a result, you may not be provided with the benefits of certain corporate governance requirements of NASDAQ applicable to U.S. domestic public companies. See "Management of GHL Following the Business Combination – Foreign Private Issuer Status."

***You may face difficulties in protecting your interests, and your ability to protect your rights through U.S. courts may be limited, because GHL is incorporated under the law of the Cayman Islands, GHL conducts substantially all of its operations, and a majority of its directors and executive officers reside, outside of the United States.***

GHL is an exempted company limited by shares incorporated under the laws of the Cayman Islands, and following the Business Combination, will conduct a majority of its operations through its subsidiary, Grab, outside the United States. Substantially all of GHL's assets are located outside the United States. A majority of GHL's officers and directors reside outside the United States and a substantial portion of the assets of those persons are located outside of the United States. As a result, it could be difficult or impossible for you to bring an action against GHL or against these individuals outside of the United States in the event that you believe that your rights have been infringed upon under the applicable securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of the jurisdictions that comprise the Southeast Asian region could render you unable to enforce a judgment against GHL's assets or the assets of GHL's directors and officers.

GHL's Management has been advised that Indonesia, Singapore, Thailand, Malaysia, Philippines and Vietnam, where GHL will be operating after the consummation of the Business Combination, do not have treaties providing for the reciprocal recognition and enforcement of judgments of courts with the United States. Further, it is unclear if extradition treaties now in effect between the United States and Southeast Asia markets would permit effective enforcement of criminal penalties of U.S. federal securities laws.

In addition, GHL's corporate affairs will be governed by the Amended GHL Articles, the Cayman Islands Companies Act and the common law of the Cayman Islands. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary duties of GHL's directors to GHL under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from the common law of England, the decisions of whose courts are of persuasive authority, but are not binding, on a court in the Cayman Islands. The rights of GHL's shareholders and the fiduciary duties of GHL's directors under Cayman Islands law may not be as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a different body of securities laws than the United States. Some U.S. states, such as Delaware, may have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States.

Shareholders of Cayman Islands exempted companies like GHL have no general rights under Cayman Islands law to inspect corporate records (other than the memorandum and articles of association) or to obtain copies of lists of shareholders of these companies. GHL's directors will have discretion under the Amended GHL Articles to determine whether or not, and under what conditions, GHL's corporate records may be inspected by its shareholders, but GHL is not obliged to make them available to the shareholders. This may make it more difficult for you to obtain the information needed to establish any facts necessary for a shareholder motion or to solicit proxies from other shareholders in connection with a proxy contest. See "Description of GHL Securities–Inspection of Books and Records."

Certain corporate governance practices in the Cayman Islands, which is GHL's home country, differ significantly from requirements for companies incorporated in other jurisdictions such as the United States. To the extent GHL chooses to follow home country practice with respect to corporate governance matters, its

120

shareholders may be afforded less protection than they otherwise would under rules and regulations applicable to U.S. domestic issuers. See "Management of GHL Following the Business Combination – Foreign Private Issuer Status."

As a result of all of the above, GHL's shareholders may have more difficulty in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a company incorporated in the United States.

***The ability of GHL's subsidiaries after the consummation of the Business Combination in certain Southeast Asia markets to distribute dividends to GHL may be subject to restrictions under their respective laws.***

GHL is a holding company, and its subsidiaries after the consummation of the Business Combination will be located throughout Southeast Asia in Indonesia, Singapore, Thailand, Malaysia, Philippines, Vietnam, Myanmar and Cambodia. Part of GHL's primary internal sources of funds to meet its cash needs will be its share of the dividends, if any, paid by GHL's subsidiaries. The distribution of dividends to GHL from the subsidiaries in these markets as well as other markets where GHL operates is subject to restrictions imposed by the applicable laws and regulations in these markets. In addition, although there are currently no foreign exchange control regulations which restrict the ability of GHL's subsidiaries in Indonesia (save for the regulations prohibiting the transfer of Indonesian Rupiah to outside of Indonesia and imposing reporting requirements on foreign exchange transactions in excess of a certain amount), Singapore, Malaysia and the Philippines (except for the regulations (i) requiring registration of the foreign investment with the *Bangko Sentral ng Pilipinas* ("BSP") to be able to source from the Philippine banking system foreign currency to be used in repatriating capital or remitting dividends outside the Philippines, and (ii) prohibiting the transfer of Philippine pesos to outside of the Philippines in excess of PHP 50,000.00 (approximately $1,000) without prior written authorization from the BSP) to distribute dividends to GHL, the relevant regulations may be changed and the ability of these subsidiaries to distribute dividends to GHL may be restricted in the future.

***It is not expected that GHL will pay dividends in the foreseeable future after the Business Combination.***

It is expected that GHL will retain most, if not all, of its available funds and any future earnings after the Business Combination to fund the development and growth of its business. As a result, it is not expected that GHL will pay any cash dividends in the foreseeable future.

Following completion of the Business Combination, GHL's board of directors will have complete discretion as to whether to distribute dividends. Even if the board of directors decides to declare and pay dividends, the timing, amount and form of future dividends, if any, will depend on the future results of operations and cash flow, capital requirements and surplus, the amount of distributions, if any, received by GHL from subsidiaries, GHL's financial condition, contractual restrictions and other factors deemed relevant by the board of directors. There is no guarantee that the shares of GHL will appreciate in value after the Business Combination or that the trading price of the shares will not decline.

***Grab has granted in the past, and GHL will also grant in the future, share incentives, which may result in increased share-based compensation expenses.***

In March 2018, Grab's board of directors adopted and the Grab's shareholders approved the 2018 Equity Incentive Plan, or the 2018 Plan, which was most recently amended and restated in April 2019 and further amended in April 2021, for the purpose of granting share-based compensation awards to employees, directors and consultants to incentivize their performance and align their interests with Grab. Upon the consummation of the Business Combination, no further awards will be granted under the 2018 Plan. However, in April 2021 in connection with the Business Combination, GHL's board of directors adopted and GHL's shareholders approved the GHL 2021 Equity Incentive Plan, or the 2021 Plan. Initially, the maximum number of ordinary shares of GHL that may be issued under the 2021 Plan after it becomes effective will be seven percent (7%) of the total

121

number of GHL Ordinary Shares that are outstanding (on a fully diluted basis) upon consummation of the Business Combination. The 2021 Plan permits the awards of options, share appreciation rights, restricted shares, restricted share units, or RSUs, and other awards to employees, directors and consultants of GHL and its subsidiaries and affiliates. GHL will account for compensation costs for all share options using a fair-value based method and recognize expenses in its consolidated statements of profit or loss in accordance with IFRS. As a result of these grants, Grab incurred share-based compensation of $54 million and $34 million in 2020 and 2019, respectively. For more information on the share incentive plans, see "Management of GHL Following the Business Combination—Share Incentive Plan." Grab believes the granting of share-based compensation is of significant importance to its ability to attract and retain key personnel and employees, and as such, after the consummation of the Business Combination, GHL will also grant share-based compensation and incur share-based compensation expenses. As a result, expenses associated with share-based compensation may increase, which may have an adverse effect on Grab and GHL's business and results of operations.

***GHL's dual-class voting structure may limit your ability to influence corporate matters and could discourage others from pursuing any change of control transactions that holders of GHL's Class A Ordinary Shares may view as beneficial.***

GHL's authorized and issued ordinary shares will be divided into Class A Ordinary Shares and Class B Ordinary Shares. Each Class A Ordinary Share will be entitled to one vote, while each Class B Ordinary Share will be entitled to 45 votes. Only GHL's Class A Ordinary Shares will be listed and traded on NASDAQ, and GHL intends to maintain the dual-class voting structure after the consummation of the Business Combination.

The Key Executives and their respective Permitted Entities will hold all of the outstanding GHL Class B Ordinary Shares. The Key Executive Proxies given to Mr. Tan by the other Key Executives and certain entities related to such Key Executives or Mr. Tan will give Mr. Tan control of the voting power of all outstanding GHL Class B Ordinary Shares. As a result, it is expected that Mr. Tan will, assuming a No Redemption Scenario and that all of Grab's outstanding stock options are exercised, all of Grab's outstanding restricted stock units vest and all remaining Grab Ordinary Shares available for grant under the Grab 2018 Plan, which will have one vote per share when granted, are granted to employees other than the Key Executives, control approximately 66.11% of the total voting power of all issued and outstanding GHL Ordinary Shares voting together as a single class immediately following the consummation of the Business Combination, even though he and his Permitted Entities will only own 2.66% of outstanding GHL Ordinary Shares.

With respect to the election of the GHL board of directors, under the terms of the GHL Class B Ordinary Shares, holders of a majority of the GHL Class B Ordinary Shares will have the right to nominate, appoint and remove a majority of the members of GHL's board of directors, which majority will be designated as Class B Directors. Mr. Tan and his Permitted Entities will own approximately 64.01% of the outstanding GHL Class B Ordinary Shares. As a result of such ownership, as well as the Key Executive Proxies delivered to him by the other Key Executives and certain entities related to such Key Executives or Mr. Tan, Mr. Tan will effectively have the right to nominate, appoint and remove all of the Class B Directors. In addition, since all of the issued and outstanding GHL Ordinary Shares voting together as a single class will elect the remaining members of GHL's board of directors, then Mr. Tan, by virtue of his control of approximately 66.11% of that total voting power, will effectively have the ability to elect and remove the entire GHL board of directors. For further information, see "Description of GHL Securities—Ordinary Shares" and "—Shareholders' Deed."

Additionally, the Key Executives and certain entities related to the Key Executives are expected to enter into a letter agreement (the "ROFO Agreement"), pursuant to which, subject to certain limited exceptions, in the event any holder of GHL Class B Ordinary Shares intends to sell or otherwise transfer GHL Class B Ordinary Shares in an open market or private transaction, that transferring shareholder first shall irrevocably offer those shares to each other holder of GHL Class B Ordinary Shares by way of a notice delivered to each such other holder. Each recipient holder then shall have a right of first offer to purchase any or all of those shares at a price per share equal to the market price (as defined in the ROFO Agreement) of the GHL Class A Ordinary Shares

122

(into which those shares would automatically convert if sold in an open market or private transaction to other purchasers). The recipients of the right of first offer generally shall have three business days within which to exercise such right, which shall be allocated pro rata among exercising recipients if the total of all shares exercised exceed the total amount of shares to be transferred. The ROFO Agreement will have the effect of providing GHL Class B Ordinary Shareholders the right to preserve the continued ownership of the GHL Class B Ordinary Shares within that group of holders. Since all of those holders shall have delivered the Key Executive Proxies, the ROFO Agreement also will have the effect of preserving Mr. Tan's control over the GHL Class B Ordinary Shares and GHL as discuss herein.

*If GHL Class A Ordinary Shares or the GHL Warrants are not eligible for deposit and clearing within the facilities of the Depository Trust Company, then transactions in the GHL Class A Ordinary Shares or the GHL Warrants may be disrupted.*

The facilities of the Depository Trust Company ("DTC") are a widely used mechanism that allow for rapid electronic transfers of securities between the participants in the DTC system, which include many large banks and brokerage firms. GHL expects that GHL Class A Ordinary Shares or the GHL Warrants will be eligible for deposit and clearing within the DTC system. GHL expects to enter into arrangements with DTC whereby it will agree to indemnify DTC for stamp duty that may be assessed upon it as a result of its service as a depository and clearing agency for the GHL Class A Ordinary Shares or the GHL Warrants. GHL expects these actions, among others, will result in DTC agreeing to accept the GHL Class A Ordinary Shares or the GHL Warrants for deposit and clearing within its facilities.

DTC is not obligated to accept GHL Class A Ordinary Shares or the GHL Warrants for deposit and clearing within its facilities in connection with the listing and, even if DTC does initially accept GHL Class A Ordinary Shares or the GHL Warrants, it will generally have discretion to cease to act as a depository and clearing agency for GHL Class A Ordinary Shares or the GHL Warrants.

If DTC determines at any time after the completion of the transactions and the listing that GHL Class A Ordinary Shares or the GHL Warrants were not eligible for continued deposit and clearance within its facilities, then GHL believes GHL Class A Ordinary Shares or the GHL Warrants would not be eligible for continued listing on a U.S. securities exchange and trading in the shares would be disrupted. While GHL would pursue alternative arrangements to preserve its listing and maintain trading, any such disruption could have a material adverse effect on the market price of GHL Class A Ordinary Shares or the GHL Warrants.

**Risks Relating to Taxation**

*The Initial Merger may be a taxable event for U.S. Holders of AGC Class A Ordinary Shares and AGC Warrants.*

Subject to the limitations and qualifications described in "United States Federal Income Tax Considerations—U.S. Federal Income Tax Consequences of the Business Combination to U.S. Holders," the Initial Merger should qualify as a "reorganization" within the meaning of Section 368 of the Code and, as a result, a U.S. Holder (as defined in "United States Federal Income Tax Considerations—U.S. Federal Income Tax Consequences of the Business Combination to U.S. Holders") should not recognize gain or loss on the exchange of AGC Securities for GHL Securities, as applicable, pursuant to the Business Combination. However, if the Initial Merger does not qualify as a reorganization within the meaning of Section 368 of the Code for any reason, a U.S. Holder that exchanges its AGC Securities for the consideration under the Business Combination will recognize gain or loss equal to the difference between (i) the sum of the fair market value of the GHL Securities received and (ii) the U.S. Holder's adjusted tax basis in the AGC Securities exchanged.

123

***GHL may be or become a passive foreign investment company ("PFIC"), which could result in adverse U.S. federal income tax consequences to U.S. Holders.***

If GHL (or its predecessor AGC) or any of its subsidiaries is a PFIC for any taxable year, or portion thereof, that is included in the holding period of a beneficial owner of the GHL Class A Ordinary Shares or GHL Warrants that is a U.S. Holder, such U.S. Holder may be subject to certain adverse U.S. federal income tax consequences and may be subject to additional reporting requirements. GHL and its subsidiaries are not currently expected to be treated as PFICs for U.S. federal income tax purposes for the taxable year of the Business Combination, the prior taxable year, or foreseeable future taxable years. However, this conclusion is a factual determination that must be made annually at the close of each taxable year and, thus, is subject to change. Accordingly, there can be no assurance that GHL or any of its subsidiaries will not be treated as a PFIC for any taxable year. Moreover, GHL does not expect to provide a PFIC annual information statement for 2021 or future taxable years. Please see the section entitled "United States Federal Income Tax Considerations—Passive Foreign Investment Company Status" for a more detailed discussion with respect to GHL's PFIC status. U.S. Holders are urged to consult their tax advisors regarding the possible application of the PFIC rules to holders of the GHL Class A Ordinary Shares and GHL Warrants.

***Future changes to tax laws could materially and adversely affect GHL and reduce net returns to GHL's shareholders.***

GHL's tax treatment is subject to changes in tax laws, regulations, and treaties, or the interpretation thereof, tax policy initiatives and reforms under consideration, and the practices of tax authorities in jurisdictions in which we operate. The income and other tax rules in the jurisdictions in which GHL operate are constantly under review by taxing authorities and other governmental bodies. Changes to tax laws (which changes may have retroactive application) could adversely affect GHL or its shareholders. We are unable to predict what tax proposals may be proposed or enacted in the future or what effect such changes would have on GHL's business, but such changes, to the extent they are brought into tax legislation, regulations, policies or practices, could affect GHL's financial position and overall or effective tax rates in the future in countries where we have operations and where GHL is organized or resident for tax purposes, and increase the complexity, burden and cost of tax compliance. We urge investors to consult with their legal and tax advisers regarding the implication of potential changes in tax laws on an investment in GHL Class A Ordinary Shares and GHL Warrants.

**Risks Relating to Redemption of AGC Class A Ordinary Shares**

***You will not have any rights or interests in funds from the trust account, except under certain limited circumstances. To liquidate your investment, therefore, you may be forced to redeem or sell your public shares or warrants, potentially at a loss.***

AGC shareholders will be entitled to receive funds from the trust account only upon the earlier to occur of: (i) AGC's completion of the Business Combination, and then only in connection with those shares of AGC Shares that such shareholder properly elected to redeem, subject to the limitations described herein, and (ii) the redemption of AGC's public shares if AGC is unable to complete a business combination by the Final Redemption Date, subject to applicable law and as further described herein. In addition, if AGC plans to redeem its public shares because AGC is unable to complete a business combination by the Final Redemption Date, for any reason, compliance with Cayman Islands law may require that AGC submit a plan of dissolution to AGC's then-existing shareholders for approval prior to the distribution of the proceeds held in AGC's trust account. In that case, AGC shareholders may be forced to wait beyond the Final Redemption Date, before they receive funds from the trust account. In no other circumstances will AGC shareholders have any right or interest of any kind in the trust account. Accordingly, to liquidate your investment, you may be forced to sell your public shares or warrants, potentially at a loss.

*Shareholders of AGC who wish to redeem their shares for a pro rata portion of the trust account must comply with specific requirements for redemption, which may make it difficult for them to exercise their redemption rights prior to the deadline. If shareholders fail to comply with the redemption requirements specified in this proxy statement/prospectus, they will not be entitled to redeem their AGC Shares for a pro rata portion of the funds held in the trust account.*

AGC shareholders who wish to redeem their shares for a pro rata portion of the trust account must submit a written request to Continental, in which you (i) request that AGC redeem all or a portion of your AGC Shares for cash and (ii) identify yourself as the beneficial holder of the AGC Shares and provide your legal name, phone number and address; and deliver your share certificates (if any) and other redemption forms (as applicable) to Continental, physically or electronically through the DTC. Any AGC shareholder who fails to properly demand redemption of such shareholder's public shares will not be entitled to convert his or her public shares into a pro rata portion of the trust account. In addition, AGC will comply with the proxy rules when conducting redemptions in connection with the Business Combination. Despite AGC's compliance with these rules, if a shareholder fails to receive AGC's tender offer or proxy materials, as applicable, such shareholder may not become aware of the opportunity to redeem its shares. Furthermore, the proxy materials, as applicable, that AGC will furnish to holders of its public shares in connection with the Business Combination will describe the various procedures that must be complied with in order to validly redeem public shares. In the event that a shareholder fails to comply with these procedures, its shares may not be redeemed.

*AGC does not have a specified maximum redemption threshold. The absence of such a redemption threshold may make it possible for AGC to complete a business combination with which a substantial majority of its shareholders do not agree.*

AGC's amended and restated memorandum and articles of association does not provide a specified maximum redemption threshold, except that in no event will AGC redeem its public shares in an amount that would cause its net tangible assets to be less than $5,000,0001, such that AGC is not subject to the SEC's "penny stock" rules. This minimum net tangible asset amount is also required as an obligation to each party's obligation to consummate the Business Combination under the Business Combination Agreement. If the Business Combination is not consummated, AGC will not redeem any shares, all AGC Shares submitted for redemption will be returned to the holders thereof, and AGC instead may search for an alternate business combination.

*The grant and future exercise of registration rights may adversely affect the market price of GHL Class A Ordinary Shares upon consummation of the Business Combination.*

Pursuant to the Registration Rights Agreement entered into in connection with the Business Combination and which is described elsewhere in this proxy statement/prospectus, Sponsor, Sponsor Related Parties and certain Grab Holders that entered into such agreement can each demand that GHL register their registrable securities under certain circumstances and will each also have piggyback registration rights for these securities in connection with certain registrations of securities that GHL undertakes. In addition, following the consummation of the Business Combination, GHL is required to file and maintain an effective registration statement under the Securities Act covering such securities and certain other securities of GHL. Additionally, pursuant to the PIPE Subscription Agreements and Registration Rights Agreement, GHL must file a registration statement within 30 days after the consummation of the Business Combination to register up to 326,500,000 GHL Class A Ordinary Shares held by the PIPE Investors, as well as GHL Class A Ordinary Shares held by the Sponsor Related Parties and GHL Class A Ordinary Shares as requested by other holders under the Registration Rights Agreement. See "Shares Eligible for Future Sale–Registration Rights."

The registration of these securities will permit the public sale of such securities. The registration and availability of such a significant number of securities for trading in the public market may have an adverse effect on the market price of GHL Class A Ordinary Shares post-Business Combination.

Table of Contents

***If you or a "group" of shareholders of which you are a part are deemed to hold an aggregate of more than 15% of the Class A Shares issued in the AGC IPO, you (or, if a member of such a group, all of the members of such group in the aggregate) will lose the ability to redeem all such shares in excess of 15% of the Class A Shares issued in the AGC IPO.***

A shareholder, together with any of his, her or its affiliates or any other person with whom it is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming in the aggregate his, her or its shares or, if part of such a group, the group's shares, in excess of 15% of the Class A Shares included in the units sold in the AGC IPO. In order to determine whether a shareholder is acting in concert or as a group with another shareholder, AGC will require each shareholder seeking to exercise redemption rights to certify to AGC whether such shareholder is acting in concert or as a group with any other shareholder. Such certifications, together with other public information relating to share ownership available to AGC at that time, such as Schedule 13D, Schedule 13G and Section 16 filings under the Exchange Act, will be the sole basis on which AGC makes the above-referenced determination. Your inability to redeem any such excess shares will reduce your influence over AGC's ability to consummate the Business Combination and you could suffer a material loss on your investment in AGC if you sell such excess shares in open market transactions. Additionally, you will not receive redemption distributions with respect to such excess shares if AGC consummates the Business Combination. As a result, you will continue to hold that number of shares aggregating to more than 15% of the shares sold in the AGC IPO and, in order to dispose of such excess shares, would be required to sell your Class A Shares in open market transactions, potentially at a loss. There is no assurance that the value of such excess shares will appreciate over time following the Business Combination or that the market price of the AGC Class A Shares will exceed the per-share redemption price. Notwithstanding the foregoing, shareholders may challenge AGC's determination as to whether a shareholder is acting in concert or as a group with another shareholder in a court of competent jurisdiction.

However, AGC shareholders' ability to vote all of their shares (including such excess shares) for or against the Business Combination is not restricted by this limitation on redemption.

***There is no guarantee that a shareholder's decision whether to redeem its shares for a pro rata portion of the trust account will put the shareholder in a better future economic position.***

There is no assurance as to the price at which an AGC shareholder may be able to sell its public shares in the future following the completion of the Business Combination or any alternative business combination. Certain events following the consummation of any initial business combination, including the Business Combination, may cause an increase in the share price, and may result in a lower value realized now than a shareholder of AGC might realize in the future had the shareholder not redeemed its shares. Similarly, if a shareholder does not redeem its shares, the shareholder will bear the risk of ownership of the public shares after the consummation of any initial business combination, and there can be no assurance that a shareholder can sell its shares in the future for a greater amount than the redemption price set forth in this proxy statement/prospectus. A shareholder should consult the shareholder's tax and/or financial advisor for assistance on how this may affect his, her or its individual situation.

126

**Table of Contents**

**THE BUSINESS COMBINATION PROPOSAL**

**General**

Holders of AGC Shares are being asked to adopt the Business Combination Agreement, approve the terms thereof and approve the transactions contemplated thereby, including the Business Combination. AGC shareholders should read carefully this proxy statement/prospectus in its entirety for more detailed information concerning the Business Combination Agreement, which is attached as Annex A to this proxy statement/prospectus. Please see the section entitled "—The Business Combination Agreement" below, for additional information and a summary of certain terms of the Business Combination Agreement. You are urged to read carefully the Business Combination Agreement in its entirety before voting on this proposal.

AGC may consummate the Business Combination only if the Business Combination Proposal is approved by the affirmative vote of the holders of a majority of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting, and the Initial Merger Proposal and the Governing Documents Proposal are approved by the affirmative vote of the holders of at least two-thirds of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting.

**The Business Combination Agreement**

On April 12, 2021, AGC, GHL, AGC Merger Sub, Grab Merger Sub and Grab entered into the Business Combination Agreement. The subsections that follow this subsection describe the material provisions of the Business Combination Agreement, but do not purport to describe all of the terms of the Business Combination Agreement. The following summary is qualified in its entirety by reference to the complete text of the Business Combination Agreement, a copy of which is attached as Annex A hereto. AGC shareholders and other interested parties are urged to read the Business Combination Agreement carefully and in its entirety (and, if appropriate, with the advice of financial and legal counsel) because it is the primary legal document that governs the Business Combination.

The Business Combination Agreement contains representations, warranties and covenants that the respective parties made to each other as of the date of the Business Combination Agreement or other specific dates. The assertions embodied in those representations, warranties and covenants were made for purposes of the contract among the respective parties and are subject to important qualifications and limitations agreed to by the parties in connection with negotiating the Business Combination Agreement. The representations, warranties and covenants in the Business Combination Agreement are also modified in important part by the disclosure schedules referred to therein which are not filed publicly and which are subject to a contractual standard of materiality different from that generally applicable to shareholders. The disclosure schedules were used for the purpose of allocating risk among the parties rather than establishing matters as facts. We do not believe that the disclosure schedules contain information that is material to an investment decision. Moreover, certain representations and warranties in the Business Combination Agreement may, may not have been or may not be, as applicable, accurate as of any specific date and do not purport to be accurate as of the date of this proxy statement/prospectus. Accordingly, no person should rely on the representations and warranties in the Business Combination Agreement or the summaries thereof in this proxy statement/prospectus as characterizations of the actual state of facts about GHL, AGC, Grab, AGC Merger Sub, Grab Merger Sub or any other matter.

Capitalized terms in this section not otherwise defined in this proxy statement/prospectus shall have the meanings ascribed to them in the Business Combination Agreement.

***General Description of the Business Combination Transactions***

In accordance with the terms and subject to the conditions of the Business Combination Agreement, the parties to the Business Combination Agreement have agreed that, in connection with the Closing, the parties shall

132

**Table of Contents**

undertake a series of transactions pursuant to which (i) AGC shall merge with and into AGC Merger Sub, with AGC Merger Sub surviving and remaining as a wholly-owned subsidiary of GHL and (ii) following the Initial Merger, Grab Merger Sub shall merge with and into Grab, with Grab being the surviving entity and becoming a wholly-owned subsidiary of GHL. The merger described in (i) is referred to as the "Initial Merger" and the merger described in (ii) is referred to as the "Acquisition Merger." The Initial Merger, the Acquisition Merger and the other transactions contemplated by the Business Combination Agreement are referred to as the "Business Combination."

*The Initial Merger*

The Initial Merger shall become effective on the date which is three business days after the first date on which all conditions set forth in the Business Combination Agreement that are required to be satisfied or waived (other than the conditions that by their terms are to be satisfied at the Initial Closing, but subject to the satisfaction or waiver of such conditions) on or prior to the closing of the Initial Merger (the "Initial Closing") or at such other time as may be agreed by Grab and AGC in writing. As a result of the Initial Merger, at the Initial Merger Effective Time (i) all the property, rights, privileges, agreements, powers and franchises, liabilities and duties of AGC and AGC Merger Sub shall vest in and become the property, rights, privileges, agreements, powers and franchises, liabilities and duties of AGC Merger Sub as the surviving company, and AGC Merger Sub shall thereafter exist as a wholly-owned subsidiary of GHL and the separate corporate existence of AGC shall cease to exist, (ii) each issued and outstanding security of AGC immediately prior to the Initial Merger Effective Time shall be cancelled in exchange for or converted into securities of GHL as set out below, (iii) the board of directors and officers of AGC Merger Sub and AGC shall cease to hold office, and the board of directors and officers of AGC Merger Sub shall be as determined by Grab, (iv) AGC Merger Sub's memorandum and articles of association shall be amended and restated to read in their entirety in the form attached as Exhibit J to the Business Combination Agreement, and (v) GHL's memorandum and articles of association shall be amended and restated to read in their entirety in the form attached as Exhibit L to the Business Combination Agreement.

Subject to the terms and conditions of the Business Combination Agreement, at the Initial Merger Effective Time:

- each AGC Unit issued and outstanding immediately prior to the Initial Merger Effective Time shall be automatically separated and the holder thereof shall be deemed to hold one AGC Class A Ordinary Share and one-fifth of an AGC Warrant;

- immediately following the separation of each AGC Unit, each (a) AGC Class A Ordinary Share issued and outstanding immediately prior to the Initial Merger Effective Time shall be cancelled in exchange for the right to receive one GHL Class A Ordinary Share, and (b) AGC Class B Ordinary Share issued and outstanding immediately prior to the Initial Merger Effective Time shall be cancelled in exchange for the right to receive one GHL Class A Ordinary Share;

- each AGC Warrant outstanding immediately prior to the Initial Merger Effective Time shall cease to be a warrant with respect to AGC Shares and be assumed by GHL and converted into a warrant to purchase one GHL Class A Ordinary Share, subject to substantially the same terms and conditions prior to the Initial Merger Effective Time in accordance with the provisions of the Assignment, Assumption and Amendment Agreement; and

- the single GHL Ordinary Share outstanding immediately prior to the Initial Merger Effective Time shall be cancelled for no consideration.

The sum of all GHL Class A Ordinary Shares receivable by AGC shareholders is referred to as "Initial Merger Consideration."

133

*Subsequent Merger*

In the event that following the consummation of the Initial Merger, and prior to the Closing, the Business Combination Agreement is terminated in certain limited circumstances in accordance with the terms thereof, then immediately prior to such termination: (i) AGC Merger Sub shall merge with and into GHL, with GHL continuing as the surviving company (the "Subsequent Survivor") in such merger (the "Subsequent Merger"), and such actions shall occur automatically without the need for action by any party thereto; (ii) the memorandum and articles of association of the Subsequent Survivor shall be amended and restated in its entirety to read in the form of the AGC Charter; (iii) (x) each GHL Class A Ordinary Share that immediately prior to the Initial Merger Effective Time represented an AGC Class A Ordinary Share shall be converted into the right to receive a Class A ordinary share of the Subsequent Survivor and (y) each GHL Class A Ordinary Share that immediately prior to the Initial Merger Effective Time represented an AGC Class B Ordinary Share shall be converted into the right to receive a Class B ordinary share of the Subsequent Survivor; (iv) the directors of the Subsequent Survivor shall be the persons who were directors of AGC immediately prior to the Initial Merger Effective Time; (v) each GHL Warrant that immediately prior to the Initial Merger Effective Time (excluding any GHL Warrants that were separated immediately prior to the Initial Merger Effective Time) was exercisable for the right to receive an AGC Share shall be converted into a warrant exercisable for the right to receive a corresponding ordinary share of the Subsequent Survivor; and (vi) a plan of merger shall be filed with the registrar of the Cayman Islands in respect of the Subsequent Merger consistent with the foregoing.

### The Acquisition Merger

Following the Initial Merger, subject to the terms and conditions set forth in the Business Combination Agreement, the Acquisition Merger shall become effective as soon as practicable following the later of three hours and one minute following the Initial Merger Effective Time and the time on which all conditions set forth in the Business Combination Agreement that are required to be satisfied or waived (other than the conditions that by their terms are to be satisfied at Closing, but subject to the satisfaction or waiver of such conditions) on or prior to the closing of the Acquisition Merger (the "Closing") or at such other time as may be agreed by GHL (with the prior written consent of the GHL directors appointed by both AGC and Grab) and Grab in writing. As a result of the Acquisition Merger, at the Acquisition Effective Time (i) all the property, rights, privileges, agreements, powers and franchises, liabilities and duties of Grab Merger Sub and Grab shall vest in and become the assets and liabilities of Grab as the surviving company, and Grab shall thereafter exist as a wholly-owned subsidiary of GHL and the separate corporate existence of Grab Merger Sub shall cease to exist, (ii) each issued and outstanding security of Grab immediately prior to the Acquisition Effective Time shall be cancelled in exchange for or converted into securities of GHL as set out below, (iii) each share of Grab Merger Sub issued and outstanding immediately prior to the Acquisition Effective Time shall automatically be converted into one ordinary share of the surviving company, (iv) the board of directors and officers of Grab Merger Sub shall cease to hold office, and the board of directors and officers of Grab shall be as determined by Grab and (v) Grab's memorandum and articles of association shall be amended and restated to read in their entirety in the form attached as Exhibit K to the Business Combination Agreement.

Subject to the terms and conditions of the Business Combination Agreement, at the Acquisition Effective Time:

- each Grab Ordinary Share and Grab Preferred Share (other than Grab Key Executive Shares, Grab Restricted Stock, Grab Key Executive Restricted Stock, Grab Dissenting Shares and Grab Treasury Shares) issued and outstanding immediately prior to the Acquisition Effective Time shall be cancelled in exchange for the right to receive such fraction of a newly issued GHL Class A Ordinary Share that is equal to the Exchange Ratio, without interest, subject to rounding up to the nearest whole GHL Class A Ordinary Share;

- each Grab Key Executive Share (other than Grab Key Executive Restricted Stock and Grab Dissenting Shares) issued and outstanding immediately prior to the Acquisition Effective Time shall be cancelled

Table of Contents

in exchange for the right to receive such fraction of a newly issued GHL Class B Ordinary Share that is equal to the Exchange Ratio, without interest, subject to rounding up to the nearest whole GHL Class A Ordinary Share;

- each Grab Option outstanding immediately prior to the Acquisition Effective Time, whether vested or unvested, shall be automatically assumed by GHL and converted into an option to purchase the number of GHL Class A Ordinary Shares equal to (i) the number of Grab Ordinary Shares subject to such Grab Option immediately prior to the Acquisition Effective Time multiplied by (ii) the Exchange Ratio (such product rounded down to the nearest whole number), and otherwise, shall be subject to substantially the same terms and conditions as were applicable to such Grab Option immediately prior to the Acquisition Effective Time;

- each Grab Key Executive Option outstanding immediately prior to the Acquisition Effective Time, whether vested or unvested, shall be automatically assumed by GHL and converted into an option to purchase the number of GHL Class B Ordinary Shares equal to (i) the number of Grab Ordinary Shares subject to such Grab Key Executive Option immediately prior to the Acquisition Effective Time multiplied by (ii) the Exchange Ratio (such product rounded down to the nearest whole number), and otherwise, shall be subject to substantially the same terms and conditions as were applicable to such Grab Key Executive Option immediately prior to the Acquisition Effective Time;

- each award of Grab Restricted Stock outstanding immediately prior to the Acquisition Effective Time shall be automatically converted into an award of restricted GHL Class A Ordinary Shares equal to (i) the number of Grab Shares subject to the Grab Restricted Stock award immediately before the Acquisition Effective Time multiplied by (ii) the Exchange Ratio (such product rounded down to the nearest whole number), and otherwise, shall be subject to substantially the same terms and conditions as were applicable to such award of Grab Restricted Stock immediately prior to the Acquisition Effective Time;

- each award of Grab Key Executive Restricted Stock outstanding immediately prior to the Acquisition Effective Time shall be automatically converted into an award of restricted GHL Class B Ordinary Shares equal to (i) the number of Grab Shares subject to the Grab Key Executive Restricted Stock award immediately before the Acquisition Effective Time multiplied by (ii) the Exchange Ratio (such product rounded down to the nearest whole number), and otherwise, shall be subject to substantially the same terms and conditions as were applicable to such award of Grab Key Executive Restricted Stock immediately prior to the Acquisition Effective Time;

- each Grab RSU outstanding immediately prior to the Acquisition Effective Time, whether vested or unvested, shall be automatically assumed by GHL and converted into an award of restricted share units representing the right to receive the number of GHL Class A Ordinary Shares equal to (i) the number of Grab Ordinary Shares subject to such Grab RSU immediately prior to the Acquisition Effective Time multiplied by (ii) the Exchange Ratio (such product rounded down to the nearest whole number), and otherwise, shall be subject to substantially the same terms and conditions as were applicable to such Grab RSU immediately prior to the Acquisition Effective Time; and

- each Grab Key Executive RSU outstanding immediately prior to the Acquisition Effective Time, whether vested or unvested, shall be automatically assumed by GHL and converted into an award of restricted share units representing the right to receive the number of GHL Class B Ordinary Shares equal to (i) the number of Grab Ordinary Shares subject to such Grab Key Executive RSU immediately prior to the Acquisition Effective Time multiplied by (ii) the Exchange Ratio (such product rounded down to the nearest whole number), and otherwise, shall be subject to substantially the same terms and conditions as were applicable to such Grab Key Executive RSU immediately prior to the Acquisition Effective Time.

The sum of all the GHL Ordinary Shares and other securities receivable by Grab shareholders is referred to as "Acquisition Merger Consideration," and the Initial Merger Consideration and the Acquisition Merger

135

Consideration are referred to as the "Shareholder Merger Consideration." At or prior to the Initial Merger Effective Time, GHL shall deposit, or cause to be deposited with Continental as Exchange Agent (or another exchange agent reasonably acceptable to Grab) the Shareholder Merger Consideration.

### Grab Dissenting Shares

To the extent available under the Cayman Islands Companies Act, Grab Shares that are outstanding immediately prior to the Acquisition Effective Time and that are held by Grab shareholders who shall have demanded properly in writing dissenters' rights for such Company Shares in accordance with Section 238 of the Cayman Islands Companies Act and otherwise complied with all of the provisions of the Cayman Islands Companies Act relevant to the exercise and perfection of dissenters' rights (the "Grab Dissenting Shares") shall not be converted into, and such shareholders shall have no right to receive, the applicable portion of the Acquisition Merger Consideration unless and until such shareholder fails to perfect or withdraws or otherwise loses his, her or its right to dissenters' rights under the Cayman Islands Companies Act. The Grab Shares owned by any Grab shareholder who fails to perfect or who effectively withdraws or otherwise loses his, her or its dissenters' rights pursuant to the Cayman Islands Companies Act shall thereupon be deemed to have been converted into, and to have become exchangeable for, as of the Acquisition Effective Time, the right to receive the applicable portion of the Acquisition Merger Consideration, without any interest thereon. Grab shall have complete control over all negotiations and proceedings with respect to such dissenters' rights (including the ability to make any payment with respect to any exercise by a shareholder of its rights to dissent from the Acquisition Merger or any demands for appraisal or offer to settle or settle any such demands or approve any withdrawal of any such dissenter rights or demands).

### Closing

The closing of the Acquisition Merger (the "Closing") shall take place remotely by conference call and electronic exchange of documents and signatures as soon as practicable following the later of three hours and one minute following the Initial Merger Effective Time and the time on which all conditions set forth in the Business Combination Agreement that are required to be satisfied or waived (other than the conditions that by their terms are to be satisfied at Closing, but subject to the satisfaction or waiver of such conditions) on or prior to the Closing or at such other time or in such other manner as may be agreed by GHL (with the prior written consent of the GHL directors appointed by both AGC and Grab) and Grab in writing.

### Representations and Warranties

The Business Combination Agreement contains representations and warranties of Grab, AGC, GHL, AGC Merger Sub and Grab Merger Sub. The representations and warranties are, in certain cases, subject to specified exceptions, materiality qualifiers, Grab Material Adverse Effect and AGC Material Adverse Effect (see "—Material Adverse Effect" below), knowledge or other qualifications which may be further modified, qualified or limited by the Disclosure Letters to the Business Combination Agreement.

### Representations and Warranties of Grab

The Business Combination Agreement contains representations and warranties of Grab relating to, among other things:

- the due organization, qualification and good standing (where applicable) of Grab and its material subsidiaries (a material subsidiary is defined as each subsidiary (x) other than those which, when considered individually or in the aggregate as a single subsidiary, would not constitute a "significant subsidiary" as such term is defined in Rule 1-02(w) of Regulation S-X or (y) other than a subsidiary that has less than $5,000,000 of assets or revenues in any fiscal year period);

- the capitalization of Grab and its material subsidiaries, including their outstanding ordinary shares, preference shares, warrants and other share purchase rights;

- the due authorization of Grab to execute the Business Combination Agreement and other transaction documents and to perform its obligations thereunder;

136

Table of Contents

- the absence of conflicts by the execution, delivery and performance of the Business Combination Agreement and other transaction documents with laws applicable to, or organizational documents and material contracts of, Grab and its material subsidiaries;

- filings, submissions, applications or consents from governmental authorities required in connection with the execution, delivery and performance of the Business Combination Agreement and other transaction documents by Grab;

- material tax returns required to be filed by or with respect to Grab, and audits, assessment or other proceedings in relation to the tax returns or taxes of Grab and its material subsidiaries;

- the audited consolidated balance sheet of Grab as of, and the audited consolidated statements of income and profit and loss, and cash flows, for the 12-month period ending as of December 31, 2018, and December 31, 2019, and the unaudited consolidated balance sheet of Grab as at December 31, 2020, and the unaudited consolidated statements of income and profit and loss account, and cash flows, for the twelve-month period ending on December 31, 2020;

- the operation of the business in the ordinary course since December 31, 2020 by Grab and its material subsidiaries, including the collection of receivables and paid payables and similar obligations in the ordinary course, and there having not been any Grab Material Adverse Effect;

- litigation and proceedings pending or threatened against, or judgments or awards unsatisfied against Grab and its subsidiaries;

- the compliance with applicable laws (including, without limitation, anticorruption laws, labor and employment laws, other laws relating to Grab's benefit plans and environmental laws) by Grab and its subsidiaries;

- Grab's registered intellectual property, and the violation, infringement or misappropriation of intellectual property against or by Grab and its subsidiaries;

- compliance by Grab with its published data privacy and data security policies and applicable laws relating to the use, collection, retention, or other processing or dealing of any personal data;

- the maintenance and implementation of reasonable and appropriate disaster recovery and security plans and other steps to safeguard Grab's and its subsidiaries' trade secrets, personal data and IT systems from unauthorized or illegal access and use;

- brokerage, finder's or other fee or commission based upon arrangements made by Grab or its controlled affiliates in connection with the transactions contemplated by the Business Combination Agreement;

- the information supplied by Grab in writing specifically for inclusion in the proxy statement/prospectus; and

- Grab's and its material subsidiaries' insurance policies.

*Representations and Warranties of AGC*

The Business Combination Agreement contains representations and warranties of AGC relating to, among other things:

- the due organization, qualification and good standing (where applicable) of AGC;

- the capitalization of AGC, including its outstanding ordinary shares, preference shares, warrants and other share purchase rights;

- the due authorization of AGC to execute the Business Combination Agreement and other transaction documents and to perform its obligations thereunder;

137

**Table of Contents**

- the absence of conflicts by the execution, delivery and performance of the Business Combination Agreement and other transaction documents with laws applicable to, or organizational documents and material contracts of, AGC;

- filings, submissions, applications or consents from governmental authorities required in connection with the execution, delivery and performance of the Business Combination Agreement and other transaction documents by AGC;

- material tax returns required to be filed by or with respect to AGC, and audits, assessment or other proceedings in relation to the tax returns or taxes of AGC;

- the financial statements contained in AGC's SEC filings;

- the operation of the business in the ordinary course since December 31, 2020, by AGC (including the collection of receivables and paid payables and similar obligations in the ordinary course), and there having not been any AGC Material Adverse Effect;

- the absence of any business activities of AGC other than activities related to AGC's IPO or directed toward the accomplishment of a business combination;

- litigation and proceedings pending or threatened against, or judgments or awards unsatisfied against AGC;

- brokerage, finder's or other fee or commission based upon arrangements made by AGC or its affiliates in connection with the transactions under the Business Combination Agreement;

- the information supplied by AGC in writing specifically for inclusion in the proxy statement/prospectus;

- AGC's trust account, including there being at least $500,000,000 in such trust account;

- AGC's status as not being an "investment company" or a person directly or indirectly "controlled" by or acting on behalf of an "investment company," in each case within the meaning of the Investment Company Act and AGC's status as an "emerging growth company" within the meaning of the JOBS Act;

- the Nasdaq listing status of the AGC Class A Ordinary Shares, the AGC Warrants and the AGC Units; and

- the PIPE Subscription Agreements, including the aggregate investment amount to be paid under such agreements.

*Representations and Warranties of GHL, AGC Merger Sub and Grab Merger Sub*

The Business Combination Agreement contains representations and warranties of each of GHL, AGC Merger Sub and Grab Merger Sub relating to, among other things:

- the due organization, qualification and good standing (where applicable) of each of GHL, AGC Merger Sub and Grab Merger Sub;

- the capitalization of each of GHL, AGC Merger Sub and Grab Merger Sub, including its issued and outstanding share capital and authorized share capital;

- the due authorization of each of GHL, AGC Merger Sub and Grab Merger Sub to execute of the Business Combination Agreement and the other transaction documents and to perform its obligations thereunder;

- the absence of conflicts by the execution, delivery and performance of the Business Combination Agreement and other transaction documents with laws applicable to, or organizational documents and material contracts of GHL, AGC Merger Sub or Grab Merger Sub;

138

- filings, submissions, applications or consents from governmental authorities required in connection with the execution, delivery and performance of the Business Combination Agreement and the other transaction documents having been made or obtained (as applicable) on the part of GHL, AGC Merger Sub or Grab Merger Sub;

- the operation of the business in the ordinary course by each of GHL, AGC Merger Sub and Grab Merger Sub, and the formation of each of GHL, AGC Merger Sub and Grab Merger Sub solely for the purpose of effecting the transactions contemplated by the Business Combination Agreement;

- litigation and proceedings pending or threatened against, or judgments or awards unsatisfied against GHL, AGC Merger Sub or Grab Merger Sub;

- brokerage, finder's or other fee or commission based upon arrangements made by GHL, AGC Merger Sub, Grab Merger Sub or each of their respective affiliates in connection with the transactions contemplated by the Business Combination Agreement;

- the information supplied by each of GHL, AGC Merger Sub and Grab Merger Sub in writing specifically for inclusion in the proxy statement/prospectus;

- the status of each of GHL, AGC Merger Sub and Grab Merger Sub not being an "investment company" or a person directly or indirectly "controlled" by or acting on behalf of an "investment company," in each case within the meaning of the Investment Company Act;

- the PIPE Subscription Agreements, including the aggregate investment amount to be paid under such agreements;

- the election by each of AGC Merger Sub and Grab Merger Sub to be disregarded as an entity separate from GHI for U.S. federal income tax purposes; and

- GHI's status as a foreign private issuer as defined in Rule 405 under the Securities Act.

*Material Adverse Effect*

With respect to Grab, "Grab Material Adverse Effect" as used in the Business Combination Agreement means any event, state of facts, development, change, circumstance, occurrence or effect that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on (i) the business, assets and liabilities, results of operations or financial condition of Grab and its subsidiaries, taken as a whole or (ii) the ability of Grab, any of its subsidiaries, GHL, AGC Merger Sub or Grab Merger Sub to consummate the Business Combination Transactions; provided, however, that in no event would any of the following, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been or will be, a "Grab Material Adverse Effect":

(a)     any change in applicable laws or IFRS or any interpretation thereof following the date of the Business Combination Agreement;

(b)     any change in interest rates or economic, political, business or financial market conditions generally;

(c)     the taking of any action expressly required to be taken under the Business Combination Agreement;

(d)     any natural disaster (including hurricanes, storms, tornadoes, flooding, earthquakes, volcanic eruptions or similar occurrences), epidemic or pandemic (including any action taken or refrained from being taken in response to COVID-19 or any COVID-19 Measures or any change in such COVID-19 Measures or interpretations following the date of the Business Combination Agreement), acts of nature or change in climate (for purposes of which, the term "COVID-19 Measures" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, safety or similar law, directive, guidelines or recommendations promulgated by any governmental authority in connection with or in response to COVID-19 for similarly situated companies);

**Table of Contents**

(e)     any acts of terrorism or war, the outbreak or escalation of hostilities, geopolitical conditions, local, national or international political conditions, riots or insurrections;

(f)     any failure in and of itself of Grab and any of its subsidiaries to meet any projections or forecasts (provided that this exception shall not prevent or otherwise affect a determination that any change, effect or development underlying such change has resulted in or contributed to a Grab Material Adverse Effect);

(g)     any event, state of facts, development, change, circumstance, occurrence or effect generally applicable to the industries or markets in which Grab or any of its subsidiaries operate;

(h)     any matter disclosed in the Grab Disclosure Letter that, reasonably apparent on its face, is responsive to a Grab representation or warranty qualified by Grab Material Adverse Effect (this proxy statement/prospectus includes disclosure of all matters in the Grab Disclosure Letter that are material to investors);

(i)     any event, state of facts, development, change, circumstance, occurrence or effect that is cured by Grab prior to the Closing; or

(j)     any worsening of the event, state of facts, development, change, circumstance, occurrence or effect referred to in clauses (b), (d), (e), (g) or (h) to the extent existing as of the date of the Business Combination Agreement;

provided, further, that in the case of each of clauses (b), (d), (e) and (g), any such event, state of facts, development, change, circumstance, occurrence or effect to the extent it disproportionately affects Grab or any of its subsidiaries relative to other participants in the industries and geographies in which such persons operate shall not be excluded from the determination of whether there has been, or would reasonably be expected to be, a Grab Material Adverse Effect.

With respect to AGC, "AGC Material Adverse Effect" as used in the Business Combination Agreement means any event, state of facts, development, change, circumstance, occurrence or effect that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on (i) the business, assets and liabilities, results of operations or financial condition of AGC or (ii) the ability of AGC to consummate the Business Combination Transactions; provided, however, that in no event would any of the following, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been or will be, an "AGC Material Adverse Effect":

(a)     any change in applicable laws or U.S. GAAP or any interpretation thereof following the date of the Business Combination Agreement;

(b)     any change in interest rates or economic, political, business or financial market conditions generally;

(c)     the taking of any action expressly required to be taken under the Business Combination Agreement;

(d)     any natural disaster (including hurricanes, storms, tornadoes, flooding, earthquakes, volcanic eruptions or similar occurrences), epidemic or pandemic (including any action taken or refrained from being taken in response to COVID-19 or any COVID-19 Measures (as defined above) or any change in such COVID-19 Measures or interpretations following the date of the Business Combination Agreement), acts of nature or change in climate;

(e)     any acts of terrorism or war, the outbreak or escalation of hostilities, geopolitical conditions, local, national or international political conditions, riots or insurrections;

(f)     any matter set forth in, or deemed to be incorporated in, Section 1.1 of the AGC Disclosure Letter;

(g)     any event, state of facts, development, change, circumstance, occurrence or effect that is cured by AGC prior to the Closing;

(h)     any change in the trading price or volume of the AGC Units, AGC Shares or AGC Warrants (provided that the underlying causes of such changes referred to in this clause (h) may be considered in

140

determining whether there is an AGC Material Adverse Effect except to the extent such cause is within the scope of any other exception within this definition); or

(i)    any worsening of the event, state of facts, development, change, circumstance, occurrence or effect referred to in clauses (b), (d), (e) or (f) to the extent existing as of the date of the Business Combination Agreement;

provided, however, that in the case of each of clauses (b), (d) and (e), any such event, state of facts, development, change, circumstance, occurrence or effect to the extent it disproportionately affects AGC relative to other special purpose acquisition companies shall not be excluded from the determination of whether there has been, or would reasonably be expected to be, an AGC Material Adverse Effect. Notwithstanding the foregoing, with respect to AGC, the amount of redemptions or the failure to obtain approval from AGC shareholders shall not be deemed to be an AGC Material Adverse Effect.

### Covenants of the Parties

#### Covenants of Grab

Grab made certain covenants under the Business Combination Agreement (subject to the terms and conditions set forth therein), including, among others, the following:

- From the signing date of the Business Combination Agreement through the earlier of the Closing or valid termination of the Business Combination Agreement (the "Interim Period"), subject to certain exceptions and except as otherwise consented to by AGC in accordance therewith, Grab shall use commercially reasonable efforts to operate the business of Grab and its material subsidiaries in all material respects in the ordinary course and shall not, and shall not permit its material subsidiaries to:

  - amend its memorandum and articles of association or other organizational documents (whether by merger, consolidation, amalgamation or otherwise), subject to certain exceptions;

  - propose or adopt a plan of complete or partial liquidation or dissolution, consolidation, restructuring, recapitalization or other reorganization, subject to certain exceptions;

  - incur, assume, guarantee or repurchase or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or options, warrants or other rights to acquire debt securities in a principal amount exceeding $325,000,000, subject to certain exceptions;

  - transfer, issue, sell, grant, pledge or otherwise dispose of any capital stock, equity interests, membership interests, partnership interests or registered capital, joint venture or other ownership interests and any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, or any other rights, agreements, arrangements, or commitment obligations of Grab to issue, deliver or sell, any such capital stock, equity interests, membership interests, partnership interests or registered capital, joint venture or other ownership interests, subject to certain exceptions;

  - amend, modify, adopt, enter into or terminate any benefit plan or any benefit or compensation plan, policy, program or contract that would be a benefit plan if in effect as of the date of the Business Combination Agreement, which exists solely for the benefit of a senior management member or which would materially disproportionately benefit a senior management member relative to the other participants in such benefit plan, subject to certain exceptions;

  - take any action to accelerate any payment, right to payment, or benefit, or the funding of any payment, right to payment or benefit, payable or to become payable to any senior management member, subject to certain exceptions;

  - sell, lease, exclusively license, transfer, abandon, allow to lapse or dispose of any material property or assets, in any single transaction or series of related transactions, subject to certain exceptions;

141

**Table of Contents**

- merge, consolidate or amalgamate with or into any person, subject to certain exceptions;

- make any acquisition of, or investment in, a business, by purchase of stock, securities or assets, merger or consolidation, or contributions to capital, or loans or advances, in any such case with a value or purchase price in excess of $150,000,000 individually and $300,000,000 in the aggregate;

- settle any charge, claim, action, complaint, petition, investigation, appeal, suit, litigation or other similar proceeding by any governmental authority or any other third-party material to the business of Grab in excess of $50,000,000 individually and $100,000,000 in the aggregate, subject to certain exceptions;

- split, combine or reclassify any shares of its share capital, subject to certain exceptions;

- redeem, repurchase, cancel or otherwise acquire or offer to redeem, repurchase, or otherwise acquire any of its equity securities, except for the redemption of equity securities issued under the ESOP in accordance with repurchase rights existing on the date of the Business Combination Agreement, subject to certain exceptions;

- declare, set aside, make or pay any dividend or other distribution, payable in cash, shares, property or otherwise, with respect to any of its share capital, subject to certain exceptions;

- amend any term or alter any rights of any of its outstanding equity securities, subject to certain exceptions;

- authorize, make or incur any capital expenditures or obligations or liabilities in connection therewith, other than any capital expenditures or obligations or liabilities in an amount not to exceed $60,000,000 in the aggregate;

- enter into any material contract, or amend any such material contract in any material respect, in each case in a manner that is adverse to Grab and its subsidiaries, taken as a whole, subject to certain exceptions;

- voluntarily terminate, suspend, abrogate, amend or modify any material permit in a manner materially adverse to Grab and its subsidiaries, taken as a whole, subject to certain exceptions;

- make any material change in its accounting principles or methods unless required by IFRS; or

- enter into any agreement or otherwise make a commitment to do any of the foregoing, subject to certain exceptions.

- During the Interim Period, Grab shall not and shall cause its controlled affiliates and its and their respective representatives not to directly or indirectly (a) solicit, initiate, submit facilitate, discuss or negotiate any inquiry, proposal or offer (written or oral) with any third party with respect to a Grab acquisition proposal, (b) furnish or disclose any non-public information to any third party in connection with or that would reasonably be expected to lead to a Grab acquisition proposal, (c) enter into any agreement, arrangement or understanding with any third party regarding a Grab acquisition proposal, (d) prepare or take any steps in connection with a public offering of any equity securities of Grab, any of its material subsidiaries or a newly formed holding company of Grab or such material subsidiaries, or (e) otherwise cooperate in any way with, or assist or participate in, or knowingly facilitate or encourage any effort or attempt by any person to do or seek to do any of the foregoing.

- Grab shall use reasonable efforts to take, or cause to be taken, and do, or cause to be done, all actions to assist AGC and GHL in their efforts to consummate the transactions contemplated by the PIPE Subscription Agreements, the Sponsor Subscription Agreement, the Backstop Subscription Agreement or the Amended and Restated Forward Purchase Agreement (collectively, the "Subscription Agreements") on the terms and conditions described therein; provided, however, that Grab shall not be required to incur any expenses or make any other payments in connection therewith other than the incurrence of Grab's ordinary course legal fees in connection with such matters.

142

Table of Contents

- Prior to or as promptly as practicable after this proxy statement/prospectus is declared effective under the Securities Act, Grab shall establish a record date for, duly call, give notice of, convene and hold a meeting of the Grab shareholders to be held as promptly as reasonably practicable following the date that this proxy statement/prospectus is declared effective under the Securities Act for the purpose of voting on the Business Combination Proposal, the Initial Merger Proposal and the Governing Documents Proposal and obtaining the Grab shareholders' approval (including any adjournment or postponement of such meeting for the purpose of soliciting additional proxies in favor of the adoption of the Business Combination Agreement), and such other matter as may be mutually agreed by AGC and Grab. Grab shall use its reasonable best efforts to solicit from its shareholders proxies in favor of the adoption of the Business Combination Proposal, the Initial Merger Proposal and the Governing Documents Proposal and shall take all other action necessary or advisable to obtain such proxies and Grab shareholders' approval and to secure the vote or consent of its shareholders required by and in compliance with all applicable law.

*Covenants of AGC, GHL, AGC Merger Sub and Grab Merger Sub*

AGC, GHL, AGC Merger Sub and Grab Merger Sub made certain covenants under the Business Combination Agreement (subject to the terms and conditions set forth therein), including, among others, the following:

- GHL shall grant awards under the GHL Incentive Equity Plan in the form attached as Exhibit M-1 to the Business Combination Agreement;

- upon satisfaction or waiver of the conditions set forth in the Business Combination Agreement and the Trust Agreement, AGC Merger Sub shall cause at Closing (i) any documents, opinions and notices required to be delivered to the Trustee pursuant to the Trust Agreement to be so delivered; (ii) the funds in the trust account to be disbursed in accordance with the Trust Agreement; and (iii) all remaining amounts then available in the trust account to be made available to GHL for immediate use, subject to the Business Combination Agreement and the Trust Agreement;

- AGC shall ensure AGC remains listed as a public company on NASDAQ from the date of the Business Combination Agreement until the closing of the Initial Merger. GHL shall apply for, and shall use reasonable best efforts to cause, the GHL Ordinary Shares to be issued in connection with the Business Combination Transactions to be approved for, listing on NASDAQ and accepted for clearance by DTC, subject to official notice of issuance, prior to the Closing Date;

- during the Interim Period, subject to certain exceptions, AGC, GHL, AGC Merger Sub and Grab Merger Sub, shall operate its respective business in the ordinary course and shall not:

  - with respect to AGC only, seek any approval from AGC shareholders to change, modify or amend the Trust Agreement or the AGC charter, except as contemplated by the Business Combination Proposal, the Initial Merger Proposal and the Governing Documents Proposal;

  - make or declare any dividend or distribution to AGC shareholders or make any other distributions in respect of any capital stock, share capital or equity securities;

  - split, combine, reclassify or otherwise amend any terms of any shares or series of its capital stock or equity securities;

  - purchase, repurchase, redeem or otherwise acquire any of its issued and outstanding share capital, outstanding shares of capital stock or membership interests, warrants or other equity securities, other than a redemption of AGC Class A Ordinary Shares made as part of SPAC share redemptions;

  - merge, consolidate or amalgamate with or into, or acquire (by purchasing a substantial portion of the assets of or equity in, or by any other manner) any other person or be acquired by any other person;

143

- make or change any material election in respect of material Taxes, except to comply with U.S. GAAP or applicable law;

- enter into, renew or amend in any material respect, any transaction or material contract, subject to certain exceptions;

- incur, guarantee or otherwise become liable for (whether directly, contingently or otherwise) any indebtedness or other material liability in a principal amount or amount, as applicable, exceeding $2,000,000 in the aggregate, subject to certain exceptions;

- make any change in accounting principles or methods unless required by U.S. GAAP;

- issue any equity securities, other than the issuance of equity securities of GHL pursuant to the Subscription Agreements or the Business Combination Agreement;

- grant any options, warrants or other equity-based awards;

- settle or agree to settle any litigation, action, proceeding or investigation before any Governmental Authority or that imposes injunctive or other non-monetary relief on AGC, GHL, AGC Merger Sub or Grab Merger Sub;

- form any subsidiary;

- liquidate, dissolve, reorganize or otherwise wind-up the business and operations of AGC; or

- enter into any agreement to do any action prohibited under any of the foregoing.

- During the period from the Initial Closing through the Closing, neither AGC Merger Sub nor GHL shall take any action except as required or contemplated by the Business Combination or other relevant transaction documents;

- Subject to the terms and conditions of the Amended GHL Articles and the Business Combination Agreement, GHL shall take all such action within its power as may be necessary or appropriate such that immediately following the Closing:

  - the board of directors of GHL (i) shall have been reconstituted to consist of six directors, which shall be Anthony Tan, Hooi Ling Tan, Dara Khosrowshahi, Ng Shin Ein, John Rogers and Oliver Jay (or, if any such person is unable or unwilling to serve as a director, a replacement determined by Grab), subject to such persons passing customary background checks and (ii) shall have reconstituted its applicable committees to consist of the directors designated by Grab prior to the Closing Date; provided that any such directors designated by Grab in accordance with clause (ii) of this sentence as members of the audit committee shall qualify as "independent" under the NASDAQ listing rules;

  - the Chairperson of the board of directors of GHL shall initially be Anthony Tan; and

  - the officers of Grab holding such positions as set forth on the Grab Disclosure Letter shall be the officers of GHL, each such officer to hold office in accordance with the Amended GHL Articles or until their respective successors are duly elected or appointed and qualified.

- During the Interim Period, AGC shall not and shall cause its affiliates and its and their respective representatives not to directly or indirectly (a) solicit, initiate, submit, facilitate, discuss or negotiate any inquiry, proposal or offer (written or oral) with respect to an AGC acquisition proposal,(b) furnish or disclose any non-public information to any person or entity in connection with or that could reasonably be expected to lead to an AGC acquisition proposal, (c) enter into any agreement, arrangement or understanding regarding an AGC acquisition proposal, or (d) otherwise cooperate in any way with, or assist or participate in, or knowingly facilitate or encourage any effort or attempt by any person to do or seek to do any of the foregoing.

144

**Table of Contents**

- During the Interim Period, each of AGC and GHL shall use reasonable efforts to keep current, accurate and timely file all reports required to be filed or furnished with the SEC and otherwise comply in all material respects with its reporting obligations under applicable laws.

- Unless otherwise consented in writing by Grab (which consent shall not be unreasonably withheld, conditioned or delayed), neither AGC nor GHL shall permit any amendment or modification in any material respect to be made to, any waiver (in whole or in part) or provide consent to (including consent to termination), any provision or remedy under, or any replacements of, any of the Subscription Agreements. AGC and GHL shall use reasonable best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated by the Subscription Agreements on the terms and conditions described therein, including, among other things, maintaining in effect the Subscription Agreements and consummating the transactions contemplated thereby.

- Prior to the Closing Date, AGC shall take all such steps (to the extent permitted under applicable law) as are reasonably necessary to cause any acquisition or disposition of GHL Ordinary Shares or any derivative thereof that occurs or is deemed to occur by reason of or pursuant to the Business Combination Transactions by each person who is or will be or may become subject to Section 16 of the Exchange Act with respect to GHL, including by virtue of being deemed a director by deputization, to be exempt under Rule 16b-3 promulgated under the Exchange Act.

- At any meeting of the shareholders of Grab called to seek the Grab shareholders' approval, or at any adjournment thereof, or in connection with any written consent of the Grab shareholders or in any other circumstances upon which a vote, consent or other approval with respect to the Business Combination Agreement, any other transaction document contemplated thereby, the Acquisition Merger, or any other Transaction is sought, AGC (a) shall, if a meeting is held, appear at such meeting or otherwise cause Grab Shares for which AGC has received a proxy pursuant to the Grab Shareholder Support Agreements to be counted as present at such meeting for purposes of establishing a quorum and respond to each request by Grab for written consent, if any, and (b) shall vote or cause to be voted (including by written consent, if applicable) such Grab Shares in favor of granting the Grab shareholders' approval.

- Prior to or as promptly as practicable after this proxy statement/prospectus is declared effective under the Securities Act, AGC shall establish a record date for, duly call, give notice of, convene and hold a meeting of the AGC shareholders to be held as promptly as reasonably practicable following the date that this proxy statement/prospectus is declared effective under the Securities Act for the purpose of voting on the Business Combination Proposal, the Initial Merger Proposal and the Governing Documents Proposal and obtaining the AGC shareholders' approval (including any adjournment or postponement of such meeting for the purpose of soliciting additional proxies in favor of the adoption of the Business Combination Agreement), providing AGC shareholders with the opportunity to elect to effect a SPAC Share Redemption and such other matter as may be mutually agreed by AGC and Grab. AGC shall use its reasonable best efforts to (i) solicit from its shareholders proxies in favor of the adoption of the Business Combination Proposal, the Initial Merger Proposal and the Governing Documents Proposal and shall take all other action necessary or advisable to obtain such proxies and AGC shareholders' approval and (ii) to obtain the vote or consent of its shareholders required by and in compliance with all applicable law, NASDAQ rules and the AGC Charter. In connection with the foregoing, AGC (i) shall consult with Grab regarding the record date and the date of the meeting of the AGC shareholders, (ii) shall not adjourn or postpone such meeting without the prior written consent of Grab (which consent shall not be unreasonably withheld, conditioned or delayed); provided, however, that AGC shall adjourn or postpone such meeting (a) to the extent necessary to ensure any supplement or amendment to the proxy statement/prospectus that AGC or GHL reasonably determines is necessary to comply with applicable laws is provided to AGC shareholders in advance of such meeting, (b) if, as of the time that such meeting is originally scheduled, adjournment of such meeting is necessary to enable solicitation of additional proxies in order to obtain the approvals necessary for the Business

Combination Proposal, Initial Merger Proposal and the Governing Documents Proposal; provided, further, however, that the adjournment of such meeting shall not take place on more than three occasions and the date of such meeting cannot be adjourned more than an aggregate of 45 consecutive days in connection with such adjournment.

*Joint Covenants*

The Business Combination Agreement also contains certain other covenants and agreements among the various parties, including, among others, that each of GHL, Grab, AGC, AGC Merger Sub and Grab Merger Sub shall use commercially reasonable efforts to, subject to the terms and conditions contained therein:

- cooperate in good faith with any governmental authority and to undertake promptly any and all action required to obtain any necessary or advisable regulatory approvals, consents, actions, nonactions or waivers in connection with the Business Combination Transactions as soon as practicable and any and all action necessary to consummate the Business Combination Transactions, and to use commercially reasonable efforts to cause the expiration or termination of the waiting, notice or review periods under any applicable regulatory approval with respect to the Business Combination Transactions as promptly as possible;

- diligently and expeditiously defend and obtain any necessary clearance, approval, consent or regulatory approval under any applicable laws prescribed or enforceable by any governmental authority for the Business Combination Transactions and to resolve any objections as may be asserted by any governmental authority with respect to the Business Combination Transactions, and cooperate fully with each other in the defense of such matters; and

- obtain all material consents and approvals of third parties that Grab and any of its subsidiaries or any of AGC, GHL, AGC Merger Sub and Grab Merger Sub, as applicable, are required to obtain in order to consummate the Business Combination Transactions.

Further, the Business Combination Agreement also contains additional covenants and agreements among the parties thereto in respect of, among other matters:

- access to information, properties and personnel;

- preparing, filing and distributing this proxy statement/prospectus on Form F-4 (including any amendments or supplements thereto);

- preparing and delivering certain accounts and financial statements;

- tax matters, including with respect to the intended tax treatment;

- litigation matters with respect to the Business Combination;

- indemnification of present and former directors and officers of Grab, AGC, GHL, AGC Merger Sub and Grab Merger Sub;

- written notice (i) of the occurrence or non-occurrence of any event the occurrence or non-occurrence of which has caused or is reasonably likely to cause any condition to the obligations of any party to effect the Business Combination Transactions not to be satisfied or (ii) of any notice or other communication from any governmental authority which is reasonably likely to have a material adverse effect on the ability of the parties to the Business Combination Agreement to consummate the Business Combination Transactions or to materially delay the timing thereof; and

- maintaining in effect liability insurances covering those persons who are currently covered by directors' and officers' liability insurance policies of Grab, AGC, GHL, AGC Merger Sub or Grab Merger Sub or their respective subsidiaries.

146

*Conditions to Closing*

*Mutual Conditions*

The obligations of the applicable parties to consummate, or cause to be consummated, the Business Combination Transactions at the Initial Closing and, solely with respect to the last bullet point in the following list, the Acquisition Closing, at the Closing are each subject to the satisfaction of the following mutual conditions (in each case, unless waived in writing by all parties):

- approval of the Business Combination Proposal, the Initial Merger Proposal and the Governing Documents Proposal by the AGC shareholders and approval of the Business Combination and the transactions contemplated thereby by the Grab shareholders;

- the effectiveness of the Form F-4 and the absence of any issued or pending stop order by the SEC, and no proceedings for that purpose shall have been initiated or threatened by the SEC and not withdrawn;

- GHL's initial listing application with NASDAQ in connection with the Business Combination Transactions shall have been conditionally approved and, immediately following the Closing, GHL shall satisfy any applicable initial and continuing listing requirements of NASDAQ and GHL shall not have received any notice of non-compliance therewith;

- receipt of approval for GHL Class A Ordinary Shares to be listed on NASDAQ, subject only to official notice of issuance; and

- the absence of any law (whether temporary, preliminary or permanent) or governmental order then in effect and which has the effect of making the Initial Closing or the Closing illegal or which otherwise prevents or prohibits the consummation of the Initial Closing or the Closing (any of the foregoing, a "restraint"), other than any such restraint that is immaterial.

Unless waived by AGC in writing, the obligations of AGC to consummate, or cause to be consummated, the Business Combination Transactions to occur at the Initial Closing are also subject to the satisfaction of each of the following conditions:

- the representations and warranties of Grab, GHL, AGC Merger Sub and Grab Merger Sub pertaining to corporate organization, due authorization and the absence of a Grab Material Adverse Effect being true and correct as of the Initial Closing Date as if made at the Initial Closing Date;

- the representations and warranties of Grab and its subsidiaries, GHL, AGC Merger Sub and Grab Merger Sub pertaining to capitalization and voting rights and the representations and warranties of GHL, AGC Merger Sub and Grab Merger Sub as to their business activities being true and correct in all material respects as of the Initial Closing Date as if made at the Initial Closing Date;

- all other representations and warranties made by Grab, GHL, AGC Merger Sub and Grab Merger Sub being true and correct as of the Initial Closing Date (except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct at and as of such date) except for inaccuracies or the failure of such representations and warranties to be true and correct that (without giving effect to any limitation as to "materiality" or "Grab Material Adverse Effect" or another similar materiality qualification set forth therein, other than in representations and warranties made by Grab pertaining to liabilities of Grab or its subsidiaries which would not have a Grab Material Adverse Effect) individually or in the aggregate, has not had, and would not reasonably be expected to have, a Grab Material Adverse Effect; and

- each of the covenants of Grab, GHL, AGC Merger Sub and Grab Merger Sub to be performed as of or prior to the Initial Closing having been performed in all material respects.

147

**Table of Contents**

Unless waived by Grab in writing, the obligations of GHL, AGC Merger Sub and Grab Merger Sub to consummate, or cause to be consummated, the Business Combination Transactions to occur at the Initial Closing are also subject to the satisfaction of each the following conditions:

- the representations and warranties of AGC pertaining to corporate organization, due authorization and the absence of any AGC Material Adverse Effect being true and correct in all respects as of the Initial Closing Date as if made at the Initial Closing Date;

- the representations and warranties of AGC pertaining to capitalization and voting rights being true and correct in all material respects as of the Initial Closing Date as if made at the Initial Closing Date;

- all other representations and warranties made by AGC being true and correct as of the Initial Closing Date (except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct at and as of such date) except for inaccuracies or the failure of such representations and warranties to be true and correct that (without giving effect to any limitation as to "materiality" or "AGC Material Adverse Effect" or another similar materiality qualification set forth therein, other than in representations and warranties made by AGC pertaining to the AGC Financial Statements) individually or in the aggregate, has not had, and would not reasonably be expected to have, an AGC Material Adverse Effect;

- each of the covenants of AGC to be performed as of or prior to the Initial Closing having been performed in all material respects; and

- each of the covenants of Sponsor and Sponsor Affiliate required under the Subscription Agreements to which Sponsor or Sponsor Affiliate, as applicable, is a party, and under Section 5(c) (Waiver of Anti-Dilution Protection) and Section 7 (Sponsor Affiliate Arrangements) of the Sponsor Support Agreement to be performed as of or prior to the Initial Closing having been performed in all material respects.

The obligations of Grab to consummate, or cause to be consummated, the Business Combination Transactions at the Acquisition Closing are also subject to the satisfaction of the following condition:

- Proceeds to GHL from the PIPE Investment and under the Amended and Restated Forward Purchase Agreements and the Sponsor Subscription Agreement shall be at least $2.5 billion consisting of (i) an amount of no less than $1.9 billion in cash which has been received by GHL and (ii) binding commitments from certain mutual fund investors in an amount of no less $600 million, subject to certain exceptions, subject to AGC having the option to arrange for other investors (which may include Sponsor or its affiliates) to subscribe for additional GHL Class A Ordinary Shares up to an aggregate amount of $336 million on the same terms and conditions as the PIPE Investors in order to meet the $2.5 billion proceeds condition.

### Termination

The Business Combination Agreement may be terminated and the transactions contemplated thereby abandoned under certain customary and limited circumstances, notwithstanding approval of the Business Combination Agreement by the AGC shareholders, as follows:

- by mutual written consent of Grab and AGC;

- by written notice from Grab or AGC to the other if any governmental authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which has become final and non-appealable and has the effect of making consummation of the Business Combination Transactions illegal or otherwise preventing or prohibiting consummation of the Business Combination Transactions;

- by written notice from Grab or AGC to the other if the Closing shall not have occurred on the 15th business day following the occurrence of the Initial Closing;

148

- by written notice from Grab to AGC if the AGC shareholders' approval shall not have been obtained by reason of the failure to obtain the required vote at the Extraordinary General Meeting duly convened therefor or at any adjournment or postponement thereof;

- by written notice to Grab from AGC if there is any breach of any representation, warranty, covenant or agreement on the part of Grab, GHL, AGC Merger Sub and Grab Merger Sub set forth in the Business Combination Agreement, such that the conditions to AGC's obligations to consummate the Business Combination Transactions would not be satisfied at the Initial Closing or the Closing, as applicable, and such breach cannot be or has not been cured within 30 days following receipt by Grab of notice from AGC of such breach;

- by written notice to AGC from Grab if there is any breach of any representation, warranty, covenant or agreement on the part of AGC, Sponsor or Sponsor Affiliate set forth in the Business Combination Agreement, such that the conditions to Grab's obligation to consummate the Business Combination Transactions would not be satisfied at the Initial Closing or the Closing, as applicable, and such breach cannot be or has not been cured within 30 days following receipt by AGC of notice from Grab of such breach;

- by written notice from AGC to Grab if the AGC shareholders' approval shall not have been obtained at the Extraordinary General Meeting, or at any adjournment or postponement thereof taken in accordance with the Business Combination Agreement, unless AGC has materially breached any of its obligations with respect to obtaining AGC shareholders' approval under the Business Combination Agreement; or

- by either AGC or Grab, if the transactions contemplated by the Business Combination Agreement shall not have been consummated on or prior to January 7, 2022.

In the event of termination of the Business Combination Agreement, the Business Combination Agreement shall become void and have no effect, without any liability on the part of any party thereto or its respective affiliates, officers, directors or shareholders, other than liability of any party thereto for any willful and material breach of the Business Combination Agreement by such party prior to such termination; provided that obligations under the NDA (as defined in the Business Combination Agreement) and certain obligations related to the trust account and certain other provisions required under the Business Combination Agreement shall, in each case, survive any termination of the Business Combination Agreement.

*Enforcement*

Each party is entitled under the Business Combination Agreement to an injunction or injunctions to prevent breaches of the Business Combination Agreement and to specific enforcement of the terms and provisions of the Business Combination Agreement, in addition to any other remedy to which any party is entitled at law or in equity.

*Non-Recourse*

All claims or causes of action that are based upon, arising out of, or related to the Business Combination Agreement or the Business Combination Transactions contemplated therein may be made only against the entities expressly named as parties to the Business Combination Agreement, and then only with respect to the specific obligations set forth therein with respect to such party.

Further, unless a named party to the Business Combination Agreement, and then only to the extent of the specific obligations undertaken by such named party under the Business Combination Agreement, no past, present or future director, officer, employee, incorporator, member, partner, shareholder, affiliate, agent, attorney, advisor or other representative of a named party to the Business Combination Agreement or affiliate of any of the foregoing shall have any liability (whether in contract, tort, equity or otherwise) for any one or more of

149

the representations, warranties, covenants, agreements or other obligations or liabilities of any other party for any claim based on, arising out of, or related to the Business Combination Agreement or the Business Combination Transactions contemplated thereby. Furthermore, there will be no recourse against the trust account in connection with any such claims or causes of action.

### *Non-Survival of Representations, Warranties and Covenants*

Except, in the event of termination of the Business Combination Agreement, for obligations under the NDA and certain obligations related to the trust account and certain other provisions of the Business Combination Agreement, none of the representations, warranties, covenants, obligations or other agreements in the Business Combination Agreement, or in any related document or instrument delivered pursuant to the Business Combination Agreement, shall survive the Closing and shall terminate and expire upon the occurrence of the Closing except for (i) any covenants and agreements contained therein that expressly by their terms apply either in part or in whole after the Closing and (ii) the miscellaneous provisions thereof, which include, among others, provisions regarding trust account waiver, waiver, notice, assignment, no third-party rights, expenses, headings and counterparts, Disclosure Letters, entire agreement, amendments, publicity, confidentiality, severability and conflicts and privilege.

### *Governing Law and Jurisdiction*

The Business Combination Agreement is governed by Delaware law, except that certain provisions including with respect to fiduciary duties are governed by the laws of the Cayman Islands. Any action based upon, arising out of or related to the Business Combination Agreement or the Business Combination Transactions contemplated thereby shall be brought in federal and state courts located in the State of Delaware. Each party has waived its rights to trial by jury in any action based upon, arising out of or related to the Business Combination Agreement or the Business Combination Transactions contemplated thereby.

### *Grab Disclosure Letter*

In connection with the execution and delivery of the Business Combination Agreement, Grab also prepared and delivered to AGC a disclosure letter, which is dated as of the date of the Business Combination Agreement and was delivered with the Business Combination Agreement, containing disclosures relating to the representations and warranties made by Grab in the Business Combination Agreement and the interim operating covenants of Grab contained in the Business Combination Agreement (the "Grab Disclosure Letter"). As is customary for transactions of this nature, the purpose of the Grab Disclosure Letter is to (i) list certain information called for by the representations and warranties contained in the Business Combination Agreement; and (ii) qualify or limit certain representations and warranties and covenants contained in the Business Combination Agreement to the extent there are exceptions to such representations and warranties or covenants. The Grab Disclosure Letter was delivered to AGC at signing of the Business Combination Agreement on April 12, 2021.

All material terms and disclosures in the Grab Disclosure Letter have been disclosed in this proxy statement/prospectus, and there are no other material terms in the Grab Disclosure Letter. In particular:

- The material shareholding arrangements relating to Grab described in the Grab Disclosure Letter are disclosed in this proxy statement/prospectus including in the sections entitled "Grab's Business—Corporate Structure" and "Risk Factors—Grab's Corporate Structure and Doing Business in Southeast Asia—In certain jurisdictions, Grab is subject to restrictions on foreign ownership";

- The material aspects of Grab's capitalization, including with respect to Grab Key Executive Options and Grab RSUs, described in the Grab Disclosure Letter are disclosed in this proxy statement/prospectus including in the sections entitled "Beneficial Ownership of Securities" and "Executive Officers and Members of the Board Of Directors Of GHL following the Business Combination—Share Incentive Plans";

150

- Descriptions of the material regulatory/compliance investigations relating to the Grab and its subsidiaries (collectively, the "Group") and which are described in the Grab Disclosure Letter are contained in this proxy statement/prospectus including in the sections entitled "Risk Factors—Risks Relating to Grab's Business" and "Grab's Business—Legal Proceedings";

- Descriptions of any material tax investigations or audits relating to the Group and which are described in the Grab Disclosure Letter are contained in this proxy statement/prospectus including in the section entitled "Risk Factors— Risks Relating to Grab's Corporate Structure and Doing Business in Southeast Asia—Grab could face uncertain tax liabilities in various jurisdictions where Grab operates, and suffer adverse financial consequences as a result";

- Descriptions of the material litigation relating to the Group and which is described in the Grab Disclosure Letter are contained in this proxy statement/prospectus including in the sections entitled "Risk Factors—Risks Relating to Grab's Business" and "Grab's Business—Legal Proceedings";

- Descriptions of the material contracts entered into by a member of the Group and which are described in the Grab Disclosure Letter are contained in this proxy statement/prospectus including in the sections entitled "Risk Factors—Risks Relating to Grab's Business" and "Grab's Business";

- Descriptions of the related party transactions entered into by Grab and which are described in the Grab Disclosure Letter are contained in this proxy statement/prospectus including in the section entitled "Certain Relationships and Related Person Transactions";

- Descriptions of the intellectual property held by the Group and which is described in the Grab Disclosure Letter are contained in this proxy statement/prospectus including in the section entitled "Grab's Business—Intellectual Property";

- Descriptions of any material data protection breaches involving the Group and which are described in the Grab Disclosure Letter are contained in this proxy statement/prospectus including in the section entitled "Risk Factors—Risks Relating to Grab's Business";

- A summary of the Group's labor relations and its unions and which are described in the Grab Disclosure Letter is contained in this proxy statement/prospectus in the section entitled "Grab's Business—Culture and Employees"; and

- A list of the officers of GHL contained in the Grab Disclosure Letter is contained in this proxy statement/prospectus in the section entitled "Executive Officers and Members of the Board Of Directors Of GHL following the Business Combination—Share Incentive Plans".

**Related Agreements**

This section describes the material provisions of certain additional agreements entered into or to be entered into pursuant to the Business Combination Agreement (the "Related Agreements") but does not purport to describe all of the terms thereof. The following summary is qualified in its entirety by reference to the complete text of each of the Related Agreements, and you are urged to read such Related Agreements in their entirety.

*PIPE Financing (Private Placement)*

Substantially concurrently with the execution of the Business Combination Agreement, (i) GHL, AGC and the PIPE Investors entered into PIPE Subscription Agreements pursuant to which the PIPE Investors have committed to subscribe for and purchase, in the aggregate, 326,500,000 GHL Class A Ordinary Shares for $10 per share, for an aggregate purchase price equal to $3.265 billion; (ii) AGC, Sponsor Affiliate and GHL entered into a subscription agreement pursuant to which Sponsor Affiliate has committed to subscribe for and purchase 57,500,000 GHL Class A Ordinary Shares for $10.00 per share for an aggregate purchase price equal to $575 million; and (iii) AGC, Sponsor Affiliate and GHL entered into the Backstop Subscription Agreement pursuant to which Sponsor Affiliate agreed to backstop SPAC Share Redemptions (as defined in the Business

151

Combination Agreement), and to the extent such backstop is required will subscribe for and purchase that number of GHL Class A Ordinary Shares to be determined in accordance with the terms of the Backstop Subscription Agreement for $10 per share.

### *Grab Voting, Support and Lock-Up Agreements*

Concurrently with the execution of the Business Combination Agreement, AGC, GHL, Grab and certain of the shareholders of Grab entered into voting support and lock-up agreements (the "Grab Shareholder Support Agreements"), pursuant to which certain shareholders who hold an aggregate of at least 67% of the outstanding Grab voting shares (on an as converted basis) have agreed, among other things: (a) to appear for purposes of constituting a quorum at any meeting of the shareholders of Grab called to seek approval of the transactions contemplated in the Business Combination Agreement and the other transaction proposals, (b) to vote in favor of the transactions contemplated by the Business Combination Agreement and other transaction proposals, (c) to vote against any proposals that would materially impede the transactions contemplated by the Business Combination Agreement or any other transaction proposal and (d) not to sell or transfer any of their shares.

The following is the list of shareholders of Grab that have entered into the Grab Shareholder Support Agreements: Anthony Tan Ping Yeow, Tan Hooi Ling, Maa Ming-Hokng, Peter Oey, Chin Yin Ong, SVF Investments (UK) Limited, Uber Technologies, Inc., Xiaoju Kuaizhi Inc., Marvelous Yarra Limited, Toyota Motor Corporation, MUFG Bank Limited, MUFG Innovation Partners No.1 Investment Partnership, Krungsri Finnovate Co. Ltd, Hibiscus Worldwide Ltd, Invesco Global Allocation Fund, OFI Global China Fund, LLC, MML Strategic Emerging Markets Fund, MassMutual Premier Strategic Emerging Markets Fund, Invesco Emerging Markets Equity Trust, Invesco Emerging Markets Equity Fund, LP, Hyundai Motor Company, KIA Corporation, SK MENA Investment B.V., SK Latin America Investment, S.A., SK S.E. Asia Pte. Ltd, SK Technology Innovation Company, SK Inc., Himension Fund, Maple Universal Limited, Chengdong Investment Corporation, Silvershore Internet Opportunity I LP, Silvershore Internet Opportunity II LP, Silvershore Internet Opportunity IV LP, Booking Holdings Treasury Company, STIC Special Situation Evergreen Cayman Limited, Coatue PE Asia III LLC, Coatue CT VII LLC, Microsoft Global Finance, TIS Inc., Fortune Technology Limited, JenCap AT, JenCap Genie Partners L.P., GGV Capital IV L.P., GGV Capital IV Entrepreneurs Fund L.P., GPI Capital Guardian HoldCo LP, Davis Opportunity Fund, Davis Global Fund, Davis International Fund, Selected International Fund, Reinet Columbus Limited, Beacon Venture Capital Company Limited, Sunshine Life Insurance Corporation Limited, Cinnamon Elites Limited and New Soul Limited.

### *Sponsor Support and Lock-Up Agreement*

Concurrently with the execution of the Business Combination Agreement, AGC, Sponsor, GHL and Grab entered into a voting support agreement (the "Sponsor Support Agreement"), pursuant to which Sponsor has agreed, among other things and subject to the terms and conditions set forth therein: (a) to vote in favor of (i) the transactions contemplated in the Business Combination Agreement and the other transaction proposals, (b) to waive the anti-dilution rights it held in respect of the AGC Shares under AGC's amended and restated memorandum and articles of association, (c) to appear at the Extraordinary General Meeting for purposes of constituting a quorum, (d) to vote against any proposals that would materially impede the transactions contemplated in the Business Combination Agreement and the other transaction proposals, (e) not to redeem any AGC Shares held by Sponsor, (f) not to amend that certain letter agreement between AGC, Sponsor and certain other parties thereto, dated as of September 30, 2020, (g) not to transfer any AGC Shares held by Sponsor, (h) to release AGC, GHL, Grab and its subsidiaries from all claims in respect of or relating to the period prior to the closing, subject to the exceptions set forth therein (with Grab agreeing to release the Sponsor and AGC on a reciprocal basis) and (i) to agree to a lock-up of its GHL Class A Ordinary Shares a during the period of three years from the Closing.

### *Shareholders' Deed*

Concurrently with the execution of the Business Combination Agreement, GHL entered into the Shareholders' Deed, with Sponsor, Grab and the Key Executives, pursuant to which Sponsor has agreed to gift or

152

Table of Contents

transfer for a nominal amount 1,227,500 GHL Class A Ordinary Shares to the GrabForGood Fund or another charitable organization, foundation, fund or similar entity as agreed between Sponsor and GHL. Sponsor has the right to make such gift or transfer at any time but is not obligated to do so until such GHL Class A Ordinary Shares have been registered for resale on an effective registration statement filed with the SEC. In addition, the Key Executives other than Mr. Tan and certain entities related to such Key Executives or Mr. Tan have appointed Mr. Tan attorney-in-fact and proxy for their GHL Class B Ordinary Shares. Such Key Executive Proxies will remain in effect until all GHL Class B Ordinary Shares are converted into GHL Class A Ordinary Shares. See "Description of GHL Securities" and "Shareholders' Deed."

### *Registration Rights Agreement*

Concurrently with the execution of the Business Combination Agreement, AGC, GHL, Sponsor, the Sponsor Related Parties and the Grab Holders entered into a registration rights agreement (the "Registration Rights Agreement"), to be effective upon the Acquisition Closing pursuant to which, among other things, GHL will agree to undertake certain resale shelf registration obligations in accordance with the U.S. Securities Act of 1933, as amended (the "Securities Act") and Sponsor, the Sponsor Related Parties and the Grab Holders have been granted customary demand and piggyback registration rights. See "Shares Eligible for Future Sale—Registration Rights."

### *Assignment, Assumption and Amendment Agreement*

Concurrently with the execution of the Business Combination Agreement, AGC, GHL and Continental entered into the Assignment, Assumption and Amendment Agreement and amended the Existing Warrant Agreement, pursuant to which, among other things, AGC assigned all of its right, title and interest in the Existing Warrant Agreement to GHL effective upon the Initial Closing, and GHL assumed the warrants provided for under the Existing Warrant Agreement.

### *Amended and Restated Forward Purchase Agreements*

Concurrently with the execution of the Business Combination Agreement, AGC, GHL and Sponsor Affiliate amended and restated that certain forward purchase agreement, dated September 16, 2020, by and between AGC and Sponsor Affiliate, and pursuant to such amendment, among other things, Sponsor Affiliate has agreed to purchase units consisting of 17,500,000 GHL Class A Ordinary Shares and 3,500,000 GHL Warrants for an aggregate price equal to $175 million immediately prior to the Acquisition Closing.

Concurrently with the execution of the Business Combination Agreement, AGC, GHL and JS Securities amended and restated that certain forward purchase agreement, dated September 16, 2020, by and between AGC and JS Securities, and pursuant to such amendment, among other things, JS Securities has agreed to purchase units consisting of 2,500,000 GHL Class A Ordinary Shares and 500,000 GHL Warrants for an aggregate price equal to $25,000,000 immediately prior to the Acquisition Closing.

153

**Table of Contents**

**Organizational Structure**

The following simplified diagram illustrates the ownership structure of Grab immediately prior to the consummation of the Acquisition Merger:



The following simplified diagram illustrates the ownership structure of AGC immediately prior to the consummation of the Initial Merger:



154

The following simplified diagram illustrates the ownership structure of GHL immediately following the consummation of the Business Combination, assuming: (i) the No Redemption Scenario; (ii) the Full Exercise Scenario; and (iii) that no Grab shareholder exercises its dissenters' rights.



Notes:
(1)    "Certain AGC Directors" refer to Richard N. Barton, Aishetu Fatima Dozie and Dev Ittycheria.
(2)    Sponsor Related Parties refer to Altimeter Partners Fund, L.P. and JS Capital LLC.

**Charter Documents of GHL Following the Business Combination**

Pursuant to the Business Combination Agreement, upon the Closing of the Business Combination, GHL's memorandum and articles of association shall be amended. See "Description of GHL Securities," for a description of the Amended GHL Articles and "Comparison of Corporate Governance and Shareholder Rights" for a comparison to the provisions of AGC's organizational documents.

**Stock Exchange Listing of GHL Class A Ordinary Shares and GHL Warrants**

GHL has applied for, and shall use reasonable best efforts to cause, the GHL Class A Ordinary Shares and GHL Warrants to be issued in connection with the Business Combination Transactions to be approved for, listing on NASDAQ and accepted for clearance by DTC.

**Delisting and Deregistration of AGC Shares**

If the Business Combination is completed, AGC Class A Ordinary Shares, AGC Warrants and AGC Units shall be delisted from NASDAQ and shall be deregistered under the Exchange Act.

**Headquarters**

After completion of the transactions contemplated by the Business Combination Agreement the corporate headquarters and principal executive offices of GHL shall be located at 3 Media Close, #01-03/06, 138498 Singapore.

**Background of the Business Combination**

The terms of the Business Combination Agreement and related ancillary documents are the result of extensive negotiations between AGC, Grab and their respective representatives. The following is a brief

description of the background of these negotiations, the proposed Business Combination and related transactions. It is not, and does not purport to be, a complete catalogue of every interaction between the applicable parties.

AGC is a blank check company incorporated as a Cayman Islands exempted company on August 25, 2020. AGC was formed to complete a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses. AGC's objective was to identify, acquire, and operate a business in a secular-growth area of the technology sector that will compound growth over the long-term for exponential value creation, though AGC reserved the right to pursue an acquisition opportunity in any business or industry.

On October 5, 2020, AGC completed its initial public offering of 50,000,000 units. Each unit consists of one share of Class A common stock and one-fifth of one redeemable warrant to purchase one share of Class A common stock. The units were sold at an offering price of $10.00 per unit, generating gross proceeds of $500 million (before underwriting discounts and commissions and offering expenses). Simultaneously with the closing of the initial public offering, AGC consummated the sale of an aggregate of 12,000,000 warrants at a price of $1.00 per warrant in a private placement to the Sponsor, generating gross proceeds of $12 million. In connection with AGC's initial public offering, Citigroup Global Markets Inc. ("Citigroup"), Goldman Sachs & Co. LLC ("Goldman") and Morgan Stanley & Co. LLC ("Morgan Stanley") acted as underwriters to AGC, Ropes & Gray LLP ("Ropes") acted as U.S. legal advisor to AGC, Maples and Calder (Cayman) LLP acted as Cayman Islands legal advisor to AGC and WithumSmith+Brown, PC acted as the independent registered public accounting firm to AGC. Citigroup, Goldman and Morgan Stanley were not engaged to render, and did not render, a fairness opinion with respect to the Business Combination. The underwriters, including Morgan Stanley, will receive deferred underwriting compensation from AGC if the Business Combination is completed. In addition, Morgan Stanley Asia (Singapore) Pte. was engaged by Grab to act as co-advisor to Grab in connection with the Business Combination and provided valuation and other financial advisory assistance in support of that transaction. See "—Certain Engagements in Connection with the Business Combination and Related Transactions".

The net proceeds from AGC's initial public offering and certain proceeds from the sale of the private placement warrants, in the aggregate amount of $500 million, were deposited in a trust account established for the benefit of AGC's public shareholders.

After its initial public offering, consistent with AGC's business purpose, AGC's officers and directors commenced an active, targeted search for an initial set of potential business combination targets, leveraging AGC and the Sponsor's network of relationships, as well as the prior experience and network of AGC's officers and directors. Representatives of AGC contacted and were contacted by numerous individuals and entities who presented ideas for business combination opportunities, including financial advisors and companies in the technology sector. In connection with the foregoing, AGC considered more than thirty businesses located outside of the United States and in the United States and focused on a subset of those businesses that it believed had attractive long-term growth potential, were well-positioned within their industry and would benefit from the substantial intellectual capital, operational experience, and network of AGC's management team. In particular, AGC focused on businesses in a secular-growth area of the technology sector that would compound growth over the long-term for potentially exponential value creation.

In the process that led to identifying Grab as an attractive investment opportunity, between approximately February 4, 2021, and February 23, 2021, AGC and its representatives engaged in discussions with another company with respect to an initial business combination. In connection with these discussions, AGC entered into a customary confidentiality agreement which did not contain a standstill provision, and conducted preliminary due diligence and negotiations, including with respect to a term sheet. The discussions with the potential counterparty did not ultimately lead to a transaction because of a difference in valuation expectations between AGC and the potential counterparty. Ultimately AGC determined that Grab was the most attractive business for a business combination given that other potential target companies did not align as well as Grab with its

156

investment criteria and that Grab presented the most attractive opportunity given that it operates in a large and growing total-addressable market, has the potential to deliver sustainable top-line growth over a long horizon and provides an opportunity to partner with a world-class management team capable of scaling its business around the globe. Additionally, AGC was attracted to Grab's SuperApp platform, and the opportunity to participate in a company that operates a highly synergistic, deeply integrated ecosystem that is designed to maximize usage and lower service costs, underpinned by proprietary technology and financial infrastructure.

On February 4, 2021, AGC's Chief Executive Officer, Brad Gerstner, Grab's President, Ming Maa and Grab's Head of Fundraising, Chuck Kim met over a conference call to discuss a potential business combination. Mr. Gerstner had been introduced to Ming Maa and Chuck Kim through a mutual business connection. Mr. Gerstner presented information on AGC Sponsor and various Sponsor affiliates and certain next steps were discussed including potentially signing a non-disclosure agreement.

On February 8, 2021, AGC and Grab entered into a customary confidentiality agreement. The confidentiality agreement did not contain a standstill provision.

On February 8, 2021, representatives of Evercore Group L.L.C. ("Evercore"), which as the lead financial adviser to Grab was conducting a competitive bidding process to seek a special purpose acquisition company counterparty for a business combination transaction, held a conference call with AGC representatives to discuss a potential business combination.

On February 10, 2021, Grab and AGC held a video conference where Grab's Chief Executive Officer and Co-founder, Anthony Tan, Mr. Maa, Grab's Chief Financial Officer, Peter Oey, and Mr. Kim made a management presentation to AGC describing the business, financial performance and results of operations of Grab.

On February 12, 2021, AGC received access to a virtual data room to begin preliminary due diligence.

On February 18, 2021, representatives of Evercore provided AGC with certain Grab management projections and Grab's requirements, terms and conditions as contained in a form of letter of intent (which included a term sheet) circulated to potential bidders, including AGC, to complete with their proposed terms.

On February 19, 2021, representatives of Evercore spoke with AGC representatives to schedule a due diligence conference call to discuss historical financials and projections, among other information.

On February 21, 2021, representatives of Grab and AGC held a due diligence call through video conference. The primary focus of this video conference was Grab's historical financials and management projections for its respective business segments.

On February 22, 2021, AGC submitted its non-binding letter of intent ("LOI") to Grab, which included a letter from Mr. Gerstner to Grab's founders and board of directors, a summary term sheet, certain information about AGC, and certain valuation information, including an initial, pre-money enterprise value of Grab between $42 billion to $45 billion on a pro forma basis based upon and subject to certain assumptions, including then-prevailing market conditions, including approximately $500 million of net proceeds from AGC's trust account (assuming no redemptions), $1.5 billion of PIPE financing, and other relevant assumptions consistent with AGC management's evaluation of the business.

As of February 24, 2021, Grab received bids from four potential business combination counterparties that included AGC, Company A, Company B and Company C ("Potential Bidders"), in response to the form of letter of intent circulated by Evercore on February 18, 2021 to a small number of potential business combination counterparties. The Potential Bidders were counterparties who have a strong track record of investing in technology-enabled businesses and/or assisting companies in going public via a transaction involving a SPAC.

**Table of Contents**

From February 24, 2021 through February 28, 2021, Evercore provided customary assistance to management of Grab in its review and evaluation of the initial terms of bids received from Potential Bidders (including, but not limited to, proposed valuation for Grab, targeted capital raise, PIPE financing, funds committed by the sponsor or its affiliates, and lock-up agreements). In addition, Evercore, J.P. Morgan's M&A Advisory Group and Morgan Stanley Asia (Singapore) Pte., as financial advisors, provided assistance to management of Grab in its review and evaluation of the alternatives for potentially becoming public, which comprised, among others things, a comparison of considerations between going public by way of (a) an initial public offering and (b) a business combination with a SPAC.

On February 28, 2021, Evercore arranged for AGC, Company A and Company B to present their respective proposals to Grab's management.

Throughout the period from February 24, 2021 to March 5, 2021, discussions were held between representatives of Evercore, AGC and other Potential Bidders on the general economic and other terms of a potential transaction, including but not limited to, proposed valuation of Grab, which, in respect of the bid from AGC, generally remained consistent with the pre-money enterprise value of Grab between $42 billion to $45 billion on a pro forma basis upon and subject to certain assumptions including then-prevailing market conditions, a targeted capital raise, PIPE financing, other funds committed by the sponsor or its affiliates (including to backstop any redemptions out of the trust fund), the proposed use of proceeds, post-transaction corporate governance, sponsor promote, open-market purchases, lock-up agreements and a proposed transaction timeline.

As part of the negotiations between AGC, Sponsor, Grab and representatives of Evercore involving the terms of the LOI and in order to make its proposal more attractive, Sponsor offered to increase the lock-up of its shares to be held in the combined entity from 180 days to a period of three years and increased the amount it was willing to provide commitments for in respect of the Business Combination through the Sponsor Related Parties. The parties also agreed to increase the size of the PIPE financing from $1.5 billion to $2.5 billion. In addition, during this time period, discussions were held between Grab's legal counsels, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") and Hughes Hubbard & Reed LLP ("Hughes Hubbard"), and AGC's legal counsel, Ropes, regarding the LOI, which included a term sheet for the key terms of the transaction documents. In addition, discussions were held and drafts were exchanged between the parties and their legal advisers on the provisions of the term sheet and the final term sheet was prepared. The principal issues discussed included the determination of the enterprise value and commercial terms regarding capital commitments to the PIPE investment, back-stop, the sponsor promote, the proposed GrabForGood Fund, open-market purchases, and post-closing lock-up agreements.

On March 1, 2021, AGC shared its diligence request list with Grab.

On March 3, 2021, AGC shared certain other materials with Grab, including presentation materials for Grab's board of directors.

On March 4, 2021, representatives of Evercore presented a summary of the bids received to Grab's board of directors, and also arranged for AGC and Company A to present their proposals to Grab's board of directors thereafter. AGC was eventually selected by Grab's management and board of directors as Grab's preferred acquirer primarily due to the management team of Sponsor's (i) proven track record of successfully investing in leading technology companies including marketplace internet businesses and helping such companies go public, (ii) strong conviction of Grab's equity story, demonstrated by the sizeable amount of capital which the Sponsor Affiliate agreed to commit alongside the transaction and its proposal to subject its sponsor promote to a 3-year lockup, and (iii) alignment with Grab's mission, demonstrated by the Sponsor's offer to donate 10% of its sponsor promote to the GrabForGood Fund. Proposals received from the other Potential Bidders were considered but were eventually not selected as the preferred proposal following various events in the process. Company A was ultimately not selected following its presentation to Grab's board on March 4, 2021 due to (a) the amount of

158

Table of Contents

funds committed by the sponsor of Company A and its respective affiliates (including the amount of proposed backstop agreement for any redemptions by public shareholders of Company A) and (b) an assessment of its alignment with Grab's social mission. Company B was ultimately not selected following its presentation to Grab's management on February 28, 2021 due to (a) the amount of funds committed by the sponsor of Company B and its respective affiliates (including the amount of proposed backstop agreement for any redemptions by public shareholders of Company B), (b) the length of its proposed sponsor promote lock-up and (c) an assessment of its alignment with Grab's social mission. Company C was ultimately not selected following the initial review period which took place between February 24, 2021 and February 28, 2021, due to (a) its proposed valuation of Grab, (b) the amount of funds committed by the sponsor of Company C and its respective affiliates (including the amount of proposed backstop agreement for any redemptions by public shareholders of Company C), (c) the length of its proposed sponsor promote lock-up and (d) an assessment of its alignment with Grab's social mission.

On or around March 5, 2021, AGC engaged J.P. Morgan's Equity Capital Markets Group and Morgan Stanley as lead placement agents and Evercore and UBS Securities LLC ("UBS") as its co-placement agents in connection with the PIPE financing. As consideration for providing these services, upon consummation of the Business Combination, J.P. Morgan is entitled to a fee of at least $27.3 million, Morgan Stanley is entitled to a fee of at least $27.3 million, Evercore is entitled to a fee of at least $3.4 million and UBS is entitled to a fee of at least $3.4 million. Evercore will also receive $30 million in connection with its role as financial advisor to Grab, and Morgan Stanley will receive $7 million as deferred underwriting fee for AGC's initial public offering if the Business Combination is completed. In addition to the fees mentioned above, $6.8 million will be disbursed among J.P. Morgan, Morgan Stanley, Evercore and UBS for their roles as placement agents in connection with the PIPE financing upon the consummation of the Business Combination, subject to AGC Board's discretion, with the exact allocation to be determined on the date of closing of the Business Combination based on (i) the number of PIPE investor meetings set up by the respective firms, (ii) the total amount of investment made by PIPE investor accounts assigned to, and managed by, the respective firms and (iii) an assessment of the overall performance of the respective firms. AGC also has discretion to pay J.P. Morgan, Morgan Stanley, Evercore and UBS additional fees of up to $8.2 million in connection with their roles as placement agents in connection with the PIPE financing upon consummation of the Business Combination, though AGC may decide not to pay any such fees. The payment and allocation of up to an additional $8.2 million of discretionary fees, if any, will be determined by the AGC Board based on the same factors as the aforementioned $6.8 million disbursement and are additional incremental fees for the work performed by the respective placement agents in connection with the PIPE financing. The maximum aggregate amount of fees (excluding any to be determined discretionary fees) that J.P. Morgan, Morgan Stanley, Evercore and UBS can be paid in connection with the Business Combination is $113.5 million.

On March 5, 2021, the non-binding LOI between AGC and Grab was executed and included the term sheet setting forth the key terms of the transaction documentation as well as standard confidentiality and exclusivity terms. Pursuant to the LOI, each of Grab and AGC agreed to be subject to an exclusivity period from the date of the LOI until the earliest of (i) the parties' mutual agreement in writing to terminate the exclusivity obligations contained in the LOI and (ii) April 18, 2021 (subject to extension for an additional ten business days by either party by giving notice to the other prior to such date) (the "Exclusivity Period"). During the Exclusivity Period, each of Grab, on the one hand, and AGC, on the other hand, agreed that it would not and would direct its representatives acting on its behalf not to, (i) solicit, initiate, submit, facilitate, discuss or negotiate, directly or indirectly, any inquiry, proposal or offer with respect to a third-party acquirer (in the case of Grab) or potential business combination targets (in the case of AGC); (ii) furnish or disclose any non-public information to any such person or entity; (iii) enter into any agreement, arrangement or understanding with respect to any such entity; or (iv) otherwise cooperate in any way with, or assist or participate in, or knowingly facilitate or encourage any effort or attempt by any or entity to do or seek to do any of the foregoing, subject to certain agreed upon exceptions. In addition, the LOI noted the parties' agreement on the following material terms of the transaction and ancillary documents: (i) a pre-money enterprise value of the combined entity between $42 billion to $45 billion on a pro forma basis upon and subject to certain assumptions (such as to valuation of certain equity

159

**Table of Contents**

grants utilizing the treasury method), (ii) a lock-up of three years for the Sponsor and of 180 days, with an early release mechanism under certain circumstances, for certain shareholders of Grab for the shares to be held by them in the combined entity, (iii) certain terms of the Registration Rights Agreement, including limiting the Sponsor to no more than three demand rights and (iv) the corporate governance of the combined entity to include a dual class structure that provides voting control to Mr. Tan through high-voting rights and voting proxies granted by Tan Hooi Ling and Ming Maa. In particular, the post-combination dual-class structure with high-voting Class B ordinary shares was agreed upon by both parties in order to ensure stability in the combined entity and allow for the continuation of the existing control that Mr. Tan exercises over Grab.

On March 5, 2021, an all-parties kick-off video conference call was held between AGC, Grab, and their respective advisers to discuss a proposed transaction timetable and coordination matters. Shortly thereafter, Grab provided AGC and its legal advisors with access to a virtual data room for purposes of conducting further business, operational, financial, legal, tax, intellectual property, key partnership arrangements and other due diligence with respect to Grab. Between March 5, 2021, through the time of the AGC Board approval of the Business Combination Agreement, representatives of AGC conducted further business, financial and other due diligence with respect to Grab and, over the same period of time, Grab's legal and tax advisors conducted due diligence with respect to Grab, including calls and other exchanges among the relevant parties. Before reaching the conclusion that it was in the best interests of AGC to approve the proposed transaction, AGC was provided with high-level summaries of the due diligence process and key due diligence findings of AGC's and its representatives' and tax and legal advisors' due diligence. The due diligence process included, but was not limited to: (i) a comprehensive review of the materials provided in the virtual data room; requests for follow-up data and information from Grab, including Grab responses to due diligence questions; (ii) multiple meetings and calls with Grab regarding Grab's business and operations, projections and technical diligence matters, as well as financial, tax and legal matters, including those related to intellectual property and technology matters, regulatory matters, litigation matters, corporate matters (including material contracts, capitalization and other customary corporate matters), and labor and employment matters; and (iii) summaries provided to AGC of key findings with respect to business, operational and financial due diligence, which included a high-level summary of the financial, tax and legal due diligence findings by AGC's various tax and legal advisors engaged in connection with the transaction, including Ropes and other local counsel in the jurisdictions in which Grab operates (legal matters) and KPMG LLP (financial and tax diligence).

Between March 5 and April 12, 2021, representatives of AGC, Grab and certain of their financial and legal advisors held several video conferences each week to discuss the status of the Business Combination and related PIPE financing and any issues relating to such transactions.

In light of (i) Morgan Stanley's role as an underwriter in AGC's initial public offering, (ii) Morgan Stanley Asia (Singapore) Pte.'s role as co-advisor to Grab in connection with the Business Combination, and (iii) Morgan Stanley's role as a lead placement agent in connection with the PIPE financing, Grab signed a conflicts waiver letter on March 16, 2021, and AGC signed a conflict waiver letter on March 17, 2021. Pursuant to these letter agreements, Grab and AGC, respectively, after careful consideration of the potential benefits of engaging Morgan Stanley and its affiliate in such roles, consented to Morgan Stanley Asia (Singapore) Pte.'s role as co-advisor to Grab in connection with the Business Combination and Morgan Stanley's roles as joint placement agent to AGC in connection with the PIPE financing and as an underwriter in AGC's public offering. The aggregate fees payable to Morgan Stanley and its affiliates upon consummation of the Business Combination in connection with the IPO, the PIPE financing and as co-advisor to Grab is at least $34.3 million.

On March 9, 2021, Skadden sent Ropes an initial draft of the form of PIPE Subscription Agreement. On March 11, 2021, Ropes sent initial comments to Skadden, and on the same day, Skadden circulated a revised draft to Cooley LLP ("Cooley"), the U.S. legal advisor to the placement agents in connection with the PIPE financing, and Ropes. Subsequently, Skadden, Cooley and Ropes exchanged numerous drafts of the form of PIPE Subscription Agreement, the most significant exchanges of which are summarized in more detail below, and in connection with each exchange they also held a number of phone discussions regarding the form of PIPE Subscription Agreement. In connection with these exchanged drafts and discussions, Skadden, Cooley and Ropes

160

**Table of Contents**

also had regular contact with their respective clients during this period to keep them apprised of the status of the form of PIPE Subscription Agreement and solicit their feedback in connection with this document.

Between March 8, and March 12, 2021, representatives of Grab, AGC, Evercore, J.P. Morgan's Equity Capital Markets Group, Morgan Stanley and Morgan Stanley Asia (Singapore) Pte. discussed valuation metrics with regard to the potential business combination and PIPE financing. Based on the discussions, AGC and Grab decided to market the PIPE financing to prospective PIPE investors at a pre-money enterprise value ranging from $30.1 billion to $34.1 billion.

On March 12, 2021, Hughes Hubbard sent Ropes an initial draft of the Business Combination Agreement. The initial draft of the Business Combination Agreement reflected the terms of the executed LOI, which included a term sheet, and as a result, there were relatively few open business points for negotiation among the parties. Subsequently, Hughes Hubbard, Skadden and Ropes exchanged drafts of the Business Combination Agreement and related ancillary documents, the most significant exchanges of which are summarized in more detail below, and in connection with each exchange Ken Lefkowitz, Carlos Lobo, Gerold Niggermann and Alexander Rahn of Hughes Hubbard, Jonathan Stone and Andrew Cohn of Skadden and Paul Scrivano, Sarah Davis and David Acquay of Ropes also held a number of phone discussions and video-conferences regarding the Business Combination Agreement and the other ancillary documents. In connection with these exchanged drafts and discussions, Ropes, Skadden and Hughes Hubbard also had regular contact with their respective clients during this period to keep them apprised of the status of the Business Combination Agreement and related ancillaries and solicit their feedback in connection with the documents. The principal terms of the Business Combination Agreement being negotiated during such time related to, among other things, (i) the structure and terms of the Initial Merger and Acquisition Merger (each as defined in the Business Combination Agreement), (ii) the scope of representations, warranties, interim operating covenants and dollar thresholds as well as the relevant materiality qualifiers, (iii) the applicable pre-closing conditions with respect to both the Initial Merger and the Acquisition Merger and approvals, including regulatory approvals, required to consummate the Business Combination, (iv) the definition of Material Adverse Effect, (v) the composition of the GHL Board of Directors and (vi) certain provisions related to the PIPE financing and the Amended and Restated Forward Purchase Agreements. The parties also negotiated certain terms of the related ancillary documents such as the Shareholders' Deed pursuant to which, among other things, Tan Hooi Ling and Ming Maa and their Permitted Entities granted proxies to Mr. Tan, the Amended GHL Articles, the Grab Shareholder Support Agreements, the Sponsor Support Agreement, the Lock-up Agreement and the Registration Rights Agreement, which were also negotiated in conjunction with the Business Combination Agreement.

During March 2021 upon the request of Grab, Evercore, J.P. Morgan's M&A Advisory Group and Morgan Stanley Asia (Singapore) Pte. provided Grab with market information on dual-class structures adopted by US-listed technology companies, and they along with Grab held numerous discussions regarding the voting ratio between the Class B Ordinary Shares and Class A Ordinary Shares. After taking into consideration, among other things, relevant marketing considerations for PIPE investors including such investors' acceptance of the proposed voting ratio and potential future dilutive transactions, Grab proposed to AGC that each Class B Ordinary Share would carry forty-five (45) votes for such time as such Class B Ordinary Share was held by any of Mr. Tan, Tan Hooi Ling, Ming Maa or their respective Permitted Entities, and that, irrespective of such high-voting rights, the Class B Ordinary Shareholders would have the power to elect the majority of the members of the GHL Board of Directors. The purpose of this proposal was to ensure, in combination with the Shareholders' Deed, the continuity of the control that Mr. Tan currently exercises. In response to this proposal, the parties discussed under which circumstances and at what time the Class B Ordinary Shares would mandatorily convert into Class A Ordinary Shares, thereby losing their special powers and privileges. During the negotiations, the Key Executives agreed to a lock-up of three years for certain of their equity grants in order to align interests with all shareholders.

On March 14, 2021, Ropes sent Hughes Hubbard a revised draft of the Business Combination Agreement that proposed revisions to the overall suite of representations, warranties and covenants to be provided by each party under the Business Combination Agreement, including, among others, revisions to the scope of the interim operating covenants of Grab and AGC and the required level of shareholder support for the Business Combination.

161

Beginning on March 14, 2021, representatives of J.P. Morgan's Equity Capital Markets Group and Morgan Stanley, as lead placement agents in connection with the PIPE financing, and Evercore and UBS, as co-placement agents in connection with the PIPE financing, began contacting a limited number of prospective PIPE investors, each of whom agreed to maintain the confidentiality of the information received pursuant to customary over-the-wall procedures, to discuss Grab, the proposed Business Combination and the PIPE financing and to determine such investors' potential interest in participating in the PIPE financing. The prospective PIPE investors were selected by AGC and Grab, taking into account previous interactions (if any) in the course of Grab's investor engagements, as well as inputs from the lead placement agents and co-placement agents, which were institutional investors who had an interest in investing in similar transactions on a "wall cross" basis. Certain of the prospective PIPE investors or their affiliates were existing shareholders of AGC based on prevailing Form 13G filings. Additionally, certain investors in the PIPE are affiliated with the underwriters of AGC's initial public offering. Certain of the prospective PIPE investors also were existing holders of Grab's equity or debt securities. J.P. Morgan's Equity Capital Markets Group, Morgan Stanley, Evercore and UBS each has pre-existing relationships with certain of the prospective PIPE investors.

Beginning on March 14, 2021, and throughout the week of April 5, 2021, representatives of AGC, J.P. Morgan's Equity Capital Markets Group, Morgan Stanley, Evercore and UBS participated in various video-conference meetings with prospective PIPE investors.

On March 16, 2021, and March 17, 2021, Ropes and Hughes Hubbard held conference calls to discuss certain issues and other matters related to the March 14, 2021 draft of the Business Combination Agreement, specifically with respect to the scope of the representations and warranties (with AGC wanting more fulsome representations and warranties than Grab had initially proposed), the scope of the interim operating covenants of Grab (with AGC wanting broader covenants applicable to Grab than Grab had initially proposed) and AGC and certain closing conditions (with AGC seeking to minimize the conditionality with a more limited set of conditions than Grab had initially proposed). After discussions among the parties relating to these issues the parties reached compromises the final terms of which are reflected in the summary of the Business Combination Agreement included in this proxy statement/prospectus. See "Business Combination Proposal—Business Combination Agreement".

On March 17, 2021, Skadden and Ropes held a conference call to discuss matters related to the draft of the form of PIPE Subscription Agreement, and on March 19, 2021, Skadden sent a revised draft of the form of PIPE Subscription Agreement to Ropes and Cooley.

On March 19, 2021, Hughes Hubbard sent Ropes a revised draft of the Business Combination Agreement, and on March 22, 2021, Ropes and Hughes Hubbard held a conference call to discuss issues and other matters related to the March 19, 2021 draft of the Business Combination Agreement, most significantly with respect to the representations and warranties of each party, revisions to the scope of the interim operating covenants of Grab and AGC and revisions to certain closing conditions consistent with the conference call held on March 17, 2021.

On March 23, 2021, Hughes Hubbard, Ropes, Grab and AGC held a conference call to discuss transaction structuring considerations under the Business Combination Agreement.

On March 24, 2021, the AGC Board held a board meeting to discuss, among other things, the status of its proposed business combination with Grab and the key terms and structure of the Business Combination and the related PIPE financing. The board also discussed key investment-case and valuation-related materials and analyses included in presentations prepared by AGC as well as data and analysis provided by the Grab management team. Such investment case materials included revenue and revenue multiples as well as Adjusted EBITDA (PIPE) and Adjusted EBITDA (PIPE) multiples and, projected metrics under various expected scenarios with respect to Grab's performance and market conditions and other underlying assumptions. All board members and representatives of Ropes were present. During this meeting, the AGC Board considered the

162

**Table of Contents**

business and operations of Grab including its Super-App platform and the opportunities it presented. It discussed projections regarding Grab's business, prospects, financial condition, operations, technology, products, offerings, management, competitive position, and strategic business goals and objectives, general economic, industry, regulatory, and financial market conditions, and opportunities and competitive factors within Grab's industry. It considered the large and growing addressable market Grab operates in, given Southeast Asia is one of the fastest growing digital economies in the world. It also considered that a business combination with Grab would provide an opportunity to partner with a world-class management team capable of scaling a business around the globe and that Grab's business had the potential to deliver sustainable top-line growth for the long term.

Balanced against these considerations the AGC Board also focused on certain risks relating to the business and its operations, including:

- *Financial Matters.* The AGC Board considered that Grab is still in a relatively early stage of its growth and that future financial performance might be negatively impacted by factors outside Grab's control.

- *Regulatory Matters.* The AGC Board considered that Grab operates in various geographical regions with complex regulatory regimes that apply to Grab's business and potential difficulties Grab might have complying with such regulatory regimes, including with respect to regulations impacting the payment card industry, digital banking, fraud management, anti-money laundering, distribution of insurance products, ride hailing, worker classification, package delivery services, health and safety, data privacy, e-commerce and competition.

- *Litigation.* The AGC Board considered Grab's involvement in litigation related to driver-partner classification and the investigation relating to potential violations of certain anti-corruption laws that Grab voluntarily self-reported to the U.S. Department of Justice. With respect to driver-partner classification litigation, the only matter the AGC Board considered was Grab's current involvement in an action relating to a driver-partner's classification as an independent contractor in Malaysia, which is further described in this proxy statement/prospectus on page 299 under "Independent Contractor Matters" which AGC management concluded did not present a material issue given that at such time the complaint had been dismissed (subject to the former driver-partner having filed an application for judicial review, which was subsequently dismissed) and that this issue could only impact Grab's mobility segment in Malaysia which accounts for only an immaterial portion of Grab's overall business given its diverse business model and geographic scale. In light of this context, the AGC Board relied on AGC management's judgment that such matter did not present a material risk to the transaction or Grab's business and did not engage in any further specific discussion or analysis on this topic other than to consider it as a potential issue and ultimately conclude it was not material. This issue similarly was not considered material for purposes of the negotiations relating to the Business Combination Agreement and did not influence the negotiations or final terms of the business combination. With respect to the investigation relating to potential violations of certain anti-corruption laws, the AGC Board relied on AGC management's judgment that such matter did not present a material risk to the transaction or Grab's business given the potential violations were self-reported on a voluntary basis, relate to operations in a country which did not represent a material portion of Grab's revenue in 2020 and the monetary amount in respect of such potential violations was immaterial relative to the valuation of the transaction and/or to Grab's business; therefore, the AGC Board did not engage in any further specific discussion or analysis on this topic other than to consider it as a potential issue and ultimately conclude it was not material. Similarly, in light of this context, while the potential violations were discussed during the due diligence process, the potential violations were not a material part of the negotiations relating to the Business Combination Agreement and did not materially impact its final terms and AGC did not raise these issues in the negotiations because they were immaterial and if they had been raised might have erroneously signaled that AGC was overly focused on immaterial and de minimis issues. See "Risk Factors—Risks Relating to Grab's Business—Grab is subject to various laws with regard to anti-corruption, anti-bribery, anti-money laundering and countering the financing of terrorism and has operations in certain countries known to experience high levels of corruption.

163

Grab's audit and risk committee led an investigation into potential violations of certain anti-corruption laws related to its operations in one of the countries in which it operates and has voluntarily self-reported the potential violations to the U.S. Department of Justice. There can be no assurance that failure to comply with any such laws would not have a material adverse effect on it."

Risks related to intellectual property, technology, corporate (including material contracts), and labor and employment matters were not specifically discussed on an in-depth level at this meeting. The AGC Board did not consider and engage in discussion of more specific matters relating to the topics described above given that the AGC Board relied on AGC management's judgment that they did not materially impact the agreed upon valuation of the transaction and did not materially impact the AGC Board's decision to approve and recommend the transaction on the terms in the Business Combination Agreement. The AGC Board focused their discussions on the key investment-case and valuation-related materials and analyses and related topics that are discussed in "The Business Combination Proposal—AGC's Board of Directors' Reasons for the Approval of the Business Combination".

In connection with considering risks applicable to Grab and the transaction, the AGC Board and its representatives reviewed due diligence summaries prepared by outside advisors (i.e., Ropes, Baker & McKenzie LLP, DFDL, Noerr, Shin & Kim LLC with respect to legal due diligence matters and KPMG LLP with respect to tax, financial, commercial and cyber security due diligence matters) and members of AGC management discussed the findings contained therein with such outside advisors throughout the time period leading up to approval of the Business Combination. Each of Ropes, Baker & McKenzie LLP, DFDL, Noerr, and Shin & Kim LLC prepared due diligence summaries (collectively, the "legal due diligence summaries") with respect to legal due diligence matters in their respective jurisdictions, which included the United States, China, Indonesia, Malaysia, Myanmar, Philippines, Singapore, Thailand, Vietnam, Cambodia, Romania and South Korea, with respect to corporate matters, intellectual property matters, regulatory matters, material contracts, and employment matters, as applicable. KPMG LLP provided a due diligence summary with respect to Grab's tax, financial, commercial and cyber security matters. These due diligence materials were prepared by the relevant advisors to assist AGC in its due diligence review of certain aspects of Grab's business based on each of the advisor's respective expertise and their review of materials provided by Grab throughout the due diligence process. The legal due diligence summaries considered matters based on information provided by Grab relating to the impact of the transaction on Grab's material contracts and employee benefit plans (including with respect to any change of control clauses or other rights triggered upon announcement or consummation of the transaction, indemnification obligations and potential termination events triggered by the transaction), Grab's corporate organizational structure and the approvals required in connection with the transaction, ongoing litigation, regulatory and compliance matters and the sufficiency of Grab's programs and policies with respect to protection of its intellectual property. The summary prepared by KPMG considered matters based on information provided by Grab relating to various costs and liabilities identified during the diligence process, a review of Grab's tax function and related filings, a review of the business verticals and countries covered by Grab, a market assessment by country, a competition assessment by country, and an assessment of Grab's governance and processes relating to cyber security.

As for potentially material items in the due diligence materials described above, the legal due diligence summaries identified the investigation relating to potential violations of certain anticorruption laws that Grab voluntarily self-reported to the U.S. Department of Justice which the AGC Board considered, and concluded that the issue was not viewed as material as further described above with respect to the March 24, 2021 board meeting. Similarly, given AGC's view that it was not a material issue, while the potential violations were discussed during the due diligence process, the potential violations were not a material part of the negotiations relating to the Business Combination Agreement. The legal due diligence summaries also identified Grab's current involvement in an action relating to a driver-partner's classification as an independent contractor in Malaysia, which is further described in this proxy statement/prospectus on page 299 under "Independent Contractor Matters" which AGC management concluded did not present a material issue given that at such time the complaint had been dismissed (subject to the former driver-partner having filed an application for judicial

164

**Table of Contents**

review, which was subsequently dismissed) and that this issue could only impact Grab's mobility segment in Malaysia which accounts for only an immaterial portion of Grab's overall business given its diverse business model and geographic scale. In light of this context, this issue similarly was not considered material for purposes of the negotiations relating to the Business Combination Agreement. Other than these two specific issues, there were no issues in the diligence materials that were specifically discussed or analyzed as potential issues or that were a material part of the negotiations relating to the Business Combination Agreement.

On March 26, 2021, Ropes sent Hughes Hubbard a revised draft of the Business Combination Agreement which included proposed revisions, among others, relating to certain changes to the representations and warranties of Grab and AGC and revisions to the scope of the interim operating covenants of Grab and AGC, and Ropes and Hughes Hubbard held a conference call to discuss these issues.

On March 29, 2021, Skadden and Ropes held a conference call to discuss comments from Ropes received on the same day on the draft of the form of PIPE Subscription Agreement.

On March 30, 2021, Hughes Hubbard sent Ropes a revised draft of the Business Combination Agreement, and on April 3, 2021, Ropes, Skadden and Hughes Hubbard held a conference call to discuss certain issues and other matters related to the March 30, 2021 draft of the Business Combination Agreement and related documents, including the timing of the Grab shareholder approval, the timing of the Initial Merger and Acquisition Closing, the scope of the representations and warranties, the scope of the interim operating covenants of Grab and AGC and certain closing conditions.

On April 1, 2021, the AGC Board held a board meeting to discuss the proposed business combination with Grab and the key terms and structure of the Business Combination and the related PIPE financing. All board members and representatives of Ropes were present. At the meeting, a representative of Ropes provided the AGC Board with an overview of the board's fiduciary duties in the context of the proposed Business Combination and an overview of the proposed Business Combination and related PIPE financing (including the potential benefits and the risks related thereto), the key terms of the Business Combination Agreement and related ancillary documents (copies of all of which were provided to all of the members of the AGC Board in advance of the meeting) and provided a status update with respect to negotiations around key terms in such documents. The board also discussed key investment-case and valuation-related materials and analyses including updated information based on the same materials considered at the March 24, 2021 board meeting described above. In terms of specific investment-case items discussed, the AGC Board considered that the business combination with Grab presented an opportunity to participate in a company that operates a highly synergistic, deeply integrated ecosystem that is designed to maximize usage and lower service costs, underpinned by proprietary technology and financial infrastructure. It considered Grab's commitment to investing in research and development, which has created strong core technology and AI assets that allowed Grab to build a trusted and customized platform. In terms of specific risks relating to Grab's business and operations, the AGC Board focused on the following matters in addition to those previously considered by the Board (which are summarized above with respect to the March 24, 2021 board meeting):

- *Financial Matters.* The AGC Board considered that Grab's future financial performance may not meet the AGC Board's expectations due to factors in Grab's control or out of Grab's control, including risks relating to ongoing and unpredictable developments relating to the COVID-19 pandemic.

- *Intellectual Property and Technology Matters.* The AGC Board considered that Grab's brand value and technology, including its intellectual property, are some of its core assets, and evaluated the sufficiency of Grab's protection of these assets as well as the potential for infringement or competition to adversely impact the value of Grab's intellectual property and technology.

- *Tax Matters.* The AGC Board considered the material tax compliance programs in place at Grab, and the risk that various positions asserted could be challenged by relevant authorities.

There were no new additional risks related to regulatory or litigation matters and no corporate (including material contracts), and labor and employment matters specifically discussed in depth at this meeting. The AGC

Table of Contents

Board did not consider and engage in discussion of more specific matters relating to the topics described above given that the AGC Board relied on AGC management's judgment that they did not materially impact the agreed upon valuation of the transaction and did not materially impact the AGC Board's decision to approve and recommend the transaction on the terms in the Business Combination Agreement. The AGC Board focused their discussions on the key investment-case and valuation-related materials and analyses and related topics that are discussed in "The Business Combination Proposal—AGC's Board of Directors' Reasons for the Approval of the Business Combination".

On April 1, 2021, the initial draft of the form of PIPE Subscription Agreement was sent to potential investors considering participating in the proposed PIPE financing in connection with the Business Combination. After a draft form of the PIPE Subscription Agreement had been provided to the prospective PIPE investors, the terms of the forms of PIPE Subscription Agreements, including with respect to certain closing conditions and the registration rights set forth in the form, among other terms and conditions, were further negotiated between representatives of Skadden, Hughes Hubbard, Ropes and Cooley, on behalf of their respective clients, and on behalf of the PIPE investors by their respective advisors.

On April 2, 2021, Ropes sent Hughes Hubbard a revised draft of the Business Combination Agreement which included proposed revisions, among others, relating to certain changes to the representations and warranties of Grab and AGC, revisions to the scope of the interim operating covenants of Grab and AGC and revisions to certain closing conditions and related structuring matters.

On April 3, 2021, Ropes, Skadden and Hughes Hubbard held a conference call to discuss the above-described issues and other matters related to the April 2, 2021 draft of the Business Combination Agreement and related documents and were able to find compromise positions with respect to these issues after further discussing the concerns of each party, which final terms are reflected in the summary of the Business Combination Agreement included in this proxy statement/prospectus. See "Business Combination Proposal—Business Combination Agreement".

On April 3, 2021, Grab and AGC continued their discussion around pricing transaction at a pre-money enterprise value of $30.4 billion, taking into consideration the market conditions at that time, size of the PIPE financing, feedback from certain prospective PIPE investors, among other things. Such prospective PIPE investors were generally positive on the growth opportunities in Southeast Asia and believed Grab would be able to continue to grow and build on its leading category position in deliveries, mobility and financial services. They also were generally agreeable to the valuation multiples relative to selected comparable companies and, considering the above factors, indicated their willingness to invest at the pre-money enterprise value of $30.4 billion. In addition, the near-final versions of the investor presentations that had been prepared to be used in connection with the PIPE financing were uploaded to the virtual data room for prospective PIPE investors.

On April 5, 2021, Hughes Hubbard sent Ropes revised drafts of the Business Combination Agreement, and Grab, AGC, Ropes, Skadden and Hughes Hubbard held a conference call to discuss issues and other matters related to the April 5, 2021 draft of the Business Combination Agreement and related documents including specifically with respect to the timing and mechanics of the Initial Merger and Acquisition Closing (to ensure structuring would be respected and to minimize changes between the closings), certain changes to the representations and warranties of Grab and AGC (with Grab seeking to limit the representations and warranties applicable to it based on what AGC had proposed), revisions to the scope of the interim operating covenants of Grab (with Grab seeking to have broader exceptions to such covenants than AGC had proposed) and revisions to certain closing conditions. After negotiating compromises based on the priorities of each party, the parties were able to reach agreement which final terms are reflected in the summary of the Business Combination Agreement included in this proxy statement/prospectus. See "Business Combination Proposal—Business Combination Agreement".

On April 7, 2021, Skadden sent consolidated comments received from potential investors in the proposed PIPE financing to Cooley and Ropes, and after Skadden, Cooley and Ropes exchanged further drafts of the form

166

of PIPE Subscription Agreement, and a second revised draft was sent to the potential PIPE investors on April 9, 2021.

On April 7, 2021, representatives of AGC, Grab, J.P. Morgan's Equity Capital Markets Group, J.P. Morgan's M&A Advisory Group, Morgan Stanley, Evercore and UBS held a video-conference call to discuss order allocations to prospective PIPE investors.

On April 8, 2021, Ropes sent Hughes Hubbard a revised draft of the Business Combination Agreement which included proposed revisions, among others, relating to the timing and mechanics of the Initial Merger and Acquisition Closing, the timing of the Grab shareholder approval, certain changes to the representations and warranties of Grab and AGC, revisions to the scope of the interim operating covenants of Grab and AGC and revisions to certain closing conditions.

On or around April 8, 2021, the near-final version of the Business Combination Agreement was uploaded to the virtual data room for prospective PIPE investors.

On April 9, 2021, Ropes and Hughes Hubbard held a conference call to discuss the above-described issues and other matters related to the April 8, 2021 draft of the Business Combination Agreement and related documents and were able to find compromise positions with respect to these issues after further discussing the concerns of each party, which final terms are reflected in the summary of the Business Combination Agreement included in this proxy statement/prospectus. See "Business Combination Proposal—Business Combination Agreement".

Following signing of the LOI until on or around April 8, 2021 when the key business terms of the Business Combination Agreement were being finalized, Grab and AGC continued to review the initial, pre-money enterprise value of Grab which was agreed at the LOI stage to be between $42 billion to $45 billion on a pro forma basis in light of then-current market conditions and the latest financial information available relating to Grab. Based on the latest available information, the parties immediately prior to signing agreed to a final implied pro forma enterprise value in connection with the Business Combination of approximately $31.2 billion.

On April 9, 2021, another meeting of the AGC Board was held to discuss the proposed business combination with Grab. All board members and representatives of Ropes were present. At the meeting, a representative of Ropes provided the AGC Board with another overview of the board's fiduciary duties in the context of the proposed Business Combination and an updated overview of the proposed Business Combination and related PIPE financing (including the potential benefits and the risks related thereto). In connection with the foregoing, copies of the Business Combination Agreement and related ancillary documents were provided to all of the members of the AGC Board in advance of the meeting.

In connection with the foregoing, the Board considered that Grab's hyperlocal strategy enables localized experiences for its driver- and merchant-partners and consumers, which allows Grab to navigate each market's unique complexities, and enables partnerships with leading local businesses in various sectors. It also considered that Grab operates in a region still in a relatively early stage of online disruption and which represents an underpenetrated market in the online food delivery, ride-hailing, e-wallet payments and digital financial services verticals. In terms of specific risks relating to the business and its operations, the AGC Board focused on the following matters in addition to those previously considered by the Board (which are summarized above with respect to the March 24, 2021 and April 1, 2021 board meetings):

- *Financial Matters.* The AGC Board considered that Grab faces intense competition across the segments and markets it serves.

- *Corporate Matters (including Material Contracts).* The AGC Board considered that Grab operates in markets such as Thailand, Vietnam, the Philippines and Indonesia with laws and regulations that place restrictions on foreign investment in and ownership of entities engaged in a number of business

167

activities which adds a level of complexity to its structure and contractual arrangements relating to operations in these jurisdictions.

- *Labor and Employment Matters.* The AGC Board considered that Grab is required to classify drivers as employees or otherwise, and the independent contractor status of drivers is currently being challenged in courts, by government agencies, non-governmental organizations, groups of drivers, labor unions and trade associations all around the world and this presents an operational and legal risk to Grab.

There were no new additional risks related to regulatory, litigation matters, intellectual property, technology or tax matters specifically discussed in depth at this meeting. The AGC Board did not consider and engage in discussion of more specific matters relating to the topics described above given that the AGC Board relied on AGC management's judgment that they did not materially impact the agreed upon valuation of the transaction and did not materially impact the AGC Board's decision to approve and recommend the transaction on the terms in the Business Combination Agreement. The AGC Board focused their discussions on the key investment-case and valuation-related materials and analyses and related topics that are discussed in "The Business Combination Proposal—AGC's Board of Directors' Reasons for the Approval of the Business Combination".

Following an in-depth discussion of the Business Combination Transactions, the board unanimously approved AGC's entry into the Business Combination Agreement, the Business Combination Transactions and the related ancillary agreements and determined that entry into the transactions and the proposals to be approved pursuant to this proxy statement/prospectus were in the best interest of AGC and recommended that its shareholders vote "FOR" the proposals to be approved pursuant to this proxy statement/prospectus. The AGC Board did not obtain a third-party valuation or fairness opinion in connection with its resolution to approve the Business Combination but determined that AGC's directors and officers and the other representatives of AGC had substantial experience in evaluating the operating and financial merits of companies similar to Grab and reviewed certain financial information of Grab, including with respect to GMV, Adjusted Net Revenue, Contribution Profit and Adjusted EBITDA (PIPE) for the 2018, 2019 and 2020 fiscal years, as well as management's projections for such metrics as well as other financial information for the 2021, 2022 and 2023 fiscal years including the Projections included in this proxy statement/prospectus, which included certain of these metrics presented on a "Pre-Interco" basis. AGC concluded that the experience and background of Grab's directors and officers members, the members of the AGC Board and the other representatives of AGC enabled the AGC Board to make the necessary analyses and determinations regarding the Business Combination.

On April 10, 2021, Hughes Hubbard sent Ropes a revised draft of the Business Combination Agreement.

On April 10, 2021, Ropes sent Hughes Hubbard a revised draft of the Business Combination Agreement.

On April 11, 2021, AGC, Grab, Ropes, Hughes Hubbard and Skadden held a conference call to discuss certain issues and other matters related to the April 10, 2021 draft of the Business Combination Agreement and related documents. Subsequently, Ropes, Skadden and Hughes Hubbard exchanged a number of drafts of the Business Combination Agreement and related documents and held conference calls to discuss the remaining issues in connection with the same, which related primarily to the timing and mechanics of the Initial Merger and Acquisition Closing (with all parties wanting to be sure the sequencing and conditionality aligned with each party's objectives) and revisions to certain closing conditions (including in respect of regulatory approvals, which AGC sought to minimize to the extent not required by law), up until the execution of the Business Combination Agreement and related documents. In each case, the parties were able to find compromise positions with respect to these issues after further discussing the concerns of each party, which final terms are reflected in the summary of the Business Combination Agreement included in this proxy statement/prospectus. See "Business Combination Proposal—Business Combination Agreement".

On April 11, 2021, Skadden sent a revised consolidated draft of the form of PIPE Subscription Agreement to Ropes and Cooley based on the comments received from potential PIPE investors and Ropes. After exchanging further comments, a revised draft of the form of PIPE Subscription Agreement was sent to potential PIPE investors on April 11, 2021.

168

On April 11, 2021, the Grab board of directors also unanimously approved Grab's entry into the Business Combination Agreement.

On April 12, 2021, the respective sole director and the shareholders of GHL, AGC Merger Sub and Grab Merger Sub also approved GHL, AGC Merger Sub and Grab Merger Sub's respective entry into the Business Combination Agreement.

On April 12, 2021, Skadden and Ropes held conference calls to discuss the final comments from the PIPE Investors on the form of PIPE Subscription Agreement, and on April 12, 2021, a final execution version of the PIPE Subscription Agreement was sent to the PIPE Investors for execution.

On April 12, 2021, Grab and AGC mutually executed and delivered the Business Combination Agreement and related documents and agreements.

On April 12, 2021, substantially concurrently with the execution and delivery of the Business Combination Agreement, (i) GHL, AGC and the PIPE Investors entered into the PIPE Subscription Agreements pursuant to which the PIPE Investors committed to subscribe for and purchase, in the aggregate, 326,500,000 GHL Class A Ordinary Shares for $10 per share for an aggregate purchase price equal to $3.265 billion.

Before the market open on April 13, 2021, AGC and Grab issued a joint press release announcing the execution of the Business Combination Agreement. On the same date, AGC filed with the SEC a Current Report on Form 8-K and Form 8-K/A announcing the execution of the Business Combination Agreement. The Current Report on Form 8-K and Form 8-K/A also contained other ancillary documents and the investor presentations prepared by members of the AGC and Grab management teams and representatives and used in connection with meetings with prospective PIPE investors and other persons regarding Grab and the Business Combination.

**AGC's Board of Directors' Reasons for the Approval of the Business Combination**

AGC was formed to complete a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more business entities. As described above, the AGC Board (the "AGC Board") sought to do so by using the networks and industry experience of both the Sponsor, the AGC Board, and AGC management to identify and acquire one or more businesses.

In evaluating the transaction with Grab, the AGC Board consulted with its legal counsel and accounting and other advisors. In determining that the terms and conditions of the Business Combination Agreement and the transactions contemplated thereby are in AGC's best interests, the AGC Board considered and evaluated a number of factors, including, but not limited to, the factors discussed below. In light of the number and wide variety of factors considered in connection with its evaluation of the Business Combination Agreement and the transactions contemplated thereby, the AGC Board did not consider it practicable to, and did not attempt to, quantify or otherwise assign relative weights to the specific factors that the AGC Board considered in reaching its determination and supporting its decision. The AGC Board viewed its decision as being based on all of the information available and the factors presented to and considered by the AGC Board. In addition, individual directors may have given different weight to different factors. The AGC Board realized that there can be no assurance about future results, including results considered or expected as disclosed in the following reasons. This explanation of AGC's reasons for the Business Combination and all other information presented in this section is forward-looking in nature and, therefore, should be read in light of the factors discussed under "Forward-Looking Statements."

The members of the AGC Board are well qualified to evaluate the Business Combination with Grab. The AGC Board and management collectively have extensive transactional experience, particularly in the software, internet, fin-tech, and technology sectors.

169

Table of Contents

The AGC Board considered a number of factors pertaining to the Business Combination Agreement and the transactions contemplated thereby in determining that the Business Combination Agreement, the Business Combination, and the other transactions contemplated by the Business Combination Agreement, were in AGC's best interests. The following discussion of the information and factors considered by the AGC Board of directors is not intended to be exhaustive. In particular, the AGC Board considered the following reasons or made the following determinations, as applicable:

- *Grab satisfies a number of acquisition criteria that AGC had established to evaluate prospective business combination targets*. The AGC Board determined that Grab satisfies a number of the criteria and guidelines that AGC established at its initial public offering, including (i) operating in a large and growing total-addressable market, (ii) having potential to deliver sustainable top-line growth for the long-term, and (iii) providing an opportunity to partner with a world-class management team capable of scaling a business around the globe.

- *Favorable Prospects for Future Growth and Financial Performance*. Current information and forecast projections from AGC and Grab's management regarding (i) Grab's business, prospects, financial condition, operations, technology, products, offerings, management, competitive position, and strategic business goals and objectives, with specific reference to GMV, Adjusted Net Revenue, Contribution Profit and Adjusted EBITDA (PIPE) for the 2018, 2019 and 2020 fiscal years, as well as management's projections for such metrics as well as other financial information for the 2021, 2022 and 2023 fiscal years including the Projections included in this proxy statement/prospectus, which included certain of these metrics presented on a "Pre-Interco" basis, (ii) general economic, industry, regulatory, and financial market conditions, and (iii) opportunities and competitive factors within Grab's industry.

- *Super-App Ecosystem Creates Cross Vertical Synergies*. The opportunity to participate in a company that operates a highly synergistic, deeply integrated ecosystem that is designed to maximize usage and lower service costs, underpinned by proprietary technology and financial infrastructure.

- *Underpenetrated Market Opportunity*. Grab operates in Southeast Asia, a region still in a relatively early stage of online disruption and which represents an underpenetrated market in the online food delivery, ride-hailing, e-wallet payments and digital financial services verticals.

- *Large and Growing Total-Addressable Market*. Southeast Asia is one of the fastest growing digital economies in the world, with a population approximately twice the size of the United States. Across online food delivery, ride-hailing, e-wallet payments, and digital financial services, Grab expects its total addressable market to grow from approximately $52 billion in 2020 to more than $180 billion by 2025.

- *Category Leadership in Presence, Scale, and Diversity*. Grab was the category leader in 2020 by GMV in each of food deliveries and mobility and by TPV in the e-wallets segment of financial services in Southeast Asia according to Euromonitor. Grab has a consistent track record of revenue growth diversified across the eight countries in which it operates.

- *Hyperlocalized Approach*. Grab's hyperlocal execution enables localized experiences for its driver- and merchant-partners and consumers, promotes regular and transparent dialogue with local government agencies to allow Grab to navigate each market's unique complexities, and enables landmark partnerships with leading local corporates across various sectors.

- *Commitment to R&D Investments*. Grab's commitment to investing in research and development, which has created strong core technology and AI assets that allow Grab to build a trusted and customized platform.

- *Compelling Valuation*. The implied pro forma enterprise value in connection with the Business Combination of approximately $31.2 billion, which the AGC Board believes represents an attractive valuation relative to selected comparable companies in analogous markets, including in respect of the deliveries segment, DoorDash Inc. and Meituan; in respect of the mobility segment, Uber Technologies, Inc. and Lyft; in respect of the financial services segment, Square and PayPal Holdings,

170

**Table of Contents**

Inc.; and as relevant global SuperApp comparable companies, MercadoLibre and Sea Limited. The public trading market valuations of these comparable companies implied 2022 projected multiples of enterprise value to sales of 10.1x (DoorDash Inc.); 6.3x (Meituan); 5.1x (Uber Technologies, Inc.); 4.5x (Lyft); 6.7x (Square); 9.4x (PayPal Holdings, Inc.); 9.5x (Sea Limited) and 9.1x (MercadoLibre), in all cases based on publicly available market data as of April 1, 2021. While there is no direct comparable company with leading market share across Southeast Asia, the AGC Board focused most closely on Sea Limited and MercardoLibre for the comparable companies analysis to the exclusion of the other companies which were comparable on a segment-only basis because Sea Limited and MercardoLibre are leading SuperApps with similar operating profiles within the global technology landscape. Given Grab's overall 2022 projected multiples of enterprise value to sales (9.6x) was in line with MercadoLibre (9.1x) and Sea Limited (9.5x) despite being projected to grow faster, the AGC Board believed the comparable companies analysis supported the valuation; however, given that none of the selected companies is exactly the same as Grab, the AGC Board believed that it was inappropriate to, and therefore did not, rely solely on the quantitative results of the comparable company analysis. Accordingly, the AGC Board also made qualitative judgments, based on its experience and judgment, concerning differences between the operational, business and/or financial characteristics of Grab and the selected companies that could affect the public trading values of each in order to provide a context in which to consider the results of the quantitative analysis.

- *Best Available Opportunity*. The AGC Board determined, after a thorough review of other business combination opportunities reasonably available to AGC, that the proposed Business Combination represents the best potential business combination for AGC based upon the process utilized to evaluate and assess other potential acquisition targets, and the AGC Board's belief that such processes had not presented a better alternative.

- *Experienced, Proven, and Committed Management Team*. The AGC Board considered the fact that GHL will be led by Grab's founders-led management team, which has a proven track record of operational excellence, financial performance, growth, and innovation.

- *Continued Significant Ownership by Grab*. The AGC Board considered that Grab's existing equity holders would be receiving a significant amount of GHL Ordinary Shares in the proposed Business Combination and that Grab's principal shareholders and Key Executives are "rolling over" their existing equity interests of Grab into equity interests in GHL and are also agreeing to be subject to a "lock-up" of up to three years in certain cases. The current Grab shareholders are expected to hold approximately 88.19% of the pro forma ownership of the combined company after Closing, assuming (i) the No Redemption Scenario; (ii) that all of Grab's outstanding stock options are exercised, all of Grab's outstanding restricted stock units vest, and all remaining Grab Ordinary Shares available for grant under the Grab 2018 Plan, which will have one vote per share when granted, are granted to employees other than the Key Executives; and (iii) that no Grab shareholder exercises its dissenters' rights. If the actual facts are different from these assumptions, the percentage ownership retained by Grab's existing shareholders in the combined company will be different.

- *Substantial Retained Proceeds.* A majority of the proceeds to be delivered to the combined company in connection with the Business Combination (including from AGC's trust account and from the PIPE financing), are expected to remain on the balance sheet of the combined company after Closing in order to fund Grab's existing operations and support new and existing growth initiatives. AGC's Board considered this as a strong sign of confidence in GHL following the Business Combination and the benefits to be realized as a result of the Business Combination.

- *PIPE Financing Success*. The success of the PIPE financing process, to which sophisticated third-party investors over-subscribed.

- *Likelihood of Closing the Business Combination*. The AGC Board's belief that an acquisition by AGC has a reasonable likelihood of closing without potential issues under applicable antitrust and competition laws and without potential issues from any regulatory authorities.

171

The AGC Board also considered a variety of uncertainties and risks and other potentially negative factors concerning the Business Combination, including, but not limited to, the following:

- *Business Risk.* The risk that the future financial performance of Grab may not meet the AGC Board's expectations due to factors in Grab's control or out of Grab's control, including risks relating to ongoing and unpredictable developments relating to the COVID-19 pandemic.

- *Competition Risk.* The risk that Grab faces intense competition across the segments and markets it serves.

- *Legal and Regulatory Risk.* The risks involved with Grab being subject to various laws in multiple jurisdictions, including with respect to (i) to anti-corruption, anti-bribery, anti-money laundering and countering the financing of terrorism, (ii) security and data privacy and (iii) the classification of drivers as employees or otherwise.

- *Benefits May Not Be Achieved.* The risk that the Business Combination's potential benefits may not be achieved in full or in part, including the risk that Grab would not be able to achieve its growth projections, or may not be achieved within the expected timeframe.

- *Closing of the Business Combination May Not Occur.* The risks and costs to AGC if the Business Combination is not completed, including the risk of diverting management focus and resources to other business combination opportunities, which could result in AGC being unable to effect a business combination by the Final Redemption Date, forcing AGC to liquidate the trust account.

- *Current Public Shareholders Exercising Redemption Rights.* The risk that some of AGC's current public shareholders would decide to exercise their redemption rights, thereby depleting the amount of cash available in the trust account and requiring Sponsor Affiliate to backstop such redemptions.

- *No Third-Party Valuation.* The risk that AGC did not obtain a third-party valuation or fairness opinion in connection with the Business Combination.

- *Closing Conditions of the Business Combination.* That the Business Combination's closing is conditioned on satisfying certain closing conditions, many of which are not within AGC's control.

- *AGC Shareholders Not Holding a Majority Position in GHL.* The fact that AGC shareholders will not hold a majority position in GHL following the Business Combination, which may reduce the influence that AGC's current shareholders have on GHL's management.

- *Post-Closing Corporate Governance.* The fact that post-Closing, Mr. Tan will control the voting power of all outstanding GHL Class B Ordinary Shares and the voting power of approximately 66.11% of total issued and outstanding GHL Ordinary Shares voting together as a single class assuming a No Redemption Scenario and that all of Grab's outstanding stock options are exercised, all of Grab's outstanding restricted stock units vest and all remaining Grab Ordinary Shares available for grant under the Grab 2018 Plan, which will have one vote per share when granted, are granted to employees other than the Key Executives. Given the rights of holders of GHL Class B Ordinary Shares to elect and remove the Class B Directors, Mr. Tan will be able to nominate, appoint and remove a majority of GHL's board of directors, and given Mr. Tan's voting power over the GHL Ordinary Shares as described in this paragraph, Mr. Tan will effectively be able to nominate, appoint and remove the entirety of GHL's board of directors. Mr. Tan will therefore have decisive influence over matters requiring shareholder approval by ordinary resolution and significant influence over matters requiring shareholder approval by special resolution, including significant corporate transactions, such as a merger or sale of GHL or its assets.

- *Litigation Related to the Business Combination.* The risk of potential litigation challenging the Business Combination.

- *No Survival of Remedies for Breach of Representations, Warranties or Covenants of Grab.* The Business Combination Agreement provides that AGC will not have any surviving remedies against

172

Grab or its equity holders after the Closing to recover for losses as a result of any inaccuracies or breaches of the representations, warranties or covenants of Grab set forth in the Business Combination Agreement. As a result, AGC shareholders could be adversely affected by, among other things, a decrease in the financial performance or worsening of financial condition of Grab prior to the Closing, whether determined before or after the Closing, without any ability to recover for the amount of any damages. The AGC Board determined that this structure was appropriate and customary in light of the fact that several similar transactions include similar terms and the current equity holders of Grab will be, collectively, the majority equity holders in GHL and therefore would bear a majority of any such losses.

•   *Transaction Fees and Expenses Incurred by AGC*. The substantial transaction fees and expenses to be incurred in connection with the Business Combination (which are currently expected to be approximately $150 million) and the negative impact of such expenses on AGC's cash reserves and operating results if the Business Combination is not completed.

•   *Negative Impact Resulting from the Announcement of the Business Combination*. The possible negative effect of the Business Combination and public announcement of the Business Combination of AGC's financial performance, operating results, and stock price.

•   *Exclusivity*. The fact that the Business Combination Agreement includes an exclusivity provision that prohibits AGC from soliciting or discussing other business combination proposals, which restricts AGC's ability to consider other potential business combinations for so long as the Business Combination Agreement remains in effect.

•   *Other Risks*. Other factors that the AGC Board deemed relevant, including various other risks associated with the Business Combination, AGC's business, and Grab's business as described under the section entitled "Risk Factors."

In addition to considering the factors described above, the AGC Board also considered that certain AGC officers and directors may have interests in the Business Combination as individuals that are in addition to, and that may be different from, the interests of AGC shareholders. The AGC Board reviewed and considered these interests during the negotiation of the Business Combination and in evaluating and approving the Business Combination Agreement and the transactions contemplated therein, including the Business Combination.

The AGC Board concluded that the potential benefits that the AGC Board expected AGC and its shareholders to achieve as a result of the Business Combination outweighed the potentially negative factors associated with the Business Combination. Accordingly, the AGC Board determined that the Business Combination Agreement, the Business Combination, and the other transactions contemplated by the Business Combination Agreement, were in AGC's best interests.

**Certain Prospective Operational and Financial Information**

Grab does not, as a matter of general practice, publicly disclose long-term forecasts or internal projections of its future performance, revenue, financial condition or other results, nor does it expect or undertake to do so in the future. Nonetheless, the below summary of certain financial projections is provided in this proxy statement/prospectus because Grab provided certain internally prepared unaudited prospective financial information of Grab, including certain forecasts for the financial years ending December 31, 2021, 2022 and 2023 (the "Projections"), to AGC and AGC's board of directors in connection with their review of the proposed Business Combination and to the PIPE Investors in connection with the PIPE financing.

The Projections were not prepared with a view toward public disclosure (other than to certain parties involved in the Business Combination) nor complying with SEC guidelines or IFRS. The Projections were prepared in good faith by Grab's management, based on their reasonable best judgment, estimates and assumptions with respect to the expected future financial performance of Grab at the time the Projections were

173

prepared and speak only as of that time. The Projections were prepared as of March 2021. The Projections, except as updated herein, do not take into account any circumstances or events occurring after the date as of which they were prepared.

The inclusion of the Projections in this proxy statement/prospectus should not be regarded as an indication that AGC, the AGC board, Grab, GHL, or their respective affiliates, advisors or other representatives considered, or now considers, such Projections necessarily to be predictive of actual future results. The Projections are not included in this proxy statement/prospectus in order to induce any AGC stockholders to vote for or against the Business Combination Proposal, the Initial Merger Proposal and the Governing Documents Proposal. None of AGC, Grab or GHL, or any of their respective affiliates, officers, directors, advisors or other representatives, has made any representation or warranty as to the accuracy, reliability, appropriateness or completeness of the Projections. The Projections are not facts and should not be relied upon as being necessarily indicative of future results, and readers of this proxy statement/prospectus, including investors or shareholders, are cautioned not to place undue reliance on this information.

The Projections included GMV, Adjusted Net Revenue, Contribution Profit and Adjusted EBITDA (PIPE) of Grab, as summarized in the following table. GHL has included GMV as operating metrics in "Grab Management's Discussion And Analysis Of Financial Condition And Results Of Operations." The other measures in the Projections are not included by GHL as non-IFRS financial measures or operating metrics in "Grab Management's Discussion And Analysis Of Financial Condition And Results Of Operations." Adjusted EBITDA (PIPE) as used in the Projections, and as set forth in the following table, differs from Adjusted EBITDA, which is included as a non-IFRS financial measure in "Grab Management's Discussion And Analysis Of Financial Condition And Results Of Operations". GHL does not intend or expect to refer back to the Projections in its future periodic reports filed under the Exchange Act. The following tables summarize the Projections of Grab for the periods presented.

| ($ billions unless otherwise stated) | Year Ending December 31, | | |
|---|---|---|---|
| | **2023E** | **2022E** | **2021E(5)** |
| GMV(1) | 34.2 | 24.7 | 16.7 |
| Adjusted Net Revenue(2) | 4.5 | 3.3 | 2.3 |
| Contribution Profit(3) | 1.7 | 1.0 | 0.5 |
| Adjusted EBITDA (PIPE)(4) | 0.5 | (0.2) | (0.6) |

(1)  GMV is an operating metric representing the sum of the total dollar value of transactions from Grab's services, including any applicable taxes, tips, tolls and fees, over the period of measurement. GMV projections for 2023E, 2022E and 2021E for the deliveries segment were $14.7 billion, $10.6 billion and $7.5 billion, respectively. GMV projections for 2023E, 2022E and 2021E for the mobility segment were $7.9 billion, $6.1 billion and $4.2 billion, respectively. GMV projections for 2023E, 2022E and 2021E for the enterprise and others segment (which is referred to as the "enterprise and new initiatives" segment in this proxy statement/prospectus) were $0.3 billion, $0.2 billion and $0.1 billion, respectively. GMV projections for 2023E, 2022E and 2021E for the financial services segment were $11.3 billion, $7.8 billion and $4.9 billion, respectively (GMV for the financial services segment is equivalent to the total payments volume, or TPV, processed through our platform for the financial services segment, excluding amounts from transactions between entities within the Grab group that are eliminated upon consolidation).

(2)  Adjusted Net Revenue is an operating metric that was included in the Projections and was defined as the total dollar value paid to Grab in the form of commissions and fees from each transaction less driver- and merchant-partner base incentives, over the period of measurement. Adjusted Net Revenue projections for 2023E, 2022E and 2021E for the deliveries segment were $2.2 billion, $1.6 billion and $1.2 billion, respectively. Adjusted Net Revenue projections for 2023E, 2022E and 2021E for the mobility segment were $1.6 billion, $1.2 billion and $0.8 billion, respectively. Adjusted Net Revenue projections for 2023E, 2022E and 2021E for the financial services segment were $0.4 billion, $0.3 billion and $0.2 billion, respectively, and Adjusted Net Revenue projections for 2023E, 2022E and 2021E for the enterprise and others segment were $0.3 billion, $0.2 billion and $0.1 billion, respectively.

174

(3)    Contribution Profit is a non-IFRS financial measure, defined as Adjusted Net Revenue less direct costs (adjusted net revenue less subsidies, financial services costs, rewards costs and other direct costs) and sales and marketing expense (marketing costs and acquisition costs).

(4)    Adjusted EBITDA (PIPE) is a non-IFRS financial measure calculated as net loss adjusted to exclude: (i) net interest income (loss), (ii) interest expense, (iii) income tax expenses, (iv) depreciation and amortization, (v) stock-based compensation expenses, (vi) costs related to mergers and acquisitions, (vii) impairment losses on goodwill and long-term assets, (viii) fair value changes on investments, and (ix) restructuring costs. Adjusted EBITDA (PIPE) differs from Adjusted EBITDA, which is included as a non-IFRS financial measure in "Grab Management's Discussion And Analysis Of Financial Condition And Results Of Operations." Adjusted EBITDA (PIPE) does not include both realized and unrealized foreign exchange gain (loss) while Adjusted EBITDA excludes only the unrealized portion. In addition, Adjusted EBITDA (PIPE) does not exclude legal, tax and regulatory settlement provisions, which are excluded from Adjusted EBITDA. Consolidated Adjusted EBITDA (PIPE) projections for 2023E, 2022E and 2021E were $0.5 billion, $(0.2) billion and $(0.6) billion, respectively, and consolidated Adjusted EBITDA (PIPE) projections for 2023E, 2022E and 2021E include regional corporate costs of $0.8 billion, $0.8 billion and $0.7 billion, respectively. Adjusted EBITDA (PIPE) projections for 2023E, 2022E and 2021E for the deliveries segment were $0.5 billion, $0.2 billion and $0.1 billion, respectively. Adjusted EBITDA (PIPE) projections for 2023E, 2022E and 2021E for the mobility segment were $1.0 billion, $0.8 billion and $0.5 billion, respectively. Adjusted EBITDA (PIPE) projections for 2023E, 2022E and 2021E for the financial services segment were $(0.3) billion, $(0.4) billion and $(0.5) billion, respectively. Adjusted EBITDA (PIPE) projections for 2023E, 2022E and 2021E for the enterprise and others segment were $0.1 billion, $0.1 billion and $0.0 billion, respectively.

(5)    The Projections for the financial year ending December 31, 2021, also does not include additional costs related to a U.S. listing, such as (i) costs for Sarbanes-Oxley Act compliance, including additional hires to expand the Grab finance and compliance teams, (ii) costs of having NASDAQ-listed securities, and (iii) costs related to independent board members.

| ($ billions unless otherwise stated) | Year Ending December 31, | | |
| --- | --- | --- | --- |
| | 2023E | 2022E | 2021E(1) |
| Pre-InterCo GMV | 42.0 | 31.5 | 22.8 |
| Pre-InterCo TPV | 19.1 | 14.6 | 11.0 |
| Pre-InterCo consolidated Adjusted Net Revenue | 4.7 | 3.4 | 2.5 |
| Pre-InterCo Adjusted EBITDA (PIPE) for deliveries | 0.3 | 0.1 | (0.0) |
| Pre-InterCo Adjusted EBITDA (PIPE) for mobility | 1.0 | 0.7 | 0.5 |
| Pre-InterCo Adjusted EBITDA (PIPE) for financial services | (0.1) | (0.3) | (0.3) |

(1)    The Projections for the financial year ending December 31, 2021, also does not include additional costs related to a U.S. listing, such as (i) costs for Sarbanes-Oxley Act compliance, including additional hires to expand the Grab finance and compliance teams, (ii) costs of having NASDAQ-listed securities, and (iii) costs related to independent board members.

The "Pre-InterCo" data set forth above includes earnings and other amounts from transactions between entities within the Grab group that are eliminated upon consolidation, and these figures differ materially from segment data that is presented after elimination of transactions between entities within the Grab group. Such Pre-InterCo segment data was presented to help to show the extent to which Grab's offerings are in use across the Grab platform and ecosystem. In particular, historical Pre-InterCo segment data helps Grab's management understand the usage and scale of the businesses on the Grab platform and facilitates the monitoring of consumer adoption, frequency of use and assimilation of consumers onto the broader Grab ecosystem. For example, Pre-InterCo financial services data allows Grab's management to understand the extent to which Grab's e-wallet is used by consumers for Grab services. Given the potentially high-frequency nature of ride-hailing and food delivery services, such Pre-InterCo scale and growth serve an important role in tracking and understanding the adoption/penetration rate of Grab's services.

The Projections reflect numerous estimates and assumptions with respect to general business, economic, regulatory, market and financial conditions and competition, future industry performance and competitor actions and other future events, as well as matters specific to Grab's business, all of which are difficult to predict and many of which are beyond Grab's and AGC's control. The Projections are forward looking statements that are inherently subject to significant uncertainties and contingencies, many of which are beyond Grab's and AGC's control. In developing the Projections, Grab's management made a number of significant assumptions, in addition to the assumptions described above, some of which are outlined below.

Projected growth in GMV was driven by assumptions of an increasing number of users of Grab's services, as well as increasing transaction frequency and spend per transaction. The table below sets forth Grab management's assumptions with respect to the number of users of Grab's services (as measured by overall MTUs), transaction frequency (as measured by transactions per MTU) and spend per transaction (as measured by GMV per transaction) used in developing the Projections. However, such assumptions for the year ending December 31, 2021 below have been revised to reflect a range in line with the updated Projections for the year ended December 31, 2021.

|  | Year Ended December 31, | | | Year Ending December 31, | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | **2018** | **2019** | **2020** | **2021E** | **2022E** | **2023E** |
| Overall MTU (in millions) | 23 | 29 | 25 | 24 to 25 | 36 | 43 |
| GMV per MTU ($) | 249 | 419 | 509 | 612 to 657 | 684 | 799 |
| Transactions per MTU | 81 | 91 | 78 | 78 to 83 | 97 | 104 |
| GMV per transaction ($) | 3.1 | 4.6 | 6.6 | 7.0 to 7.9 | 7.0 | 7.7 |

Although the overall MTUs decreased from 2019 to 2020 and remained relatively stagnant between 2020 and 2021 due to COVID-19 related lockdowns and restrictions that affected the mobility segment in particular, Grab's management expects MTUs for both mobility and deleveries to increase as such restrictions are eased and markets reopen. In particular, Grab's management expects mobility MTUs to increase as lockdowns and other mobility restrictions are lifted, more people return to commuting to and from their places of employment and other locations and both domestic and international travel levels increase. With respect to deliveries MTUs, although Grab's management expects that there may be a modest decline in food deliveries as markets reopen and consumers return to dining in restaurants, Grab's management also expects overall deliveries MTUs to continue to increase as Grab continues to expand its deliveries offerings, including groceries and daily essentials (through GrabMart), parcel deliveries (through GrabExpress) and last-mile delivery services for e-commerce business, among others. Based on this outlook and expectations regarding continued growth in the financial services segment, Grab's management assumed that there would be an increasing number of users of Grab's services in preparing the Projections. Similarly, Grab's management expects frequency of use as measured by transactions per MTU to increase as the mobility segment recovers. In addition, Grab's management assumed that spend per transaction as measured by GMV per transaction would continue to increase in line with historic results.

In addition, Grab's deliveries segment was assumed to be a key contributor of GMV growth, as Grab anticipated it would be able to continue to scale existing offerings and expand into new verticals. In the near-term, Grab's mobility projections assume that it would be subject to the effects of the COVID-19 pandemic, but it also anticipates return to secular growth trends in the medium- to longer-term. Growth in financial services TPV assumed increasing scale of Grab's established payments business and also the continued expansion of its off-platform payments and non-payments financial services.

Furthermore, Grab's projections for adjusted net revenue assumed that Grab's take rate as a percentage of GMV would increase to reach steady state levels. Grab assumed that EBITDA margins would continue to improve as stated in the Projections as its business continues to scale, which was consistent with trends that Grab has observed historically. Grab expected Contribution Profit margin and Adjusted EBITDA (PIPE) margin to increase, as its revenue base grows faster than its fixed cost base and Grab is able to take advantage of economies

176

of scale. While Grab is close to its expected long-term margins for the mobility business, Grab assumed that there is significant headroom to improve margins for the delivery and financial services businesses.

The Projections are forward looking statements that are inherently subject to significant uncertainties and contingencies, many of which are beyond Grab's control. Grab believes the assumptions relating to the Projections were reasonable at the time the Projections were prepared, given the information Grab had at the time. However, important factors that may affect actual results and cause the results reflected in the Projections not to be achieved include, among other things, risks and uncertainties relating to Grab's business, industry performance, the regulatory environment, and general business and economic conditions. The Projections also reflect assumptions as to certain business decisions that are subject to change. The various contingencies, uncertainties and risks include those set forth in the "Risk Factors," "Grab Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Forward-Looking Statements" sections of this proxy statement/prospectus. As a result, there can be no assurance that the Projections will be realized or that actual results will not be significantly higher or lower than projected. Since the Projections cover multiple years, such information by its nature becomes less reliable with each successive year. These Projections are subjective in many respects and thus are susceptible to multiple interpretations and periodic revisions based on actual experience and business developments.

Given in part to the material impact of COVID-19 on Grab's business, including ongoing and unpredictable developments relating to the COVID-19 pandemic, Grab is considering how COVID-19 and other developments may impact the Projections. For example, the impact from COVID-19 has previously resulted in certain positive impacts on the deliveries segment and certain negative impact on the mobility segment as well as overall volatility in demand. Accordingly, the Projections related to the deliveries and mobility segments are expected be positively or negatively impacted based on factors that are not predictable. With respect to the financial services segment, after the date of preparation of the Projections, Grab reassessed its revenue recognition conclusions for prior periods with respect to its OVO points program (which resulted in a reduction of $135 million and $204 million from revenues for 2020 and 2019, respectively, with an equivalent reversal under cost of revenue); however, OVO operates in a single country and represents just one part of Grab's financial services, which in itself represents a small portion of Grab's overall business. Accordingly, the reassessment of Grab's revenue recognition conclusion for prior periods with respect to its OVO points program did not materially impact the projections as presented. See "Risk Factors—Risks Relating to Grab's Business" including "Risk Factors—Risks Relating to Grab's Business Industry data, forecasts and estimates, including the Projections, contained in this proxy statement/prospectus are inherently uncertain and subject to interpretation, and may not be an indication of the actual results of the transaction or Grab's future results. Accordingly, you should not place undue reliance on such information" and "Risk Factors—Risks Relating to GHL—If GHL fails to maintain an effective system of disclosure controls and internal control over financial reporting, GHL may not be able to accurately report its financial results or prevent fraud. As a result, shareholders could lose confidence in GHL's financial and other public reporting, which is likely to negatively affect GHL's business and the market price of GHL Ordinary Shares."

Separately, Grab is providing an update to the Projections for the year ended December 31, 2021 below. In providing the update, Grab's management considered the following factors and information, among others:

- Macroeconomic factors including (i) the projected compounded annual growth rate ("CAGR") of Southeast Asia's nominal GDP of 7.4% from 2020 to 2025, compared to 7.1% and 4.6% for China and the U.S., respectively (according to Euromonitor); and (ii) economic growth based on digitization;

- COVID-19 related information including (i) vaccination rates based on public government sources; (ii) published government policy on COVID-19 restrictions; (iii) general trend towards reopening and historical behaviors/growth post-implementation and cessation of COVID-19 measures; (iv) internal estimates on reopening of borders and travel and (v) internal historical data during the post-pandemic period;

**Table of Contents**

- Factors related to penetration growth for on-demand services such as (i) approximately 20% of Southeast Asian population gaining internet access between 2016 and 2020; (ii) online penetration of meal ordering in Southeast Asia being 12% in 2020 compared with 21% in the United States and China, based on the percentage of total prepared meals ordered online (including online ordering for dine-in and takeaway) according to Euromonitor; (iii) on-demand mobility penetration in Southeast Asia in 2020 being only 3% compared with 12% in China and 5% in the United States, based on the percentage of total personal consumption expenditure on ride-hailing out of personal consumption expenditure on buses, coaches and taxis, and operation of personal transport equipment according to Euromonitor; and (iv) roughly six in every ten adults in the region being either unbanked or underbanked according to Euromonitor, and the vast majority of commerce (by transaction volume) continuing to be conducted in cash;

- Competitive benchmarking of growth rates of global peers based on public sources; and

- Internal data such as historical growth rates, consumer research data based on marketing surveys and industry/competition landscape studies.

Based on above-mentioned factors, Grab's management considered the following, among others, assumptions in updating the Projections for 2021:

- *Group*: Despite the COVID-19 pandemic, Grab's management believes that Grab's fundamentals remain sound and detrimental changes are not expected to be permanent as the region makes progress towards recovery;

- *Deliveries*: Healthy growth rates (although slower than recent historical trends) are expected based on continued digitalization of traditional businesses, growing middle class and affluence in the region and opportunities beyond F&B such as groceries and on-demand parcel deliveries; however, short-term growth rates will likely vary significantly (or even become negative in some periods) due to the COVID-19 pandemic;

- *Mobility*: Mobility segment expected to recover in line with peers globally, and the pace of recovery in 2021 and 2022 is expected to largely depend on COVID-19 related factors such as (i) the pace of vaccination in the region, which Grab's management believes will pick up towards the end of 2021 and in 2022 with greater availability of vaccines, (ii) local government lockdowns and movement control orders that are expected to vary significantly across countries; and (iii) the resumption of international and regional travel;

- *Financial services*: Grab's on-platform financial services are expected to grow in-line with the deliveries and mobility segments and the growth of off-platform financial services is expected to depend on the increasing adoption of digital financial services, acceleration of partnerships and cross-selling of portfolio of financial services to under-banked consumers; and

- *Enterprise and new initiatives*: A large portion of the enterprise and new initiatives business is advertisement tied to the deliveries segment, and growth rate expected to track or outpace that of the deliveries business. Current penetration level of the advertisement services as a percentage of total GMV still remains fairly low compared to global peers.

However, the spread of the Delta variant has led to lockdowns of varying extents and durations in the region, and there is increasing uncertainty as to recovery paths. For example, in Indonesia, strict social restrictions including closing of shopping malls, dining limitations and mandatory online learning for schools were reintroduced at the end of June 2021 for Java and Bali as COVID-19 cases reached an all-time high. In Vietnam, COVID-19 restrictions were introduced to halt both mobility and deliveries services across many provinces. While Grab expects the current trends to change as the COVID-19 pandemic situation in Southeast Asia improves, including through the increased prevalence of vaccinations in the region, the timing of such improvement is difficult to forecast given the evolving situation with respect to the Delta variant and the

178

**Table of Contents**

unknown impact of possible additional variants. In such uncertain circumstances, forecasting of segment level performance is increasingly difficult as Grab's business segments are affected very differently by the COVID-19 pandemic. In the event of tighter and prolonged COVID restrictions, Grab's mobility business will likely be materially negatively impacted as fewer consumers utilize the service for commuting and travel, but Grab expects this would be offset by increased demand for Grab's deliveries offerings. In the event of accelerated recovery from COVID, Grab expects the reverse would hold: Grab's mobility segment will likely benefit from increased travel and general commuting, but the greater capacity to dine at restaurants could impact the pace of Grab's deliveries segment's growth. However, Grab's management believes in either situation, overall performance and growth at the group level would be similar despite the variance in segment performance. As such, Grab believes the diversified nature of Grab's business across segments and geographies provide a more stable basis for updating the Projections at the group level. Accordingly, Grab is updating the Projections for 2021 at the group level, but is not updating the Projections for 2021, 2022 and 2023 at a segment level. Accordingly, Projections at a segment level should no longer be relied upon. Subject to the inherent uncertainty of projections and the uncertainties, contingencies and assumptions described herein relating to the Projections, many of which are beyond Grab's control, Grab management believes, given the information available at the time the updated Projections were prepared, that as of such time and the date of the proxy statement/prospectus, the updated Projections were achievable. The changes to the initial Projections and the need to update the Projections have not impacted Grab management's recommendation in favor of the business combination.

| ($ billions unless otherwise stated) | Year Ending December 31, 2021E |
|---|---|
| GMV | 15.0 to 15.5 |
| Adjusted Net Revenue | 2.1 to 2.2 |
| Contribution Profit | 0.1 to 0.3 |
| Adjusted EBITDA(PIPE) | (0.9) to (0.7) |

Certain of the measures included in the Projections may be considered non-IFRS financial measures. Non-IFRS financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with IFRS, and non-IFRS financial measures as used by Grab may not be comparable to similarly titled amounts used by other companies. These items are uncertain, and depend on various factors and so reconciliations for non-IFRS financial measures have not been provided. These items and factors could be material to Grab's results computed in accordance with IFRS. We encourage you to review the financial statements of Grab included elsewhere in this proxy statement/prospectus and to not rely on any single financial measure nor to place undue reliance on any of the Projections.

The Projections included in this proxy statement/prospectus have been prepared by, and are the responsibility of, Grab's management. Neither WithumSmith+Brown, PC nor KPMG LLP has audited, reviewed, examined, compiled or applied agreed-upon procedures with respect to the Projections and accordingly, neither WithumSmith+Brown, PC nor KPMG LLP expresses any opinion or any other form of assurance with respect thereto. The KPMG LLP report included in this proxy statement/prospectus relates to Grab's historical financial statements, and the WithumSmith+Brown, PC report included in this proxy statement/prospectus relates to AGC's historical financial statements. These reports of WithumSmith+Brown, PC and KPMG LLP do not extend to the Projections and should not be read to do so.

EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE FEDERAL SECURITIES LAWS, BY INCLUDING IN THIS PROXY STATEMENT/PROSPECTUS A SUMMARY OF THE PROJECTIONS FOR GRAB, EACH OF AGC, GHL AND GRAB UNDERTAKES NO OBLIGATIONS AND EXPRESSLY DISCLAIMS ANY RESPONSIBILITY TO UPDATE OR REVISE, OR PUBLICLY DISCLOSE ANY UPDATE OR REVISION TO, THESE PROJECTIONS TO REFLECT CIRCUMSTANCES OR EVENTS, INCLUDING UNANTICIPATED CIRCUMSTANCES OR EVENTS, THAT MAY HAVE OCCURRED OR THAT MAY OCCUR AFTER THE DATE OF PREPARATION OF THESE PROJECTIONS, EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS UNDERLYING THE PROJECTIONS ARE SHOWN TO BE IN ERROR OR CHANGE.

**Interests of AGC's Directors and Officers in the Business Combination**

When considering the AGC Board's recommendation to vote in favor of approving the Business Combination Proposal, the Initial Merger Proposal and the Governing Documents Proposal, AGC shareholders should keep in mind that Sponsor, Sponsor Affiliate and AGC's directors and executive officers, have interests in such proposals that are different from, or in addition to (and which may conflict with), those of AGC shareholders and warrant holders generally. These interests include, among other things, the interests listed below:

- the fact that the Sponsor and AGC's directors have agreed not to redeem any AGC Class B Ordinary Shares held by them in connection with a shareholder vote to approve the proposed Business Combination;

- the fact that Sponsor paid an aggregate of $25,000 for the 12,500,000 AGC Class B Ordinary Shares currently owned by Sponsor and its directors and such securities will have a significantly higher value after the Business Combination. As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these shares, if unrestricted and freely tradable, would be $186,625,000, based upon a closing price of $14.93 per public share on NASDAQ (and will have zero value if neither this Business Combination nor any other business combination is completed on or before the Final Redemption Date);

- the fact that Sponsor paid $12,000,000 to purchase an aggregate of 12,000,000 private placement warrants, each exercisable to purchase one AGC Class A Ordinary Share at $11.50, subject to adjustment, at a price of $1.00 per warrant, and those warrants would be worthless – and the entire $12,000,000 warrant investment would be lost – if a Business Combination is not consummated by the Final Redemption Date. As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these warrants, if unrestricted and freely tradable, would be $56,400,000, based upon a closing price of $4.70 per AGC Warrant on NASDAQ;

- the fact that given the differential in the purchase price that Sponsor paid for the AGC Class B Ordinary Shares as compared to the price of the Units sold in AGC's IPO and the substantial number of shares of GHL Class A Ordinary Shares that Sponsor will receive upon conversion of the AGC Class B Ordinary Shares in connection with the Business Combination, the Sponsor and its affiliates may earn a positive rate of return on their investment even if the GHL Class A Ordinary Shares trade below the price initially paid for the Units in the AGC IPO and the AGC public shareholders experience a negative rate of return following the completion of the Business Combination;

- the fact that Sponsor and AGC's directors have agreed to waive their rights to liquidating distributions from the trust account with respect to any AGC Shares (other than public shares) held by them if AGC fails to complete an initial business combination by the Final Redemption Date;

- the fact that pursuant to the Registration Rights Agreement, the Sponsor can demand that GHL register its registrable securities under certain circumstances and will also have piggyback registration rights for these securities in connection with certain registrations of securities that GHL undertakes;

- the fact that Sponsor Affiliate has agreed to purchase, pursuant to the Amended and Restated Forward Purchase Agreement with Sponsor Affiliate, 17,500,000 GHL Class A Ordinary Shares and 3,500,000 GHL Warrants for an aggregate purchase price equal to $175,000,000 immediately prior to the Closing. As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these shares and warrants, if unrestricted and freely tradable, would be $277,725,000, based upon a closing price of $14.93 per public share on NASDAQ (based upon the right to receive one GHL Class A Ordinary Share per AGC Class A Ordinary Share in connection with the Business Combination) and a closing price of $4.70 per AGC Warrant on NASDAQ (based upon the right to receive one GHL Warrant per AGC Warrant in connection with the Business Combination);

180

- the fact that Sponsor Affiliate has agreed, pursuant to the Sponsor Subscription Agreement, to purchase 575,000,000 GHL Class A Ordinary Shares for $10 per share for an aggregate purchase price equal to $575 million immediately prior to the Closing. As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these shares, if unrestricted and freely tradable, would be $8,584,750,000, based upon a closing price of $14.93 per public share on NASDAQ (based upon the right to receive one GHL Class A Ordinary Share per AGC Share in connection with the Business Combination);

- the fact that Richard N. Barton, a current director of AGC, has agreed, pursuant to a PIPE Subscription Agreement, to purchase 300,000 GHL Class A Ordinary Shares for $10 per share for an aggregate purchase price equal to $3 million immediately prior to the Closing. As of November 15, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, the aggregate market value of these shares, if unrestricted and freely tradable, would be $4,479,000, based upon a closing price of $14.93 per public share on NASDAQ (based upon a right to receive one GHL Class A Ordinary Share per AGC Share in connection with the Business Combination);

- the fact that Sponsor Affiliate has agreed, pursuant to the Backstop Subscription Agreement, to backstop SPAC Share Redemptions (as defined in the Business Combination Agreement), and to the extent such backstop is required, will agree to subscribe for and purchase that number of GHL Class A Ordinary Shares to be determined in accordance with the terms of the Backstop Subscription Agreement, for $10 per share;

- the continued indemnification of AGC's directors and officers and the continuation of AGC's directors' and officers' liability insurance after the Business Combination (i.e. a "tail policy");

- the fact that Sponsor and AGC's officers and directors will lose their entire investment in AGC and will not be reimbursed for any out-of-pocket expenses if an initial business combination is not consummated by the Final Redemption Date;

- the fact that if the trust account is liquidated, including in the event AGC is unable to complete an initial business combination by the Final Redemption Date, the Sponsor has agreed to indemnify AGC to ensure that the proceeds in the trust account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the trust account on the liquidation date, by the claims of prospective target businesses with which AGC has discussed entering into a transaction agreement or claims of any third party for services rendered or products sold to AGC, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the trust account; and

- the fact that the Sponsor (including its representatives and affiliates) and AGC's directors and officers, are, or may in the future become, affiliated with entities that are engaged in a similar business to AGC. For example, in January 2021, the Sponsor and AGC's officers launched AGC 2 for which Brad Gerstner serves as Chairman, Chief Executive Officer and President; Hab Siam serves as General Counsel and Richard N. Barton serves as a director. The Sponsor and AGC's directors and officers are not prohibited from sponsoring, or otherwise becoming involved with, any other blank check companies prior to completing the Business Combination. Accordingly, if any of AGC's officers or directors becomes aware of a business combination opportunity that is suitable for an entity to which he or she has then current fiduciary or contractual obligations (including AGC 2), he or she will honor his or her fiduciary or contractual obligations to present such Business Combination opportunity to such entity, subject to their fiduciary duties under Cayman Islands law.

The Sponsor and each AGC director have agreed to, among other things, vote all of their AGC Shares in favor of the proposals being presented at the Extraordinary General Meeting and waive their redemption rights with respect to their AGC Shares in connection with the consummation of the Business Combination. As of the date of this proxy statement/prospectus, on an as-converted basis, the Sponsor and certain AGC directors own, collectively, approximately 20% of issued and outstanding AGC Shares.

Table of Contents

At any time at or before the Business Combination, during a period when they are not then aware of any material nonpublic information regarding AGC or its securities, the Sponsor, Grab, and/or AGC's or Grab's directors, officers, advisors or respective affiliates (including separate accounts or other accounts, clients, funds, or pooled investment vehicles managed or advised by, or affiliated with, Sponsor Affiliate or its affiliates) may purchase public shares from institutional and other investors who vote, or indicate an intention to vote, against the Business Combination Proposal, Initial Merger Proposal or the Governing Documents Proposal, or execute agreements to purchase such shares from such investors in the future, or they may enter into transactions with such investors and others to provide them with incentives to acquire public shares or vote their public shares in favor of the Business Combination Proposal, Initial Merger Proposal or the Governing Documents Proposal. Such a purchase may include a contractual acknowledgement that such shareholder, although still the record or beneficial holder of AGC Shares, is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights.

If the Sponsor, Grab, and/or AGC's or Grab's directors, officers, advisors, or respective affiliates (including separate accounts or other accounts, clients, funds, or pooled investment vehicles managed or advised by, or affiliated with, Sponsor Affiliate or its affiliates) purchase shares in privately negotiated transactions from public AGC shareholders who have already elected to exercise their redemption rights, then such selling shareholder would be required to revoke their prior elections to redeem their shares. The Sponsor, Grab, and/or AGC's or Grab's directors, officers, advisors or respective affiliates (including separate accounts or other accounts, clients, funds, or pooled investment vehicles managed or advised by, or affiliated with, Sponsor Affiliate or its affiliates) may also purchase public shares from institutional and other investors who indicate an intention to redeem AGC Shares, or, if the price per share of AGC Shares falls below $10.00 per share, then such parties may seek to enforce their redemption rights. The above-described activity could be especially prevalent in and around the time of Closing. The purpose of such share purchases and other transactions would be to increase the likelihood that the following requirements are satisfied: (i) the Business Combination Proposal is approved by the affirmative vote of the holders of a majority of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting; (ii) the Initial Merger Proposal is approved by the affirmative vote of at least two-thirds of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting; (iii) the Governing Documents Proposal is approved by the affirmative vote of at least two-thirds of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting (iv) otherwise limit the number of public shares electing to redeem; and (v) GHL's net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) being at least $5,000,001 after giving effect to the transactions contemplated by the Business Combination Agreement and the PIPE financing. The Sponsor, Grab and/or AGC's or Grab's directors, officers, advisors, or respective affiliates (including separate accounts or other accounts, clients, funds, or pooled investment vehicles managed or advised by, or affiliated with, Sponsor Affiliate or its affiliates) may also purchase shares from institutional and other investors for investment purposes.

Entering into any such arrangements may have a depressive effect on the AGC Shares. For example, as a result of these arrangements, an investor or holder may have the ability to effectively purchase shares at a lower-than-market price and may therefore be more likely to sell the shares he, she, or they own, either at or before the Business Combination. If such transactions are executed, then the Business Combination could be completed in circumstances where such consummation could not have otherwise occurred. Share purchases by the persons described above would allow them to exert more influence over approving the proposals to be presented at the Extraordinary General Meeting and would likely increase the chances that such proposals would be approved. AGC will file or submit a Current Report on Form 8-K to disclose any material arrangements entered into or significant purchases made by any of the persons mentioned in the preceding paragraph that would affect the vote on the proposals to be put to the Extraordinary General Meeting or the redemption threshold. Any such report will include descriptions of any arrangements entered into or significant purchases by any of the aforementioned persons.

The existence of financial and personal interests of one or more of AGC's directors results in conflicts of interest on the part of such director(s) between what he, she, or they may believe is in the best interests of AGC and what he, she, or they may believe is best for himself, herself, or themselves in determining to recommend that shareholders vote for the proposals. In addition, AGC's officers have interests in the Business Combination that may conflict with your interests as a shareholder.

In addition to the above, please see "Risk Factors— Risks Relating to AGC and the Business Combination" and "Information Related to AGC – Conflicts of Interest" for additional information on interests of AGC's directors and officers.

**Certain Engagements in Connection with the Business Combination and Related Transactions**

J.P. Morgan's Equity Capital Markets Group ("J.P. Morgan") and Morgan Stanley acted as lead placement agents, and Evercore and UBS acted as co-placement agents to AGC in connection with the PIPE financing pursuant to the PIPE Subscription Agreements. As consideration for providing these services, upon consummation of the Business Combination, J.P. Morgan is entitled to a fee of at least $27.3 million, Morgan Stanley is entitled to a fee of at least $27.3 million, Evercore is entitled to a fee of at least $3.4 million and UBS is entitled to a fee of at least $3.4 million. In addition, Evercore acted as lead financial advisor, and J.P. Morgan's M&A Advisory Group and Morgan Stanley Asia (Singapore) Pte. acted as co-advisors to Grab in connection with the Business Combination. Evercore will also receive $30 million in connection with its role as financial advisor to Grab, and Morgan Stanley will receive $7 million as deferred underwriting fee for AGC's initial public offering if the Business Combination is completed. In addition to the fees mentioned above, $6.8 million will be disbursed among J.P. Morgan, Morgan Stanley, Evercore and UBS for their roles as placement agents in connection with the PIPE financing upon the consummation of the Business Combination, subject to AGC Board's discretion, with the exact allocation to be determined on the date of closing of the Business Combination based on (i) the number of PIPE investor meetings set up by the respective firms, (ii) the total amount of investment made by PIPE investor accounts assigned to, and managed by, the respective firms and (iii) an assessment of the overall performance of the respective firms. AGC also has discretion to pay J.P. Morgan, Morgan Stanley, Evercore and UBS additional fees of up to $8.2 million in connection with their roles as placement agents in connection with the PIPE financing upon consummation of the Business Combination, though AGC may decide not to pay any such fees. The payment and allocation of up to an additional $8.2 million of discretionary fees, if any, will be determined by the AGC Board based on the same factors as the aforementioned $6.8 million disbursement and are additional incremental fees for the work performed by the respective placement agents in connection with the PIPE financing. The maximum aggregate amount of fees (excluding any to be determined discretionary fees) that J.P. Morgan, Morgan Stanley, Evercore and UBS can be paid in connection with the Business Combination is $113.5 million.

Morgan Stanley previously acted as one of the several underwriters in AGC's initial public offering consummated on October 5, 2020, and will receive deferred underwriting compensation from AGC for AGC's initial public offering if the Business Combination is completed. Morgan Stanley or its affiliates' financial interests tied to the consummation of an initial business combination transaction may give rise to potential conflicts of interest in providing such additional services to AGC and Grab, including potential conflicts of interest in connection with the Business Combination.

After carefully considering the potential benefits of engaging J.P. Morgan's Equity Capital Markets Group, Morgan Stanley, Evercore and UBS as placement agents for the PIPE financing, and the potential benefits of engaging Evercore, J.P. Morgan's M&A Advisory Group and Morgan Stanley Asia (Singapore) Pte. as advisors to Grab in connection with the Business Combination, and the potential conflicts of interest or a perception thereof, that may arise from such engagements, including that each of J.P. Morgan, an affiliate of Morgan Stanley and UBS acted as placement agent in connection with prior issuances of preferred shares by Grab, AGC and Grab each consented to these engagements and waived potential conflicts in connection with such roles.

In addition, each of J.P. Morgan, Morgan Stanley, Evercore and UBS, together with its respective affiliates, is a full service financial institution engaged in various activities, which may include sales and trading, commercial and investment banking, advisory, investment management, wealth management, investment research, principal investing, hedging, market making, brokerage and other financial and non-financial activities and services, and they may provide investment banking and other services to AGC, Grab and their respective affiliates from time to time, for which they would expect to receive compensation.

In addition, in the ordinary course of its business activities, J.P. Morgan, Morgan Stanley, Evercore and UBS, and their respective affiliates, officers, directors and employees may also make investment recommendations and/or publish or express independent research views in respect of such securities or financial instruments and may hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments, and may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers. Such investments and securities activities may involve securities and/or instruments of GHL, AGC, Grab or their respective affiliates.

In considering the recommendation of AGC's board of directors to vote in favor of approval of the Business Combination Proposal, the Initial Merger Proposal and the Governing Documents Proposal, shareholders should keep in mind that AGC's or Grab's advisors and respective entities affiliated with these advisors have interests in such proposals that are different from, or in addition to (and which may conflict with), those of AGC shareholders and warrant holders generally, including those discussed above.

## Anticipated Accounting Treatment

The Business Combination is made up of the series of transactions provided for in the Business Combination Agreement as described elsewhere within this proxy statement/prospectus. The transactions will be accounted for as a reverse acquisition under the acquisition method of accounting in accordance with IFRS 3, Business Combinations, whereby Grab will be considered the accounting acquirer and AGC will be treated as the acquired company. Under this method of accounting, the net assets of Grab will be stated at historical cost.

## Regulatory Matters

The Business Combination Agreement and the transactions contemplated by the Business Combination Agreement are not subject as a closing condition to any additional federal, state or foreign regulatory requirement or approval, except for filings with the registrar of the Cayman Islands necessary to effectuate the transactions contemplated by the Business Combination Agreement.

## Appraisal or Dissenters' Rights

Neither AGC shareholders nor AGC Unit holders nor AGC warrant holders have appraisal or dissenters' rights in connection with the Business Combination under the laws of the Cayman Islands. Although under the Cayman Islands Companies Act, shareholders of a Cayman Islands company have dissenters' rights with respect to a merger, dissenters' rights are not considered to be available under the Cayman Islands Companies Act if the consideration under the proposed merger consists of shares listed on a national securities exchange. Therefore, no dissenters' rights are available under the Initial Merger in respect of the AGC Shares; however, holders have a redemption right as further described in this proxy statement/prospectus. See "Extraordinary General Meeting of AGC Shareholders—Redemption Rights" for a detailed description of the procedures to be followed if you wish to redeem your public shares for cash.

184

**Resolution to be Voted Upon**

The full text of the resolution to be proposed is as follows:

"RESOLVED, as an ordinary resolution, that the business combination contemplated by the Business Combination Agreement, dated April 12, 2021 (as may be amended, supplemented, or otherwise modified from time to time, the "Business Combination Agreement"), by and among Grab Holdings Limited, an exempted company limited by shares incorporated under the laws of the Cayman Islands ("GHL"), AGC, J2 Holdings Inc., an exempted company limited by shares incorporated under the laws of the Cayman Islands and a direct wholly-owned subsidiary of GHL ("AGC Merger Sub"), J3 Holdings Inc., an exempted company limited by shares incorporated under the laws of the Cayman Islands and a direct wholly-owned subsidiary of GHL ("Grab Merger Sub") and Grab Holdings Inc., an exempted company limited by shares incorporated under the laws of the Cayman Islands ("Grab"), pursuant to which (i) AGC shall merge with and into AGC Merger Sub, with AGC Merger Sub surviving and remaining as a wholly-owned subsidiary of GHL (the "Initial Merger") and (ii) following the Initial Merger, Grab Merger Sub shall merge with and into Grab, with Grab being the surviving entity and becoming a wholly-owned subsidiary of GHL (the "Acquisition Merger") and the other transactions contemplated by the Business Combination Agreement (the business combination, the Initial Merger, the Acquisition Merger, and the other transactions contemplated by the Business Combination Agreement, the "Business Combination") be confirmed, ratified and approved in all respects."

**Votes Required for Approval**

The approval of the Business Combination Proposal will require an ordinary resolution, being the affirmative vote of the holders of a majority of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting. The approval of the Initial Merger Proposal will require a special resolution under the Cayman Islands Companies Act, being the affirmative vote of the holders of at least two-thirds of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting. The approval of the Governing Documents Proposal will require a special resolution under the Cayman Islands Companies Act, being the affirmative vote of the holders of at least two-thirds of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting. The approval of the Adjournment Proposal, if presented, will be sought as an ordinary resolution, being the affirmative vote of the holders of a majority of the issued and outstanding AGC Shares entitled to vote, who attend, in person or by proxy, and vote thereupon at the Extraordinary General Meeting.

The approval of the Business Combination Proposal is a condition to the consummation of the Business Combination Transactions. If the Business Combination Proposal is not approved, the other proposals (except the Adjournment Proposal, as described below) shall not be presented to the AGC shareholders for a vote.

An abstention or broker non-vote will be counted towards the quorum requirement but will not count as a vote cast at the Extraordinary General Meeting.

**Recommendation of AGC Board of Directors**

**THE AGC BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT THE AGC SHAREHOLDERS VOTE "FOR" THE APPROVAL OF THE BUSINESS COMBINATION PROPOSAL.**

**Table of Contents**

**Enterprise and New Initiative Offerings**

We have a growing suite of enterprise offerings including our advertising and marketing offerings, GrabAds and anti-fraud offerings, GrabDefence.

GrabAds enables businesses to foster growth through different advertising touch points depending on their target audience and objectives. We provide online advertising solutions on our superapp and deliveries offerings, and offline advertising solutions on our vehicle fleet. Our superapp is the first touchpoint for consumers accessing our platform, providing an important mobile advertising opportunity for consumer-facing businesses. For our GrabFood and GrabMart merchant-partners, we provide promoted listings and banner advertisements enabling them to promote their businesses within the food and grocery delivery offerings on our platform and enhance their consumer reach. While our GrabAds offering is relatively new, in the first half of 2021, 47% of our food and grocery merchant-partners utilized our marketing services. We also provide offline advertising solutions by leveraging our vehicle fleet, such as in-car product placements and mobile billboards to generate mass awareness.

GrabDefence allows us to offer our suite of self-developed in-house fraud detection and prevention technologies to third-party businesses, including traditional financial institutions and on-demand delivery, in order to help them protect their ecosystems.

Additionally, in pursuit of continuing to experiment with new offerings to better serve the needs of our driver- and merchant-partners and consumers, our platform also facilitates other lifestyle services through our superapp including managing home services, attraction tickets, flights and hotel bookings.

## Our Competitive Advantage

### *Category Leadership with Recognized and Trusted Brand*

We were the category leader in 2020 by GMV in each of food deliveries, mobility and by TPV in the e-wallets segment of financial services in Southeast Asia according to Euromonitor. We have a diversified business model across the eight countries in which we operate. With our scale and category leadership, we are well-positioned to further penetrate our markets within Southeast Asia.

- *Deliveries*: According to Euromonitor's estimates, we were the leading food delivery platform in the region, facilitating approximately half of total online food delivery GMV in Southeast Asia, with the next closest competitor having approximately 20% of regional GMV share.

  - However, food remains a highly competitive sector, as price-sensitive consumers in Southeast Asia continue to have easy access to a variety of food options, from restaurants, to hawker centers, to jollijeeps, to warungs. Amid the COVID-19 pandemic, home cooking has also become a popular and necessary trend as consumers spend more time at home.

- *Mobility*: We were the category leader regionally by GMV in 2020 according to Euromonitor's estimates, facilitating approximately 72% of GMV for ride-hailing in Southeast Asia, with the next closest competitor contributing approximately 15% of regional GMV.

  - As there are a diverse range of transportation options in Southeast Asia, we face competitive pressures from other players in the private transportation sector, affordable public transportation and vehicle ownership.

- *Financial Services*: We operated the largest e-wallet by total payments volume in Southeast Asia in 2020 according to Euromonitor's estimates, with an extensive suite of financial services licenses across our markets. We have substantially increased the breadth of our payments business, and in the first half of 2021, almost 40% of GrabPay transaction volumes took place outside of our platform. Examples of these off-platform transactions include: QR scan-enabled instore payments, online payments on

275

e-commerce and other platforms, airtime (mobile credit) top-ups, bill payments, P2P transfers, insurance premium payments and remittance.

- With various types of companies offering e-wallet payment services, the e-wallet industry in Southeast Asia is highly competitive, and traditional payment methods still remain very relevant and widely-used.

| Segment | Euromonitor estimated regional category share in 2020 | | Grab's share relative to next largest competitor |
|---|---|---|---|
| | Grab | Next closest competitor | |
| Online food delivery | 50% | 20% | 2.5X |
| Ride hailing | 72% | 15% | 4.8X |
| E-wallet | 23% | 14% | 1.6X |

*Source: Euromonitor International estimates from desk research and trade interviews with leading market players and relevant industry stakeholders in the prepared meal, ride hailing and e-wallet sectors*

Our brand is closely associated with quality, reliability, safety and convenience in the minds of the Southeast Asian consumers that seek to access services offered through our platform. For example, in a consumer survey on online food delivery services conducted by Euromonitor across six Southeast Asian countries, GrabFood was found to be the top brand that came to consumers' mind when thinking about online food delivery service providers, with 44% of consumers naming the brand unprompted, and 36% of the respondents from the same survey also selected GrabFood as the online food delivery platform that they use most frequently, ahead of all other regional competitors.

| | % of SEA consumers surveyed by Euromonitor | |
|---|---|---|
| | GrabFood | Next closest competitor |
| Unprompted food delivery brand recall | 44% | 27% |
| Most often used food delivery brand | 36% | 27% |

*Source: Euromonitor International survey in 2021. Base: All respondents who have used online food delivery services in the past 6 months*
Note: SEA includes Singapore, Malaysia, Indonesia, Thailand, the Philippines and Vietnam only

We believe driver- and merchant-partners want to partner with us because of our scale and the strength of our brand, and consumers choose to use our platform first for key everyday needs. We believe our presence, scale and the strength of our brand also makes us the partner of choice for multinational corporations that are looking to accelerate growth of their businesses in Southeast Asia. For example, we have developed a number of highly successful corporate partnerships with leading multinational companies including Heineken, Marriott International, Mastercard, Singapore Airlines, Unilever and Watsons, and we have strong relationships with top Southeast Asian companies including Ayala Land, Central Group and LinkAja.

**Our Business Model**

Our platform connects millions of consumers with millions of driver- and merchant-partners to facilitate interaction and trade between these stakeholders. We generate the majority of our revenue from service fees and commissions paid by driver- and merchant-partners for use of the Grab superapp to connect them with consumers and facilitate transactions. Based on service agreements with driver- and merchant-partners, we retain the applicable fee or commission from the fare or order and related charges that we collect on behalf of the driver- and merchant-partners.

We offer various incentives to our driver- and merchant-partners, which are deducted from the fees normally received from driver- or merchant-partners (typically being a percentage of the fare paid by the

276

consumer to the driver- or merchant-partner) and such incentives may sometimes exceed Grab's fee from a particular transaction. Excess incentives refer to payments made to driver- and merchant-partners that exceed the amount of commissions and fees earned by Grab from those driver- and merchant-partners. We also offer consumer incentives. All of the foregoing incentives are recorded as reductions in revenue. We also generate revenue from payment processing services transaction fees charged to merchant-partners.

Set forth below are descriptions of our business model by segment.

*Deliveries.* Our deliveries platform connects driver- and merchant-partners with consumers to create a localized logistics platform, facilitating on-demand and scheduled delivery of a wide variety of daily necessities, including ready-to-eat meals and groceries, as well as point-to-point package delivery. This segment includes GrabFood, GrabKitchen, GrabMart, GrabExpress, and GrabKios.

The graphic below illustrates the economics of a typical deliveries order:



*Consumer Economics:* The consumer pays the total dollar value of goods ordered, delivery fee, and platform and other fees, which is partially offset by a promotion given. In the example above, the GMV of the consumer's delivery order is $27.60, consisting of the following components:

- The dollar value of goods ordered: $24.00;

- Delivery fee: $3.40; and

- Platform and other fees: $0.20.

*Merchant-partner Economics:* We charge our merchant-partners a commission by applying an agreed-upon commission to the total dollar value of goods ordered. Merchant-partners receive the dollar value of goods ordered as well as any incentives, net of the Grab commission. In the example above, the merchant receives $20.00.

277

**Table of Contents**

*Driver-partner Economics:* The driver-partners receive the delivery fee, and we may charge a commission in certain markets. In the example above, the driver-partner receives $4.60, which consists of the delivery fee and incentives.

*Grab Economics:* We retain the commission paid by merchant-partners and driver-partners. In the example above, we would retain $1.00 in total, of the $5.00, after accounting for partner incentives of $2.00 and consumer incentives of $2.00.

*Platform and Other fees:* Platform fees are ultimately borne by the driver-partner for benefits that they receive from utilizing our offerings. We collect the platform fees from consumers on behalf of driver-partners which enables us to maintain and enhance safety measures, costs for platform improvements and support our driver-partner's welfare. Other fees include a small order fee which is the difference between the order amount and the minimum order quantity when the goods ordered are less than the specified minimum order amount.

***Mobility.*** Our mobility offerings connect consumers with rides provided by driver-partners across a wide variety of multi-modal mobility options including private cars, taxis, motorcycles (in certain countries), and shared mobility options, such as carpooling. This segment includes GrabCar, GrabTaxi, JustGrab, GrabBike, three-wheel vehicles, GrabShare, and GrabRentals. Through GrabRentals, we utilize Grab's fleet of cars to provide one-stop car rental to driver-partners at affordable rates.

The graphic below illustrates the economics of a typical ride:



**Consumer**

| | |
|---|---|
| Cost of Ride | $13.00 |
| Tolls and Other Fees | $0.80 |
| Grab Platform Fee | $0.20 |
| **GMV (Total before incentives)** | **$14.00** |
| Consumer Incentives | $(1.00) |
| **Consumer pays** | **$13.00** |

**Driver-Partner**

| | |
|---|---|
| **GMV (Total before incentives)** | **$14.00** |
| *including Grab Platform Fee* | *$0.20* |
| *including Consumer Incentives* | *$1.00* |
| **Commissions** | **$(2.60)** |
| Driver-Partner Incentives | $1.00 |
| **Driver-Partner Receives** | **$12.40** |

**Grab**

| | |
|---|---|
| **GMV (Total before incentives)** | **$14.00** |
| **Commissions** | **$2.60** |
| Driver-Partner Incentives | $(1.00) |
| Consumer Incentives | $(1.00) |
| **Revenue** | **$0.60** |

278

**Table of Contents**

*Consumer Economics:* The consumer pays the total dollar value of the ride, including any tolls (tolls are collected by us from the consumer and remitted directly to the driver-partner who paid for the initial toll), tips, and other platform fees, which is partially offset by an incentive given. In the example above, the consumer pays $13.00. The GMV of the consumer's ride is $14.00, consisting of the following components:

- The dollar value of the ride: $13.00;

- Tolls and other fees: $0.80; and

- Platform fee: $0.20.

*Driver-partner Economics:* The driver-partner receives the value of the ride, including tolls and other platform fees, and incentives, net of the Grab commission. Commissions are based on an agreed-upon rate based on the cost of the ride. In the example above, the driver-partner earns $12.40.

*Grab Economics:* We retain the commission earned from the journey. In the example above, Grab earns $0.60 after accounting for partner incentives of $1.00 and consumer incentives of $1.00.

***Financial Services*** Our financial services offerings include digital solutions to address the financial needs of our driver- and merchant-partners and consumers, including digital payments, lending, receivables factoring, insurance and wealth management. This segment includes GrabPay, GrabRewards, GrabFinance, GrabInsure, GrabInvest, and OVO. The financial results of OVO, which is a leading Indonesian digital payments and smart financial services business, are consolidated in our financial results and included in our financial services segment. We are also in the process of launching our digital bank in Singapore after being selected for the award of a digital full bank license by the Monetary Authority of Singapore.

Merchant-partners that have entered into contractual agreements with Grab pay us a commission fee, based on transaction volumes, to support the GrabPay e-wallet services we provide or facilitate for merchant-partners and consumers. Inter-company revenue generated from on-platform payments, together with the corresponding costs charged to other Grab segments, is eliminated when we consolidate our financial results. Consumer incentives and consumer rewards are recorded as reductions in revenue (and not as expense), and therefore in the past, we have recorded negative revenues from financial services for certain periods.

We also generate revenue from other financial services, namely lending, insurance, wealth management, and others. For lending and receivables factoring, we generate revenue primarily based on the interest income we receive from the loans we extend to borrowers and from the factoring fee or discount when we purchase the receivables. For other financial services, we generate revenue through commissions received from the sale of products and services. We also maintain a rewards program, which helps to increase retention as consumers earn rewards points that can be redeemed on our platform.

***Enterprise and New Initiatives.*** We have a growing suite of enterprise offerings, including GrabAds and GrabDefence, that we are progressively making available to our driver- and merchant-partners and consumers. In addition, this segment includes other lifestyle services offered by third party service providers to consumers through the Grab app, including domestic and home services, flight bookings, hotel bookings, subscriptions and more in certain countries.

GrabAds provides online and offline advertising solutions for brands. We provide GrabAds offerings across three categories—mobile billboards, which turns our fleet of vehicles into roving billboards to generate mass offline awareness, and generates additional income for our driver-partners, in-car engagement and in-app engagement, which includes merchants-featured advertising and other digital content through our Grab superapp. GrabDefence opens our strong suite of in-house fraud detection and prevention technologies to third-party businesses. We generate revenue by directly selling these services to merchants and businesses.

For lifestyle offerings, we earn revenues from commissions charged to service providers in return for selling these services through our platform.

279

**GRAB MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*Unless the context otherwise requires, all references in this section to "we," "us," or "our" refer to Grab and its subsidiaries prior to the Closing.*

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with "Selected Consolidated Financial Data" and our unaudited and audited consolidated financial statements and the related notes and other financial information included elsewhere in this proxy statement/prospectus. In addition to historical consolidated financial information, the following discussion contains forward-looking statements that reflect our plans, estimates, and beliefs that involve risks and uncertainties. Our actual results could differ materially from those discussed in the forward-looking statements as a result of many factors, including those factors set forth in the sections titled "Risk Factors" and "Forward-Looking Statements", which you should review for a discussion of some of the factors that could cause actual results to differ materially from the results described in or implied by the forward-looking statements contained in the following discussion and analysis and elsewhere in this proxy statement/prospectus.*

## Southeast Asia's Leading Superapp

We are Southeast Asia's leading superapp, operating primarily across the deliveries, mobility and digital financial services sectors across eight countries in the region—Malaysia, Singapore, the Philippines, Thailand, Indonesia, Vietnam, Cambodia, and Myanmar. We enable millions of people each day to access driver- and merchant-partners to order food or groceries, hail a ride or taxi, pay for online purchases, or use offerings such as lending, insurance and telemedicine. Our platform allows important high frequency hyperlocal experiences—all available in a single "everyday everything" app. We were the category leader in 2020 by GMV in each of online food delivery and mobility and by TPV in e-wallet payments in Southeast Asia according to Euromonitor.

We operate in over 400 cities in eight countries with over five million registered driver-partners, a wide selection of over two million registered merchant-partners across the region and over two million registered GrabKios agents in Indonesia as of June 2021. According to Euromonitor, we had the region's largest on-demand driver supply network, based on the total number of registered driver-partners in Southeast Asia in 2020, and its largest food delivery network, based on the number of registered food delivery merchant-partners in Southeast Asia in 2020.

## Recent Developments

### *Resilience through COVID-19*

Our well-diversified "everyday everything" app strategy provides us with the flexibility to deploy resources to where demand is highest. For example, our driver-partners can seamlessly service multiple verticals and we have the ability to quickly roll out new offerings to enable them to meet the needs of consumers. During the COVID-19 pandemic, our operational and technology teams were able to adjust to evolving demands. In 2020, we transitioned 237,000 driver-partners from mobility bookings to food, grocery and package delivery, enabling them to continue earning an income. Furthermore, we were able to roll out our GrabMart delivery offering across five new countries (Singapore, Thailand, Vietnam, the Philippines, and Myanmar) in less than three months. We also have a highly variable cost structure, which has allowed us to reduce expenses, in particular sales and marketing, through a sustained downturn without compromising our growth ambitions.

As cities and countries went through lockdowns in 2020 and 2021, we have experienced an acceleration of our deliveries business as stay-at-home, work-from-home and social distancing measures increased the demand for food and grocery delivery services. During periods where lockdowns have eased, we have seen increases in demand for our mobility offerings, demonstrating the resilience of this business.

336

However, the governments in the markets we operate in from time to time continue to implement measures or encourage actions to curb the spread of COVID-19, including new stay-at-home and movement control orders, work-from-home arrangements and social distancing measures as cases spike, and as a result, our business continues to be impacted. The COVID-19 pandemic and government actions to curb the pandemic are constantly evolving, and uncertainty remains with respect to the duration of the pandemic and its impact on our business going forward.

***Key Financial and Operational Highlights for the Three Months Ended September 30, 2021***

The unaudited selected financial and operating data for the three months ended September 30, 2021 and 2020 discussed below has been prepared by Grab's management. KPMG LLP has not audited, reviewed, compiled, or performed any procedures with respect to the financial data, and KPMG LLP expresses no opinion nor any other form of assurance with respect thereto.

Despite tighter movement controls and heightened restrictions across Southeast Asia, we continued to demonstrate resilience across our consolidated business in the three months ended September 30, 2021.

- Revenue was $157 million for the three months ended September 30, 2021, down 9% year-over-year, as a result of the decline in mobility due to the severe lockdowns in Vietnam. Revenue is net of consumer incentives and merchant- and driver-partner incentives.

- Loss for the period for the three months ended September 30, 2021 grew by $366 million to $(988) million and includes $748 million in non-cash items. The non-cash items primarily consists of interest accrued on our convertible redeemable preference shares, equity-settled share-based payment and fair value changes on investments.

- Adjusted EBITDA was $(212) million for the three months ended September 30, 2021, down by $85 million year-over-year. The Adjusted EBITDA margin for the three months ended September 30, 2021 was (5.3)% of GMV. Adjusted EBITDA in the three months ended September 30, 2021 was negatively impacted by a drop in mobility, which had been segment Adjusted EBITDA positive since the three months ended December 31, 2020, as well as an increase in regional corporate costs as we continued to invest in product development and technological investments for the future.

- GMV for the three months ended September 30, 2021 grew 32% year-over-year to reach $4.0 billion. Deliveries GMV grew 63% year-over-year to reach $2.3 billion, which offset a 30% year-over-year decline in mobility GMV due to lockdowns and movement restrictions in many of our markets caused by COVID-19 and the Delta variant.

- MTUs for the three months ended September 30, 2021 declined by 8% year-over-year, as a result of total lockdowns across Vietnam between July and September 2021 which resulted in suspension of both food delivery and ride-hailing services.

- Average spend per user for the three months ended September 30, 2021, defined as GMV per MTU, increased 43% year-over-year.

As of September 30, 2021, we had $5.2 billion of cash liquidity (including $2.7 billion of unrestricted cash, $1.7 billion of time deposits, $495 million of marketable securities and $264 million of restricted cash), an increase of $1.5 billion from $3.7 billion as of December 31, 2020. Our total outstanding debt as of September 30, 2021 was $2.2 billion, a $2.0 billion increase from $212 million as of December 31, 2020, primarily due to the closing of our first senior secured term loan facility, the $2.0 billion Term Loan B Facility, in January 2021.

337

| ($ in millions, unless otherwise stated) | Three Months Ended September 30, | | 2020-2021% Change |
| --- | --- | --- | --- |
| | 2021 | 2020 | |
| **Financial Measures:** | | | |
| Revenue | 157 | 172 | (9)% |
| Loss for the period | (988) | (621) | (59)% |
| Total Segment Adjusted EBITDA (Non-IFRS)[1] | (33) | 10 | NM |
| Adjusted EBITDA (Non-IFRS)[1] | (212) | (128) | (66)% |
| | | | |
| **Operating Metrics:** | | | |
| GMV[2] | 4,038 | 3,061 | 32% |
| MTU[3] (millions of users) | 22.1 | 23.9 | (8)% |
| GMV per MTU ($) | 183 | 128 | 43% |
| Partner incentives[4] | (187) | (132) | 42% |
| Consumer incentives[5] | (271) | (132) | 106% |

Notes:

(1) For a reconciliation to the most directly comparable IFRS measure see the section titled "—Reconciliation of Non-IFRS Financial Measures for the Three Months Ended September 30, 2021 and 2020."

(2) GMV means gross merchandise value, an operating metric representing the sum of the total dollar value of transactions from Grab's services, including any applicable taxes, tips, tolls and fees, over the period of measurement.

(3) MTUs means monthly transacting users, which is defined as the monthly number of unique users who transact via Grab's products, where transact means to have successfully paid for any of Grab's products. MTUs over a quarterly or annual period are calculated based on the average of the MTUs for each month in the relevant period.

(4) Partner incentives represent the dollar value of incentives granted to driver- and merchant-partners, the effect of which is to reduce revenue. The incentives granted to driver- and merchant-partners include base incentives and excess incentives, with base incentives being the amount of incentives paid to driver- and merchant-partners up to the amount of commissions and fees earned by Grab from those driver- and merchant-partners, and excess incentives being the amount of payments made to driver- and merchant-partners that exceed the amount of commissions and fees earned by Grab from those driver- and merchant-partners. Base incentives amounted to $37 million and $36 million, for the three months ended September 30, 2021 and 2020, respectively.

(5) Consumer incentives represent the dollar value of discounts and promotions offered to consumers, the effect of which is to reduce revenue.

### *Segment Highlights*

*Deliveries*

- Revenue for deliveries for the three months ended September 30, 2021 grew 58% year-over-year to $49 million.

- Deliveries Segment Adjusted EBITDA for the three months ended September 30, 2021 of $(22) million improved by $1 million year-over-year. Deliveries Segment Adjusted EBITDA margin was at (0.9)% as a percentage of deliveries GMV, an improvement compared to (1.6)% in the three months ended September 30, 2020.

- GMV for deliveries for the three months ended September 30, 2021 grew 63% year-over-year to $2.3 billion. GrabMart continued to show strong traction, with GMV growing approximately 380% year-over-year.

- We continue to expand our role as an e-commerce enabler, particularly in deliveries. In November, we announced a partnership with Lazada to enable Lazada sellers to provide same-day delivery services

338

for their consumers in Singapore via GrabExpress. We have a similar partnership with Lazada in Indonesia and Malaysia.

• We also announced in November the addition of new major retail chains to GrabMart as we continue to scale up grocery delivery across Southeast Asia. New partners joining GrabMart include convenience store chain, Indomaret in Indonesia, hypermarket chain, Big C in Thailand, supermarket chain Lotus's (formerly known as Tesco) in Malaysia, and S&R supermarket in the Philippines best known for their attractive members-only discounts, and Mega Market in Vietnam, a leading wholesaler and distributor of grocery products.

*Mobility*

• Mobility revenue for the three months ended September 30, 2021 was $88 million, down 26% year-over-year.

• Mobility Segment Adjusted EBITDA for the three months ended September 30, 2021 was $64 million, a 26% decrease year-over-year. Segment Adjusted EBITDA margin for mobility reached 12.0% of GMV, up from 11.4% in the three months ended September 30, 2020.

• GMV for mobility for the three months ended September 30, 2021 declined 30% year-over-year to $529 million, primarily due to increased movement restrictions across the region as a result of COVID-19.

*Financial Services*

• Financial services revenue for the three months ended September 30, 2021 grew by 11% year-over-year to $14 million.

• Financial services Segment Adjusted EBITDA for the three months ended September 30, 2021 was $(76) million, compared to $(58) million in the three months ended September 30, 2020.

• Our financial service segment achieved Pre-Interco TPV of $3.1 billion for the three months ended September 30, 2021, a 44% increase year-over-year.

• The percentage of mobility and deliveries GMV that were transacted via Grab Financial Group products such as GrabPay have increased from 58.5% for the three months ended September 30, 2020 to 69.9% for the three months ended September 30, 2021.

• We have increased our ownership stake in OVO in October 2021, which operates on an open ecosystem platform with a wide range of acceptance points. We believe closer collaboration with OVO will create a stronger financial services platform with an open ecosystem, allowing both companies to expand the suite of financial services they can offer to ecosystem partners as well as increase speed to market.

*Enterprise and New Initiatives*

• Revenue for the segment for the three months ended September 30, 2021 declined by 37% year-over-year to $7 million.

• Enterprise and new initiatives Segment Adjusted EBITDA for the three months ended September 30, 2021 was $1 million, down $4 million year-over-year due to continued reinvestments into growing the merchant-partner base.

• Segment Adjusted EBITDA margin for enterprise and new initiatives for the three months ended September 30, 2021 was 2.1% of GMV, down from 60.3% in the three months ended September 30, 2020.

• GMV for enterprise and new initiatives for the three months ended September 30, 2021 grew 351% year-over-year to $41 million.

339

*Reconciliation of Non-IFRS Financial Measures for the Three Months Ended September 30, 2021 and 2020*

The following tables provide reconciliations of Adjusted EBITDA, Segment Adjusted EBITDA and Total Segment Adjusted EBITDA.

| | For the three months ended Sept 30, | |
|---|---|---|
| ($ in millions, unless otherwise stated) | 2021 | 2020 |
| **Loss for the period** | (988) | (621) |
| Net interest expenses | 472 | 364 |
| Other income | (8) | (5) |
| Income tax expenses | 3 | 5 |
| Depreciation and amortization | 86 | 93 |
| Stock-based compensation expenses | 106 | 37 |
| Unrealized foreign exchange gain | (5) | (8) |
| Impairment losses on goodwill and non-financial assets | * | 20 |
| Fair value changes on investments | 113 | * |
| Restructuring costs | 1 | (6) |
| Legal, tax and regulatory settlement provisions | 8 | (7) |
| **Adjusted EBITDA** | (212) | (128) |
| Regional corporate costs | 179 | 138 |
| **Total Segment Adjusted EBITDA** | (33) | 10 |
| **Segment Adjusted EBITDA** | | |
| Deliveries | (22) | (23) |
| Mobility | 64 | 86 |
| Financial services | (76) | (58) |
| Enterprise and new initiatives | 1 | 5 |
| **Total Segment Adjusted EBITDA** | (33) | 10 |

Note:
*Amountless than $1 million

**Financial and Operational Highlights**

| | Six Months Ended June 30, | | 2021-2020 | Year Ended December 31, | | 2020-2019 |
|---|---|---|---|---|---|---|
| ($ in millions, unless otherwise stated) | 2021 | 2020 | % Change | 2020 | 2019 | % Change |
| **Financial Measures:** | | | | | | |
| Revenue | 396 | 78 | 406% | 469 | (845) | 155% |
| Loss for the period | (1,467) | (1,489) | 1% | (2,745) | (3,988) | 31% |
| Total Segment Adjusted EBITDA (Non-IFRS)[1] | 21 | (285) | NM | (226) | (1,554) | 85% |
| Adjusted EBITDA (Non-IFRS)[1] | (325) | (550) | 41% | (780) | (2,237) | 65% |
| **Operating Metrics:** | | | | | | |
| GMV[2] | 7,522 | 5,858 | 28% | 12,492 | 12,251 | 2% |
| MTU[3] (millions of users) | 24.3 | 24.5 | (1)% | 24.5 | 29.2 | (16)% |
| GMV per MTU ($) | 310 | 239 | 30% | 509 | 419 | 21% |
| Partner incentives[4] | (311) | (364) | (14)% | (621) | (1,234) | (50)% |
| Consumer incentives[5] | (429) | (322) | 33% | (616) | (1,117) | (45)% |

Notes:
(1)    For a reconciliation to the most directly comparable IFRS measure see the section titled "—Reconciliation of Non-IFRS Financial Measures."

340

(2)  GMV means gross merchandise value, an operating metric representing the sum of the total dollar value of transactions from Grab's services, including any applicable taxes, tips, tolls and fees, over the period of measurement.

(3)  MTUs means monthly transacting users, which is defined as the monthly number of unique users who transact via Grab's products, where transact means to have successfully paid for any of Grab's products. MTUs over a quarterly or annual period are calculated based on the average of the MTUs for each month in the relevant period.

(4)  Partner incentives represent the dollar value of incentives granted to driver- and merchant-partners, the effect of which is to reduce revenue. The incentives granted to driver- and merchant-partners include base incentives and excess incentives, with base incentives being the amount of incentives paid to driver- and merchant-partners up to the amount of commissions and fees earned by Grab from those driver- and merchant-partners, and excess incentives being the amount of payments made to driver- and merchant-partners that exceed the amount of commissions and fees earned by Grab from those driver- and merchant-partners. Base incentives amounted to $78 million and $111 million, for the six months ended June 30, 2021 and 2020, respectively, and $178 million and $519 million for the year ended December 31, 2020 and 2019, respectively.

(5)  Consumer incentives represent the dollar value of discounts and promotions offered to consumers, the effect of which is to reduce revenue.



341

The COVID-19 pandemic negatively impacted our operations in 2020. For example, we saw a decline in demand for our mobility offerings starting in March 2020 when the first city and country lockdowns were implemented in our markets. However, the diversification and resilience of our business enabled us to grow despite the COVID-19 pandemic as, for example, demand for deliveries increased as consumption patterns shifted, and our business continued to scale and benefitted from synergies.

Our deliveries, mobility, financial services and enterprise and new initiatives represented (i) 24.8%, 66.4%, 3.5% and 5.3%, respectively, of our revenue in the six months ended June 30, 2021 and (ii) 1.2%, 93.3%, (2.2)% and 7.7%, respectively, of our revenue in the year ended December 31, 2020.

Our revenue growth in 2020 and the six months ended June 30, 2021 was driven by an increase in GMV for the same periods. The revenue growth in 2020 was also driven by a decrease in partner and consumer incentives. Deliveries, mobility, financial services and enterprise and new initiatives represented (i) 50.2%, 19.9%, 29.2% and 0.8%, respectively, of our GMV in the six months ended June 30, 2021 and (ii) 43.8%, 25.9%, 30.0% and 0.4%, respectively, of our GMV in the year ended December 31, 2020.

As of June 30, 2021, we had $5.3 billion of cash liquidity (including $3.3 billion of unrestricted cash, $1.5 billion of time deposits, $264 million of marketable securities and $263 million of restricted cash), an increase of $1.6 billion from $3.7 billion which included $2.0 billion of unrestricted cash, $1.3 billion of time deposits, $250 million of marketable securities and $169 million of restricted cash) as of December 31, 2020. Our total outstanding debt as of June 30, 2021 was $2.1 billion, a $1.9 billion increase from our $212 million outstanding debt as of December 31, 2020, primarily due to the closing of our first senior secured term loan facility, the $2.0 billion Term Loan B Facility, in January 2021.

## Key Factors Affecting Our Performance

### *Our ability to grow and engage platform consumers*

The number of platform consumers, which we measure by MTUs, is a key driver of the activity on our platform and the scale of our business. More consumers accessing offerings on our platform not only drives increased revenue, but contributes to powerful synergies that accelerate with scale. We expect platform consumers to grow as the value offered to them on our platform increases through product innovation, improved user experience, and more offerings. Building on our brand and category leadership across online food delivery, mobility and e-wallet payments, we expect platform consumers to grow organically. We also intend to continue to use promotions to attract consumers to our platform base and to engage MTUs.

We believe platform consumers will increase their usage and spend on services offered through our platform as they discover additional features and offerings, and as they choose to incorporate them more deeply into their daily lives. In addition, we expect usage and spend to increase as we grow our platform, benefiting our driver- and merchant-partners. This is demonstrated by the increase in the average number of offerings used per MTU and GMV per MTU.

### *Our ability to grow driver- and merchant-partners and scope of our offerings*

Our growing base of merchant-partners provides opportunities to drive revenue growth, and our expanding base of driver-partners allows us to benefit from significant cost synergies and economies of scale as we deploy resources more efficiently. Our ability to maintain and grow our merchant-partner base depends in part on our ability to continue to solve mission-critical challenges for our merchant-partners. We therefore continue to invest in our merchant-centric initiatives to enable more small businesses to thrive on our platform. We also plan to continue investing in strengthening our sales force. We have also invested substantially in our technology platform to provide our merchant-partners with the tools they need to thrive in the digital economy.

Additionally, maintaining and continuing to grow our base of driver-partners is critical to delivering a quality experience on our platform. The more driver-partners that we have on our platform, the more deliveries

342

Table of Contents

and rides our driver-partners are able to provide, while maintaining high quality service and low wait times. Our driver-partner loyalty program provides our most engaged driver-partners with a variety of benefits, and we have encouraged our driver-partners to participate in training programs. As of December 2020, more than 550,000 digital literacy certificates had been issued to our driver-partners through GrabAcademy, our online training platform available through the Grab driver-partner app. Finally, we actively listen to our driver-partners' concerns and feedback. Driver-partners' representative committees gather and provide insights on how Grab can further enhance their experience.

We have also created the GrabForGood Fund that will support programs that help to uplift our driver- and merchant-partners' lives, as well as the broader Southeast Asia community. This includes plans to provide free COVID-19 vaccinations for Grab partners who are not covered by a national vaccination program, and initiatives such as subsidized insurance and financial and digital literacy programs that will provide the foundations for social and economic mobility.

We believe that increasing the depth and breadth of our offerings will attract more consumers to our platform and in turn more driver- and merchant-partners to our platform. We intend to enhance our value proposition to driver- and merchant-partners by continuing to evolve the scope of our offerings, increasing the size and engagement of the consumer base to drive greater demand, developing innovative marketing services, and improving the analytics tools available to our partners.

### *Our ability to realize operating leverage on our platform*

Since our founding, we have established numerous touch points with consumers, which allows us to facilitate a broad range of additional services through our platform. We believe we can leverage our platform and ecosystem to roll out new offerings faster than any of our peers. For example, we expanded our food deliveries business across four markets in just three months because of our experience and expertise from building our mobility business in these markets. Similarly, the gross written premiums of our online insurance business more than tripled within three months from its launch in Singapore in April 2019 due to significant demand from our extensive driver-partner base and our distribution platform. Increasing the depth and breadth of offerings on our platform drives the attractiveness of our platform for merchant-partners and consumers.

We foster an ecosystem in which participants engage with each other through our platform. Consumers purchase goods and services from driver- and merchant-partners, and driver- and merchant-partners interact with each other to fulfill delivery orders. Driver- and merchant-partners also purchase financial services directly through our platform and transact across verticals. We believe that this is a unique aspect of our platform, which underpins the strength of our competitive advantage.

During the initial stages of growth, we offered significant incentives and promotions to attract platform consumers as well as incentives to attract driver- and merchant-partners, and conducted advertising activities to enhance our brand awareness. We also invested in research and development and other operating expenses to support the growth of our platform. Going forward, with increasing scale and synergies on our platform, we expect to enjoy economies of scale, which we expect will allow us to more efficiently and cost effectively acquire new platform consumers and engage existing consumers.

### *Our ability to invest effectively in technology and research and development*

We have made, and will continue to make, significant investments in research and development and technology to improve our platform to attract and retain driver- and merchant-partners, and consumers, expand the capabilities and scope of our offerings, and enhance the consumer experience.

Our engineers and data scientists are critical to the success of our business and we will continue to invest in the best talent in these areas. In addition, we have dedicated and will continue to dedicate significant resources to

research and development efforts, focusing on developing innovative applications and offerings aimed at fulfilling the everyday needs of consumers by enabling merchant-partners to improve their service quality and operational efficiency, as well as advancing our big data and AI capabilities.

### *Our ability to enter into win-win strategic partnerships, investments, and acquisitions*

Since our founding, we have made a number of critical strategic investments and acquisitions to enhance our platform and attract consumers. The most strategic of these was our acquisition of Uber's Southeast Asia operations in 2018, which led to us becoming the category leader by GMV in 2020 for food deliveries and mobility in Southeast Asia according to Euromonitor.

We expect to continue to make strategic investments in, and acquisitions of, other businesses that we believe will expand or enhance the offerings on our platform and attract more merchants and consumers to our platform. We have already acquired an extensive suite of financial services licenses, including payments licenses in six core regional markets, and were recently selected to be a recipient of a digital full bank license in Singapore through a consortium with our partner Singtel.

### *Our ability to continue to reduce driver- and merchant-partner and consumer incentives*

We offer various incentives to our driver- and merchant-partners that are deducted from the fees received from driver- or merchant-partners (typically being a percentage of the fare paid by the consumer to the driver- or merchant-partner). We also offer consumer incentives that reduce the amount payable by a consumer to driver- or merchant-partners. The incentives that we offer to driver- and merchant-partners and consumers for a transaction may sometimes exceed Grab's fees and commissions from a particular transaction, and may in aggregate sometimes exceed Grab's aggregate fees and commissions in a particular reporting period.

Grab's revenues are reported net of partner and consumer incentives, so if incentives exceed Grab's commissions and fees received, it can result in Grab reporting negative revenue. For the years ended December 31, 2019 and 2020 and the six months ended June 30, 2021, Grab incurred incentives of $2,351 million, $1,237 million and $740 million, respectively (comprised of partner incentives of $1,234 million, $621 million, and $311 million, respectively, and consumer incentives of $1,117 million, $616 million and $429 million, respectively) resulting in reductions to Grab's reported revenues of the same amounts, which in the case of the year ended December 31, 2019 resulted in Grab reporting negative revenues of $(845) million. Notwithstanding Grab's use of significant incentive payments to encourage use of its platform, Grab's monthly transacting users nevertheless declined from approximately 29.2 million in the year ended December 31, 2019 to approximately 24.5 million for the year ended December 31, 2020, and thereafter remained relatively stagnant at approximately 24.3 million for the six months ended June 30, 2021. The decline in monthly transacting users during the year ended December 31, 2020 was primarily driven by a decrease in users of Grab's mobility services as a result of various degrees of COVID-19 related travel restrictions imposed across Southeast Asia.

The incentives that Grab provides to its partners and consumers represented a higher proportion of our GMV during the initial stages of growth of our business. For example in 2019, incentives accounted for $2.1 billion (24% of GMV) across mobility and deliveries segment whereas in 2020 and the first half of 2021, this number dropped to $1.2 billion (13% of GMV) and $668 million (13% of GMV), respectively. This is due to both reduced incentive spend over time as well as growth in GMV in the respective segments. As our platform grows, we have been able to take advantage of the synergies of our platform and more effectively use incentives to encourage the use of our platform and acquire driver- and merchant-partners on to our platform over time, leading to an increase in revenue as a percentage of GMV in 2020. However, from time to time we may also increase incentives due to competitive factors in a particular country or area.

We expect that our ability to successfully reduce the amount of incentives paid to driver- and merchant-partners and consumers over time relative to the commissions and fees we receive will likely impact our ability to increase revenues, raise capital, reduce net losses and achieve profitability and reduce net cash outflows. In

344

addition, future decreases in the use of incentives could also result in decreased growth in the number of users and driver- and merchant-partners or an overall decrease in users and driver- and merchant-partners, which could negatively impact our financial condition and results of operations.

### *The impact of government policies and regulations in the markets in which we operate*

We operate across the deliveries, mobility and financial services segments in the Southeast Asia region. Each of our businesses is subject to government regulation in each jurisdiction in which we operate. Regulations have impacted or could impact, among others, the nature of and scope of offerings we are able to make available through our platform, the pricing of offerings on our platform, our relationship with, and incentives, fees and commissions provided to or charged from, driver- and merchant-partners, incentives provided to consumers, our ability to operate in certain segments of our business, our ownership percentage in operating entities that may be subject to foreign ownership restrictions and insurance we are required to maintain. We expect that our ability to manage our relationships with regulators in each of our markets, as well as existing and evolving regulations will continue to impact our results in the future.

### Components of Results of Operations

### *Revenue*

We primarily generate revenue from commissions and fees for our deliveries, mobility and financial services offerings. Revenue is presented net of driver-partner, merchant-partner and consumer incentives, which could result in negative revenue where these amounts exceed Grab's commissions and fees. We act as an agent in connecting our driver- and merchant-partners to consumers. For further details on our revenue recognition, see "— Significant Accounting Policies—Revenue."

### *Business Segments*

- *Deliveries*. We primarily generate revenue from commissions and other fees from driver- and merchant-partners. We also generate revenue from order, platform, delivery and other fees. Our revenue from the deliveries segment is recognized net of driver-partner, merchant-partner and consumer incentives, and is recognized when the product is successfully fulfilled and delivered to the consumer. We earn GrabKios revenues through commissions charged as a percentage of the value of transactions through GrabKios agents.

- *Mobility*. We primarily generate revenue from commissions paid by driver-partners and platform fees from consumers for the use of our platform. Our revenue from the mobility segment is recognized net of driver-partner and consumer incentives and we recognize revenue upon the completion of each booking. We also generate other revenue through rental fees paid by driver-partners from our GrabRentals offering.

- *Financial Services*. We primarily generate revenue from transaction and commission fees. For payment services, we generate revenue from transaction fees from merchant-partners and transaction platforms based on a percentage of transaction volumes. We also generate revenue from non-payments related financial services, namely lending, insurance, wealth management, and other financial services. For lending and receivables factoring, we generate revenue primarily based on the interest income we receive from the loans we extend and from the factoring fee or discount when we purchase the receivables. For other financial services, we generate revenue through commissions received from the provision of the service.

- *Enterprise and New Initiatives*. Our enterprise revenues primarily consist of advertising revenue earned from our GrabAds offering and licensing fees for our other enterprise offerings such as GrabDefence. We generate other revenue from lifestyle and other offerings, through the commissions that we receive when such services are sold through our platform.

345

*Cost of Revenue*

Cost of revenue comprises expenses directly or indirectly attributable to our deliveries, mobility, financial services and enterprise and new initiatives offerings and primarily consists of data management and platform related technology costs including amortization of technology and market activity related intangible assets, compensation costs (including share-based compensation) for operations and support personnel, payment processing fees, costs incurred in relation to our motor vehicle fleet used for rental services (including depreciation and impairment) and costs incurred for certain deliveries transactions where we are primarily responsible for delivery services and pay delivery driver-partners for their services provided.

We expect that operation costs will increase on an absolute dollar basis in tandem with the growth of our businesses for the foreseeable future as we continue to invest and broaden our offerings and scale our operations. To the extent we are successful in becoming more efficient in supporting platform users and partners, we expect cost of revenue as a percentage of revenue to decrease.

*Other Income*

Other income includes income earned from government grants and other miscellaneous income.

*Sales and Marketing Expenses*

Sales and marketing expenses primarily consist of advertising costs, compensation costs (including share-based compensation) to sales and marketing employees and allocation of associated corporate costs. These costs are recognized as incurred.

We plan to continue to invest in sales and marketing expenses to attract and retain platform users and increase our brand awareness. We expect that, in the long-term, our sales and marketing expenses will decrease as a percentage of revenue.

*General and Administrative Expenses*

General and administrative expenses primarily consist of compensation costs (including share-based compensation) for executive management and administrative personnel (including finance and accounting, human resources, policy and communications, legal, facility and general administration employees), occupancy and facility costs, administrative fees, professional service fees, depreciation on certain administration assets, legal settlement accrual and allocation of associated corporate costs.

We expect that general and administrative expenses as a percentage of revenue will decrease in the longer term as our business achieves scale. However, in the short-term, we expect to incur additional expenses as a result of operating as a public company, including expenses to comply with the rules and regulations applicable to companies listed on a national securities exchange, expenses related to compliance and reporting obligations pursuant to the rules and regulations of the Securities and Exchange Commission, as well as higher expenses for general and director and officer insurance, investor relations, and professional services.

*Research and Development Expenses*

Research and development expenses primarily consist of compensation cost (including share-based compensation) to engineering, design and product development employees and allocation of associated corporate costs.

*Net Impairment Losses on Financial Assets*

Net impairment losses on financial assets relate to impairment losses in respect of trade receivables and loans and advances to driver- and merchant-partners.

346

*Other Expenses*

Other expenses mainly include goodwill impairment.

*Net Finance Costs*

Net finance costs primarily consist of interest expense on our outstanding debt instruments, partially offset by interest earned on debt investments and cash and cash equivalents, coupled with the fair value gain or loss on the debt instruments. Net finance costs also include accrued interest on redeemable convertible preference shares, which will convert into GHL Class A Ordinary Shares upon the consummation of the Business Combination. Additionally, net finance costs include the foreign currency gain or loss on financial assets and financial liabilities.

*Share of Loss of Equity-Accounted Investees (Net of Tax)*

Share of loss of equity-accounted investees (net of tax) relates to Grab's share of the results of our investments in associates and joint ventures.

*Income Tax (Expense)/Credit*

We are subject to income taxes in the jurisdictions in which we do business. These foreign jurisdictions have different statutory tax rates. Accordingly, our effective tax rate will vary depending on the relative proportion of income derived in each jurisdiction, use of tax credits, changes in the valuation of our deferred tax assets, and liabilities and changes in tax laws.

**Results of Operations**

The following table summarizes our consolidated statements of profit or loss for each of the periods presented:

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2020 | 2019 |
| **Revenue** | **396** | **78** | **469** | **(845)** |
| Cost of revenue | (507) | (496) | (963) | (1,320) |
| Other income | 16 | 16 | 33 | 14 |
| Sales and marketing expenses | (105) | (77) | (151) | (238) |
| General and administrative expense | (243) | (163) | (326) | (304) |
| Research and development expenses | (167) | (135) | (257) | (231) |
| Net impairment losses on financial assets | (10) | (27) | (63) | (56) |
| Other expenses | * | (6) | (40) | (30) |
| **Operating loss** | **(620)** | **(810)** | **(1,298)** | **(3,010)** |
| **Net finance costs** | **(840)** | **(677)** | **(1,437)** | **(971)** |
| Share of loss of equity-accounted investees (net of tax) | (4) | (4) | (8) | * |
| **Loss before income tax** | **(1,464)** | **(1,491)** | **(2,743)** | **(3,981)** |
| Income tax (expense)/credit | (3) | 2 | (2) | (7) |
| **Loss for the period** | **(1,467)** | **(1,489)** | **(2,745)** | **(3,988)** |

Note:
*Amounts less than $1 million

**Comparison of the Six Months Ended June 30, 2021 and 2020**

*Revenue*

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **Revenue** | **396** | **78** |
| Deliveries | 98 | (76) |
| Mobility | 263 | 175 |
| Financial Services | 14 | (19) |
| Enterprise and New Initiatives | 21 | (2) |

*Revenue by segment*



Our revenue increased by $317 million to $396 million in the six months ended June 30, 2021 from $78 million in the six months ended June 30, 2020.

Revenue is presented net of base incentives, excess incentives and consumer incentives. Base incentives were $78 million and $111 million in the six months ended June 30, 2021 and 2020, respectively. Excess incentives were $233 million and $252 million in the six months ended June 30, 2021 and 2020, respectively, and consumer incentives were $429 million and $322 million in the six months ended June 30, 2021 and 2020, respectively.

Deliveries revenue was $98 million for the six months ended June 30, 2021 compared to $(76) million for the six months ended June 30, 2020. These increases were driven by an increase in deliveries GMV of 54%, or $1.3 billion, to $3.8 billion in the six months ended June 30, 2021 compared to $2.4 billion in the six months ended June 30, 2020, driven primarily by increasing consumer demand and number of merchant-partners using our platform. The increased demand for deliveries was driven by stay-at-home and movement control orders, work-from-home arrangements and social distancing measures implemented as a result of the COVID-19 pandemic in our markets. We were also able to utilize our driver-partners providing mobility services to support and meet the increasing demand for delivery services. Deliveries revenue as a percentage of deliveries GMV improved as we gained network efficiency in our driver-partner base, and were able to improve our overall value proposition in terms of merchant selection, delivery performance and application experience on our superapp

**Table of Contents**

platform. Our partner incentives were $262 million and $251 million for the six months ended June 30, 2021 and 2020, respectively. Our consumer incentives were $323 million and $211 million for the six months ended June 30, 2021 and 2020, respectively. We increased our consumer incentives during the six months ended June 30, 2021 to maintain the strong growth momentum in our deliveries GMV and market share, with the increase in consumer incentives of 53% slightly below the 54% increase in our deliveries GMV.

Mobility revenue increased by $88 million to $263 million for the six months ended June 30, 2021 compared to $175 million for the six months ended June 30, 2020, which was primarily due to ride hailing revenue increasing by $87 million and rental income from motor vehicles increasing by $1 million. The increase in revenue was primarily due to the reduction of driver-partner incentives and fees and consumer incentives, despite a decrease in ride hailing demand, which was adversely impacted by the COVID-19 pandemic, as reflected by the decrease in GMV for mobility. Our incentives decreased by $83 million (comprised of decreases of $61 million in partner incentives and $23 million in consumer incentives) to $82 million (comprised of $48 million in partner incentives and $34 million in consumer incentives) for the six months ended June 30, 2021 compared to $166 million (comprised of $109 million in partner incentives and $57 million in consumer incentives) for the six months ended June 30, 2020, which resulted in a corresponding increase in our mobility revenue, as we reduced incentives in the face of the COVID-19 pandemic. The COVID-19 pandemic and the associated stay-at-home and movement control orders, work-from-home arrangements and social distancing measures, as well as border closures and travel restrictions, had a negative impact on mobility demand, and accordingly also on mobility GMV, though mobility GMV for the six months ended June 30, 2021 only decreased slightly to $1.5 billion as compared to mobility GMV of $1.6 billion for the six months ended June 30, 2020 as a result of the six month period ended June 30, 2020 reflecting the gradual onset of the COVID-19 pandemic while the six months ended June 30, 2021 reflected the effects of the ongoing COVID-19 pandemic throughout the entire period. In addition, in order to comply with social distancing requirements and improve safety, we suspended our GrabShare offering and temporarily suspended our GrabHitch offering. The increase in rental income from motor vehicles was due to increased demand from corporate users. Mobility revenue as a percentage of mobility GMV increased from 11% in the six months ended June 30, 2020 to 18% in the six months ended June 30, 2021, as we continued to reduce partner and consumer incentives.

Financial services revenue improved to $14 million in the six months ended June 30, 2021, compared to $(19) million in the six months ended June 30, 2020. The increase was primarily due to optimization in the issuance of free OVO points and growth in our GrabPay e-wallet business as consumers increased online spending and increased usage of the GrabPay as cashless transactions increased, in each case driven primarily by changing consumer preferences resulting from the COVID-19 pandemic and an increase in merchant-partners acceptance of GrabPay.

Enterprise and new initiatives revenue increased by $22 million to $21 million in the six months ended June 30, 2021 compared to $(2) million in the six months ended June 30, 2020. The increase was primarily due to the growth of GrabAds and other services in the six months ended June 30, 2021.

*Cost of revenue*

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | 2020-2021 % Change |
|---|---|---|---|
| | **2021** | **2020** | |
| Cost of revenue | 507 | 496 | 2% |

Cost of revenue increased by $11 million, or 2%, to $507 million in the six months ended June 30, 2021 from $496 million in the six months ended June 30, 2020, primarily due to higher staff costs associated with an increase in headcount, which was partially offset by lower depreciation of fixed assets and amortization of intangible assets.

349

*Sales and marketing expenses*

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | 2020-2021 % Change |
|---|---|---|---|
| | **2021** | **2020** | |
| Sales and marketing expenses | 105 | 77 | 36% |

Sales and marketing expenses increased by $28 million, or 36%, to $105 million in the six months ended June 30, 2021 from $77 million in the six months ended June 30, 2020. The increase was due to the increase in media and direct marketing activities in response to changes in consumers' preferences during the COVID-19 pandemic.

*General and administrative expenses*

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | 2020-2021 % Change |
|---|---|---|---|
| | **2021** | **2020** | |
| General and administrative expenses | 243 | 163 | 48% |

General and administrative expenses increased by $79 million, or 48%, to $243 million in the six months ended June 30, 2021 from $163 million in the six months ended June 30, 2020. This was primarily due to higher professional fees relating to mergers and acquisitions, and corporate initiatives, and higher staff compensation cost with the expansion of our operations.

*Research and development expenses*

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | 2020-2021 % Change |
|---|---|---|---|
| | **2021** | **2020** | |
| Research and development expenses | 167 | 135 | 23% |

Research and development expenses increased by $31 million, or 23%, to $167 million in the six months ended June 30, 2021, primarily due to the increase in personnel-related compensation from incentives such as bonus and equity compensation.

*Net impairment losses on financial assets*

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | 2020-2021 % Change |
|---|---|---|---|
| | **2021** | **2020** | |
| Net impairment losses on financial assets | 10 | 27 | (63)% |

Net impairment losses on financial assets decreased by $17 million, or 63%, to $10 million in the six months ended June 30, 2021, primarily driven by lower provision for bad debts with the transition towards electronic wallets.

350

Table of Contents

*Other expenses*

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | 2020-2021 % Change |
|---|---|---|---|
| | **2021** | **2020** | |
| Other expenses | * | 6 | NM |

Note:
*Amounts less than $1 million

Other expenses decreased by $6 million to less than $1 million in the six months ended June 30, 2021, due to a reduction in loss on disposal of fixed assets.

*Net finance costs*

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | 2020-2021 % Change |
|---|---|---|---|
| | **2021** | **2020** | |
| Net finance costs | 840 | 677 | 24% |

Net finance costs increased by $162 million, or 24%, to $840 million in the six months ended June 30, 2021. The increase in net finance costs was primarily due to a higher interest incurred as a result of the issuance of additional convertible redeemable preference shares and secured term loan, and interest accretion. For the six months ended June 30, 2021, the Company issued $262 million of convertible redeemable preference shares with a net increase in finance costs by $157 million from higher interest accretion.

**Comparison of the Years Ended December 31, 2020 and 2019**

*Revenue*

| ($ in millions, unless otherwise stated) | Year Ended December 31, | |
|---|---|---|
| | **2020** | **2019** |
| **Revenue** | **469** | **(845)** |
| Deliveries | 5 | (638) |
| Mobility | 438 | 9 |
| Financial Services | (10) | (229) |
| Enterprise and New Initiatives | 36 | 13 |

351

*Revenue by segment*



| ($ in millions, unless otherwise stated) | Year Ended December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Singapore | 246 | (30) |
| Malaysia | 91 | 92 |
| Vietnam | 76 | (26) |
| Rest of Southeast Asia | 56 | (881) |
| | 469 | (845) |

Our revenue increased by $1.3 billion, to $469 million in 2020 from $(845) million in 2019.

Revenue is presented net of base incentives, excess incentives and consumer incentives. Base incentives were $178 million and $519 million in 2020 and 2019, respectively. Excess incentives were $443 million and $715 million in 2020 and 2019, respectively, and consumer incentives were $616 million and $1.1 billion in 2020 and 2019, respectively.

Deliveries revenue was $5 million in 2020 compared to revenue of $(638) million in 2019. These increases were driven by an increase in deliveries GMV of 86%, or $2.5 billion, to $5.5 billion in 2020 compared to $2.9 billion in 2019, driven primarily by increasing consumer demand and number of merchant-partners using our platform. Demand was driven by growth in digitalization resulting from stay-at-home and movement control orders, work-from-home arrangements and social distancing measures implemented as a result of the COVID-19 pandemic in our markets. We were also able to utilize our driver-partners providing mobility services to support and meet the increasing demand for delivery services. Deliveries revenue as a percentage of deliveries GMV improved as we gained network efficiency in our driver-partner base, and were able to improve our overall value proposition in terms of merchant selection, delivery performance and application experience on our superapp platform. In addition, the increase in revenue was also due to the reduction of driver- and merchant-partner and consumer incentives. Our partner incentives were $466 million and $477 million in 2020 and 2019, respectively. Our consumer incentives were $437 million and $483 million in 2020 and 2019, respectively.

Mobility revenue increased by $429 million, to $438 million in 2020 compared to $9 million in 2019, which was primarily due to ride hailing revenue increasing by $474 million, partially offset by decrease in rental income from motor vehicles of $45 million. The increase in revenue was primarily due to the reduction of driver-partner incentives and fees and consumer incentives, despite a decrease in ride hailing demand, which was

adversely impacted by the COVID-19 pandemic, as reflected by the decrease in GMV for mobility. Our incentives decreased by $887 million (comprised of decreases of $592 million in partner incentives and $294 million in consumer incentives) to $251 million (comprised of $151 million in partner incentives and $100 million in consumer incentives) for the year ended December 31, 2020 compared to $1,137 million (comprised of $743 million in partner incentives and $394 million in consumer incentives) for the year ended December 31, 2019, which resulted in a corresponding increase in our mobility revenue, as we reduced incentives in the face of the COVID-19 pandemic. The COVID-19 pandemic and the associated stay-at-home and movement control orders, work-from-home arrangements and social distancing measures, as well as border closures and travel restrictions, which started in 2020, had a negative impact on mobility demand, and accordingly also on mobility GMV, in 2020. As a result of the effects of the COVID-19 pandemic, GMV for mobility decreased to $3.2 billion in 2020 compared to $5.7 billion in 2019. In addition, in order to comply with social distancing requirements and improve safety, we suspended our GrabShare offering and temporarily suspended our GrabHitch offering. The decrease in rental income was due to reduced demand for mobility offerings. Mobility revenue as a percentage of mobility GMV increased from 0% in 2019 to 14% in 2020, as we continued to reduce partner and consumer incentives and our reliance on such incentives to maintain and grow our driver-partner and consumer base.

Financial services revenue improved to $(10) million in 2020, compared to $(229) million in 2019. The increase was primarily due to optimization on reduction in free OVO points issuance coupled with growth in our GrabPay e-wallet business as consumers increased online spending and increased usage of the GrabPay and OVO wallets as cashless transactions increased, in each case driven primarily by changing consumer preferences resulting from the COVID-19 pandemic and an increase in merchant-partners acceptance of GrabPay.

Enterprise and new initiatives revenue increased by $23 million, or 178%, to $36 million in 2020 compared to $13 million in 2019. The increase was primarily due to the introduction of GrabAds through the second half of 2019 and early 2020.

*Cost of revenue*

| ($ in millions, unless otherwise stated) | Year Ended December 31, | | 2019-2020 |
| --- | --- | --- | --- |
| | **2020** | **2019** | **% Change** |
| Cost of revenue | 963 | 1,320 | (27)% |

Cost of revenue decreased by $357 million, or 27%, to $963 million in 2020 from $1.3 billion in 2019, primarily due to the $274 million reduction in the amortization of intangible assets, on a reducing balance basis, relating to our non-compete agreement with Uber. The remaining cost improvement was due to optimization of technology costs, lower processing fees and impairment costs.

*Other income*

| ($ in millions, unless otherwise stated) | Year Ended December 31, | | 2019-2020 |
| --- | --- | --- | --- |
| | **2020** | **2019** | **% Change** |
| Other income | 33 | 14 | 136% |

Other income increased by $19 million or 136% to $33 million in 2020 from $14 million in 2019. The increase was due to wage reimbursements from various governments due to the COVID-19 pandemic.

**Table of Contents**

*Sales and marketing expenses*

| ($ in millions, unless otherwise stated) | Year Ended December 31, | | 2019-2020 |
| --- | --- | --- | --- |
| | **2020** | **2019** | **% Change** |
| Sales and marketing expenses | 151 | 238 | (37)% |

Sales and marketing expenses decreased by $87 million, or 37%, to $151 million in 2020 from $238 million in 2019. The reduction is mainly driven by an overall reduction in media and direct marketing activities due to the impact of the COVID-19 pandemic.

*General and administrative expenses*

| ($ in millions, unless otherwise stated) | Year Ended December 31, | | 2019-2020 |
| --- | --- | --- | --- |
| | **2020** | **2019** | **% Change** |
| General and administrative expenses | 326 | 304 | 7% |

General and administrative expenses increased by $22 million, or 7%, to $326 million from 2019 to 2020 primarily due to higher professional fees relating to mergers and acquisitions, litigation provisions and higher staff compensation cost as a result of higher headcount as we expanded our operations.

*Research and development expenses*

| ($ in millions, unless otherwise stated) | Year Ended December 31, | | 2019-2020 |
| --- | --- | --- | --- |
| | **2020** | **2019** | **% Change** |
| Research and development expenses | 257 | 231 | 11% |

Research and development expenses increased by $26 million, or 11%, to $257 million in 2020, primarily due to the increase in personnel-related compensation from increased research and development headcount to support innovation, coupled with a decrease in capitalized research and development expenses for qualified development projects during 2020 compared to 2019.

*Net impairment losses on financial assets*

| ($ in millions, unless otherwise stated) | Year Ended December 31, | | 2019-2020 |
| --- | --- | --- | --- |
| | **2020** | **2019** | **% Change** |
| Net impairment losses on financial assets | 63 | 56 | 13% |

Net impairment losses on financial assets increased by $7 million, or 13%, to $63 million in 2020, primarily driven by increased provision for bad debts as a result of the COVID-19 pandemic.

*Other expenses*

| ($ in millions, unless otherwise stated) | Year Ended December 31, | | 2019-2020 |
| --- | --- | --- | --- |
| | **2020** | **2019** | **% Change** |
| Other expenses | 40 | 30 | 33% |

Other expenses increased by $10 million, or 33%, to $40 million in 2020, due to an increase in goodwill impairment.

354

*Net finance costs*

| ($ in millions, unless otherwise stated) | Year Ended December 31, | | 2019-2020 |
|---|---|---|---|
| | **2020** | **2019** | **% Change** |
| Net finance costs | 1,437 | 971 | 48% |

Net finance costs increased by $466 million, or 48%, to $1.4 billion in 2020. The increase in net finance costs was primarily due to higher interest incurred as a result of the issuance of additional convertible redeemable preference shares, net change in fair value of financial assets and impairment loss and change in fair value on investments in associates. In 2020, the Company issued $1.4 billion of convertible redeemable preference shares with a net increase in finance costs of $384 million from higher interest accretion.

**Key Non-IFRS Financial Measures**

In addition to the measures presented in our consolidated financial statements, we use the following key non-IFRS financial measures to help us evaluate our business, identify trends affecting our business, formulate business plans, and make strategic decisions.

*Total Segment Adjusted EBITDA*

Total Segment Adjusted EBITDA is a non-IFRS financial measure representing the sum of Segment Adjusted EBITDA of our four business segments. Segment Adjusted EBITDA is a non-IFRS financial measure, representing the Adjusted EBITDA of each of our four business segments, excluding, in each case, regional corporate costs. Total Segment Adjusted EBITDA and Segment Adjusted EBITDA also reflect any applicable exclusions from Adjusted EBITDA. See "Adjusted EBITDA" below. Total Segment Adjusted EBITDA and Segment Adjusted EBITDA each have limitations as financial measures, should be considered as supplemental in nature, and are not meant as a substitute for the related financial information prepared in accordance with IFRS. For a reconciliation of Total Segment Adjusted EBITDA to the most directly comparable IFRS measure see the section titled "—Reconciliation of Non-IFRS Financial Measures."

Regional corporate costs are costs that are not attributed to any of the business segments, including certain regional research and development expenses, general and administrative expenses and marketing expenses. These regional research and development expenses also include mapping and payment technologies and support and development of the internal technology infrastructure. These general and administrative expenses also include certain shared costs such as finance, accounting, tax, human resources, technology and legal costs. Regional corporate costs exclude stock-based compensation expenses. Total Segment Adjusted EBITDA is a useful indicator of the economics of our segments, as it does not include regional corporate costs.

Despite the impact of the COVID-19 pandemic, our mobility business experienced revenue growth in 2020 and the six months ended June 30, 2021, and positive Segment Adjusted EBITDA for the same periods. Meanwhile, our deliveries Segment Adjusted EBITDA is trending positively, driven by the revenue growth experienced by the segment in 2020 and the six months ended June 30, 2021. We expect continued Segment Adjusted EBITDA improvement over the long-term as we continue to scale our business and achieve greater efficiencies in our operating expenses.

*Total Segment Adjusted EBITDA (in $ millions)*



*Adjusted EBITDA*

Adjusted EBITDA is a non-IFRS financial measure calculated as net loss adjusted to exclude: (i) net interest income (expenses), (ii) other income (expenses), (iii) income tax expenses, (iv) depreciation and amortization, (v) stock-based compensation expenses, (vi) costs related to mergers and acquisitions, (vii) unrealized foreign exchange gain (loss), (viii) impairment losses on goodwill and non-financial assets, (ix) fair value changes on investments, (x) restructuring costs and (xi) legal, tax and regulatory settlement provisions.

Adjusted EBITDA has limitations as a financial measure, should be considered as supplemental in nature, and is not meant as a substitute for the related financial information prepared in accordance with IFRS. For a reconciliation of Adjusted EBITDA to the most directly comparable IFRS measure see the section titled "—Reconciliation of Non-IFRS Financial Measures."

Our loss for the period decreased in 2020 and the six months ended June 30, 2021, in line with the positive trend in the Adjusted EBITDA for the same periods.

*Reconciliation of Non-IFRS Financial Measures*

To supplement our financial information, we use the following non-IFRS financial measures: Adjusted EBITDA, Segment Adjusted EBITDA and Total Segment Adjusted EBITDA. However, the definitions of our non-IFRS financial measures may be different from those used by other companies, and therefore, may not be comparable. Furthermore, these non-IFRS financial measures have certain limitations in that they do not include the impact of certain expenses that are reflected in our consolidated financial statements that are necessary to run our business. Thus, these non-IFRS financial measures should be considered in addition to, not as substitutes for, or in isolation from, measures prepared in accordance with IFRS.

We compensate for these limitations by providing a reconciliation of these non-IFRS financial measures to the related IFRS financial measures. We encourage investors and others to review our financial information in its entirety, not to rely on any single financial measure and to view these non-IFRS financial measures in conjunction with their respective related IFRS financial measures.

**Table of Contents**

The following tables provide reconciliations of Adjusted EBITDA, Segment Adjusted EBITDA and Total Segment Adjusted EBITDA.

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, 2021 | 2020 | Year Ended December 31, 2020 | 2019 |
|---|---|---|---|---|
| **Loss for the period** | **(1,467)** | **(1,489)** | **(2,745)** | **(3,988)** |
| Net interest (income) expenses | 864 | 644 | 1,391 | 977 |
| Other (income)/expense | (10) | (7) | (10) | (13) |
| Income tax expense/(credit) | 3 | (2) | 2 | 7 |
| Depreciation and amortization expense | 170 | 195 | 387 | 647 |
| Stock-based compensation expense | 140 | 26 | 54 | 34 |
| Unrealized foreign exchange (gain)/loss | (4) | (2) | * | 4 |
| Impairment losses on goodwill and non-financial assets | 1 | 16 | 43 | 60 |
| Fair value change on investments | (47) | 49 | 57 | 3 |
| Restructuring costs | * | 7 | 2 | 1 |
| Legal, tax and regulatory settlement provisions | 25 | 13 | 39 | 31 |
| **Adjusted EBITDA** | **(325)** | **(550)** | **(780)** | **(2,237)** |
| Regional corporate costs | 346 | 265 | 554 | 683 |
| **Total Segment Adjusted EBITDA** | **21** | **(285)** | **(226)** | **(1,554)** |
| **Segment Adjusted EBITDA** | | | | |
| Deliveries | (24) | (186) | (211) | (809) |
| Mobility | 205 | 108 | 307 | (194) |
| Financial Services | (163) | (191) | (331) | (548) |
| Enterprise and New Initiatives | 3 | (16) | 9 | (3) |
| **Total Segment Adjusted EBITDA** | **21** | **(285)** | **(226)** | **(1,554)** |

Note:

\*      Amount less than $1 million

**Financial Measures by Business Segment**

*Deliveries*

The table below highlights key financial measures for our deliveries segment.

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, 2021 | 2020 | 2020-2021 % Change | Year Ended December 31, 2020 | 2019 | 2019-2020 % Change |
|---|---|---|---|---|---|---|
| Revenue | 98 | (76) | NM | 5 | (638) | NM |
| Segment Adjusted EBITDA[1] | (24) | (186) | 87% | (211) | (809) | 74% |
| *% of GMV* | *(1)%* | *(8)%* | | *(4)%* | *(27)%* | |

Note:

(1)    Segment Adjusted EBITDA is a non-IFRS financial measure, representing the Adjusted EBITDA of each of our four business segments, excluding, in each case, regional corporate costs.

Our deliveries business has scaled significantly since its launch in 2018, with growth further accelerating as consumers increased adoption of deliveries services in response to the COVID-19 pandemic. This strong growth is reflected in an increase in revenue of $174 million to $98 million for the six months ended June 30, 2021. Going forward, we expect Segment Adjusted EBITDA to further improve as we continue to scale and develop our deliveries business.

*Mobility*

The table below highlights key financial measures for our mobility segment.

| ($ millions) | Six Months Ended June 30, | | 2020-2021 % Change | Year Ended December 31, | | 2019-2020 % Change |
|---|---|---|---|---|---|---|
| | **2021** | **2020** | | **2020** | **2019** | |
| Revenue | 263 | 175 | 50% | 438 | 9 | NM |
| Segment Adjusted EBITDA[1] | 205 | 108 | 89% | 307 | (194) | NM |
| *% of GMV* | 14% | 7% | | 9% | (3)% | |

Note:
(1)  Segment Adjusted EBITDA is a non-IFRS financial measure, representing the Adjusted EBITDA of each of our four business segments, excluding, in each case, regional corporate costs.

Our mobility business was impacted significantly by the COVID-19 pandemic and the implementation of city and country lockdowns in the first half of 2020. In the latter half of 2020, mobility volumes began to recover as government mandated restrictions eased and consumers returned to using our mobility offerings. However, governments from time to time continue to implement measures or encourage actions to curb the spread of COVID-19, including new stay-at-home and movement control orders, work-from-home arrangements and social distancing measures, and as a result, our mobility offerings continue to be impacted by the COVID-19 pandemic. Despite these challenging circumstances, revenue increased by 50% to $263 million for the six months ended June 30, 2021, underlining strong unit economics fundamentals in our mobility business.

**Financial Services**

The table below highlights key financial measures for our financial services segment.

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | 2020-2021 % Change | Year Ended December 31, | | 2019-2020 % Change |
|---|---|---|---|---|---|---|
| | **2021** | **2020** | | **2020** | **2019** | |
| Revenue | 14 | (19) | NM | (10) | (229) | 95% |
| Segment Adjusted EBITDA[1] | (163) | (191) | 15% | (331) | (548) | 40% |

Note:
(1)  Segment Adjusted EBITDA is a non-IFRS financial measure, representing the Adjusted EBITDA of each of our four business segments, excluding, in each case, regional corporate costs.

Our financial services business has scaled significantly over the past three years as we have rolled out new offerings. Despite the impact of the COVID-19 pandemic, our revenue increased from $(19) million for the six months ended June 30, 2020 to $14 million for the six months ended June 30, 2021, reflecting the continued growth potential in the financial services business and we have trended towards positive Segment Adjusted EBITDA.

**Enterprises and New Initiatives**

The table below highlights key financial measures for our enterprise and new initiatives segment.

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | 2020-2021 % Change | Year Ended December 31, | | 2020-2021 % Change |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | | 2020 | 2019 | |
| Revenue | 21 | (2) | NM | 36 | 13 | 178% |
| Segment Adjusted EBITDA[1] | 3 | (16) | NM | 9 | (3) | NM |
| *% of GMV* | 5% | (130)% | | 21% | (34)% | |

Note:

(1)    Segment Adjusted EBITDA is a non-IFRS financial measure, representing the Adjusted EBITDA of each of our four business segments, excluding, in each case, regional corporate costs.

The enterprise and new initiatives segment generated revenue of $21 million and ($2) million for the six months ended June 30, 2021 and June 30, 2020, respectively. Additionally, Segment Adjusted EBITDA increased by $19 million to $3 million in the six months ended June 30, 2021 from $(16) million in the six months ended June 30, 2020, and Segment Adjusted EBITDA as a percentage of GMV went from (130)% during the six months ended June 30, 2020 to 5% during the six months ended June 30, 2021.

**Key Operating Metrics**

Our revenue and results of operations are driven by the following key operating metrics, which our management reviews in order to understand and evaluate our current and past business and financial performance, identify trends affecting our business, formulate business plans, and make strategic decisions.

*Gross Merchandise Value*

Gross Merchandise Value ("GMV") is an operating metric representing the sum of the total dollar value of transactions from Grab's services, including any applicable taxes, tips, tolls and fees, over the period of measurement. GMV is a metric by which we understand, evaluate and manage our business, and we believe is necessary for investors to understand and evaluate our business. GMV provides useful information to investors as it represents the amount of a consumer's spend that is being directed through our platform. This metric enables us and investors to understand, evaluate and compare the total amount of consumer spending that is being directed through our platform over a period of time. We present GMV as a metric to understand and compare, and to enable investors to understand and compare, our aggregate operating results, which captures significant trends in our business over time. GMV has historically increased as our business has grown and was $7.5 billion for the six months ended June 30, 2021. In 2020, due to the impact of the COVID-19 pandemic, GMV declined for the first half but recovered from the second half onwards. This was underpinned by similar trends in our number of MTUs. This allowed us to achieve growth in GMV from 2020 to 2021 of approximately 28%. We believe that we have a significant opportunity to continue growing GMV due to the extent of the market opportunity across all of our business verticals, along with our platform advantages. In addition to a rebound in mobility volumes and GMV as countries eventually enter into a recovery phase from COVID-19, we expect to achieve growth in our newer deliveries, financial services and enterprise and new initiative businesses as they continue to mature.

359

Table of Contents

*Gross Merchandise Value (in $ millions)*



*Monthly Transacting Users*

Monthly transacting users ("MTUs") is an operating metric defined as the number of unique consumers who have successfully paid for an offering on our platform within a given month, across any of our segments. For example, a consumer who made one food delivery transaction and one mobility transaction in the same month is counted as only one Grab MTU. MTUs over a quarterly or annual period are calculated based on the average of the MTUs for each month in the relevant period. We present our MTUs as a metric to understand and evaluate our business growth, and to enable investors to do the same. Due to the impact of the COVID-19 pandemic, we experienced a decline in MTUs from the second quarter of 2020 as movement restrictions severely impacted our mobility business. As we continue to face continued movement restrictions in 2021, our overall MTUs for the first half of 2021 remained consistent with the first half of 2020. Although we expect a return to MTU growth when economies in our markets recover from the COVID-19 pandemic, uncertainty remains as to the nature and timing of a full recovery as the COVID-19 pandemic continues to impact Southeast Asia and our markets have seen spikes in COVID-19 cases, and government measures are tightened from time to time.

*Monthly Transacting Users (monthly average in millions)*



360

The table below sets forth MTUs by segment for the periods indicated.

| (in millions, unless otherwise noted) | Six months ended June 30, | | 2021-2020 % change | Year ended December 31, | | 2020-2019 % change |
|---|---|---|---|---|---|---|
| | **2021** | **2020** | | **2020** | **2019** | |
| Overall MTUs | 24.3 | 24.5 | (1)% | 24.5 | 29.2 | (16)% |
| Deliveries MTUs | 16.4 | 14.1 | 16% | 14.8 | 10.7 | 38% |
| Mobility MTUs | 12.5 | 15.2 | (18)% | 14.6 | 24.7 | (41)% |
| Financial Services MTUs | 12.3 | 10.1 | 22% | 10.4 | 10.3 | 1% |

Overall Group MTUs have stayed relatively stable in the six months ended June 30, 2021 compared to the six months ended June 30, 2020. This was mainly caused by the decrease in mobility MTUs due to the extensive COVID-19 related restrictions and lockdowns across our markets in the first half of 2021, which was partially offset by the increase in deliveries MTUs and financial services MTUs in the same period. However, we expect our MTUs to return to normalized levels as COVID-19 related restrictions and lockdowns ease across our markets. In addition, the decrease in on-platform rides and in-store cashless transactions due to COVID-19 related restrictions and lockdowns also negatively affected the growth trend in our MTUs for financial services. Such negative impact on the growth trend in our MTUs for financial services was partially offset by an increase in on-platform payments for deliveries orders.

*Gross Merchandise Value per Monthly Transacting User*

Our ecosystem synergies and the continued rollout of new offerings drive increasing spend and engagement across the existing user base and attract new consumers to try offerings on our platform. This is evidenced by our GMV per MTU which has grown significantly since 2020 due to the growing proportion of MTUs using multiple offerings. We expect to drive growth in GMV per MTU as we continue to scale our offerings and realize the benefits of our ecosystem. Financial services offerings have contributed to GMV per MTU growth and we believe this continues to be a meaningful metric as it represents the amount of a consumer's spend that is being directed through our platform. Financial services GMV includes OVO and GrabPay payments from successful P2P (peer-to-peer), P2M (peer-to-merchant) transactions, payments from successful digital goods transactions from Grab's airtime and BillPay services, payments from successful online acceptance transactions (on-demand via Wallet Balance or PayLater from non-Grab services online), payments from subscription fees for deliveries and mobility offerings, value of buy transactions for wealth products and gross written premiums for insurance products.

*GMV per MTU (in $)*



361

*Partner Incentives and Consumer Incentives*

Partner incentives represent the dollar value of incentives granted to driver- and merchant-partners, the effect of which is to reduce revenue. The incentives granted to driver- and merchant-partners include base incentives and excess incentives, with base incentives being the amount of incentives paid to driver- and merchant-partners up to the amount of commissions and fees earned by Grab from those driver- and merchant-partners, and excess incentives being the amount of payments made to driver- and merchant-partners that exceed the amount of commissions and fees earned by Grab from those driver- and merchant-partners. Consumer incentives represent the dollar value of discounts and promotions offered to consumers, the effect of which is to reduce revenue. Partner incentives and consumer incentives are metrics by which we understand, evaluate and manage our business, and we believe are necessary for investors to understand and evaluate our business. We believe these metrics capture significant trends in our business over time.

**Partner Incentives** *(in $ millions)*



**Consumer Incentives** *(in $ millions)*



362

**Partner and Consumer Incentives** *(in $ millions)*



**Key Operating Metrics by Business Segment**

*Deliveries*

The table below highlights key operating metrics which drive our revenue for the deliveries segment.

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | 2020-2021 % Change | Year Ended December 31, | | 2019-2020 % Change |
|---|---|---|---|---|---|---|
| | **2021** | **2020** | | **2020** | **2019** | |
| Revenue | 98 | (76) | NM | 5 | (638) | NM |
| GMV[1] | 3,775 | 2,449 | 54% | 5,468 | 2,947 | 86% |
| Partner incentives[2] | (262) | (251) | 5% | (466) | (477) | (2)% |
| Consumer incentives[3] | (323) | (211) | 53% | (437) | (483) | (10)% |

Note:
(1) GMV means gross merchandise value, an operating metric representing the sum of the total dollar value of transactions from Grab's services, including any applicable taxes, tips, tolls and fees, over the period of measurement.
(2) Partner incentives represent the dollar value of incentives granted to driver- and merchant-partners, the effect of which is to reduce revenue. The incentives granted to driver- and merchant-partners include base incentives and excess incentives, with base incentives being the amount of incentives paid to driver- and merchant-partners up to the amount of commissions and fees earned by Grab from those driver- and merchant-partners, and excess incentives being the amount of payments made to driver- and merchant-partners that exceed the amount of commissions and fees earned by Grab from those driver- and merchant-partners. Base incentives amounted to $46 million and $31 million, for the six months ended June 30, 2021 and 2020, respectively, and $64 million and $53 million for the year ended December 31, 2020 and 2019, respectively.
(3) Consumer incentives represent the dollar value of discounts and promotions offered to consumers, the effect of which is to reduce revenue.

The revenue growth for our deliveries segment in 2020 and the six months ended June 30, 2021 was driven by an increase in GMV for the same periods. For the six months ended June 30, 2021, the revenue growth was partially offset by an increase in partner and consumer incentives. GMV for our deliveries segment is calculated as the sum of the total dollar value of the orders placed through our platform, including any applicable taxes, tips, tolls, delivery fees and platform and other fees. We generate revenue through commissions from driver- and merchant-partners, calculated as a percentage of the total dollar value and delivery fee of each GrabFood,

363

GrabKitchen, GrabMart, and GrabExpress order. For GrabKios, we generate revenue by charging a commission on the total value of goods sold by GrabKios agents.

*Mobility*

The table below highlights key operating metrics which drive our revenue for the mobility segment.

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | 2020-2021 % Change | Year Ended December 31, | | 2019-2020 % Change |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | | 2020 | 2019 | |
| Revenue | 263 | 175 | 50% | 438 | 9 | NM |
| GMV[1] | 1,493 | 1,621 | (8)% | 3,232 | 5,715 | (43)% |
| Partner incentives[2] | (48) | (109) | (56)% | (151) | (743) | (80)% |
| Consumer incentives[3] | (34) | (57) | (40)% | (100) | (394) | (75)% |

Note:
(1) GMV means gross merchandise value, an operating metric representing the sum of the total dollar value of transactions from Grab's services, including any applicable taxes, tips, tolls and fees, over the period of measurement.
(2) Partner incentives represent the dollar value of incentives granted to driver- and merchant-partners, the effect of which is to reduce revenue. The incentives granted to driver- and merchant-partners include base incentives and excess incentives, with base incentives being the amount of incentives paid to driver- and merchant-partners up to the amount of commissions and fees earned by Grab from those driver- and merchant-partners, and excess incentives being the amount of payments made to driver- and merchant-partners that exceed the amount of commissions and fees earned by Grab from those driver- and merchant-partners. Base incentives amounted to $32 million and $80 million, for the six months ended June 30, 2021 and 2020, respectively, and $114 million and $464 million for the year ended December 31, 2020 and 2019, respectively.
(3) Consumer incentives represent the dollar value of discounts and promotions offered to consumers, the effect of which is to reduce revenue.

Our mobility segment experienced revenue growth in 2020 and the six months ended June 30, 2021. The reduced demand for mobility offerings due to the COVID-19 pandemic was reflected in decreased GMV for the same periods. Despite challenging conditions, we continued to reduce partner and consumer incentives for the mobility segment in the six months ended June 30, 2021, which drove the growth in revenue. GMV for our mobility segment is calculated as the sum of the total dollar value of rides taken on our platform, including any applicable taxes, tips, tolls, and fees. Revenue from lease payments from our rentals business is also included in our mobility segment financials. We generate revenue for each ride based on a commission as a percentage of the total cost of the ride, exclusive of tolls and taxes.

*Financial Services*

The table below highlights the key operating metrics which drive our revenue for the financial services segment.

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | 2020-2021 % Change | Year Ended December 31, | | 2019-2020 % Change |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | | 2020 | 2019 | |
| Revenue | 14 | (19) | NM | (10) | (229) | 95% |
| Pre-InterCo TPV[1] | 5,614 | 4,046 | 39% | 8,856 | 7,773 | 14% |
| GMV[2] | 2,193 | 1,775 | 24% | 3,748 | 3,579 | 5% |
| Partner incentives[3] | (*) | (2) | (86)% | (3) | (13) | (80)% |
| Consumer incentives[4] | (34) | (45) | (23)% | (80) | (244) | (67)% |

**Table of Contents**

Note:

\*     Amount less than $1 million.

(1)    Pre-InterCo TPV for the financial services segment is equivalent to the total payments volume, or TPV, processed through our platform for the financial services segment. TPV is the value of payments received from consumers, net of payment reversals, successfully completed through our platform.

(2)    GMV for the financial services segment is equivalent to the total payments volume, or TPV, processed through our platform for the financial services segment, excluding amounts from transactions between entities within the Grab group that are eliminated upon consolidation.

(3)    Partner incentives represent the dollar value of incentives granted to driver- and merchant-partners, the effect of which is to reduce revenue. The incentives granted to driver- and merchant-partners include base incentives and excess incentives, with base incentives being the amount of incentives paid to driver- and merchant-partners up to the amount of commissions and fees earned by Grab from those driver- and merchant-partners, and excess incentives being the amount of payments made to driver- and merchant-partners that exceed the amount of commissions and fees earned by Grab from those driver- and merchant-partners. Base incentives were less than $1 million for the six months ended June 30, 2021 and 2020 and $1 million and $2 million for the year ended December 31, 2020 and 2019, respectively.

(4)    Consumer incentives represent the dollar value of discounts and promotions offered to consumers, the effect of which is to reduce revenue.

The revenue growth for our financial services segment in 2020 and the six months ended June 30, 2021 was driven by an increase in GMV for the same periods with the roll-out of new offerings.

*Enterprise and New Initiatives*

The table below highlights the key operating metrics which drive our revenue for the enterprise and new initiatives segment.

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | 2020-2021 % Change | Full Year Ended December 31, | | 2020-2021 % Change |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | | 2020 | 2019 | |
| Revenue | 21 | (2) | NM | 36 | 13 | 178% |
| GMV[1] | 61 | 12 | 399% | 44 | 9 | 416% |
| Partner incentives[2] | (*) | (2) | (99)% | (2) | (1) | 139% |
| Consumer incentives[3] | (37) | (9) | 301% | (*) | 5 | NM |

Note:

\*     Amount less than $1 million

(1)    GMV means gross merchandise value, an operating metric representing the sum of the total dollar value of transactions from Grab's services, including any applicable taxes, tips, tolls and fees, over the period of measurement.

(2)    Partner incentives represent the dollar value of incentives granted to driver- and merchant-partners, the effect of which is to reduce revenue. The incentives granted to driver- and merchant-partners include base incentives and excess incentives, with base incentives being the amount of incentives paid to driver- and merchant-partners up to the amount of commissions and fees earned by Grab from those driver- and merchant-partners, and excess incentives being the amount of payments made to driver- and merchant-partners that exceed the amount of commissions and fees earned by Grab from those driver- and merchant-partners. Base incentives were less than $1 million for the six months ended June 30, 2021 and 2020 and for the year ended December 31, 2020 and 2019.

(3)    Consumer incentives represent the dollar value of discounts and promotions offered to consumers, the effect of which is to reduce revenue.

The revenue growth for our enterprises and new initiatives segment in 2020 and the six months ended June 30, 2021 was driven by an increase in GMV with the growth in services.

365

**Table of Contents**

**Liquidity and Capital Resources**

Our principal sources of liquidity have been cash and cash equivalents raised from the issuance of convertible redeemable preference shares, loan facilities, equity financing at the subsidiary level and cash generated from operating activities.

Our liabilities exceeded our assets by $7.0 billion and $6.3 billion as of June 30, 2021 and December 31, 2020, respectively, and we incurred a net loss after tax of $1.5 billion and $1.5 billion for the six months ended June 30, 2021 and 2020, respectively. In addition, we had accumulated losses of $11.9 billion as of June 30, 2021. To support our business plans, we raise funding primarily through a term loan facility and issuance of convertible redeemable preference shares. We have secured additional liquidity with the closing of our first senior secured term loan facility, the Term Loan B Facility, in January 2021 of $2.0 billion that carries an interest rate based on cost of funds plus 4.5%. We also secured additional funding of approximately $45 million as part of our Series A financing round for our Grab Financial Group for the six months ended June 2021. We raised $0.3 billion and $0.7 billion of cash during the six months ended June 30, 2021 and June 30, 2020, respectively, through the issuance of convertible redeemable preference shares. We also incurred non-cash interest expenses related to such convertible redeemable preference shares of $0.8 billion and $0.7 billion for the six months ended June 30, 2021 and 2020, respectively. Such convertible redeemable preference shares will be cancelled and converted into the right to receive GHL Ordinary Shares upon completion of the Business Combination and as a result, following completion, we will no longer recognize any liability component nor any interest expense incurred with respect to such convertible redeemable preference shares.

Our unrestricted cash and cash equivalents comprise cash balances and short-term deposits with maturities of three months or less from the date of acquisition that are subject to an insignificant risk of changes in their fair value and are used to manage short-term commitments. Marketable securities consisted primarily of investment-grade corporate bonds. Restricted cash comprises deposits pledged with banks as security in relation to the utilization of certain bank services, monies received and held in escrow in connection with certain contractual obligations and advances received in connection with our electronic wallet or e-wallet services. Our cash and cash equivalents are primarily denominated in U.S. Dollars as well as in local currencies of the markets where we operate.

We believe that our current available cash and cash equivalents and our credit facilities will be sufficient to meet our working capital requirements and capital expenditures in the ordinary course of business for a period of at least twelve months from the date hereof. We intend to finance our future working capital requirements and capital expenditures from cash generated from operating activities, funds raised from financing activities, and funds raised in connection with the Business Combination Transactions, including proceeds raised from the PIPE Investment, the funds in the trust account and proceeds raised under the Amended and Restated Forward Purchase Agreements and the Sponsor Subscription Agreement. We may use debt, equity or a portion of the proceeds from the PIPE Investment to refinance all or a portion of our debt under our existing credit facilities. Our future capital requirements depend on many factors including our growth rate, the continuing market acceptance of our offerings, the timing and extent of spending to support our efforts to develop our platform, and the expansion of sales and marketing activities. Further, we may in the future enter into arrangements to acquire or invest in businesses, products, services, and technologies, Therefore, we may decide to enhance our liquidity position or increase our cash reserve for future investments or operations through additional financing activities, which may include further equity or debt financing. The issuance and sale of additional equity would result in further dilution to our shareholders. The incurrence of indebtedness would result in increased fixed obligations and could result in operating or financial covenants that restrict our operations.

The following table sets forth a summary of our cash flows for the periods indicated.

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | Year Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2020 | 2019 |
| **Net cash flow** | **1,323** | **439** | **617** | **232** |
| Net cash used in operating activities | (303) | (537) | (643) | (2,112) |
| Net cash provided by (used in) investing activities | (700) | 374 | (318) | 393 |
| Net cash provided by financing activities | 2,326 | 602 | 1,578 | 1,951 |

*Operating Activities*

Net cash used in operating activities was $303 million for the six months ended June 30, 2021, primarily consisting of $1.5 billion of loss for the period, adjusted for certain non-cash items, which included a $0.9 billion non-cash charge mainly for finance costs relating to convertible redeemable preference shares, a $117 million non-cash amortization of intangible assets mainly relating to a non-compete agreement, depreciation expense of $53 million, $10 million of financial assets impairment, non-cash stock compensation expense of $140 million, and a $4 million share of loss from equity accounted investees. This was offset by a $61 million change in finance income mainly relating to interest income on our debt investments. The net change in operating assets and liabilities is primarily due to a $50 million increase in trade and other payables, with a partial offsetting from a $43 million increase in trade and other receivables. Additionally, there was a $4 million charge for taxes paid.

Net cash used in operating activities was $537 million for the six months ended June 30, 2020, primarily consisting of $1.5 billion of loss for the period, adjusted for certain non-cash items, which included a $0.7 billion non-cash charge mainly for finance costs relating to convertible redeemable preference shares and $129 million in amortization of intangible assets mainly relating to a non-compete agreement, depreciation expense of $67 million, $16 million of non-cash impairment of property, plant and equipment, $27 million of financial assets impairment and non-cash stock compensation expense of $26 million. This was offset by a change in finance income mainly relating to interest income on our debt investments of $42 million. The net change in operating assets and liabilities was due to a $10 million decrease in trade and other receivables, with partial offsetting from a $4 million decrease in trade and other payables. Additionally, there was a $3 million charge for tax paid.

Net cash used in operating activities was $643 million for the year ended December 31, 2020, primarily consisting of $2.7 billion of loss for the year, adjusted for certain non-cash items, which included a $1.5 billion non-cash charge mainly for finance costs relating to convertible redeemable preference shares, non-cash amortization of intangible assets mainly relating to a non-compete agreement of $261 million related to the Uber non-competition arrangement, depreciation expense of $126 million, $43 million of non-cash impairment of intangible assets and property, plant and equipment, $63 million of financial assets impairment, non-cash stock compensation expense of $54 million, a non-cash charge to litigation provisions of $31 million, a $8 million loss of our share of loss of equity accounted investees, and a $9 million loss on disposal of property, plant and equipment. This was offset by a change in finance income mainly relating to interest income on our debt investments of $53 million. The net change in operating assets and liabilities are primarily the result of a $31 million decrease in trade and other receivables and a $42 million increase in trade and other payables. Additionally, there was a $7 million charge for taxes paid.

Net cash used in operating activities was $2.1 billion for the year ended December 31, 2019, primarily consisting of $4.0 billion of loss for the year, adjusted for certain non-cash items, which included a $1.1 billion non-cash charge mainly for finance costs relating to convertible redeemable preference shares and amortization of intangible assets mainly relating to a non-compete agreement of $538 million, depreciation expense of $109 million, $60 million of non-cash impairment of intangible assets and property, plant and equipment, $56 million of financial assets impairment and non-cash stock compensation expense of $34 million. This was

**Table of Contents**

offset by a change in finance income mainly relating to interest income on our debt investments of $85 million. The net change in operating assets and liabilities was primarily the result of a $75 million increase in trade and other receivables and a $181 million increase in trade and other payables. Additionally, there was a $8 million charge for tax paid.

### *Investing Activities*

Net cash used in investing activities was $700 million for the six months ended June 30, 2021, primarily consisting of $614 million for the purchase of other investments, placement of certain restricted cash deposits of $94 million and $9 million in share subscription in an associate. Additionally, $22 million was used for the purchases of property, plant and equipment and intangible assets. These were offset by proceeds from the sale of property, plant and equipment of $17 million, proceeds from sale of an associate of $8 million and cash interest received of $14 million.

Net cash from investing activities was $374 million for the six months ended June 30, 2020, primarily consisting of $378 million in proceeds from the sale of other investments, $30 million in cash interest received, $33 million in proceeds from the sale of property, plant and equipment, offset by $6 million for the purchase of intangible assets, $18 million for the purchases of property, plant and equipment, $3 million for the acquisition of businesses and the placement of certain fixed restricted cash deposits of $40 million.

Net cash used in investing activities was $318 million in 2020, primarily consisting of $109 million for the purchase of investments, coupled with the purchase of certain investment bonds of $250 million and the placement of certain restricted cash deposits of $30 million. Additionally, $18 million used for the purchase of intangible assets and $22 million used for the purchases of property, plant and equipment were offset by proceeds from the sale of property, plant and equipment of $63 million and cash interest received of $51 million.

Net cash from investing activities was $393 million in 2019, primarily consisting of $579 million in proceeds from the sale of other investments, $79 million in cash interest received and $6 million in proceeds from the sale of property, plant and equipment offset by $42 million for the purchase of intangible assets, $98 million for the purchases of property, plant and equipment, $32 million for the acquisition of subsidiaries and non-controlling interests and the placement of certain fixed restricted cash deposits of $99 million.

### *Financing Activities*

Net cash provided by financing activities was $2.3 billion for the six months ended June 30, 2021, primarily consisting of $1.9 billion in proceeds from borrowings, $262 million in the issuance of convertible redeemable preference shares, and an additional $217 million attributed from proceeds from subscription of shares in a subsidiary by non-controlling interests, $44 million from the proceeds of the exercising of share options, offset by $89 million in the repayment of long and short-term debt, $12 million for the payment of lease liabilities and $40 million for cash interest paid.

Net cash provided by financing activities was $602 million for the six months ended June 30, 2020, primarily consisting of $659 million in proceeds from the issuance of convertible redeemable preference shares, $2 million from the proceeds of the exercising of share options, $4 million from long and short-term debts and an additional $25 million attributed from proceeds from subscription of shares in a subsidiary by non-controlling interests, offset by $61 million in the repayment of long and short-term debt, $17 million for the payment of lease liabilities and $10 million for cash interest paid.

Net cash provided by financing activities was $1.6 billion in 2020, primarily consisting of $1.4 billion in proceeds from the issuance of convertible redeemable preference shares, and an additional $329 million attributed from proceeds from subscription of shares in a subsidiary by non-controlling interests, $5 million from the proceeds of the exercising of share options and $8 million in proceeds from borrowings, offset by

$106 million in the repayment of long and short-term debt, $30 million for the payment of lease liabilities and $17 million for cash interest paid.

Net cash provided by financing activities was $2.0 billion in 2019, primarily consisting of $1.9 billion in proceeds from the issuance of convertible redeemable preference shares, $6 million from the proceeds of the exercising of share options and an additional $327 million from proceeds from subscription of shares in a subsidiary by non-controlling interests, offset by $69 million in the repayment of long and short-term debt, $28 million for the payment of lease liabilities, $203 million for the acquisition of noncontrolling interests and $20 million for cash interest paid.

**Capital Expenditures**

Our capital expenditures amounted to $32 million and $40 million for the six months ended June 30, 2021 and 2020, respectively. Our historical capital expenditures are primarily related to our facilities and procurement of our vehicles fleet, primarily across Singapore and Indonesia. We expect to continue to make capital expenditures to meet the expected growth in scale of our business and expect that cash generated from our cash and cash equivalents following the Business Combination Transactions and cash from operating activities and financing activities may be used to meet our capital expenditure needs in the foreseeable future.

**Indebtedness**

The following table shows the amount of Grab's total consolidated short-term and long-term debt outstanding as of June 30, 2021 and 2020 and December 31, 2020 and 2019:

| ($ in millions, unless otherwise stated) | Six Months Ended June 30, | | As of December 31, | |
| --- | --- | --- | --- | --- |
| | **2021** | **2020** | **2020** | **2019** |
| **Current maturities of long-term liabilities** | | | | |
| Bank loans and term loans | 146 | 121 | 91 | 163 |
| **Long-term liabilities—net of current maturities** | | | | |
| Bank loans and term loans | 1,942 | 116 | 121 | 133 |
| **Total** | **2,088** | **238** | **212** | **296** |

We entered into a $2.0 billion senior secured term loan B facility (the "Term Loan B Facility") in January 2021. Borrowings under the Term Loan B Facility bear interest at a floating rate equal to either, at Grab's option, (i) a base rate, subject to a 2.00% floor, plus a margin of 3.50% per annum or (ii) a Eurodollar rate, subject to a 1.00% floor, plus a margin of 4.50% per annum. The Term Loan B Facility matures on January 29, 2026, and requires quarterly principal payments of 0.25% of the original principal amount per quarter through December 31, 2025, with any remaining balance payable on January 29, 2026. The term loan credit agreement in connection with the Term Loan B Facility contains certain affirmative and negative covenants applicable to Grab and certain of Grab's subsidiaries, including, among other things, restrictions on indebtedness, liens and fundamental changes. The Term Loan B Facility is secured by substantially all assets of Grab and certain of Grab's subsidiaries and all proceeds and products of the foregoing. The Term Loan B Facility proceeds may be used for general corporate purposes of Grab and certain of its subsidiaries. As of June 30, 2021, $2.0 billion in principal amount and accrued interest was outstanding under the Term Loan B Facility.

As of June 30, 2021, we and our subsidiaries had available credit facilities of an aggregate of $2.6 billion, of which $2.1 billion was drawn and outstanding while $485 million was unutilized. From time to time, we may also decide to refinance our indebtedness, including the Term Loan B Facility. Other than the Term Loan B Facility, a majority of these facilities are secured against vehicles rented to driver-partners through our rental business in Malaysia, Singapore and Indonesia. These financings are on an arm's-length terms with an average duration of five years and interest rates of up to 11.50%. These facilities are denominated in local currencies with

369

**Table of Contents**

local financial institutions and leasing companies and contain customary affirmative and negative covenants applicable to Grab and/or certain of our subsidiaries, including, among other things, restrictions on indebtedness, liens, and fundamental changes. Among such facilities is an aggregate of approximately $283 million (the "Maybank Facilities") entered into based on letters of blanket hire purchase facility with Malayan Banking Berhad, by one of our subsidiaries, Grab Rentals Pte. Ltd., of which approximately $55 million was drawn and outstanding as of June 30, 2021. The Maybank Facilities are secured against vehicles we rent to driver-partners in Singapore and have tiered interest rates ranging between 1.8% and 2.08% with an average duration of five years.

**Contractual Obligations and Commitments**

The following table summarizes our contractual obligations and commitments as of June 30, 2021:

| ($ in millions, unless otherwise stated) | Payments Due by Period | | | |
|---|---|---|---|---|
| | Total | Less than 1 year | 1-5 years | More than 5 years |
| Bank loans and term loans[1] | 2,676 | 249 | 2,427 | — |
| Lease liabilities commitments | 32 | 13 | 18 | * |
| Obligations for leases not yet commenced | 104 | 3 | 47 | 54 |
| Non-cancelable purchase obligations[2] | 831 | 396 | 435 | — |
| **Total contractual obligations** | 3,643 | 661 | 2,927 | 55 |

Notes:
* Amount less than $1 million
(1) Each item includes expected interest payments.
(2) Non-cancelable purchase obligations primarily pertain to the purchase of onboarding, data processing and technology platform infrastructure services.

**Off-Balance Sheet Arrangements**

We did not have during the periods presented, and we do not currently have, any off-balance sheet financing arrangements or any relationships with unconsolidated entities or financial partnerships, including entities sometimes referred to as structured finance or special purpose entities, that were established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes.

**Internal Control Over Financial Reporting**

We are a private company with limited accounting personnel and other resources to address our internal control over financial reporting. In connection with the audit of our consolidated financial statements as of and for the years ended December 31, 2020 and 2019, we and our independent registered public accounting firm identified three material weaknesses as of December 31, 2020, in accordance with the standards established by PCAOB. As defined in standards established by the PCAOB, a "material weakness" is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

The material weaknesses identified relate to (i) improper revenue recognition conclusions with respect to OVO that resulted in a material overstatement of revenue and expenses in Grab's consolidated financial statements that were previously audited under International Standards on Auditing as a private company; (ii) the review process over assumptions and inputs used in several key accounting estimates; (iii) not having a sufficient number of personnel with an appropriate level of IFRS accounting skills, SEC reporting knowledge and experience and training in internal controls over financial reporting. Neither we nor our independent registered public accounting firm undertook a comprehensive assessment of our internal control over financial reporting

370

Table of Contents

under the Sarbanes-Oxley Act for purposes of identifying and reporting any weakness or significant deficiency in our internal control over financial reporting, as we and they will be required to do upon the consummation of the Business Combination. Had we performed a formal assessment of our internal control over financial reporting or had our independent registered public accounting firm performed an audit of our internal control over financial reporting, additional control deficiencies may have been identified.

To remedy our identified material weaknesses and control deficiencies, we plan to adopt several measures that will improve our internal control over financial reporting, including: (i) evaluating our existing communication channels and making improvements to ensure a higher level of collaboration and compliance with our accounting policies at the subsidiary level; (ii) design management review controls, including establishing proper precision levels at which the management review controls should operate and the timing of when controls should be performed; and (iii) performing a resource and skills gap analysis within our existing finance organization, implementing regular and consistent accounting and financial reporting training programs for our accounting and financial reporting personnel and recruiting more qualified personnel equipped with relevant experience and qualifications to strengthen the financial reporting function and setting up a financial and system control framework.

We expect to complete the measures above as soon as practicable and we will continue to implement measures to remedy our internal control deficiencies. The process of designing and implementing an effective financial reporting system is a continuous effort that requires us to anticipate and react to changes in our business and the economic and regulatory environments and to expend significant resources to maintain a financial reporting system that is adequate to satisfy our reporting obligations. If we fail to develop or maintain an effective system of internal controls over our financial reporting, we may not be able to accurately report our financial results, prevent fraud or meet our reporting obligations. See "Risk Factors—Risks Relating to GHL—If GHL fails to maintain an effective system of disclosure controls and internal control over financial reporting, GHL may not be able to accurately report its financial results or prevent fraud. As a result, shareholders could lose confidence in GHL's financial and other public reporting, which is likely to negatively affect GHL's business and the market price of GHL Ordinary Shares."

**Holding Company Structure**

Grab Holdings Inc. is a Cayman Islands incorporated investment holding company. It facilitates group treasury activities and international financial transactions such as fund raising but does not have substantive business operations. We conduct our operations in Southeast Asia primarily through our subsidiaries and our consolidated affiliated entities. As a result, our ability to pay dividends depends upon dividends paid by our subsidiaries. If our subsidiaries or any newly formed subsidiaries incur debt on their own behalf in the future, the instruments governing their debt may restrict their ability to pay dividends to us.

In addition, as determined in accordance with local regulations, our subsidiaries in certain Southeast Asian markets may be restricted from paying us dividends offshore or from transferring a portion of their assets to us, either in the form of dividends, loans or advances, unless certain requirements are met and regulatory approvals are obtained. Even though we currently do not require any such dividends, loans or advances from our entities for working capital and other funding purposes, we may in the future require additional cash resources from them due to changes in business conditions, to fund future acquisitions and development, or merely to declare and pay dividends or distributions to our shareholders.

Certain of the markets in which we have significant subsidiaries, including Indonesia and Thailand, require those subsidiaries to establish and fund statutory reserves. Indonesian laws require a limited liability company to reserve an unspecified amount from its net profit in any year for which the balance of retained earnings is positive as a reserve fund until such fund amounts to at least 20% of its issued and paid up capital. Regulations in Thailand require a private limited liability company to allocate at least 5% of its retained earnings into a legal reserve fund at the time the dividend is paid until and unless the legal reserve fund reaches 10% of the company's registered capital. The legal reserve is not available for dividend distribution.

**Table of Contents**

**Quantitative and Qualitative Disclosure about Market Risks**

We are exposed to market risks in the ordinary course of our business. These risks primarily include credit risk, foreign currency risk and interest rate risk. See Note 24 to our consolidated financial statements included elsewhere in this proxy statement/prospectus for further details.

*Credit Risk*

We are exposed to credit risk from our operating activities and from our financing activities, which arises principally from our trade receivables, loans and advances to customers or consumers, deposits and cash and cash equivalents. With respect to trade receivables, we are not exposed to a major default risk from a single customer, and we actively monitor and manage credit risk by performing credit checks and optimizing the payment process. With respect to our loans and advances to customers, our credit risk mainly pertains to term loans provided to borrowers. We closely monitor credit quality for the loans and advances to manage and evaluate our related exposure to credit risk, and such efforts begin with initial underwriting and continue through to full repayment of a loan or advance. We have developed risk models using detailed information from internal historical experience, including customers' prior repayment histories with us, to assess customer requests for a loan or advance. We also use delinquency status and trends and other indicators to assist in making new and ongoing credit decisions, adjust models and plan collection practices and strategies. With respect to our financial instruments, our deposits and cash and cash equivalents are all held with reputable bank and financial institution counterparties.

*Foreign Currency Risk*

We are exposed to foreign exchange risk on transactional foreign currency risk to the extent that there is a mismatch between the currencies in which sales, purchases, receivables and borrowings that are denominated in a currency other than the respective functional currencies of our entities, including Singapore Dollars, Indonesian Rupiah, Thai Baht, Malaysian Ringgit, Vietnamese Dong and Philippine Pesos, among other currencies. The functional currencies of our entities are primarily the currency of the country in which the entity operates. The currencies in which these transactions primarily are denominated are also in the currency in which the entity operates. Accordingly, changes in exchange rates are reflected in reported income and loss from our international businesses included in our consolidated statements of operations. A continued strengthening of the U.S. dollar would therefore reduce reported revenue and expenses from our international businesses included in our consolidated statements of operations

Interest on external borrowings is denominated in the currency of the borrowing. Generally, our entities' external borrowings are denominated in currencies that match the cash flows generated by the underlying operations, which is also the currency of the country in which the entity operates.

Based on the above, we believe we are not exposed to significant currency transactional foreign currency risk. We may in the future, enter into derivatives or other financial instruments in an attempt to hedge our foreign currency exchange risk. It is difficult to predict the impact hedging activities would have on our results of operations.

*Translation Exposure*

We are also exposed to foreign exchange rate fluctuations as we translate the financial statements of our subsidiaries into U.S. dollars in consolidation. If there is a change in foreign currency exchange rates, the translation adjustments resulting from the conversion of the financial statements of our subsidiaries into U.S. dollars would result in a gain or loss recorded as a component of accumulated other comprehensive income (loss).

**Table of Contents**

*Interest Rate Risk*

Our main interest rate risk arises from long-term borrowings with variable rates, which expose us to cash flow interest rate risk. Our borrowings at variable rate are mainly denominated in U.S. Dollars and Singapore Dollars. The borrowings are periodically contractually repriced and to the extent are also exposed to the risk of future changes in market interest rates. Therefore, fluctuations in interest rates will impact our consolidated financial statements. A rising interest rate environment will increase the amount of interest paid on these loans. As an example, for the $2 billion Term Loan B Facility, a hypothetical 100 basis point increase in LIBOR, over and above the 1.00% floor, would increase our interest expense by $20 million. At this time, we do not, but we may in the future, enter into derivatives or other financial instruments to hedge our interest rate risk and provide certainty to our fixed obligations.

**Critical Accounting Policies and Estimates**

*Our consolidated financial statements are prepared in accordance with IFRS. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, expenses and related disclosures. We evaluate our estimates and assumptions on an ongoing basis. Our estimates are based on historical experience and other assumptions that we believe to be reasonable under the circumstances. Our actual results could differ from these estimates under different assumptions or conditions. We believe that the following critical accounting policies reflect the more significant judgments, estimates and assumptions used in the preparation of our consolidated financial statements.*

*Revenue recognition*

We enable access to transportation, delivery, financial services and enterprise offerings in Southeast Asia through our platform; and recognize revenue as or when we satisfy our service obligations. We primarily earn revenue from the following:

*Mobility*

We earn fees from driver-partners and consumers for connecting consumers with transportation rides provided by driver-partners across a variety of multi-modal mobility options. We recognize revenue upon completion of each ride. Our mobility revenue also includes rental income from the leasing of motor vehicles to driver-partners, who typically use the vehicles to offer services through our platform.

*Deliveries*

We earn fees from driver-partners, merchant-partners and consumers for connecting driver-partners and merchant-partners with consumers to facilitate deliveries, including of prepared meals and groceries, as well as point-to-point parcel delivery. We recognize revenue on completion of each delivery.

*Mobility and Deliveries business: principal vs. agent considerations*

We enter into service agreements with driver-partners and merchant-partners to use our platform. A contract exists between us and the driver-partners and merchant-partners once they accept a transaction request and their ability to cancel the transaction lapses.

We evaluate the presentation of revenue on a gross or net basis based on whether we act as a principal by controlling the services provided to consumers, or whether we act as an agent by arranging for third parties to provide the services to consumers. We facilitate the provision of services by driver-partners and merchant-partners to consumers for the driver-partners and merchant-partners to fulfill their contractual promise to consumers. The driver-partners and merchant-partners fulfill their promise to provide services to consumers through use of our platform. While we facilitate setting the price for services, the driver-partners and consumers

have discretion in accepting the transaction price through our platform. We are not responsible for fulfilling the services being provided to the consumers nor do we have inventory risk related to these services. We are acting as an agent to facilitate the successful completion of transportation or delivery services by the driver-partners and merchant-partners to consumers. We have concluded that we are an agent to the driver-partners and merchant-partners, as our role is to connect them with consumers to facilitate the successful completion of transportation or delivery services.

In enabling connection, the driver-partners, merchant-partners and consumers are our customers; and we have a separate performance obligation to each:

- the driver-partners (to connect the drive-partners with consumers to facilitate and successfully complete ride-hailing and delivery services);

- the merchant-partners (to connect the merchant-partners with consumers to facilitate and successfully complete ordering services); and

- the consumer (to connect the consumer with driver-partners and merchant-partners).

We recognize fees on the completion of the successful transportation ride or delivery by the driver-partners and merchant-partners. We report revenue on a net basis, reflecting the fee owed to us from the driver-partners and merchant-partners as revenue, and not the gross amount collected from the consumers.

*Financial services*

We earn fees from digital payment processing services charged to merchant-partners primarily based on the total payments volume ("TPV") processed through our platform. TPV is the value of payments, net of payment reversals, successfully completed through our platform. Revenue resulting from a payment processing service is recognized once the processing transaction is complete.

Financial services revenue also includes effective interest earned on loans and advances provided to merchant-partners, driver-partners and consumers, and fees from wealth management and insurance distribution offerings.

*Enterprise and new initiatives*

We earn fees from enterprise offerings which are predominantly from digital advertising and marketing services. Revenue is recognized once the obligation to provide the service is satisfied.

*Incentives to customers*

We offer various incentive programs to driver-partners, merchant-partners and consumers which are recorded as a reduction from fees from the respective customers as these incentives are considered to be consideration payable to the customers. In certain arrangements, the incentives paid to driver-partners, merchant-partners and consumers could exceed the fees received from the respective customers. In these situations, presenting the incentives as a reduction from fees from the respective customers would resulted in "negative revenue."

**Share-based compensation**

We incur share-based payment expenses from options granted to purchase our ordinary shares ('Share Options'), and restricted share units/awards ('RSUs') issued primarily to our employees.

The grant date fair value of Share Options and RSU is recognized as an employee expense, with a corresponding increase in equity, over the period that the employees unconditionally become entitled to the

374

**Table of Contents**

awards. The amount recognized as an expense is adjusted to reflect the number of awards for which the related service and non-market performance conditions are expected to be met, such that the amount ultimately recognized as an expense is based on the number of awards that meet the related service and non-market performance conditions at the vesting date. For share-based payment awards with non-vesting conditions, the grant date fair value of the share-based payment is measured to reflect such conditions and there is no true-up for differences between expected and actual outcomes.

When the terms of an equity-settled award are modified, the minimum expense recognized is the grant date fair value of the unmodified award, provided the original vesting terms of the award are met. An additional expense, measured as at the date of modification, is recognized for any modification that increases the total fair value of the share-based payment transaction, or is otherwise beneficial to the employee. Where an award is cancelled by the entity or by the counterparty, any remaining element of the fair value of the award is expensed immediately through profit or loss.

The grant date fair value of the Share Options and the RSUs are measured using valuation models that require inputs of subjective assumptions that include:

- Expected term: We estimate the expected term based on the simplified method.

- Expected volatility: We estimate the volatility of our ordinary shares on the date of grant based on the average historical stock price volatility of comparable publicly traded companies.

- Ordinary share price: We estimate the value of our ordinary shares on the date of grant based on a hybrid weighted average, scenario-based valuation methodology that involve multiple variables including revenue multiples of comparable companies, expected revenue projections and growth rates and a discount for a lack of marketability in an option pricing model.

*Impairment assessment of non-financial assets*

Our non-financial assets include:

- Property, plant and equipment which primarily comprise our motor vehicles held for leasing, property lease right of use assets, property renovations and computers.

- Intangible assets and goodwill which primarily comprise internally developed and externally acquired software, a non-compete agreement acquired and goodwill recognized from business combinations.

The carrying amounts of our non-financial assets are reviewed at each reporting date to determine whether there is any indication of impairment. If any such indication exists, then the asset's recoverable amount is estimated. Goodwill is tested annually for impairment and the recoverable amount is estimated each year.

An impairment loss is recognized if the carrying amount of an asset or its related cash-generating unit, or CGU, exceeds its estimated recoverable amount.

The recoverable amount of an asset or CGU is the greater of its value in use and its fair value less costs to sell. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset or CGU. For impairment testing, assets that cannot be tested individually are grouped together into the smallest group of assets that generates cash inflows from continuing use that are largely independent of the cash inflows of other assets or CGUs. Subject to an operating segment ceiling test, for the purposes of goodwill impairment testing, CGUs to which goodwill has been allocated are aggregated so that the level at which impairment testing is performed reflects the lowest level at which goodwill is monitored for internal reporting purposes. Goodwill acquired in a business combination is allocated to groups of CGUs that are expected to benefit from the synergies of the combination.

**Table of Contents**

Our corporate assets do not generate separate cash inflows and are utilized by more than one CGU. Corporate assets are allocated to CGUs on a reasonable and consistent basis and tested for impairment as part of the testing of the CGU to which the corporate asset is allocated.

Impairment losses are recognized in profit or loss. Impairment losses recognized in respect of CGUs are allocated first to reduce the carrying amount of any goodwill allocated to the CGU (group of CGUs), and then to reduce the carrying amounts of the other assets in the CGU (group of CGUs) on a pro rata basis.

An impairment loss in respect of goodwill is not reversed. In respect of other assets, impairment losses recognized in prior periods are assessed at each reporting date for any indications that the loss has decreased or no longer exists. An impairment loss is reversed if there has been a change in the estimates used to determine the recoverable amount. An impairment loss is reversed only to the extent that the asset's carrying amount does not exceed the carrying amount that would have been determined, net of depreciation or amortization, if no impairment loss had been recognized.

### *Impairment of financial assets*

We recognize loss allowances for expected credit losses (ECLs) on financial assets measured at amortized costs. Our financial assets primarily comprise trade receivables, loans and advances, fixed term deposits and other receivables.

Loss allowances on financial assets are measured on either of the following bases:

- 12-month ECLs: these are ECLs that result from default events that are possible within the 12 months after the reporting date (or for a shorter period if the expected life of the instrument is less than 12 months); or

- Lifetime ECLs: these are ECLs that result from all possible default events over the expected life of a financial instrument or contract asset.

### *Simplified approach*

We apply the simplified approach to provide for ECLs for all trade receivables. The simplified approach requires the loss allowance to be measured at an amount equal to lifetime ECLs.

### *General approach*

We apply the general approach to provide for ECLs on all other financial instruments. Under the general approach, the loss allowance is measured at an amount equal to 12-month ECLs at initial recognition.

At each reporting date, we assess whether the credit risk of a financial instrument has increased significantly since initial recognition. When credit risk has increased significantly since initial recognition, loss allowance is measured at an amount equal to lifetime ECLs.

When determining whether the credit risk of a financial asset has increased significantly since initial recognition and when estimating ECLs, we consider reasonable and supportable information that is relevant and available without undue cost or effort. This includes both quantitative and qualitative information and analysis, based on our historical experience and informed credit assessment and includes forward-looking information.

If credit risk has not increased significantly since initial recognition or if the credit quality of the financial instruments improves such that there is no longer a significant increase in credit risk since initial recognition, loss allowance is measured at an amount equal to 12-month ECLs.

**Table of Contents**

We consider a financial asset to be in default when:

- The borrower is unlikely to pay its credit obligations to us in full, without recourse by Grab to actions such as realizing security (if any is held); or

- The financial asset is more than 90 days past due (more than 120 days past due for trade receivables).

*Measurement of ECLs*

ECLs are probability-weighted estimates of credit losses. Credit losses are measured at the present value of all cash shortfalls (i.e. the difference between the cash flows due to the entity in accordance with the contract and the cash flows that we expect to receive). ECLs are discounted at the effective interest rate of the financial asset.

*Credit-impaired financial assets*

At each reporting date, we assess whether financial assets carried at amortized cost and debt investments at fair value to other comprehensive income ("FVOCI") are 'credit-impaired.' A financial asset is 'credit-impaired' when one or more events that have a detrimental impact on the estimated future cash flows of the financial asset have occurred.

Evidence that a financial asset is credit-impaired includes the following observable data:

- Significant financial difficulty of the borrower or issuer;

- A breach of contract such as a default or being more than 90 days past due (more than 120 days past due for trade receivables);

- The restructuring of a loan or advance by us on terms that we would not consider otherwise;

- It is probable that the borrower will enter bankruptcy or another financial reorganization; or

- The disappearance of an active market for a security because of financial difficulties.

*Presentation of allowance for ECLs in the statement of financial position*

Loss allowances for financial assets measured at amortized cost are deducted from the gross carrying amount of the assets.

*Write-off*

The gross carrying amount of a financial asset is written off (either partially or in full) to the extent that there is no realistic prospect of recovery. This is generally the case when we determine that the debtor does not have assets or sources of income that could generate sufficient cash flows to repay the amounts subject to the write-off. However, financial assets that are written off could still be subject to enforcement activities in order to comply with our procedures for recovery of amounts due.

**Fair value measurement of financial Instruments**

Fair value reflects the price at which an orderly transaction would take place between market participants on the measurement date. Several of our financial instruments require to be measured at fair value on the reporting date. These include our equity and debt investments with a change in value recognized through profit or loss.

These investments include assets for which the markets are not typically active. These can include financial investments which are not quoted on active markets and financial investments for which markets are no longer active as a result of market conditions e.g. market illiquidity. When the markets are not active, there is generally

377

**Table of Contents**

limited observable market data to measure the financial investments at fair value. The determination of whether an active market exists for a financial investment requires our judgement.

If the market for a financial investment is not active, we determine its fair value using valuation techniques. We establish the fair value for these financial investments by using quotations from independent third parties, such as brokers or pricing services or by using internally developed pricing models. Priority is given to publicly available prices from independent sources when available, with the source of pricing and/or the valuation technique chosen with the objective of arriving at an observable fair value measurement. The valuation techniques include the use of recent arm's length transactions, reference to other instruments that are substantially the same, discounted cash flow analysis, option adjusted spread models and, if applicable, enterprise valuation, and may include a number of assumptions relating to variables such as credit risk and interest rates. Changes in assumptions relating to these variables could impact the reported fair value of these financial investments.

Fair values are categorized into different levels in a fair value hierarchy based on the inputs used in the valuation techniques as follows:

- Level 1: quoted prices (unadjusted) in active markets for identical assets or liabilities.

- Level 2: inputs other than quoted prices included in Level 1 that are observable for the asset or liability, either directly (i.e. as prices) or indirectly (i.e. derived from prices).

- Level 3: inputs for the asset or liability that are not based on observable market data (unobservable inputs).

*Provisions and contingent liabilities*

We are involved in multiple legal proceedings in the countries in which we operate. These legal proceedings relate to a range of matters including personal injury or property damage cases, employment or labor-related disputes, contractual disputes with suppliers or commercial partners, disputes with third parties and regulatory inquiries and proceedings relating to compliance with competition, privacy, or other applicable regulations.

A provision is recognized if we have a present legal or constructive obligation that can be estimated reliably, and it is probable that an outflow of economic benefits will be required to settle the obligation. Provisions are determined by discounting the expected future cash flows at a pre-tax rate that reflects current market assessments of the time value of money and the risks specific to the liability. Provisions are not recognized when we do not consider the proceedings to result in obligations or in the outflow of resources based on our assessment of the facts and circumstances at each reporting date.

*Business Combinations*

We account for business combinations using the acquisition method when the acquired set of activities and assets meets the definition of a business and control is transferred to us. In determining whether a particular set of activities and assets is a business, we assess whether the set of assets and activities acquired includes, at a minimum, an input and substantive process and whether the acquired set has the ability to produce outputs.

We have an option to apply a 'concentration test' that permits a simplified assessment of whether an acquired set of activities and assets is not a business. The optional concentration test is met if substantially all the fair value of the gross assets acquired is concentrated in a single identifiable asset or group of similar identifiable assets.

We measure goodwill at the date of acquisition as:

- the fair value of the consideration transferred; plus

**Table of Contents**

- the recognized amount of any non-controlling interest ("NCI") in the acquiree; plus

- if the business combination is achieved in stages, the fair value of the pre-existing equity interest in the acquiree, over the net recognized amount (generally fair value) of the identifiable assets acquired and liabilities assumed. Any goodwill that arises is tested annually for impairment.

The consideration transferred in the acquisition is generally measured at fair value, as are the identifiable net assets acquired. When the excess is negative, a bargain purchase gain is recognized immediately in profit or loss. The consideration transferred does not include amounts related to the settlement of pre-existing relationships. Such amounts are generally recognized in profit or loss.

Any contingent consideration payable is recognized at fair value at the date of acquisition and included in the consideration transferred. If the contingent consideration that meets the definition of financial instruments is classified as equity, it is not remeasured and settlement is accounted for within equity. Otherwise, other contingent consideration is remeasured at fair value at each reporting date and subsequent changes to the fair value of the contingent consideration are recognized in profit or loss.

When share-based payments awards (replacement awards) are exchanged for awards held by the acquiree's employees (acquiree's awards) and related to past services, then all or a portion of the amount of the acquirer's replacement awards is included in measuring the consideration transferred in the business combination. This determination is based on the market-based value of the replacement awards compared with the market-based value of the acquiree's awards and the extent to which the replacement awards related to past and/or future service.

Non-controlling interest (NCI) that are present ownership interests and entitle their holders to a proportionate share of the acquiree's net assets in the event of liquidation are measured either at fair value or at the NCI's proportionate share of the recognized amounts of the acquiree's identifiable net assets, at the date of acquisition. The measurement basis taken is elected on a transaction-by-transaction basis. All other NCI are measured at acquisition-date fair value, unless another measurement basis is required by IFRSs.

Costs related to the acquisition, other than those associated with the issue of debt or equity securities, that we incur in connection with a business combination are expensed as incurred.

Changes in our interest in a subsidiary that do not result in a loss of control are accounted for as transactions with owners in their capacity as owners and therefore no adjustments are made to goodwill and no gain or loss is recognized in profit or loss. Adjustments to NCI arising from transactions that do not involve the loss of control are based on a proportionate amount of the net assets of the subsidiary.

379