**POMERANTZ LLP**
Joshua B. Silverman
Brain P. O' Connell
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

-and-

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171

*Co-Lead Counsel for Co-Lead Plaintiffs and the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE GRAB HOLDINGS LIMITED SECURITIES LITIGATION | Case No. 1:22-cv-02189-JLR<br><br>Hon. Jennifer L. Rochon<br><br><u>Oral Argument Requested</u> |

### LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................................1

II.    STATEMENT OF FACTS......................................................................................3

   A.   Grab Depends on Incentives to Retain Sufficient Drivers for Its Core Food Delivery and
        Ride Hailing Businesses ..............................................................................................3

   B.   Shortly Before Its IPO, Grab Began Experiencing a Driver Shortage and Significantly
        Increased Consumer and Partner Incentives ...............................................................3

   C.   Shareholders Approve the Merger and Grab Goes Public Via the Defective
        Proxy/Registration ......................................................................................................4

III.   ARGUMENT ..........................................................................................................6

   A.   Plaintiffs' Section 11 and 14(a) Claims Face Minimal Pleading Requirements ...................6

   B.   Plaintiffs' Section 11 Claim Is Actionable .................................................................8

      1.   Plaintiffs Adequately Pled Misstatements and Omissions in the P/RS as Required by
           Section 11..............................................................................................................8

         a.   False and Misleading Statements Regarding Driver Shortages.......................................9

         b.   False and Misleading Statements Regarding Reducing Incentives ...............................10

         c.   False and Misleading Statements Regarding Profit Margins...........................................12

      2.   Defendants' Additional Challenges to Falsity and Materiality Fail..................................13

         a.   The Alleged Misstatements and Omissions Were Material...........................................13

         b.   The PSLRA Safe Harbor and the Bespeaks Caution Doctrine Are Inapplicable ..........15

      3.   Plaintiffs Have Adequately Alleged Violations of Item 303 ..............................................17

   C.   Plaintiffs' Section 14(a) Claim Is Actionable .........................................................20

   D.   Plaintiffs' Section 10(b) Claim Is Actionable...........................................................21

      1.   The AC Adequately Pleads Actionable Misstatements and Omissions..............................21

      2.   The AC Adequately Pleads Scienter .....................................................................23

      3.   The AC Adequately Pleads Loss Causation ..................................................................25

   E.   Plaintiffs' Control Person Claims Are Actionable ....................................................25

IV.    CONCLUSION.......................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Abramson v. Newlink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020) ................................................................... 25

*Alpha Capital Anstalt v. Intellipharmaceuticals Int'l Inc.*,
    2020 WL 3318029 (S.D.N.Y. June 18, 2020) ............................................ 10, 13, 14

*Altayyar v. Etsy*,
    242 F. Supp. 3d 161 (E.D.N.Y. 2017) .................................................... 13, 17

*Asay v. Pinduoduo Inc.*,
    2020 WL 1530745 (S.D.N.Y. Mar. 30, 2020) .......................................... 17

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ............................................................................. 7

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
    2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ............................................ 19

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
    866 F. Supp. 2d 223 (S.D.N.Y. 2012) ...................................................... 20

*Cersci v. Mohawk Valley Cmty. College*,
    693 Fed. Appx. 21 (2nd Cir. 2017) .......................................................... 25

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020) ...................................................... 15

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ...................................................... 23

*City of Providence v. Aeropostale, Inc.*,
    2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ......................................... 16, 17

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
    587 F. Supp. 3d 56 (S.D.N.Y. 2022) ........................................................ 22

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
    412 F. Supp. 3d 206 (E.D.N.Y. 2019) ...................................................... 22

*Coronel v. Quanta Capital Holdings, Ltd.*,
    2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ............................................. 9

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) ...................................................... 24

*Donoghue v. Gad*,
   2022 WL 3156181 (S.D.N.Y. Aug. 8, 2022) .................................................................. 13

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ........................................................................................................ 25

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
   794 F.3d 297 (2d Cir. 2015) ........................................................................................... 23

*Erickson v. Jernigan Cap., Inc.*,
   2022 WL 3028627 (S.D.N.Y. Aug. 1, 2022) ................................................................ 6-7

*Fogarazzo v. Lehman Bros., Inc.*,
   341 F. Supp. 2d 274 (S.D.N.Y. 2004).............................................................................. 13

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................ 6, 7, 8, 20

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................................ 9

*Galestan v. Onemain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018)............................................................... 14, 15, 23

*Garber v. Legg Mason, Inc.*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008)................................................................................ 9

*Herman & Maclean v. Huddleston*,
   459 U.S. 375 (1983) ...................................................................................................... 6, 8

*In re Apple Inc. Securities Litigation*,
   2020 WL 6482014 (N.D. Cal. 2020) ............................................................................... 17

*In re Bank of Am. Corp. Sec., Der., & ERISA Litig.*,
   757 F. Supp. 2d 260 (S.D.N.Y. 2010)................................................................... 7, 18, 20

*In re Barrick Gold Corp. Sec. Litig.*,
   341 F. Supp. 3d 358 (S.D.N.Y. 2018).............................................................................. 24

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
   851 F. Supp. 2d 746 (S.D.N.Y. 2012).............................................................................. 25

*In re BioScrip, Inc. Sec Litig.*,
   95 F. Supp. 3d 711 (S.D.N.Y. 2015)................................................................... 10, 12, 25

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
   2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020).................................................................. 16

iv

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018)............................................................. 23

*In re Citigroup Bond Litig.*,
  723 F. Supp. 2d 568 (S.D.N.Y. 2010)....................................................................... 7

*In re Coty Inc. Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ......................................................... 10

*In re CPI Card Grp. Inc. Sec. Litig.*,
  2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ............................................... 18, 19, 20

*In re Facebook, Inc.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)......................................... 14, 16, 17, 18

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 428 (S.D.N.Y. 2014)........................................................................ 13

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 524 (S.D.N.Y. 2014)........................................................................ 19

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  411 F. Supp. 2d 377 (S.D.N.Y. 2006)........................................................................ 6

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  618 F. Supp. 2d 311 (S.D.N.Y. 2009)........................................................................ 6

*In re Fuwei Films Sec. Litig.*,
  634 F. Supp.2d 419 (S.D.N.Y. 2009)........................................................................ 14

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................................... 20

*In re MF Global Holdings Secs. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)........................................................................ 7

*In re Netshoes Sec. Litig. v. XXX*,
  126 N.Y.S.3d 856 (N.Y. Sup. Ct. 2020) ................................................................... 18

*In re Nokia Corp. Sec. Litig.*,
  2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021) ......................................................... 15

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015)........................................................................ 22

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)........................................................................ 8

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ................................................ 16

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ....................................................................... 7

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) ................................................ 23

*In re Willis Towers Watson Plc Proxy Litig.*,
    439 F. Supp. 3d 704 (E.D. Va. 2020) ........................................................... 20

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016) .......................................................................... 18

*Karimi v. Deutsche Bank Aktiengesellschaft*,
    2022 WL 2114628 (S.D.N.Y. June 13, 2022) ............................................... 14

*Lasker v. New York State Elec. & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996) ............................................................................ 15

*Lematta v. Casper Sleep, Inc.*,
    2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022) ......................................... 17, 18

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ........................................................................ 25

*Litwin v. Blackstone Group, L.P.*,
    634 F.3d 706 (2d Cir. 2011) ........................................................................ 14

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ...................................................................................... 22

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014) .......................................................................... 9

*Noto v. 22nd Century Grp., Inc.*,
    35 F.4th 95 (2d Cir. 2022) ........................................................................... 22

