United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHARON BERNSTEIN,

　　　　　Plaintiff,

　　v.

GINKGO BIOWORKS HOLDINGS, INC., et al.,

　　　　　Defendants.

Case No. 4:21-cv-08943-KAW

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Re: Dkt. No. 61

On July 21, 2022, Defendants filed a motion to dismiss the second amended complaint. Upon review of the moving papers, the Court finds this matter suitable for resolution without oral argument pursuant to Civil Local Rule 7-1(b), and, for the reasons set forth below, GRANTS IN PART AND DENIES IN PART the motion to dismiss.

## I.　BACKGROUND

Defendant Ginkgo Bioworks Holdings, Inc. ("Ginkgo" or the "Company") is a synthetic biology company that primarily provides commodity engineering of the *Pichia pastoris* yeast strain, the same service provided by several other companies. (Second Am. Compl., "SAC," Dkt. No. 58 ¶ 2.) Individual Defendants Harry E. Sloan, Eli Baker, Scott M. Delman, Joshua Kazam, Isaac Lee, Timothy Leiweke, Dennis A. Miller, and Laurence E. Paul were directors of Soaring Eagle Acquisition Corp., and all signed the Proxy Statement themselves or via the authorized signature of their attorney-in-fact Defendant Harry E. Sloan. (SAC ¶¶ 19–26.) Individual Defendants Jason Kelly, Reshma Shetty, Arie Belldegrun, Marijn Dekkers, Christian Henry, Reshma Kewalramani, Shyam Sankar (collectively the "Registration Statement Defendants"), each gave consent to be listed in the Proxy Statement as a director of the merged Company, and became a director after the merger was completed. (SAC ¶¶ 27–34.) Finally, individual

Defendant Anna Marie Wagner served as Ginkgo's Senior Vice President, Corporate Development, throughout the putative class period. (SAC ¶ 35.)

Ginkgo's business consists of two main parts called "Foundry" and "Codebase." The Foundry is a yeast strain engineering lab with which Ginkgo provides R&D services to other companies. (SAC ¶ 3.) The Codebase is a repository of the strains it has produced and the data it has retained about those strains. (SAC ¶ 3.)

Soaring Eagle Acquisition Corp. ("SRNG") was a special purpose acquisition company ("SPAC") formed as a corporation in the Cayman Islands in 2020 for the purpose of merging with, and bringing public, a business to be later identified by its managers. (SAC ¶ 36.) From its earliest SEC filings, SRNG described itself as a "blank check company." *Id.* On May 11, 2021, Soaring Eagle announced that it had entered into a merger agreement with Ginkgo to affect the initial public offering of Ginkgo. (SAC ¶ 42.) SRNG shares were listed and publicly traded on the NASDAQ. (SAC ¶ 18.)

All public Ginkgo shares, including those to be received by conversion of shares in the SPAC sponsor, Soaring Eagle, were registered with the SEC as a Securities Act offering on Form S-4. (*See* SAC ¶ 4.) The final, full, amended, and signed Form S-4/A filed on August 4, 2021, is part of what Plaintiff refers to as the "Defective Proxy/Registration Statement," or what the court will refer to as the "Proxy Statement." (SAC ¶ 4.) The Proxy Statement is comprised of (a) the prospectus filed on Form 424(b)(3), which includes the August 4, 2021, Form S-4/A, as well as (b) additional information filed under Form 425 as a supplement to that registration statement pursuant to Rule 425 promulgated under the Securities Act. (SAC ¶ 4.) The Proxy Statement instructed investors not to conduct their own due diligence, stating: "You should rely only on the information contained or incorporated by reference into this proxy statement/prospectus. No one has been authorized to provide you with information that is different from that contained in, or incorporated by reference into, this proxy statement/prospectus." (SAC ¶ 48.)

The Proxy Statement claimed that the SRNG Board conducted extensive due diligence of Ginkgo before agreeing to take it public via the merger, including research into the synthetic biology industry, extensive meetings with Ginkgo's management team, interviewing Ginkgo's

2

customers, engaging independent consultants to review the underlying science and technology employed by Ginkgo, reviewing Ginkgo's material business contracts as well as patents and trademarks, and conducting financial and accounting due diligence. (SAC ¶ 44.) The Proxy Statement claimed that the fair value of Ginkgo was $15 billion. (SAC ¶ 45.)

