UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE GRAB HOLDINGS LIMITED SECURITIES
LITIGATION

Case No. 1:22-cv-02189 (JLR)

**<u>OPINION AND ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

Si Fan, Amit Batra, and SLG Cloudbank Holdings, LLC (collectively, "Plaintiffs")

bring this putative class action against Grab Holdings Limited ("Grab"), Brad Gerstner

("Gerstner"), Hab Siam ("Siam"), Richard N. Barton ("Barton"), Aishetu Fatima Dozie

("Dozie"), Dev Ittycheria ("Ittycheria"), Anthony Tan ("Tan"), Peter Oey ("Oey"), Tan Hooi

Ling ("Ling"), Maa Ming-Hokng ("Maa"), John Rogers ("Rogers"), Dara Khosrowshahi

("Khosrowshahi"), Ng Shin Ein ("Ein"), and Oliver Jay ("Jay" and, collectively,

"Defendants").  ECF No. 58 (the "Amended Complaint" or "Am. Compl.").

The Amended Complaint asserts five causes of action.  First, Plaintiffs allege that all

Defendants except Maa violated Section 11 of the Securities Act of 1933 (the "Securities

Act"), 15 U.S.C. § 77k ("Section 11").  Am. Compl. ¶¶ 119-127.  Second, Plaintiffs allege

that Tan and Oey violated Section 15 of the Securities Act, 15 U.S.C. § 77o ("Section 15"), as

controlling persons with respect to the conduct underlying Plaintiffs' Section 11 claim.  Am.

Compl. ¶¶ 128-131.  Third, Plaintiffs allege that Grab, Gerstner, Siam, Barton, Dozie, and

Ittycheria violated Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange

Act"), 15 U.S.C. § 78n(a) ("Section 14(a)"), and Rule 14a-9 promulgated thereunder, 17

C.F.R. § 240.14a-9 ("Rule 14a-9").  Am. Compl. ¶¶ 132-140.  Fourth, Plaintiffs allege that

Grab, Tan, and Maa violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) ("Section

10(b)"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").  Am.

Compl. ¶¶ 141-148.  Plaintiffs define the "10(b) Class Period" as "between December 2, 2021 and March 3, 2022, both dates inclusive."  *Id.* ¶ 1.  Fifth, Plaintiffs allege that Tan and Maa violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"), as controlling persons with respect to the conduct underlying Plaintiffs' Section 10(b) claim. Am. Compl. ¶¶ 149-153.

Defendants have moved to dismiss the Amended Complaint for failure to state a claim. ECF No. 90 ("Br.").  For the following reasons, the motion to dismiss the Amended Complaint is GRANTED in part and DENIED in part.

## BACKGROUND

### I.   Factual Allegations

In ruling on the motion to dismiss, the Court assumes that the Amended Complaint's factual allegations are true and views them in the light most favorable to Plaintiffs.  *New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 168 (2d Cir. 2023).

### A.  SPACs, Altimeter, and Grab

A special-purpose-acquisition corporation (a "SPAC") is a type of "shell company." Am. Compl. ¶ 31.  Following its formation, a SPAC conducts an initial public offering (an "IPO") through a conventional underwriting.  *Id.*  In addition to common stock, "[i]nitial investors also commonly obtain warrants to buy additional stock as at a fixed price, and sponsors of the SPAC obtain a 'promote' – [that is,] greater equity than their cash contribution or commitment would otherwise imply."  *Id.*  The proceeds from these sales are deposited in a trust account for the sole purpose of funding the acquisition of a private company.  *Id.* "SPACs usually have an 18-to-24-month period to find an acquisition target."  1 Thomas Lee Hazen, Law Sec. Reg. § 3:58 (Westlaw database updated Nov. 2023).  The resulting business

combination "is often referred to as a de-SPAC transaction." *Id.*; *accord* Am. Compl. ¶ 31. A de-SPAC transaction thus offers a private company seeking to go public an alternative to undertaking a traditional IPO. Am. Compl. ¶ 34. "If a merger is completed within the allocated time frame, founders and managers of the SPAC generally reap windfall profits from their ownership of SPAC securities they obtained cheaply prior to public offering, and enjoy considerable control such as the ability to nominate board members to the new company." *Id.* ¶ 32. But "if an acquisition is not effectuated within that time frame, then the SPAC is dissolved and the money in the trust is returned to investors, with no compensation paid to the founders and managers of the SPAC." *Id.*

Altimeter Growth Corp. ("Altimeter") was a SPAC incorporated in the Cayman Islands on August 25, 2020. *Id.* at 1 & ¶ 30. Altimeter filed its IPO prospectus with the Securities and Exchange Commission (the "SEC") a little over a month later. *Id.* ¶ 30; Altimeter Growth Corp., Prospectus (Form 424B4) (Sept. 30, 2020) (the "IPO Prospectus"), https://www.sec.gov/Archives/edgar/data/1823340/000114036120022204/nt10014830x9_424 b4.htm [https://perma.cc/JWZ8-6EKV]. Altimeter described itself as "a newly formed blank check company incorporated as a Cayman Islands exempted company for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses." IPO Prospectus at 2. The IPO Prospectus stated that Altimeter's board of directors (the "Altimeter Board") consisted of five people: Gerstner (chairperson, chief executive officer, and president), Siam (general counsel and director), Barton (director), Dozie (director), and Ittycheria (director). *Id.* at 113; *see* Am. Compl. ¶¶ 17-21.

On October 5, 2020, Altimeter consummated the IPO of 50 million units for $10.00 per unit, generating gross proceeds of $500 million (excluding certain costs). Altimeter

Growth Corp., Current Report (Form 8-K) (Oct. 6, 2020), https://www.sec.gov/Archives/edgar/data/1823340/000114036120022583/nc100115874x1_8k.htm [https://perma.cc/8XS7-PY3A].  Each unit consisted of one share of common stock and one-fifth of a warrant; a holder of a whole warrant was entitled to purchase one share of common stock at a price of $11.50 per share.  *Id.*  Altimeter deposited the proceeds from the IPO – along with the proceeds from a private placement of an additional 12 million warrants at a price of $1.00 per warrant – in a trust account for the purpose of funding a business combination.  *Id.*

On April 13, 2021, Altimeter announced that it had entered into a merger agreement with Grab, a private company.  Am. Compl. ¶ 36.  If the merger were consummated, Altimeter would cease to exist, and Grab would be the surviving entity.  *Id.*  As is typical in de-SPAC transactions, the business combination was contingent on the shareholders of the SPAC (here, Altimeter) voting to approve the deal.  *Id.* ¶¶ 31, 33, 37.

Grab offers a mobile application that provides consumers with ride-hailing services, food-delivery services, business services, and a digital wallet.  *Id.* ¶ 43.  Two of these lines of business – ride hailing and food delivery – constitute Grab's core business and generate the vast majority of Grab's revenue.  *Id.* ¶¶ 4, 43-44; *see* Altimeter Growth Corp. & Grab Holdings Ltd., Proxy Statement and Prospectus (Form F-4/A) at 89 (Nov. 19, 2021) (the "Proxy"), https://www.sec.gov/Archives/edgar/data/1855612/000119312521334426/d197617df4a.htm [https://perma.cc/K2Z2-6GV2] ("more than 90% of Grab's revenue was derived from its deliveries and mobility segments in the six months ended June 30, 2021 and the year ended December 31, 2020").  Grab offers ride-hailing and food-delivery services in over 400 cities across eight countries in Southeast Asia: Cambodia, Indonesia, Malaysia, Myanmar, the Philippines, Singapore, Thailand, and Vietnam.  Am. Compl. ¶ 4.  Grab's ride-

hailing services include private cars, taxis, and, in some countries, motorcycles. *Id.* ¶ 45.
Grab's food-delivery services include prepared meals and groceries. *Id.* ¶ 46.

For its ride-hailing and food-delivery businesses, Grab offers incentives both to drivers
and to consumers; these incentives can significantly impact whether a transaction is profitable.
*Id.* ¶¶ 6-7, 54-62. Grab's app tabulates a gross merchandise value (a "GMV"), which includes
the cost of providing the service to the consumer (before any discounts) plus applicable taxes,
tolls, tips, and fees. *Id.* ¶ 6. Grab's revenue from a given transaction is a set commission of
the GMV minus the value of incentives offered to consumers and drivers. *Id.* Consider the
following example:



Proxy at 279; *see* Am. Compl. ¶¶ 6, 50. As this example illustrates, each dollar spent on
incentives reduces Grab's revenue by an equal amount. Am. Compl. ¶ 50. When, for a given
transaction, the amount spent on incentives exceeds the amount received in commissions and
platform fees, Grab loses money on that transaction. *Id.* ¶ 51. Grab refers to such occurrences
as transactions with "excess incentives." *Id.* ¶¶ 7, 51.

Grab markets its incentive programs to drivers to encourage them to provide services for Grab rather than its competitors. *Id.* ¶ 54. Grab offers several types of incentives to drivers, including distance-based incentives, group-order incentives, performance-based incentives, and "gem" incentives (also called "zone boosts"). *Id.* ¶¶ 55-56. Grab also offers additional incentives for new drivers and referral bonuses for people who recruit new drivers. *Id.* ¶ 55. Grab markets these incentives to drivers via weekly emails to its drivers, as well as through Telegram, a social-messaging platform. *Id.* ¶¶ 54-56.

The Amended Complaint gives several examples of Grab's driver incentives. For instance, in Malaysia, Grab offered an additional bonus of up to 1,000 Malaysian Ringgit ("RM") when a new driver started picking up orders. *Id.* ¶ 55 (during the relevant time, RM 1,000 equaled roughly $227). As another example, during the summer of 2020, Grab "initiated a Performance Rebate incentive plan, which offers quarterly commission rebates to Grab's top driver-partners who meet the eligibility criteria." *Id.* ¶ 60. "The Grab Performance Rebate was a 12% rebate of the commissions that Grab collected from the driver in the quarter. Drivers who rent vehicles through Grab (GrabRentals) were eligible for an additional 8% rebate." *Id.* ¶ 61. Also, on October 20, 2021, Grab announced a bonus for its Singaporean drivers of 2 Singapore Dollars ("SGD") per food-delivery order between 2:45 p.m. and 4:00 p.m. *Id.* ¶ 56 (during the relevant time, 1 SGD equaled approximately $0.72). During the fourth quarter of 2021, Grab Singapore sent out 86 such announcements via Telegram offering an extra 2 or 3 SGD bonus payments on deliveries, or nearly one for each day of the quarter – which was more than twice the number of announcements during the third quarter of 2021. *Id.* ¶ 57. Also, between November 22 and December 31, 2021, Grab offered

drivers up to 300 SGD for referrals of new drivers.  *Id.* ¶ 66.[1]  On December 1, 2021, Grab

announced another promotion for its drivers in Singapore, under which Grab would pay

drivers increasing bonuses per trip made between December 1 and December 4.  *Id.* ¶¶ 58-59.

Specifically, Grab offered 1 SGD bonuses per trip for trips 1 through 3, 1.50 SGD per trip for

trips 4 through 7, and 2 SGD per trip for trips 8 and above.  *Id.*

The Amended Complaint also gives some examples of consumer incentives.  Between

October 4 and 31, 2021, Grab's food-delivery business "offered what it called a 'Blockbuster

Sale,' giving 30% off across the menu."  *Id.* ¶ 67.  This sale "was brought back for an

extended period with even bigger sales between November 25, 2021 and December 12, 2021,

where some offers were as high as 50% off."  *Id.* ¶ 68.  "Grab also offered large incentives in

Q4 2021 to consumers on its ride hailing platform.  For example, from early October 2021

---

[1] The Amended Complaint states: "Specifically, among other partner incentives, Grab offered incentives of up to $300 SGD for referrals of new drivers.  *See, e.g.*, https://web.archive.org/ web/20211130025749/https://www.grab.com/sg/drd/."  Am. Compl. ¶ 66.  The archived web page accessible at that URL states:

> From 22 Nov 2021 till 31st Dec 2021, look out for the following
> sign-up promotions . . . .  If you're an existing delivery-partner
> in Grab: Know someone who can help us?  Refer a friend to us
> and get up to $300 in referral reward for each friend you
> successfully refer, T&C apply.  The good news is, there is no
> limit to the amount of referrals!

