# Exhibit A

**UNITED STATES DISTRICT COURT OF THE**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GRAB HOLDINGS LIMITED SECURITIES LITIGATION | Case No. 1:22-cv-02189-JLR<br>Hon. Jennifer L. Rochon<br>JURY TRIAL DEMANDED |

## <u>REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS DATED MARCH 18, 1970</u>

The United States District Court for the Southern District of New York presents its compliments to the judicial authorities of Singapore and requests international judicial assistance to obtain discovery evidence from a non-party to this action located in Singapore to be used in a civil action before this Court ("Letter Rogatory" or "Request"). This Letter Rogatory is made pursuant to, and in conformity with, Chapter I of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters Dated March 18, 1970 ("Hague Convention"), to which both the United States and Singapore are signatories.

Based on Plaintiffs' application, this Court finds that there are sufficient grounds to obtain documentary evidence from non-party Morgan Stanley Asia (Singapore) Pte. ("Morgan Stanley Singapore"), located at #16-01 Capital Square, 23 Church Street, Singapore 049481, in the above-captioned action and that such evidence should be produced in the interest of justice. Based on the information presented to the Court by Plaintiffs, this Court finds that the documentary evidence sought through this Letter Rogatory is likely to be relevant to Plaintiffs' claims.

The particulars of this Letter Rogatory are as follows:

1. **Sender**    LEVI & KORSINSKY, LLP
Shannon L. Hopkins
1111 Summer Street, Suite 403

1

Stamford, CT 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171

As authorized by:
The Honorable Jennifer L. Rochon
United States District Court
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007

| 2. | **Central Authority of the Requested State** | Registrar of the Supreme Court Supreme Court of Singapore 1 Supreme Court Lane Singapore, 178879 |
|---|---|---|
| 3. | **Person to Whom the Executed Request is to be Returned** | LEVI & KORSINSKY, LLP Shannon L. Hopkins 1111 Summer Street, Suite 403 Stamford, CT 06905 Tel.: (203) 992-4523 Fax: (212) 363-7171 |

**4.      Specification of the Date by Which the Requesting Authority Requires Receipt of the Response to the Letter Rogatory**

The requesting authority respectfully requests that a response to the Letter Rogatory be provided as soon as is practicable.

In conformity with Article 3 of the Hague Convention, the undersigned applicants submit the following request:

| 5.a | **The Requesting Judicial Authority** | The Honorable Jennifer L. Rochon United States District Court Southern District of New York Daniel Patrick Moynihan United States Courthouse 500 Pearl St. New York, NY 10007 |
|---|---|---|
| 5.b | **To the Competent Authority of Singapore** | Registrar of the Supreme Court Supreme Court of Singapore |

2

1 Supreme Court Lane
Singapore, 178879

| 5.c | **Name of the Case and Identifying Docket Number** | *In re Grab Holdings Limited Securities Litigation*<br>Case No. 1:22-cv-02189-JLR |
|---|---|---|
| **6.** | **Names and Addresses of the Parties and their Representatives** | |
| 6.a | **Co-Lead Plaintiffs** | SLG Cloudbank Holdings, LLC<br>c/o Levi & Korsinsky, LLP<br>1111 Summer Street, Suite 403<br>Stamford, CT 06905<br>(203) 992-4523<br><br>Si Fan<br>c/o Pomerantz LLP<br>10 South LaSalle St., Suite 3505<br>Chicago, IL 60603<br>(312) 377-1181<br><br>Amit Batra<br>c/o Pomerantz LLP<br>10 South LaSalle St., Suite 3505<br>Chicago, IL 60603<br>(312) 377-1181 |
| | **Plaintiffs' Representatives** | LEVI & KORSINSKY, LLP<br>Shannon L. Hopkins<br>Gregory M. Potrepka<br>1111 Summer Street, Suite 403<br>Stamford, CT 06905<br>Tel.: (203) 992-4523<br>Fax: (212) 363-7171<br><br>POMERANTZ LLP<br>Joshua B. Silverman<br>Brian P. O'Connell<br>10 South La Salle Street, Suite 3505<br>Chicago, Illinois 60603<br>Telephone: (312) 377-1181<br>Facsimile: (312) 377-1184 |

3

**6.b    Defendants**

Grab Holdings Limited ("Grab" or the "Company")
Susan L. Saltzstein
Jeffrey Geier
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
(212) 735-3000

Anthony Tan
c/o counsel to the Grab Defendants
Susan L. Saltzstein
Jeffrey Geier
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
(212) 735-3000

Peter Oey
c/o counsel to the Grab Defendants
Susan L. Saltzstein
Jeffrey Geier
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
(212) 735-3000

Tan Hooi Ling
c/o counsel to the Grab Defendants
Susan L. Saltzstein
Jeffrey Geier
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
(212) 735-3000

John Rogers
c/o counsel to the Grab Defendants
Susan L. Saltzstein
Jeffrey Geier
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
(212) 735-3000

Dara Khosrowshahi

4

c/o counsel to the Grab Defendants
Susan L. Saltzstein
Jeffrey Geier
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
(212) 735-3000

Ng Shin Ein
c/o counsel to the Grab Defendants
Susan L. Saltzstein
Jeffrey Geier
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
(212) 735-3000

Oliver Jay
c/o counsel to the Grab Defendants
Susan L. Saltzstein
Jeffrey Geier
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
(212) 735-3000


Brad Gerstner
c/o counsel to the Altimeter Defendants
David Hennes
Amy Jane Longo
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9289

Hab Siam
c/o counsel to the Altimeter Defendants
David Hennes
Amy Jane Longo
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9289

Richard N. Barton

5

c/o counsel to the Altimeter Defendants
David Hennes
Amy Jane Longo
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9289

Aishetu Fatima Dozie
c/o counsel to the Altimeter Defendants
David Hennes
Amy Jane Longo
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9289

Dev Ittycheria
c/o counsel to the Altimeter Defendants
David Hennes
Amy Jane Longo
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9289

**Defendants' Representatives**

Counsel to the Grab Defendants
Susan L. Saltzstein
Jeffrey Geier
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
(212) 735-3000

Counsel to the Altimeter Defendants
David Hennes
Amy Jane Longo
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9289

### 7.a    Nature of the Proceedings

This is a civil securities class action arising from allegations that Defendants made false and misleading statements, and omitted material information necessary to make those statements not false or misleading, in the proxy and registration statement issued in connection with Defendant Grab's business combination agreement with Altimeter Growth Corp. ("AGC"), which was filed with the SEC on Form F-4 on August 2, 2021, and was thereafter amended on Forms F-4/A on September 13, 2021, October 18, 2021, November 12, 2021, November 17, 2021, and November 19, 2021, and the body of which was incorporated into the final prospectus on Form 424(b)(3) filed on November 19, 2021, as amended, the Proxy/Registration Statement." On November 30, 2021, having only the information in the Proxy/Registration Statement, investors overwhelmingly approved the Merger, which Grab described as the "largest-ever U.S. public market debut by a Southeast Asian company." Compl., ¶91. Plaintiffs allege that though all public shareholders of AGC had the right to redeem shares for $10 regardless of whether the shareholder voted to approve the merger, less than one percent elected to redeem.

Plaintiffs SLG Cloudbank Holdings, LLC, Si Fan, and Amit Batra, and the putative class of investors they seek to represent, allegedly: (i) purchased or otherwise acquired public shares in Grab (including by way of exchange of publicly-listed AGC shares) pursuant to or traceable to the Proxy/Registration Statement; and/or (ii) were solicited to approve the merger and exchanged publicly-listed AGC shares for Grab Class A Ordinary shares rather than redeeming the same pursuant to the Proxy/Registration Statement. These claims were upheld in part at the pleading stage with respect to certain statements concerning Grab's use of incentives in attracting drivers and consumers by the Honorable Jennifer L. Rochon of the United States District Court for the

Southern District of New York.[1] However, these claims must still be proved at trial.

A copy of Plaintiffs' Amended Complaint ("Complaint" or "Compl."), dated August 22, 2022, is attached as Exhibit 2 to this Request. The nature of the action is summarized at Complaint ¶¶1-10. Plaintiffs seek damages and other relief for injury caused by Defendants' alleged wrongdoing.

### 7.b    Summary of the Complaint[2]

Founded in 2012, Grab primarily offers ride hailing and food delivery services in over 400 cities in eight countries in Southeast Asia—Cambodia, Indonesia, Malaysia, Myanmar, the Philippines, Singapore, Thailand and Vietnam. Compl. ¶4. On December 2, 2021, Grab became publicly listed in the United States via a multi-billion-dollar business combination agreement with AGC, a special purpose acquisition company ("SPAC"). *Id.* ¶2. Plaintiffs contend that Defendants effected the business combination agreement, valued at $39.6 billion, through an allegedly defective and negligently prepared proxy/registration statement. *Id.*

The Proxy/Registration Statement describes Grab's business model in part as follows: "our platform connects millions of consumers with millions of driver- and merchant-partners to facilitate interaction and trade between these stakeholders. We generate the majority of our revenue from service fees and commissions paid by driver- and merchant-partners for use of the Grab superapp to connect them with consumers and facilitate transactions. Based on service agreements

---

[1] A copy of the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss the Complaint (the "Order"), dated March 12, 2024, is attached as Exhibit 3 to this Request.

[2] This section provides a high-level summary of the claims asserted by Plaintiffs that the Court sustained in the Order. These claims have not been proven, and Defendants reserve all rights and defenses with respect to the claims asserted. Moreover, this summary is not intended to be a comprehensive description of the claims that Plaintiffs may raise. Plaintiffs reserve all rights to amend the Complaint within the deadliness set by the Court's May 24, 2024 Civil Case Management Plan and Scheduling Order. *See* ECF No. 117.

with driver- and merchant-partners, we retain the applicable fee or commission from the fare or order and related charges that we collect on behalf of the driver- and merchant-partners." *Id.* ¶5.

In connection with its core ride-hailing and food delivery businesses, Grab offers both consumer and driver incentives which can dramatically impact the profitability of transactions. Plaintiffs allege that Grab tabulates a gross merchandise value ("GMV"), which includes the cost of the service to the consumer (before any discounts), and applicable taxes, tolls, tips, and fees. Plaintiffs contend that Grab's revenue from a given transaction is a set commission of the GMV, minus the incentives it offers to consumers and to drivers. *Id.* ¶6.

Plaintiffs allege that the Proxy/Registration Statement represented to investors that Grab "ha[d] and may continue to seek to reduce incentives[,]" and that "achieving profitability will require Grab, for example, to continue to grow and scale its business, manage promotion and incentive spending, improve monetization, reduce marketing and other spending and increase consumer spending." *Id.* ¶70. Plaintiffs further allege that the Proxy/Registration Statement also represented that risks to the Company's operations associated with lack of driver-partner supply and use of incentives were hypothetical. *See id.* ¶¶72, 76, 78, 79. Plaintiffs allege that these statements were false and misleading because the Proxy/Registration Statement failed to disclose an alleged driver shortage, forcing it to significantly increase driver incentives in order to hire and retain drivers, and that in Q3 and Q4 of 2021 Grab increased its consumer incentives, including large discounts for ride hailing consumers to offset increased pricing stemming from the alleged lack of drivers and a "blockbuster" incentive providing massive discounts to food delivery customers. Plaintiffs contend that these undisclosed changes made Grab's core driver-based services significantly less profitable for Grab. *Id.*¶9.

9

Plaintiffs further allege that, on March 3, 2022, Grab disclosed its costs and reported high rates of incentive spending.

### 8.a    Evidence to be Obtained

The undersigned applicant is honored to request that in the interest of justice and for the purpose of obtaining evidence in a judicial proceeding now being litigated before the Requesting Court and for the due determination of the matters in dispute between the parties hereto, that the appropriate judicial authority of Singapore direct, through competent authority by your usual and proper process, summons to Morgan Stanley Singapore to provide documents and reports to be examined, and produce documentary and testimonial evidence related to this litigation for use at trial.

### 8.b    Purpose of the Evidence or Judicial Act Sought

This action is centered on the effect of Grab's alleged driver shortages, and the driver and consumer incentives the Company allegedly instituted. As one of Grab's advisers in relation to the Company's merger with AGC, Morgan Stanley Singapore provided valuation analyses and other financial services. Plaintiffs assert that determining whether, or the extent to which, Grab's alleged driver shortages and incentive programs factored into the Company's valuation prior to the merger, and whether those considerations were accurately reflected in the proxy/registration statement, will be a central point of contention in this action. Accordingly, this Court finds that the interests of justice require Morgan Stanley Singapore to produce the documents referenced in Exhibit 1 to this Request.

In addition, because Morgan Stanley Singapore is not a party to this action, Plaintiffs may only obtain its documents through a Letter Rogatory.

10

**9.      Documents or Other Property to be Inspected**

*See* Exhibit 1, Section IV of Schedule A of this Request.

**9.      Identity of Any Person to be Examined**

This Court also respectfully requests that the judicial authorities of Singapore summon a designated representative most knowledgeable of the issues from Morgan Stanley Singapore, and put each of the questions listed in Section V of Schedule A to that witness. *See* Exhibit 1. The Court requests that the testimony of the witnesses be taken under oath and transcribed verbatim. Any expenses incurred by the Singapore Court executing the letters rogatory will be paid by counsel for the Plaintiffs. The Court also requests that representatives of the Plaintiffs and Defendants be permitted to attend the questioning, to make notes of what is said during the questioning, and, to the extent permissible under the law of Singapore, to put follow-up questions to the witnesses, either directly or through the court.

**10.      Questions to be Put to the Persons to be Examined or Statement of the Subject Matter About Which they are Being Examined**

*See* Exhibit 1, Section V of Schedule A of this Request.

**11.      Request for Notification of the Time and Place for the Execution of the Request and Identify and Address of any Person to be Notified**

LEVI & KORSINSKY, LLP
Shannon L. Hopkins
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171

Counsel for Plaintiffs will promptly send notice to counsel for all parties to this action.

**12.    Specification of Privilege or Duty to Refuse to Produce Documents Under Law of the State of Origin**

Neither this Request for International Judicial Assistance nor the transmission of documents pursuant to the Hague Convention shall waive, or be deemed or argued to have waived, the attorney-client privilege, the work product doctrine, or any other privileges, rights, protections, or prohibitions that may apply to that evidence under the laws of Singapore, the United States, or the State of New York, including the privilege against self-incrimination under the Fifth Amendment to the United States Constitution.

Morgan Stanley Singapore's production of documents will not be burdensome as the requests are tailored to encompass a limited subset of documents and testimony related to Morgan Stanley Singapore's role as Grab's adviser, valuation analyses, and other financial services related to the business combination agreement between Grab and AGC. In addition, the documents will be produced under the terms of a protective order (attached hereto as Exhibit 4), and therefore will be given confidential treatment in connection with this litigation.

**13.    The Fees and Costs Incurred Which are Reimbursable Under the Second Paragraph of Article 14 or under Article 26 of the Convention**

Fees and costs incurred which are reimbursable under the Hague Convention shall be borne by Plaintiffs. The payment of any such fees and costs is without prejudice to Plaintiffs' rights to make subsequent requests for reimbursement of those fees and costs from other parties to the proceedings before the Requesting Court.

**14.    Closing**

In the furtherance of justice and by the proper and usual process of this court, the United States District Court for the Southern District of New York assures the appropriate judicial authority in Singapore that it is willing to provide similar cooperation and assistance to the judicial

authorities of Singapore in the event that Singapore requests similar assistance. We respectfully request that the requesting party provide copies of the documents produced to the parties' representative as identified in Section 6 above and to:

Honorable Jennifer L. Rochon
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Honorable Jennifer L. Rochon, United States District Court Judge of the United States District Court for the Southern District of New York and the seal thereof, this __6th__ day of __August__, 2024.

SIGNATURE    AND    SEAL    OF    THE
REQUESTING AUTHORITY

_Jennifer Rochon_

The Honorable Jennifer L. Rochon

13

# Exhibit 1

SCHEDULE A

(Morgan Stanley Asia (Singapore) Pte.)

## I.   DEFINITIONS

The following definitions and rules of construction apply to each Request set forth below:

1.      "Action" means *In re Grab Holdings Limited Securities Litigation*, 1:22-cv-02189-JLR.

2.      "AGC" means Altimeter Growth Corp., which traded under the ticker symbol "AGC", and all of its corporate parents, subsidiaries, affiliates, attorneys, accountants, officers, directors, employees, partners, Agents, representatives, or other Persons occupying similar positions or performing similar functions, and anyone acting or purporting to act on AGC's behalf.

3.      "Communication" means the transmittal or transfer (orally, in writing, electronically, or in any other manner) of information of any kind (in the form of facts, ideas, inquiries, or otherwise) and is not limited to transfers of information between Persons, but also includes other transfers, such as records and memoranda to file.

4.      "Company" or "Grab" means Grab Holdings Limited and includes any subsidiaries thereof or predecessors in interest thereof.

5.      "Concern," "Concerns," and "Concerning" mean constituting, evidencing, reflecting, referring to, incorporating, effecting, including, or otherwise pertaining or relating, or logically or factually connected with the subject matter of the inquiry or Request.

6.      "Consumer Incentives" means any discounts, promotions, sales, or other bonuses or incentives offered, marketed, or promoted by Grab to consumers in any country or locale during the Relevant Period, including, but not limited to any "Blockbuster Sale," as referenced as an example in the Complaint. ¶¶67-68.

1

7. "Correspondence" means any letter, memorandum, note, e-mail, facsimile, text message, instant message, internet message board posting, or any other writing containing a Communication from one Person or Persons to another or others. Unless otherwise specified, Correspondence shall be interpreted to include both internal and external Correspondence made within Morgan Stanley Singapore or made between Morgan Stanley Singapore and a third party. Correspondence is a subset of Communications and Documents.

8. "Defendants" means Grab, Brad Gerstner, Hab Siam, Richard N. Barton, Aishetu Fatima Dozie, Dev Ittycheria, Anthony Tan, Peter Oey, Tan Hooi Ling, John Rogers, Dara Khosrowshahi, Ng Shin Ein, Oliver Jay, and all of their corporate parents, subsidiaries, affiliates, and Agents.

9. "Delivery Segment" means Grab's food delivery segment, which may sometimes be referred to as "GrabFood," and includes all of Grab's food delivery and other delivery operations in all of the countries in which Grab operates or has operated.

10. "Document(s)" means hard-copy documents and electronic documents, and includes Meeting minutes, reports, letters, prospective contracts, agreements, records, studies, surveys, resolutions, tabulations, notes, summaries, memoranda, data, spreadsheets, diagrams, charts, graphs, audio tapes, voice-mail messages, videotapes, electronic recordings, facsimile transmissions, and includes originals and drafts, in any and all languages.

11. "Driver-Partner Incentives" means any incentives offered or promoted by Grab to drivers and other mobility or delivery partners in its Mobility Segment or Delivery Segment in any country or locale during the Relevant Period including, but not limited to, any distance-based adjustments, group-order incentives, performance incentives, zone boosts, surge pricing, or gem incentives.

12.    "Grab Defendants" means Grab, Anthony Tan, Peter Oey, Tan Hooi Ling, John Rogers, Dara Khosrowshahi, Ng Shin Ein, and Oliver Jay, and all of their corporate parents, subsidiaries, affiliates, predecessors, and Agents.

13.    "Grab Individual Defendants" means Anthony Tan, Peter Oey, Tan Hooi Ling, John Rogers, Dara Khosrowshahi, Ng Shin Ein, and Oliver Jay, and all of their Agents.

14.    "Identify" means as follows:

    a.  "Identify," when used in reference to a Document, means to state its formal and informal title(s), subject matter or nature, date(s) of preparation, and date(s) of use, and to identify the Person(s) who signed it or under whose name the Document was issued, the author(s), addressee(s), and recipient(s) of the Document, and its present or last known custodian.

    b.  "Identify" when used in reference to a natural Person, means to state the Person's full name, present (or last known) business and home address(es) and phone number(s), e-mail address(es), and that Person's employment title(s) or position(s) at the relevant time.

    c.  "Identify," when used in reference to an entity other than a natural Person, means to state the full name of the entity, the type of entity, and the address and phone number of the entity's principal place of business or operations, as applicable.

    d.  "Identify," when used in reference to a discussion or other non-written Communication, means to (a) state its date and its physical location (or to identify how the Communication or discussion took place if not in person, e.g., by telephone), (b) Identify each Person(s) who participated in, was in

3

attendance for, was dialed in for, or otherwise participated in the discussion or Communication; and (c) state the substance of the discussion or Communication, and of any responses exchanged.

15.     "Individual Defendants" means Brad Gerstner, Hab Siam, Richard N. Barton, Aishetu Fatima Dozie, Dev Ittycheria, Anthony Tan, Peter Oey, Tan Hooi Ling, John Rogers, Dara Khosrowshahi, Ng Shin Ein, Oliver Jay and all of their Agents.

16.     "Merger" means the merger between AGC and GRAB, on or about December 1, 2021.

17.     "Mobility Segment" means Grab's ride-hailing segment and includes all of Grab's ride and mobility operations in all of the countries in which Grab operates or has operated.

18.     "Morgan Stanley & Co. LLC" means Morgan Stanley & Co. LLC, and all of Morgan Stanley & Co. LLC's corporate parents, subsidiaries, affiliates, attorneys, accountants, officers, directors, employees, partners, Agents, representatives, or other Persons occupying similar positions or performing similar functions, and anyone acting or purporting to act on Morgan Stanley & Co. LLC's behalf.

19.     "Morgan Stanley Singapore" means Morgan Stanley Asia (Singapore) Pte., and all of its corporate parents, subsidiaries, affiliates, attorneys, accountants, officers, directors, employees, partners, Agents, representatives, or other Persons occupying similar positions or performing similar functions, and anyone acting or purporting to act on Morgan Stanley Singapore's behalf.

20.     "PIPE investors" means any third-party investors who entered into Private Investment in Public Equities ("PIPE") Subscription Agreements, as referenced for example on page 8 of the Proxy/Registration Statement.

4

21.     "Plaintiffs" means Court-appointed Lead Plaintiffs Si Fan, Amit Batra, and SLG Cloudbanks Holdings, LLC.

22.     "Prospectus" means Defendants' Form 424(b)(3) filed on November 19, 2021, and any previous filings or drafts, which incorporates the body of the Proxy/Registration Statement.

23.     "Proxy/Registration Statement" means the proxy/registration statement Defendants filed with the SEC on Form F-4 on August 2, 2021, including all drafts thereof and amendments thereto (whether or not filed with the SEC), the body of which was incorporated into the Prospectus.

24.     "SEC" means the United States Securities and Exchange Commission, and any of its employees or Agents.

25.     "Services" means any services offered and/or performed by Morgan Stanley Singapore, including but not limited to capital raising, valuation, financial advisory services, including providing advice on mergers, acquisitions, and strategies for taking the Company public, and market research such as analysis of companies, sectors, markets, and economies.

26.     "SPAC" means Special Purpose Acquisition Company.

27.     "You" and "Your" refer to Morgan Stanley Singapore.

## II.     INSTRUCTIONS

28.     None of the Instructions contained herein shall be construed to in any way abrogate or limit Your obligations under the rules set forth in the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters dated March 18, 1970 or any other privileges, rights, protections, or prohibitions that may apply to that evidence under the laws of Singapore.

29.     These Requests are continuing in nature and require that You timely supplement any production whenever You acquire or locate additional Documents between the time of these Requests and the final resolution of this Action.

30.     In producing Documents, You are to furnish all Documents in Your possession, custody, or control.

31.     Each Document requested shall be produced in its entirety. If a Document responsive to any Request cannot be produced in full, it shall be produced to the extent possible.

32.     If any responsive Document has been lost, destroyed, removed from, or is no longer in Your possession, custody, or control for any reason, please identify as such in Your response.

33.     Each request should be responded to separately. However, a document responsive to more than one request may, if the relevant portion is marked or indexed, be produced and referred to in a later response.

34.     To the extent You object to any portion of any Request, You shall set forth all reasons for your objection and furnish Documents responsive to the remainder of the Request. If Documents are withheld on the basis of an objection, You shall state that responsive materials are being withheld on the basis of that objection.

## III.     RELEVANT TIME PERIOD

All Requests herein refer to the period October 1, 2020 through March 31, 2022, unless otherwise indicated, and shall include all Documents that relate, in whole or in part, to such period even if dated, prepared, or received prior to or subsequent to that period. If a Document prepared before the Relevant Period is necessary for a correct or complete understanding of any Document covered by a Request, produce the earlier or subsequent Document, as well.

IV.    **REQUESTS FOR PRODUCTION**

**REQUEST NO. 1:**

The conflict waiver letters signed on March 16, 2021 and March 17, 2021 by Grab and AGC, respectively, and the drafts and amendments of those contracts and agreements as referenced on page 160 of the Proxy/Registration Statement, filed with the U.S. Securities and Exchange Commission on November 19, 2021.

**REQUEST NO. 2:**

The letter agreement reflecting Morgan Stanley Singapore's role as co-advisor to Grab in connection with the Merger, including fees received in connection with its role as co-advisor, as referenced on page 160 of the Proxy/Registration Statement filed with the U.S. Securities and Exchange Commission on November 19, 2021.

**REQUEST NO. 3:**

The Documents Concerning AGC and Grab's decision to market the PIPE financing to prospective PIPE investors at a pre-money enterprise value ranging from $30.1 billion to $34.1 billion, as stated on page 161 of the Proxy/Registration Statement filed with the U.S. Securities and Exchange Commission on November 19, 2021.

**REQUEST NO. 4:**

The Documents Concerning the discussion of valuation metrics held between March 8 and March 12, 2021, between You, representatives of Grab, AGC, Evercore, and J.P. Morgan's Equity Capital Markets Group, as described on page 161 of the Proxy/Registration Statement filed with the U.S. Securities and Exchange Commission on November 19, 2021.