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019) ............................................... 18, 19, 20

*Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018) ...................................................... 21-22

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
    297 F.3d 1182 (11th Cir. 2002) ................................................................... 17

*Panther Partners Inc. v. Ikanos Communs., Inc.*,
   681 F.3d 114 (2nd Cir. 2012) ............................................................ 6, 18, 19

*Panther v. Jianpu Tech., Inc.*,
   2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) .................................... 10, 11

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
   2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ..................................... 10, 25

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ................................................................... 8, 21

*Rubinstein v. Credit Suisse Grp. AG*,
   457 F.Supp.3d 289 (S.D.N.Y. 2020) ..................................................... 10, 16

*Silvercreek Mgmt. v. Citigroup, Inc.*,
   248 F.Supp.3d 428 (S.D.N.Y. 2017) ............................................................ 8

*Stadnick v. Vivint Solar, Inc.*,
   861 F.3d 31 (2d Cir. 2017) ......................................................................... 19

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015) ......................................................................... 17

*Strougo v. Barclays PLC*,
   105 F. Supp. 3d 330 (S.D.N.Y. 2015) ........................................................ 24

*Szulik v. Tagliaferri*,
   966 F. Supp. 2d 339 (S.D.N.Y. 2013) ........................................................ 13

*Tellabs, Inv. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................................ 21, 23

*Wallace v. Intralinks*,
   2013 WL 1907685 (S.D.N.Y. 2013) ........................................................ 7, 8

*Washington State Inv. Bd. v. Odebrecht S.A.*,
   461 F. Supp. 3d 46 (S.D.N.Y. 2020) .......................................................... 22

*Willard v. UP Fintech Holding Ltd.*,
   527 F. Supp. 3d 609 (S.D.N.Y. 2021) ......................................................... 19

*Yannes v. SCWorx Corp.*,
   2021 WL 2555437 (S.D.N.Y. June 21, 2021) ....................................... 23, 24

*Yaroni v. Pintec Tech. Holdings Ltd.*,
   2022 WL 1215450 (S.D.N.Y. Apr. 25, 2022) ............................................. 11

**Statutes**

15 U.S.C §15(a)(2) .................................................................................................... 25

15 U.S.C. § 78u-4(b) ................................................................................................ 21

15 U.S.C. §78u-5(b)(1)(B) ....................................................................................... 15

15 U.S.C. §78u-5(b)(2)(D) ....................................................................................... 15

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................................ 7, 8

Fed. R. Civ. P. 15(a)(2) ............................................................................................ 25

**Regulations**

17 C.F.R. § 229.303 ................................................................................................. 18

Special Purpose Acquisition Companies, Shell Companies, and Projections

87 Fed. Reg. 29458 (proposed May 13, 2022) ........................................................ 15, 16

Lead Plaintiffs Si Fan, Amit Batra, and SLG Cloudbank Holdings ("Plaintiffs"), individually and on behalf of all other persons similarly situated, respectfully submit this memorandum of law in opposition to Defendants' Joint Motion to Dismiss the Amended Class Action Complaint ("AC").

## I. INTRODUCTION

In December 2021, Grab Holdings, Limited ("Grab" or the "Company") used an inaccurate and Defective Proxy/Registration Statement ("P/RS") to pull off what it called the "largest-ever U.S. public market debut by a Southeast Asian company" by completing a de-SPAC merger with Altimeter Growth Corp. ("AGC"). ¶¶1.a, 91.[1] The P/RS purported to reflect extensive due diligence by Defendants and instructed investors not to conduct their own diligence, instead requiring them to accept the facts as disclosed in the P/RS. ¶¶41-42. As a result, AGC shareholders overwhelmingly approved the merger and nearly all elected to convert their shares into Grab common stock. ¶91. Grab received proceeds of $4.5 billion from the IPO.

As detailed in the AC, the P/RS was defective and failed to accurately disclose crucial information about: (a) driver shortages undermining Grab's core ride hailing and food delivery businesses; (b) driver and consumer incentive payments; and (c) the sustainability of Grab's profit margins. For example, the P/RS inaccurately stated that drivers were sufficiently available, but that Grab "*may*" experience "driver-partner supply constraints" in the future, and that incentive payments were then declining and "expected ***to continue to decline***," boosting margins and profitability. ¶¶72, 80. The facts at the time of the IPO were the exact opposite: Grab had ***already*** been experiencing

---

[1] "¶" or "¶¶" refers to paragraphs in Plaintiffs' Amended Class Action Complaint for Violation of Federal Securities Laws (ECF No. 58). All emphasis is added and internal citations omitted unless otherwise noted. "DB" refers to the Joint Memorandum of Law in Support of Defendants' Motion to Dismiss (ECF No. 90). Defendants Gerstner, Siam, Barton, Dozie and Ittycheria constitute the "AGC Board," and, together with Grab and Defendants Oey, Tan, Ling, Rogers, Khosrowshahi. Ein, and Jay are collectively referred to as the "Section 11 Defendants."

significant declines in drivers for months and had ***already*** embarked on a massive incentive spending ***increase***, slashing profit margins.

In a March 3, 2022 press release, Grab finally admitted that at the time of its IPO, it was spending 94% more on partner incentives compared with the average quarter in 2020, and 137% more on consumer incentives. ¶93. On April 28, 2022, Grab clarified that it had already experienced driver declines "in the third quarter of 2021," before the P/RS and IPO, and by the time it went public, had "preemptively invested in driver incentives to grow the supply of active drivers on the platform." *Id*. After the March 3, 2022 disclosure, Grab's stock price fell $1.95, or 37.3%, on unusually heavy trading volume. ¶104.

Unable to dispute these well-pleaded facts showing a deep disparity between actual conditions at the time of the P/RS and the statements made to investors, Defendants engage in strawman arguments, urge the Court to make improper findings of fact, and seek shelter in the sheer length of Grab's P/RS and the theoretical warnings therein that were, themselves, misleading. Such arguments cannot warrant dismissal. Far from pleading fraud by hindsight, Plaintiffs allege glaring misstatements and omissions of then-current facts in Defendants' disclosures that caused concrete and substantial harm to investors. *See* § III.B-D, *infra*. Moreover, Defendants address the wrong pleading standard for the AC's principal claims under Section 11 and 14(a), which are entirely discrete from the AC's limited fraud claims and require only the "short and plain statement" specified in Rule 8(a). *See* § III.A, *infra*.

Because Defendants' motion fails to show any pleading deficiency in the AC, their motion should be denied in its entirety and the parties directed to proceed to discovery without further delay.

## II.    STATEMENT OF FACTS

### A.    Grab Depends on Incentives to Retain Sufficient Drivers for Its Core Food Delivery and Ride Hailing Businesses

Grab is an app-based, ride hailing and delivery business operating in Southeast Asia. ¶¶43-44. The overwhelming majority of Grab's revenue is derived from (1) mobility offerings, which connect consumers with rides, and (2) food delivery. ¶¶44-46. Both services depend on Grab's ability to generate and retain partner relationships with drivers. *Id.* Moreover, Grab's success in any market requires sufficient drivers to attract consumers and merchants to its platform. ¶72.

To attract and retain drivers, Grab utilizes substantial monetary incentives, including "gem incentives," which reward longer trips. ¶48, 55. Additionally, Grab provides referral bonuses, "special incentive periods" with a graduated per-trip bonus, and a Performance Rebate incentive plan, which offered quarterly commission rebates to top drivers. ¶¶55-60. Grab aggressively promoted its incentives to drivers in weekly emails and promoted additional bonuses via the Telegram messaging app and email. ¶¶54, 56. The frequency of promotional bonuses increased substantially in Q3 and Q4 of 2021. ¶57.