Plaintiff alleges that, in the Proxy Statement, Ginkgo made over a dozen false and misleading statements regarding its operations, including: (a) inaccurately describing circular, related party deals that manipulated reported revenue and deferred revenue; (b) inaccurately describing the value of services it performed under the related party deals; (c) misrepresenting certain related parties as independent; and (d) overstating the amount of non-party related revenue Ginkgo generated. (SAC ¶¶ 9, 49–81.)

The merger was contingent upon approval by SRNG shareholders and having closing cash of at least $1.25 billion. (SAC ¶ 43.) If those conditions were met, shareholders had the right to either convert SRNG shares to Ginkgo shares post-closing, or to redeem shares at $10/share. *Id.* The right to redeem applied to all shareholders, whether or not they voted to approve the merger. *Id.*

The Proxy Statement stated that Ginkgo operated "in much the same way that cloud computing companies charge usage fees for utilization of computing capacity or contract research organizations ("CROs") charge for services." (SAC ¶¶ 5, 49.) Plaintiff alleges that the Company did not operate in this manner. (SAC ¶ 5.) Instead, unlike cloud computing and CRO companies that obtain customers through competition and bill as services are rendered, Ginkgo and/or Ginkgo's three largest outside investors (Viking Global, Cascade, and General Atlantic) provided the overwhelming majority of funds that were recirculated by related party companies back to Ginkgo in the form of "revenue," often prepaid. *Id.*

Regarding Foundry revenue, the Proxy Statement stated Ginkgo received "upfront payments to cover R&D costs for customer programs" and that the Foundry division provided a "[h]ighly predictable revenue stream independent of program success," and doubled down that this revenue "provides a strong foundation of predictable revenue." (SAC ¶¶ 54, 56.) The Proxy Statement also claimed that "transparency" was "essential" to Ginkgo. (SAC ¶ 63.) It stated that

3

its platform ventures allowed partnerships between Ginkgo and "leading multinationals." (SAC ¶ 51.) In fact, of Ginkgo's main platform ventures – Allonnia, Kalo Ingredients, Motif Foodworks and Joyn Bio – only one (Joyn Bio) was with a leading multinational, and the revenue was highly unpredictable. (SAC ¶¶ 51, 86.)

On a conference call announcing the SPAC merger, Defendant Kelly claimed that the work that Ginkgo did for Motif FoodWorks was similar to the plant-based food breakthroughs already achieved by Impossible Foods: "[Motif] want[s] to pursue a whole range of different animal proteins that otherwise wouldn't be available in plants and then make those available to food developers so that we can have more Impossible Burgers. So they came to us with that spec. 'Get me a yeast that produces these animal proteins.'" (SAC ¶¶ 70–71.) At a conference held by UBS, Defendant Wagner further touted Ginkgo as a "great host" for producing "proteins on behalf of Motif." (SAC ¶ 72.) Both of these statements were expressly incorporated into the Proxy Statement via filings with the SEC on Form 425. (SAC ¶¶ 70, 72.)

The Proxy Statement touted Motif FoodWorks as a top-two customer, stating that it represented more than 10% of Ginkgo's total revenue, but inaccurately minimized the interdependence by claiming that Ginkgo did not control the decisions of Motif. (SAC ¶¶ 52-53.) Motif FoodWorks operated out of Ginkgo's Boston headquarters, listed Defendant Shetty as its corporate agent, and listed Defendant Kelly and Ginkgo officer Jason Kakoyiannis as its directors. (SAC ¶ 7(c).) Ginkgo investors led a $90 million preferred stock investment in Motif FoodWorks, and Motif FoodWorks provided Ginkgo common stock at a claimed value of $65.1 million as a prepayment for R&D services and licensing from Ginkgo. *Id.* Ginkgo recognized $20.8 million of revenue from Motif FoodWorks under this arrangement in 2020 and $19.0 million in 2019. *Id.* The Proxy Statement touted that Motif FoodWorks "leverage[d] our Codebase and Foundry" to engineer "top performing proteins," but omitted that Motif's breakthrough actually came from stealing the patented invention owned by Impossible Foods. (SAC ¶¶ 52-53, 105.) The Proxy Statement also failed to disclose that Motif's CEO had raised concerns to Defendants Kelly and Ginkgo about "the unpredictable way" that Ginkgo was invoicing foundry credits. (SAC ¶ 86.)