Because the archived web page is incorporated by reference into the Amended Complaint, the Court may consider it in ruling on the motion to dismiss.  *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam) ("When ruling on a motion to dismiss, documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." (quotation marks and citation omitted)); *Mockingbird 38, LLC v. Int'l Bus. Times, Inc.*, No. 21-cv-00283 (LJL), 2022 WL 154137, at *4 n.4 (S.D.N.Y. Jan. 18, 2022) (on motion to dismiss, examining webpage located at URL referenced in complaint); *Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 337 n.1 (S.D.N.Y. 2021) (same).

through December 31, 2021, it offered 50% off rides to or from some of the largest airports it serviced." *Id.* ¶ 69.

Tan and Ling co-founded Grab in 2012. *Id.* ¶¶ 4, 43. Tan was Grab's chief executive officer and a director of Grab at all relevant times. *Id.* ¶ 22. Ling was Grab's chief operating officer at all relevant times; he became a director of Grab on December 1, 2021. *Id.* ¶ 24. Oey was Grab's chief financial officer at all relevant times. *Id.* ¶ 23. Maa was Grab's president at all relevant times. *Id.* ¶ 25. Rogers became a director of Grab on December 1, 2021. *Id.* ¶ 26. Khosrowshahi, Ein, and Jay were directors of Grab at all relevant times. *Id.* ¶¶ 27-29.

### B. The Proxy

Altimeter and Grab filed the final registration statement and proxy statement for the de-SPAC transaction with the SEC on November 19, 2021. *Id.* ¶ 1; Proxy. In the Proxy, Grab explained that it "offer[s] various incentives to our driver- and merchant-partners, which are deducted from the fees normally received from driver- or merchant-partners," and that "such incentives may sometimes exceed Grab's fee from a particular transaction." Am. Compl. ¶ 7. The Proxy noted that Grab "also offer[s] consumer incentives." Proxy at 278. The Proxy further stated that during the preceding two years (through the first half of 2021), Grab had reduced its incentives, both in total and as a percentage of GMV. Am. Compl. ¶ 52. Specifically, Grab spent 10 percent of GMV on incentives during the first half of 2021, compared to 19 percent for the full year of 2019. *Id.* ¶¶ 52-53.

According to the Proxy, the Altimeter Board had conducted due diligence by reviewing "Grab and the industries in which it operates, including the financial and other information provided by Grab." *Id.* ¶ 38; *see id.* ¶ 39 (quoting the Proxy's overview of the Altimeter Board's due-diligence process). The Proxy stated that the Altimeter Board, without

obtaining a third-party valuation or fairness opinion, had valued Grab at approximately $39.6

billion.  *Id.* ¶ 40.  The Proxy assured investors that Altimeter's managers and directors "have

substantial experience in evaluating the operating and financial merits of companies similar to

Grab and reviewed certain financial information of Grab and other relevant financial

information selected based on the experience and the professional judgment of [Altimeter's]

management team, which enabled them to make the necessary analyses and determinations."

*Id.*  The Altimeter Board opined that the merger was in the best interests of Altimeter's

shareholders, and it unanimously recommended that investors vote in favor of the proposal.

*Id.* ¶ 41.

There are six passages in the Proxy that, according to Plaintiffs, contain materially

false and misleading statements and omissions.  *See id.* ¶¶ 70-79, 87.  First, in a section titled

"Risk Factors," the Proxy stated:

> In addition, achieving profitability will require Grab, for
> example, to continue to grow and scale its business, manage
> promotion and incentive spending, improve monetization,
> reduce marketing and other spending and increase consumer
> spending.  Grab's growth so far has been driven in part by
> incentives Grab offers driver-partners, merchant-partners and
> consumers.  As Grab has achieved greater scale, it has and may
> continue to seek to reduce incentives, which can impact both
> profitability and growth.

Proxy at 56 ("Proxy Portion 1"); *see* Am. Compl. ¶ 70.  Second, in the same Risk Factors

section, the Proxy stated:

> Grab has paid significant amounts of incentives to attract new
> driver and merchant partners and consumers to its services in
> order to grow its business and generate new demand for its
> services and may continue to do so in the future.  These
> incentives, which are typically in the form of additional
> payments made to partners and consumers, have in the past and
> may in the future exceed the amount of the commissions and
> fees that Grab receives for its services.  Grab's revenues are
> reported net of partner and consumer incentives, so if incentives

exceed Grab's commissions and fees received, it can result in Grab reporting negative revenue. . . .  Grab's ability to increase its revenues and, in turn, decrease its net losses and achieve profitability is therefore significantly dependent on its ability to effectively use incentives to encourage the use of its platform and over time to reduce the amount of incentives it pays to both its driver and merchant partners and consumers of its services relative to the amount of commissions and fees it receives for its services.  If Grab is unable to reduce the amount of incentives it pays over time relative to the commissions and fees it receives, it will likely impact Grab's ability to increase its revenues, raise capital, reduce its net losses and achieve profitability and reduce its net cash outflows, any or all of which could prevent Grab from continuing as a going concern or achieving or maintaining profitability.  In addition, given Grab's use of incentives to encourage use of its platform, future decreases in the use of incentives could also result in decreased growth in the number of users and driver- and merchant-partners or an overall decrease in users and driver- and merchant-partners and decreases in its revenues, which could negatively impact its financial condition and results of operations.

Proxy at 59 ("Proxy Portion 2"); *see* Am. Compl. ¶ 78.  Third, also in the Risk Factors section, the Proxy stated:

Grab's success in a given geographic market depends on its ability to increase the scale of its driver- and merchant-partner base and the number of consumers transacting through its platform as well as expand the deliveries, mobility and financial services offerings on its platform. . . .  If driver-partners are not attracted to the Grab platform or choose not to offer their services through its platform, or elect to offer them through a competitor's platform, Grab may lack a sufficient supply of driver-partners to attract and retain consumers and merchant-partners to the Grab platform. . . .  It is also important that Grab maintains a balance between demand and supply for mobility services in any given area at any given time.  Grab has experienced and expects to continue to experience driver-partner supply constraints or oversupply from time to time in certain areas (including certain areas or locations within cities). To the extent that Grab experiences driver-partner supply constraints in a given market, Grab may need to increase, or may not be able to reduce, the driver-partner incentives that Grab offers.

Proxy at 67-68 ("Proxy Portion 3"); *see* Am. Compl. ¶ 72.  Fourth, once more in the Risk

Factors section, the Proxy stated:

> Factors such as inflation, increased fuel prices, and increased
> vehicle purchase, rental, or maintenance costs may increase the
> costs incurred by Grab's driver-partners when providing
> services on its platform . . . [and] may increase merchant-partner
> operating costs. . . .  In many cases, these increased costs may
> cause driver-partners to spend less time providing services on
> the Grab platform or to seek alternative sources of income.
> Likewise, these increased costs may cause merchant-partners to
> pass costs on to consumers by increasing prices.  A decreased
> supply of consumers and driver- and merchant-partners on the
> Grab platform could harm its business, financial condition,
> results of operations and prospects.

Proxy at 90 ("Proxy Portion 4"); *see* Am. Compl. ¶ 76.  Fifth, in a section titled "Grab

Management's Discussion and Analysis of Financial Condition and Results of Operations"

(the "MD&A"), the Proxy stated:

> Revenue was $157 million for the three months ended
> September 30, 2021, down 9% year-over-year, as a result of the
> decline in mobility due to the severe lockdowns in Vietnam.
> Revenue is net of consumer incentives and merchant- and
> driver-partner incentives.

Proxy at 338 ("Proxy Portion 5"); *see* Am. Compl. ¶ 87.  Sixth, also in the MD&A, the Proxy

stated:

> During the initial stages of growth, we offered significant
> incentives and promotions to attract platform consumers as well
> as incentives to attract driver- and merchant-partners, and
> conducted advertising activities to enhance our brand
> awareness.  We also invested in research and development and
> other operating expenses to support the growth of our platform.
> Going forward, with increasing scale and synergies on our
> platform, we expect to enjoy economies of scale, which we
> expect will allow us to more efficiently and cost effectively
> acquire new platform consumers and engage existing
> consumers.

Proxy at 344 ("Proxy Portion 6"); *see* Am. Compl. ¶ 74.

### C.  Additional Pre-Merger Statements

On August 2, 2021, Grab announced its earnings for the second quarter of 2021.  Am. Compl. ¶ 80.  Grab filed this announcement with the SEC the same day, and later it was incorporated into the Proxy.  *Id.*; Grab Holdings Ltd., Prospectus (Form 425) (Aug. 2, 2021) (the "8/2/21 Press Release"), https://www.sec.gov/Archives/edgar/data/1823340/ 000119312521232789/d114160d425.htm [https://perma.cc/KV3D-Y6QD].  The 8/2/21 Press Release stated that Grab's "excess driver, merchant and consumer incentives . . . are expected to continue to decline over time as Grab's business matures."  8/2/21 Press Release (footnotes omitted); *see* Am. Compl. ¶ 80.  The 8/2/21 Press Release also noted that it "may include 'forward-looking statements' within the meaning of the federal securities laws," and that such statements "can be identified by the use of forward-looking words, including . . . 'expect.'" 8/2/21 Press Release.  The 8/2/21 Press Release warned that its forward-looking statements "are subject to a number of factors, risks and uncertainties," and that the reader "should carefully consider the foregoing factors and the other risks and uncertainties described in the 'Risk Factors' section of [the Proxy, whose initial draft was released that same day]."  *Id.*  For its part, the initial draft of the Proxy listed numerous risk factors, including that: (1) "If driver-partners are not attracted to the Grab platform or choose not to offer their services through its platform, or elect to offer them through a competitor's platform, Grab may lack a sufficient supply of driver-partners to attract and retain consumers and merchant-partners to the Grab platform"; and (2) "To the extent that Grab experiences driver-partner supply constraints in a given market, Grab may need to increase, or may not be able to reduce, the driver-partner incentives that Grab offers."  Altimeter Growth Corp. & Grab Holdings Ltd., Proxy Statement and Prospectus (Form F-4/A) at 56 (Nov. 19, 2021) (the "Draft Proxy"), https://www.sec.gov/

Archives/edgar/data/1855612/000119312521232151/d496451df4.htm [https://perma.cc/

PG69-5GH6].

On September 13, 2021, Grab, Tan, and Oey held a conference call to discuss Grab's

quarterly earnings.  Am. Compl. ¶¶ 81, 83.  Grab filed a transcript of the conference call with

the SEC the following day, and later it was incorporated into the Proxy.  *Id.*; Grab Holdings

Ltd., Prospectus (Form 425) (Sept. 13, 2021) (the "9/13/21 Conference Call"),

https://www.sec.gov/Archives/edgar/data/1823340/000119312521272151/d114160d425.htm

[https://perma.cc/9KEW-BZ54].  At one point during the 9/13/21 Conference Call, Tan stated:

> Allow me to explain with this slide that illustrates the flywheel
> effects underpinning our superapp strategy.  Each of our
> businesses helps the others scale.  First, [n]ew services can be
> quickly launched by leveraging collective assets.  Our pervasive
> mobility user base enabled us rapidly achieve category
> leadership in deliveries, and every transaction on our platform is
> an opportunity to offer a customized financial product, whether
> payments, lending, or insurance.  Then, [c]onsumer spending
> grows in tandem with more services, thereby creating more
> income opportunities for our merchant and driver-partners, who
> remain loyal to the platform.  This creates wider selection, faster
> delivery times, and improved consumer experience.  Even
> amidst the pandemic, consumer demand for deliveries has
> helped to cushion the impact of softer mobility demand on
> driver-partner earnings.  This has helped us sustain the supply
> network of our business in a truly cost-effective way.  A core
> component of our success is our ability to tie all this together
> into an integrated superapp that seamlessly connects each of our
> stakeholders.  Our superapp flywheel allows us to grow the
> ecosystem in a vastly accelerated manner, versus other single-
> vertical players.  This is our Secret Sauce.