**REQUEST NO. 5:**

The Documents provided by Morgan Stanley Singapore, to management of Grab, providing review and evaluation of Grab going public, which included the comparison of considerations between going public by way of (a) an initial public offering and (b) a business combination with a SPAC, as stated on page 158 of the Proxy/Registration Statement, filed with the U.S. Securities and Exchange Commission on November 19, 2021.

**REQUEST NO. 6:**

The drafts and amendments of the Proxy/Registration Statement, including proposed revisions, as provided by Morgan Stanley Singapore to Grab in connection with the Merger.

**REQUEST NO. 7:**

The market information on dual-class structures adopted by US-listed technology companies, provided by Morgan Stanley Singapore, upon the request of Grab, and documents reflecting the follow-up discussions regarding the voting ratio between the Class B Ordinary Shares and Class A Ordinary Shares, as referenced on page 161 of the Proxy/Registration Statement, filed with the U.S. Securities and Exchange Commission on November 19, 2021.

**REQUEST NO. 8:**

The Documents and Communications Concerning Grab's Driver-Partner Incentives, Merchant Partner Incentives, Consumer Incentives, Surge Pricing, and other incentives contemplated by Grab, which are deducted from the fees normally received from driver- or merchant-partners (typically being a percentage of the fare paid by the consumer to the driver- or merchant-partner) and which may sometimes exceed Grab's fee from a particular transaction, as

stated in Grab's Business Model, referenced on pages 277-278 of the Proxy/ Registration Statement, filed with the U.S. Securities and Exchange Commission on November 19, 2021.

**REQUEST NO. 9:**

The Documents and Communications Concerning driver shortages in the countries in which Grab operated, including the impact or potential impact of driver shortages on Your valuation of Grab.

**REQUEST NO. 10:**

The diligence request list from AGC, dated March 1, 2021, and the presentation materials for Grab's board of directors from AGC, dated March 3, 2021, as referenced on page 158 of the Proxy/Registration Statement, filed with the U.S. Securities and Exchange Commission on November 19, 2021.

**REQUEST NO. 11:**

The non-binding letter of intent ("LOI") between AGC and Grab dated March 5, 2021, including the term sheet setting forth the key terms of the transaction documentation as well as standard confidentiality and exclusivity terms, as referenced on page 159 of the Proxy/Registration Statement, filed with the U.S. Securities and Exchange Commission on November 19, 2021.

**REQUEST NO. 12:**

The minutes, recordings, and presentation materials from the March 5, 2021, all-parties kick-off video conference call held between AGC, Grab, and their advisers to discuss the proposed transaction timetable and coordination matters, as referenced on page 160 of the Proxy/Registration Statement, filed with the U.S. Securities and Exchange Commission on November 19, 2021.

9

**REQUEST NO. 13:**

The Documents and Communications between Morgan Stanley Singapore and Morgan Stanley & Co. LLC Concerning the Merger and the services performed by Morgan Stanley & Co. LLC as an underwriter Concerning AGC's initial public offering, as referenced on page 156 of the Proxy/Registration Statement, filed with the U.S. Securities and Exchange Commission on November 19, 2021.

## V.    DEPOSITION QUESTIONS

1.    Who were the Persons affiliated with or employed by Morgan Stanley Singapore who provided Services to AGC and Grab during the Relevant Time Period?

2.    Did You participate or were You involved in Grab's and/or AGC's public statements, i.e. Grab's press releases, including drafts of such press releases during the Relevant Time Period?

If yes, please describe in detail how You were involved in Grab's and/or AGC's public statements.

4. Did you communicate with any Grab personnel regarding driver shortages in the countries in which Grab operated, including the impact or potential impact of driver shortages on Your valuation of Grab?

If yes, Identify all such communications.

5. Did you communicate with any Grab personnel regarding Driver-Partner Incentives, Merchant Partner Incentives, Consumer Incentives, Surge Pricing, and other incentives with Grab during the Relevant Time Period?

If yes, Identify all such communications.

6. Did You participate in any communications regarding metrics concerning Grab's valuation held between March 8 and March 12, 2021?

If yes, Identify all such communications.

Dated: August 5, 2024

**LEVI & KORSINSKY, LLP**

By: /s/ *Shannon L. Hopkins*
Shannon L. Hopkins
Gregory M. Potrepka
Morgan M. Embleton (*pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Fax: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
membleton@zk.com

-and-

**POMERANTZ LLP**

Joshua B. Silverman
Brian P. O'Connell
Diego Martinez-Krippner
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Fax: (312) 377-1184
jbsilverman@pomlaw.com
boconnell@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100

11

Fax: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
*Attorneys for Co-Lead Plaintiffs*

# Exhibit 2

**POMERANTZ LLP**
Joshua B. Silverman
Brian P. O'Connell
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

-and-

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171

*Co-Lead Counsel for Co-Lead Plaintiffs and the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE GRAB HOLDINGS LIMITED<br><br>SECURITIES LITIGATION | Case No. 1:22-cv-02189-VM<br><br>Hon. Victor Marrero<br><br>JURY TRIAL DEMANDED |

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATION OF FEDERAL SECURITIES LAWS**

Lead Plaintiffs Si Fan, Amit Batra, and SLG Cloudbank Holdings ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for Plaintiffs' amended complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of Defendants' public documents; conference calls and announcements made by Defendants; United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Grab Holdings, Limited ("Grab" or the "Company") and Altimeter Growth Corp. ("Altimeter" or "AGC"); analysts' reports and advisories about the Company; information obtained from interviews with knowledgeable individuals; and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of the following three classes:

a.  <u>Securities Act Class</u>: a class consisting of all persons who purchased or otherwise acquired public shares in Grab (including by way of exchange of publicly-listed AGC shares) pursuant to or traceable to the defective proxy/registration statement that Defendants filed with the SEC on Form F-4 on August 2, 2021, and that was thereafter amended on Forms F-4/A on September 13, 2021, October 18, 2021, November 12, 2021, November 17, 2021, and November 19, 2021, and the body of which was incorporated into the final prospectus on Form 424(b)(3) filed on November 19, 2021, as amended, the "Defective Proxy/Registration Statement." The Securities Act Class asserts claims under Sections 11 and 15 of the Securities Act.  These claims arise from Defendants' negligence, and do not assert that

1

Defendants acted with scienter.

b. 14(a) Class: a class consisting of all persons who were solicited to approve the merger and who exchanged publicly-listed AGC shares for Grab Class A Ordinary shares rather than redeeming the same pursuant to the Defective Proxy/Registration Statement. The 14(a) Class asserts claims pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

c. 10(b) Class: a class consisting of all persons who purchased or otherwise acquired public Grab Class A Ordinary Shares or other public Grab securities between December 2, 2021 and March 3, 2022, both dates inclusive (the "10(b) Class Period"). The 10(b) Class asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

Excluded from all Classes are: (a) Defendants and their immediate families; (b) current and former directors or officers of Grab or AGC; (c) any entity that has entered into a stockholder agreement or co-venture agreement with Grab, or was a Private Investment in Public Equities ("PIPE") investor in Grab; (d) any entity controlled, majority-owned or wholly owned, or affiliated with any of the above.

2. Grab went public on December 2, 2021 via a multi-billion dollar merger with AGC, a special purpose acquisition company ("SPAC"). The merger was effected through a defective and negligently prepared proxy and registration statement registered with the SEC pursuant to the Securities Act on Form F-4.

3. Structurally, every public shareholder of the AGC SPAC was impacted by the Defective Proxy/Registration Statement in three ways:

2

a. <u>Redemption</u>: public shareholders were provided the right to redeem AGC shares for $10, if they preferred to receive their money back rather than obtain Grab shares in the merger.

b. <u>Merger Vote</u>: whether or not they redeemed shares, the Defective Proxy/Registration Statement called for AGC public shareholders to vote to approve or reject the merger between AGC and Grab.

c. <u>Replacement Share Issuance</u>: AGC shareholders who did not redeem shares had their AGC shares "cancelled in exchange for the right to receive one [Grab] Class A Ordinary Share." These shares comprised the entire public market for Grab Class A Ordinary Shares, as all other shareholders (as admitted in the Defective Proxy/Registration Statement) were required to "wait[] until one year after [Grab's] filing with the SEC of a Form 20-F transition report reflecting the Business Combination" before selling. For this reason, and because of the redemption and merger vote, all Grab Class A Ordinary Shares publicly traded on or after December 2, 2021 (and until at least the effective date of a subsequent registration statement) are traceable to the Defective Proxy/Registration Statement.

4. Founded in 2012, Grab primarily offers ride hailing and food delivery services similar to Uber in over 400 cities in eight countries in Southeast Asia—Cambodia, Indonesia, Malaysia, Myanmar, the Philippines, Singapore, Thailand and Vietnam. Grab also offers digital financial services via its "superapp," but that business is far less significant than its driver-based services.

5. The Defective Proxy/Registration Statement describes Grab's business model as follows: "our platform connects millions of consumers with millions of driver- and merchant-

partners to facilitate interaction and trade between these stakeholders. We generate the majority of our revenue from service fees and commissions paid by driver- and merchant-partners for use of the Grab superapp to connect them with consumers and facilitate transactions. Based on service agreements with driver- and merchant-partners, we retain the applicable fee or commission from the fare or order and related charges that we collect on behalf of the driver- and merchant-partners."

6.      For its core ride hailing and food delivery businesses, Grab offers both consumer and driver incentives which can dramatically impact whether a transaction is profitable or unprofitable. Grab's app tabulates a gross merchandise value ("GMV"), which includes the cost of the service to the consumer (before any discounts), and applicable taxes, tolls, tips and fees. Grab's revenue from a given transaction is a set commission of the GMV, *less* the amount of incentives it offers to consumers and to drivers. The following graphic describes the economics of a typical transaction to the consumer, the driver and to Grab:

4



7.      As explained in the Defective Proxy/Registration Statement, incentives in a transaction can exceed the amount of Grab's commissions and fees, resulting in negative revenue to Grab: "[w]e offer various incentives to our driver- and merchant-partners, which are deducted from the fees normally received from driver- or merchant-partners (typically being a percentage of the fare paid by the consumer to the driver- or merchant-partner) and such incentives may sometimes exceed Grab's fee from a particular transaction.  Excess incentives refer to payments made to driver- and merchant-partners that exceed the amount of commissions and fees earned by Grab from those driver- and merchant-partners."  Thus, it was vital for investors to be accurately informed about the status of, and trends in, Grab's incentive programs.

8.      Without the benefit of accurate disclosure in the Defective Proxy/Registration Statement, AGC investors overwhelmingly approved the merger with Grab, and less than one

5

percent redeemed shares.  On December 1, 2021, the merger closed, effecting Grab's initial public offering via one of the largest SPAC transactions ever.

9.    Because the Defective Proxy/Registration Statement was negligently prepared, it did not accurately inform investors of critical information.  Specifically, it did not accurately disclose that Grab was experiencing a severe driver shortage, forcing it to significantly increase driver incentives in order to hire and retain drivers, and that in Q4 2021 Grab significantly increased its consumer incentives, including large discounts for ride hailing consumers to offset increased pricing stemming from the lack of drivers and a "blockbuster" incentive providing massive discounts to food delivery customers.  Together, these undisclosed changes made the economics of Grab's core driver-based services significantly less profitable for Grab.

10.    Certain Defendants also made additional false and misleading statements regarding incentives and Grab's performance in violation of Section 10(b) throughout the 10(b) Class Period.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act (15 U.S.C. §§77k, 77l and 77o) and §§10(b), 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78n and 78t(a)) and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC (17 C.F.R. §§240.10b-5, 240.14a-9).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act, and §27 of the Exchange Act.

13.    Venue is proper in this Judicial District pursuant to §22 of the Securities Act, (15 U.S.C. §77v), §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

14. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15. Lead Plaintiffs Si Fan, Amit Batra, and SLG Cloudbank Holdings purchased or otherwise acquired Grab securities traceable to the Defective Proxy/Registration Statement, elected to exchange rather than redeem shares pursuant to the Defective Proxy/Registration Statement, and/or purchased or otherwise acquired Grab Class A Common Stock during the 10(b) Class Period, as described in their Certifications previously filed with this Court, *see* ECF Nos. 22, 31, and suffered damages as a result of Defendants' violations of federal securities laws alleged herein.

16. Defendant Grab is incorporated under the laws of the Cayman Islands with its principal executive offices located in Singapore. Since December 2, 2021, Grab's Class A common stock trades on the NASDAQ exchange under the symbol "GRAB," and its warrants trade under the symbol "GRABW." Grab went public at that time via a merger with Altimeter Growth Corp. Prior to that time, Altimeter Growth Corp existed as a blank check SPAC and traded on the NASDAQ under the ticker symbol "AGC."

17. Defendant Brad Gerstner ("Gerstner") was the Chairman, Chief Executive Officer, and President of Altimeter, and served on the board of directors of AGC. Gerstner consented to being listed as a director in the Defective Proxy/Registration Statement.

18. Defendant Hab Siam ("Siam") was the General Counsel of AGC, and served on its board of directors. Siam consented to being listed as a director in the Defective Proxy/Registration

7

Statement.

19.     Defendant Richard N. Barton ("Barton") served on the board of directors of AGC. Barton consented to being listed as a director in the Defective Proxy/Registration Statement.

20.     Defendant Aishetu Fatima Dozie ("Dozie") served on the board of directors of AGC.  Dozie consented to being listed as a director in the Defective Proxy/Registration Statement.

21.     Defendant Dev Ittycheria ("Ittycheria") served on the board of directors of AGC. Ittycheria consented to being listed as a director in the Defective Proxy/Registration Statement.

22.     Defendant Anthony Tan ("Tan") was Grab's Chief Executive Officer ("CEO") and Chairman at all relevant times and one of Grab's founders.   Tan was a director of Grab at all times relevant hereto and a director of the Company following the merger.  Tan gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.  Tan also made statements in the Forms 425 filed on September 14, 2021 and November 12, 2021.

23.     Defendant Peter Oey ("Oey") was Grab's Chief Financial Officer ("CFO") at all relevant times, and was involved with the day-to-day operations of the Company prior to the merger and was involved in reviewing and providing the descriptions of Grab's operations and incentive payments in the Defective Proxy/Registration Statement.  Oey also made statements in the Form 425 filed on September 14, 2021.

24.     Defendant Tan Hooi Ling ("Ling") was Grab's Chief Operating Officer at all relevant times and has served as a director of Grab since December 1, 2021. Ling is one of Grab's founders.  Ling gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

25.     Defendant Maa Ming-Hokng ("Maa") was Grab's President at all relevant times. Maa also made the materially misleading statement identified in Paragraph 100.

8

26.     Defendant John Rogers ("Rogers") has served as a director of Grab since December 1, 2021.  Rogers gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

27.     Defendant Dara Khosrowshahi ("Khosrowshahi") was a director of Grab at all times relevant hereto and a director of the Company following the merger.  Khosrowshahi gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

28.     Defendant Ng Shin Ein ("Ein") was a director of Grab at all times relevant hereto and a director of the Company following the merger.  Ein gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

29.     Defendant Oliver Jay ("Jay") was a director of Grab at all times relevant hereto and a director of the Company following the merger.  Jay gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

## FACTS COMMON TO ALL CLAIMS

### I.      AGC forms as a SPAC to acquire a company with high growth potential

30.     AGC was a blank check company incorporated on August 25, 2020, as a Cayman Islands exempted company for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or entities.  From its earliest SEC filings, AGC described itself as a "blank check company."  *See, e.g.*, AGC Form 424(b)(4), filed on October 1, 2020.

31.     John Coates, speaking as Acting Director of the SEC's Division of Corporate Finance, described the SPAC structure as follows:

> The basics of a typical SPAC are complex, but can be simplified as follows. A
> SPAC is a shell company with no operations. It proceeds in two stages. In the first

9

stage, it registers the offer and sale of redeemable securities for cash through a conventional underwriting, sells them primarily to hedge funds and other institutions, and places the proceeds in a trust for a future acquisition of a private operating company. Initial investors also commonly obtain warrants to buy additional stock as at a fixed price, and sponsors of the SPAC obtain a "promote" – greater equity than their cash contribution or commitment would otherwise imply – and their promote is at risk. If the SPAC fails to find and acquire a target within a period of two years, the promote is forfeited and the SPAC liquidates. About ten percent of SPACs have liquidated between 2009 and now.

But most SPACs since 2009 have gone on to identify acquisition candidates. In their second stage, SPACs complete a business combination transaction, in which the SPAC, the target (i.e., the private company to be acquired), or a new shell "holdco" issues equity to target owners, and sometimes to other investors. SPAC shareholders typically have a vote on the so-called "de-SPAC" transaction, and many investors who purchased securities in the first stage SPAC either sell on the secondary market or have their shares redeemed before or shortly after the de-SPAC. After the de-SPAC, the entity carries on its operations as a public company. In this way, SPACs offer private companies an alternative pathway to "go public" and obtain a stock exchange listing, a broader shareholder base, status as a public company with Exchange Act registered securities, and a liquid market for its shares.

John Coates, "SPACS, IPOs and Liability Risk Under Securities Laws," https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (April 8, 2021) (footnotes omitted).

32.      The SPAC structure creates manager incentives to pursue a target that may not be in investors' best interest, and to avoid disclosures that may dissuade investors from exchanging shares in the merger.  If a merger is completed within the allocated time frame, founders and managers of the SPAC generally reap windfall profits from their ownership of SPAC securities they obtained cheaply prior to public offering, and enjoy considerable control such as the ability to nominate board members to the new company.  However, if an acquisition is not effectuated within that time frame, then the SPAC is dissolved and the money in the trust is returned to investors, with no compensation paid to the founders and managers of the SPAC.  Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition

10

within their deadline, even if the transaction may be to the detriment of the public shareholders.

33.      The SPAC structure does not require a shareholder to exchange pre-merger SPAC shares into shares of the merged company.  Instead, after what is supposed to be full disclosure of material information, such holders are afforded the opportunity to redeem shares prior to exchange. The redemption of shares directly impacts the working capital of the merged company, and indirectly impacts the economic interests of SPAC sponsors.  As a result, SPAC sponsors and merger targets are highly incentivized to minimize the number of redemptions by SPAC shareholders.

34.      Companies seeking to go public have increasingly turned to SPAC structures in recent years.  SPAC transactions are faster than traditional IPOs, the price is determined in advance instead of by the volatile market, and SPAC sponsors often have a network of contacts and management expertise they can offer to the new company.  However, SPAC mergers also have the potential to be rife with inaccurate disclosures, as the process allows companies to sidestep traditional underwriting and regulatory scrutiny.  SEC officials have also expressed concern over the recent surge in SPACS, in particular about the "baseless hype" by which many are sold.  *See* John    Coates,    "SPACS,    IPOs    and    Liability    Risk    Under    Securities    Laws," https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (April 8, 2021).  As SEC Chair Gary Gensler testified in front of Congress, the "surge of SPACs raises a number of policy questions.  First and foremost, are SPAC investors being appropriately protected?" *See* https://www.sec.gov/news/testimony/gensler-2021-05-26.

35.      From its earliest filings, AGC encouraged investors to set aside concerns about it being a "blank check company" by touting the business acumen of AGC's Board of Directors, and promising that it would focus on the "objective [] to identify, acquire, and operate a business in a

secular-growth area of the technology sector that will compound growth over the long-term for exponential value creation." *See, e.g.,* Form 424(b)(4) filed on October 1, 2020.

## II.    AGC claims extensive due diligence confirmed Grab's business operations and valuation

36.    On April 13, 2021, AGC announced that it had entered into a merger agreement with Grab. The merger was intended to and did effect an initial public offering of Grab, which was previously a private company. Upon approval and closing of the merger, AGC would cease to exist and Grab would become the surviving entity.

37.    As is customary in SPAC transactions, the merger was contingent upon approval by AGC shareholders, and regardless of the vote, AGC shareholders would be permitted to redeem shares at $10/share if they did not want to hold shares in Grab post-closing.

38.    In the Defective Proxy/Registration Statement, Defendants claimed to have conducted extensive due diligence of Grab, including that the AGC Board reviewed the results of due diligence regarding "investigations of Grab and the industries in which it operates, including the financial and other information provided by Grab." In particular, the AGC Board represented that it considered, among other things, whether Grab satisfied the following factors: (i) operating in a large and growing total-addressable market, (ii) having potential to deliver sustainable top-line growth for the long-term, and (iii) providing an opportunity to partner with a world-class management team capable of scaling a business around the globe. The AGC Board also stated that it considered Grab's future growth and financial performance, including (i) Grab's business, prospects, financial condition, operations, technology, products, offerings, management, competitive position, and strategic business goals and objectives, (ii) general economic, industry, regulatory, and financial market conditions, and (iii) opportunities and competitive factors within Grab's industry.

39.     In the Defective Proxy/Registration Statement, Defendants represented that the AGC Board was provided:

 (i) a comprehensive review of the materials provided in the virtual data room; requests for follow-up data and information from Grab, including Grab responses to due diligence questions; (ii) multiple meetings and calls with Grab regarding Grab's business and operations, projections and technical diligence matters, as well as financial, tax and legal matters, including those related to intellectual property and technology matters, regulatory matters, litigation matters, corporate matters (including material contracts, capitalization and other customary corporate matters), and labor and employment matters; and (iii) summaries provided to AGC of key findings with respect to business, operational and financial due diligence, which included a high-level summary of the financial, tax and legal due diligence findings by AGC's various tax and legal advisors engaged in connection with the transaction, including Ropes and other local counsel in the jurisdictions in which Grab operates (legal matters) and KPMG LLP (financial and tax diligence).

40.     Based upon their "experience in evaluating the operating and financial merits of companies similar to Grab" and "due diligence," the AGC Board claimed that Grab warranted a whopping valuation of $39.6 billion:

The AGC Board did not obtain a third-party valuation or fairness opinion in connection with its determination to approve the Business Combination. However, AGC's management, the members of the AGC Board and the other representatives of AGC have substantial experience in evaluating the operating and financial merits of companies similar to Grab and reviewed certain financial information of Grab and other relevant financial information selected based on the experience and the professional judgment of AGC's management team, which enabled them to make the necessary analyses and determinations regarding the Business Combination. Accordingly, investors will be relying solely on the judgment of the AGC Board in valuing Grab's business and assume the risk that the AGC Board may not have properly valued such business.

41.     As a result of this due diligence and what they told investors was "careful consideration," the AGC Board told investors in the Defective Proxy/Registration Statement that they concluded merging with Grab at a $39.6 billion valuation for Grab was "in the best interests" of AGC shareholders, and "unanimously recommend[]" that investors "vote or give instruction to vote '**FOR**'" the proposal.  *See* Defective Proxy/Registration Statement (emphasis in original).

13

42.      The Defective Proxy/Registration Statement expressly directed investors *to avoid doing their own due diligence*, and instead to rely *solely* on the information they provided or incorporated into that document: "None of AGC, GHL or Grab has authorized anyone to give any information or make any representation about the Business Combination or their companies that is different from, or in addition to, that which is contained in this proxy statement/prospectus or in any of the materials that have been incorporated in this proxy statement/prospectus.  Therefore, **if anyone does give you information of this sort, you should not rely on it**."[1]

### III.    Grab offers app-based ride hailing and food delivery services in Southeast Asia

43.      Anthony Tan and Tan Hooi Ling co-founded Grab in 2012.  Its product, Grab, uses a mobile app to provide ride hailing and related services (its "mobility" segment), online food delivery ("deliveries" segment), a digital wallet ("e-wallet" segment) and business services ("enterprises" segment).  In 2018, Grab acquired Uber's business in Southeast Asia, in exchange for Uber receiving a 27.5% stake in Grab.  Uber's ride hailing and food delivery business in the region were then merged into Grab's operations.

44.      Although Grab nominally operates in many different businesses, two dominate: food delivery and ride hailing.  These segments collectively provided the overwhelming majority of revenue in both fiscal year 2020 and the first half of 2021:

---

[1] Except as otherwise stated, all emphasis is supplied.



45.     According to the Defective Proxy/Registration Statement, the mobility offerings connect consumers with rides provided by driver-partners across a wide variety of multi-modal mobility options including private cars, taxis, motorcycles (in certain countries), and shared mobility options, such as carpooling.

46.     The deliveries offerings available through the Grab platform include prepared meal, grocery and point-to-point delivery services ordered through its mobile application.

47.     According to the Defective Proxy/Registration Statement, the multiple offerings on the superapp create "significant synergistic benefits" and that Grab has created "ecosystem" that creates a "competitive advantage."  Tan has stated that its superapp ecosystem leads drivers to "remain loyal to the Grab platform" because it allows for multiple income opportunities.

**IV.     Grab's business model depends on its ability to reduce incentives**

48.     As Grab stated in its Defective Proxy/Registration Statement under the section titled "Our Business Model," Grab offers various incentives to drivers, consumers, and merchants in order to generate business.  Key metrics that affect Grab's profits include: commissions to Grab, partner incentives provided by Grab, and consumer incentives such as discount coupons and

promotional offers.

49.    During the pandemic, Grab conducted flexible incentive plans to regain drivers. Financial data show that the high driver and consumer incentive strategy failed to revive financial performance.