Grab's transaction revenue is its allotted percentage of gross merchandise value ("GMV")—the cost of a service to a consumer—minus partner and consumer incentives. ¶6. Thus, each dollar offered in partner or consumer incentives decreases Grab's revenue and profitability by an equal amount. ¶50. Incentive offers were of key concern to investors and analysts, who recognized the importance of keeping incentives "in check" to control operating-margin impact. ¶¶51, 62.

### B.    Shortly Before Its IPO, Grab Began Experiencing a Driver Shortage and Significantly Increased Consumer and Partner Incentives

During 2020 and the first half ("H1") of 2021, Grab reduced incentives from 19% of GMV in 2019 to 10% in H1 2021, resulting in overall positive revenue for its key mobility and delivery segments. ¶¶51, 53. In Q3 2021, however, Grab experienced a decline in drivers, causing supply

constraint. ¶65. News outlets and numerous online customer complaints prior to the IPO discussed the shortage, including one November 2021 article entitled "Where have all the Grab drivers gone?" ¶65.

In response to the driver shortage, and as Grab later admitted, at the time of the IPO, the Company had "preemptively" ramped incentives in response to continuing declines that had begun in Q3. ¶¶64-65.[2] It dramatically escalated incentive announcements beginning in Q3 2021, and by Q4 2021, nearly doubled its quarterly Telegram bonus announcements and instituted special incentive periods. ¶¶57-58. In total, Grab paid quarterly incentives in Q4 that were more than 90% higher year-over-year ("Y/Y"), and massively increased incentives to its driver partners in Q3 and Q4 of 2021 by 33.8% in just those two quarters. ¶64. At the same time, Grab also significantly increased consumer incentives to boost demand, including 30% off its entire delivery menu in October 2021 and 50% off rides to several airports beginning in October 2021. ¶¶67-69. Such consumer incentives increased approximately 73% in 2021, not decreased as the P/RS would have investors believe. These aforementioned incentive numbers are outlined in the figure below:

|  | Q3 '21 | Q3 '20 | Q4 '21 | Q4 '20 | 2021 | 2020 |
|---|---|---|---|---|---|---|
| Partner Incentives | $187 | $132 | $218 | $126 | $717 | $621 |
| Consumer Incentives | $271 | $132 | $365 | $162 | $1,065 | $616 |
| Total | $458 | $264 | $583 | $288 | $1,782 | $1,237 |

¶¶63, 93 (deriving figures from Grab's November 11, 2021 Press Release and March 3, 2022 Press Release); *see also* n. 8, *infra*.

### C. Shareholders Approve the Merger and Grab Goes Public Via the Defective Proxy/Registration

Grab utilized the P/RS and the inaccurate statements therein to solicit votes and avoid redemptions, allowing it to go public on December 2, 2021 via a de-SPAC merger with AGC. ¶2. The P/RS asserted an artificial $39.6 billion valuation for Grab—purportedly based on Defendants'

---

[2] Grab's decision to increase incentives in response to declines is proof the declines caused constraints.

extensive due diligence and experience. ¶¶38-41. The P/RS specifically instructed shareholders not to perform their own due diligence and to rely solely on the information provided in the P/RS. *See* ¶¶38-39; *see also* ¶42 ("None of AGC, GHL, or Grab has authorized anyone to give any information or make any representation about the Business Combination, or their companies that is different from … that which is contained in [or incorporated into] this proxy statement/prospectus … Therefore, if anyone does give you information of this sort, ***you should not rely on it***."). The merger was contingent upon approval by AGC shareholders, who, regardless of vote, could redeem their shares for $10.00 per share. ¶37. As a result of the material inaccuracies in the P/RS, the merger was approved and less than 1% of shareholders elected to redeem—an exceptionally favorable result for Defendants. ¶92.

As detailed in the AC, both the P/RS and documents incorporated therein contained materially false and misleading statements and omissions. Specifically, they misrepresented that (1) Grab had sufficient drivers, (2) Grab was then reducing incentive payments, and (3) Grab's profit margins were improving and sustainable. *See* ¶¶70-87. These misrepresentations were exacerbated by inaccurate risk disclosures falsely describing actual events as mere hypothetical possibilities: that Grab "may" increase incentives in the future and that "if" it did so, profitability would suffer. ¶¶72, 76, 78; *see* §§III.B.1.a-b, III.B.2.b, *infra*.

In truth, and as Defendants later disclosed, Grab had ***already*** embarked on a massive incentive increase in Q3 and Q4 2021 and had ***already*** experienced a driver shortage in 3Q 2021. ¶93. Specifically, in a March 3, 2022 press release, Grab admitted that at the time of the IPO, it was spending 94% more on incentives than in the average quarter in 2020, and 137% more in consumer incentives. *Id.* On April 28, 2022, Grab clarified that it had already experienced driver declines "in the third quarter of 2021," and, by the time it went public, had "preemptively invested in driver

incentives to grow the supply of active drivers on [its] platform." *Id.* On March 3, 2022, Grab's stock price fell $1.95, or 37.3%, on unusually heavy trading volume. ¶104. Grab shares continued to decline through the date of the lawsuit, and still have not recovered today.

## III.   ARGUMENT

### A.  Plaintiffs' Section 11 and 14(a) Claims Face Minimal Pleading Requirements

"Section 11 imposes strict liability on issuers and signatories, and negligence liability on underwriters[.]" *See Panther Partners Inc. v. Ikanos Communs., Inc.*, 681 F.3d 114, 120 (2nd Cir. 2012). Under Section 11, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements[.]" *Fresno Cty. Emps. Ret. Ass'n v. comScore, Inc.,* 268 F. Supp. 3d 526, 557 (S.D.N.Y. 2017). The burden on the plaintiff is "relatively minimal." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 382 (1983).[3] "To establish a prima facie claim under Section 11, '[a] plaintiff need only plead a material misstatement or omission in the registration statement[,]" and need not plead "intent to defraud." *Fresno*, 268 F. Supp. 3d at 557 (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006)). Plaintiffs face a similarly "low bar" to plead an actionable Section 14(a) claim. *Fresno*, 268 F. Supp. 3d at 560. They need only "allege that (1) a proxy statement contained a material misrepresentation or omission, which (2) caused the plaintiff loss, and (3) the proxy solicitation was an essential link in accomplishing the proposed transaction." *See Erickson v. Jernigan Cap., Inc.*, 2022 WL 3028627, at *2 (S.D.N.Y. Aug.

---

[3] This strict liability standard goes to the very purpose of Section 11. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 321 (S.D.N.Y. 2009) ("Section 11 'was designed to assure compliance with the disclosure provisions of the [Securities Act] by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.'") (citing *Herman*, 459 U.S. at 381–82).

1, 2022). Scienter is not an element of Section 11 or 14(a) claims.[4] DB 16, 21, 23; *Fresno,* 268 F. Supp. 3d at 557.

Section 11 and 14(a) claims are governed by Rule 8(a) of the Federal Rules of Civil Procedure, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2); *see Fresno*, 268 F. Supp. 3d at 557-60. "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations[.]'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Rather, Rule 8(a) only requires plaintiffs to plead sufficient facts "'to state a claim … that is plausible on its face.'" *Id.*

"[O]nly where 'the gravamen of the complaint is plainly fraud' should the heightened pleading requirements of Rule 9 be applied." *See In re Citigroup Bond Litig.*, 723 F. Supp. 2d 568, 586 (S.D.N.Y. 2010). Merely utilizing statutory language (*e.g.*, describing a statement as misleading) does not mean that claim sounds in fraud. *See Fresno*, 268 F. Supp. 3d at 559; *In re Bank of Am. Corp. Sec., Der., & ERISA Litig.*, 757 F. Supp. 2d 260, 321-22 (S.D.N.Y. 2010).