The Proxy Statement also stated that Ginkgo entered an agreement to provide R&D

United States District Court
Northern District of California

4

services for another entity, Allonnia, "in return for cash consideration on a cost-plus fixed margin basis," and claimed revenue from Allonnia of $4.96 million in 2021 and almost $2.3 million in the first quarter of 2021 alone – a $9 million annual run rate. (SAC ¶ 61.) It did not disclose that these funds were grossly out of line with the few employees and limited operations that Allonnia had, and were not actual revenues from needed services purchased competitively but rather recirculated funds that were provided to Allonnia by Ginkgo's own investors to then provide to Ginkgo. (SAC ¶ 7(a).) Nor did the Proxy Statement accurately disclose the relationship between Ginkgo and Allonnia. It stated that Ginkgo "is not the primary beneficiary of Allonnia as it does not control the decisions that most significantly impact Allonnia's economic performance," including "development activities." (SAC ¶ 61.) In fact, according to Allonnia's filings with the Massachusetts Secretary of State Corporations Division, Allonnia's principal office was in Ginkgo's corporate headquarters, and Allonnia was managed by Defendant Kelly and Ginkgo's Head of Ventures, Jason Kakoyiannis, among others, for the benefit of Ginkgo. (SAC ¶ 97.)

Yet another entity, Kalo, was described in the Proxy Statement as a "vendor-customer" that had paid for $11.9 million in deferred revenue balance with Ginkgo by March 31, 2021, despite the fact that it had been formed only sixteen days earlier on March 15, 2021. (SAC ¶¶ 7(b), 64.) The Proxy Statement did not disclose that Kalo had almost no employees at that time, making it virtually impossible that such prepayments represented payments for actual needed services. (SAC ¶¶ 7(b), 64.) Also not disclosed in Ginkgo's filings, but as Kalo admitted to Massachusetts regulators, Kalo operated out of the same building as Ginkgo's headquarters and had three Ginkgo executives, including Defendant Kelly, as its managers. (SAC ¶¶ 95–96.)

Plaintiff further alleges that the Proxy Statement also misreported the business relationship between Ginkgo and Synlogic. While it disclosed the accounting treatment of 2019 transactions between Ginkgo and Synlogic, it did not disclose that the purpose of those transactions was to recycle $30 million of Ginkgo's own funds back to Ginkgo, which were provided by Ginkgo to Synlogic via purchasing Synlogic's securities at a price that exceeded fair value by $30 million. (SAC ¶ 6.) Nor did the Proxy Statement accurately describe Ginkgo's then-current deferred revenue liability to Synlogic, claiming it was only $72,000. (SAC ¶ 58.) In fact, Ginkgo owed

United States District Court
Northern District of California

Synlogic nearly $14 million in prepaid R&D services. (SAC ¶¶ 58–60.) And the Proxy Statement claimed that only $90,000 of revenue from Synlogic between 2019 and 2020 was related party revenue, in stark contrast to Synlogic's indication that it actually expended $16.4 million in prepaid services with Ginkgo in 2019 and 2020, all of which were pursuant to related party transactions. (SAC ¶ 60.) Synlogic CEO, Aoife Brennan, later described Ginkgo's accounting of the services it billed to Synlogic as "loosey-goosey." (SAC ¶ 86.)

Plaintiff alleges that, having received inaccurate and misleading disclosures in the Proxy Statement, as well as the instruction not to rely on any other source for information, on September 14, 2021: (1) SRNG investors overwhelmingly approved the merger with Ginkgo, effecting the initial public offering of Ginkgo shares; and (2) the majority of SRNG investors opted to receive Ginkgo shares rather than redeem for $10/share, allowing Ginkgo to satisfy the cash contingency. (SAC ¶ 12.) On September 17, 2021, Ginkgo shares went public on the New York Stock Exchange ("NYSE"), trading under the ticker "DNA." (SAC ¶ 18.)