9/13/21 Conference Call; *see* Am. Compl. ¶ 81.  Later during that same call, Oey stated:

> From a bottom-line perspective, we continue to demonstrate
> strong trends in our path to profitability.  Our Total Segment
> Adjusted EBITDA of $14 million loss saw a marked
> improvement by $75 million, underpinned by the strong top-
> line growth and improving margins across our business
> segments.  Group Adjusted EBITDA was $214 million loss for
> the quarter.  This was a decline of $8 million year-on-year, as

> we invest further in product development.  We saw our adjusted
> EBITDA margins as a percentage of GMV improved for the
> quarter to negative 5.5%, as compared to negative 9% in the
> same period last year.  We will continue to execute sustainable
> and improving margins despite challenges in the operating
> environment.

9/13/21 Conference Call; *see* Am. Compl. ¶ 83.

On November 11, 2021, Grab announced its earnings for the third quarter.  Am.

Compl. ¶ 85.  Grab filed this announcement with the SEC the following day, and later it was

incorporated into the Proxy.  *Id.*; Grab Holdings Ltd., Prospectus (Form 425) (Nov. 12, 2021)

(the "11/12/21 Press Release"), https://www.sec.gov/Archives/edgar/data/1823340/

000119312521327087/d114160d425.htm [https://perma.cc/7MKF-BZZ8].  The 11/21/21

Press Release stated that "[r]evenue was $157 million, down 9% YoY [that is, year over year],

as a result of the expected decline in mobility due to the severe lockdowns in Vietnam.

Grab's reported revenue is net of consumer, merchant and driver-partner incentives."

11/21/21 Press Release; *see* Am. Compl. ¶ 85.  The 11/21/21 Press Release also quoted Tan as

saying that "[d]espite severe lockdowns in Vietnam and heightened restrictions across the

region in the third quarter due to COVID-19, we executed well on our superapp strategy and

delivered strong growth."  11/21/21 Press Release; *see* Am. Compl. ¶ 85.

### D.  Consummation of the Merger and Post-Merger Events

Altimeter's shareholders overwhelmingly approved the merger with Grab.  Am.

Compl. ¶ 8.  Altimeter's shareholders could redeem their shares at $10.00 per share if they

wanted their money back rather than receive Grab shares post-merger.  *Id.* ¶¶ 3, 37.  Less than

one percent of Altimeter's shareholders redeemed their shares.  *Id.* ¶ 8.  The merger closed on

December 1, 2021.  *Id.*  Grab issued a press release that day celebrating the transaction as the

"largest-ever U.S. public market debut by a Southeast Asian company."  *Id.* ¶ 91.

Grab began trading on the NASDAQ on December 2, 2021. *Id.* ¶¶ 2, 16, 98. That day, Tan appeared on the CNBC show "Squawk Box." *Id.* ¶ 98. During the interview, Tan stated: "[Our] mobility margins are strong. We're seeing in our deliveries business, break even, just after 3 years in the majority of our markets." *Id.* (brackets in original).

Also on December 2, 2021, Maa was interviewed by Fortune Magazine. *Id.* ¶ 100. During the interview, the following exchange took place:

> **Fortune:**
>
> Can you walk me through Grab's plans to become profitable? Grab's third quarter results last month showed losses of $988 million, despite steady growth in gross merchandise value (GMV), which ballooned to a record $4 billion in Q3. Market research firm Euromonitor said in a July report that a key weakness is Grab's big spending on advertising, promotions and incentives, and that a challenge going forward is whether the company can make money and maintain customer loyalty without such discounts.
>
> **Maa:**
>
> We don't see profitability and growth as mutually exclusive. In Q3, we posted our third consecutive quarter of record GMV growth. We've also made very good strides on improving our economics. Our mobility segment has been positive since Q4 2019 and our margins are industry-leading [in that sector].
>
> Our deliveries business – which is much younger at three years old – is already breaking even in a majority of our markets.
>
> Our key is driving our super app strategy, which allows us to cross-sell new services when we roll them out, while maintaining discipline around our marketing costs. [It] also allows [Grab] drivers to earn more via [new] income opportunities [when ride-hailing is down] and helps us maintain discipline around [spending on] driver incentives. So the super app is really key to driving the new economics of our business.

*Id.* (brackets in original; further emphasis omitted).

Before the market opened on March 3, 2022, Grab issued a press release announcing its financial results for the fourth quarter of 2021 and the full year of 2021. *Id.* ¶¶ 93, 102;

*Grab Reports Fourth Quarter and Full Year 2021 Results*, Grab Holdings Ltd. (Mar. 3, 2022) (the "3/3/22 Press Release"), https://investors.grab.com/news-releases/news-release-details/ grab-reports-fourth-quarter-and-full-year-2021-results [https://perma.cc/2J4M-P9PF].  Grab announced that its revenue for the fourth quarter of 2021 was "$122 million, a 44% decline YoY as Grab preemptively invested to grow driver supply to support strong recovery in mobility demand.  Consumer incentives for mobility and deliveries also increased as Grab invested in its category share and [monthly-transacting-user] growth."  Am. Compl. ¶ 102. Grab also announced that the company lost $1.1 billion during that quarter.  *Id.*  Grab further disclosed that, compared to the fourth quarter of 2020, Grab spent 74 percent more on incentives and 126 percent more on ride-hailing during the fourth quarter of 2021.  *Id.*  And compared to the average quarterly spend in 2020, Grab spent 94 percent more on total incentives and 137 percent more on consumer incentives during the fourth quarter of 2021. *Id.* ¶ 93.  During a conference call that same day, Tan stated: "we're preemptively investing to recalibrate driver supply to capture a strong recovery in mobility demand.  Similar to what was observed in other parts of the world, our driver supply base moderated down amid lower mobility demand in the third quarter."  *Id.* ¶ 103.  Grab's stock price fell $1.95, or 37.3 percent, to close at $3.28 per share on March 3, 2022, on unusually heavy trading volume.  *Id.* ¶ 104.  Analysts lowered their price targets for Grab, noting that Grab used a higher level of incentives to combat a shortage of drivers than the analysts had expected.  *Id.*

Grab's annual report for 2021, filed with the SEC on April 28, 2022, stated: "We also saw a decrease in the number of driver-partners in the third quarter of 2021 due to similar COVID-19 measures in response to a new wave of COVID-19, and we preemptively invested in driver incentives to grow the supply of active drivers on our platform in the fourth quarter of 2021."  Grab Holdings Ltd., Annual Report (Form 20-F) at 120 (Apr. 28, 2022) (the "2021

Annual Report"), https://www.sec.gov/Archives/edgar/data/1855612/000119312522125634/
d170219d20f.htm [https://perma.cc/9X4R-3ZJ8]; *see* Am. Compl. ¶ 93.

### E.  Grab's Alleged Undisclosed Change in Strategy

Plaintiffs allege that "Grab reversed its incentive reduction strategy just before" the
business combination between Altimeter and Grab on December 1, 2021, Am. Compl. ¶¶ 8,
63, that "Grab was actually increasing its incentives" at the time, *id.* ¶ 62.  Plaintiffs point to
the fact that, according to the Proxy, Grab spent $1.237 billion on incentives during all of
2020 and $740 million on incentives during the first half of 2021.  *Id.* ¶ 52.  Thus, Plaintiffs
allege, Grab spent an average of $309.25 million on incentives during each quarter of 2020
and $370 million on incentives during each of the first two quarters of 2021.  *Id.* ¶¶ 52, 63.
Plaintiffs note that Grab spent $458 million on incentives during the third quarter of 2021 (per
the 11/12/21 Press Release) and $583 million on incentives during the fourth quarter of 2021
(per the 3/3/22 Press Release).  *See* 11/12/21 Press Release; 3/3/22 Press Release.  Plaintiff
therefore argue that, "[alt]hough not disclosed in the [Proxy], by Q4 2021, Grab was paying
quarterly incentives that were more than 90% higher year-over-year."  Am. Compl. ¶ 63.

Plaintiffs further contend that "[t]he massive boost in incentives cannot be explained
by increased business, because there was also a large rise in incentives paid as a percentage of
GMV."  *Id.* ¶ 64.  Plaintiffs allege that "incentives as a percent of GMV held steady at 10%
throughout 2020 and Q1/Q2 2021," but then rose to 11.45 percent in the third quarter of 2021
and 13.38 percent in the fourth quarter of 2021.  *Id.*  The increase from 10 percent to 13.38
percent, Plaintiffs argue, represents "a 33.8% increase in just two quarters."  *Id.*  The figures
for each quarter of 2020 and the first two quarters of 2021 come from dividing the amount
spent in 2020 by four and the amount spent in the first half of 2021 by two, respectively,
while the figures for the last two quarters of 2021 come from Grab's press releases.  *See id.*

According to Plaintiffs, "Grab later conceded that it 'preemptively' ramped incentives in Q4 2021 (at the time Grab went public) in reaction to a decline in driver-partners it experienced in Q3 2021." *Id.* ¶ 65.  Plaintiffs further allege that "[c]onsumers also complained bitterly about driver shortages, and the resulting cancellations and surge pricing, just before Grab went public." *Id.*; *see id.* (citing, as examples, an editorial in a Malaysian online news publication and two posts on Reddit).  Plaintiffs then point to the incentives of up to SGD 300 offered for referrals of new drivers (discussed above), and state: "Plaintiffs are informed and believe that this and other increased partner incentives occurred in the beginning of Q4 2021, before Grab went public, because: (a) Grab conceded it was done 'preemptively' in reaction to a Q3 driver decline rather than waiting until the end of Q4; and (b) as discussed [above], Grab was also ramping consumer incentives in the beginning two months of Q4 2021, before the IPO." *Id.* ¶ 66.

Plaintiffs allege that "[m]arket analysts understood the importance of Grab's incentives to its business." *Id.* ¶ 62.  "As a UBS analyst report dated December 9, 2021 explained, '[d]river incentive is primarily a tool to increase and maintain the size of its online driver pool, which is aimed at managing rider churn, improving efficiency and amplifying its networking effect.'" *Id.* (alteration in original).  The UBS report "emphasized the importance of limiting consumer and driver incentives, and based on the [information in the Proxy], described them as 'in check.'" *Id.*  Specifically, the report stated that Grab "has managed to keep incentives (for consumers and drivers) in check while sales & marketing costs have declined as % of GMV from 1.9% in 2019 to 1.2% in 2020.  While sequential volatility in margins is possible, especially as economies reopen in 2022 and the company accelerates spending on marketing, we expect the two core segments to improve margins with economies of scale." *Id.*

## II.  Procedural History

On March 16, 2022, Vincenzo Peccarino filed a putative class action against Grab, Tan, and Oey, asserting one cause of action under Section 10(b) and Rule 10b-5 and a second cause of action under Section 20(a).  ECF No. 1.  On April 21, 2022, Si Fan filed a putative class action against Grab, Tan, and Oey, also asserting one cause of action under Section 10(b) and Rule 10b-5 and a second cause of action under Section 20(a).  Complaint, *Fan v. Grab Holdings Ltd.*, No. 22-cv-03277 (VM) (S.D.N.Y. filed Apr. 21, 2022).  On June 7, 2022, Judge Marrero consolidated the two actions and appointed Plaintiffs to serve as co-lead plaintiffs.  ECF Nos. 38-39.

Plaintiffs filed the Amended Complaint on August 22, 2022.  Am. Compl.  On September 23, 2022, the case was reassigned to the undersigned.  Defendants jointly moved to dismiss the Amended Complaint on November 18, 2022.  Br.  The motion is fully briefed. ECF Nos. 91 (attorney declaration), 92 ("Opp."), 93 ("Reply"); *see also* ECF Nos. 94, 101-02 (letters regarding supplemental authority).  The parties requested oral argument via notations on their briefs.  The Court held oral argument on March 7, 2024.  Mar. 7, 2024 Oral Arg. Tr. ("Tr.").