50.    Each dollar spent on incentives reduces Grab's revenue by an equal amount. In the example below, the dollar value of a ride for a consumer is $13.00, after tolls and other fees ($.80) and a platform fee ($.20), the total cost to the consumer is $14.00 before incentives. If Grab offers an incentive of $1.00 to the consumer, the consumer pays $13.00 for the ride. The driver-partner meanwhile, receives the $14.00 for the ride, minus a $2.60 commission to Grab. In this example, Grab provides the driver with a $1.00 incentive, and therefore receives $12.40 ($14.00- $2.60+ $1.00). Grab meanwhile, receives the $2.60 commission from the driver minus the $1.00 for consumer incentives and $1.00 for driver-partner incentives, to receive $.60 in revenue:

16



The graphic below illustrates the economics of a typical ride:

**Consumer**

| | |
|---|---|
| Cost of Ride | $13.00 |
| Tolls and Other Fees | $0.80 |
| Grab Platform Fee | $0.20 |
| **GMV (Total before incentives)** | **$14.00** |
| Consumer Incentives | $(1.00) |
| **Consumer pays** | **$13.00** |

**Driver-Partner**

| | |
|---|---|
| **GMV (Total before incentives)** | **$14.00** |
| including Grab Platform Fee | $0.20 |
| including Consumer Incentives | $1.00 |
| **Commissions** | **$(2.60)** |
| Driver-Partner Incentives | $1.00 |
| **Driver-Partner Receives** | **$12.40** |

**Grab**

| | |
|---|---|
| **GMV (Total before incentives)** | **$14.00** |
| **Commissions** | **$2.60** |
| Driver-Partner Incentives | $(1.00) |
| Consumer Incentives | $(1.00) |
| **Revenue** | **$0.60** |

279

51.     Grab defines "excess incentives" as the undesirable situation where the "amount of payments made to driver and merchant partners exceed the amount of commission and fees earned by Grab from those driver- and merchant- partners." Because the amount Grab pays in these cases exceeds its commissions and platform fees, Grab incurs negative revenue on these rides. High incentives resulted in negative revenue for Grab in fiscal year 2019, but Grab had reduced incentives resulting in positive revenue for its key mobility and delivery segments for both fiscal year 2020 and the first half of 2021.

52.     The Defective Proxy/Registration Statement emphasized that during the preceding two years through H1 2021, Grab reduced incentives in both total amount as a percentage of GMV:

17



Source: Grab

53.    The chart above, reproduced from the Defective Proxy/Registration Statement, purports to show that Grab spent 10% of GMV on incentives in the first half of 2021, down from 19% in 2019, when Grab reported negative revenues due to higher incentives.

54.    Grab aggressively marketed its partner incentive programs to drivers, to entice them to provide services for Grab rather than competitors like Gojek.  Grab sends weekly emails to its drivers offering that week's list of incentives.  *See* https://help.grab.com/driver/en-sg /360026765912-Trip-fares-and-incentives-guide.  Grab also aggressively markets its incentives over the social messaging platform Telegram.

55.    Grab's partner incentives include distance-based adjustments, which include extra payment for longer trips, group order incentives, and performance incentives as well as zone boosts, called gem incentives.  Grab also marketed incentives for new drivers during this period and referral bonuses.  For example, in Malaysia, Grab offered an additional bonus of up to RM 1,000 (USD 227) when a driver applicant activated and started to pick up orders.

56.    Grab also routinely offered bonus partner incentives on top of additional "gem incentives" by communicating over Telegram and over email.  For example, see the below Grab

18

Singapore announcement for $2 Singapore Dollar ("SGD," one SGD is roughly $.72 United States Dollar) bonuses for GrabFood and other deliveries:



57.     The frequency of announcements such as these increased dramatically in Q3 2021, and further escalated into Q4 2021.  For example, in Q4 2021, Grab Singapore sent out 86 such announcements via Telegram offering an extra $2 or $3 SGD bonus payments on deliveries, or nearly one for each day of the quarter, more than twice the amount announced in Q3 2021.

58.     Grab also initiated special incentive periods in which Grab would pay increasing bonuses per trip made.  For example:

19



59.    In the example above, Grab offered $1.00 SGD bonuses per trip for trips 1-3, $1.50 SGD per trip for trips 4-7, and $2.00 SGD per trip for trips 8 and above.

60.    In summer 2020, Grab also initiated a Performance Rebate incentive plan, which offers quarterly commission rebates to Grab's top driver-partners who meet the eligibility criteria which are

- Driver-partners who opt to Auto-Accept Always On throughout the quarter and are of the top 18,000 driver-partners based on commissions;

- Quarterly Cancellation Rating (Below 10%);

- Driver Rating (Above 4.6).

61.    The Grab Performance Rebate was a 12% rebate of the commissions that Grab collected from the driver in the quarter.  Drivers who rent vehicles through Grab (GrabRentals) were eligible for an additional 8% rebate:

20



62.    Market analysts understood the importance of Grab's incentives to its business. As a UBS analyst report dated December 9, 2021 explained, "[d]river incentive is primarily a tool to increase and maintain the size of its online driver pool, which is aimed at managing rider churn, improving efficiency and amplifying its networking effect. The driver incentives can be further broken down into two categories: surge pricing per ride and monthly/weekly ride targets. Surge

21

pricing is a mechanism to lure more drivers to be in an area where demand is high." The analyst emphasized the importance of limiting consumer and driver incentives, and based on the inaccurate information in the Defective Proxy/Registration Statement, described them as "in check": "the company has managed to keep incentives (for consumers and drivers) in check while sales & marketing costs have declined as % of GMV from 1.9% in 2019 to 1.2% in 2020. While sequential volatility in margins is possible, especially as economies reopen in 2022 and the company accelerates spending on marketing, we expect the two core segments to improve margins with economies of scale." As was later revealed, at the time Grab was actually increasing its incentives.

## V.    Grab dramatically shifts operating strategy from reducing incentives to massively boosting incentives just before IPO

63.    Grab reversed its incentive reduction strategy just before the IPO. Though not disclosed in the Defective Proxy/Registration Statement, by Q4 2021, Grab was paying quarterly incentives that were more than 90% higher year-over-year:



Sources: 2020 numbers derived from dividing annual figure from F-4 chart reproduced in Paragraph 52 and dividing by 4; Q1/Q2 2021 numbers derived from dividing H1 2021 figure from F-4 chart and dividing by 2; Q3 2021 numbers taken from earnings release published on November 11, 2021; Q4 2021 numbers figure taken from earnings release published March 3, 2022.

64.     The massive boost in incentives cannot be explained by increased business, because there was also a large rise in incentives paid as a percentage of GMV.  While, according to the F-4 chart reproduced in Paragraph 52, incentives as a percent of GMV held steady at 10% throughout 2020 and Q1/Q2 2021, by Q4 2021 they had risen to 13.38%, a 33.8% increase in just two quarters.



Sources: Grab Form F-4 (2020, and 2021 First Half), and earnings press releases (Q3 2021 and Q4 2021).

65.     On the partner incentive side, Grab later conceded that it "preemptively" ramped incentives in Q4 2021 (at the time Grab went public) in reaction to a decline in driver-partners it experienced in Q3 2021.  *See* Paragraph 93, *infra.*  Consumers also complained bitterly about driver shortages, and the resulting cancellations and surge pricing, just before Grab went public. *See, e.g.,* https://www.freemalaysiatoday.com/category/opinion/2021/11/24/where-have-all-the-grab-drivers-gone/ ("Of late, the message, 'Fares are higher due to higher demand', that customers are frequently bombarded with, even during off-peak hours, has become extremely annoying."); https://www.reddit.com/r/singapore/comments/qy3uby/grab_cancels_my_order_

and_immediately_raised_the/ ("Grab cancels my order and immediately raised the delivery fees, is this even ethical business practices?"); https://www.reddit.com/r/askSingapore/comments/ sf8e42/why_does_my_a_grab_app_always_say_its_peak_hour/ ("I work flexible hours so sometimes I start work at 8am, 10am, 12pm, 3pm, 4pm. But nowadays it always say that it is peak hour, no matter what time I'm grabbing. Lowest I could get these days was $20 because of peak hour.").

66.    Specifically, among other partner incentives, Grab offered incentives of up to $300 SGD for referrals of new drivers. *See, e.g.,* https://web.archive.org/web/20211130025749/ https://www.grab.com/sg/drd/. Plaintiffs are informed and believe that this and other increased partner incentives occurred in the beginning of Q4 2021, before Grab went public, because: (a) Grab conceded it was done "preemptively" in reaction to a Q3 driver decline rather than waiting until the end of Q4; and (b) as discussed below, Grab was also ramping consumer incentives in the beginning two months of Q4 2021, before the IPO.

67.    In the first two months of Q4, Grab also massively boosted its consumer incentives. On October 4-31, 2021, GrabFood (its food delivery business) offered what it called a "Blockbuster Sale," giving 30% off across the menu:

24



68.    While the GrabFood Blockbuster Sale was scheduled to end on October 31, 2021, it was brought back for an extended period with even bigger sales between November 25, 2021 and December 12, 2021, where some offers were as high as 50% off.  *See* https://www .misstamchiak.com/grabfood-blockbuster-sale/.

69.    Grab also offered large incentives in Q4 2021 to consumers on its ride hailing platform.  For example, from early October 2021 through December 31, 2021, it offered 50% off rides to or from some of the largest airports it serviced.  *See, e.g.,* https://mothership.sg/2021/10/ grab-changi-airport-promo-code/.

## VI.    False and misleading statements in the Defective Proxy/Registration Statement

70.    The Defective Proxy/Registration Statement contained untrue statements of material fact and omitted to state other facts necessary to make the statements not misleading under the circumstances in which they were made.  For example, in the Defective Proxy/Registration Statement, Grab made the following statement about its growth and profitability:

25

In addition, achieving profitability will require Grab, for example, **to continue to grow and scale its business, manage promotion and incentive spending, improve monetization, reduce marketing and other spending** and increase consumer spending. Grab's growth so far has been driven in part by incentives Grab offers driver-partners, merchant-partners and consumers. **As Grab has achieved greater scale, it has and may continue to seek to reduce incentives**, which can impact both profitability and growth.

71.     The statements identified in Paragraph 70 above were materially false and misleading when made because: (a) Grab was not reducing incentives, but instead, was increasing incentives especially in Q4 2021 as it would later admit on March 3, 2022, and, thus, Grab was not "manag[ing] promotion and incentive spending" towards profitability; (b) Grab was not "continu[ing] to seek to reduce incentives" and was not reducing incentives as it "achieved greater scale," as demonstrated by the fact that incentives as a percentage of GMV increased by over 33.5% between 2020 and Q4 2021, even as scale grew; and (c) as a result, the Defective Proxy/Registration Statement did not accurately portray Grab's then-current financial situation or its business prospects.

72.     The Defective Proxy/Registration Statement made the following statements inaccurately characterizing supply constraints as hypothetical:

> *If Grab is unable to continue to grow its base of platform users, including driver- or merchant-partners and consumers accessing Grab's offerings, Grab's value proposition for each such constituent group could diminish, impacting its results of operations and prospects*.

> Grab's success in a given geographic market depends on its ability to increase the scale of its driver- and merchant-partner base and the number of consumers transacting through its platform as well as expand the deliveries, mobility and financial services offerings on its platform.

***

> • **If driver-partners are not attracted to the Grab platform or choose not to offer their services through its platform, or elect to offer them through a competitor's platform, Grab may lack a sufficient supply of driver-partners to attract and retain consumers and merchant partners to the Grab platform.** Driver-partners choose Grab based on many factors,

26

> including the opportunity to earn money, the flexibility and autonomy to choose where, when and how often to work, the tools and opportunities Grab provides to seek to maximize productivity and other benefits that Grab provides to them. It is also important that Grab maintains a balance between demand and supply for mobility services in any given area at any given time. Grab has experienced and expects to continue to experience driver-partner supply constraints or oversupply from time to time in certain areas (including certain areas or locations within cities). **To the extent that Grab experiences driver-partner supply constraints in a given market, Grab may need to increase, or may not be able to reduce, the driver-partner incentives that Grab offers.**

(Emphasis in the original in the first paragraph only).

73.    The statements identified in Paragraph 72 above were materially false and misleading when made because: (a) at the time Grab was *already* experiencing driver shortages in key markets; (b) these shortages were *already* negatively affecting operations at the time the statements were made; (c) Grab at the time was *already* increasing partner incentives (including referral incentives) to combat the driver supply constraint; and (d) as a result, the Defective Proxy/Registration Statement did not accurately portray Grab's then-current financial situation or its business prospects.

74.    The Defective Proxy/Registration Statement also inaccurately characterized the role of high incentives within Grab's business model:

> We foster an ecosystem in which participants engage with each other through our platform. Consumers purchase goods and services from driver and merchant-partners, and driver- and merchant-partners interact with each other to fulfill delivery orders. Driver- and merchant-partners also purchase financial services directly through our platform and transact across verticals. We believe that this is a unique aspect of our platform, which underpins the strength of our competitive advantage.
>
> **During the initial stages of growth, we offered significant incentives and promotions to attract platform consumers as well as incentives to attract driver- and merchant-partners, and conducted advertising activities to enhance our brand awareness.** We also invested in research and development and other operating expenses to support the growth of our platform. Going forward, with increasing scale and synergies on our platform, we expect to enjoy economies of scale, which we expect will allow us to more efficiently and cost effectively

27

acquire new platform consumers and engage existing consumers.

75.    The statements identified in Paragraph 74 above were materially false and misleading when made because they omitted to disclose that: (a) Grab's significant incentives were not simply "during the initial stages of growth" but were being re-implemented at the time even in markets where Grab's services were well-established; (b) Grab's "scale and synergies" were not at the time functioning as explained in these statements, because despite higher scale and synergies Grab did not experience an ability in Q3 2021 and Q4 2021 to "more efficiently and cost effectively acquire new platform consumers and engage existing consumers"; (c) high incentives were still needed to attract consumers and drivers; and (d) as a result, the Defective Proxy/Registration Statement did not accurately portray Grab's then-current financial situation or its business prospects.

76.    Other text in the Defective Proxy/Registration Statement also inaccurately characterized driver supply issues as hypothetical, when they were already being experienced and already adversely impacting Grab's revenue and profitability:

*Increases in fuel, food, labor, energy, and other costs could adversely affect Grab*.

Factors such as inflation, increased fuel prices, and increased vehicle purchase, rental, or maintenance costs may increase the costs incurred by Grab's driver-partners when providing services on its platform.

Similarly, factors such as inflation, increased food costs, increased labor and employee benefit costs, increased rental costs, and increased energy costs may increase merchant-partner operating costs. Many of the factors affecting driver- and merchant-partner costs are beyond the control of these parties. In many cases, these increased costs may cause driver-partners to spend less time providing services on the Grab platform or to seek alternative sources of income. Likewise, these increased costs may cause merchant-partners to pass costs on to consumers by increasing prices. **A decreased supply of consumers and driver- and merchant-partners on the Grab platform could harm its business, financial condition, results of operations and prospects.**

(Emphasis in the original in the first paragraph only).

28

77.    The statements identified in Paragraph 76 above were materially false and misleading when made because they omitted to disclose that: (a) at the time Grab was *already* experiencing driver shortages in key markets; (b) these shortages were *already* affecting operations at the time the statements were made; (c) Grab at the time was *already* increasing partner incentives to combat the driver supply constraint and increasing consumer incentives to maintain consumer usage; (d) Grab was *already* experiencing an increase in the costs of labor, as demonstrated by their increased incentives; and (e) as a result, the Defective Proxy/Registration Statement did not accurately portray Grab's then-current financial situation or its business prospects.

78.    Regarding Grab's revenue, the Defective Proxy/Registration Statement stated:

**Grab's ability to decrease its net losses and achieve profitability is dependent on its ability to reduce the amount of partner and consumer incentives it pays relative to the commissions and fees it receives for its service.**

Grab has paid significant amounts of incentives to attract new driver and merchant partners and consumers to its services in order to grow its business and generate new demand for its services and may continue to do so in the future. These incentives, which are typically in the form of additional payments made to partners and consumers, have in the past and may in the future exceed the amount of the commissions and fees that Grab receives for its services. Grab's revenues are reported net of partner and consumer incentives, so if incentives exceed Grab's commissions and fees received, it can result in Grab reporting negative revenue. For the years ended December 31, 2019 and 2020 and the six months ended June 30, 2021, Grab incurred incentives of $2,351 million, $1,237 million and $740 million, respectively (comprised of partner incentives of $1,234 million, $621 million, and $311 million, respectively, and consumer incentives of $1,117 million, $616 million and $429 million, respectively) resulting in reductions to Grab's reported revenues of the same amounts, which in the case of the year ended December 31, 2019 resulted in Grab reporting negative revenues of $(845) million. Notwithstanding Grab's use of significant incentive payments to encourage use of its platform, Grab's monthly transacting users nevertheless declined from approximately 29.2 million in the year ended December 31, 2019 to approximately 24.5 million for the year ended December 31, 2020, in part due to the impact of the COVID-19 pandemic on Grab's mobility segment, and thereafter remained relatively stagnant at approximately 24.3 million for the six months ended June 30, 2021.

**Grab's ability to increase its revenues and, in turn, decrease its net losses and achieve profitability is therefore significantly dependent on its ability to effectively use incentives to encourage the use of its platform and over time to reduce the amount of incentives it pays to both its driver and merchant partners and consumers of its services relative to the amount of commissions and fees it receives for its services. If Grab is unable to reduce the amount of incentives it pays over time relative to the commissions and fees it receives, it will likely impact Grab's ability to increase its revenues, raise capital, reduce its net losses and achieve profitability and reduce its net cash outflows, any or all of which could prevent Grab from continuing as a going concern or achieving or maintaining profitability**. In addition, given Grab's use of incentives to encourage use of its platform, future decreases in the use of incentives could also result in decreased growth in the number of users and driver- and merchant-partners or an overall decrease in users and driver and merchant-partners and decreases in its revenues, which could negatively impact its financial condition and results of operations.

(Emphasis in the original in the first paragraph only).

79.    The statements identified in Paragraph 78 above were materially false and misleading when made because they omitted to disclose that: (a) Grab's inability to increase its revenues was a realized harm at the time the statement was made, rather than a hypothetical risk; (b) Grab was not "maintaining profitability"; (c) Grab was already experiencing a shortage of drivers and "preemptively" ramping partner incentives to offset; (d) Grab was already increasing incentives to maintain its base of consumers, including with massive "blockbuster" incentives at GrabFood; (e) Grab was *then* paying an increased level of driver and consumer incentives that was *already* impacting Grab's "ability to increase its revenues" and "reduce its net losses and achieve profitability"; and (f) as a result, the Defective Proxy/Registration Statement did not accurately portray Grab's then-current financial situation or its business prospects.

80.    Other statements which were filed with the SEC on Form 425 incorporated into the Defective Proxy/Registration Statement were also materially false and misleading.  On August 2, 2021, Grab announced its quarterly earnings.  The announcement was filed on Form 425 that same day, and incorporated into the Defective Proxy/Registration Statement.  In that Press Release, Grab

30

touted that its "**merchant and consumer incentives … are expected to continue to decline over time as Grab's business matures**." That statement was materially false and misleading when made because it omitted to disclose that Grab was actually then increasing both driver and consumer incentives, even though its business was maturing.

81.     On September 13, 2021, Defendants Grab, Tan and Oey held a conference call to discuss Grab's quarterly earnings. The transcript of that call was filed on Form 425 that following day, on September 14, and was incorporated into the Defective Proxy/Registration Statement. In that call, Defendants Grab and Tan made the following statements regarding Grab's consumer base:

> **Anthony Tan:**
> Allow me to explain with this slide that illustrates the flywheel effects underpinning our super app strategy. Each of our businesses helps the others scale. First, New services can be quickly launched by leveraging collective assets. Our pervasive mobility user base enabled us rapidly achieve category leadership in deliveries, and every transaction on our platform is an opportunity to offer a customized financial product, whether payments, lending, or insurance. **Then, Consumer spending grows in tandem with more services, thereby creating more income opportunities for our merchant and driver partners, who remain loyal to the platform**. This creates wider selection, faster delivery times, and improved consumer experience. Even amidst the pandemic, consumer demand for deliveries has helped to cushion the impact of softer mobility demand on driver-partner earnings. This has helped us sustain the supply network of our business in a truly cost-effective way. A core component of our success is our ability to tie all this together into an integrated superapp that seamlessly connects each of our stakeholders. Our superapp flywheel allows us to grow the ecosystem in a vastly accelerated manner, versus other single-vertical players. This is our Secret Sauce.

82.     The statements identified in Paragraph 81 above were materially false and misleading when made because: (a) Grab's consumer base and driver-partners were not "loyal" but in fact required increasing incentives, which Grab was actually increasing at the time, to keep them using the platform; (b) at the time Grab went public, consumer spending was not growing "in tandem" with the number of services offered; (c) at the time, Grab's "supply network" was not

31

being "sustain[ed] … in a truly cost-effective way"; and (d) Grab was already increasing partner incentives to offset a decline in drivers, including large referral bonuses.

83.    On that same call, Defendants Grab and Oey made the following statement about Grab's "strong trends in our path to profitability":

> **Peter Oey**:
> From a bottom-line perspective, **we continue to demonstrate strong trends in our path to profitability**. Our Total Segment Adjusted EBITDA of $14 million loss saw a marked improvement by $75million [sic], underpinned by the strong top-line growth and improving margins across our business segments. Group Adjusted EBITDA was $214 million loss for the quarter. This was a decline of $8 million year-on-year, as we invest further in product development. We saw our adjusted EBITDA margins as a percentage of GMV improved for the quarter to negative 5.5%, as compared to negative 9% in the same period last year. **We will continue to execute sustainable and improving margins despite challenges in the operating environment.**

84.    The statements identified in Paragraph 83 above were materially false and misleading when made because they omitted to disclose that: (a) Grab was not "continu[ing] to demonstrate strong trends in its path to profitability"; (b) Grab was then experiencing a severe driver shortage and was then increasing both partner and consumer incentives, which necessarily decreased margins and revenue; (c) Grab's margins were not "improving" or "sustainable"; and (d) the Company was not then "continu[ing] to execute sustainable and improving margins despite challenges in the operating environment."

85.    On November 11, 2021, Grab announced its third quarter earnings in a Press Release filed on Form 425 on November 12, 2021, that was incorporated into the Defective Proxy/Registration Statement.  In that release, Defendants Grab and Tan stated:

> Revenue was $157 million, down 9% YoY, as a result of the expected decline in mobility due to the severe lockdowns in Vietnam. Grab's reported revenue is net of consumer,  merchant and driver-partner incentives.
>
> "Despite severe lockdowns in Vietnam and heightened restrictions across the region in the third quarter due to COVID-19, we executed well on our superapp

strategy and delivered strong growth,"- Anthony Tan

86.     The statements identified in Paragraph 85 above were materially false and misleading when made because they omitted to disclose that: (a) Grab's driver supply was *then* constrained; (b) Grab's declining mobility revenue was not limited to Vietnam, and was not caused exclusively by lockdowns and restrictions in that region; and (c)  Grab was rapidly increasing both consumer and partner incentives at the time, and thus eroding margins.

87.     Also on November 19, 2021, Grab filed its amended Defective Proxy/Registration statement.   The Defective Proxy/Registration Statement mirrored the inaccurate statements identified in Paragraph 85: "[r]evenue was $157 million for the three months ended September 30, 2021, down 9% year-over-year, as a result of the decline in mobility due to the severe lockdowns in Vietnam.  Revenue is net of consumer incentives and merchant- and driver-partner incentives." Those statements were materially misleading for the same reasons as identified in Paragraph 86.

88.     In addition to excluding information necessary to make the inaccurate statements provided not misleading under the circumstances in which they were made, the Defective Proxy/Registration Statement also omitted material information it was affirmatively required to include under Items 303 of SEC Regulation S-K (17 C.F.R. §§229.303, 229.503).   Item 303 requires the disclosure of commitments, demands, events, trends, or uncertainties reasonably likely to affect the registrant's financial condition.  SEC Regulation S-K required Defendants to disclose in the Defective Proxy/Registration Statement: "any known trends or any known demands, commitments, events, or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way"; "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and…the extent to which income was so affected";

and "any known  trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  "Disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations." SEC Release Nos. 33-8056; 34-45321; FR-61.

89.     The SEC has emphasized that the disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17.

90.     In violation of Item 303 and Regulation S-K, the Defective Proxy/Registration Statement omitted the following known adverse trends that were not only "reasonably likely" but virtually certain to have a material adverse effect on Grab's financial condition or results: (a) a known decline in the supply of drivers; (b) a known material increase in partner incentives (both in the absolute and as a percentage of GMV); and (c) a known material increase in consumer incentives (both in the absolute and as a percentage of GMV).

## VII.    Shareholders approve the merger and Grab goes public via the Defective Proxy/ Registration Statement

91.     Having only available the materially inaccurate and misleading information contained in the Defective Proxy/Registration Statement, described above, shareholders overwhelmingly approved the merger, thereby effecting the IPO of Grab.  Grab's December 1, 2021 press release described the transaction as "largest-ever U.S. public market debut by a Southeast Asian company."

92.    Although all public shareholders of AGC had the right to redeem shares for $10 whether or not the shareholder voted to approve the merger, as a result of the Defective Proxy/Registration Statement, less than one percent elected to redeem.  This was an exceptionally favorable result, as other SPAC transactions that closed at the same time experienced redemption rates averaging above 50%:



Source: https://everploeg.medium.com/tech-spac-redemption-rates-e8ff7d32633f.

93.    On March 3, 2022, Grab finally disclosed its incentive spending spree in Q4 2021, admitting that at the time of closing it was spending 94% more on total incentives compared to the average incentives per quarter in 2020, and 137% more in consumer incentives. *See* March 3, 2022  Grab  Holdings  Press  Release Details, https://investors.grab.com/news-releases/news-release-details/grab-reports-fourth-quarter-and-full-year-2021-results.    In  another  SEC  filing thereafter, Grab conceded that preceding its public debut, it had *already* experienced "a decrease in the number of driver-partners in the third quarter of 2021," and at the time it went public it

35

"preemptively invested in driver incentives to grow the supply of active drivers on our platform in the fourth quarter of 2021." *See* April 28, 2022 Form 20-F. None of this was accurately disclosed in the Defective Proxy/Registration Statement.