Here, the AC meticulously distinguishes its negligence and strict liability claims from its limited fraud claims, which involve different statements made at a different time. *See e.g.,* ¶¶1, 10, 96-118. Rule 8(a) applies where, as here, "[p]laintiffs have properly separated their Section 10(b) allegations based on fraud, from their Section 11 … allegations based on negligence." *Wallace v. Intralinks*, 2013 WL 1907685, at *12 (S.D.N.Y. May 8, 2013). The AC is "structured … to draw a clear distinction between negligence and fraud claims" with the Section 11, 14(a), and 15 allegations (¶¶70-95) expressly delineated from those supporting the narrow Section 10(b) and 20(a) allegations

---

[4] *See In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1405 n.3 (9th Cir. 1996) ("Of course, the scienter requirement of Rule 9(b) does not apply to Section 11 claims, as such claims may be based on negligent or innocent misstatements or omissions."); *see also In re MF Global Holdings Secs. Litig.,* 982 F. Supp. 2d 277, 308 (S.D.N.Y. 2013) (Noting "that Securities Act claims do not need to be pled with particularity unless they sound in fraud" and "unlike claims under the Exchange Act, claims under the Securities Act 'do not require allegations of scienter[.]'"); *id.* at 311, 321-324 (finding that plaintiffs met "Rule (9)(b) particularity standard" and stated a Section 11 claim without pleading scienter).

(¶¶96-110, 113.d-g, 117-18), which apply to only three of the fourteen Defendants and involve only non-overlapping, post-merger misstatements. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007); *see also Fresno*, 268 F. Supp. 3d at 558.

Plaintiffs' Section 11 and 14(a) claims expressly plead negligence and strict liability. *See e.g.*, ¶2 ("The merger was effected through a defective and ***negligently*** prepared proxy and registration statement[.]"), ¶120 (Section 11 Count "is based on negligence and strict liability[.]"); *see also* ¶¶123-25 (alleging that Defendants failed to "make a reasonable investigation into the statements contained in the [P/RS]" or "exercise [] reasonable care[.]"); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 632 (Securities Act claims do not sound in fraud where they "are carefully couched in the language of negligence."); *Wallace*, 2013 WL 1907685 at *12. The AC also expressly disclaims fraud in relation to Plaintiffs' Section 11 and 14(a) claims. *See e.g.*, ¶¶96, 111, 120; *see also Silvercreek Mgmt. v. Citigroup, Inc.,* 248 F.Supp.3d 428, 448 (S.D.N.Y. 2017). Accordingly, Rule 8(a) is the appropriate pleading standard for Plaintiffs' Section 11 and 14(a) claims. And, even if particularized pleading were required, it would be satisfied by the AC's detailed allegations, which: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

### B.  Plaintiffs' Section 11 Claim Is Actionable

#### 1.    Plaintiffs Adequately Pled Misstatements and Omissions in the P/RS as Required by Section 11

Because the AC here pleads actionable material misstatement and omissions in the P/RS, Plaintiffs have met the "relatively minimal" burden to establish a *prime facie* case under Section 11 against Grab and the Section 11 Defendants. *See Herman*, 459 U.S. at 382; *see also Fresno*, 268 F.3d at 556-57.

### a. False and Misleading Statements Regarding Driver Shortages

The P/RS falsely spoke of driver shortages as hypotheticals, stating that "increased costs *may* cause driver-partners to spend less time providing services on the Grab platform" (¶76), and "*[i]f* driver-partners are not attracted to the Grab platform[,]" the Company "*may* lack a sufficient supply of driver-partners[.]" ¶72. However, as the Company later admitted (¶¶65, 93), Grab was facing a significant decline in drivers starting in Q3 2021 and leading up to its IPO. Defendants mince words claiming that a decrease in the number of driver partners in the Q3 2021 does not equate to a driver shortage. DB 12-14. This is belied by Grab's own admission, the dramatic increase in incentives implemented to combat not only the declining number of drivers but also the increase in consumer complaints stemming from the driver shortage, and the resulting cancellations and price surges.[5] *See* ¶¶57-59, 65, 93; § II.B-C, *supra*. Indeed, Grab increased incentive spending from a steady 10% at the end of Q2 2021 to 13.38% by the end of Q4 2021—a 33.8% rise in just two quarters. ¶64.

By choosing to discuss Grab's driver-partner supply, the Section 11 Defendants created "a duty to the tell the whole truth" regarding the driver shortage. *See Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). Such information was readily available to the Section 11 Defendants as Grab admitted that it saw "a decrease in the number of driver partners *in the third quarter of* 2021." ¶¶65, 93; *see Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 183-84 (S.D.N.Y. 2010) ("The Second Circuit has explicitly recognized that plaintiffs may rel[y] on post-class period [statements] to confirm what a defendant should have known during the class period.");

---

[5] Because Plaintiffs support their claims with contemporaneous facts detailing consumer complaints regarding driver shortages, increasing incentives implemented in Q3 and Q4 2021 to offset the same, and Defendants' own admission that the Company *saw* declining driver partnerships in Q3 2021 and *preemptively* increased incentives, Defendants' reliance on *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008), where plaintiff "merely allege[d] that [defendant] was 'experiencing an increase' in broker attrition and customer withdrawals[,]" without any factual support or admissions by the defendant, is inapposite. Further, for the same reasons, Defendants' reliance on *Coronel v. Quanta Capital Holdings, Ltd*., 2009 WL 174656, at *13 (S.D.N.Y. Jan. 26, 2009), where plaintiff challenged the veracity of a loss estimate relying only on subsequent increases and the company's ineffective internal controls, is similarly misplaced.

*see also Alpha Capital Anstalt v. Intellipharmaceuticals Int'l Inc.*, 2020 WL 3318029, at *1-3 (S.D.N.Y. June 18, 2020) (defendant's post-class period admission supported falsity).[6]

Rather than acknowledging the driver shortage, Grab falsely stated that it "*may*" experience "driver-partner supply constraints" and, if that happens, Grab "*may* need to increase …the driver-partner incentives that Grab offers," when these purported risks were already occurring. ¶72. Further speaking in hypotheticals, Defendants stated that "[a] decreased supply of consumers and driver- and merchant- partners on the Grab platform *could* harm its business" when, in fact, the Section 11 Defendants were concealing that Grab was then significantly increasing incentives to combat drive shortages at the expense of revenue and profit. ¶¶65, 76, 93; *see In re BioScrip, Inc. Sec Litig.*, 95 F. Supp. 3d 711, 743 (S.D.N.Y. 2015) ("'hypothetical warnings will not eliminate liability based on the failure to disclose present knowledge'"); *see also Panther v. Jianpu Tech., Inc.*, 2020 WL 5757628, *12 (S.D.N.Y. Sept. 27, 2020) (risk disclosures insufficient where "framed as mere hypotheticals" but plaintiff alleged risk had "already materialized"); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *11-12 (S.D.N.Y. Apr. 14, 2020) (same). In contrast, Defendants' cited case, *Rubinstein v. Credit Suisse Grp. AG*, 457 F.Supp.3d 289, 296-98 (S.D.N.Y. 2020), involved a risk that materialized after the registration statement supplement was filed.