On October 6, 2021, after the shareholder vote and after Ginkgo's IPO via reverse merger with Soaring Eagle, market researcher Scorpion Capital released a 175-page report ("Scorpion Report") describing Ginkgo as a "shell game" whose revenue is highly dependent on related party transactions. (SAC ¶ 87.) On that same day, Citron Research also came out with an article corroborating the factual findings in the Scorpion Report. (SAC ¶ 87.) The Scorpion Report's allegations were also consistent with an article in the *MIT Technology Review*, which cited a source stating Ginkgo was acting as "an arm of [its principal investor] Viking," and that its "true business could be described as financial engineering, not genetic engineering." (SAC ¶ 85.)

The Scorpion Report was based on 21 interviews "encompassing a broad sample of former employees and executives of Ginkgo, as well as individuals who are currently employed at its related party 'customers.'" (SAC ¶ 88.) The Scorpion Report explained how nearly all Ginkgo revenue was actually derived from related parties, many of which were largely illusory entities with little or no operations. (SAC ¶ 90.) It analyzed the prepayments made by related parties, compiling evidence indicating that they were not "legitimate vendor-customer transactions[s]." (SAC ¶ 92.) The Scorpion Report further revealed that the primary customers of Ginkgo, such as

United States District Court
Northern District of California

Allonnia, Kalo, Joyn Bio, and Motif all operated out of Ginkgo's Boston headquarters, that many listed Ginkgo's phone number as their own, and that Ginkgo used intertwined employees, managers and directors to control these "customers." (SAC ¶¶ 94–100.)

On November 18, 2021, this putative class action complaint was filed. On July 18, 2022, Plaintiff Bernstein filed the second amended complaint on behalf of the putative class.

On July 21, 2022, Defendants filed the instant motion to dismiss and the request for judicial notice. (Defs.' Mot., Dkt. No. 61; Req. for Judicial Not., Dkt. No. 62.) On September 6, 2022, Plaintiff filed an opposition. (Pl.'s Opp'n, Dkt. No. 64.) On October 6, 2022, Defendants filed a reply. (Defs.' Reply, Dkt. No. 67.)

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss based on the failure to state a claim upon which relief may be granted. A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

In considering such a motion, a court must "accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted), and may dismiss the case or a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); *Navarro*, 250 F.3d at 732) (internal quotation marks omitted).

A claim is plausible on its face when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action" and "conclusory statements" are inadequate. *Iqbal*, 556 U.S. at

United States District Court
Northern District of California

7

678; *see also Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996) ("[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim."). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully . . . When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal citations omitted).

Generally, if the court grants a motion to dismiss, it should grant leave to amend even if no request to amend is made "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (citations omitted).

### B.   Request for Judicial Notice

As a general rule, a district court may not consider any material beyond the pleadings in ruling on a motion to dismiss for failure to state a claim. *Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir. 2001). A district court may take notice of facts not subject to reasonable dispute that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *United States v. Bernal-Obeso,* 989 F.2d 331, 333 (9th Cir. 1993). "[A] court may take judicial notice of 'matters of public record,'" *Lee*, 250 F.3d at 689 (citing *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)), and may also consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading" without converting a motion to dismiss under Rule 12(b)(6) into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). The court need not accept as true allegations that contradict facts which may be judicially noticed. *See Mullis v. United States Bankruptcy Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987).