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A court accepts a complaint's factual allegations as true and draws all reasonable inferences in favor of the plaintiff.  *DeCarlo*, 80 F.4th at 168.  Still, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely

consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). A court may also consider a document, even if not incorporated into the complaint or subject to judicial notice, if "the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint," so long as there is no dispute about the document's "authenticity or accuracy." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (further quotation marks and citations omitted).

## DISCUSSION

### I.    Statutory and Regulatory Overview

"Together, the Securities Act of 1933 and the Securities Exchange Act of 1934 form the backbone of American securities law." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 762 (2023) (citations omitted). The Court begins by describing the relevant provisions of each.

Section 11 of the Securities Act gives purchasers of registered securities "a right of action against an issuer or designated individuals (directors, partners, underwriters, and so forth) for material misstatements or omissions in registration statements." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2015). "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v.*

*Huddleston*, 459 U.S. 375, 382 (1983) (footnote omitted); *accord Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (Section 11 "imposes strict liability on issuers and signatories, and negligence liability on underwriters"). Thus, Section 11 claims "do not require a showing of scienter, reliance, or loss causation." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016). Further, "unless they are premised on allegations of fraud," Section 11 claims "need not satisfy the heightened particularity requirements" of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). *Panther Partners*, 681 F.3d at 120. Likewise, the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") do not "apply to such non-fraud claims." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156 (2d Cir. 2012).

Section 10(b) of the Exchange Act and Rule 10b-5 "prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (citation omitted). Such claims must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166 (2d Cir. 2021). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "To do so, a plaintiff must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Synchrony*, 988 F.3d at 167 (quotation marks and citation omitted). For its part, the PSLRA provides that "the complaint shall specify each

statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  The PSLRA also requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2).

Section 14(a) of the Exchange Act "makes it unlawful to solicit proxies in contravention of any rule or regulation promulgated by the SEC."  *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993).  Rule 14a-9 prohibits the issuance of a proxy statement which is "false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).  To state a claim under Section 14(a) and Rule 14a-9, "a shareholder must, at the very least, identify a materially misleading misrepresentation or omission in the proxy materials."  *St. Clair-Hibbard v. Am. Fin. Tr., Inc.*, 812 F. App'x 36, 38 (2d Cir. 2020) (summary order).  "[T]here is no requirement in the Second Circuit that plaintiffs allege fraud in order to state a cause of action pursuant to Section 14(a)," and mere negligence is enough.  *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 506 (S.D.N.Y. 2019) (further brackets and citation omitted).  But if a plaintiff asserts a Section 14(a) claim premised on allegations of fraud, Rule 9(b) applies.  *See id.*[2]

---

[2] Although the Second Circuit "has not directly addressed the issue, courts have generally concluded that Section 14(a) allegations must identify with precision any misleading statements or omitted material facts pursuant to the PSLRA," even if the claim sounds merely in negligence.  *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 557 (S.D.N.Y. 2017).  Plaintiffs have satisfied that requirement for their Section 14(a) claims, as well as for their Section 10(b) claims discussed below.

Thus, claims under Section 11, Section 10(b), and Section 14(a) "have somewhat different elements, but all of them share the common requirement that the plaintiff identify 'a materially misleading statement made by the defendant.'" *In re N.Y. Cmty. Bancorp, Inc., Sec. Litig.*, 448 F. Supp. 2d 466, 477 (E.D.N.Y. 2006) (quoting *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 57-58 (2d Cir. 1996) (per curiam)).  The standard for establishing a material misrepresentation or omission is the same under each provision.  *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (announcing the materiality standard applicable to Section 14(a) and Rule 14a-9 claims); *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988) ("We now expressly adopt the *TSC Industries* standard of materiality for the § 10(b) and Rule 10b-5 context."); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) ("[T]he definition of 'materiality' under § 11 of the Securities Act is the same as under § 10(b) of the Exchange Act."); *Chen v. Missfresh Ltd.*, --- F. Supp. 3d ----, 2023 WL 7289750, at *11 n.7 (S.D.N.Y. Nov. 6, 2023) ("[T]he existence (or non-existence) of a duty to disclose the omitted information . . . is analyzed the same under both statutes.").

"At the pleading stage, a plaintiff satisfies the materiality requirement by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *DeCarlo*, 80 F.4th at 182 (ellipsis and citation omitted).  Put otherwise, there must be a "substantial likelihood" that the statement or omission "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quotation marks and citation omitted).

"[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor."  *Omnicare*, 575 U.S. at 186.  "The inquiry (like the one into materiality) is objective," *id.* at 187, and it considers not only a statement's "literal truth," but also the

"context and manner of presentation," *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019)

(citation omitted); *accord In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 105 (2d Cir. 2013).

Also, "an omission is actionable under the securities laws only when the corporation is subject

to a duty to disclose the omitted facts." *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir.

2014) (citation omitted).  "This duty may arise when a corporate insider trades on confidential

information, a statute or regulation requires disclosure, or a statement is made that would be

inaccurate, incomplete, or misleading without further context." *In re Synchrony*, 988 F.3d at

167 (brackets, quotation marks, and citation omitted).

## II.  Section 11 and Section 14(a)

Plaintiffs challenge the same statements – namely, those made in the Proxy or

incorporated by reference therein – under Section 11 of the Securities Act and Section 14(a)

of the Exchange Act.  *See* Am. Compl. ¶¶ 119-127, 132-140.  Defendants make the same

arguments for dismissing Plaintiffs' claims under both provisions.  *See* Br. at 10-22.  The

Court therefore addresses the claims together.

### A.  Applicable Pleading Standard

Defendants argue that Plaintiffs' Section 11 and Section 14(a) claims sound in fraud

and therefore are subject to the heightened pleading standards of Rule 9(b).  *See* Br. at 10, 21.

The Court rejects this argument because Plaintiffs' Section 11 and Section 14(a) claims do not

sound in fraud.[3]

It is "black-letter law in this Circuit that, in order to determine whether the

particularity requirements of Rule 9(b) apply in a given case, courts must undertake 'a case-

---

[3] Defendants also argue that, insofar as Plaintiffs' Section 11 and Section 14(a) claims sound in fraud, Plaintiffs must allege scienter for those claims.  *See* Br. at 16, 21.  Given the Court's holding that Plaintiffs' Section 11 and Section 14(a) claims do not sound in fraud, the Court need not consider the scienter issue.

by-case analysis of particular pleadings.'" *In re Orion Sec. Litig.*, No. 08-cv-01328 (RJS), 2009 WL 2601952, at *1 (S.D.N.Y. Aug. 20, 2009) (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007)). Courts generally consider four factors in determining whether claims sound in fraud, namely, whether: (1) "the complaint contains merely a blanket disclaimer" that the plaintiff does not allege fraud for purposes of the claim; (2) "the allegations themselves include classic fraud language"; (3) the complaint includes a non-fraudulent basis for the claim alleged; and (4) the complaint separates the factual allegations supporting the fraud claims and negligence claims. *In re NIO, Inc. Sec. Litig.*, No. 19-cv-01424 (NGG), 2021 WL 3566300, at *5 (E.D.N.Y. Aug. 12, 2021) (citation omitted).

*In re Refco* is instructive. In that case, the complaint asserted claims under Sections 11, 12, and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act. 503 F. Supp. 2d at 622-23. The defendants argued that the Section 11 claims "sound[ed] in fraud, and [we]re therefore subject to a higher pleading standard." *Id.* at 631. The court held that "[t]his argument [wa]s without merit." *Id.* The court observed that the complaint was "carefully structured so as to draw a clear distinction between negligence and fraud claims. The Securities Act claims [we]re found in the first half of the complaint," while "the Exchange Act allegations, which include[d] allegations of fraud by some – but not all – of the defendants named in the Securities Act claims, [we]re found in the second half of the complaint." *Id.* at 632. To be sure, "[t]he Securities Act section of the complaint allege[d] various untrue or misleading statements in [several documents]. As to the defendants' intent, however, these claims [we]re carefully couched in the language of negligence." *Id.* "The relevant factual allegations [we]re contained in a section called 'Defendants' Negligence,' which allege[d] exactly that." *Id.* (citation omitted). And "Defendants ha[d] pointed to no allegations in the Securities Act section of the complaint that contain[ed] even a hint of

fraud." *Id.*  Altogether, the "plaintiffs ha[d] done more than disclaim fraud; they ha[d] specifically pl[ead]ed alternate theories of fraud and negligence."  *Id.* at 633.

Other courts in this District have applied *In re Refco*'s approach.  *See, e.g.*, *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 558 (S.D.N.Y. 2017) (collecting cases in which "courts have consistently held that Section 11 and Section 14(a) are subject to notice pleading where, as here, the division between the claims is clear"); *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11-cv-02700 (PKC), 2012 WL 3957916, at *9 (S.D.N.Y. Sept. 10, 2012) ("In this case, plaintiffs have structured the amended complaint in a manner that mirrors the structure discussed in *Refco* . . . .  Therefore, plaintiffs adequately distinguish their Securities Act claims, relieving them of the heightened pleading requirements of Rule 9(b)."); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 424-25 (S.D.N.Y. 2011) (similar); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 374-75 (S.D.N.Y. 2011) (similar); *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 116 (S.D.N.Y. 2010) (similar).  The Court finds this approach sound and applies it here.

The Section 11 and Section 14(a) claims in the Amended Complaint sound in negligence, not fraud.  The Amended Complaint contains more than "merely a blanket disclaimer that the plaintiffs do not allege fraud for the purposes of the [Section 11 and Section 14(a)] claims."  *In re NIO*, 2021 WL 3566300, at *5 (citation omitted).  Instead, the Amended Complaint is "carefully structured so as to draw a clear distinction between negligence and fraud claims."  *In re Refco*, 503 F. Supp. 2d at 632.  The allegations specific to Plaintiffs' fraud-based claims under Section 10(b) and Section 20(a) are confined to a section titled "Additional Facts Alleged Only With Respect To [Plaintiffs' Section 10(b) and Section 20(a) Claims]."  Am. Compl. at 36 (further capitalization and emphasis omitted); *see id.* ¶¶ 96-110 (fraud-specific allegations); *id.* ¶ 119 (in support of Section 11 claim, "Plaintiffs

restate and reallege Paragraphs 1 through 95 and 111 through 116 as though fully set forth

herein"); *id.* ¶ 128 (same for Section 15 claim); *id.* ¶ 132 (same for Section 14(a) claim);

*EnergySolutions*, 814 F. Supp. 2d at 424 (plaintiffs "provided additional scienter allegations

limited to the Exchange Act claims in a separate section after the Securities Act claims").  For

Plaintiffs' Section 11 and Section 14(a) claims, all references to Defendants' intent "are

carefully couched in the language of negligence."  *In re Refco*, 503 F. Supp. 2d at 632; *see,*

*e.g.*, Am. Compl. ¶ 2 ("The merger was effected through a defective and negligently prepared

proxy and registration statement registered with the SEC pursuant to the Securities Act on

Form F-4."); *id.* ¶ 9 ("Because the Defective Proxy/Registration Statement was negligently

prepared, it did not accurately inform investors of critical information.").[4]

That the Amended Complaint also allege violations of Item 303 of Regulation S-K, 17

C.F.R. § 229.303 ("Item 303"), *see* Am. Compl. ¶¶ 88-90, does not require a different

conclusion.  As discussed below, Item 303 "requires the registrant's actual knowledge of the

relevant trend or uncertainty."  *Ind. Pub. Emps.' Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d

Cir. 2016).  But just because "a fact was known and not disclosed does not mean, as a matter

of law, that the circumstances of the resulting omission sound in fraud."  *Wallace v.*

*IntraLinks*, No. 11-cv-08861 (TPG), 2013 WL 1907685, at *12 (S.D.N.Y. May 8, 2013)

(quoting *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 513 (S.D.N.Y. 2010)).

With the pleading standard established, the Court turns to the statements at issue.