## VIII. None of the misrepresentations in the Defective Proxy/Registration Statement were shielded by the PSLRA's "safe harbor"

94.    None of the aforementioned misrepresentations and omissions were protected by the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), because they fell outside the scope of the safe harbor provision

95.    Alternately, even if otherwise within the scope of the safe harbor provision, the identified misrepresentations and omissions were subject to an exception of the safe harbor provision. According to the PSLRA, the safe harbor does not apply to statements made "in connection with an offering of securities by a blank check company," *see* 15 U.S.C. §78u-5(b)(1)(B) or was "made in connection with an initial public offering," *see* 15 U.S.C. §78u-5(b)(2)(D). At the time that the Defective Proxy/Prospectus was filed, the issuer (Altimeter Growth Corp.) was a blank check company. Additionally, the statements were made in connection with the initial public offering of Grab, which was effected by the Form F-4 and de-SPAC transaction with Altimeter Growth Corp.

## ADDITIONAL FACTS ALLEGED ONLY WITH RESPECT TO COUNTS IV and V

### I.    Section 10(b) Defendants make additional false and misleading statements leading to investor losses

96.    Unlike Counts I, II and III, which are premised only on negligence and/or strict liability, Counts IV and V allege that following the Defective Proxy/Registration Statement, Defendants Grab, Tan, and Maa ("Section 10(b) Defendants") made additional misstatements with scienter in violation of Section 10(b) and 20(a) of the Exchange Act.

36

97.     Section 10(b) Defendants possessed the power and authority to control the contents of the Company's Form 425 and other SEC filings, press releases, and other market communications.  Each was provided with copies of Grab's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

98.     On December 2, 2021, the day of Grab's initial trading, Anthony Tan appeared on CNBC's Squawk Box.  In the interview, Tan stated "[Our] mobility margins are strong.  We're seeing in our deliveries business, break even, just after 3 years in the majority of our markets."

99.     The statement identified in Paragraph 98 above was false and misleading when made because: (a) the mobility margins were not then strong, and Grab was in fact then losing money and experiencing declining revenue and (b) it failed to disclose that Grab was then massively spending on consumer and partner incentives, including a large partner referral bonus and a delivery promotion so large that Grab's own advertisements called it a "blockbuster," which devastated Grab's margins and revenue.

100.     Also on December 2, 2021, Defendant Maa was interviewed by Fortune Magazine, during that interview, Maa touted Grab's "improving economics":

> ***Fortune:***
> **Can you walk me through Grab's plans to become profitable? Grab's third quarter results last month showed losses of $988 million, despite steady growth in gross merchandise value (GMV), which ballooned to a record $4 billion in Q3. Market research firm Euromonitor said in a July report that a key weakness is Grab's big spending on advertising, promotions and incentives, and that a challenge going forward is whether the company can make money and maintain customer loyalty without such discounts.**
>
> **<u>Maa</u>**:
> We don't see profitability and growth as mutually exclusive. In Q3, we posted our third consecutive quarter of record GMV growth**. <u>We've also made very good strides on improving our economics. Our mobility segment has been positive since Q4 2019 and our margins are industry-leading [in that sector]</u>.**

37

> Our deliveries business—which is much younger at three years old—is already breaking even in a majority of our markets.
>
> Our key is driving our super app strategy, which allows us to cross-sell new services when we roll them out, while maintaining discipline around our marketing costs. [It] also allows [Grab] drivers to earn more via [new] income opportunities [when ride-hailing is down] and helps us maintain discipline around [spending on] driver incentives. So the super app is really key to driving the new economics of our business.

(emphasis in the original in the Fortune report's question paragraph, added elsewhere, brackets in the original transcript pulled from https://fortune.com/2021/12/02/grab-ipo-stock-shares-spac-price/).

101. The statements identified in Paragraph 100 above were materially false and misleading when made because: (a) Grab was not then improving its economics, but was struggling to manage a consumer and partner decline by ramping large incentives; (b) they failed to disclose Grab's mobility and delivery services were then experiencing increasing losses due to increased incentives, and therefore lower revenue; and (c) Grab's "super app" was not "driving the new economics of [the] business."

102. On March 3, 2022, before the market opened, Grab disclosed that it experienced adverse financial results as a direct result from the undisclosed increased in driver and consumer incentives. Specifically, Grab announced that fourth quarter 2021 revenues had declined 44% from the previous quarter and reported a $1.1 billion loss for the quarter. It issued a press release stating: "Revenue was $122 million, a 44% decline YoY as Grab preemptively invested to grow driver supply to support strong recovery in mobility demand. Consumer incentives for mobility and deliveries also increased as Grab invested in its category share and MTU growth." Grab also disclosed that it spent 74% more on incentives in the three months ending December 31, 2021 compared to the same period in 2020 and 126% more in ride-hailing in the three months ending

38

December 31, 2021  compared to the same period in 2020.

103.    During a conference call held in connection with the results on March 3, 2022, Defendant Tan also admitted that Grab had been experiencing a decline in driver supply: "we're preemptively investing to recalibrate driver supply to capture a strong recovery in mobility demand.  Similar to what was observed in other parts of the world, our driver supply base moderated down amid lower mobility demand in the third quarter."

104.    On this news, the Company's stock price fell $1.95, or 37.3%, to close at $3.28 per share on March 3, 2022, on unusually heavy trading volume.  Analysts lowered their price targets for Grab, noting higher than expected incentives to combat a driver shortage.

## II.    Section 10(b) Defendants acted with scienter in making the additional statements identified in this section

105.    With respect to the additional statements identified in this section, numerous facts establish that the Section 10(b) Defendants knew their statements were false when made, or were reckless to the likelihood of deceiving investors through unbalanced and misleading statements.  First, Grab expressly admitted that it "saw a decrease in the number of driver ***partners in the third quarter of 2021***."  *See* April 28, 2022, Form 20-F.  Specifically, in Grab Malaysia, Grab revealed that it had 70% fewer drivers than it had before the start of the pandemic.  *See* https://www.lowyat.net/2022/274430/grab-fare-structure-same-fewer-drivers./

106.    Second, Grab had previously admitted in the Defective Proxy/Registration Statement that it provides its executives (including the Section 10(b) Defendants) with tracking information, including current data regarding incentives and other key operating metrics: "Grab tracks certain key operating metrics, including, among others, its GMV, MTUs, partner incentives, consumer incentives, registered driver-partners and cohort data, with internal systems and tools."  Thus, each had access to the actual performance data contradicting his public misrepresentations

39

at the time such misrepresentations were made.

107.    Third, each of the Section 10(b) Defendants held itself or himself out to investors both in the Defective Proxy/Registration Statements and in the quoted earnings reports as being knowledgeable about the Company's actual incentive payments, incentive trends, margins and revenue trends.    Thus, each either actually had the knowledge purported, or was reckless in holding himself or itself out as having such knowledge.

108.    Fourth, as Grab has conceded that the Company itself adjusted incentive levels and therefore margin as a mechanism to enhance either profitability (by reducing incentives) or consumer engagement/driver supply (by increasing incentives), and each of the Section 10(b) Defendants claimed to understand and be aware of those adjustments, they could not have executed this important function without gaining actual knowledge of the actual, current level of incentives.

109.    Fifth, as Grab published incentives to its driver-partners and via advertisements to consumers, the Company and its senior executives would have access to and knowledge of the incentive offers it was making at the time.

110.    Sixth, as the ride hailing and food delivery businesses were Grab's core operations, and the Section 10(b) Defendants spoke to investors about the trends and metrics in those businesses, it would be absurd for them to not have knowledge of those trends and metrics.

**CLASS ACTION ALLEGATIONS**

111.    Plaintiffs bring these claims individually and on behalf of three Classes:

    a.    <u>Securities Act Class</u>: all persons who purchased or otherwise acquired shares in Grab (including by way of exchange of AGC shares) pursuant to or traceable to the Defective Proxy/Registration Statement that Defendants filed with the SEC on Form F-4 on August 2, 2021, and amended on Forms F-4/A on September 13, 2021,

40

October 18, 2021, November 12, 2021, November 17, 2021, and November 19, 2021. Securities Act Class asserts claims under Sections 11 and 15 of the Securities Act. These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

b. 14(a) Class: all persons who were solicited to approve the merger and who exchanged AGC shares for Grab Class A Ordinary shares rather than redeeming the same pursuant to the Defective Proxy/Registration Statement. The 14(a) Class asserts claims pursuant to Section 14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder. These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

c. 10(b) Class: all persons who purchased or otherwise acquired Grab Class A Ordinary Shares between December 2, 2021 and March 3, 2022, both dates inclusive. The 10(b) Class asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

Excluded from all Classes are: (a) Defendants and their immediate families; (b) current and former directors of Grab or AGC; (c) any entity that has entered into a stockholders agreement or co-venture agreement with Grab, or was a Private Investment in Public Equities ("PIPE") investor in Grab; and (d) any entity controlled, majority-owned or wholly owned, or affiliated with any of the above.

112. The members of the Classes are so numerous that joinder of all members is impracticable. The Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the

41

proposed Class. Plaintiffs base this belief, in part, on the fact that Grab consistently traded tens of millions of shares per week. Record owners and other members of the Class may be identified from records maintained by the Company, its transfer agent and brokers, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

113. Common questions of law and fact exist as to all members of each Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Classes are:

a. Whether Defendants made inaccurate statements and/or omitted material information to investors in the Defective Proxy/Registration Statement;

b. Whether Defendants' misrepresentations and omissions violated federal securities laws;

c. Whether Defendants' misrepresentations and omissions were material;

d. [For the 10(b) Class only] Whether Section 10(b) Defendants made additional misrepresentations and omissions to investors outside the Defective Proxy/ Registration Statement, and whether those misrepresentations and omissions were material;

e. [For the 10(b) Class only] Whether Section 10(b) Defendants acted with scienter;

f. [For the 10(b) Class only] Whether the prices of Grab securities during the 10(b) Class Period were artificially inflated because of Section 10(b) Defendants' conduct complained of herein; and

g. [For the 10(b) Class only] Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

42

114.    Plaintiffs' claims are typical of the claims of the members of the Classes as all members of each Class were similarly affected by Defendants' wrongful conduct in violation of federal law, and all assert the same legal claims arising out of the same conduct.

115.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes.    Plaintiffs have no interests antagonistic to the Classes, and have retained highly experienced counsel specializing in securities litigation.

116.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all claims is impracticable.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

117.    [Alleged only with respect to the 10(b) Class] For the 10(b) Class, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

      a.  During the 10(b) Class Period, Defendants made public misrepresentations of material facts and failed to disclose material facts necessary to make the statements they publicly made during the 10(b) Class Period not misleading under the circumstances in which they were made;

      b.  Company shares traded in an efficient market;

      c.  Company shares were liquid and traded with heavy volume during the 10(b) Class Period;

      d.  Company shares traded on the NASDAQ, and the Company was covered by multiple analysts, journalists, and industry commentators;

e. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

f. Plaintiffs and members of the 10(b) Class purchased, acquired and/or sold Company shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

g. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

118. [Alleged only with respect to the 10(b) Class] Alternatively, Plaintiffs and the members of the 10(b) Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### Violation of Section 11 of the Securities Act of 1933
**Against the Company and Defendants Gerstner,  Siam, Barton, Dozie, Ittycheria, Tan, Oey, Ling, Ein,  Rogers,  Khosrowshahi, and Jay**

119. Plaintiffs restate and reallege Paragraphs 1 through 95 and 111 through 116 as though fully set forth herein.

120. This Count is based on negligence and strict liability and does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

121. This count is asserted against the Company and each individual Defendant for violations of Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiffs, who

44

purchased and/or otherwise acquired Grab securities traceable to the Defective Proxy/Registration Statement, and all members of the Class who purchased or otherwise acquired Grab securities pursuant to or traceable to the Defective Proxy/Registration Statement.

122. The Company is the issuer of the stock issued via the Defective Proxy/Registration Statement. As such, the Company is strictly liable for each false and misleading statement contained therein, even for innocent misrepresentations.

123. Defendants Gerstner, Siam, Barton, Dozie, Ittycheria were directors of AGC at the time the Defective Proxy/Registration Statement was effected and each consented to be identified as a director in the Defective Proxy/Registration Statement. Therefore, each had a duty to make a reasonable investigation into the statements contained in the Defective Proxy/Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, these Defendants should have known of the material misstatements and omissions contained in the Defective Proxy/Registration Statement. As such, each of these Defendants is liable to Plaintiffs and the Securities Act Class.

124. Defendants Tan, Ling, Ein, Rogers, Khosrowshahi, and Jay were named in the Defective Proxy/Registration Statement as persons who were about to become directors in the merged Company, and consented to being so named. Therefore, each of these Defendants had a duty to make a reasonable investigation into the statements contained in the Defective Proxy/Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, these Defendants should have known of the material misstatements and omissions contained in the Defective Proxy/Registration

45

Statement. As such, each of these Defendants is liable to Plaintiffs and the Securities Act Class.

125. Defendant Oey was named as the person responsible for the statements attributed to him in the Form 425 referenced in Paragraph 83, and consented to those statements being incorporated thereby into the Defective Proxy/Registration Statement. Therefore, he had a duty to make a reasonable investigation into those statements to ensure they were true and that there was no omission to state any material fact required to be stated in order to make the statements not misleading. In the exercise of reasonable care, Oey should have known that these statements contained material misrepresentations and omissions.

126. Plaintiffs and other members of the Securities Act Class acquired Grab securities without knowledge of the untruths and/or omissions alleged herein. Plaintiffs and the other members of the Securities Act Class were thus damaged by Defendants' material misstatements and omissions.

127. This action was brought within one year after the discovery of the untrue statements and omissions and within three years of the offering date.

## COUNT II

### Violation of Section 15 of the Securities Act of 1933
### Against Defendants Tan and Oey

128. Plaintiffs restate and reallege Paragraphs 1 through 95, 111 through 116, and 119 through 127, as though fully set forth herein.

129. This Count is asserted pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendants Tan and Oey. These Defendants, in addition to their own primary liability under the Securities Act, are also secondarily liable for the primary violations of Grab.

130. As the CEO and CFO of Grab, each was involved with the day-to-day operations of the Company prior to the merger and was involved in reviewing and providing the descriptions

46

of Grab's operations and incentive payments in the Defective Proxy/Registration Statement. Each had the ability to control the contents thereof.

131.    Plaintiffs and other members of the Securities Act Class acquired Grab securities without knowledge of the untruths and/or omissions alleged herein. Plaintiffs and the other members of the Securities Act Class were thus damaged by the primary violations of the Company. By virtue of the conduct alleged herein, and their status as control persons of the Company, these Defendants are secondarily liable to Plaintiffs and the Securities Act Class for the primary violations of Grab.

## COUNT III

**Violation of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9
Against the Company and Defendants Gerstner, Siam, Barton, Dozie, and Ittycheria**

132.    Plaintiffs restate and reallege Paragraphs 1 through 95 and 111 through 116 as though fully set forth herein.

133.    This Count is asserted pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. §78n, and Rule 14a-9 promulgated thereunder, against the Company and Defendants Gerstner, Siam, Barton, Dozie, and Ittycheria and does not sound in fraud. Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent with respect to this Count as that intent is not an element of a Section 14(a) claim.

134.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any

47

statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

135.    These Defendants prepared, reviewed, and disseminated the Defective Proxy/Registration Statement, which as specified above made false statements, omitted material information that was required to be set forth therein, and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

136.    By virtue of their positions within the pre-merger Company and their due diligence regarding Grab and the merger, these Defendants were aware of the undisclosed or misrepresented information and of their duty to disclose this information in the Defective Proxy/Registration Statement.    The Defective Proxy/Registration Statement was prepared, reviewed, and/or disseminated by the Defendants named herein.    It misrepresented and/or omitted material facts, as detailed above.    Defendants were at least negligent in filing the Defective Proxy/Registration Statement with these materially false and misleading statements.

137.    As a direct result of these Defendants' negligent preparation, review and dissemination of the Defective Proxy/Registration Statement, members of the 14(a) Class were precluded from exercising their right to seek redemption of their AGC shares prior to the merger on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the merger.    The Defective Proxy/Registration Statement used to obtain shareholder approval of the merger deprived 14(a) Class members of their right to a fully informed shareholder vote in connection therewith, and deprived them of their right to the information necessary to make an informed redemption decision.    At all times relevant to the dissemination of

the Defective Proxy/Registration Statement, these Defendants were aware of and/or had access to the true facts concerning Grab. Thus, as a direct and proximate result of the dissemination of the Defective Proxy/Registration Statement that Defendants used to obtain shareholder approval of and thereby consummate the merger, and to dissuade investors from redeeming AGC shares, the 14(a) Class suffered damages and actual economic losses in an amount to be determined at trial.

138. The omissions and false and misleading statements in the Defective Proxy/Registration Statement were material in that a reasonable stockholder would have considered them important in deciding how to vote on the merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

139. As stated herein, the Defective Proxy/Registration Statement contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. It was an essential link in the consummation of the Merger, and described itself as the sole source of information investors were to rely upon in making the Merger vote and redemption decisions. These Defendants failed to correct the Defective Proxy/Registration Statement prior to the merger vote or redemption deadline, and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

140. By reason of the foregoing, these Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

## COUNT IV

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against the Company, Tan, and Maa**

141.    Plaintiffs restate and reallege each and every Paragraph above as though fully set forth herein.

142.    During the 10(b) Class Period, the Company, and Defendants Tan and Maa, individually and in concert, directly or indirectly, (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

143.    These Defendants acted with scienter in that they knew or deliberately disregarded that the public statements made during the 10(b) Class Period; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements as primary violations of the securities laws.  These Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's materially misleading statements, and/or their associations with the Company, were privy to confidential proprietary information concerning the Company and participated in the fraudulent scheme alleged herein.

144.    Tan and Maa spearheaded the merger on behalf of Grab and had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and during the 10(b) Class Period intended to be deceitful, or, in the alternative, acted with reckless disregard

50

for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company personnel.

145.    As a result of the foregoing, the market price of Company securities was artificially inflated during the 10(b) Class Period.  Plaintiffs and the other members of the 10(b) Class relied on the statements described above and/or the integrity of the market price of Company securities during the 10(b) Class Period in purchasing Company securities at prices that were artificially inflated as a result of these Defendants' false and misleading statements.

146.    Had Plaintiffs and the other members of the 10(b) Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

147.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the 10(b) Class have suffered damages in an amount to be established at trial.

148.    By reason of the foregoing, these Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the 10(b) Class for substantial damages which they suffered in connection with their purchase of Company securities during the Class Period.

## COUNT V

### Violation of Section 20(a) of the Exchange Act
### Against Defendants Tan and Maa

149.    Plaintiffs restate and reallege each and every Paragraph above as though fully set forth herein.

150.    During the 10(b) Class Period, Defendants Tan and Maa as senior executives,

51

exercised control over the day-to-day activities of Grab, including the setting of incentive policy and the description to investors of Grab's operations, policies, material trends, and operating environment. Because of their roles and responsibilities at Grab, Tan and Maa knew the adverse non-public information concealed by Grab's misstatements. Both exercised authority and capability to control the contents of the misrepresentations made as alleged herein.

151. Moreover, Tan was a director of Grab both before and after the merger. Maa has served as Grab President since 2016. Because of their roles and responsibilities at Grab, Tan and Maa knew the adverse non-public information concealed by the Company's misleading statements. Each used his influence to control the day-to-day operations of Grab.

152. Accordingly, Tan and Maa are secondarily liable as control persons for the primary §10(b) violations of Grab, as alleged herein. By reason of their senior management positions and/or being a director of the Company, these Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. These Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

153. Each also culpably participated in the misrepresentations to investors as alleged in Count IV. Because of their positions of control and authority as senior officers, Tan and Maa were able to, and did, control the contents of Grab's direct communications with investors, which the Company disseminated in the marketplace during the 10(b) Class Period concerning the Company's operations. Throughout the 10(b) Class Period, Tan and Maa exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in favor of Plaintiffs and each Class, and against Defendants as follows:

A. Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives and Co-Lead Counsel as Class Counsel;

B. Awarding Plaintiffs and each Class compensatory damages;

C. Awarding Plaintiffs and each Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs;

D. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

E. Awarding such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs and each Class demand a trial by jury.

Dated: August 22, 2022                    Respectfully submitted,


                                          **POMERANTZ LLP**

                                          */s/ Joshua B. Silverman*
                                          Joshua B. Silverman
                                          Brian P. O'Connell
                                          10 South La Salle Street, Suite 3505
                                          Chicago, Illinois 60603
                                          Telephone:  (312) 377-1181
                                          Facsimile:   (312) 377-1184
                                          Email: jbsilverman@pomlaw.com

boconnell@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
            ahood@pomlaw.com

**LEVI & KORSINSKY, LLP**

**/s/** *Shannon L. Hopkins*

Shannon L. Hopkins
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com

*Co-Lead Counsel for Co-Lead Plaintiffs and the Proposed Classes*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

Eitan Kimelman
60 E 42nd Street, Suite 4600, New York, New York 10165
Phone: 212-697-6484
Fax:    212-697-7296
Email: eitank@bgandg.com

*Additional Counsel for Lead Plaintiffs and the Proposed Classes*

54

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2022, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

Dated: August 22, 2022

**POMERANTZ LLP**

By: _/s/ Joshua B. Silverman_
   Joshua B. Silverman

*Lead Counsel*

55

# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE GRAB HOLDINGS LIMITED SECURITIES LITIGATION | Case No. 1:22-cv-02189 (JLR)<br><br>**<u>OPINION AND ORDER</u>** |

JENNIFER L. ROCHON, United States District Judge:

Si Fan, Amit Batra, and SLG Cloudbank Holdings, LLC (collectively, "Plaintiffs") bring this putative class action against Grab Holdings Limited ("Grab"), Brad Gerstner ("Gerstner"), Hab Siam ("Siam"), Richard N. Barton ("Barton"), Aishetu Fatima Dozie ("Dozie"), Dev Ittycheria ("Ittycheria"), Anthony Tan ("Tan"), Peter Oey ("Oey"), Tan Hooi Ling ("Ling"), Maa Ming-Hokng ("Maa"), John Rogers ("Rogers"), Dara Khosrowshahi ("Khosrowshahi"), Ng Shin Ein ("Ein"), and Oliver Jay ("Jay" and, collectively, "Defendants").  ECF No. 58 (the "Amended Complaint" or "Am. Compl.").

The Amended Complaint asserts five causes of action.  First, Plaintiffs allege that all Defendants except Maa violated Section 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k ("Section 11").  Am. Compl. ¶¶ 119-127.  Second, Plaintiffs allege that Tan and Oey violated Section 15 of the Securities Act, 15 U.S.C. § 77o ("Section 15"), as controlling persons with respect to the conduct underlying Plaintiffs' Section 11 claim.  Am. Compl. ¶¶ 128-131.  Third, Plaintiffs allege that Grab, Gerstner, Siam, Barton, Dozie, and Ittycheria violated Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a) ("Section 14(a)"), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9 ("Rule 14a-9").  Am. Compl. ¶¶ 132-140.  Fourth, Plaintiffs allege that Grab, Tan, and Maa violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) ("Section 10(b)"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").  Am.

1

Compl. ¶¶ 141-148. Plaintiffs define the "10(b) Class Period" as "between December 2, 2021 and March 3, 2022, both dates inclusive." *Id.* ¶ 1. Fifth, Plaintiffs allege that Tan and Maa violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"), as controlling persons with respect to the conduct underlying Plaintiffs' Section 10(b) claim. Am. Compl. ¶¶ 149-153.

Defendants have moved to dismiss the Amended Complaint for failure to state a claim. ECF No. 90 ("Br."). For the following reasons, the motion to dismiss the Amended Complaint is GRANTED in part and DENIED in part.

## BACKGROUND

### I. Factual Allegations

In ruling on the motion to dismiss, the Court assumes that the Amended Complaint's factual allegations are true and views them in the light most favorable to Plaintiffs. *New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 168 (2d Cir. 2023).

### A. SPACs, Altimeter, and Grab

A special-purpose-acquisition corporation (a "SPAC") is a type of "shell company." Am. Compl. ¶ 31. Following its formation, a SPAC conducts an initial public offering (an "IPO") through a conventional underwriting. *Id.* In addition to common stock, "[i]nitial investors also commonly obtain warrants to buy additional stock as at a fixed price, and sponsors of the SPAC obtain a 'promote' – [that is,] greater equity than their cash contribution or commitment would otherwise imply." *Id.* The proceeds from these sales are deposited in a trust account for the sole purpose of funding the acquisition of a private company. *Id.* "SPACs usually have an 18-to-24-month period to find an acquisition target." 1 Thomas Lee Hazen, Law Sec. Reg. § 3:58 (Westlaw database updated Nov. 2023). The resulting business

combination "is often referred to as a de-SPAC transaction." *Id.*; *accord* Am. Compl. ¶ 31.  A de-SPAC transaction thus offers a private company seeking to go public an alternative to undertaking a traditional IPO.  Am. Compl. ¶ 34.  "If a merger is completed within the allocated time frame, founders and managers of the SPAC generally reap windfall profits from their ownership of SPAC securities they obtained cheaply prior to public offering, and enjoy considerable control such as the ability to nominate board members to the new company."  *Id.* ¶ 32.  But "if an acquisition is not effectuated within that time frame, then the SPAC is dissolved and the money in the trust is returned to investors, with no compensation paid to the founders and managers of the SPAC."  *Id.*

Altimeter Growth Corp. ("Altimeter") was a SPAC incorporated in the Cayman Islands on August 25, 2020.  *Id.* at 1 & ¶ 30.  Altimeter filed its IPO prospectus with the Securities and Exchange Commission (the "SEC") a little over a month later.  *Id.* ¶ 30; Altimeter Growth Corp., Prospectus (Form 424B4) (Sept. 30, 2020) (the "IPO Prospectus"), https://www.sec.gov/Archives/edgar/data/1823340/000114036120022204/nt10014830x9_424 b4.htm [https://perma.cc/JWZ8-6EKV].  Altimeter described itself as "a newly formed blank check company incorporated as a Cayman Islands exempted company for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses."  IPO Prospectus at 2.  The IPO Prospectus stated that Altimeter's board of directors (the "Altimeter Board") consisted of five people: Gerstner (chairperson, chief executive officer, and president), Siam (general counsel and director), Barton (director), Dozie (director), and Ittycheria (director).  *Id.* at 113; *see* Am. Compl. ¶¶ 17-21.