### b.  False and Misleading Statements Regarding Reducing Incentives

To entice investors to approve the de-SPAC and/or purchase Grab stock in its IPO, Defendants understated its use of significant increased incentives to attract more drivers by inaccurately casting it as having already occurred "[d]uring the initial stages of growth[.]" ¶74. The P/RS also touted that "[a]s Grab has achieved greater scale, ***it has and may <u>continue to reduce</u>***

---

[6] Here, unlike in *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016), where plaintiffs relied on a decrease in financials that "offer[ed] little guidance as to the information that was available at the time of the IPO[,]" Defendants' admission describes the information they had in the months ***preceding*** the de-SPAC. ¶¶65, 93.

*incentives*" and further emphasized that "merchant and consumer incentives …are expected ***to continue to decline*** over time as Grab's business matures." ¶¶70, 80.

These incentive statements were false because Grab's incentives were not declining. Rather, they were massively increasing as a result of Defendants "aggressively market[ing] its partner incentive programs[,]" including by "routinely offer[ing] bonus partner incentives on top of additional 'gem incentives[.]'" ¶¶54, 56. Indeed, the Company dramatically increased the frequency of incentive announcements in Q3 2021, and "by Q4 2021, Grab was paying quarterly incentives that were more than 90% high year-over-year[.]" ¶¶57, 63, 66. Grab also massively boosted consumer incentives during the first two months of Q4 2021. ¶¶67-69. By choosing to address incentives and the expected, continued decreases (¶¶70, 80) in the P/RS, Defendants were legally obligated to make "complete and accurate" disclosures, *i.e.*, truthfully disclose that Grab's driver and consumer incentives were actually then ballooning. *See* ¶¶57-58, 65; *see Jianpu*, 2020 WL 5757628, at *13.

Unable to explain their incomplete, inaccurate, and highly misleading incentive statements, Defendants mischaracterize the AC's allegations. DB 11-12. The AC does not allege Defendants made an "implicit promise[]" to reduce incentives indefinitely and a "later...strategic decision to increase incentives at a particular point."[7] *Id*. Instead, it alleges that the Section 11 Defendants' statements falsely described the trend in incentives ***at the time,*** which was significantly increasing. ¶¶65, 70, 93. Such strawman arguments cannot show a pleading defect. Defendants must address the allegations as pled.

---

[7] Here, unlike in *Yaroni v. Pintec Tech. Holdings Ltd.* where the alleged false statement was merely implicit in the offering materials, the P/RS explicitly represented that Grab had already reduced and expected to continue reducing incentives. *Compare* 2022 WL 1215450, at *10 (S.D.N.Y. Apr. 25, 2022) *with* ¶¶70, 74, 80.

### c. False and Misleading Statements Regarding Profit Margins

Adding to the misleading impression of Grab's successful business, Defendants incorporated into the P/RS a false earnings call statement touting claimed "flywheel effects." ¶81. Specifically, the statements claimed that "merchant and driver partners ... remain loyal to the platform," and claimed that "consumer demand for deliveries" allowed Grab to "sustain the supply network of our business in a truly cost-effective way." *Id*. The incorporated statements also inaccurately touted that Grab "continue[d] to demonstrate strong trends in our path to profitability" and would "continue to execute sustainable and improving margins despite challenges in the operating environment." ¶83.

These statements emphasizing driver loyalty and a continued trend to profitability were not accurate. By this time, Grab was experiencing a driver shortage and rapidly ramping up incentive spending. *See* ¶¶54, 56-58, 63, 65, 68-69, 93; *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d at 727 (veracity measured by "ability to accurately inform" investors, not "literal truth"). At the time of the IPO, Grab's eroding margins were a far cry from "sustainable" or "improving." ¶¶81-84.[8]

On November 11, 2021, Grab announced its "[r]evenue was $157 million, down 9% YoY[.]" ¶85. Defendants blamed COVID-19 for the revenue decline and claimed it was an "***expected*** decline in mobility due to the severe lockdowns in Vietnam." *Id*. On November 19, 2021, just eleven days before the shareholder vote, Grab reiterated its financial results and again inaccurately attributed the impacts to its revenue exclusively to lockdowns. ¶87. These statements, which were incorporated into the P/RS, were false because declining revenue was attributable to driver shortages and increased incentive spending and was not solely caused by lockdowns in a specific region, as Grab

---

[8] The P/RS's inclusion of separate incentive data for the three months ended September 30, 2021, DB 7, does not soften Plaintiffs' claims. The P/RS directed investors to consider that data falsely as part of an overall trend of reducing incentives and further reductions. *See* ¶¶1.a, 70, 87. In any event, the P/RS was also misleading because it failed to disclose: (i) that incentives were ballooning in Q4; and (ii) the known future revenue impact of the Q3 increases, in violation of Item 303. *See* § III.B.1-3, *infra*.

later admitted. *See* ¶93 (at the time of IPO Grab was spending 94% more on total incentives compared to the average incentives per quarter in 2020, and 137% more in consumer incentives); *see also e.g.,* ¶¶55-57 (alleging increased incentives in Malaysia and Singapore).[9]

Defendants' reliance on extrinsic evidence regarding COVID-19 only highlights that the issues they raise are factual disputes for trial, not pleading defects. *See Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 356-357 (S.D.N.Y. 2013) (declining to consider extrinsic documents not cited by or relied on by plaintiffs). Moreover, while attempting to blame COVID-19, Defendants conveniently overlook Tan's September 13, 2021 statement that COVID-19 helped increase consumer demand for deliveries, enabling Grab to sustain the Company's driver supply network. *See* ¶81. Defendants' argument further ignores that the Company reduced incentives during the heart of the pandemic, only to raise them before and at the time of the IPO. *See* ¶¶51-53.[10]

### 2. Defendants' Additional Challenges to Falsity and Materiality Fail

#### a. The Alleged Misstatements and Omissions Were Material

Defendants erroneously argue that their statements describing Grab's business strategy, initial use of incentives, and financials were immaterial puffery. DB 15-16. "A statement or omission is 'material' if a 'reasonable investor would view it as significantly altering the total mix of information made available.'" *Alpha Capital Anstalt*, 2020 WL 3318029, at *2. Materiality is a

---

[9] Contrary to Defendants' contention (DB 15), the AC does not challenge the accuracy of Grab's reported financial results (¶¶83-87), but rather statements that: (a) it was continuing on its "path to profitability[,]" (b) it was continuing to "execute sustainable and improving margins[,]" and (c) revenue declines were caused by Vietnam, while omitting that a driver shortage and skyrocketing incentives were the real problems and destroyed Grab's margins, as Grab later admitted. *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 466 (S.D.N.Y. 2014) (quoting *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004)) ("A statement can also be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact."); *see* ¶70 (expressly linking profitability to, *inter alia*, the company's ability to manage incentive spending). Thus, *Altayyar v. Etsy*, 242 F. Supp. 3d 161, 180 (E.D.N.Y. 2017), where plaintiffs alleged false line items in the financial statements, is simply not on point.

[10] While Plaintiffs do not object to the Court considering Defendants' excerpts (*see* ECF No. 91), they do object to the Court accepting their contents as true to the degree Defendants submit them for that purpose. *See Donoghue v. Gad*, 2022 WL 3156181, *5 n.7 (S.D.N.Y. Aug. 8, 2022).

"'mixed question of law and fact,'" generally not appropriate for resolution on the pleadings. *Id.* at *3. Indeed, "'[c]ourts do not grant motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on grounds of immateriality, unless the misstatements "'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"" *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 439 (S.D.N.Y. 2009).