United States District Court
Northern District of California

United States District Court
Northern District of California

## III. DISCUSSION

### A. Request for Judicial Notice

As a preliminary matter, Defendants ask that the Court take judicial notice of eight documents in support of its motion to dismiss. (Req. for Judicial Notice, "RJN," Dkt. No. 62.) The documents are purportedly true and correct copies of: (1) Ginkgo's combined Proxy Statement and Prospectus filed on SEC Form 424(b)(3), dated August 13, 2021; (2) Ginkgo's Current Report filed on SEC Form 8-K on September 14, 2021; (3) Ginkgo's Current Report filed on SEC Form 8-K on September 20, 2021; (4) Scorpion Capital's report on Ginkgo, dated October 6, 2021; 5) the complaint captioned *Impossible Foods Inc. v. Motif Foodworks, Inc.*, No. 1:22-cv-00311-CRC (D. Del. Mar. 9, 2022); (6) table listing the historical stock prices of Ginkgo from September 17, 2021 to November 1, 2021, as downloaded from Yahoo! Finance, which was obtained from the Yahoo! Finance website, http://finance.yahoo.com; (7) Cronos Group Inc.'s Quarterly Report filed on SEC Form 10-Q, dated February 18, 2022; and (8) Ginkgo's Registration Statement filed on SEC Form S-1, dated December 23, 2020. (RJN at 2-5; Exhibits, Decl. of Anitha Reddy, Dkt. No. 61-1, Exs. 1-8.)

Plaintiff believes that judicial notice is not necessary, but she does not oppose the consideration of the documents provided "so long as the Court does not assume the truth of statements contained in those exhibits." (Pl.'s Resp., Dkt. No. 63 at 1.)

Exhibits 1, 2, 4, 5, 7, and 8 are cited to in the complaint, and deemed incorporated by reference, which makes them judicially noticeable. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). Exhibit 3 is a filing with the U.S. Securities and Exchange Commission, which is subject to judicial notice. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n. 7 (9th Cir. 2008). The undersigned, however, denies the request as to Exhibit 6, which is an unlabeled table purportedly listing Ginkgo's stock prices for a finite period of time, which is not easily authenticated.[1]

Accordingly, Defendants' request for judicial notice is GRANTED IN PART AND DENIED IN PART.

---

[1] It appears that the data was copied and pasted into a blank spreadsheet.

**B.** **Motion to Dismiss**

Defendants move to dismiss all claims under Rule 12(b)(6).  The Court will address the claims in the order in which they appear in Defendants' motion to dismiss.

### i. Violation of Section 10(b) of the Exchange Act and Rule 10b-5

The fourth cause of action is for violation of Section 10(b) and Rule 10b-5, and is brought against the Company and Defendants Sloan, Kelly, and Wagner.  (SAC ¶¶ 143–150.)

To state a claim, Plaintiff "must adequately plead six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re BofI Holding, Inc. Sec. Litig.* ("*BofI Holding*"), 977 F.3d 781, 786 (9th Cir. 2020) (citing *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 267 (2014)).  The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that complaints in private securities fraud litigation plead falsity and scienter with particularity.  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).  Thus, under the PSLRA, "a complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"  *Id.* at 429 (quoting 15 U.S.C. § 78u–4(b)(1)).  Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted . . . with intentionality or deliberate recklessness or, where the challenged act is a forward[-]looking statement, with actual knowledge ... that the statement was false or misleading." *Ronconi*, 253 F.3d at 429 (citations and internal quotations omitted).

Here, Defendants argue that the operative complaint fails to adequately plead falsity, scienter, and loss causation.  (Defs.' Mot. at 6-17.)  As a result, the Court need only address those three elements.

#### a. Falsity

Defendants argue that Plaintiff fails to adequately allege that the challenged statements are false or misleading.  (Defs.' Mot. at 6–7.)  "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen*

10

*Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). "Even if a statement is not false, it may be misleading if it omits material information." *Id.* at 1008–09. As to affirmative representations, "to properly allege falsity, a securities fraud complaint must now specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012) (internal quotation marks, citation, and alteration omitted). In order for an omission to be actionable, it "must be misleading; in other words[,] it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citing *McCormick v. The Fund American Cos.*, 26 F.3d 869, 880 (9th Cir.1994)).