---

[4] *In re HEXO Corp. Securities Litigation*, 524 F. Supp. 3d 283 (S.D.N.Y. 2021), cited by
Defendants, *see* Br. at 10 n.7, is distinguishable.  There, the claims under the Securities Act
and the Exchange Act "[we]re almost a mirror image of one another."  524 F. Supp. 3d at 299
n.17 (quotation marks and citation omitted).  The same is not true here because (among other
reasons) only pre-merger statements underlie Plaintiffs' Section 11 and Section 14(a) claims,
while only post-merger statements underlie Plaintiffs' Section 10(b) claims.

**B. Proxy Portions 1, 2, 3, and 4**

Proxy Portions 1, 2, 3, and 4 discussed Grab's use of incentives in attracting drivers and consumers; these sections also noted that Grab might increase its incentives in the future and that, if Grab were to do so, it could negatively impact Grab's profitability. Proxy Portion 1 stated that "achieving profitability will require Grab . . . to continue to grow and scale its business, manage promotion and incentive spending, improve monetization, reduce marketing and other spending[,] and increase consumer spending." Proxy at 56. It added: "As Grab has achieved greater scale, it has and *may continue* to seek to reduce incentives." *Id.* (emphasis added). Proxy Portion 2 stated that "Grab has paid significant amounts of incentives to attract new driver and merchant partners and consumers," and that Grab "may continue to do so in the future." *Id.* at 59. Proxy Portion 2 added: "*If* Grab is unable to reduce the amount of incentives it pays over time relative to the commissions and fees it receives, it will likely impact Grab's ability to . . . continu[e] as a going concern or achiev[e] or maintain[] profitability." *Id.* (emphasis added). Proxy Portion 3 stated that "Grab's success in a given geographic market depends on its ability to increase the [number of drivers] and the number of consumers transacting through its platform." *Id.* at 67. Proxy Portion 3 added, however, that if driver-partners are not attracted to the Grab platform or choose to offer their services elsewhere, "Grab *may* lack a sufficient supply of driver-partners to attract and retain consumers and merchant-partners to the Grab platform." *Id.* at 68 (emphasis added). Proxy Portion 3 further explained that, "*[t]o the extent* that Grab experiences driver-partner supply constraints in a given market, Grab *may* need to increase, or *may* not be able to reduce, the driver-partner incentives that Grab offers." *Id.* (emphases added). In the same vein, Proxy Portion 4 stated that a "decreased supply" of drivers "*could* harm [Grab's] business, financial condition, results of operations[,] and prospects." *Id.* at 90 (emphasis added). According to

28

Plaintiffs, Proxy Portions 1, 2, 3, and 4 "were materially false and misleading when made

because: (a) at the time Grab was *already* experiencing driver shortages in key markets; (b)

these shortages were *already* negatively affecting operations at the time the statements were

made; (c) Grab at the time was *already* increasing partner incentives (including referral

incentives) to combat the driver supply constraint; and (d) as a result, the [Proxy] did not

accurately portray Grab's then-current financial situation or its business prospects." Am.

Compl. ¶ 73 (further emphasis omitted) (discussing Proxy Portion 3); *see id.* ¶ 75 (same for

Proxy Portion 4); *id.* ¶ 71 (similar for Proxy Portion 1); *id.* ¶ 79 (similar for Proxy Portion 2);

*see also, e.g.*, Opp. at 1-2, 5-6, 8-11.

     Accepting the factual allegations in the Amended Complaint as true and making all

reasonable inferences in favor of Plaintiffs, the Court agrees.  "It is well-established precedent

in this Circuit that once a company speaks on an issue or topic, there is a duty to tell the whole

truth, even when there is no existing independent duty to disclose information on the issue or

topic." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (brackets, quotation

marks, and citation omitted).  "Revealing one fact about a subject does not trigger a duty to

reveal all facts on the subject," *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 402

(S.D.N.Y. 2019) (brackets and citation omitted), but a speaker must not "omit material facts

whose omission, in the light of what was stated, would be misleading," *Setzer v. Omega

Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020); *see, e.g.*, *id.* at 214 & n.15

("[B]ecause in July 2017 Omega had stated that Orianna was making 'partial monthly

payments,' Omega was duty-bound to disclose that its loan was the source of Orianna's rent

payments. . . .  [B]y putting Orianna's rental payments 'in play,' Defendants were required to

speak accurately and completely." (citations omitted)); *Meyer v. Jinkosolar Holdings Co.*, 761

F.3d 245, 251 ("Although this statement [in the prospectus] warned of a financial risk to the

company from environmental violations, the failure to disclose then-ongoing and serious pollution violations would cause a reasonable investor to make an overly optimistic assessment of the risk.  A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."); *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002) ("Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete."); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 612 (S.D.N.Y. 2017) ("Having chosen to speak about specific features of its business model and the advantages it offered, ITG had an obligation to ensure its statements were both accurate and complete, even if it lacked an independent duty to discuss the information in the first place." (quotation marks and citation omitted)).

Proxy Portions 1, 2, 3, and 4 discussed the importance of incentives in attracting drivers and consumers, as well as the profitability issues that would arise if Grab were unable to decrease its use of incentives or if Grab's driver pool were to shrink.  *See* Proxy at 56, 59, 67-68, 90.  Defendants "put the[se] issue[s] 'in play,'" so they had "a duty to tell the whole truth."  *Meyer*, 761 F.3d at 250 & n.3 (citation omitted).  Yet as Plaintiffs allege, Defendants did not "tell the whole truth," *id.* at 250, because Defendants did not disclose that, at the time that the Proxy was issued, Grab "was *already* experiencing driver shortages in key markets," that "these shortages were *already* negatively affecting operations," and that Grab "was *already* increasing partner incentives . . . to combat the driver supply constraint," Am. Compl. ¶ 73 (further emphasis omitted).  Therefore, drawing all reasonable inferences in favor of Plaintiffs and accepting well-pleaded factual allegations as true, Defendants omitted information that they had a duty to disclose.

Defendants contest this conclusion on seven grounds.  The Court rejects all seven.

First, Defendants argue, in effect, that nothing stated in Proxy Portions 1, 2, 3, and 4 was literally untrue. *See, e.g.*, Br. at 11-12, 14; Tr. at 12:20-21, 13:24-25. But "the law is well settled that so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims" under the securities laws. *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021) (citation omitted); *accord Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 551 (S.D.N.Y. 2021) ("An entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it materially misleading." (brackets, ellipsis, and citation omitted)); *In re Facebook, Inc., IPO Sec. & Derivatives Litig.*, 986 F. Supp. 2d 428, 466 (S.D.N.Y. 2013) ("A statement can also be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact." (citation omitted)). Therefore, although the literal truth of Proxy Portions 1, 2, 3, and 4 is relevant, it is not dispositive.[5]

Second, Defendants assert that the Proxy "disclosed that Grab had experienced driver supply constraints, that it may need to increase incentives to combat such constraints, and that '[t]here can be no assurance that Grab will be successful' in 'adapt[ing] to changing circumstances' relating to the impacts of COVID-19, 'including by maintaining and optimizing utilization of its driver-partner base.'" Br. at 14 (brackets in original; citation

---

[5] *Yaroni v. Pintec Technology Holdings Ltd.*, 600 F. Supp. 3d 385 (S.D.N.Y. 2022), cited by Defendants, *see* Br. at 12, is not on point. In *Yaroni*, the plaintiff "argu[ed] that the Registration Statement was materially false and misleading because it indicated that '[the defendant] recorded technical service fee revenues in compliance with [generally accepted accounting principles] on a gross basis.'" 600 F. Supp. 3d at 401. The court rejected this argument as "simply inaccurate" because a "review of the Complaint and the Registration Statement reveal[ed] no such claim, and [a] [p]laintiff cannot base a Section 11 claim on implicit promises read into the offering materials." *Id.* (quotation marks and citation omitted). Here, Plaintiffs do not contend that Defendants made any "implicit promises." *Id.* (citation omitted). Rather, Plaintiffs argue that "Defendants' statements falsely described the trend in incentives at the time" that the statements were made, and specifically that incentives were "significantly increasing." Opp. at 11 (emphasis omitted).

omitted); *see also id.* at 20-21 (similar).  But "cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."  *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) (brackets omitted) (quoting *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)); *accord Meyer*, 761 F.3d at 251 ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability [of that risk coming to pass].").  As another court in this District recently and cogently explained: "[I]f a company is warning investors about future risks and the company's efforts to deal with them, a reasonable investor would infer that those risks have not yet happened.  If the 'risk' has already happened or is then happening, the company has a duty to say so.  Omitting that information makes the statements misleading."  *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, No. 22-cv-06978 (AS), 2024 WL 456745, at *2 (S.D.N.Y. Feb. 5, 2024) (citations omitted).  That is precisely what Plaintiffs allege happened here.

It is also no saving grace for Defendants that the Proxy "revealed that incentives had increased in the *third* quarter," Tr. at 9:21-22 (emphasis added), because Plaintiffs plausibly allege and argue that Defendants failed to disclose the issues with driver shortages and incentive spending that befell Grab during the *fourth* quarter, *see, e.g.*, Am. Compl. ¶ 9 ("[The Proxy] did not accurately disclose that . . . in Q4 2021 Grab significantly increased its consumer incentives, including large discounts for ride hailing consumers to offset increased pricing stemming from the lack of drivers and a 'blockbuster' incentive providing massive discounts to food delivery customers."); Opp. at 11 ("Grab also massively boosted consumer incentives during the first two months of Q4 2021.  By choosing to address incentives and the expected, continued decreases in the [Proxy], Defendants were legally obligated to make complete and accurate disclosures, *i.e.*, truthfully disclose that Grab's driver and consumer

incentives were actually then ballooning." (quotation marks and citations omitted)); Tr. at 17:21-18:15 (similar). Especially considering Grab's reduction in spending on incentives (both in total and as a percentage of GMV) during the two-year period running through the first half of 2021, Am. Compl. ¶ 52; Tr. at 13:17-21, the Court cannot conclude as a matter of law that the disclosure of Grab's third-quarter financial results freed Defendants from having to warn that its fourth-quarter results would be even worse.

Third, Defendants argue that Plaintiffs have not established that Defendants were under a "legal obligation to disclose" the "metrics concerning the ongoing Q4 [2021]" in the Proxy. Br. at 16-17. The Court disagrees. It is true that, generally, "there is no duty to disclose a fact in the offering documents merely because a reasonable investor would very much like to know that fact." *Meyer*, 761 F.3d at 250 (quotation marks and citation omitted). As the Court has explained, however, by putting the issues of driver retention and incentive amounts in play, Defendants assumed "a duty to tell the whole truth." *Id.* at 250.[6]

Fourth, Defendants argue that although "Plaintiffs complain that the [Proxy] disclosures were misleading because Grab 'already' was suffering from driver shortages in Q3, causing it to increase partner incentives," "the Complaint lacks any coherent pleading that these alleged circumstances existed at the time of the [Proxy], or when or to what degree those

---

[6] Defendants note that "courts have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress." Br. at 17 (quoting *In re Coty Inc. Sec. Litig.*, No. 14-cv-00919 (RJS), 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016) (quoting *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 540 (S.D.N.Y. 2010))). The Court declines Defendants' implicit invitation to convert this practical hesitancy into a *de facto* absolute rule. Notably, the principal justification for this reluctance is the concern that a change in data "may be passing or momentary," and thus "not . . . a 'trend' for purposes of the disclos[ur]es required by Item 303." *In re AppHarvest Sec. Litig.*, --- F. Supp. 3d ----, 2023 WL 4866233, at *43-44 (S.D.N.Y. July 31, 2023) (citation omitted); *see id.* at *44 (collecting Item 303 cases, including *In re Focus Media*). This rationale, grounded in the meaning of "trend" as used in Item 303 – a regulation that the Court separately addresses below – does not self-evidently apply with equal force to claims not involving Item 303.

circumstances affected Grab." Br. at 12-13. The factual allegations recounted above – including, but not limited to, the Amended Complaint's specific references to multiple major promotions predating the issuance of the Proxy – refute Defendants' position. Defendants also cite no authority to support their insistence that, at the pleading stage, Plaintiffs needed to "quantify the financial impact of those incentives" or expansively detail "how they compared to incentives offered in other regions." *Id.* at 14.