On October 5, 2020, Altimeter consummated the IPO of 50 million units for $10.00 per unit, generating gross proceeds of $500 million (excluding certain costs).  Altimeter

3

Growth Corp., Current Report (Form 8-K) (Oct. 6, 2020), https://www.sec.gov/Archives/ edgar/data/1823340/000114036120022583/nc100115874x1_8k.htm [https://perma.cc/8XS7-PY3A]. Each unit consisted of one share of common stock and one-fifth of a warrant; a holder of a whole warrant was entitled to purchase one share of common stock at a price of $11.50 per share. *Id.* Altimeter deposited the proceeds from the IPO – along with the proceeds from a private placement of an additional 12 million warrants at a price of $1.00 per warrant – in a trust account for the purpose of funding a business combination. *Id.*

On April 13, 2021, Altimeter announced that it had entered into a merger agreement with Grab, a private company. Am. Compl. ¶ 36. If the merger were consummated, Altimeter would cease to exist, and Grab would be the surviving entity. *Id.* As is typical in de-SPAC transactions, the business combination was contingent on the shareholders of the SPAC (here, Altimeter) voting to approve the deal. *Id.* ¶¶ 31, 33, 37.

Grab offers a mobile application that provides consumers with ride-hailing services, food-delivery services, business services, and a digital wallet. *Id.* ¶ 43. Two of these lines of business – ride hailing and food delivery – constitute Grab's core business and generate the vast majority of Grab's revenue. *Id.* ¶¶ 4, 43-44; *see* Altimeter Growth Corp. & Grab Holdings Ltd., Proxy Statement and Prospectus (Form F-4/A) at 89 (Nov. 19, 2021) (the "Proxy"), https://www.sec.gov/Archives/edgar/data/1855612/000119312521334426/ d197617df4a.htm [https://perma.cc/K2Z2-6GV2] ("more than 90% of Grab's revenue was derived from its deliveries and mobility segments in the six months ended June 30, 2021 and the year ended December 31, 2020"). Grab offers ride-hailing and food-delivery services in over 400 cities across eight countries in Southeast Asia: Cambodia, Indonesia, Malaysia, Myanmar, the Philippines, Singapore, Thailand, and Vietnam. Am. Compl. ¶ 4. Grab's ride-

hailing services include private cars, taxis, and, in some countries, motorcycles.  *Id.* ¶ 45.
Grab's food-delivery services include prepared meals and groceries.  *Id.* ¶ 46.

For its ride-hailing and food-delivery businesses, Grab offers incentives both to drivers and to consumers; these incentives can significantly impact whether a transaction is profitable.  *Id.* ¶¶ 6-7, 54-62.  Grab's app tabulates a gross merchandise value (a "GMV"), which includes the cost of providing the service to the consumer (before any discounts) plus applicable taxes, tolls, tips, and fees.  *Id.* ¶ 6.  Grab's revenue from a given transaction is a set commission of the GMV minus the value of incentives offered to consumers and drivers.  *Id.*  Consider the following example:



Proxy at 279; *see* Am. Compl. ¶¶ 6, 50.  As this example illustrates, each dollar spent on incentives reduces Grab's revenue by an equal amount.  Am. Compl. ¶ 50.  When, for a given transaction, the amount spent on incentives exceeds the amount received in commissions and platform fees, Grab loses money on that transaction.  *Id.* ¶ 51.  Grab refers to such occurrences as transactions with "excess incentives."  *Id.* ¶¶ 7, 51.

Grab markets its incentive programs to drivers to encourage them to provide services for Grab rather than its competitors.  *Id.* ¶ 54.  Grab offers several types of incentives to drivers, including distance-based incentives, group-order incentives, performance-based incentives, and "gem" incentives (also called "zone boosts").  *Id.* ¶¶ 55-56.  Grab also offers additional incentives for new drivers and referral bonuses for people who recruit new drivers.  *Id.* ¶ 55.  Grab markets these incentives to drivers via weekly emails to its drivers, as well as through Telegram, a social-messaging platform.  *Id.* ¶¶ 54-56.

The Amended Complaint gives several examples of Grab's driver incentives.  For instance, in Malaysia, Grab offered an additional bonus of up to 1,000 Malaysian Ringgit ("RM") when a new driver started picking up orders.  *Id.* ¶ 55 (during the relevant time, RM 1,000 equaled roughly $227).  As another example, during the summer of 2020, Grab "initiated a Performance Rebate incentive plan, which offers quarterly commission rebates to Grab's top driver-partners who meet the eligibility criteria."  *Id.* ¶ 60.  "The Grab Performance Rebate was a 12% rebate of the commissions that Grab collected from the driver in the quarter.  Drivers who rent vehicles through Grab (GrabRentals) were eligible for an additional 8% rebate."  *Id.* ¶ 61.  Also, on October 20, 2021, Grab announced a bonus for its Singaporean drivers of 2 Singapore Dollars ("SGD") per food-delivery order between 2:45 p.m. and 4:00 p.m.  *Id.* ¶ 56 (during the relevant time, 1 SGD equaled approximately $0.72).  During the fourth quarter of 2021, Grab Singapore sent out 86 such announcements via Telegram offering an extra 2 or 3 SGD bonus payments on deliveries, or nearly one for each day of the quarter – which was more than twice the number of announcements during the third quarter of 2021.  *Id.* ¶ 57.  Also, between November 22 and December 31, 2021, Grab offered

drivers up to 300 SGD for referrals of new drivers.  *Id.* ¶ 66.[1]  On December 1, 2021, Grab

announced another promotion for its drivers in Singapore, under which Grab would pay

drivers increasing bonuses per trip made between December 1 and December 4.  *Id.* ¶¶ 58-59.

Specifically, Grab offered 1 SGD bonuses per trip for trips 1 through 3, 1.50 SGD per trip for

trips 4 through 7, and 2 SGD per trip for trips 8 and above.  *Id.*

The Amended Complaint also gives some examples of consumer incentives.  Between

October 4 and 31, 2021, Grab's food-delivery business "offered what it called a 'Blockbuster

Sale,' giving 30% off across the menu."  *Id.* ¶ 67.  This sale "was brought back for an

extended period with even bigger sales between November 25, 2021 and December 12, 2021,

where some offers were as high as 50% off."  *Id.* ¶ 68.  "Grab also offered large incentives in

Q4 2021 to consumers on its ride hailing platform.  For example, from early October 2021

---

[1] The Amended Complaint states: "Specifically, among other partner incentives, Grab offered incentives of up to $300 SGD for referrals of new drivers.  *See, e.g.*, https://web.archive.org/web/20211130025749/https://www.grab.com/sg/drd/."  Am. Compl. ¶ 66.  The archived web page accessible at that URL states:

> From 22 Nov 2021 till 31st Dec 2021, look out for the following
> sign-up promotions . . . .  If you're an existing delivery-partner
> in Grab: Know someone who can help us?  Refer a friend to us
> and get up to $300 in referral reward for each friend you
> successfully refer, T&C apply.  The good news is, there is no
> limit to the amount of referrals!

Because the archived web page is incorporated by reference into the Amended Complaint, the Court may consider it in ruling on the motion to dismiss.  *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam) ("When ruling on a motion to dismiss, documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." (quotation marks and citation omitted)); *Mockingbird 38, LLC v. Int'l Bus. Times, Inc.*, No. 21-cv-00283 (LJL), 2022 WL 154137, at *4 n.4 (S.D.N.Y. Jan. 18, 2022) (on motion to dismiss, examining webpage located at URL referenced in complaint); *Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 337 n.1 (S.D.N.Y. 2021) (same).

through December 31, 2021, it offered 50% off rides to or from some of the largest airports it serviced." *Id.* ¶ 69.

Tan and Ling co-founded Grab in 2012. *Id.* ¶¶ 4, 43. Tan was Grab's chief executive officer and a director of Grab at all relevant times. *Id.* ¶ 22. Ling was Grab's chief operating officer at all relevant times; he became a director of Grab on December 1, 2021. *Id.* ¶ 24. Oey was Grab's chief financial officer at all relevant times. *Id.* ¶ 23. Maa was Grab's president at all relevant times. *Id.* ¶ 25. Rogers became a director of Grab on December 1, 2021. *Id.* ¶ 26. Khosrowshahi, Ein, and Jay were directors of Grab at all relevant times. *Id.* ¶¶ 27-29.

### B. The Proxy

Altimeter and Grab filed the final registration statement and proxy statement for the de-SPAC transaction with the SEC on November 19, 2021. *Id.* ¶ 1; Proxy. In the Proxy, Grab explained that it "offer[s] various incentives to our driver- and merchant-partners, which are deducted from the fees normally received from driver- or merchant-partners," and that "such incentives may sometimes exceed Grab's fee from a particular transaction." Am. Compl. ¶ 7. The Proxy noted that Grab "also offer[s] consumer incentives." Proxy at 278. The Proxy further stated that during the preceding two years (through the first half of 2021), Grab had reduced its incentives, both in total and as a percentage of GMV. Am. Compl. ¶ 52. Specifically, Grab spent 10 percent of GMV on incentives during the first half of 2021, compared to 19 percent for the full year of 2019. *Id.* ¶¶ 52-53.

According to the Proxy, the Altimeter Board had conducted due diligence by reviewing "Grab and the industries in which it operates, including the financial and other information provided by Grab." *Id.* ¶ 38; *see id.* ¶ 39 (quoting the Proxy's overview of the Altimeter Board's due-diligence process). The Proxy stated that the Altimeter Board, without

obtaining a third-party valuation or fairness opinion, had valued Grab at approximately $39.6 billion. *Id.* ¶ 40. The Proxy assured investors that Altimeter's managers and directors "have substantial experience in evaluating the operating and financial merits of companies similar to Grab and reviewed certain financial information of Grab and other relevant financial information selected based on the experience and the professional judgment of [Altimeter's] management team, which enabled them to make the necessary analyses and determinations." *Id.* The Altimeter Board opined that the merger was in the best interests of Altimeter's shareholders, and it unanimously recommended that investors vote in favor of the proposal. *Id.* ¶ 41.

There are six passages in the Proxy that, according to Plaintiffs, contain materially false and misleading statements and omissions. *See id.* ¶¶ 70-79, 87. First, in a section titled "Risk Factors," the Proxy stated:

> In addition, achieving profitability will require Grab, for example, to continue to grow and scale its business, manage promotion and incentive spending, improve monetization, reduce marketing and other spending and increase consumer spending. Grab's growth so far has been driven in part by incentives Grab offers driver-partners, merchant-partners and consumers. As Grab has achieved greater scale, it has and may continue to seek to reduce incentives, which can impact both profitability and growth.

Proxy at 56 ("Proxy Portion 1"); *see* Am. Compl. ¶ 70. Second, in the same Risk Factors section, the Proxy stated:

> Grab has paid significant amounts of incentives to attract new driver and merchant partners and consumers to its services in order to grow its business and generate new demand for its services and may continue to do so in the future. These incentives, which are typically in the form of additional payments made to partners and consumers, have in the past and may in the future exceed the amount of the commissions and fees that Grab receives for its services. Grab's revenues are reported net of partner and consumer incentives, so if incentives

9

> exceed Grab's commissions and fees received, it can result in Grab reporting negative revenue. . . . Grab's ability to increase its revenues and, in turn, decrease its net losses and achieve profitability is therefore significantly dependent on its ability to effectively use incentives to encourage the use of its platform and over time to reduce the amount of incentives it pays to both its driver and merchant partners and consumers of its services relative to the amount of commissions and fees it receives for its services. If Grab is unable to reduce the amount of incentives it pays over time relative to the commissions and fees it receives, it will likely impact Grab's ability to increase its revenues, raise capital, reduce its net losses and achieve profitability and reduce its net cash outflows, any or all of which could prevent Grab from continuing as a going concern or achieving or maintaining profitability. In addition, given Grab's use of incentives to encourage use of its platform, future decreases in the use of incentives could also result in decreased growth in the number of users and driver- and merchant-partners or an overall decrease in users and driver- and merchant-partners and decreases in its revenues, which could negatively impact its financial condition and results of operations.

Proxy at 59 ("Proxy Portion 2"); *see* Am. Compl. ¶ 78. Third, also in the Risk Factors

section, the Proxy stated:

> Grab's success in a given geographic market depends on its ability to increase the scale of its driver- and merchant-partner base and the number of consumers transacting through its platform as well as expand the deliveries, mobility and financial services offerings on its platform. . . . If driver-partners are not attracted to the Grab platform or choose not to offer their services through its platform, or elect to offer them through a competitor's platform, Grab may lack a sufficient supply of driver-partners to attract and retain consumers and merchant-partners to the Grab platform. . . . It is also important that Grab maintains a balance between demand and supply for mobility services in any given area at any given time. Grab has experienced and expects to continue to experience driver-partner supply constraints or oversupply from time to time in certain areas (including certain areas or locations within cities). To the extent that Grab experiences driver-partner supply constraints in a given market, Grab may need to increase, or may not be able to reduce, the driver-partner incentives that Grab offers.

10

Proxy at 67-68 ("Proxy Portion 3"); *see* Am. Compl. ¶ 72.  Fourth, once more in the Risk

Factors section, the Proxy stated:

> Factors such as inflation, increased fuel prices, and increased vehicle purchase, rental, or maintenance costs may increase the costs incurred by Grab's driver-partners when providing services on its platform . . . [and] may increase merchant-partner operating costs. . . .  In many cases, these increased costs may cause driver-partners to spend less time providing services on the Grab platform or to seek alternative sources of income. Likewise, these increased costs may cause merchant-partners to pass costs on to consumers by increasing prices.  A decreased supply of consumers and driver- and merchant-partners on the Grab platform could harm its business, financial condition, results of operations and prospects.

Proxy at 90 ("Proxy Portion 4"); *see* Am. Compl. ¶ 76.  Fifth, in a section titled "Grab

Management's Discussion and Analysis of Financial Condition and Results of Operations"

(the "MD&A"), the Proxy stated:

> Revenue was $157 million for the three months ended September 30, 2021, down 9% year-over-year, as a result of the decline in mobility due to the severe lockdowns in Vietnam. Revenue is net of consumer incentives and merchant- and driver-partner incentives.

Proxy at 338 ("Proxy Portion 5"); *see* Am. Compl. ¶ 87.  Sixth, also in the MD&A, the Proxy

stated:

> During the initial stages of growth, we offered significant incentives and promotions to attract platform consumers as well as incentives to attract driver- and merchant-partners, and conducted advertising activities to enhance our brand awareness.  We also invested in research and development and other operating expenses to support the growth of our platform. Going forward, with increasing scale and synergies on our platform, we expect to enjoy economies of scale, which we expect will allow us to more efficiently and cost effectively acquire new platform consumers and engage existing consumers.

Proxy at 344 ("Proxy Portion 6"); *see* Am. Compl. ¶ 74.

11

### C. Additional Pre-Merger Statements

On August 2, 2021, Grab announced its earnings for the second quarter of 2021.  Am. Compl. ¶ 80.  Grab filed this announcement with the SEC the same day, and later it was incorporated into the Proxy.  *Id.*; Grab Holdings Ltd., Prospectus (Form 425) (Aug. 2, 2021) (the "8/2/21 Press Release"), https://www.sec.gov/Archives/edgar/data/1823340/000119312521232789/d114160d425.htm [https://perma.cc/KV3D-Y6QD].  The 8/2/21 Press Release stated that Grab's "excess driver, merchant and consumer incentives . . . are expected to continue to decline over time as Grab's business matures."  8/2/21 Press Release (footnotes omitted); *see* Am. Compl. ¶ 80.  The 8/2/21 Press Release also noted that it "may include 'forward-looking statements' within the meaning of the federal securities laws," and that such statements "can be identified by the use of forward-looking words, including . . . 'expect.'"  8/2/21 Press Release.  The 8/2/21 Press Release warned that its forward-looking statements "are subject to a number of factors, risks and uncertainties," and that the reader "should carefully consider the foregoing factors and the other risks and uncertainties described in the 'Risk Factors' section of [the Proxy, whose initial draft was released that same day]."  *Id.*  For its part, the initial draft of the Proxy listed numerous risk factors, including that: (1) "If driver-partners are not attracted to the Grab platform or choose not to offer their services through its platform, or elect to offer them through a competitor's platform, Grab may lack a sufficient supply of driver-partners to attract and retain consumers and merchant-partners to the Grab platform"; and (2) "To the extent that Grab experiences driver-partner supply constraints in a given market, Grab may need to increase, or may not be able to reduce, the driver-partner incentives that Grab offers."  Altimeter Growth Corp. & Grab Holdings Ltd., Proxy Statement and Prospectus (Form F-4/A) at 56 (Nov. 19, 2021) (the "Draft Proxy"), https://www.sec.gov/

Archives/edgar/data/1855612/000119312521232151/d496451df4.htm [https://perma.cc/ PG69-5GH6].

On September 13, 2021, Grab, Tan, and Oey held a conference call to discuss Grab's quarterly earnings.  Am. Compl. ¶¶ 81, 83.  Grab filed a transcript of the conference call with the SEC the following day, and later it was incorporated into the Proxy.  *Id.*; Grab Holdings Ltd., Prospectus (Form 425) (Sept. 13, 2021) (the "9/13/21 Conference Call"), https://www.sec.gov/Archives/edgar/data/1823340/000119312521272151/d114160d425.htm [https://perma.cc/9KEW-BZ54].  At one point during the 9/13/21 Conference Call, Tan stated:

> Allow me to explain with this slide that illustrates the flywheel effects underpinning our superapp strategy.  Each of our businesses helps the others scale.  First, [n]ew services can be quickly launched by leveraging collective assets.  Our pervasive mobility user base enabled us rapidly achieve category leadership in deliveries, and every transaction on our platform is an opportunity to offer a customized financial product, whether payments, lending, or insurance.  Then, [c]onsumer spending grows in tandem with more services, thereby creating more income opportunities for our merchant and driver-partners, who remain loyal to the platform.  This creates wider selection, faster delivery times, and improved consumer experience.  Even amidst the pandemic, consumer demand for deliveries has helped to cushion the impact of softer mobility demand on driver-partner earnings.  This has helped us sustain the supply network of our business in a truly cost-effective way.  A core component of our success is our ability to tie all this together into an integrated superapp that seamlessly connects each of our stakeholders.  Our superapp flywheel allows us to grow the ecosystem in a vastly accelerated manner, versus other single-vertical players.  This is our Secret Sauce.

9/13/21 Conference Call; *see* Am. Compl. ¶ 81.  Later during that same call, Oey stated:

> From a bottom-line perspective, we continue to demonstrate strong trends in our path to profitability.  Our Total Segment Adjusted EBITDA of $14 million loss saw a marked improvement by $75 million, underpinned by the strong top-line growth and improving margins across our business segments.  Group Adjusted EBITDA was $214 million loss for the quarter.  This was a decline of $8 million year-on-year, as

13

we invest further in product development. We saw our adjusted EBITDA margins as a percentage of GMV improved for the quarter to negative 5.5%, as compared to negative 9% in the same period last year. We will continue to execute sustainable and improving margins despite challenges in the operating environment.

9/13/21 Conference Call; *see* Am. Compl. ¶ 83.

On November 11, 2021, Grab announced its earnings for the third quarter. Am. Compl. ¶ 85. Grab filed this announcement with the SEC the following day, and later it was incorporated into the Proxy. *Id.*; Grab Holdings Ltd., Prospectus (Form 425) (Nov. 12, 2021) (the "11/12/21 Press Release"), https://www.sec.gov/Archives/edgar/data/1823340/000119312521327087/d114160d425.htm [https://perma.cc/7MKF-BZZ8]. The 11/21/21 Press Release stated that "[r]evenue was $157 million, down 9% YoY [that is, year over year], as a result of the expected decline in mobility due to the severe lockdowns in Vietnam. Grab's reported revenue is net of consumer, merchant and driver-partner incentives." 11/21/21 Press Release; *see* Am. Compl. ¶ 85. The 11/21/21 Press Release also quoted Tan as saying that "[d]espite severe lockdowns in Vietnam and heightened restrictions across the region in the third quarter due to COVID-19, we executed well on our superapp strategy and delivered strong growth." 11/21/21 Press Release; *see* Am. Compl. ¶ 85.

### D. Consummation of the Merger and Post-Merger Events

Altimeter's shareholders overwhelmingly approved the merger with Grab. Am. Compl. ¶ 8. Altimeter's shareholders could redeem their shares at $10.00 per share if they wanted their money back rather than receive Grab shares post-merger. *Id.* ¶¶ 3, 37. Less than one percent of Altimeter's shareholders redeemed their shares. *Id.* ¶ 8. The merger closed on December 1, 2021. *Id.* Grab issued a press release that day celebrating the transaction as the "largest-ever U.S. public market debut by a Southeast Asian company." *Id.* ¶ 91.

14

Grab began trading on the NASDAQ on December 2, 2021. *Id.* ¶¶ 2, 16, 98. That day, Tan appeared on the CNBC show "Squawk Box." *Id.* ¶ 98. During the interview, Tan stated: "[Our] mobility margins are strong. We're seeing in our deliveries business, break even, just after 3 years in the majority of our markets." *Id.* (brackets in original).

Also on December 2, 2021, Maa was interviewed by Fortune Magazine. *Id.* ¶ 100. During the interview, the following exchange took place:

> **Fortune:**
>
> Can you walk me through Grab's plans to become profitable? Grab's third quarter results last month showed losses of $988 million, despite steady growth in gross merchandise value (GMV), which ballooned to a record $4 billion in Q3. Market research firm Euromonitor said in a July report that a key weakness is Grab's big spending on advertising, promotions and incentives, and that a challenge going forward is whether the company can make money and maintain customer loyalty without such discounts.
>
> **Maa:**
>
> We don't see profitability and growth as mutually exclusive. In Q3, we posted our third consecutive quarter of record GMV growth. We've also made very good strides on improving our economics. Our mobility segment has been positive since Q4 2019 and our margins are industry-leading [in that sector].
>
> Our deliveries business – which is much younger at three years old – is already breaking even in a majority of our markets.
>
> Our key is driving our super app strategy, which allows us to cross-sell new services when we roll them out, while maintaining discipline around our marketing costs. [It] also allows [Grab] drivers to earn more via [new] income opportunities [when ride-hailing is down] and helps us maintain discipline around [spending on] driver incentives. So the super app is really key to driving the new economics of our business.

*Id.* (brackets in original; further emphasis omitted).

Before the market opened on March 3, 2022, Grab issued a press release announcing its financial results for the fourth quarter of 2021 and the full year of 2021. *Id.* ¶¶ 93, 102;

15

*Grab Reports Fourth Quarter and Full Year 2021 Results*, Grab Holdings Ltd. (Mar. 3, 2022) (the "3/3/22 Press Release"), https://investors.grab.com/news-releases/news-release-details/ grab-reports-fourth-quarter-and-full-year-2021-results [https://perma.cc/2J4M-P9PF]. Grab announced that its revenue for the fourth quarter of 2021 was "$122 million, a 44% decline YoY as Grab preemptively invested to grow driver supply to support strong recovery in mobility demand. Consumer incentives for mobility and deliveries also increased as Grab invested in its category share and [monthly-transacting-user] growth." Am. Compl. ¶ 102. Grab also announced that the company lost $1.1 billion during that quarter. *Id.* Grab further disclosed that, compared to the fourth quarter of 2020, Grab spent 74 percent more on incentives and 126 percent more on ride-hailing during the fourth quarter of 2021. *Id.* And compared to the average quarterly spend in 2020, Grab spent 94 percent more on total incentives and 137 percent more on consumer incentives during the fourth quarter of 2021. *Id.* ¶ 93. During a conference call that same day, Tan stated: "we're preemptively investing to recalibrate driver supply to capture a strong recovery in mobility demand. Similar to what was observed in other parts of the world, our driver supply base moderated down amid lower mobility demand in the third quarter." *Id.* ¶ 103. Grab's stock price fell $1.95, or 37.3 percent, to close at $3.28 per share on March 3, 2022, on unusually heavy trading volume. *Id.* ¶ 104. Analysts lowered their price targets for Grab, noting that Grab used a higher level of incentives to combat a shortage of drivers than the analysts had expected. *Id.*

Grab's annual report for 2021, filed with the SEC on April 28, 2022, stated: "We also saw a decrease in the number of driver-partners in the third quarter of 2021 due to similar COVID-19 measures in response to a new wave of COVID-19, and we preemptively invested in driver incentives to grow the supply of active drivers on our platform in the fourth quarter of 2021." Grab Holdings Ltd., Annual Report (Form 20-F) at 120 (Apr. 28, 2022) (the "2021

16

Annual Report"), https://www.sec.gov/Archives/edgar/data/1855612/000119312522125634/
d170219d20f.htm [https://perma.cc/9X4R-3ZJ8]; *see* Am. Compl. ¶ 93.