Here, the misstatements involved Grab's most important businesses (delivery and ride hailing) and most important metric (profit margins). ¶44. Such topics that "play[] a significant role" in the business are clearly material. *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 722 (2d Cir. 2011); *see also In re Facebook, Inc.*, 986 F. Supp. 2d 487, 519 (S.D.N.Y. 2013). And, as the AC details, Defendants repeatedly conceded that reducing incentives while sustaining demand for delivery and ride hailing businesses were crucial to its profitability. ¶¶78, 81.

Defendants' statements were concrete, and "not so general that a reasonable investor could not have relied upon them[.]" *Galestan v. Onemain Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018). Indeed, a UBS analyst report published 10 days after the de-SPAC noted the importance of Grab's claims that it "managed to keep incentives (for consumers and drivers) ***in check***." ¶¶62, 74. Any fair reading must concede that the false statements were highly important, not "so obviously unimportant" as to warrant dismissal. *See Litwin*, 634 F.3d at 717.

Nor were Defendants' statements mere corporate optimism. *Cf.* DB 15-16. The statements outlined in ¶¶74, 81, and 83, read in context, show that "what was actually going on" at the Company was "wholly at odds" with Defendants' descriptions. *Karimi v. Deutsche Bank Aktiengesellschaft*, 2022 WL 2114628, at *6 (S.D.N.Y. June 13, 2022). Unable to explain away the P/RS inaccuracies, Defendants mischaracterize the statements. As alleged in the AC and as set forth in the P/RS, the statements in question are not about future "anticipated benefits" or "future financial prospects." DB

15. To the contrary, Defendants' statements indicate that elevated incentives were only "offered"—in the past-tense—"during the initial stages of [Grab's] growth" (¶74), which was then wholly untrue. Other statements made in the present-tense misstated trends at the time of the IPO. *See* ¶83 (falsely describing present "strong trends in [Grab's] path to profitability"); ¶81 (falsely asserting that Grab's consumer spending "grows in tandem" with more services, when that correlation had already broken); *see also Galestan*, 348 F. Supp. 3d at 303 (awareness of contradictory information negates puffery).[11] But contrary to Defendants' statements, and as they later conceded, Grab was—by the time of its IPO—experiencing driver shortages and offering ballooning incentives. ¶¶54, 56-58, 63, 65, 68-69, 93. Further, that Grab was only offering incentives during the initial stages of growth (¶74) and that its purported flywheel effects were creating income opportunities for driver partners and sustaining Grab's driver supply (¶81) are objective statements that can be proven true or false. *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 412 (S.D.N.Y. 2020).

### b. The PSLRA Safe Harbor and the Bespeaks Caution Doctrine Are Inapplicable

Defendants' P/RS statements are categorically outside the PSLRA's safe harbor. By its plain terms, the safe harbor cannot apply to statements made "in connection with an offering of securities by a blank check company[,]" *see* 15 U.S.C. § 78u-5(b)(1)(B) or "made in connection with an initial public offering[,]" *see* 15 U.S.C. § 78u-5(b)(2)(D). At the time that the P/RS was filed, AGC was a blank check company (¶30), and the statements were made "in connection with [Grab's] initial public offering," effected by the Form F-4 and de-SPAC with AGC. ¶¶2, 95; *see* Special Purpose

---

[11] These statements are nothing like the vague, broad, future-tense statements at issue in Defendants' cited cases, DB 15. *See Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 57 (2d Cir. 1996) ("We are convinced our business strategies will lead to continued prosperity."); *see also In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at *17 (S.D.N.Y. Mar. 29, 2021) (holding statement that integration "went beautifully" was too vague).

Acquisition Companies, Shell Companies, and Projections, 87 Fed. Reg. 29458, 29482 (proposed May 13, 2022) (for safe harbor purposes, "no reason" to treat statements made in connection with de-SPAC differently than those "made in traditional initial public offerings").

Nor would the statements qualify for protection even if the safe harbor were available, or for protection under the bespeaks caution doctrine. Neither offers protection for the misrepresentation of historical and current material fact alleged in the AC. *See City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12-13 (S.D.N.Y. Mar. 25, 2013); *see also* ¶¶70, 74, 80-81. Indeed, the P/RS represented that Grab had already reduced incentives, that those reductions were ongoing, and that they were expected to continue, while Defendants were simultaneously ramping up incentive spending. *See* ¶¶70, 74, 80; *see also In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at *9 (E.D.N.Y. Apr. 22, 2020) (already-declining rates and existing delays invalidated bespeaks caution protections); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (boilerplate risk disclosures insufficient).[12]

Moreover, Grab's cautionary language was not meaningful and was itself misleadingly couched as theoretical when the adverse events had actually occurred at the time of the IPO.[13] *See e.g.,* ¶72 ("***To the extent*** that Grab experiences driver-partner supply constraints … Grab ***may*** need to increase, or ***may*** not be able to reduce" incentives); ¶78 ("***If*** Grab is unable to reduce the amount of incentives" it could impact results). It is "misleading" to "warn[] only that a risk may impact" a company's "business when that risk has already materialized." *Facebook*, 986 F. Supp. 2d at 516-

---

[12] Defendants erroneously assert that the mischaracterization of the superapp as a "flywheel" was forward looking. DB 15 n.11. It is not, as Defendants' use of the past tense demonstrates. *See* ¶81 (Explaining that Grab's "pervasive mobility user base ***enabled*** [it to] rapidly achieve category leadership in deliveries" which grew consumer spending, and ***"helped to cushion*** the impact of softer mobility demand" and ***"helped [it] sustain*** the supply network[.]").

[13] Unlike here, plaintiffs in *Rubinstein v. Credit Suisse Grp. AG* did not allege that the risks disclosed were already occurring. *See* 457 F. Supp. 3d at 296-99.

18. "[T]o caution that it is only possible for the unfavorable events to happen when they have already happened is deceit." *City of Providence*, 2013 WL 1197755 at *14.[14]

Defendants' contention that Plaintiffs recast the P/RS's risk disclosures into "assurance[s] that Grab had achieved" its purported goals is simply false. *Compare* DB 12 *with* ¶70. The AC alleges these disclosures were false and misleading because they misconstrued then-current facts—driver-partner declines and incentive increases were already occurring—as hypothetical risks. As Grab itself later admitted, it experienced "a decrease in the number of driver-partners *in the third quarter of 2021*," a quarter before the IPO. ¶93; *see In re Apple Inc. Securities Litigation*, 2020 WL 6482014, at *10 (N.D. Cal. Nov. 4, 2020) (after-the-fact statement that Defendants "saw" trend "as the quarter went on" constituted "I knew it all along" admission).

### 3.    Plaintiffs Have Adequately Alleged Violations of Item 303

Item 303 requires "'analysis 'of known material trends'…'and the extent to which reported financial information is indicative of future results.'" *Lematta v. Casper Sleep, Inc.*, 2022 WL 4637795, at *13 (E.D.N.Y. Sept. 30, 2022); *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). The "obvious focus" of these requirements is "preventing the latest reported results [in a registration statement] from misleading potential investors[.]" *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1192 (11th Cir. 2002). Here, by the time the P/RS was published, existing driver shortages and incentive increases were already negatively impacting Grab's future financial conditions and results, such that prior results were unlikely to be (and, in fact, were not) indicative

---

[14] Defendants' representations that they had and expected to continue decreasing incentives while simultaneously increasing them is the opposite of *Asay*, where defendants admitted that they "expect[ed] [] costs and expenses to continue to increase." *See Asay v. Pinduoduo*, 2020 WL 1530745, at *9-10 (S.D.N.Y. Mar. 30, 2020). Similarly, representations that a company was "not afraid" to change course if managers felt off course or would "strive" to make decisions, *see Altayyar*, 242 F. Supp. 3d at 173, 176, are nothing like Grab's affirmative representation that the Company had then and expected to continue to decrease incentives.

of future results. ¶90. Defendants had an affirmative obligation to disclose these risks and their potential future impact in the P/RS pursuant to Item 303. ¶88.