Moreover, securities laws "do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (citation omitted). "[O]nly if the adequacy of the disclosure or the materiality of the statement is 'so obvious that reasonable minds [could] not differ' are these issues 'appropriately resolved as a matter of law.'" *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)

Defendants argue that the complaint ignores the disclosures made about its financial relationships with customers. (Defs.' Mot. at 8.) The Court disagrees. Indeed, the fact that the Company's primary customers—such as Allonnia, Kalo, Joyn Bio, and Motif—operated out of Ginkgo's headquarters, that many listed Ginkgo's phone number as their own, and that Ginkgo used intertwined employees, managers, and directors to control these "customers" would surely satisfy the falsity requirement given that Defendants disclosed that it lacked control over these entities. (SAC ¶¶ 94-100; *cf.* Proxy Statement, RJN, Ex. 1 at 295–96.) Additionally, if the reports cited by Plaintiff are true, most of Ginkgo's reported revenue was derived from related party entities, rather than external customers, at rates higher than reported in the Proxy Statement, which indicates that they were not "legitimate vendor-customer transactions[s]." (SAC ¶¶ 90–92.) The

11

allegations of close links between these various entities flatly contradict Defendants' representations that the entities were independent.

Thus, taking the allegations as true for the purposes of this motion, the operative complaint satisfies the falsity requirement.

### b. Scienter

Defendants argue that Plaintiff has failed to adequately plead scienter. (Defs.' Mot. at 13.) Under the PSLRA, plaintiffs must plead facts that create a "strong inference" of the defendant's scienter. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007). The inference need not be "even the most plausible of competing inferences," but it must be "cogent and compelling." *Id.* (internal quotation marks and citations omitted). Scienter is a mental state that covers "intent to deceive, manipulate, or defraud," and "deliberate recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (internal quotation marks and citations omitted). "Deliberate recklessness," in turn, means "more than mere recklessness or a motive to commit fraud"; it is instead "an extreme departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (internal quotation marks and citations omitted).

Here, "falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts." *Ronconi*, 253 F.3d at 429. As a result, most of the facts that lead to a strong inference of scienter are the same that show falsity. *See id.* Accepting as true that Ginkgo shared management, directors, and office space with Allonnia, Kalo, and Joyn Bio, scienter is easily inferred. Defendants' representations of the entities' independence despite their alleged interdependence suggests an intent to deceive. "If that is true, the defendants must have known they were not reporting the truth—there is no middle ground between the two positions. The most cogent inference that can be drawn, therefore, is that the defendants acted with scienter." *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 741 (N.D. Cal. 2022).

Thus, the operative complaint satisfies the scienter requirement.

### c. Loss Causation

Defendants argue that Plaintiff fails to adequately plead loss causation because the SAC

lacks particular allegations that the purported corrective disclosure provided new information to the market that was not reflected in the stock price. (Defs.' Mot. at 17–18.) Plaintiff alleges that the Scorpion Report, a short-seller report released on October 6, 2021, was the corrective disclosure, which resulted in the share price falling approximately 12%. (SAC ¶ 111.)

In certain circumstances, a short-sheller's report can constitute the loss causation element if it is plausible that it provides new information to the market that was not reflected in the stock price. *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022). The Ninth Circuit has found that this is a high bar when the underlying data is publicly available. *Id.* at 839 (quoting *BofI Holding*, 977 F.3d at 797).

Like the short-seller report in *BofI Holding*, 977 F.3d at 797, Scorpion acknowledged that it held a short position in Ginkgo and stood "to realize significant gains in the event that the price of [Ginkgo's] stock . . . decline[s]" and disclaimed "any representations or warranties with respect to the accuracy of [the] materials" used to prepare the report. (Scorpion Report, RJN, Ex. 4 at 2.) Unlike the anonymous short-seller report in *BofI Holding* that consisted of a series of eight blog posts, however, the Scorpion Report provided previously unknown information, including admissions from "21 research interviews, encompassing a broad sample of former employees and executives of Ginkgo, as well as individuals who are currently employed at its related-party 'customers.'" (SAC ¶ 88 (quoting Scorpion Report).) Furthermore, Plaintiff contends that the Scorpion Report's 175 pages assessed "extensive and tedious research" analyzing "far-flung bits and pieces of data." (Pl.'s Opp'n at 23 (citing *In re Nektar*, 34 F.4th at 839; *see also* SAC ¶¶ 87-103).) The Court agrees. The Scorpion Report provided new information that was not previously reflected in the stock price. Indeed, the Scorpion Report solidified for the public the previously undisclosed relationships between Ginkgo and its so-called customers. The Court finds that Plaintiff satisfies the loss causation element, particularly given that some information provided was not publicly available.