Fifth, Defendants contest the accuracy of the Amended Complaint's allegations regarding Grab's quarterly spending on incentives: "Instead of depicting the actual numbers by quarter, the [Amended] Complaint takes the total incentives for the year [of 2020], divides by four, and presents the quotient as the 'quarterly' incentives. By mathematically eliminating quarterly fluctuations, this methodology all but guarantees a false level of consistency for every quarter, except Q3 and Q4 2021 (reported on a quarterly basis)." *Id.* at 8 n.5. But surely it is a *reasonable* inference, absent any indication to the contrary, that the amount Grab spent on incentives during each quarter of 2020 was one-fourth of what it spent on incentives during all of 2020, and that the amount Grab spent on incentives during the first two quarters of 2021 was one-half of what it spent on incentives during the first half of 2021.

To be sure, if Plaintiffs' general allegations were contradicted by "more specific allegations or documentary evidence," the latter would control. *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011); *accord In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 529 (S.D.N.Y. 2010). But Defendants point the Court to no such allegations or evidence here. Thus, at the pleading stage, Plaintiffs enjoy the benefit of reasonable inferences rooted in "simple computations." *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 273 (S.D.N.Y. 2014); *see N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 125 (2d Cir. 2013) ("Discovery may reveal that the

actual facts support the inferences drawn by the [defendants], rather than those drawn by the [plaintiff]. But that has no bearing on the question before us. . . . [W]e ask only whether the facts alleged in the [complaint], taken as true, allow us to draw the 'reasonable inference' that the [at-issue] offering documents contained misstatements and omissions." (quoting *Iqbal*, 556 U.S. at 678)).

In any event, the Court notes that Plaintiffs' back-of-the-envelope calculations for spending on incentives during the third and fourth quarters of 2020 are borne out by Defendants' own documents. For example, the 11/12/21 Press Release states that, during the third quarter of 2020, Grab spent $264 million on incentives ($132 million on partner incentives and $132 million on consumer incentives). *See* 11/12/21 Press Release. Likewise, the 3/3/22 Press Release states that, during the fourth quarter of 2020, Grab spent $288 million on incentives ($126 million on partner incentives and $162 million on consumer incentives). *See* 3/3/22 Press Release. For comparison, the Amended Complaint alleges that Grab spent $309.25 million on incentives during each quarter of 2020. Am. Compl. ¶¶ 52, 63. Thus, if anything, Plaintiffs' estimates *understate* the degree of the increase in spending on incentives between the last two quarters of 2020 and the last two quarters of 2021.

Sixth, Defendants argue that the challenged statements in Proxy Portions 1, 2, 3, and 4 are forward-looking statements protected under the PSLRA's safe-harbor provision and/or the bespeaks-caution doctrine. "Two doctrines – one statutory, the other judge-made – protect certain forward-looking statements from serving as the basis for claims of securities fraud." *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 597 (S.D.N.Y. 2022) (citation omitted), *aff'd sub nom. Tseng v. De Vries*, No. 22-2787, 2023 WL 8073087 (2d Cir. Nov. 21, 2023) (summary order). "First, the Private Securities Litigation Reform Act of 1995 creates a statutory 'safe harbor' for certain statements." *Id.* (brackets and citation omitted). "Second,

courts have long protected forward-looking statements, even those made in connection with an IPO, under the bespeaks-caution doctrine." *Id.* (citation omitted).  In support of its position that the PSLRA's safe harbor for certain forward-looking statements applies, Defendants' sole argument is that the statements at issue "were accompanied by meaningful cautionary disclosures."  Br. at 15.  Similarly, under the bespeaks-caution doctrine, a forward-looking statement is not actionable if it is "accompanied by sufficient cautionary language." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010).

The Court assumes without deciding that all of the statements at issue in Proxy Portions 1, 2, 3, and 4 were forward-looking statements.  Even so, those portions of the Proxy were not accompanied by meaningful cautionary language, and therefore they are not protected under either the PSLRA or the bespeaks-caution doctrine.  "[C]autionary language that is misleading in light of historical fact cannot be meaningful." *Slayton v. Am. Express Co.*, 604 F.3d 758, 770 n.5 (2d Cir. 2010).  Put otherwise, and as already noted, "cautionary words about *future risk* cannot insulate from liability the failure to disclose that the *risk has transpired*." *Wilson*, 671 F.3d at 130 (brackets and citation omitted; emphases added); *accord Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 16-cv-03591 (GHW), 2020 WL 1877821, at *11 (S.D.N.Y. Apr. 14, 2020) ("To offer [an] analogy, the bespeaks caution doctrine will not protect a defendant from liability for a disclosure that a house may be at an increased risk of fire damage if the house is already on fire.").  Here, Plaintiffs plausibly allege that Grab "couched [the risks of losing drivers and increasing incentives] as theoretical when the adverse events had actually occurred at the time of the [de-SPAC transaction]."  Opp. at 16; *see, e.g.*, Am. Compl. ¶¶ 73, 77, 79.  Hence, neither the PSLRA safe harbor nor the bespeaks-caution doctrine protects Grab's statements in Proxy Portions 2, 3, and 4.

Seventh, Defendants argue that Plaintiffs have failed to plead materiality. *See* Br. at 18 (contending that Plaintiffs have failed to show that "there is a substantial likelihood that the disclosure of the omitted information would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" (brackets, quotation marks, and citation omitted)); *id.* at 19-21 (section titled "No Material Information Was Omitted"). But "materiality is a mixed question of law and fact, rarely resolved at the motion to dismiss stage." *Setzer*, 968 F.3d at 213 n.12. Materiality "can be decided on a motion to dismiss only if 'reasonable minds cannot differ on the question of materiality.'" *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 101 (2d Cir. 2021) (quoting *TSC Indus.*, 426 U.S. at 450); *accord In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 439 (S.D.N.Y. 2009).

Simply put, Defendants make no persuasive argument that "reasonable minds cannot differ on the question of [the] materiality" of the allegedly omitted information, especially since it concerned a potentially significant drain on Grab's largest sources of revenue. *Danske Bank*, 11 F.4th at 101 (citation omitted). At the very least, it is plausible that "a reasonable investor would have considered" Grab's failure to disclose a significant uptick in spending on incentives to be "significant in making investment decisions." *DeCarlo*, 80 F.4th at 182 (citation omitted).

*Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31 (2d Cir. 2017), cited by Defendants, *see* Br. at 16, 18, does not require a different result. In *Stadnick*, the plaintiffs alleged that the defendants had violated Section 11 by "failing to disclose the 2014 third quarter financial information in its registration statement, which was issued the day after the third quarter ended." *Id.* at 36. In rejecting that contention, the Second Circuit emphasized (among other things) the other information about the company's financial performance that was already

available "in the public domain," such that the alleged omissions did not alter "the total mix of information" available to investors. *Id.* at 38. Defendants point to no comparable public-domain information about Grab's business operations that investors could consider here, such that the undisclosed information about driver shortages and the increased use of incentives could be deemed immaterial. Also, because the undisclosed metrics in *Stadnick* were "consistent with a pattern of fluctuation that began with the first quarter of 2013" – a year and a half before the defendants issued the registration statement at issue – a "reasonable investor . . . would not have harbored any solid expectations based on prior performance as to [the company's] third quarter 2014 performance as measured by the [undisclosed] metrics." *Id.* A reasonable investor would have different expectations here, given the reductions in incentives (both in total and as a percentage of GMV) during the two-year period (through the first half of 2021) that Grab trumpeted in the Proxy. *See* Am. Compl. ¶¶ 52-53.

In sum, Plaintiffs have sufficiently alleged that Proxy Portions 1, 2, 3, and 4 contained material misstatements and omissions.

### C.  Proxy Portion 5

Proxy Portion 5 stated that "[r]evenue was $157 million for the three months ended September 30, 2021, down 9% year-over-year, as a result of the decline in mobility due to the severe lockdowns in Vietnam." Proxy at 338. According to Plaintiffs, Proxy Portion 5 was "materially false and misleading when made" because it failed to disclose that "Grab's driver supply was then constrained," that "Grab's declining mobility revenue was not limited to Vietnam, and was not caused exclusively by lockdowns and restrictions in that region," and that "Grab was rapidly increasing both consumer and partner incentives at the time, and thus eroding margins." Am. Compl. ¶¶ 86-87.

The Court disagrees.  Plaintiffs "do not allege that the financial numbers [in Proxy Portion 5] were manipulated in any way – just that [Proxy Portion 5] failed to simultaneously disclose" that the supply of drivers was constrained, that this issue existed beyond Vietnam, and that Grab was increasing margins.  *Danske Bank*, 11 F.4th at 99; *see* Opp. at 13 n.9 (the Amended Complaint "does not challenge the accuracy of Grab's reported financial results").  But "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data."  *Danske Bank*, 11 F.4th at 99 (citation omitted); *accord Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004) (summary order) ("Accurate statements about past performance are self evidently not actionable under the securities laws."); *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 211 (S.D.N.Y. 2019) ("Multitudes of case law in this district foreclose any argument that accurate statements about past performance could be actionable under the securities laws.").

Plaintiffs suggest that Proxy Portion 5's reference to the Vietnam lockdowns was an actionable half-truth because it indicated that "revenue declines were caused by Vietnam, while omitting that a driver shortage and skyrocketing incentives were the real problems and destroyed Grab's margins, as Grab later admitted."  Opp. at 13 n.9.  To be sure, "[t]he words 'as a result of' plainly suggest causation."  *Paroline v. United States*, 572 U.S. 434, 445 (2014); *see* Proxy at 338 ("Revenue was $157 million for the three months ended September 30, 2021, down 9% year-over-year, *as a result of* the decline in mobility due to the severe lockdowns in Vietnam." (emphasis added)).  A reasonable investor, however, would not interpret Proxy Portion 5 as stating that the Vietnam lockdowns were the *sole* cause of the decline in revenue.  *See Omnicare*, 575 U.S. at 186 ("whether a statement is 'misleading' depends on the perspective of a reasonable investor").  Rather, a reasonable investor would understand Proxy Portion 5 as stating that the Vietnam lockdowns were a *leading* cause.  And

although Plaintiffs assert that "a driver shortage and skyrocketing incentives were the real problems [as opposed to the issues in Vietnam]," they cite no allegations in the complaint (other than the paragraph quoting Proxy Portion 5) to support this proposition. Opp. at 13 n.9 (citing Am. Compl. ¶ 70); *see Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 354 F. Supp. 3d 375, 382 (S.D.N.Y. 2018) ("Statements of counsel . . . in a brief, of course, are not evidence."). Thus, Proxy Portion 5's mention of the Vietnam lockdowns was not an actionable half-truth.

### D.  Proxy Portion 6

The first two sentences of Proxy Portion 6 described how, "[d]uring the initial stages of growth, [Grab] offered significant incentives and promotions," "conducted advertising activities," and "invested in research and development and other operating expenses to support the growth of our platform." Proxy at 344. The last sentence of Proxy Portion 6 added: "Going forward, with increasing scale and synergies on our platform, we expect to enjoy economies of scale, which we expect will allow us to more efficiently and cost effectively acquire new platform consumers and engage existing consumers." *Id.*

Plaintiffs allege that the statements in Proxy Portion 6 "were materially false and misleading when made because they omitted to disclose that: (a) Grab's significant incentives were not simply 'during the initial stages of growth' but were being re-implemented at the time even in markets where Grab's services were well-established; (b) Grab's 'scale and synergies' were not at the time functioning as explained in these statements, because despite higher scale and synergies Grab did not experience an ability in Q3 2021 and Q4 2021 to 'more efficiently and cost effectively acquire new platform consumers and engage existing consumers'; (c) high incentives were still needed to attract consumers and drivers; and (d) as a

result, the [Proxy] did not accurately portray Grab's then-current financial situation or its business prospects." Am. Compl. ¶ 75. The Court is not persuaded.