### E.  Grab's Alleged Undisclosed Change in Strategy

Plaintiffs allege that "Grab reversed its incentive reduction strategy just before" the business combination between Altimeter and Grab on December 1, 2021, Am. Compl. ¶¶ 8, 63, that "Grab was actually increasing its incentives" at the time, *id.* ¶ 62.  Plaintiffs point to the fact that, according to the Proxy, Grab spent $1.237 billion on incentives during all of 2020 and $740 million on incentives during the first half of 2021.  *Id.* ¶ 52.  Thus, Plaintiffs allege, Grab spent an average of $309.25 million on incentives during each quarter of 2020 and $370 million on incentives during each of the first two quarters of 2021.  *Id.* ¶¶ 52, 63.  Plaintiffs note that Grab spent $458 million on incentives during the third quarter of 2021 (per the 11/12/21 Press Release) and $583 million on incentives during the fourth quarter of 2021 (per the 3/3/22 Press Release).  *See* 11/12/21 Press Release; 3/3/22 Press Release.  Plaintiff therefore argue that, "[alt]hough not disclosed in the [Proxy], by Q4 2021, Grab was paying quarterly incentives that were more than 90% higher year-over-year."  Am. Compl. ¶ 63.

Plaintiffs further contend that "[t]he massive boost in incentives cannot be explained by increased business, because there was also a large rise in incentives paid as a percentage of GMV."  *Id.* ¶ 64.  Plaintiffs allege that "incentives as a percent of GMV held steady at 10% throughout 2020 and Q1/Q2 2021," but then rose to 11.45 percent in the third quarter of 2021 and 13.38 percent in the fourth quarter of 2021.  *Id.*  The increase from 10 percent to 13.38 percent, Plaintiffs argue, represents "a 33.8% increase in just two quarters."  *Id.*  The figures for each quarter of 2020 and the first two quarters of 2021 come from dividing the amount spent in 2020 by four and the amount spent in the first half of 2021 by two, respectively, while the figures for the last two quarters of 2021 come from Grab's press releases.  *See id.*

17

According to Plaintiffs, "Grab later conceded that it 'preemptively' ramped incentives in Q4 2021 (at the time Grab went public) in reaction to a decline in driver-partners it experienced in Q3 2021." *Id.* ¶ 65. Plaintiffs further allege that "[c]onsumers also complained bitterly about driver shortages, and the resulting cancellations and surge pricing, just before Grab went public." *Id.*; *see id.* (citing, as examples, an editorial in a Malaysian online news publication and two posts on Reddit). Plaintiffs then point to the incentives of up to SGD 300 offered for referrals of new drivers (discussed above), and state: "Plaintiffs are informed and believe that this and other increased partner incentives occurred in the beginning of Q4 2021, before Grab went public, because: (a) Grab conceded it was done 'preemptively' in reaction to a Q3 driver decline rather than waiting until the end of Q4; and (b) as discussed [above], Grab was also ramping consumer incentives in the beginning two months of Q4 2021, before the IPO." *Id.* ¶ 66.

Plaintiffs allege that "[m]arket analysts understood the importance of Grab's incentives to its business." *Id.* ¶ 62. "As a UBS analyst report dated December 9, 2021 explained, '[d]river incentive is primarily a tool to increase and maintain the size of its online driver pool, which is aimed at managing rider churn, improving efficiency and amplifying its networking effect.'" *Id.* (alteration in original). The UBS report "emphasized the importance of limiting consumer and driver incentives, and based on the [information in the Proxy], described them as 'in check.'" *Id.* Specifically, the report stated that Grab "has managed to keep incentives (for consumers and drivers) in check while sales & marketing costs have declined as % of GMV from 1.9% in 2019 to 1.2% in 2020. While sequential volatility in margins is possible, especially as economies reopen in 2022 and the company accelerates spending on marketing, we expect the two core segments to improve margins with economies of scale." *Id.*

18

## II.  Procedural History

On March 16, 2022, Vincenzo Peccarino filed a putative class action against Grab, Tan, and Oey, asserting one cause of action under Section 10(b) and Rule 10b-5 and a second cause of action under Section 20(a).  ECF No. 1.  On April 21, 2022, Si Fan filed a putative class action against Grab, Tan, and Oey, also asserting one cause of action under Section 10(b) and Rule 10b-5 and a second cause of action under Section 20(a).  Complaint, *Fan v. Grab Holdings Ltd.*, No. 22-cv-03277 (VM) (S.D.N.Y. filed Apr. 21, 2022).  On June 7, 2022, Judge Marrero consolidated the two actions and appointed Plaintiffs to serve as co-lead plaintiffs.  ECF Nos. 38-39.

Plaintiffs filed the Amended Complaint on August 22, 2022.  Am. Compl.  On September 23, 2022, the case was reassigned to the undersigned.  Defendants jointly moved to dismiss the Amended Complaint on November 18, 2022.  Br.  The motion is fully briefed.  ECF Nos. 91 (attorney declaration), 92 ("Opp."), 93 ("Reply"); *see also* ECF Nos. 94, 101-02 (letters regarding supplemental authority).  The parties requested oral argument via notations on their briefs.  The Court held oral argument on March 7, 2024.  Mar. 7, 2024 Oral Arg. Tr. ("Tr.").

### LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A court accepts a complaint's factual allegations as true and draws all reasonable inferences in favor of the plaintiff.  *DeCarlo*, 80 F.4th at 168.  Still, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely

19

consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). A court may also consider a document, even if not incorporated into the complaint or subject to judicial notice, if "the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint," so long as there is no dispute about the document's "authenticity or accuracy." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (further quotation marks and citations omitted).

## DISCUSSION

### I.    Statutory and Regulatory Overview

"Together, the Securities Act of 1933 and the Securities Exchange Act of 1934 form the backbone of American securities law." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 762 (2023) (citations omitted). The Court begins by describing the relevant provisions of each.

Section 11 of the Securities Act gives purchasers of registered securities "a right of action against an issuer or designated individuals (directors, partners, underwriters, and so forth) for material misstatements or omissions in registration statements." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2015). "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v.*

20

*Huddleston*, 459 U.S. 375, 382 (1983) (footnote omitted); *accord Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (Section 11 "imposes strict liability on issuers and signatories, and negligence liability on underwriters").  Thus, Section 11 claims "do not require a showing of scienter, reliance, or loss causation." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).  Further, "unless they are premised on allegations of fraud," Section 11 claims "need not satisfy the heightened particularity requirements" of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)").  *Panther Partners*, 681 F.3d at 120.  Likewise, the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") do not "apply to such non-fraud claims." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156 (2d Cir. 2012).

Section 10(b) of the Exchange Act and Rule 10b-5 "prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).  To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (citation omitted).  Such claims must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA.  *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166 (2d Cir. 2021).  Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  "To do so, a plaintiff must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Synchrony*, 988 F.3d at 167 (quotation marks and citation omitted).  For its part, the PSLRA provides that "the complaint shall specify each

21

statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  The PSLRA also requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2).

Section 14(a) of the Exchange Act "makes it unlawful to solicit proxies in contravention of any rule or regulation promulgated by the SEC."  *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993).  Rule 14a-9 prohibits the issuance of a proxy statement which is "false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).  To state a claim under Section 14(a) and Rule 14a-9, "a shareholder must, at the very least, identify a materially misleading misrepresentation or omission in the proxy materials."  *St. Clair-Hibbard v. Am. Fin. Tr., Inc.*, 812 F. App'x 36, 38 (2d Cir. 2020) (summary order).  "[T]here is no requirement in the Second Circuit that plaintiffs allege fraud in order to state a cause of action pursuant to Section 14(a)," and mere negligence is enough.  *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 506 (S.D.N.Y. 2019) (further brackets and citation omitted).  But if a plaintiff asserts a Section 14(a) claim premised on allegations of fraud, Rule 9(b) applies.  *See id.*[2]

---

[2] Although the Second Circuit "has not directly addressed the issue, courts have generally concluded that Section 14(a) allegations must identify with precision any misleading statements or omitted material facts pursuant to the PSLRA," even if the claim sounds merely in negligence.  *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 557 (S.D.N.Y. 2017).  Plaintiffs have satisfied that requirement for their Section 14(a) claims, as well as for their Section 10(b) claims discussed below.

Thus, claims under Section 11, Section 10(b), and Section 14(a) "have somewhat different elements, but all of them share the common requirement that the plaintiff identify 'a materially misleading statement made by the defendant.'" *In re N.Y. Cmty. Bancorp, Inc., Sec. Litig.*, 448 F. Supp. 2d 466, 477 (E.D.N.Y. 2006) (quoting *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 57-58 (2d Cir. 1996) (per curiam)).  The standard for establishing a material misrepresentation or omission is the same under each provision.  *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (announcing the materiality standard applicable to Section 14(a) and Rule 14a-9 claims); *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988) ("We now expressly adopt the *TSC Industries* standard of materiality for the § 10(b) and Rule 10b-5 context."); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) ("[T]he definition of 'materiality' under § 11 of the Securities Act is the same as under § 10(b) of the Exchange Act."); *Chen v. Missfresh Ltd.*, --- F. Supp. 3d ----, 2023 WL 7289750, at *11 n.7 (S.D.N.Y. Nov. 6, 2023) ("[T]he existence (or non-existence) of a duty to disclose the omitted information . . . is analyzed the same under both statutes.").

"At the pleading stage, a plaintiff satisfies the materiality requirement by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *DeCarlo*, 80 F.4th at 182 (ellipsis and citation omitted).  Put otherwise, there must be a "substantial likelihood" that the statement or omission "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quotation marks and citation omitted).

"[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor." *Omnicare*, 575 U.S. at 186.  "The inquiry (like the one into materiality) is objective," *id.* at 187, and it considers not only a statement's "literal truth," but also the

23

"context and manner of presentation," *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (citation omitted); *accord In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 105 (2d Cir. 2013). Also, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) (citation omitted). "This duty may arise when a corporate insider trades on confidential information, a statute or regulation requires disclosure, or a statement is made that would be inaccurate, incomplete, or misleading without further context." *In re Synchrony*, 988 F.3d at 167 (brackets, quotation marks, and citation omitted).

## II.  Section 11 and Section 14(a)

Plaintiffs challenge the same statements – namely, those made in the Proxy or incorporated by reference therein – under Section 11 of the Securities Act and Section 14(a) of the Exchange Act. *See* Am. Compl. ¶¶ 119-127, 132-140.  Defendants make the same arguments for dismissing Plaintiffs' claims under both provisions. *See* Br. at 10-22.  The Court therefore addresses the claims together.

### A.  Applicable Pleading Standard

Defendants argue that Plaintiffs' Section 11 and Section 14(a) claims sound in fraud and therefore are subject to the heightened pleading standards of Rule 9(b). *See* Br. at 10, 21. The Court rejects this argument because Plaintiffs' Section 11 and Section 14(a) claims do not sound in fraud.[3]

It is "black-letter law in this Circuit that, in order to determine whether the particularity requirements of Rule 9(b) apply in a given case, courts must undertake 'a case-

---

[3] Defendants also argue that, insofar as Plaintiffs' Section 11 and Section 14(a) claims sound in fraud, Plaintiffs must allege scienter for those claims. *See* Br. at 16, 21.  Given the Court's holding that Plaintiffs' Section 11 and Section 14(a) claims do not sound in fraud, the Court need not consider the scienter issue.

by-case analysis of particular pleadings.'" *In re Orion Sec. Litig.*, No. 08-cv-01328 (RJS), 2009 WL 2601952, at *1 (S.D.N.Y. Aug. 20, 2009) (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007)).  Courts generally consider four factors in determining whether claims sound in fraud, namely, whether: (1) "the complaint contains merely a blanket disclaimer" that the plaintiff does not allege fraud for purposes of the claim; (2) "the allegations themselves include classic fraud language"; (3) the complaint includes a non-fraudulent basis for the claim alleged; and (4) the complaint separates the factual allegations supporting the fraud claims and negligence claims.  *In re NIO, Inc. Sec. Litig.*, No. 19-cv-01424 (NGG), 2021 WL 3566300, at *5 (E.D.N.Y. Aug. 12, 2021) (citation omitted).

*In re Refco* is instructive.  In that case, the complaint asserted claims under Sections 11, 12, and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act.  503 F. Supp. 2d at 622-23.  The defendants argued that the Section 11 claims "sound[ed] in fraud, and [we]re therefore subject to a higher pleading standard."  *Id.* at 631.  The court held that "[t]his argument [wa]s without merit."  *Id.*  The court observed that the complaint was "carefully structured so as to draw a clear distinction between negligence and fraud claims. The Securities Act claims [we]re found in the first half of the complaint," while "the Exchange Act allegations, which include[d] allegations of fraud by some – but not all – of the defendants named in the Securities Act claims, [we]re found in the second half of the complaint."  *Id.* at 632.  To be sure, "[t]he Securities Act section of the complaint allege[d] various untrue or misleading statements in [several documents].  As to the defendants' intent, however, these claims [we]re carefully couched in the language of negligence."  *Id.*  "The relevant factual allegations [we]re contained in a section called 'Defendants' Negligence,' which allege[d] exactly that."  *Id.* (citation omitted).  And "Defendants ha[d] pointed to no allegations in the Securities Act section of the complaint that contain[ed] even a hint of

25

fraud." *Id.* Altogether, the "plaintiffs ha[d] done more than disclaim fraud; they ha[d] specifically pl[ead]ed alternate theories of fraud and negligence." *Id.* at 633.

Other courts in this District have applied *In re Refco*'s approach. *See, e.g.*, *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 558 (S.D.N.Y. 2017) (collecting cases in which "courts have consistently held that Section 11 and Section 14(a) are subject to notice pleading where, as here, the division between the claims is clear"); *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11-cv-02700 (PKC), 2012 WL 3957916, at *9 (S.D.N.Y. Sept. 10, 2012) ("In this case, plaintiffs have structured the amended complaint in a manner that mirrors the structure discussed in *Refco* . . . . Therefore, plaintiffs adequately distinguish their Securities Act claims, relieving them of the heightened pleading requirements of Rule 9(b)."); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 424-25 (S.D.N.Y. 2011) (similar); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 374-75 (S.D.N.Y. 2011) (similar); *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 116 (S.D.N.Y. 2010) (similar). The Court finds this approach sound and applies it here.

The Section 11 and Section 14(a) claims in the Amended Complaint sound in negligence, not fraud. The Amended Complaint contains more than "merely a blanket disclaimer that the plaintiffs do not allege fraud for the purposes of the [Section 11 and Section 14(a)] claims." *In re NIO*, 2021 WL 3566300, at *5 (citation omitted). Instead, the Amended Complaint is "carefully structured so as to draw a clear distinction between negligence and fraud claims." *In re Refco*, 503 F. Supp. 2d at 632. The allegations specific to Plaintiffs' fraud-based claims under Section 10(b) and Section 20(a) are confined to a section titled "Additional Facts Alleged Only With Respect To [Plaintiffs' Section 10(b) and Section 20(a) Claims]." Am. Compl. at 36 (further capitalization and emphasis omitted); *see id.* ¶¶ 96-110 (fraud-specific allegations); *id.* ¶ 119 (in support of Section 11 claim, "Plaintiffs

26

restate and reallege Paragraphs 1 through 95 and 111 through 116 as though fully set forth herein"); *id.* ¶ 128 (same for Section 15 claim); *id.* ¶ 132 (same for Section 14(a) claim); *EnergySolutions*, 814 F. Supp. 2d at 424 (plaintiffs "provided additional scienter allegations limited to the Exchange Act claims in a separate section after the Securities Act claims").  For Plaintiffs' Section 11 and Section 14(a) claims, all references to Defendants' intent "are carefully couched in the language of negligence."  *In re Refco*, 503 F. Supp. 2d at 632; *see, e.g.*, Am. Compl. ¶ 2 ("The merger was effected through a defective and negligently prepared proxy and registration statement registered with the SEC pursuant to the Securities Act on Form F-4."); *id.* ¶ 9 ("Because the Defective Proxy/Registration Statement was negligently prepared, it did not accurately inform investors of critical information.").[4]

That the Amended Complaint also allege violations of Item 303 of Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), *see* Am. Compl. ¶¶ 88-90, does not require a different conclusion.  As discussed below, Item 303 "requires the registrant's actual knowledge of the relevant trend or uncertainty."  *Ind. Pub. Emps.' Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016).  But just because "a fact was known and not disclosed does not mean, as a matter of law, that the circumstances of the resulting omission sound in fraud."  *Wallace v. IntraLinks*, No. 11-cv-08861 (TPG), 2013 WL 1907685, at *12 (S.D.N.Y. May 8, 2013) (quoting *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 513 (S.D.N.Y. 2010)).

With the pleading standard established, the Court turns to the statements at issue.

---

[4] *In re HEXO Corp. Securities Litigation*, 524 F. Supp. 3d 283 (S.D.N.Y. 2021), cited by Defendants, *see* Br. at 10 n.7, is distinguishable.  There, the claims under the Securities Act and the Exchange Act "[we]re almost a mirror image of one another."  524 F. Supp. 3d at 299 n.17 (quotation marks and citation omitted).  The same is not true here because (among other reasons) only pre-merger statements underlie Plaintiffs' Section 11 and Section 14(a) claims, while only post-merger statements underlie Plaintiffs' Section 10(b) claims.

### B. Proxy Portions 1, 2, 3, and 4

Proxy Portions 1, 2, 3, and 4 discussed Grab's use of incentives in attracting drivers and consumers; these sections also noted that Grab might increase its incentives in the future and that, if Grab were to do so, it could negatively impact Grab's profitability. Proxy Portion 1 stated that "achieving profitability will require Grab . . . to continue to grow and scale its business, manage promotion and incentive spending, improve monetization, reduce marketing and other spending[,] and increase consumer spending." Proxy at 56. It added: "As Grab has achieved greater scale, it has and *may continue* to seek to reduce incentives." *Id.* (emphasis added). Proxy Portion 2 stated that "Grab has paid significant amounts of incentives to attract new driver and merchant partners and consumers," and that Grab "may continue to do so in the future." *Id.* at 59. Proxy Portion 2 added: "*If* Grab is unable to reduce the amount of incentives it pays over time relative to the commissions and fees it receives, it will likely impact Grab's ability to . . . continu[e] as a going concern or achiev[e] or maintain[] profitability." *Id.* (emphasis added). Proxy Portion 3 stated that "Grab's success in a given geographic market depends on its ability to increase the [number of drivers] and the number of consumers transacting through its platform." *Id.* at 67. Proxy Portion 3 added, however, that if driver-partners are not attracted to the Grab platform or choose to offer their services elsewhere, "Grab *may* lack a sufficient supply of driver-partners to attract and retain consumers and merchant-partners to the Grab platform." *Id.* at 68 (emphasis added). Proxy Portion 3 further explained that, "*[t]o the extent* that Grab experiences driver-partner supply constraints in a given market, Grab *may* need to increase, or *may* not be able to reduce, the driver-partner incentives that Grab offers." *Id.* (emphases added). In the same vein, Proxy Portion 4 stated that a "decreased supply" of drivers "*could* harm [Grab's] business, financial condition, results of operations[,] and prospects." *Id.* at 90 (emphasis added). According to

28

Plaintiffs, Proxy Portions 1, 2, 3, and 4 "were materially false and misleading when made because: (a) at the time Grab was *already* experiencing driver shortages in key markets; (b) these shortages were *already* negatively affecting operations at the time the statements were made; (c) Grab at the time was *already* increasing partner incentives (including referral incentives) to combat the driver supply constraint; and (d) as a result, the [Proxy] did not accurately portray Grab's then-current financial situation or its business prospects." Am. Compl. ¶ 73 (further emphasis omitted) (discussing Proxy Portion 3); *see id.* ¶ 75 (same for Proxy Portion 4); *id.* ¶ 71 (similar for Proxy Portion 1); *id.* ¶ 79 (similar for Proxy Portion 2); *see also, e.g.*, Opp. at 1-2, 5-6, 8-11.

Accepting the factual allegations in the Amended Complaint as true and making all reasonable inferences in favor of Plaintiffs, the Court agrees. "It is well-established precedent in this Circuit that once a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information on the issue or topic." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (brackets, quotation marks, and citation omitted). "Revealing one fact about a subject does not trigger a duty to reveal all facts on the subject," *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 402 (S.D.N.Y. 2019) (brackets and citation omitted), but a speaker must not "omit material facts whose omission, in the light of what was stated, would be misleading," *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020); *see, e.g.*, *id.* at 214 & n.15 ("[B]ecause in July 2017 Omega had stated that Orianna was making 'partial monthly payments,' Omega was duty-bound to disclose that its loan was the source of Orianna's rent payments. . . . [B]y putting Orianna's rental payments 'in play,' Defendants were required to speak accurately and completely." (citations omitted)); *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 ("Although this statement [in the prospectus] warned of a financial risk to the

company from environmental violations, the failure to disclose then-ongoing and serious pollution violations would cause a reasonable investor to make an overly optimistic assessment of the risk.  A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."); *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002) ("Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete."); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 612 (S.D.N.Y. 2017) ("Having chosen to speak about specific features of its business model and the advantages it offered, ITG had an obligation to ensure its statements were both accurate and complete, even if it lacked an independent duty to discuss the information in the first place." (quotation marks and citation omitted)).

Proxy Portions 1, 2, 3, and 4 discussed the importance of incentives in attracting drivers and consumers, as well as the profitability issues that would arise if Grab were unable to decrease its use of incentives or if Grab's driver pool were to shrink.  *See* Proxy at 56, 59, 67-68, 90.  Defendants "put the[se] issue[s] 'in play,'" so they had "a duty to tell the whole truth." *Meyer*, 761 F.3d at 250 & n.3 (citation omitted).  Yet as Plaintiffs allege, Defendants did not "tell the whole truth," *id.* at 250, because Defendants did not disclose that, at the time that the Proxy was issued, Grab "was *already* experiencing driver shortages in key markets," that "these shortages were *already* negatively affecting operations," and that Grab "was *already* increasing partner incentives . . . to combat the driver supply constraint," Am. Compl. ¶ 73 (further emphasis omitted).  Therefore, drawing all reasonable inferences in favor of Plaintiffs and accepting well-pleaded factual allegations as true, Defendants omitted information that they had a duty to disclose.

Defendants contest this conclusion on seven grounds.  The Court rejects all seven.

30

First, Defendants argue, in effect, that nothing stated in Proxy Portions 1, 2, 3, and 4 was literally untrue.  *See, e.g.*, Br. at 11-12, 14; Tr. at 12:20-21, 13:24-25.  But "the law is well settled that so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims" under the securities laws.  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021) (citation omitted); *accord Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 551 (S.D.N.Y. 2021) ("An entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it materially misleading." (brackets, ellipsis, and citation omitted)); *In re Facebook, Inc., IPO Sec. & Derivatives Litig.*, 986 F. Supp. 2d 428, 466 (S.D.N.Y. 2013) ("A statement can also be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact." (citation omitted)).  Therefore, although the literal truth of Proxy Portions 1, 2, 3, and 4 is relevant, it is not dispositive.[5]

Second, Defendants assert that the Proxy "disclosed that Grab had experienced driver supply constraints, that it may need to increase incentives to combat such constraints, and that '[t]here can be no assurance that Grab will be successful' in 'adapt[ing] to changing circumstances' relating to the impacts of COVID-19, 'including by maintaining and optimizing utilization of its driver-partner base.'"  Br. at 14 (brackets in original; citation

_____

[5] *Yaroni v. Pintec Technology Holdings Ltd.*, 600 F. Supp. 3d 385 (S.D.N.Y. 2022), cited by Defendants, *see* Br. at 12, is not on point.  In *Yaroni*, the plaintiff "argu[ed] that the Registration Statement was materially false and misleading because it indicated that '[the defendant] recorded technical service fee revenues in compliance with [generally accepted accounting principles] on a gross basis.'"  600 F. Supp. 3d at 401.  The court rejected this argument as "simply inaccurate" because a "review of the Complaint and the Registration Statement reveal[ed] no such claim, and [a] [p]laintiff cannot base a Section 11 claim on implicit promises read into the offering materials."  *Id.* (quotation marks and citation omitted).  Here, Plaintiffs do not contend that Defendants made any "implicit promises."  *Id.* (citation omitted).  Rather, Plaintiffs argue that "Defendants' statements falsely described the trend in incentives at the time" that the statements were made, and specifically that incentives were "significantly increasing."  Opp. at 11 (emphasis omitted).

omitted); *see also id.* at 20-21 (similar).  But "cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."  *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) (brackets omitted) (quoting *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)); *accord Meyer*, 761 F.3d at 251 ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability [of that risk coming to pass].").  As another court in this District recently and cogently explained: "[I]f a company is warning investors about future risks and the company's efforts to deal with them, a reasonable investor would infer that those risks have not yet happened.  If the 'risk' has already happened or is then happening, the company has a duty to say so.  Omitting that information makes the statements misleading."  *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, No. 22-cv-06978 (AS), 2024 WL 456745, at *2 (S.D.N.Y. Feb. 5, 2024) (citations omitted).  That is precisely what Plaintiffs allege happened here.