Defendants' arguments incorrectly seek to excuse nondisclosure based on the length of the undisclosed trends. DB 16-19. This argument fails on its face. "[W]hether a pattern or occurrence is sufficiently lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage." *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019); *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017). Moreover, the statute expressly covers "trends," "events," or "uncertainties" in the disjunctive. 17 C.F.R. § 229.303. Thus, interval notwithstanding, Defendants were required to disclose the *uncertainty* that then-known driver shortages and then-increasing incentives posed for future revenues. *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95-96 (2d Cir. 2016) ("uncertainty" about likely effect on future revenue); *Panther Partners Inc.*, 681 F.3d at 120 (issue is "manner in which uncertainty…might reasonably be expected to have a material impact on future revenues"). In any event, the problems alleged began in Q3 2021, so by mid-Q4, a trend was firmly established. ¶93; *see CPI Card*, 2017 WL 4941597 at *3 n. 38 (trend that began in Q1 required disclosure in 3Q IPO).

Moreover, intra-quarter updates are required (a) if "intervening events trigger a duty to disclose[,]" or (b) as necessary to make "disclosures under Item 303…accurate and complete as of the time [a] Registration Statement bec[omes] effective." *Facebook*, 986 F. Supp. 2d at 513; *see also LeMatta,* 2022 WL 4637795 at *13; *In re Netshoes Sec. Litig. v. XXX*, 126 N.Y.S.3d 856, 869 (N.Y. Sup. Ct. 2020) (duty triggered before registration statement became effective); *Bank of Am. Corp.*, 757 F. Supp. 2d at 304-306 (duty to disclose historically high losses before quarter end). Here, Grab

18

knew of driver shortages and increasing incentives before November 19, 2021 and was required to disclose them in the P/RS under Item 303. ¶¶87, 90.

Further, Defendants' attempt to manufacture bright-line rules violates controlling authority. The Second Circuit has made clear that Item 303 does "not turn on restrictive mechanical or quantitative inquiries[,]" and that a subjective materiality standard "supersedes the 135-day [] rule[]" they cite. *Panther Partners Inc.*, 681 F.3d at 122; *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 542 (S.D.N.Y. 2014).[15] As stated above, the misrepresented matters pled in the AC were not merely subjectively material, but critical to investors. § III.B.2.a, *supra*.

Nor does an Item 303 violation require pleading scienter, as Defendants incorrectly suggest. Item 303 requires only that Plaintiffs plead "with some specificity" facts that "at least together" "support an inference" of knowability or knowledge. *Lexmark*, 367 F. Supp. 3d at 35; *CPI Card*, 2017 WL 4941597 at *4. The AC easily clears this standard: the P/RS's assurance that Defendants conducted extensive due diligence regarding Grab, including consideration of "Grab's future growth and financial performance" (¶38), the statement that "Grab track[ed] certain key operating metrics, including…partner incentives [and] consumer incentives…" (¶106), and Grab's April 28, 2022 admission of a "decrease in the number of driver partners" prior to its IPO and that it "preemptively invested in driver incentives" at the time of the IPO (¶93) all support a plausible inference that Defendants knew the trends and uncertainties omitted from the P/RS. These allegations equal or

---

[15] Defendants' authority does not hold otherwise. DB 17-18; *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 624 (S.D.N.Y. 2021) (note in "Recent Developments" section of registration statement disclosed the relevant changes); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 303 n. 20 (S.D.N.Y. 2021) (unlike here where up to date figures regarding significant incentive increases were not disclosed prior to the IPO, the *Hexo* defendants disclosed the relevant numbers, and the *Hexo* plaintiffs merely conducted "simple math" to derive conclusions regarding lack of demand); *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *9-10 (S.D.N.Y. Jan. 14, 2010) (unlike here (¶¶65,93), the *Blackmoss* plaintiffs relied on information that "w[as] published after the IPO" to argue a trend existing "prior to the IPO"); *Stadnick v. Vivint Solar, Inc*., 861 F.3d 31, 37-39 (2d Cir. 2017) (finding "critical[]" that "the peculiarities" of the defendant's business model "render[ed] the metrics…less probative of…performance.") Here, Defendants expressly acknowledged that Grab's profitability was "dependent" on reducing incentives. ¶78.

surpass allegations supporting knowledge in similar cases. *See, e.g., Lexmark*, 367 F. Supp. 3d at 35 (defendants tracked inventory and saw data at monthly meetings); *CPI Card,* 2017 WL 4941597 at *3 (admission of knowledge soon after IPO, statements on topic in earnings calls, and account of one confidential witness). Thus, Plaintiffs have adequately alleged omissions in violation of Item 303.

### C.  Plaintiffs' Section 14(a) Claim Is Actionable

Because a proxy/registration statement also solicits votes of shareholders, misrepresentations and omissions therein also give rise to a Section 14(a) claim. *Fresno*, 268 F. Supp. 3d at 560. Intent to defraud is not required. *In re Willis Towers Watson Plc Proxy Litig.*, 439 F. Supp. 3d 704, 714 (E.D. Va. 2020); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1266 (N.D. Cal. 2000). The AC's Section 14(a) claim cogently pleads that the P/RS deprived investors of material information needed to properly consider whether to: (a) redeem shares and/or (b) approve the de-SPAC transaction. ¶¶3, 92. Defendants all but concede the sufficiency of this claim, limiting their challenge to a mere half-page addressing only pleading standards. DB 21-22.

And, Defendants misstate the standard for the one argument they do raise. Though not settled, the "better reasoned cases" reject application of a heightened pleading standard to such claims. *Fresno*, 268 F. Supp. 3d at 559 (listing authorities); *accord Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.,* 866 F. Supp. 2d 223, 240 (S.D.N.Y. 2012); *Bank of Am. Corp.*, 757 F. Supp. 2d at 321-22. Because Plaintiffs have adequately pled (1) material misstatements and omissions (2) in the P/RS supporting the AGC-Grab merger (3) that caused injury to the 14(a) Class, they have satisfied the pleading requirements. *Fresno*, 268 F. Supp. 3d at 557; *see* § III.B, *supra*. Regardless, the AC's Section 14(a) claim specifies the misrepresentations, omissions, manner and time of making, signatories, and why each statement was

misleading, and therefore would satisfy a heightened pleading standard even if it did apply. *See Rombach*, 355 F.3d at 170.

### D. Plaintiffs' Section 10(b) Claim Is Actionable

#### 1. The AC Adequately Pleads Actionable Misstatements and Omissions

The AC pleads misrepresentations under Section 10(b) outside the P/RS and entirely distinct from the Section 11 and 14(a) claims. The Section 10(b) claim satisfies Rule 9(b) and the PSLRA, "specify[ing] each statement alleged to have been misleading" and the "reasons why the statement is misleading[.]" 15 U.S.C. § 78u-4(b); *Tellabs, Inv. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007).