Moreover, Plaintiff adequately alleges that the stock price fell approximately 12% "on heavy [trading] volume" after the Scorpion Report was released. (*See* SAC ¶ 11.) "That a stock price drop comes immediately after the revelation of fraud can help to rule out alternative causes."

13

*Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018). Thus, taking the allegations in the complaint as true, it is plausible that the Scorpion Report "caused the stock price drop due to their timing" and "that the revelation of alleged fraud was at least a substantial cause of the loss of value." *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 742 (N.D. Cal. 2022).[2]

Accordingly, Defendants' motion to dismiss the fourth cause of action is denied.

### ii. Violation of Section 20(a) of the Exchange Act

The fifth cause of action is for violation of Section 20(a), and it is brought against Defendants Kelly and Shetty. (SAC ¶¶ 151–55.) Specifically, this is a secondary liability claim based on Kelly and Shetty being control persons for the primary Section 10(b) violations of Ginkgo and Wagner. (SAC ¶ 154.) Here, Defendants argue that Plaintiff's failure to state a claim for a 10(b) violation means that she does not state a claim for secondary liability under Section 20(a). (Defs.' Mot. at 20.)

Since Plaintiff's fourth cause of action sufficiently states a claim, this secondary liability claim is sufficiently plead and the motion to dismiss this cause of action is denied. *See* discussion, *supra,* Part III.B.i.

### iii. Violation of Section 14(a) of the Securities Act of 1934 and Rule 14a-9

The third cause of action is for violation of Section 14(a), and is brought against the Company, and Defendants Sloan, Baker, Delman, Kazam, Lee, Leiweki, Miller, and Paul. (SAC ¶¶ 134–42.) These individual defendants were directors of SRNG, and all signed the Proxy Statement themselves or via the authorized signature of their attorney-in-fact, Defendant Harry E. Sloan. (SAC ¶¶ 19–26.)

To state a claim under § 14(a) and Rule 14a-9, Plaintiff must establish that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation

---

[2] The Court is not persuaded by Defendants' reliance on *Wochos v. Tesla, Inc.,* 985 F.3d 1180, 1198 (9th Cir. 2021), which involved "a modest" 3.9% drop in stock price, rather than a "material" one. (*See* Defs.' Mot. at 23.)

United States District Court
Northern District of California

14

materials, was an essential link in the accomplishment of the transaction." *New York City Employees' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012)). "In addition, private plaintiffs must meet the heightened pleading standards of the PSLRA, as well as its loss causation requirement." *New York City Employees' Ret. Sys.*, 693 F.3d at 1022 (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 165 (2008)).

Defendants argue that the complaint fails to allege falsity and loss causation for the same reasons it failed to adequately allege these elements in relation to the Section 10(b) claim. (Defs.' Mot. at 20.) As discussed above, Plaintiff satisfies the falsity and loss causation requirements. *See* discussion, *supra,* Part III.B.i.a,c.

Additionally, Defendants argue that the SAC fails to satisfy the heightened pleading requirements, because it sounds in fraud. (Defs.' Mot. at 21.) In opposition, Plaintiff contends that the operative complaint satisfies the PSLRA's particularly requirement, because it identifies the Proxy Statement's misleading proxy solicitation, identifying when and how that document was disseminated, who prepared and reviewed the document, which particular statements Plaintiff contends were misleading, and why each was misleading when made. (Pl.'s Opp'n at 19 (citing SAC ¶¶ 49–81).) Moreover, Plaintiff argues that claims under Rule 14(a) only require allegations of negligence, rather than scienter. *Id.* (citing *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000)). In reply, Defendants do not dispute that Plaintiff need only plead facts that give rise to a strong inference of negligence.