The first two sentences of Proxy Portion 6 – discussing Grab's practices "[d]uring the initial stages of growth"– are not actionable primarily because they appear to be (and Plaintiffs do not dispute that they are) accurate descriptions of Grab's actions during those "initial stages." Proxy at 344. The general rule is that "accurate statements of historical fact are nonactionable." *DoubleLine*, 413 F. Supp. 3d at 211 (ellipsis and citation omitted); *see, e.g.*, *In re AstraZeneca plc Sec. Litig.*, No. 21-cv-00722 (JPO), 2022 WL 4133258, at *7 (S.D.N.Y. Sept. 12, 2022) ("Plaintiffs have identified only accurate statements describing the launch and historical progression of the Phase II/III clinical trials. . . . Such statements are not actionable; they merely recite historical fact." (quotation marks and citation omitted)), *aff'd sub nom. Nandkumar v. AstraZeneca PLC*, No. 22-2704, 2023 WL 3477164 (2d Cir. May 16, 2023) (summary order); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 586 (S.D.N.Y. 2016) ("QRX's statements that it had received the CRL, that it had been granted a meeting with the FDA, and that the FDA had requested additional information regarding Study 022, are all accurate statements of objective historical facts. They are not at all misleading."). So too here.

Meanwhile, the last sentence of Proxy Portion 6 is non-actionable puffery. "Puffery encompasses statements that are too general to cause a reasonable investor to rely upon them and thus cannot have misled a reasonable investor. They are statements that lack the sort of definite positive projections that might require later correction." *In re Vivendi*, 838 F.3d at 245 (brackets, quotation marks, and citations omitted); *accord Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018) ("The key distinction between these [statements of mere puffery] and potentially actionable statements is that these

41

statements [of mere puffery] were non-verifiable."), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (summary order).  Generally, "expressions of puffery . . . do not give rise to securities violations."  *Rombach*, 355 F.3d at 174; *see Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173-74 (2d Cir. 2020) ("We have found puffery . . . actionable only when the speaker knew that the contrary was true." (quotation marks and citation omitted)); *see also In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-06278 (CM), 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018) ("Whether a representation constitutes mere puffery depends, in part, on the context in which it was made.").

As pleaded, the statement at issue here – that, with "increasing scale and synergies on [its] platform, [Grab] expect[s] to enjoy economies of scale" and "more efficiently and cost effectively acquire new platform consumers and engage existing consumers," Proxy at 344 – are what some courts in this District have labeled "declarations of intention," *Gillis*, 197 F. Supp. 3d at 593 (brackets and citation omitted).  Such statements – "general[ly]" phrased, "delivered in corporate jargon," and "relat[ing] to future expectations," *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 400 (S.D.N.Y. 2020) (citation omitted) – are "a hallmark of inactionable puffery" where, as here, "they are too broad and nebulous to be material," *Gillis*, 197 F. Supp. 3d at 593 (brackets and citation omitted), they "are not worded as guarantees," and "there are no allegations that defendants did not reasonably believe them," *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015).

Indeed, the challenged statement in Proxy Portion 6 is comparable to other general declarations that courts have deemed non-actionable puffery.  *See, e.g.*, *In re AppHarvest Sec. Litig.*, --- F. Supp. 3d ----, 2023 WL 4866233, at *33 n.12 (S.D.N.Y. July 31, 2023) (statement that "we believe we can staff and retain our workers with less churn, immigration

challenges[,] and unfilled positions that many of our competitors face" was puffery); *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 523-24 (S.D.N.Y. 2020) (statements that "[a]s we build those volumes up, those are products that will get scalable margins," and that defendant was "feeling very good about the ability to retain price and the customers feeling good about getting value," were puffery), *aff'd sub nom. Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, No. 21-2698, 2022 WL 17587853 (2d Cir. Dec. 13, 2022) (summary order); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019) (statement that defendant intended to "be laser-like in our pursuit of cost synergies" and "turn[] over every rock to get those synergies that are out there for the taking" was puffery); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 748, 757-58 (S.D.N.Y. 2018) (statements in November 2015 that "[w]e are proud of the fact that 2.5 years later we believe that we are on track to have these products . . . reach the market in 2016," and that "[w]e very much look forward to launching these products next year," were puffery (original brackets omitted)); *Gillis*, 197 F. Supp. 3d at 593 (statement that defendant "inten[ds] to pursue an 'aggressive commercialisation strategy'" was puffery); *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 648 (S.D.N.Y. 2015) ("China Gerui's statements about its fiscal strategy, including, for example, that the Company would 'remain fiscally disciplined with its cash resources given the working capital intensive nature of its business,' are generalizations about its fiscal discipline that are usually considered non-actionable.  Moreover, Plaintiff makes no allegations that China Gerui made specific commitments regarding its fiscal strategy or guaranteed that its cash holdings would not be utilized such that these statements would be actionable.  Accordingly, statements about China Gerui's fiscal strategy are best considered non-actionable puffery." (brackets and citations omitted)).

Thus, Proxy Portion 6 does not contain an actionable misstatement or omission.

### E.  8/2/21 Press Release

The 8/2/21 Press Release stated that "excess driver, merchant and consumer incentives . . . are expected to continue to decline over time as Grab's business matures."  8/2/21 Press Release.  According to Plaintiffs, "[t]hat statement was materially false and misleading when made because it omitted to disclose that Grab was actually then increasing both driver and consumer incentives, even though its business was maturing."  Am. Compl. ¶ 80.

The Court holds that this statement in the 8/2/21 Press Release was protected by the bespeaks-caution doctrine.[7]  Under the bespeaks-caution doctrine, a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading."  *MF Glob.*, 620 F.3d at 141.  The question thus becomes (1) whether this statement in the 8/2/21 Press Release was a forward-looking statement, and (2) if so, whether it was accompanied by sufficient cautionary language.

The Court first holds that this statement in the 8/2/21 Press Release was a forward-looking statement.  "As a general rule, statements whose truth cannot be ascertained until some time after the time they are made are forward-looking statements."  *In re Philip Morris Int'l, Inc. Sec. Litig.*, 89 F.4th 408, 428 (2d Cir. 2023) (quotation marks and citation omitted).  Under this standard, the statement in the 8/2/21 Press Release was a forward-looking statement because it addressed what was expected to happen "over time."  8/2/21 Press Release; *see Gissin v. Endres*, 739 F. Supp. 2d 488, 507 (S.D.N.Y. 2010) (statements "cast in predictive terms . . . are by definition forward-looking").

---

[7] Because the Court relies on the bespeaks-caution doctrine, the Court need not decide whether the PSLRA's safe-harbor provision would protect Defendants here.

The Court also holds that the 8/2/21 Press Release was accompanied by sufficient cautionary language.  "A forward-looking statement is accompanied by meaningful cautionary language when it 'conveys substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements.'" *Steamship Trade Ass'n of Balt.-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, --- F. Supp. 3d ----, 2023 WL 8287681, at *7 (S.D.N.Y. Nov. 30, 2023) (brackets omitted) (quoting *Slayton*, 604 F.3d at 771).  The 8/2/21 Press Release instructed readers to consult the Draft Proxy's risk-factors discussion.  8/2/21 Press Release.  In turn, the Draft Proxy warned that Grab may "lack a sufficient supply of driver-partners" and that Grab therefore "may need to increase, or may not be able to reduce, the driver-partner incentives that Grab offers."  Draft Proxy at 56.  Hence, the 8/2/21 Press Release (when read together with the language in the Draft Proxy) sufficiently warned that excess incentives may, in fact, *not* "decline over time." 8/2/21 Press Release; *see also In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 378 (S.D.N.Y. 2018) ("When defendants warn investors of a potential risk, they need not predict the precise manner in which the risks will manifest themselves." (brackets and citation omitted)).

To be clear, as the Court held above, similar language in the final version of the Proxy did not support applying the bespeaks-caution doctrine because Plaintiffs plausibly allege that, by the time of the Proxy's final publication on November 19, 2021, Grab was already increasing its use of incentives in response to a driver shortage.  Yet although Plaintiffs flatly assert that Grab was "increasing both driver and consumer incentives" as of August 2, 2021, Am. Compl. ¶ 80, the Amended Complaint lacks sufficient allegations to make that conclusion plausible.  Therefore, although an omission-based theory of falsity is tenable for the final version of the Proxy, the same is not true for the earlier 8/2/21 Press Release.

### F.  9/13/21 Conference Call

None of the statements during the 9/13/21 Conference Call was actionable.  Tan's

remarks, quoted above, were "quite general, delivered in corporate jargon, and relate[d] to

future expectations.  A reasonable investor would not rely on them.  Accordingly, they are

non-actionable puffery."  *Evoqua*, 450 F. Supp. 3d at 400 (quotation marks and citation

omitted); *accord In re Synchrony*, 988 F.3d at 173 ("[G]eneric statements about [a

company's] overall business model do not invite reasonable reliance.  They are simply too

generic to express any objective fact." (quotation marks and citation omitted)); *ECA, Loc. 134

IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)

("JPMC's statements were merely generalizations regarding JPMC's business practices.  Such

generalizations are precisely the type of puffery that this and other circuits have consistently

held to be inactionable." (quotation marks and citation omitted)).

The claims based on Oey's statements fare no better.  During the 9/13/21 Conference

Call, Oey discussed various statistics relating to Grab's financial performance.  As explained

above with respect to Proxy Portion 5, "a violation of federal securities law cannot be

premised upon a company's disclosure of accurate historical data."  *Danske Bank*, 11 F.4th at

99 (citation omitted).  "Whatever the scope of the responsibility not to make statements that

constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate

earnings."  *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38

(2d Cir. 2012) (summary order).  Oey's bookending remarks – that Grab "continue[s] to

demonstrate strong trends in [its] path to profitability," and that Grab "[w]ill continue to

execute sustainable and improving margins despite challenges in the operating environment,"

9/13/21 Conference Call – were non-actionable puffery because they were "too general to

cause a reasonable investor to rely upon them and thus cannot have misled a reasonable

investor," *In re Vivendi*, 838 F.3d at 245 (quotation marks and citations omitted); *see, e.g.*, *In re AT&T/DirecTV Now*, 480 F. Supp. 3d at 523-24 (corporation described its video-streaming service as "attractive" and "starting strong" and "really fast"; corporation also cited its "unique position" potentially to bundle its service with other services to "gain customers and grow revenues" and "continue quality margins and profit expansion"; court held that these and other similar statements were non-actionable puffery); *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 223 (E.D.N.Y. 2019) ("broad characterizations of [the defendant's] vendor relationships as 'strong,' 'positive,' and 'great'" were "statements that amount[ed] to puffery").

Altogether, the remarks during the 9/13/21 Conference Call provide no basis for suit.

### G. 11/12/21 Press Release

The 11/21/21 Press Release reported that "[r]evenue was $157 million, down 9% YoY, as a result of the expected decline in mobility due to the severe lockdowns in Vietnam." 11/21/21 Press Release. It also quoted Tan as stating that "[d]espite severe lockdowns in Vietnam and heightened restrictions across the region in the third quarter due to COVID-19, we executed well on our superapp strategy and delivered strong growth." *Id.*

For the reasons stated above regarding the virtually identical statement in Proxy Portion 5, the first sentence at issue in the 11/21/21 Press Release was not actionable. As for the second sentence, it is non-actionable puffery because Tan's claim that Grab "executed well on [its] superapp strategy and delivered strong growth," *id.*, was "too general to cause a reasonable investor to rely upon [it]," *In re Vivendi*, 838 F.3d at 245 (citation omitted).

### H. Item 303

Item 303 required the Proxy to:

> Describe any known trends or uncertainties that have had or that
> are reasonably likely to have a material favorable or unfavorable
> impact on net sales or revenues or income from continuing
> operations.  If the registrant knows of events that are reasonably
> likely to cause a material change in the relationship between
> costs and revenues (such as known or reasonably likely future
> increases in costs of labor or materials or price increases or
> inventory adjustments), the change in the relationship must be
> disclosed.