It is also no saving grace for Defendants that the Proxy "revealed that incentives had increased in the *third* quarter," Tr. at 9:21-22 (emphasis added), because Plaintiffs plausibly allege and argue that Defendants failed to disclose the issues with driver shortages and incentive spending that befell Grab during the *fourth* quarter, *see, e.g.*, Am. Compl. ¶ 9 ("[The Proxy] did not accurately disclose that . . . in Q4 2021 Grab significantly increased its consumer incentives, including large discounts for ride hailing consumers to offset increased pricing stemming from the lack of drivers and a 'blockbuster' incentive providing massive discounts to food delivery customers."); Opp. at 11 ("Grab also massively boosted consumer incentives during the first two months of Q4 2021.  By choosing to address incentives and the expected, continued decreases in the [Proxy], Defendants were legally obligated to make complete and accurate disclosures, *i.e.*, truthfully disclose that Grab's driver and consumer

32

incentives were actually then ballooning." (quotation marks and citations omitted)); Tr. at 17:21-18:15 (similar). Especially considering Grab's reduction in spending on incentives (both in total and as a percentage of GMV) during the two-year period running through the first half of 2021, Am. Compl. ¶ 52; Tr. at 13:17-21, the Court cannot conclude as a matter of law that the disclosure of Grab's third-quarter financial results freed Defendants from having to warn that its fourth-quarter results would be even worse.

Third, Defendants argue that Plaintiffs have not established that Defendants were under a "legal obligation to disclose" the "metrics concerning the ongoing Q4 [2021]" in the Proxy. Br. at 16-17. The Court disagrees. It is true that, generally, "there is no duty to disclose a fact in the offering documents merely because a reasonable investor would very much like to know that fact." *Meyer*, 761 F.3d at 250 (quotation marks and citation omitted). As the Court has explained, however, by putting the issues of driver retention and incentive amounts in play, Defendants assumed "a duty to tell the whole truth." *Id.* at 250.[6]

Fourth, Defendants argue that although "Plaintiffs complain that the [Proxy] disclosures were misleading because Grab 'already' was suffering from driver shortages in Q3, causing it to increase partner incentives," "the Complaint lacks any coherent pleading that these alleged circumstances existed at the time of the [Proxy], or when or to what degree those

---

[6] Defendants note that "courts have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress." Br. at 17 (quoting *In re Coty Inc. Sec. Litig.*, No. 14-cv-00919 (RJS), 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016) (quoting *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 540 (S.D.N.Y. 2010))). The Court declines Defendants' implicit invitation to convert this practical hesitancy into a *de facto* absolute rule. Notably, the principal justification for this reluctance is the concern that a change in data "may be passing or momentary," and thus "not . . . a 'trend' for purposes of the disclos[ur]es required by Item 303." *In re AppHarvest Sec. Litig.*, --- F. Supp. 3d ----, 2023 WL 4866233, at *43-44 (S.D.N.Y. July 31, 2023) (citation omitted); *see id.* at *44 (collecting Item 303 cases, including *In re Focus Media*). This rationale, grounded in the meaning of "trend" as used in Item 303 – a regulation that the Court separately addresses below – does not self-evidently apply with equal force to claims not involving Item 303.

33

circumstances affected Grab." Br. at 12-13. The factual allegations recounted above – including, but not limited to, the Amended Complaint's specific references to multiple major promotions predating the issuance of the Proxy – refute Defendants' position. Defendants also cite no authority to support their insistence that, at the pleading stage, Plaintiffs needed to "quantify the financial impact of those incentives" or expansively detail "how they compared to incentives offered in other regions." *Id.* at 14.

Fifth, Defendants contest the accuracy of the Amended Complaint's allegations regarding Grab's quarterly spending on incentives: "Instead of depicting the actual numbers by quarter, the [Amended] Complaint takes the total incentives for the year [of 2020], divides by four, and presents the quotient as the 'quarterly' incentives. By mathematically eliminating quarterly fluctuations, this methodology all but guarantees a false level of consistency for every quarter, except Q3 and Q4 2021 (reported on a quarterly basis)." *Id.* at 8 n.5. But surely it is a *reasonable* inference, absent any indication to the contrary, that the amount Grab spent on incentives during each quarter of 2020 was one-fourth of what it spent on incentives during all of 2020, and that the amount Grab spent on incentives during the first two quarters of 2021 was one-half of what it spent on incentives during the first half of 2021.

To be sure, if Plaintiffs' general allegations were contradicted by "more specific allegations or documentary evidence," the latter would control. *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011); *accord In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 529 (S.D.N.Y. 2010). But Defendants point the Court to no such allegations or evidence here. Thus, at the pleading stage, Plaintiffs enjoy the benefit of reasonable inferences rooted in "simple computations." *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 273 (S.D.N.Y. 2014); *see N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 125 (2d Cir. 2013) ("Discovery may reveal that the

34

actual facts support the inferences drawn by the [defendants], rather than those drawn by the [plaintiff]. But that has no bearing on the question before us. . . . [W]e ask only whether the facts alleged in the [complaint], taken as true, allow us to draw the 'reasonable inference' that the [at-issue] offering documents contained misstatements and omissions." (quoting *Iqbal*, 556 U.S. at 678)).

In any event, the Court notes that Plaintiffs' back-of-the-envelope calculations for spending on incentives during the third and fourth quarters of 2020 are borne out by Defendants' own documents. For example, the 11/12/21 Press Release states that, during the third quarter of 2020, Grab spent $264 million on incentives ($132 million on partner incentives and $132 million on consumer incentives). *See* 11/12/21 Press Release. Likewise, the 3/3/22 Press Release states that, during the fourth quarter of 2020, Grab spent $288 million on incentives ($126 million on partner incentives and $162 million on consumer incentives). *See* 3/3/22 Press Release. For comparison, the Amended Complaint alleges that Grab spent $309.25 million on incentives during each quarter of 2020. Am. Compl. ¶¶ 52, 63. Thus, if anything, Plaintiffs' estimates *understate* the degree of the increase in spending on incentives between the last two quarters of 2020 and the last two quarters of 2021.

Sixth, Defendants argue that the challenged statements in Proxy Portions 1, 2, 3, and 4 are forward-looking statements protected under the PSLRA's safe-harbor provision and/or the bespeaks-caution doctrine. "Two doctrines – one statutory, the other judge-made – protect certain forward-looking statements from serving as the basis for claims of securities fraud." *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 597 (S.D.N.Y. 2022) (citation omitted), *aff'd sub nom. Tseng v. De Vries*, No. 22-2787, 2023 WL 8073087 (2d Cir. Nov. 21, 2023) (summary order). "First, the Private Securities Litigation Reform Act of 1995 creates a statutory 'safe harbor' for certain statements." *Id.* (brackets and citation omitted). "Second,

35

courts have long protected forward-looking statements, even those made in connection with an IPO, under the bespeaks-caution doctrine." *Id.* (citation omitted). In support of its position that the PSLRA's safe harbor for certain forward-looking statements applies, Defendants' sole argument is that the statements at issue "were accompanied by meaningful cautionary disclosures." Br. at 15. Similarly, under the bespeaks-caution doctrine, a forward-looking statement is not actionable if it is "accompanied by sufficient cautionary language." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010).

The Court assumes without deciding that all of the statements at issue in Proxy Portions 1, 2, 3, and 4 were forward-looking statements. Even so, those portions of the Proxy were not accompanied by meaningful cautionary language, and therefore they are not protected under either the PSLRA or the bespeaks-caution doctrine. "[C]autionary language that is misleading in light of historical fact cannot be meaningful." *Slayton v. Am. Express Co.*, 604 F.3d 758, 770 n.5 (2d Cir. 2010). Put otherwise, and as already noted, "cautionary words about *future risk* cannot insulate from liability the failure to disclose that the *risk has transpired*." *Wilson*, 671 F.3d at 130 (brackets and citation omitted; emphases added); *accord Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 16-cv-03591 (GHW), 2020 WL 1877821, at *11 (S.D.N.Y. Apr. 14, 2020) ("To offer [an] analogy, the bespeaks caution doctrine will not protect a defendant from liability for a disclosure that a house may be at an increased risk of fire damage if the house is already on fire."). Here, Plaintiffs plausibly allege that Grab "couched [the risks of losing drivers and increasing incentives] as theoretical when the adverse events had actually occurred at the time of the [de-SPAC transaction]." Opp. at 16; *see, e.g.*, Am. Compl. ¶¶ 73, 77, 79. Hence, neither the PSLRA safe harbor nor the bespeaks-caution doctrine protects Grab's statements in Proxy Portions 2, 3, and 4.

36

Seventh, Defendants argue that Plaintiffs have failed to plead materiality. *See* Br. at 18 (contending that Plaintiffs have failed to show that "there is a substantial likelihood that the disclosure of the omitted information would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" (brackets, quotation marks, and citation omitted)); *id.* at 19-21 (section titled "No Material Information Was Omitted"). But "materiality is a mixed question of law and fact, rarely resolved at the motion to dismiss stage." *Setzer*, 968 F.3d at 213 n.12. Materiality "can be decided on a motion to dismiss only if 'reasonable minds cannot differ on the question of materiality.'" *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 101 (2d Cir. 2021) (quoting *TSC Indus.*, 426 U.S. at 450); *accord In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 439 (S.D.N.Y. 2009).

Simply put, Defendants make no persuasive argument that "reasonable minds cannot differ on the question of [the] materiality" of the allegedly omitted information, especially since it concerned a potentially significant drain on Grab's largest sources of revenue. *Danske Bank*, 11 F.4th at 101 (citation omitted). At the very least, it is plausible that "a reasonable investor would have considered" Grab's failure to disclose a significant uptick in spending on incentives to be "significant in making investment decisions." *DeCarlo*, 80 F.4th at 182 (citation omitted).

*Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31 (2d Cir. 2017), cited by Defendants, *see* Br. at 16, 18, does not require a different result. In *Stadnick*, the plaintiffs alleged that the defendants had violated Section 11 by "failing to disclose the 2014 third quarter financial information in its registration statement, which was issued the day after the third quarter ended." *Id.* at 36. In rejecting that contention, the Second Circuit emphasized (among other things) the other information about the company's financial performance that was already

37

available "in the public domain," such that the alleged omissions did not alter "the total mix of information" available to investors. *Id.* at 38. Defendants point to no comparable public-domain information about Grab's business operations that investors could consider here, such that the undisclosed information about driver shortages and the increased use of incentives could be deemed immaterial. Also, because the undisclosed metrics in *Stadnick* were "consistent with a pattern of fluctuation that began with the first quarter of 2013" – a year and a half before the defendants issued the registration statement at issue – a "reasonable investor . . . would not have harbored any solid expectations based on prior performance as to [the company's] third quarter 2014 performance as measured by the [undisclosed] metrics." *Id.* A reasonable investor would have different expectations here, given the reductions in incentives (both in total and as a percentage of GMV) during the two-year period (through the first half of 2021) that Grab trumpeted in the Proxy. *See* Am. Compl. ¶¶ 52-53.

In sum, Plaintiffs have sufficiently alleged that Proxy Portions 1, 2, 3, and 4 contained material misstatements and omissions.

### C.  Proxy Portion 5

Proxy Portion 5 stated that "[r]evenue was $157 million for the three months ended September 30, 2021, down 9% year-over-year, as a result of the decline in mobility due to the severe lockdowns in Vietnam." Proxy at 338. According to Plaintiffs, Proxy Portion 5 was "materially false and misleading when made" because it failed to disclose that "Grab's driver supply was then constrained," that "Grab's declining mobility revenue was not limited to Vietnam, and was not caused exclusively by lockdowns and restrictions in that region," and that "Grab was rapidly increasing both consumer and partner incentives at the time, and thus eroding margins." Am. Compl. ¶¶ 86-87.

38

The Court disagrees.  Plaintiffs "do not allege that the financial numbers [in Proxy Portion 5] were manipulated in any way – just that [Proxy Portion 5] failed to simultaneously disclose" that the supply of drivers was constrained, that this issue existed beyond Vietnam, and that Grab was increasing margins.  *Danske Bank*, 11 F.4th at 99; *see* Opp. at 13 n.9 (the Amended Complaint "does not challenge the accuracy of Grab's reported financial results").  But "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data."  *Danske Bank*, 11 F.4th at 99 (citation omitted); *accord Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004) (summary order) ("Accurate statements about past performance are self evidently not actionable under the securities laws."); *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 211 (S.D.N.Y. 2019) ("Multitudes of case law in this district foreclose any argument that accurate statements about past performance could be actionable under the securities laws.").

Plaintiffs suggest that Proxy Portion 5's reference to the Vietnam lockdowns was an actionable half-truth because it indicated that "revenue declines were caused by Vietnam, while omitting that a driver shortage and skyrocketing incentives were the real problems and destroyed Grab's margins, as Grab later admitted."  Opp. at 13 n.9.  To be sure, "[t]he words 'as a result of' plainly suggest causation."  *Paroline v. United States*, 572 U.S. 434, 445 (2014); *see* Proxy at 338 ("Revenue was $157 million for the three months ended September 30, 2021, down 9% year-over-year, *as a result of* the decline in mobility due to the severe lockdowns in Vietnam." (emphasis added)).  A reasonable investor, however, would not interpret Proxy Portion 5 as stating that the Vietnam lockdowns were the *sole* cause of the decline in revenue.  *See Omnicare*, 575 U.S. at 186 ("whether a statement is 'misleading' depends on the perspective of a reasonable investor").  Rather, a reasonable investor would understand Proxy Portion 5 as stating that the Vietnam lockdowns were a *leading* cause.  And

39

although Plaintiffs assert that "a driver shortage and skyrocketing incentives were the real problems [as opposed to the issues in Vietnam]," they cite no allegations in the complaint (other than the paragraph quoting Proxy Portion 5) to support this proposition. Opp. at 13 n.9 (citing Am. Compl. ¶ 70); *see Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 354 F. Supp. 3d 375, 382 (S.D.N.Y. 2018) ("Statements of counsel . . . in a brief, of course, are not evidence."). Thus, Proxy Portion 5's mention of the Vietnam lockdowns was not an actionable half-truth.

### D. Proxy Portion 6

The first two sentences of Proxy Portion 6 described how, "[d]uring the initial stages of growth, [Grab] offered significant incentives and promotions," "conducted advertising activities," and "invested in research and development and other operating expenses to support the growth of our platform." Proxy at 344. The last sentence of Proxy Portion 6 added: "Going forward, with increasing scale and synergies on our platform, we expect to enjoy economies of scale, which we expect will allow us to more efficiently and cost effectively acquire new platform consumers and engage existing consumers." *Id.*

Plaintiffs allege that the statements in Proxy Portion 6 "were materially false and misleading when made because they omitted to disclose that: (a) Grab's significant incentives were not simply 'during the initial stages of growth' but were being re-implemented at the time even in markets where Grab's services were well-established; (b) Grab's 'scale and synergies' were not at the time functioning as explained in these statements, because despite higher scale and synergies Grab did not experience an ability in Q3 2021 and Q4 2021 to 'more efficiently and cost effectively acquire new platform consumers and engage existing consumers'; (c) high incentives were still needed to attract consumers and drivers; and (d) as a

result, the [Proxy] did not accurately portray Grab's then-current financial situation or its business prospects." Am. Compl. ¶ 75. The Court is not persuaded.

The first two sentences of Proxy Portion 6 – discussing Grab's practices "[d]uring the initial stages of growth"– are not actionable primarily because they appear to be (and Plaintiffs do not dispute that they are) accurate descriptions of Grab's actions during those "initial stages." Proxy at 344. The general rule is that "accurate statements of historical fact are nonactionable." *DoubleLine*, 413 F. Supp. 3d at 211 (ellipsis and citation omitted); *see, e.g.*, *In re AstraZeneca plc Sec. Litig.*, No. 21-cv-00722 (JPO), 2022 WL 4133258, at *7 (S.D.N.Y. Sept. 12, 2022) ("Plaintiffs have identified only accurate statements describing the launch and historical progression of the Phase II/III clinical trials. . . . Such statements are not actionable; they merely recite historical fact." (quotation marks and citation omitted)), *aff'd sub nom. Nandkumar v. AstraZeneca PLC*, No. 22-2704, 2023 WL 3477164 (2d Cir. May 16, 2023) (summary order); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 586 (S.D.N.Y. 2016) ("QRX's statements that it had received the CRL, that it had been granted a meeting with the FDA, and that the FDA had requested additional information regarding Study 022, are all accurate statements of objective historical facts. They are not at all misleading."). So too here.

Meanwhile, the last sentence of Proxy Portion 6 is non-actionable puffery. "Puffery encompasses statements that are too general to cause a reasonable investor to rely upon them and thus cannot have misled a reasonable investor. They are statements that lack the sort of definite positive projections that might require later correction." *In re Vivendi*, 838 F.3d at 245 (brackets, quotation marks, and citations omitted); *accord Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018) ("The key distinction between these [statements of mere puffery] and potentially actionable statements is that these

41

statements [of mere puffery] were non-verifiable."), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (summary order).  Generally, "expressions of puffery . . . do not give rise to securities violations."  *Rombach*, 355 F.3d at 174; *see Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173-74 (2d Cir. 2020) ("We have found puffery . . . actionable only when the speaker knew that the contrary was true." (quotation marks and citation omitted)); *see also In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-06278 (CM), 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018) ("Whether a representation constitutes mere puffery depends, in part, on the context in which it was made.").

As pleaded, the statement at issue here – that, with "increasing scale and synergies on [its] platform, [Grab] expect[s] to enjoy economies of scale" and "more efficiently and cost effectively acquire new platform consumers and engage existing consumers," Proxy at 344 – are what some courts in this District have labeled "declarations of intention," *Gillis*, 197 F. Supp. 3d at 593 (brackets and citation omitted).  Such statements – "general[ly]" phrased, "delivered in corporate jargon," and "relat[ing] to future expectations," *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 400 (S.D.N.Y. 2020) (citation omitted) – are "a hallmark of inactionable puffery" where, as here, "they are too broad and nebulous to be material," *Gillis*, 197 F. Supp. 3d at 593 (brackets and citation omitted), they "are not worded as guarantees," and "there are no allegations that defendants did not reasonably believe them," *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015).

Indeed, the challenged statement in Proxy Portion 6 is comparable to other general declarations that courts have deemed non-actionable puffery.  *See, e.g.*, *In re AppHarvest Sec. Litig.*, --- F. Supp. 3d ----, 2023 WL 4866233, at *33 n.12 (S.D.N.Y. July 31, 2023) (statement that "we believe we can staff and retain our workers with less churn, immigration

challenges[,] and unfilled positions that many of our competitors face" was puffery); *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 523-24 (S.D.N.Y. 2020) (statements that "[a]s we build those volumes up, those are products that will get scalable margins," and that defendant was "feeling very good about the ability to retain price and the customers feeling good about getting value," were puffery), *aff'd sub nom. Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, No. 21-2698, 2022 WL 17587853 (2d Cir. Dec. 13, 2022) (summary order); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019) (statement that defendant intended to "be laser-like in our pursuit of cost synergies" and "turn[] over every rock to get those synergies that are out there for the taking" was puffery); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 748, 757-58 (S.D.N.Y. 2018) (statements in November 2015 that "[w]e are proud of the fact that 2.5 years later we believe that we are on track to have these products . . . reach the market in 2016," and that "[w]e very much look forward to launching these products next year," were puffery (original brackets omitted)); *Gillis*, 197 F. Supp. 3d at 593 (statement that defendant "inten[ds] to pursue an 'aggressive commercialisation strategy'" was puffery); *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 648 (S.D.N.Y. 2015) ("China Gerui's statements about its fiscal strategy, including, for example, that the Company would 'remain fiscally disciplined with its cash resources given the working capital intensive nature of its business,' are generalizations about its fiscal discipline that are usually considered non-actionable.  Moreover, Plaintiff makes no allegations that China Gerui made specific commitments regarding its fiscal strategy or guaranteed that its cash holdings would not be utilized such that these statements would be actionable.  Accordingly, statements about China Gerui's fiscal strategy are best considered non-actionable puffery." (brackets and citations omitted)).

Thus, Proxy Portion 6 does not contain an actionable misstatement or omission.

### E.  8/2/21 Press Release

The 8/2/21 Press Release stated that "excess driver, merchant and consumer incentives . . . are expected to continue to decline over time as Grab's business matures."  8/2/21 Press Release.  According to Plaintiffs, "[t]hat statement was materially false and misleading when made because it omitted to disclose that Grab was actually then increasing both driver and consumer incentives, even though its business was maturing."  Am. Compl. ¶ 80.

The Court holds that this statement in the 8/2/21 Press Release was protected by the bespeaks-caution doctrine.[7]  Under the bespeaks-caution doctrine, a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading."  *MF Glob.*, 620 F.3d at 141.  The question thus becomes (1) whether this statement in the 8/2/21 Press Release was a forward-looking statement, and (2) if so, whether it was accompanied by sufficient cautionary language.

The Court first holds that this statement in the 8/2/21 Press Release was a forward-looking statement.  "As a general rule, statements whose truth cannot be ascertained until some time after the time they are made are forward-looking statements."  *In re Philip Morris Int'l, Inc. Sec. Litig.*, 89 F.4th 408, 428 (2d Cir. 2023) (quotation marks and citation omitted).  Under this standard, the statement in the 8/2/21 Press Release was a forward-looking statement because it addressed what was expected to happen "over time."  8/2/21 Press Release; *see Gissin v. Endres*, 739 F. Supp. 2d 488, 507 (S.D.N.Y. 2010) (statements "cast in predictive terms . . . are by definition forward-looking").

---

[7] Because the Court relies on the bespeaks-caution doctrine, the Court need not decide whether the PSLRA's safe-harbor provision would protect Defendants here.

The Court also holds that the 8/2/21 Press Release was accompanied by sufficient cautionary language.  "A forward-looking statement is accompanied by meaningful cautionary language when it 'conveys substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements.'" *Steamship Trade Ass'n of Balt.-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, --- F. Supp. 3d ----, 2023 WL 8287681, at *7 (S.D.N.Y. Nov. 30, 2023) (brackets omitted) (quoting *Slayton*, 604 F.3d at 771).  The 8/2/21 Press Release instructed readers to consult the Draft Proxy's risk-factors discussion.  8/2/21 Press Release.  In turn, the Draft Proxy warned that Grab may "lack a sufficient supply of driver-partners" and that Grab therefore "may need to increase, or may not be able to reduce, the driver-partner incentives that Grab offers."  Draft Proxy at 56.  Hence, the 8/2/21 Press Release (when read together with the language in the Draft Proxy) sufficiently warned that excess incentives may, in fact, *not* "decline over time." 8/2/21 Press Release; *see also In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 378 (S.D.N.Y. 2018) ("When defendants warn investors of a potential risk, they need not predict the precise manner in which the risks will manifest themselves." (brackets and citation omitted)).

To be clear, as the Court held above, similar language in the final version of the Proxy did not support applying the bespeaks-caution doctrine because Plaintiffs plausibly allege that, by the time of the Proxy's final publication on November 19, 2021, Grab was already increasing its use of incentives in response to a driver shortage.  Yet although Plaintiffs flatly assert that Grab was "increasing both driver and consumer incentives" as of August 2, 2021, Am. Compl. ¶ 80, the Amended Complaint lacks sufficient allegations to make that conclusion plausible.  Therefore, although an omission-based theory of falsity is tenable for the final version of the Proxy, the same is not true for the earlier 8/2/21 Press Release.

45

### F.  9/13/21 Conference Call

None of the statements during the 9/13/21 Conference Call was actionable.  Tan's remarks, quoted above, were "quite general, delivered in corporate jargon, and relate[d] to future expectations.  A reasonable investor would not rely on them.  Accordingly, they are non-actionable puffery."  *Evoqua*, 450 F. Supp. 3d at 400 (quotation marks and citation omitted); *accord In re Synchrony*, 988 F.3d at 173 ("[G]eneric statements about [a company's] overall business model do not invite reasonable reliance.  They are simply too generic to express any objective fact." (quotation marks and citation omitted)); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) ("JPMC's statements were merely generalizations regarding JPMC's business practices.  Such generalizations are precisely the type of puffery that this and other circuits have consistently held to be inactionable." (quotation marks and citation omitted)).

The claims based on Oey's statements fare no better.  During the 9/13/21 Conference Call, Oey discussed various statistics relating to Grab's financial performance.  As explained above with respect to Proxy Portion 5, "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data."  *Danske Bank*, 11 F.4th at 99 (citation omitted).  "Whatever the scope of the responsibility not to make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate earnings."  *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) (summary order).  Oey's bookending remarks – that Grab "continue[s] to demonstrate strong trends in [its] path to profitability," and that Grab "[w]ill continue to execute sustainable and improving margins despite challenges in the operating environment," 9/13/21 Conference Call – were non-actionable puffery because they were "too general to cause a reasonable investor to rely upon them and thus cannot have misled a reasonable

investor," *In re Vivendi*, 838 F.3d at 245 (quotation marks and citations omitted); *see, e.g.*, *In re AT&T/DirecTV Now*, 480 F. Supp. 3d at 523-24 (corporation described its video-streaming service as "attractive" and "starting strong" and "really fast"; corporation also cited its "unique position" potentially to bundle its service with other services to "gain customers and grow revenues" and "continue quality margins and profit expansion"; court held that these and other similar statements were non-actionable puffery); *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 223 (E.D.N.Y. 2019) ("broad characterizations of [the defendant's] vendor relationships as 'strong,' 'positive,' and 'great'" were "statements that amount[ed] to puffery").

Altogether, the remarks during the 9/13/21 Conference Call provide no basis for suit.

### G.  11/12/21 Press Release

The 11/21/21 Press Release reported that "[r]evenue was $157 million, down 9% YoY, as a result of the expected decline in mobility due to the severe lockdowns in Vietnam." 11/21/21 Press Release.  It also quoted Tan as stating that "[d]espite severe lockdowns in Vietnam and heightened restrictions across the region in the third quarter due to COVID-19, we executed well on our superapp strategy and delivered strong growth."  *Id.*

For the reasons stated above regarding the virtually identical statement in Proxy Portion 5, the first sentence at issue in the 11/21/21 Press Release was not actionable.  As for the second sentence, it is non-actionable puffery because Tan's claim that Grab "executed well on [its] superapp strategy and delivered strong growth," *id.*, was "too general to cause a reasonable investor to rely upon [it]," *In re Vivendi*, 838 F.3d at 245 (citation omitted).