*First*, on December 2, 2021, Defendant Tan stated "mobility [ride hailing] margins ***are strong***. We're seeing in our deliveries business, break even, just after 3 years in the majority of our markets." ¶98. This was false and misleading when made because Grab's mobility margins were not then strong, and both mobility and deliveries businesses were in fact then losing money. ¶99. Also on December 2, 2021, Defendant Maa responded to an interview question concerning the Company's plans for profitability and a suggestion by a market-research firm that third-quarter losses stemmed from "big spending on advertising, promotions, and incentives" that could create a "challenge" going forward, by stating:

> We don't see profitability and growth as mutually exclusive. In Q3, we posted our third consecutive quarter of record GMV growth. ***We've also made very good strides on improving our economics***. ***Our mobility segment has been positive since Q4 2019 and our margins are industry-leading [in that sector]***.

¶100. This statement was false and misleading when made because Grab was not then improving its economics but was struggling to manage driver shortages using large incentives. ¶101.

Neither statement could properly be considered puffery even under Defendants' cited cases because each was verifiable. *Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F.

Supp. 3d 551, 570 (S.D.N.Y. 2018) ("The key distinction between these and potentially actionable statements is that these statements were non-verifiable."); *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 221 (E.D.N.Y. 2019) (same). Moreover, Defendant Maa's statement directly responded to an analyst question about incentive costs and profitability, confirming that investors were relying upon his answer. *See Washington State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 74 (S.D.N.Y. 2020) ("statements [] made to reassure investors as to specific risks … cannot be dismissed as 'mere puffery.'"); *see also In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (same).

*Second*, the AC pleads that these statements were misleading by omission, because they failed to disclose that Grab was spending heavily on consumer and partner incentives, causing increasing losses. ¶¶99, 101. Defendants' assertion that these statements should be assumed only to apply to Q3 2021, DB 23, is no defense; Tan emphasized in that same statement that margins were also "stable," for several quarters. Either way, by choosing to speak publicly about margin percentages, the Section 10(b) Defendants incurred a duty "to tell the whole truth": that margins were *not* strong as of December 2021 because Grab was spending massively on consumer and partner incentives, thereby cannibalizing margins and revenue. *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 85 (S.D.N.Y. 2022); *see also Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 105 n. 49 (2d Cir. 2022) (duty to be "both accurate and complete"); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011) (duty to disclose facts to make the "statements made, in the light of the circumstances under which they were made, not misleading").

### 2. The AC Adequately Pleads Scienter

Scienter is adequately pled where "all of the facts alleged, taken collectively," not "in isolation," "give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323. An inference of scienter need not be of the "'smoking-gun'" variety or "even the 'most plausible of the competing inferences[.]'" *Id.* at 324. Corporate scienter is imputed from individual defendants. *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *52 (S.D.N.Y. Sept. 2, 2022). Recklessness is sufficient. *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *9 (S.D.N.Y. May 24, 2018). Taking the AC's allegations together, "'a reasonable person would deem the [AC's] inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

By the time of the Section 10(b) statements, Grab had already witnessed declining numbers of driver partners for over a full quarter. ¶105. Moreover, Defendants admitted to actively adjusting incentive levels immediately preceding and continuing after the IPO, which they could not have done without knowledge of then-current levels. ¶108; *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 371 (S.D.N.Y. 2012) (active involvement supports scienter). Defendants also pushed Grab's dramatically boosted partner and consumer incentives via public advertisements in Q3 and Q4, and therefore would have had access to and knowledge of the offers at the time they were made. ¶¶63, 65, 67, 109. And, Grab provided executives with tracking information, including up-to-date data on incentives. ¶106; *Galestan*, 348 F. Supp. 3d at 300-01 (access to reports shows scienter).

In addition, Defendants held themselves out to investors as knowledgeable about incentive payments, margins, and revenue. ¶107; *see Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *5

(S.D.N.Y. June 21, 2021) (finding scienter where defendants held themselves out as knowledgeable); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 351 (S.D.N.Y. 2015) (same). Also bolstering scienter, the misrepresentations concerned Grab's core operations. ¶110; *Yannes*, 2021 WL 2555437 at *5 (core operations doctrine supports inference of scienter). Defendants' authority does not support a different conclusion. DB 24; *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) ("[T]his Court has considered [core operations] allegations to constitute supplementary…means to plead scienter."); *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 374 (S.D.N.Y. 2018) ("[T]he majority rule is to consider the core operations allegations to constitute supplementary…means to plead scienter[.]"). Further, Grab, Defendant Tan (Director and Chief Executive Officer of Grab, ¶22), and Defendant Maa (President of Grab, ¶25) participated in the extensive due diligence, including multiple meetings and calls. ¶¶38-39. Given these strong and corroborating indicia of scienter, the more compelling inference is that the Section 10(b) Defendants knew (or recklessly ignored) at the time of the IPO that Grab was implementing costly driver-incentives to combat driver shortages, thereby eroding margins and revenue.

Defendants' counter-narrative—that they were victims of pandemic-driven uncertainty—is a smokescreen. Defendants concede that they were aware of the declines in Q3 2021, arguing only that the "fast-changing" nature of the pandemic purportedly blinded their ability to "predict[] the strategies" they would employ in response. DB 23-24. Yet in the same breath, as Defendants later acknowledged, they admittedly took "preemptive" steps by the time of the IPO to address pandemic-related driver shortages in Q3. *Id.* In any event, nearly all the data in the P/RS was pandemic-era data. ¶52. The suggestion that Defendants were somehow caught off-guard by an expected spike in a pandemic they had then been navigating for over two years is tenuous at best. Plaintiffs' position

is at least as compelling. *See Plumbers & Pipefitters Nat'l Pension Fund*, 2020 WL 1877821 at *13 (even a "tie on scienter" goes to the plaintiffs).

### 3.    The AC Adequately Pleads Loss Causation

The AC pleads loss causation by alleging a corrective disclosure on March 3, 2022 that revealed to the market the falsity of their prior misstatements by disclosing massive increases in driver incentives and adverse financial results attributable to "invest[ments]" intended to "grow driver supply," and causing a 37.3% decline in share price. ¶¶102-104; *see Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) ("[P]laintiffs sufficiently plead loss causation when they allege that their share's 'price fell significantly after the truth became known.'"). Unlike in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), DB 25, where the eventual downgrade of a stock did not reveal the falsity of a prior recommendation, the March 3, 2022 statement expressly relates back to the alleged false statements and omissions. In any event, *Lentell* predates the Supreme Court's seminal holding on loss causation in *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346-7 (2005) and is inapposite. Thus, Plaintiffs have adequately pled loss causation.

### E.  Plaintiffs' Control Person Claims Are Actionable

Because Plaintiffs have adequately stated claims for the requisite primary violations, their §§15 and 20(a) control liability claims should be sustained. *See In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d at 746-47.[16]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.[17]

Respectfully submitted,

---

[16] "[A] majority of judges in this District...have held [culpable participation] is not required." *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012).

[17] If the Court grants any part of Defendants' motion, Plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *see also Cersci v. Mohawk Valley Cmty. College*, 693 Fed. Appx. 21, 25 (2nd Cir. 2017).

Dated: January 27, 2023

**LEVI & KORSINSKY, LLP**

By: */s/ Shannon L. Hopkins*
Shannon L. Hopkins
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com

-and-

**POMERANTZ LLP**

Joshua B. Silverman
Omar Jafri
Brian P. O'Connell
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Fax:          (312) 377-1184
Email:  jbsilverman@pomlaw.com
          ojafri@pomlaw.com
          boconnell@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Fax:          (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com

*Attorneys for Co-Lead Plaintiffs*

## CERTIFICATE OF SERVICE

On January 27, 2023, the foregoing document was filed through the Court's ECF system and

will be sent electronically to the registered participants as identified on the Notice of Electronic Filing

(NEF).

 */s/ Shannon L. Hopkins*
Shannon L. Hopkins