Here, the SAC alleges that each SRNG director was personally involved in the review of the Proxy Statement, but they did not exercise due care. (SAC ¶ 138.) These individual Defendants represented that they had conducted extensive due diligence as to Gingko's business, including for example interviews with managers, interviews with major customers, as well as "financial and accounting due diligence." (SAC ¶ 44.) But the Defendants omitted from the Proxy Statement several aspects of Gingko's business, including its exercise of control over entities identified as customers elsewhere. (*See, e.g.*, SAC ¶ 53.) "[A] director may be found negligent under Section 14(a) for a failure to notice material omissions upon reading a proxy

United States District Court
Northern District of California

statement." *Brown v. Brewer*, No. CV06-3731-GHK SHX, 2010 WL 2472182, at *24 (C.D. Cal. June 17, 2010).

Plaintiff's allegations regarding falsity were already found sufficient, and the allegations regarding negligence are also adequately pled. *See* discussion, *supra,* Part III.B.i.a. Thus, the motion to dismiss is denied as to the third cause of action.

### iv.    Violation of Section 11 of the Securities Act of 1933

The first cause of action is for violation of Section 11, and is brought against the Company and Defendants Sloan, Baker, Delman, Kazam, Lee, Leiweke, Miller, Paul, Kelly, Shetty, Belldegrun, Dekkers, Henry, Kewalramani, and Sankar. (SAC ¶¶ 122-129.)

Section 11 "provides a cause of action to any person who buys a security issued under a materially false or misleading registration statement." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013); *see also* 15 U.S.C. § 77k(a). Defendants argue that this claim is subject to dismissal for three reasons:

> (1) it fails to allege facts showing that plaintiff's shares can be traced to the registration statement at issue and thus that plaintiff has standing, (2) it does not adequately allege that the registration statement contained materially misleading statements or omissions, and (3) it fails to plausibly allege loss causation.

(Defs.' Mot. at 21.)

As discussed above, the Court finds that Plaintiff has already satisfied the falsity and loss causation requirements. *See* discussion, *supra*, Part III.B.i., B.iii.

Finally, Plaintiff argues that she adequately alleges that her shares can be traced to the registration statement, because all shares were re-registered by the Proxy Statement, and that her filed certification (Dkt. No. 11-3) describes her purchase. (Pl.'s Opp'n at 8.) While Plaintiff is correct that her shares would be traceable to "the registration statement for purposes of Section 11 if their trading was facilitated by the registration statement, whether the shares themselves were registered or unregistered," that does not cure the pleading deficiency raised by Defendants. (*See* Pl.'s Opp'n at 9 (citing *Pirani v. Slack Techs., Inc.*, 13 F.4th 940, 948 (9th Cir. 2021)).) Generally, an amended complaint must be complete without reference to other court filings, so Plaintiff's failure to allege the facts pertaining to her stock purchase and how it was traced to the

United States District Court
Northern District of California

Proxy Statement requires that the cause of action be dismissed with leave to amend. Even so, the Court finds that the assertions made in the opposition would satisfy the registration requirement, so amendment is certainly not futile.

Accordingly, the first cause of action is dismissed with leave to amend.

### v. Violation of Section 15 of the Securities Act of 1933

The second cause of action is for violation of Section 15, and is brought is against Defendants Sloan, Baker, Delman, Kazam, Lee, Leiweke, Miller, and Paul. (SAC ¶¶ 130-133.) This is another secondary liability claim alleged against the control persons premised on the Section 11 violation. (SAC ¶ 132.) Here, Defendants argue that Plaintiff's failure to state a claim for the Section 11 violation means that she does not state a claim for secondary liability under Section 15. (Defs.' Mot. at 24.) Since Plaintiff's first cause of action currently fails to state a claim, this secondary liability claim is also dismissed with leave to amend. *See* discussion, *supra,* Part III.B.iv.

### IV. CONCLUSION

For the reasons set forth above, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion to dismiss the second amended complaint. Specifically, the motion is only granted in respect to the first and second causes of action, which are dismissed with leave to amend. It is denied with respect to the remaining claims.

Plaintiff shall file a third amended complaint within 21 days of this order.

IT IS SO ORDERED.

Dated: March 10, 2023

KANDIS A. WESTMORE
United States Magistrate Judge

17