17 C.F.R. § 229.303(b)(2)(ii); *see* Opp. at 17-18; Tr. at 22:8-12.  Item 303 requires disclosure "where the trend is both (1) known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." *Stadnick*, 861 F.3d at 39 (quotation marks and citation omitted).  Significantly, "Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it *actually knows of* when it files the relevant report with the SEC.  It is not enough that it should have known of the existing trend, event, or uncertainty." *SAIC*, 818 F.3d at 95 (emphasis added).

Plaintiffs argue that "by the time the [Proxy] was published, existing driver shortages and incentive increases were already negatively impacting Grab's future financial conditions and results, such that prior results were unlikely to be (and, in fact, were not) indicative of future results.  Defendants had an affirmative obligation to disclose these risks and their potential future impact in the P/RS pursuant to Item 303." Opp. at 17-18 (citation omitted).

This argument fails because Plaintiffs do not allege sufficient facts supporting the reasonable inference that management "actually kn[ew]" about these trends "when it file[d] [the Proxy] with the SEC." *SAIC*, 818 F.3d at 95.  Notably, the most direct allegations of actual knowledge in the Amended Complaint are concentrated in the portions specific to Plaintiffs' Section 10(b) claims and their scienter requirement.  *See* Am. Compl. ¶¶ 105, 107-110, 143-144, 150-151.  In contrast, the allegations pertaining to Plaintiffs' Section 11 and Section 14(a) allege merely that, "[i]n the exercise of reasonable care, [certain] Defendants

*should have known* of the material misstatements and omissions contained in the [Proxy]." *Id.* ¶ 123; *see also, e.g.*, *id.* ¶¶ 124-125.  At most, Plaintiffs summarily allege that the Proxy "omitted the following known adverse trends that were not only 'reasonably likely' but virtually certain to have a material adverse effect on Grab's financial condition or results: (a) a known decline in the supply of drivers; (b) a known material increase in partner incentives (both in the absolute and as a percentage of GMV); and (c) a known material increase in consumer incentives (both in the absolute and as a percentage of GMV)." *Id.* ¶ 90.  But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim.  *Iqbal*, 556 U.S. at 678.  To the extent that Plaintiffs seek to resuscitate the inference of actual knowledge in their brief, both cases that they cite are distinguishable.  *See* Opp. at 20 (citing *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019); *In re CPI Card Grp. Inc. Sec. Litig.*, No. 16-cv-04531 (LAK), 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017)).  As Plaintiffs' own parentheticals make clear, the facts supporting an inference of knowledge in those cases were stronger and more specific than those alleged here.  *See id.* (in *Lexmark*, "defendants tracked inventory and saw data at monthly meetings"; in *In re CPI*, there was an "admission of knowledge soon after IPO, statements on [the] topic in earnings calls, and [the] account of one confidential witness").[8]

---

[8] The Court also notes that the lengths of the undisclosed "trends" (as defined for purposes of Item 303) were longer in Plaintiffs' cited cases than the alleged undisclosed "trend" here.  *See Lexmark*, 367 F. Supp. 3d at 35 ("The length of this alleged nine-month trend is sufficiently distinguishable from Defendants' cited authorities, where plaintiffs' allegations concerned time periods as brief as two to five months or would have required near-instantaneous disclosure."); *In re CPI*, 2017 WL 4941597, at *1, 3 & n.38 ("plaintiffs here allege that the trend began in the first half of 2015" and continued until the company's IPO in mid-October 2015).  This difference in length – although potentially less salient outside the Item 303 context, *see supra* note 6 – is relevant to the issue of actual knowledge for purposes of an Item 303 claim.

*          *          *

To conclude, Plaintiffs sufficiently allege that Proxy Portions 1, 2, 3, and 4 contain material misstatements and omissions.  But Plaintiffs do not sufficiently allege that the other pre-merger statements contain material misstatements and omissions.  Plaintiffs also do not successfully allege a violation of Item 303.  Therefore, the Court grants in part and denies in part Defendants' motion to dismiss Plaintiffs' claims under Section 11 and Section 14(a).

### III. Section 10(b) Claims

Under Section 10(b) and Rule 10b-5, Plaintiffs challenge only the post-merger statements – that is, Tan's statements during the Squawk Box interview and Maa's statements during the Fortune interview.  Opp. at 21-25; Tr. at 16:10-12.  Defendants argue that none of the identified statements was materially false or misleading.  *See* Br. at 22-23.  The Court agrees, so it declines to reach Defendants' additional arguments about scienter and loss causation.  *See id.* at 23-25; *see, e.g.*, *In re Philip Morris*, 89 F.4th at 417 (declining to address scienter because plaintiffs failed to successfully plead falsity); *Danske Bank*, 11 F.4th at 98 n.2 (same); *Singh*, 918 F.3d at 62 (same).

Tan's statements on Squawk Box were non-actionable puffery.  Tan's reference on Squawk Box to "strong" mobility margins is non-actionable for the same reasons that his claim of "strong" growth in the 11/21/21 Press Release was non-actionable.  Plaintiffs allege no facts suggesting that Tan's statement that Grab's delivery business was at "break even" in the majority of Grab's markets was false when made.  And nothing in the Squawk Box interview put Grab's alleged struggles with driver recruitment (and attendant increase in spending on incentives) "in play."  *Meyer*, 761 F.3d at 250 n.3 (citation omitted).

Maa's remarks during the interview with Fortune were non-actionable as well.  Plaintiffs do not argue that Maa's statements that Grab "posted [its] third consecutive quarter

50

of record GMV growth" during the third quarter of 2021, that Grab's "margins [we]re industry-leading" in the mobility sector, or that Grab's delivery business "[wa]s already breaking even in a majority of [its] markets" were untrue.  Am. Compl. ¶ 100.  Meanwhile, Maa's claims that Grab "made very good strides on improving [its] economics" and that its "mobility segment has been positive since Q4 2019," *id.*, were "too broad and nebulous to be material," *Gillis*, 197 F. Supp. 3d at 593.

Plaintiffs correctly note that Maa's statement "directly responded to [the interviewer's] question about incentive costs and profitability."  Opp. at 22.  Plaintiffs also point to two cases holding that certain statements "were made to reassure investors" and therefore could not "be dismissed as 'mere puffery.'"  *Wash. State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 74 (S.D.N.Y. 2020); *see also In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015).  Neither decision, however, established a *per se* rule that every statement made in response to an analyst's question, no matter how vacuous or jargon-laden that statement might be, is actionable.  Rather, the courts in those cases considered the statements in context.  *See In re Vivendi*, 838 F.3d at 250 ("The test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself, but whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor." (quotation marks and citation omitted)).

Moreover, the facts of each case are distinguishable.  In *Odebrecht*, the plaintiff "allege[d] that, in several offering memoranda, [the] [d]efendants describe a 'competitive bidding process' that did not exist."  461 F. Supp. 3d at 73.  Significantly, "the statements about competitive bidding were made in reference to other statements [made by the defendants] about an increasingly competitive business environment."  *Id.*  The court thus concluded that the statements at issue "were made to reassure investors as to specific risks

regarding international competition, and accordingly they cannot be dismissed as 'mere puffery.'" *Id.* at 74.  In *Odebrecht*, however, these "other statements" were more detailed than Maa's surrounding remarks here, which largely sound in puffery.  *Compare id.* at 73, *with* Am. Compl. ¶ 100.  It is also notable that the statements in *Odebrecht* were included in offering documents, whereas Maa's statements were made during a live interview.  Without question, spoken statements (like written statements) are subject to the securities laws.  *See, e.g.*, *In re Synchrony*, 988 F.3d at 167-70 (statement during earnings call was actionable).  But as the Supreme Court has explained, "whether an omission makes an expression of opinion misleading always depends on context.  Registration statements as a class are formal documents, filed with the SEC as a legal prerequisite for selling securities to the public. Investors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments, of the kind that an individual might communicate in daily life." *Omnicare*, 575 U.S. at 190.  Given the comparatively "off-the-cuff" nature of Maa's interview, *id.*, the Court is reticent to expand *Odebrecht*'s holding beyond the bounds of statements made in official documents filed with the SEC.

In *In re Petrobras*, the plaintiffs alleged that the defendant "repeatedly represented that it maintained effective internal controls and procedures, when in fact those controls and procedures suffered from material weaknesses."  116 F. Supp. 3d at 375.  The court emphasized the context in which the alleged misrepresentations were made and concluded that because "the statements were made repeatedly in an effort to reassure the investing public about the [defendant's] integrity, a reasonable investor could rely on them as reflective of the [defendant's] true state of affairs." *Id.* at 381.  There, too, the statements were made in formal documents submitted to the SEC rather than in extemporaneous remarks.  *See, e.g.*, Consolidated Am. Compl. ¶¶ 164, 184, 198, 251-252, 260, *In re Petrobras Sec. Litig.*, 116 F.

Supp. 3d 368 (S.D.N.Y. 2015) (No. 14-cv-09662 (JSR)), ECF No. 109; *see Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (citation omitted)).  Further, the "repeated[]" assurances in *In re Petrobras*, 116 F. Supp. 3d at 381, contrast with Maa's singular statement here, *see* Am. Compl. ¶ 100.

Thus, the Court grants Defendants' motion to dismiss Plaintiffs' claim under Section 10(b) and Rule 10b-5.

## IV.      Derivative-Liability Claims

"Section 15 [of the Securities Act] imposes liability on those who control persons or entities found to have violated [Section] 11."  *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 135 n.1 (2d Cir. 2013).  Likewise, "Section 20(a) of the Exchange Act provides that individual executives, as 'controlling persons' of a company, are secondarily liable for their company's violations of the Exchange Act."  *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (brackets and citation omitted).

Defendants argue only that Plaintiffs' controlling-person claims should be dismissed because the primary-violation claims fail.  *See* Br. at 25.  Plaintiffs likewise tie the success of their controlling-person claims to the success of their primary-violation claims.  *See* Opp. at 25.  The Court therefore dismisses the portions of Plaintiffs' Section 15 and Section 20(a) claims premised on statements identified above as non-actionable.  The Court otherwise declines to dismiss these claims.

## V.      Leave to Amend

Plaintiffs request that, if the Court dismisses some or all of the claims in the Amended Complaint, the Court grant leave to amend their complaint.  *See id.* at 25 n.17.  Defendants

request that the Court dismiss the Amended Complaint with prejudice. *See, e.g.*, Br. at 1. The Court grants Plaintiffs' request and denies Defendants' request.

A court "should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). "This permissive standard is consistent with [the Second Circuit's] strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam) (quotation marks and citation omitted). Of course, "it is within the sound discretion of the district court" to deny leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (citation omitted). But "in the absence of a valid rationale like undue delay or futility, it is improper to simultaneously dismiss a complaint with prejudice under Rule 12(b)(6) and deny leave to amend when the district court has not adequately informed the plaintiffs of its view of the complaint's deficiencies." *Mandala v. NTT Data, Inc.*, 88 F.4th 353, 363 (2d Cir. 2023).

The Court grants Plaintiffs leave to amend within twenty-one (21) days of the date of this opinion and order. Plaintiffs have not "repeated[ly] fail[ed] to cure deficiencies by amendments previously allowed." *Foman v. Davis*, 371 U.S. 178, 182 (1962). And the Court has no reason to conclude that Plaintiffs have unduly delayed or acted in bad faith, that granting leave to amend would unduly prejudice Defendants, or that granting leave to amend would be futile. *See Broidy*, 944 F.3d at 447.

## CONCLUSION

For the foregoing reasons, the motion to dismiss the Amended Complaint is GRANTED IN PART and DENIED IN PART. The Clerk of Court is respectfully directed to terminate the pending motion at ECF No. 89. Plaintiffs may file an amended complaint within **twenty-one (21) days** of this opinion and order. If Plaintiffs decides not to file an

amended complaint, then the parties shall meet, confer, and jointly submit a proposed case-management plan within **thirty (30) days** of this opinion and order.

Dated: March 12, 2024
        New York, New York

SO ORDERED.

_Jennifer Rochon_

JENNIFER L. ROCHON
United States District Judge