### H.  Item 303

Item 303 required the Proxy to:

47

> Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

17 C.F.R. § 229.303(b)(2)(ii); *see* Opp. at 17-18; Tr. at 22:8-12. Item 303 requires disclosure "where the trend is both (1) known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." *Stadnick*, 861 F.3d at 39 (quotation marks and citation omitted). Significantly, "Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it *actually knows of* when it files the relevant report with the SEC. It is not enough that it should have known of the existing trend, event, or uncertainty." *SAIC*, 818 F.3d at 95 (emphasis added).

Plaintiffs argue that "by the time the [Proxy] was published, existing driver shortages and incentive increases were already negatively impacting Grab's future financial conditions and results, such that prior results were unlikely to be (and, in fact, were not) indicative of future results. Defendants had an affirmative obligation to disclose these risks and their potential future impact in the P/RS pursuant to Item 303." Opp. at 17-18 (citation omitted).

This argument fails because Plaintiffs do not allege sufficient facts supporting the reasonable inference that management "actually kn[ew]" about these trends "when it file[d] [the Proxy] with the SEC." *SAIC*, 818 F.3d at 95. Notably, the most direct allegations of actual knowledge in the Amended Complaint are concentrated in the portions specific to Plaintiffs' Section 10(b) claims and their scienter requirement. *See* Am. Compl. ¶¶ 105, 107-110, 143-144, 150-151. In contrast, the allegations pertaining to Plaintiffs' Section 11 and Section 14(a) allege merely that, "[i]n the exercise of reasonable care, [certain] Defendants

48

*should have known* of the material misstatements and omissions contained in the [Proxy]." *Id.* ¶ 123; *see also, e.g.*, *id.* ¶¶ 124-125. At most, Plaintiffs summarily allege that the Proxy "omitted the following known adverse trends that were not only 'reasonably likely' but virtually certain to have a material adverse effect on Grab's financial condition or results: (a) a known decline in the supply of drivers; (b) a known material increase in partner incentives (both in the absolute and as a percentage of GMV); and (c) a known material increase in consumer incentives (both in the absolute and as a percentage of GMV)." *Id.* ¶ 90. But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Iqbal*, 556 U.S. at 678. To the extent that Plaintiffs seek to resuscitate the inference of actual knowledge in their brief, both cases that they cite are distinguishable. *See* Opp. at 20 (citing *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019); *In re CPI Card Grp. Inc. Sec. Litig.*, No. 16-cv-04531 (LAK), 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017)). As Plaintiffs' own parentheticals make clear, the facts supporting an inference of knowledge in those cases were stronger and more specific than those alleged here. *See id.* (in *Lexmark*, "defendants tracked inventory and saw data at monthly meetings"; in *In re CPI*, there was an "admission of knowledge soon after IPO, statements on [the] topic in earnings calls, and [the] account of one confidential witness").[8]

---

[8] The Court also notes that the lengths of the undisclosed "trends" (as defined for purposes of Item 303) were longer in Plaintiffs' cited cases than the alleged undisclosed "trend" here. *See Lexmark*, 367 F. Supp. 3d at 35 ("The length of this alleged nine-month trend is sufficiently distinguishable from Defendants' cited authorities, where plaintiffs' allegations concerned time periods as brief as two to five months or would have required near-instantaneous disclosure."); *In re CPI*, 2017 WL 4941597, at *1, 3 & n.38 ("plaintiffs here allege that the trend began in the first half of 2015" and continued until the company's IPO in mid-October 2015). This difference in length – although potentially less salient outside the Item 303 context, *see supra* note 6 – is relevant to the issue of actual knowledge for purposes of an Item 303 claim.

* * *

To conclude, Plaintiffs sufficiently allege that Proxy Portions 1, 2, 3, and 4 contain material misstatements and omissions. But Plaintiffs do not sufficiently allege that the other pre-merger statements contain material misstatements and omissions. Plaintiffs also do not successfully allege a violation of Item 303. Therefore, the Court grants in part and denies in part Defendants' motion to dismiss Plaintiffs' claims under Section 11 and Section 14(a).

### III. Section 10(b) Claims

Under Section 10(b) and Rule 10b-5, Plaintiffs challenge only the post-merger statements – that is, Tan's statements during the Squawk Box interview and Maa's statements during the Fortune interview. Opp. at 21-25; Tr. at 16:10-12. Defendants argue that none of the identified statements was materially false or misleading. *See* Br. at 22-23. The Court agrees, so it declines to reach Defendants' additional arguments about scienter and loss causation. *See id.* at 23-25; *see, e.g.*, *In re Philip Morris*, 89 F.4th at 417 (declining to address scienter because plaintiffs failed to successfully plead falsity); *Danske Bank*, 11 F.4th at 98 n.2 (same); *Singh*, 918 F.3d at 62 (same).

Tan's statements on Squawk Box were non-actionable puffery. Tan's reference on Squawk Box to "strong" mobility margins is non-actionable for the same reasons that his claim of "strong" growth in the 11/21/21 Press Release was non-actionable. Plaintiffs allege no facts suggesting that Tan's statement that Grab's delivery business was at "break even" in the majority of Grab's markets was false when made. And nothing in the Squawk Box interview put Grab's alleged struggles with driver recruitment (and attendant increase in spending on incentives) "in play." *Meyer*, 761 F.3d at 250 n.3 (citation omitted).

Maa's remarks during the interview with Fortune were non-actionable as well. Plaintiffs do not argue that Maa's statements that Grab "posted [its] third consecutive quarter

50

of record GMV growth" during the third quarter of 2021, that Grab's "margins [we]re industry-leading" in the mobility sector, or that Grab's delivery business "[wa]s already breaking even in a majority of [its] markets" were untrue.  Am. Compl. ¶ 100.  Meanwhile, Maa's claims that Grab "made very good strides on improving [its] economics" and that its "mobility segment has been positive since Q4 2019," *id.*, were "too broad and nebulous to be material," *Gillis*, 197 F. Supp. 3d at 593.

Plaintiffs correctly note that Maa's statement "directly responded to [the interviewer's] question about incentive costs and profitability."  Opp. at 22.  Plaintiffs also point to two cases holding that certain statements "were made to reassure investors" and therefore could not "be dismissed as 'mere puffery.'"  *Wash. State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 74 (S.D.N.Y. 2020); *see also In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015).  Neither decision, however, established a *per se* rule that every statement made in response to an analyst's question, no matter how vacuous or jargon-laden that statement might be, is actionable.  Rather, the courts in those cases considered the statements in context.  *See In re Vivendi*, 838 F.3d at 250 ("The test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself, but whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor." (quotation marks and citation omitted)).

Moreover, the facts of each case are distinguishable.  In *Odebrecht*, the plaintiff "allege[d] that, in several offering memoranda, [the] [d]efendants describe a 'competitive bidding process' that did not exist."  461 F. Supp. 3d at 73.  Significantly, "the statements about competitive bidding were made in reference to other statements [made by the defendants] about an increasingly competitive business environment."  *Id.*  The court thus concluded that the statements at issue "were made to reassure investors as to specific risks

51

regarding international competition, and accordingly they cannot be dismissed as 'mere puffery.'" *Id.* at 74. In *Odebrecht*, however, these "other statements" were more detailed than Maa's surrounding remarks here, which largely sound in puffery. *Compare id.* at 73, *with* Am. Compl. ¶ 100. It is also notable that the statements in *Odebrecht* were included in offering documents, whereas Maa's statements were made during a live interview. Without question, spoken statements (like written statements) are subject to the securities laws. *See, e.g.*, *In re Synchrony*, 988 F.3d at 167-70 (statement during earnings call was actionable). But as the Supreme Court has explained, "whether an omission makes an expression of opinion misleading always depends on context. Registration statements as a class are formal documents, filed with the SEC as a legal prerequisite for selling securities to the public. Investors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments, of the kind that an individual might communicate in daily life." *Omnicare*, 575 U.S. at 190. Given the comparatively "off-the-cuff" nature of Maa's interview, *id.*, the Court is reticent to expand *Odebrecht*'s holding beyond the bounds of statements made in official documents filed with the SEC.

In *In re Petrobras*, the plaintiffs alleged that the defendant "repeatedly represented that it maintained effective internal controls and procedures, when in fact those controls and procedures suffered from material weaknesses." 116 F. Supp. 3d at 375. The court emphasized the context in which the alleged misrepresentations were made and concluded that because "the statements were made repeatedly in an effort to reassure the investing public about the [defendant's] integrity, a reasonable investor could rely on them as reflective of the [defendant's] true state of affairs." *Id.* at 381. There, too, the statements were made in formal documents submitted to the SEC rather than in extemporaneous remarks. *See, e.g.*, Consolidated Am. Compl. ¶¶ 164, 184, 198, 251-252, 260, *In re Petrobras Sec. Litig.*, 116 F.

52

Supp. 3d 368 (S.D.N.Y. 2015) (No. 14-cv-09662 (JSR)), ECF No. 109; *see Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (citation omitted)).  Further, the "repeated[]" assurances in *In re Petrobras*, 116 F. Supp. 3d at 381, contrast with Maa's singular statement here, *see* Am. Compl. ¶ 100.

Thus, the Court grants Defendants' motion to dismiss Plaintiffs' claim under Section 10(b) and Rule 10b-5.

## IV.    Derivative-Liability Claims

"Section 15 [of the Securities Act] imposes liability on those who control persons or entities found to have violated [Section] 11." *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 135 n.1 (2d Cir. 2013).  Likewise, "Section 20(a) of the Exchange Act provides that individual executives, as 'controlling persons' of a company, are secondarily liable for their company's violations of the Exchange Act." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (brackets and citation omitted).

Defendants argue only that Plaintiffs' controlling-person claims should be dismissed because the primary-violation claims fail.  *See* Br. at 25.  Plaintiffs likewise tie the success of their controlling-person claims to the success of their primary-violation claims.  *See* Opp. at 25.  The Court therefore dismisses the portions of Plaintiffs' Section 15 and Section 20(a) claims premised on statements identified above as non-actionable.  The Court otherwise declines to dismiss these claims.

## V.    Leave to Amend

Plaintiffs request that, if the Court dismisses some or all of the claims in the Amended Complaint, the Court grant leave to amend their complaint.  *See id.* at 25 n.17.  Defendants

53

request that the Court dismiss the Amended Complaint with prejudice.  *See, e.g.*, Br. at 1.  The Court grants Plaintiffs' request and denies Defendants' request.

A court "should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2).  "This permissive standard is consistent with [the Second Circuit's] strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam) (quotation marks and citation omitted).  Of course, "it is within the sound discretion of the district court" to deny leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (citation omitted).  But "in the absence of a valid rationale like undue delay or futility, it is improper to simultaneously dismiss a complaint with prejudice under Rule 12(b)(6) and deny leave to amend when the district court has not adequately informed the plaintiffs of its view of the complaint's deficiencies." *Mandala v. NTT Data, Inc.*, 88 F.4th 353, 363 (2d Cir. 2023).

The Court grants Plaintiffs leave to amend within twenty-one (21) days of the date of this opinion and order.  Plaintiffs have not "repeated[ly] fail[ed] to cure deficiencies by amendments previously allowed." *Foman v. Davis*, 371 U.S. 178, 182 (1962).  And the Court has no reason to conclude that Plaintiffs have unduly delayed or acted in bad faith, that granting leave to amend would unduly prejudice Defendants, or that granting leave to amend would be futile. *See Broidy*, 944 F.3d at 447.

## CONCLUSION

For the foregoing reasons, the motion to dismiss the Amended Complaint is GRANTED IN PART and DENIED IN PART.  The Clerk of Court is respectfully directed to terminate the pending motion at ECF No. 89.  Plaintiffs may file an amended complaint within **twenty-one (21) days** of this opinion and order.  If Plaintiffs decides not to file an

54

amended complaint, then the parties shall meet, confer, and jointly submit a proposed case-management plan within **thirty (30) days** of this opinion and order.

Dated:  March 12, 2024
        New York, New York

                                        SO ORDERED.

                                        _Jennifer Rochon_
                                        _____
                                        JENNIFER L. ROCHON
                                        United States District Judge

# Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE GRAB HOLDINGS LIMITED SECURITIES LITIGATION | Case No. 1:22-cv-02189-JLR<br><br>**PROTECTIVE ORDER** |

JENNIFER L. ROCHON, United States District Judge:

WHEREAS all of the parties to this action (collectively, the "Parties," and individually, a "Party") request that this Court issue a protective order pursuant to Federal Rule of Civil Procedure 26(c) to protect the confidentiality of certain nonpublic and confidential material that will be exchanged pursuant to and during the course of discovery in this case;

WHEREAS, the Parties, through counsel, agree to the following terms;

WHEREAS, the Parties acknowledge that this Protective Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords only extends to the limited information or items that are entitled, under the applicable legal principles, to confidential treatment;

WHEREAS, the Parties further acknowledge that this Protective Order does not create entitlement to file confidential information under seal; and

WHEREAS, in light of these acknowledgements, and based on the representations of the Parties that discovery in this case will involve confidential documents or information the public disclosure of which will cause harm to the producing person and/or third party to whom a duty of confidentiality is owed, and to protect against injury caused by dissemination of confidential documents and information, this Court finds good cause for issuance of an appropriately tailored confidentiality order governing the pretrial phase of this action;

IT IS HEREBY ORDERED that any person subject to this Protective Order – including without limitation the Parties to this action, their representatives, agents, experts and consultants, all third parties providing discovery in this action, and all other interested persons with actual or constructive notice of this Protective Order – shall adhere to the following terms:

1.      Any person subject to this Protective Order who receives from any other person subject to this Protective Order any "Discovery Material" (*i.e.*, information of any kind produced or disclosed pursuant to and in course of discovery in this action) that is designated as "Confidential" pursuant to the terms of this Protective Order (hereinafter "Confidential Discovery Material") shall not disclose such Confidential Discovery Material to anyone else except as expressly permitted hereunder.

1

2.      The person producing any given Discovery Material may designate as Confidential only such portion of such material the public disclosure of which is either restricted by law or will cause harm to the business, commercial, financial or personal interests of the producing person and/or a third party to whom a duty of confidentiality is owed and that consists of:

(a) previously nondisclosed financial information (including without limitation profitability reports or estimates, percentage fees, design fees, royalty rates, minimum guarantee payments, sales reports, and sale margins);

(b)  previously nondisclosed material relating to ownership or control of any non-public company;

(c) previously nondisclosed business plans, product development information, marketing plans, or any other commercially sensitive or proprietary commercial information;

(d)  previously nondisclosed material relating to proprietary trading strategies or securities holdings or trading of any kind, whether actual or contemplated;

(e) any information of a personal or intimate nature regarding any individual;

(f) any information required to be kept confidential pursuant to a contractual obligation or the laws of any jurisdiction (foreign or domestic); or

(g) any other category of information hereinafter given confidential status by the Court.

3.      With respect to the Confidential portion of any Discovery Material other than deposition transcripts and exhibits, the producing person or that person's counsel may designate such portion as "Confidential" by: (a) affixing the legend "Confidential" to each page (or its image, if produced electronically) containing any Confidential Discovery Material or, in the case of ESI produced in native format, audio files, or video files, by including "Confidential" in the file or directory name; and, where Discovery Material is only partially confidential, (b) conferring with the receiving party regarding appropriate redactions to said Discovery Material with the confidential information redacted at the time any party desires to publicly disclose or file the Discovery Material.

4.      With respect to deposition transcripts, a producing person or that person's counsel may designate such portion as Confidential either by (a) indicating on the record during the deposition that a question calls for Confidential information, in which case the reporter will bind the transcript of the designated testimony (consisting of question and answer) in a separate volume and mark it as "Confidential Information Governed by Protective Order"; or (b) notifying the reporter and all counsel of record, in writing, within 30 days after a deposition has concluded, of the specific pages and lines of the transcript and/or the specific exhibits that are to be designated Confidential, in which case all counsel receiving the transcript will be responsible for marking the copies of the designated transcript or exhibit

2

(as the case may be), in their possession or under their control as directed by the producing person or that person's counsel by the reporter. During the 30-day period following the conclusion of a deposition, the entire deposition transcript will be treated as if it had been designated Confidential.

5.      If at any time prior to the trial of this action, a producing person realizes that some portion(s) of Discovery Material that she, he, or it had previously produced without limitation should be designated as Confidential, she, he, or it may so designate by so apprising all prior recipients of the Discovery Material in writing, and thereafter such designated portion(s) of the Discovery Material will thereafter be deemed to be and treated as Confidential under the terms of this Protective Order.

6.      No person subject to this Protective Order other than the producing person shall Disclose any of the Discovery Material designated by the producing person as Confidential to any other person whomsoever, except to:

(a) the Parties to this action any agents thereof who are assisting with or making decisions concerning this Action; and the Parties' insurers and counsel to their insurers;

(b) counsel retained specifically for this action, including any paralegals, clerical and other assistants, and other regular and temporary employees employed by such counsel and assigned to this matter;

(c) outside vendors or service providers (such as copy-service providers and document-management consultants, graphic production services or other litigation support services) that counsel hire and assign to this matter, including computer service personnel performing duties in relation to a computerized litigation system;

(d) any mediator or arbitrator, and their staff,  that the Parties engage in this matter or that this Court appoints, provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto;

(e) as to any document, its author, its addressee, and any other person indicated on the face of the document or an accompanying communication as having received a copy or, in the case of meeting minutes, an attendee of the meeting;

(f) any witness who counsel for a Party in good faith believes may be called to testify at trial or deposition in this action, provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto;

(g) any person retained by a Party to serve as an expert witness or consultant or otherwise provide specialized advice to counsel in connection with this action, provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto, and partners, associates, paralegals,

3

secretaries, clerical, regular and temporary employees, and service vendors of such experts or consultants (including outside copying services and outside support services) who are assisting with the Action;

(h) stenographers and videographers engaged to transcribe depositions conducted in this action; and

(i) this Court, including any appellate court, and the court reporters and support personnel for the same.

7.    Prior to any disclosure of any Confidential Discovery Material to any person referred to in subparagraphs 6(d), 6(f) or 6(g) above, such person shall be provided by counsel with a copy of this Protective Order and shall sign a Non-Disclosure Agreement in the form annexed as an Exhibit hereto stating that that person has read this Protective Order and agrees to be bound by its terms. Said counsel shall retain each signed Non-Disclosure Agreement, hold it in escrow, and produce it to opposing counsel either prior to such person being permitted to testify (at deposition or trial) or at the conclusion of the case, whichever comes first.

8.    Any Party who objects to any designation of confidentiality may at any time prior to the trial of this action serve upon counsel for the designating person a written notice stating with particularity the grounds of the objection. If the Parties cannot reach agreement promptly, counsel for all Parties will address their dispute to this Court in accordance with Paragraph 2(E) of this Court's Individual Practices in Civil Cases. While such an application is pending, the Discovery Material or testimony in question shall be treated as confidential Discovery Material pursuant to this Protective Order.

9.    Any Party who requests additional limits on disclosure (such as "attorneys' eyes only" in extraordinary circumstances) may at any time prior to the trial of this action serve upon counsel for the receiving Party a written notice stating with particularity the grounds for the request. If the Parties cannot reach agreement promptly, counsel for all Parties will address their dispute to this Court in accordance with Paragraph 2(E) of this Court's Individual Practices in Civil Cases.

10.    A Party may be requested to produce Discovery Material that is subject to contractual or other obligations of confidentiality owed to a third party. Within five business days of receiving the request or becoming aware that a request calls for such information, the receiving Party subject to such obligation shall inform the third party of the request and that the third party may seek a protective order or other relief from this Court. If neither the third party nor the receiving Party seeks a protective order or other relief from this Court within 21 days of that notice, the receiving Party shall produce the information responsive to the discovery request but may affix the appropriate controlling designation.

11.    Recipients of Confidential Discovery Material under this Protective Order may use such material solely for the prosecution and defense of this action and any appeals thereto, and specifically (and by way of example and not limitations) may not use Confidential Discovery Material for any business, commercial, or competitive purpose.

4

Nothing contained in this Protective Order, however, will affect or restrict the rights of any person with respect to its own documents or information produced in this action. Nor does anything contained in this Protective Order limit or restrict the rights of any person to use or disclose information or material obtained independently from and not through or pursuant to the Federal Rules of Civil Procedure.

12.    Nothing in this Protective Order will prevent any person subject to it from producing any Confidential Discovery Material in its possession in response to a lawful subpoena or other compulsory process, or if required to produce by law or by any government agency having jurisdiction, provided, however, that such person receiving a request, will provide written notice to the producing person before disclosure and as soon as reasonably possible, and, if permitted by the time allowed under the request, at least 10 days before any disclosure. Upon receiving such notice, the producing person will have the right to oppose compliance with the subpoena, other compulsory process, or other legal notice if the producing person deems it appropriate to do so.

13.    All persons seeking to file redacted documents or documents under seal with the Court shall follow Rule 4(B) of this Court's Individual Practices in Civil Cases. No person may file with the Court redacted documents or documents under seal without first seeking leave to file such papers. All persons producing Confidential Discovery Material are deemed to be on notice that the Second Circuit puts limitations on the documents or information that may be filed in redacted form or under seal and that the Court retains discretion not to afford confidential treatment to any Confidential Discovery Material submitted to the Court or presented in connection with any motion, application or proceeding that may result in an order and/or decision by the Court unless it is able to make the specific findings required by law in order to retain the confidential nature of such material. Notwithstanding its designation, there is no presumption that Confidential Discovery Material will be filed with the Court under seal. The Parties will use their best efforts to minimize such sealing.

14.    All persons are hereby placed on notice that the Court is unlikely to seal or otherwise afford confidential treatment to any Discovery Material introduced in evidence at trial or supporting or refuting any motion for summary judgment, even if such material has previously been sealed or designated as Confidential.

15.    Any Party filing a motion or any other papers with the Court under seal shall also publicly file a redacted copy of the same, via the Court's Electronic Case Filing system, that redacts only the Confidential Discovery Material itself, and not text that in no material way reveals the Confidential Discovery Material.

16.    Each person who has access to Discovery Material that has been designated as Confidential shall take all due precautions to prevent the unauthorized or inadvertent disclosure of such material.

17.    Any Personally Identifying Information ("PII") (*e.g.*, social security numbers, financial account numbers, passwords, and information that may be used for identity theft) exchanged in discovery shall be maintained by the persons who receive such information and are bound by this Protective Order in a manner that is secure and confidential. In the event

5

that the person receiving PII experiences a data breach, she, he, or it shall immediately notify the producing person of the same and cooperate with the producing person to address and remedy the breach. Nothing herein shall preclude the producing person from asserting legal claims or constitute a waiver of legal rights or defenses in the event of litigation arising out of the receiving person's failure to appropriately protect PII from unauthorized disclosure.

18.     This Protective Order shall survive the termination of the litigation. Within 30 days of the final disposition of this action, all Discovery Material designated as "Confidential," and all copies thereof, shall be promptly returned to the producing person, or, upon permission of the producing person, destroyed.

19.     All persons subject to this Protective Order acknowledge that willful violation of this Protective Order could subject them to punishment for contempt of Court. This Court shall retain jurisdiction over all persons subject to this Protective Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

SO STIPULATED AND AGREED.

Dated: April 30, 2024

**LEVI & KORSINSKY, LLP**

By: /s/ *Shannon L. Hopkins*
Shannon L. Hopkins
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Fax: (212) 363-7171
shopkins@zlk.com

-and-

**POMERANTZ LLP**

Joshua B. Silverman
Brian P. O'Connell
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Fax: (312) 377-1184
jbsilverman@pomlaw.com
boconnell@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor

**SKADDEN, ARPS, SLATE, MEAGHER, & FLOM LLP**
By: /s/ *Lara A. Flath*

Susan L. Saltzstein
Lara A. Flath
Jeffrey S. Geier
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000
susan.saltzstein@skadden.com
lara.flath@skadden.com
jeffrey.geier@skadden.com
*Attorneys for Grab and the Grab Individuals*

**ROPES & GRAY LLP**

/s/ *Amy Jane Longo*
David B. Hennes
Amy Jane Longo
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000

New York, New York 10016
Telephone: (212) 661-1100
Fax: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
*Attorneys for Co-Lead Plaintiffs*

Fax: (212) 596-9090
David.Hennes@ropesgray.com
Amy.Longo@ropesgray.com
*Attorneys for the Altimeter*
*Individuals*

SO ORDERED.

Dated:    May 1, 2024
        New York, New York

*Jennifer Rochon*
JENNIFER L. ROCHON
United States District Judge

7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE GRAB HOLDINGS LIMITED SECURITIES LITIGATION | 1:22-cv-02189 (JLR) **NON-DISCLOSURE AGREEMENT** |

JENNIFER L. ROCHON, United States District Judge:

        I, _____ , acknowledge that I have read and understand the Protective Order in this action governing the non-disclosure of those portions of Discovery Material that have been designated as Confidential. I agree that I will not disclose such Confidential Discovery Material to anyone other than for purposes of this litigation and that at the conclusion of the litigation I will either return all discovery information to the party or attorney from whom I received it, or upon permission of the producing party, destroy such discovery information. By acknowledging these obligations under the Protective Order, I understand that I am submitting myself to the jurisdiction of the United States District Court for the Southern District of New York for the purpose of any issue or dispute arising hereunder and that my willful violation of any term of the Protective Order could subject me to punishment for contempt of Court.

Dated:

8