UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE GRAB HOLDINGS LIMITED SECURITIES LITIGATION | Case No. 1:22-cv-02189-JLR |

**JOINT DECLARATION OF SHANNON L. HOPKINS AND BRIAN P. O'CONNELL IN SUPPORT OF (I) LEAD PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION, AND (II) CO-LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND AWARD TO LEAD PLAINTIFFS**

SHANNON L. HOPKINS and BRIAN P. O'CONNELL, declare as follows:

1.      I, Shannon L. Hopkins, am a partner at the law firm of Levi & Korsinsky, LLP ("Levi & Korsinsky"), counsel for Lead Plaintiff SLG Cloudbank Holdings, LLC ("SLG Cloudbank"), and Co-Lead Counsel for the proposed Settlement Class in the above-captioned action (the "Action").[1]  I am admitted to practice in this District.  I have personal knowledge of the facts stated herein and, if called upon as a witness, I could and would testify competently thereto.

2.      I, Brian P. O'Connell, am of counsel at the law firm of Pomerantz LLP ("Pomerantz"), counsel for Lead Plaintiffs Si Fan and Amit Batra, and Co-Lead Counsel for the proposed Settlement Class in this Action.  I am licensed to practice in the States of Illinois and California, and am admitted *pro hac vice* in this Action.  I have personal knowledge of the facts stated herein and, if called upon as a witness, I could and would testify competently thereto.

3.      We submit this declaration, together with the exhibits thereto, in support of (i) Lead Plaintiffs' unopposed motion, pursuant to Federal Rule of Civil Procedure 23(e), for final approval of the proposed $80,000,000 Settlement for the benefit of the Settlement Class and the proposed plan of allocation of Settlement proceeds (the "Plan of Allocation"); and (ii) Co-Lead Counsel's motion for attorneys' fees in the amount of one-third of Settlement Fund (plus applicable interest thereon), reimbursement of litigation expenses in the total amount of $224,744.92, and awards of $15,000 to each of the three Lead Plaintiffs pursuant to the Private Litigation Reform Act of 1995 ("PSLRA") to reimburse their reasonable time, costs and expenses in representing the Settlement

---

[1] All capitalized terms, unless otherwise defined herein, have the same meaning as set forth in the Stipulation and Agreement of Settlement dated December 30, 2024 (the "Stipulation").  ECF No. 140-1.

Class (the "Fee and Expense Application"). In support of these motions, Lead Plaintiffs and Co-Lead Counsel also submit: (i) the exhibits attached hereto; (ii) the Memorandum of Law in Support of Lead Plaintiffs' Unopposed Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum"); and (iii) the Memorandum of Law in Support of Co-Lead Counsel's Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Award to Plaintiffs (the "Fee Memorandum").

4.     The Court preliminarily approved the proposed Settlement by Order dated January 13, 2025 (the "Preliminary Approval Order"), and thereby directed notice of the Settlement to be disseminated to the Settlement Class. ECF No. 142. Pursuant to the Preliminary Approval Order, A.B. Data, the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Co-Lead Counsel, whereby notice was given to potential Settlement Class Members by email, mail and by publication. The details of the notice program are set forth in the Declaration of Rochelle J. Teichmiller Regarding: (A) Mailing and Emailing of Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("A.B. Data Decl."), a true and correct copy of which is attached hereto as Exhibit 1.

5.     In total, Postcard Notice of the Settlement has been disseminated to 70,229 potential Settlement Class Members, and thus far, only one request for exclusion has been received, and no objections have been filed with the Court. *See* A.B. Data Decl., ¶¶12, 17-18.

I.     **INTRODUCTION**

6.     This is a securities class action asserting claims under (i) Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), and (ii) Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act ("Exchange Act"), and Securities and Exchange Commission ("SEC") Rules 10b-5

2

and 14a-9.[2]  On June 7, 2022, Judge Victor Marrero appointed Si Fan, Amit Batra, and SLG Cloudbank as Co-Lead Plaintiffs ("Lead Plaintiffs") and approved their selection of Pomerantz and Levi & Korsinsky to serve as Co-Lead Counsel.  ECF No. 39.

7.     Lead Plaintiffs' claims were brought on behalf of (i) all persons who purchased or otherwise acquired public shares in Grab Holdings, Limited ("Grab") (including by way of exchange of publicly-listed Altimeter Growth Corp. ("AGC") shares) pursuant or traceable to the proxy/registration statement that Defendants filed with the SEC on Form F-4 on August 2, 2021, and after several amendments, was incorporated into the final prospectus on Form 424(b)(3) filed on November 19, 2021 (the "Proxy/Registration Statement"); (ii) all persons who were solicited to approve the merger between AGC and Grab and who exchanged publicly-listed AGC shares for Grab Class A Ordinary shares rather than redeeming them for the $10 per share redemption price, pursuant to the Proxy/Registration Statement; and (iii) all persons who purchased or otherwise acquired public Grab Class A Ordinary Shares or other public Grab securities between December 2, 2021 and March 3, 2022, inclusive.  Named as Defendants were Grab and certain officers and directors of Grab and AGC.

8.     The Settlement now before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $80,000,000 (the "Settlement Amount") for the benefit of the Settlement Class.  As detailed herein, the proposed Settlement represents a fair and adequate result for the Settlement Class considering the case's procedural posture as well as the significant risks remaining in the Action.

9.     As explained in greater detail herein, this Settlement was reached only after

---

[2] The Court dismissed Lead Plaintiffs' Section 10(b) and 20(a) claims in the Motion to Dismiss Order (defined in ¶9, *infra*).

comprehensive inquiry into the merits of the claims alleged and the likely damages that could be recovered by the Settlement Class.  Co-Lead Counsel's investigation and prosecution of the Action included, among other things:

- Filing a complaint based on, *inter alia*, review and analysis of (a) filings with the SEC by both Grab and AGC; (b) public reports, news articles, and research reports prepared by securities and financial analysts concerning Grab and AGC; (c) transcripts of investor calls conducted by Grab's management; and (d) press releases issued by and about Grab and AGC;

- Filing contested motions for appointment of Lead Plaintiff and Lead Counsel pursuant to PSLRA;

- Conducting a further investigation of the claims asserted in the Action in support of an amended complaint by, *inter alia*, consulting with an expert in market efficiency, loss causation and damages, and working with both domestic and foreign private investigators to interview former Grab employees, drivers, merchants, local regulators, and conduct in-depth investigation of Grab's business in the Southeast Asian countries in which it operated;

- Drafting and filing the detailed Amended Complaint, which included, *inter alia*: (a) new evidence based on information obtained through the use of the private investigator, including through witness interviews and in-depth investigation of Grab and its operations; (b) allegations against eleven additional defendants; (c) an expanded class period; (d) additional false statements; (e) new theories concerning the falsity behind Defendants' statements; (f) two additional substantive claims, for liability under Section 11 of the Securities Act and Section 14(a) of the Exchange Act; and (g) allegations based on additional SEC filings, in particular those incorporated into the allegedly defective proxy/registration statement on Form 425 that Defendants filed with the SEC, as amended, in connection with the "de-SPAC" transaction with AGC pursuant to which Grab became a publicly-traded company;

- Researching, drafting, and filing an opposition to Defendants' joint motion to dismiss the Amended Complaint, which, after oral argument, this Court denied in part and granted in part (ECF No. 103; *In re Grab Holdings Ltd.. Sec. Litig.*, 2024 WL 1076277 (S.D.N.Y. Mar. 12, 2024); the "Motion to Dismiss Order");

- Engaging in substantial discovery, which entailed, *inter alia*: (a) exchanging initial disclosures; (b) exchanging and responding to Party requests for the production of documents; (c) serving ten subpoenas on third parties and negotiating document productions therefrom; (d) negotiating an ESI and search protocol with Defendants, as well as a stipulated Protective Order, pursuant to which Defendants and third parties produced nearly 300,000 pages of documents that Co-Lead Counsel reviewed and analyzed; (e) engaging in extensive meet-and-confer sessions and correspondence

regarding all of the foregoing; (f) producing more than 900 pages of documents from Lead Plaintiffs; and (g) causing to be issued letters rogatory commanding production of information in certain foreign countries;

- Engaging in two full-day mediation sessions overseen by a mediator highly experienced in complex actions, David M. Murphy, Esq., of Phillips ADR Enterprises, which involved an exchange of two detailed mediation submissions concerning the facts of the case, liability, and damages, and consultation with damages experts;

- Preparing a motion for class certification and memorandum in support thereof, which Co-Lead Counsel were ready to file in case a settlement agreement was not reached; and

- Engaging in months of follow-up negotiations with Mr. Murphy and Defendants' Counsel (through Mr. Murphy) following the initial mediation session, that ultimately resulted in a mediator's double-blind recommendation to settle the Action for $80.0 million. *See* Stipulation (ECF No. 140-1), Section I, pp. 1-5.

10.     Based on the foregoing efforts, Lead Plaintiffs and Co-Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of its members.  For all the reasons set forth herein and in the accompanying memoranda and declarations, Lead Plaintiffs and Co-Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

11.     In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable.  As discussed in further detail below, Co-Lead Counsel developed the Plan of Allocation with the assistance of Plaintiffs' consulting damages expert.  The Plan of Allocation provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis.  Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Loss divided by the total Recognized Losses of all

5

Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.

12.    Finally, Co-Lead Counsel seek approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the accompanying motion and Fee Memorandum in support of Co-Lead Counsel's fee application (collectively with the motion, "Attorneys' Fee Motion").  As discussed in detail in the Fee Memorandum, the requested 33⅓% fee is squarely within the range of percentage awards granted by courts in this Circuit in comparable securities class actions.  Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check and warranted in light of the extent and quality of the work performed, the fully contingent nature of the representation, and the substantial result achieved. Likewise, the requested reimbursement of Co-Lead Counsel's out-of-pocket litigation costs of $224,744.92, and of costs pursuant to the PSLRA (including lost wages and time) in the aggregate amount of $45,000 to the three Lead Plaintiffs, are also fair and reasonable.  Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, Co-Lead Counsel respectfully request that the request for attorneys' fees and reimbursement of Litigation Expenses be approved.

## II.    PROCEDURAL HISTORY

### A.  Initial Complaint and Appointment of Lead Plaintiffs and Co-Lead Counsel

13.    On March 16, 2022, a putative securities class action was filed in the United States District Court for the Southern District of New York captioned *Peccarino v. Grab Holdings Limited, et al.*, Case No. 1:22-cv-02189 (S.D.N.Y) (the "*Peccarino* Action") on behalf of persons and entities who purchased or otherwise acquired Grab securities between November 12, 2021 and March 3, 2022, inclusive.  ECF No. 1 at ¶1.  On April 21, 2022, Pomerantz filed a similar securities class action captioned *Si Fan v. Grab Holdings Limited et al.*, Case No. 1:22-cv-03277

6

(S.D.N.Y.) (the "*Fan* Action") in this District seeking the same relief against the same defendants on behalf of persons and entities that purchased or otherwise acquired Grab securities between August 2, 2021 and March 3, 2022, inclusive.  ECF No. 39 at 1.

14.    On May 16, 2022, six movants filed motions for appointment of lead plaintiff and lead counsel, including SLG Cloudbank, and Si Fan and Amit Batra, who moved for appointment of Lead Plaintiff, and their choice of Levi & Korsinsky and Pomerantz, respectively, to serve as lead counsel.  ECF Nos. 17-18, 22, 24, 27-28, 31.

15.    On June 7, 2022, Judge Marrero entered an Order, *inter alia*, consolidating the *Peccarino* and *Fan* Actions under the caption of *In re Grab Holdings Limited Securities Litigation*, appointing Fan, Batra, and SLG as Lead Plaintiffs, and appointing Levi & Korsinsky and Pomerantz as Co-Lead Counsel.  ECF No. 39.

**B.  Amended Consolidated Pleadings and Defendants' Motions to Dismiss**

16.    On August 22, 2022, Lead Plaintiffs filed their detailed Amended Class Action Complaint for Violation of Federal Securities Laws (the "Complaint").  The Complaint was filed after Co-Lead Counsel conducted an extensive investigation of the claims asserted in the Action, including, *inter alia*, consulting with an expert in market efficiency, loss causation and damages, and working with a private investigator to interview former Grab employees, drivers, merchants, local regulators, and conducted an in-depth investigation of Grab's business in the countries in which it operated in Southeast Asia.

17.    As a result of Co-Lead Counsel's investigation, the Complaint included (a) extensive new evidence based on information obtained from witness interviews and an in-depth investigation of Grab and its operations; (b) allegations against eleven additional defendants; (c) an expanded class period; (d) additional false statements; (e) new theories concerning the falsity

behind Defendants' statements; (f) two valuable additional claims for liability under Section 11 of the Securities Act and Section 14(a) of the Exchange Act; and (g) allegations based on additional SEC filings, in particular those incorporated into the allegedly defective proxy/registration statement on Form 425 that Defendants filed with the SEC.

18.    Thus, the Complaint alleged five causes of action: (a) violations of Section 11 of the Securities Act against all Defendants (except Maa)[3] on behalf of all persons who purchased or otherwise acquired public shares in Grab (including by way of exchange of publicly-listed AGC shares pursuant or traceable to the Proxy/Registration Statement (the "Securities Act Class"); (b) violations of Section 15 of the Securities Act against Defendants Tan and Oey on behalf of the Securities Act Class; (c) violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder against Defendants Grab, Gerstner, Siam, Barton, Dozie, and Ittycheria on behalf of all persons who were solicited to approve the merger between AGC and Grab and who exchanged publicly-listed AGC shares for Grab Class A Ordinary Shares rather than redeeming the same pursuant to the Proxy/Registration Statement (the "14(a) Class"); (d) violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder against Defendants Grab, Tan, and Maa, on behalf of all persons who purchased or otherwise acquired public Grab Class A Ordinary Shares or other public Grab securities between December 2, 2021 and March 3, 2022, inclusive (the "10(b) Class"); and (e) violations of Section 20(a) of the Exchange Act against Defendants Tan and Maa on behalf of the 10(b) Class.  ECF No. 58.

19.    On September 26, 2022, the case was reassigned to the Honorable Jennifer L. Rochon.  ECF No. 81.

---

[3] All claims asserted against Maa were dismissed from this Action pursuant to the Motion to Dismiss Order.

8

20.    On November 18, 2022, Defendants jointly moved to dismiss the Complaint, arguing, *inter alia*, that (a) the Section 11 claim failed because all material facts and risks were disclosed in the Proxy/Registration Statement, there was no material misstatement, no material omission and no duty to disclose additional information, and that, at any rate, the alleged undisclosed facts were insufficiently pled; (b) the Section 14(a) claim failed because there was no material misrepresentation or omission and, since the entire Complaint sounded in fraud, Lead Plaintiffs were required to show Defendants' scienter which they failed to do; (c) the Section 10(b) claim failed because Lead Plaintiffs had not alleged a misleading statement or omission, pled scienter with the requisite particularity, or loss causation, and (d) the Section 15 and 20(a) control person claims failed because Lead Plaintiffs had not pled an underlying primary claim, or the Defendants' culpable participation.  ECF Nos. 89-91.

21.    On January 27, 2023, Lead Plaintiffs filed a memorandum in opposition to Defendants' joint motion to dismiss the Complaint, addressing all of Defendants' arguments. ECF No. 92.  On February 27, 2023, Defendants filed a joint reply in further support of their motion to dismiss.  ECF No. 93.  On May 12, 2023, Plaintiffs filed a notice of supplemental authority in support of their opposition to the motion to dismiss.  ECF No. 94.  On March 5, 2024, Defendants filed a letter submitting supplemental authority in support of their motion to dismiss, to which Plaintiffs responded on March 6, 2024.  ECF Nos. 101-02.  On March 7, 2024, the Court held oral argument on Defendants' motion to dismiss the Complaint.

22.    On March 12, 2024, the Court issued an opinion and order granting in part and denying in part Defendants' motion to dismiss the Complaint.  ECF No. 103; *In re Grab Holdings Ltd.. Sec. Litig.*, 2024 WL 1076277.  In its opinion and order, the Court dismissed Lead Plaintiffs' Section 10(b) claim, but largely sustained Lead Plaintiffs' Section 11 and 14(a) claims, as well as

9

the corresponding Section 15 and 20(a) control person liability claims. *Id.* at \*14-26. In particular, under Sections 11 and 14(a), the Court sustained the actionability of four statements in the Proxy/Registration Statement concerning Grab's use of incentives in attracting drivers and consumers, while dismissing claims based on other statements, *i.e.*, concerning revenues in Vietnam, and certain statements describing Grab's past practices and future expectations. *Id.* at \*14-20.

### C. Fact Discovery and Active Litigation

23.     Following the denial of Defendants' Motion to Dismiss, the Parties initiated discovery. On April 15, 2024, Lead Plaintiffs served initial document requests, and Defendants served responses and objections thereto on May 15, 2024.

24.     On April 23, 2024, the Parties exchanged Rule 26 initial disclosures.

25.     On April 30, 2024, the Parties filed a joint letter and proposed protective order (ECF No. 111), which the Court entered on May 1, 2024. ECF No. 112.

26.     On May 5, 2024, Defendants filed their respective Answers to the Complaint. ECF Nos. 114, 115.

27.     On May 23, 2024, the Parties filed a joint letter requesting the Court enter a jointly proposed civil case management plan and scheduling order (ECF No. 116), which the Court entered on May 24, 2024. ECF No. 117.

28.     On June 12, 2024, Defendants Grab, Tan, Oey, Ling, Rogers, Khosrowshahi, Ein and Jay served their initial document requests and Lead Plaintiffs served responses and objections thereto on July 12, 2024.

29.     On August 5, 2024, Lead Plaintiffs filed a motion seeking issuance of letters rogatory pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or

Commercial Matters Dated March 18, 1970 (the "Hague Convention") to Morgan Stanley Asia (Singapore) Pte., which the Court granted on August 6, 2024.  ECF Nos. 118-21.  The Court issued the letter of request on August 7, 2024.  ECF No. 122.  Lead Plaintiffs filed the letter of request with the Singaporean Court, through local Singaporean counsel, on September 19, 2024, and were negotiating the scope of production at the time the Parties reached their agreement in principle to settle this Action.

30.    On August 6, 2024, Lead Plaintiffs served their second set of requests for production of documents and first set of requests for admission, and Defendants served responses and objections thereto on September 5, 2024.

31.    On August 14, 2024, Lead Plaintiffs served their third set of requests for production of documents, and Defendants served responses and objections thereto on September 13, 2024.

32.    In connection with the Parties' respective discovery requests, Defendants produced nearly 38,000 documents totaling over 250,000 pages and Lead Plaintiffs produced 64 documents totaling nearly 1,000 pages.

33.    On August 23, 2024, Lead Plaintiffs filed a motion seeking issuance of letters rogatory pursuant to the Hague Convention to J.P. Morgan (S.E.A.) Limited in Singapore, which the Court granted on August 28, 2024.  ECF Nos. 125-27, 129.  The Court also issued the letter of request on August 28, 2024.  ECF No. 130.  Lead Plaintiffs filed the letter of request with the Singaporean Court through local Singaporean counsel on September 19, 2024, and were negotiating the scope of production at the time the Parties reached their agreement in principle to settle the Action.

34.    During this time, the Parties were actively negotiating an ESI Protocol, ultimately reaching agreement thereon in October 2024.

35.     Also during this time, from April 2024 to October 2024, Lead Plaintiffs engaged in extensive third-party discovery, having collectively subpoenaed ten (10) domestic non-parties, negotiated the responses and objections thereto, and related privilege logs, as well as in numerous meet-and-confer sessions.  Those third parties together produced over 8,700 documents totaling nearly 44,950 pages that Lead Plaintiffs had reviewed and analyzed at the time the Parties reached their agreement in principle to settle the Action.

**D.  Settlement Negotiations**

36.     In June 2024, the Parties first began initial discussions as to whether a resolution of the Action was possible.  Initial discussions were marginally productive, however, and the Parties agreed that the assistance of a Mediator would be useful to advance discussions further to see if the Action could, in fact, be resolved.

37.     On July 30, 2024, Co-Lead Counsel and counsel for Defendants engaged in a full-day mediation session before David M. Murphy, Esq., of Phillips ADR Enterprises, a well-respected and highly experienced mediator.  Lead Plaintiff SLG Cloudbank and Defendant Oey also attended the mediation.  Prior to the mediation session, the Parties exchanged detailed mediation statements.  The Parties did not reach an agreement to resolve the Action during the mediation and returned to active litigation.  However, Lead Plaintiffs and Defendants continued to negotiate a possible settlement through Mr. Murphy, and upon his recommendation, the Parties agreed to participate in a second mediation.  Prior to the October mediation session, the Parties exchanged another round of detailed mediation statements.

38.     On October 16, 2024, Co-Lead Counsel and counsel for Defendants engaged in another full-day mediation session before Mr. Murphy.  Lead Plaintiff SLG Cloudbank and Defendant Oey also attended the second mediation.  While the Parties did not reach an agreement

during the second mediation, Lead Plaintiffs and Defendants continued to negotiate a possible settlement through Mr. Murphy.

39.     On October 23, 2024, Mr. Murphy issued a double-blind mediator's recommendation to resolve the claims in the Action, which all Parties subsequently accepted.

40.     On November 1, 2024, Lead Plaintiffs notified the Court that the Parties agreed in principle to resolve all issues and claims involved in this Action.  ECF No. 136.

41.     The Parties thereafter memorialized the substantive terms of the settlement in a confidential Term Sheet (the "Term Sheet") dated November 22, 2024, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers.  The Stipulation was executed on December 30, 2024.  ECF No. 140-1.

### E.  Preliminary Approval of the Settlement

42.     On December 30, 2024 and January 2, 2025, Lead Plaintiffs filed their Unopposed Motion for Preliminary Approval of Class Action Settlement and papers in support thereof, including the Stipulation, exhibits thereto, and memorandum and supporting declaration.  ECF Nos. 137-40.  On January 13, 2025, this Court held an in-person hearing concerning the Motion for Preliminary Approval.  Later that same day, January 13, 2025, the Court issued the Preliminary Approval Order, *inter alia*, approving the notice program, setting the briefing schedule for Lead Plaintiffs' motion for final approval of the Settlement and the Fee and Expense Application, and setting May 15, 2025 as the date for the Final Approval Hearing.  ECF No. 142.

### III.    THE RISKS OF CONTINUED LITIGATION

43.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $80,000,000.  As explained more fully below,

there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.

### A.  Risks in Obtaining and Maintaining Class Action Status

44.    Had the Action not settled, Lead Plaintiffs would have had to move to certify the class.   While Co-Lead Counsel had researched and analyzed class certification, had largely prepared a class certification motion at the time the Settlement was reached, and were confident that the Court would have certified the proposed class, Plaintiffs bear the burden of proof on class certification, and Defendants had already have raised several arguments in their discussions with Lead Plaintiffs challenging the propriety of class certification, which may have ultimately been credited in whole or in part, either on class certification or at summary judgment or trial, and either defeated class certification, or significantly narrowed the size of the class and therefore total damages.

45.    For example, Defendants argued strenuously that Lead Plaintiffs would be unable to certify a class because, *inter alia*, Lead Plaintiffs (and other Settlement Class Members) could not trace their shares to the Proxy/Registration Statement, since other shares not traceable to the Proxy/Registration Statement, including shares issued under a PIPE registration declared effective on January 14, 2022, had entered the market at or around the time of the issuance of the shares that are the subject of this Action.  Defendants argued that it would be impossible to determine whether a publicly-traded Grab share was registered pursuant to the Proxy/Registration Statement, or the subsequent PIPE registration.  Although Lead Plaintiffs did not believe any such PIPE shares were actually traded from at least January 14, 2022 to February 7, 2022, at which time, at best, a small amount of PIPE shares may have been traded, they recognized the possibility

14

that an inability to show tracing after January 14, 2022 could at a minimum substantially reduce damages, although Lead Plaintiffs believed damages would still be significant.

46.    Defendants also argued that none of the three Lead Plaintiffs were proper class representatives, and therefore the class could not be certified, contending that (i) Lead Plaintiff SLG Cloudbank did not purchase any Grab shares but invested through a venture fund in Grab Holdings, Inc. preferred shares that were converted into Grab common shares; and (ii) the other Lead Plaintiffs, Batra and Fan, held their shares in margin accounts which Defendants argued would likely have been commingled in their brokers' accounts with PIPE shares after the January 14, 2022 PIPE share registration statement became effective.  Lead Plaintiffs were confident that they would have prevailed against each of Defendants' arguments, but recognized the risks presented by such arguments at class certification, and that at a minimum the size of the class could be reduced as a consequence of Defendants' tracing argument, and that damages could therefore be smaller.

47.    Moreover, even if Lead Plaintiffs successfully obtained class certification, Defendants could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery, or reducing damages if the Second Circuit's ruling reduced the size of the class and thereby reduced associated damages.

**B.  Risks to Proving Liability**

48.    In addition to the hurdle of obtaining and maintaining class action status, Lead Plaintiffs and Co-Lead Counsel faced numerous additional risks at summary judgment and trial, including in establishing Defendants' liability.  As an initial matter, Defendants have argued that the Court's Motion to Dismiss Order significantly narrowed the scope and appeal of Lead

Plaintiffs' case because (i) it dismissed Lead Plaintiffs' Sections 10(b) and 20(a) claims entirely, thus eliminating any claims based on Defendants' intentional wrongdoing from the case, and (ii) the remaining claims were limited to only four statements contained in the Proxy/Registration Statement in its "risk disclosures" section about Grab's use of incentives, which implicated only the first six weeks of Grab's Q4 2021.

49.    Moreover, Defendants forcefully argued in their motions to dismiss—and undoubtedly would have continued to argue at summary judgment and/or trial—that Lead Plaintiffs could not establish the required elements of their remaining Securities Act or Exchange Act claims.

50.    For example, Defendants continued to maintain that Lead Plaintiffs could not establish the element of material misrepresentations and omissions, required under both the Section 11 and Section 14(a) claims. For instance, a key component of Lead Plaintiffs' remaining case centered on Defendants' alleged misrepresentations and omissions in the Proxy/Registration Statement concerning the increased incentives Grab paid to attract drivers, merchant partners and consumers. Defendants argued vigorously that Grab's Proxy/Registration Statement was not misleading because it disclosed that Grab had "paid significant amounts of incentives" to attract drivers, merchant-partners and consumers "and may continue to do so in the future;" "[i]f Grab is unable to reduce the amount of incentives it pays over time" relative to revenues "it will likely impact Grab's ability to … continue[e] as a going concern" or profitability; and that Grab's "success" "depends on its ability" to attract drivers, merchant-partners and consumers, and a "decreased supply" thereof "could harm its business," such that Grab "may need to increase" incentives.

51.    Relatedly, Defendants argued that Grab accurately disclosed the exact amount of

16

incentives in Q3 2021, the quarter preceding the Proxy/Registration Statement; and that Grab's need to pay increased incentives during Q4 2021 to attract sufficient drivers, merchant-partners and consumers was determined virtually in real-time by highly volatile market and competitive conditions across some 400 cities in different countries, largely driven by the then-fluctuating effects of the COVID-19 pandemic. Accordingly, Defendants argued, Grab had no duty to disclose its corresponding fluctuations in incentives intra-quarter; disclosure of such near-daily fluctuations was not material; and Grab's reactive incentives to such fluctuations did not constitute a change in long-term strategy that needed to be disclosed.

52.    Defendants also argued that Grab's March 3, 2022 disclosure of relevant financial results—which Lead Plaintiffs alleged were corrective disclosures and triggered class members' losses—were not inconsistent with its disclosures in the Proxy/Registration Statement. For example, Defendants argued that Grab's ratio of incentives to Gross Merchandise Value ("GMV") (the sum value of Grab's transactions for products and services)—a key metric used by Grab—increased only 1.61% in Q4 2021 from the prior quarter. In this regard, Defendants also argued that JP Morgan analysts had previously estimated incentive levels "very close" to those Grab ultimately reported. Defendants also argued that Lead Plaintiffs would be unable to prove many of their factual allegations concerning the payment of incentives to drivers and consumers, and the timing thereof, which underpinned their allegations (under both Section 11 and Section 14(a)) that Defendants misrepresented or omitted material facts.

53.    With respect to the Section 14(a) claim, in addition to disputing falsity, Defendants argued that Lead Plaintiffs' Section 14(a) claim failed because the rights of AGC shareholders to not tender their shares were derived from AGC's formative documents rather than the Proxy/Registration Statement, thus the latter was not an "essential link" in the transaction at issue.

54.    Additionally, with respect to Plaintiffs' Section 11 claims, the Grab Individual Defendants and the AGC Defendants argued that they had a strong "due diligence defense" at summary judgment or trial, because discovery would show they had conducted robust due diligence, and had engaged sophisticated financial and legal advisers.

55.    Likewise, Defendants argued they had a persuasive "negative causation" defense under Section 11, and that Lead Plaintiffs could not carry their burden under Section 14(a) of establishing loss causation, as by the time of Grab's March 3, 2022 disclosures the price of Grab securities had already declined, and any declines following the March 3, 2022 disclosure were due to industry and market factors and not to any Grab statements that actually misled investors.

56.    Even if Lead Plaintiffs' claims survived a motion for summary judgment, which was not guaranteed, there is a significant risk that they would not be able to prove their case before a jury.   In this complex securities litigation relating to matters such as: (a) Defendants' interpretation and understanding of constantly changing complex data in their databases across over 400 cities across eight countries in Southeast Asia; (b) nuanced issues about the required and appropriate incentives to boost revenues and earnings for business reasons in volatile markets; and (c) the market effects of COVID and other complex factors on Defendants' business decisions, there is a risk that a jury would not understand Lead Plaintiffs' theories of the case, and the theories' intersection with economic and statistical analyses that underpin causation and damages issues.  This is compounded by the fact that Lead Plaintiffs would be forced to tell their story to the jury through Defendants' documents and adverse witnesses, most of which would have to be interpreted from various Southeast Asian languages, if they were able to be obtained at all.  Conversely, Defendants would be able to obtain testimony from the Individual Defendants themselves, as well as many other witnesses who are supportive of the Defendants.

**C. Risks to Proving Damages**

57.    Even if Lead Plaintiffs were successful in establishing liability, they would still face substantial risks in establishing damages on a class wide basis.  For example, Defendants certainly would have, and already had, disputed damages by claiming that there was no causal connection between Defendants allegedly misleading disclosures in the Proxy/Registration Statement, and later declines in the Company's stock price, and that even if there were such a connection, the damages suffered by the putative class were a mere fraction of the amount sought by Lead Plaintiffs.

58.    As noted above, Defendants contended that any damages would be substantially reduced by Defendants' "negative causation" defense, and that Lead Plaintiffs could not carry their burden under Section 14(a) of establishing loss causation, since by the time of Grab's March 3, 2022 disclosures the price of Grab securities had already significantly declined.  In doing so, they would point to, *inter alia*, reports including those from JP Morgan analysts who had previously estimated incentive payment levels "very close" to those Grab ultimately reported.  Further, Defendants would continue to argue (supported by expert reports and testimony) that any declines following the March 3, 2022 disclosure were due to industry and market factors, and not to any Grab statements that actually misled investors.

59.    Additionally, as indicated above, Defendants would argue that, at a minimum, any tracing after the effective date of the PIPE registration on January 14, 2022 (or at least following indications of trading of shares registered pursuant thereto in February 2022), was impossible, such that no shareholders who acquired Grab common shares thereafter could properly be considered members of the Settlement Class.

60.    If Defendants were to prevail on any of these arguments, in whole or in part, the

19

amount of potentially recoverable damages would have been diminished significantly.

61.     Further, Lead Plaintiffs' claims and damages theories would both be subject to complex expert testimony, offered by Defendants' experts, that would likely conflict with Lead Plaintiffs' experts' analyses.  The opinions of each side's experts can vary substantially, and continued litigation poses the risk that Defendants would prevail in a "battle of experts."

## D.  Other Risks, Including Trial and Appeals

62.     Lead Plaintiffs would have had to prevail at several stages of litigation, each of which would have presented significant risks.  Co-Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.  For example, in 2023, Co-Lead Counsel Levi & Korsinsky was lead trial counsel in a three-week securities class action jury trial in the Northern District of California.  After five years of litigation, and despite the fact that the Court ruled for *plaintiffs* at summary judgment on the elements of falsity and scienter, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs, the jury returned a verdict for the defendants.  *See In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010 (N.D. Cal. June 14, 2023), *aff'd*, 2024 WL 4688894 (9th Cir. Nov. 6, 2024).  This is yet another example demonstrating that complex securities class action litigation is highly uncertain, and success in cases like this one is never assured.  *See infra*, ¶100.

63.     Moreover, even if Lead Plaintiffs succeeded in proving all elements of their case at trial and obtained a jury verdict, Defendants would almost certainly have appealed.  An appeal not only would have renewed the risks faced by Lead Plaintiffs—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay and increased litigation costs.  Given these significant litigation risks, Lead

Plaintiffs and Co-Lead Counsel believe the Settlement represents a fair result for the Settlement Class.

64.     In addition to the risks of continued litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages.  If Lead Plaintiffs had fully prevailed in their claims at the trial stage, and if the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' best-case scenario—estimated total maximum aggregated damages would be between $599 million and $898 million.[4]  Thus, the $80 million Settlement represents a recovery of between 8.9% and 13.4% of the maximum likely recoverable damages for the sustained claims, which falls well above the 1.2% median settlement value for all securities class actions settled in 2024.  *See* Ex. 2 (Edward Flores and Svetlana Starykh, Recent Trends in Securities Class Action Litigation, 2024 Full-Year Review, at 27 (Fig. 24) (NERA Jan. 22, 2025) ("NERA Report") (median recovery in securities class actions in 2024 was approximately 1.2% of estimated damages). NERA data from 2015-2024, broken down by percentage of recovery relative to size of damages, further confirms that this Settlement is favorable. *See id.* at 26, Fig. 23.

**E.  The Complexity, Expense and Duration of Continued Litigation**

65.     As noted, securities class actions are notoriously complex, lengthy, and expensive to litigate.  However, this Action presented particular complexities, costs and likely delays, even

---

[4] Upon consulting with their damages expert, Lead Plaintiffs and Co-Lead Counsel believe that the maximum damages that the Settlement Class could recover for the Section 11 claims are between $599 million and $898 million, after accounting for Defendants' negative causation defenses.  Class-wide damages under Lead Plaintiffs' Section 14(a) claims are approximately $177.49 million, but entirely overlap with the Section 11 damages. No damages would be available at trial for the Section 10(b) claims which were dismissed and not repleaded.  However, because the release encompasses any remaining appellate or other interest for the Settlement Class, the Plan of Allocation provides up to a nominal $0.10 per share for such claims.

more than the usual securities class action. First, it involves statements in a Proxy/Registration Statement in a complex de-SPAC transaction, shareholders who held private Grab shares that were thereby converted into public shares, and AGC shareholders who exchanged their shares for Grab public shares issued in the related IPO. Second, it focuses on technology-based operations across numerous countries in Southeast Asia. Most of the discovery would be foreign discovery, with most of the key witnesses residing overseas, and a significant part thereof required the issuance of Letters Rogatory or similar methods that could take years to result in document production—much less schedule, compel and take depositions. Besides taking an inordinate amount of time, foreign discovery concerning both the Defendants and third parties would be unusually expensive and require translation from and into the many Southeast Asian languages implicated in this case, for, *e.g.*, document analysis and deposition testimony, trial or appeal, further adding to costs and delays.

66.    Even under the best of circumstances, assuming Lead Plaintiffs' claims were certified under Rule 23 (and not reversed on a Rule 23(f) interlocutory appeal or a subsequent motion for class certification), and survived summary judgment, litigating the Action through trial and post-trial appeals would have undoubtedly been a long and expensive endeavor. Were the litigation to continue, a potential recovery—if any—would occur years from now, substantially delaying payment to the Settlement Class. By contrast, the Settlement provides an immediate and substantial recovery for the Settlement Class, without exposing the Settlement Class to the risk, expense, and delay of continued litigation.

## IV.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING THE NOTICE PROGRAM

67.    The Preliminary Approval Order directed that the postcard notice highlighting key information regarding the proposed Settlement (the "Postcard Notice") be disseminated to the

22

Settlement Class, in addition to the online posting of the Notice and Claim Form, and the publication of the Summary Notice.[5] ECF No. 142. The Preliminary Approval Order also set a deadline of April 24, 2025 (21 calendar days prior to the final fairness hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Attorneys' Fee Motion or to request exclusion from the Settlement Class, and set a final fairness hearing date of May 15, 2025 (the "Settlement Hearing").

68. Pursuant to the Preliminary Approval Order, Co-Lead Counsel instructed A.B. Data, the Court-approved Claims Administrator, to begin disseminating copies of the Postcard Notice and publish the Summary Notice. Contemporaneously with the dissemination of the Postcard Notice, Co-Lead Counsel instructed A.B. Data to post downloadable copies of the Notice of Pendency of Class Action and Proposed Settlement, Final Approval Hearing and Motion for Attorneys' Fees and Expenses (the "Notice") and Proof of Claim and Release Form (the "Claim Form") online at www.GrabSecuritiesSettlement.com (the "Settlement Website").[6] Upon request, also A.B. Data mailed copies of the Notice and/or Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed.

69. The Postcard Notice directed Settlement Class Members to the Settlement Website to obtain additional information on the Settlement, including how to file a claim and access to downloadable versions of the Notice and Claim Form. The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of a Settlement Class Member's

---

[5] A copy of the Postcard Notice is attached as Exhibit A to the A.B. Data Decl., which is Ex. 1 hereto.

[6] Copies of the Notice and Claim Form are attached, respectively, as Exhibits B and C to the A.B. Data Decl.

right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Attorneys' Fee Motion, or to exclude themselves from the Settlement Class.  The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, and for reimbursement of litigation expenses in an amount not to exceed $400,000, and to apply for an award of up to $15,000 for each of the three Lead Plaintiffs for their time and expenses related to their representation of the Settlement Class.  *See* Ex. 1-B at pp. 2, 7.  In accordance with paragraph 8 of the Preliminary Approval Order, the Notice also contained the estimate of fees for the administration of the Settlement.  *See id.* p. 5 (Q. #6).

70.    On January 28, 2025, A.B. Data received the names and addresses of potential Settlement Class Members from Defendants, pursuant to paragraph 7 of the Preliminary Approval Order (the "Record Holder List").  A.B. Data  Decl. ¶5.

71.    In addition, A.B. Data maintains a proprietary database with names and addresses of the largest and most common banks, brokers, and other nominees ("Broker Mailing Database"). *Id.* at ¶6.  On February 4, 2025, A.B. Data caused the Postcard Notice to be sent by email or first class mail to the combined email and/or physical mailing addresses whose mailing records were contained in the Record Holder List and the Broker Mailing Database (*id.*), and also delivered electronic copies of the Notice and Claim Form to the banks, brokers and nominees for which it had a registered email address (*id.* at ¶7).

72.    Additionally, A.B. Data provided a copy of the Notice and Claim Form to Depository Trust Company ("DTC"), for posting on its Legal Notice System ("LENS"), which may be accessed by any nominee that participates in the DTC's security system, and provides DTC participants the ability to search and download legal notices and receive email alerts based

on particular notices, or security identifiers (CUSIPs).  The Notice and Claim Form were posted on DTC's LENS on February 4, 2025.  *Id.* at ¶8.

73.     Through April 8, 2025, A.B. Data received an additional 2,969 names and addresses of potential Settlement Class Members from individuals or brokerage firms, banks, institutions, and other nominees.  *Id.* at ¶10.  A.B. Data also received requests from brokers and other nominee holders (including Broadridge Financial Solutions, Inc.) for a total of 61,102 Postcard Notices or Notice and Claims Forms to be forwarded by the nominees to their customers.  *Id.* at ¶11.

74.     In sum, as of April 8, 2025, a total of 70,229 Postcard Notices have been disseminated to potential Settlement Class Members and their nominees, including 34,492 sent via email and 35,737 sent via First-Class Mail.  *Id.* at ¶12.

75.     On February 14, 2025, in accordance with the Preliminary Approval Order, A.B. Data caused the Summary Notice to be published once over *PR Newswire*, and once over the *Business Wire* newswire service.  *Id.* at ¶13; Exs. 1-D and 1-E (copies of publication confirmations).

76.     Co-Lead Counsel also caused A.B. Data to establish the Settlement Website, which became operational on February 4, 2025, and maintain a toll-free telephone number to provide Settlement Class Members with information concerning the Settlement, including how to submit a claim form online and download copies of the Notice and Claim Form, as well as where to obtain copies of the Stipulation, Preliminary Approval Order, and the Complaint.  *Id.* at ¶¶14-15.

77.     The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the Attorneys' Fee Motion or to request exclusion from the Settlement Class is April 24, 2025.  To date, one request for exclusion has been received, representing a purchase of only 100 shares of AGC stock.  *Id.* at ¶17.  A.B. Data will file a supplemental declaration after

25

the April 24, 2025, opt-out deadline addressing whether any requests for exclusion have been received. *Id.* In addition, to date, no objections to the Settlement or the Plan of Allocation have been entered on this Court's docket or have otherwise been received by Plaintiffs' Co-Lead Counsel. *Id.* at ¶18. Co-Lead Counsel will file reply papers by May 8, 2025, that will address any objections that may be received.

## V.   ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

78.   Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $80 million Settlement Amount, plus interest earned thereon less: (i) Court-awarded attorneys' fees and expenses (including any application for an award to Lead Plaintiffs for their reasonable time and expenses directly related to their representation of the Settlement Class); (ii) Notice and Administration Expenses; (iii) Taxes; and (iv) any other fees or expenses approved by the Court), must submit a valid Claim Form with all required information postmarked or received no later than April 24, 2025. *See id.*, Ex. 1-B (Notice), p. 5 & Q.7. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the Plan of Allocation approved by the Court. *Id.* at p.9.

79.   The proposed Plan of Allocation is detailed in the Notice. *Id.* at pp. 9-11. The Notice is posted online on the Settlement Website, is downloadable, and upon request, will be mailed to any potential Settlement Class Member. The objective of the Plan of Allocation is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses due to the alleged violations of the Securities Act and Exchange Act, and takes into consideration when each Authorized Claimant purchased or otherwise acquired and/or sold Grab shares. *Id.* at p.10.

80.     As stated in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial, or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.  *See id.* p. 9.

81.     The Plan of Allocation, which was developed by Co-Lead Counsel in consultation with Lead Plaintiffs' damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms.   In developing the Plan of Allocation, Lead Plaintiffs' expert calculated the amount of estimated artificial inflation in the price of Grab Class A Ordinary Shares related to Defendants' alleged false and misleading statements in this Action by considering the price changes in such shares in reaction to the alleged corrective disclosures, adjusting for factors including litigation risk, and pursuant to the statutory damages formula under the Securities Act Section 11(e).

82.     Under the Plan of Allocation, for Lead Plaintiffs' Section 11 claims, only Grab Class A Ordinary Shares purchased or acquired by January 13, 2022 (including by exchange in the merger of publicly-listed AGC shares and freely transferrable Grab Holdings Inc. shares[7]), the day before the effective date of the registration of additional Grab shares under a PIPE registration, are deemed traceable to the Proxy/Registration Statement for purposes of calculating Recognized Loss per share.  The calculation of Recognized Losses otherwise follows the statutory provisions of Section 11(e) and treats August 22, 2022 (the date of the filing of the Complaint

---

[7] The free transferability of such shares must be documented.  The purchase price for shares exchanged in the merger is deemed to be $10.00. Ex. 1-B, pp.10 n.5, 11.

which added Section 11 claims for the first time), as "the time such suit was brought" under Section 11(e). Ex.1-B, p.10.

83.    For Plaintiffs' Section 14(a) Exchange Act claims, Grab Class A Ordinary Shares are eligible for a recovery if they were purchased as AGC shares and exchanged for Grab A Class Ordinary shares in the merger rather than redeemed. For shares sold prior to or on the corrective disclosure on March 3, 2022, the Recognized Loss per share will be the $10.00 purchase price deemed for shares exchanged in the merger, minus the sale price; while for shares sold after the March 3, 2022 corrective disclosure date, the Recognized Loss per share will be $10.00 minus the closing price of Grab Class A Ordinary Shares on March 3, 2022. *Id.*

84.    Because the Section 10(b) claims were dismissed and given the principles of economic loss articulated by *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Plan of Allocation provides a nominal Recognized Loss in exchange for releases of appellate rights related to those claims. For shares purchased between August 2, 2021 and March 2, 2022 and held or sold on or after the March 3, 2022 corrective disclosure, the Recognized Loss will be the lesser of (i) the purchase price minus the sale price, or (ii) $0.10. *Id.*

85.    For any purchase or acquisition, a claimant's Recognized Loss will be the *highest* of their Recognized Losses under Section 11, Section 14(a), or Section 10(b)—these amounts are not cumulative, to prevent double-counting. *Id.* p. 11. Likewise, under the Plan of Allocation, claimants who have an overall market gain are not eligible for a recovery. *Id.* Authorized Claimants with Recognized Losses will receive distributions based on their *pro rata* share of the Net Settlement Fund, in proportion to their total Recognized Losses. *Id.* at 9, 11. Co-Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result

28

of the conduct alleged in the Action and who submit valid claims.  *Id.* p.9.

86.    If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant.  *Id.* pp. 9-10.  Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater.  In Co-Lead Counsel's experience, processing and sending a check for less than $10.00 is cost prohibitive.[8]  Accordingly, a claimant's total Recognized Loss will be allocated from the Net Settlement Fund to Authorized Claimants on a *pro rata* basis, in proportion to the size of their total Recognized Loss, subject to a $10 minimum distribution amount.

87.    In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on their purchases or acquisitions of Grab shares that were attributable to the conduct and violations of the Securities Act and/or the Exchange Act alleged in the Complaint.  Accordingly, Co-Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

88.    As noted above, as of April 8, 2025, a total of 70,229 Postcard Notices have been disseminated to potential Settlement Class Members and their nominees.  *See* A.B. Data Decl. at ¶12.  To date, no objections to the proposed Plan of Allocation have been received or filed on the

---

[8] Pursuant to the terms of the Stipulation, ¶7.6, if funds remain after an initial distribution to Authorized Claimants due to uncashed or returned checks or other reasons after at least six (6) months from the date of initial distribution of the Net Settlement Fund, the Claims Administrator will conduct subsequent distributions, as long as they are cost-effective.  At such time as it is reasonably determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, Co-Lead Counsel shall, after conferring with Grab's counsel, propose a non-sectarian, non-profit to the Court for a *cy pres* distribution to be approved by the Court.

Court's docket.

## VI.    CO-LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES AND LEAD PLAINTIFFS' AWARD

89.    In addition to seeking final approval of the Settlement and Plan of Allocation, Co-Lead Counsel are applying for a total fee award of 33⅓% of the Settlement Fund (or $26,666,666.67, plus interest earned at the same rate as the Settlement Fund).  Co-Lead Counsel also request reimbursement of their out-of-pocket litigation expenses incurred in connection with the prosecution of the Action in the amount of $224,744.92, and request an award of $15,000 to each of the three Lead Plaintiffs (totaling $45,000) for their costs, including time incurred in connection with their representation of the Settlement Class.  Each of these amounts was described in the Notice.  The legal authorities supporting a 33⅓% fee award and the requested expenses are set forth in the accompanying Fee Memorandum, which is being filed contemporaneously herewith, and the requested litigation expense amount is well below the maximum expense amount of $400,000 set forth in the Notice.[9]  The primary factual bases for the requested fee and reimbursement of litigation expenses and Lead Plaintiffs' award are summarized below.

### A.  The Fee Application

90.    Co-Lead Counsel are applying for a percentage-of-the-common-fund fee award to compensate Co-Lead Counsel for the services they rendered on behalf of the Settlement Class. As set forth in the accompanying Fee Memorandum, the percentage method is the best method

---

[9] These amounts do not include claims administration expenses, which are estimated in the Notice at p.5.  Lead Plaintiffs will provide updated claims administration expense numbers both in the reply brief and at the final approval hearing.

for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery. The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances. This paradigm also minimizes unnecessary drain on the Court's resources. Notably the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and the Second Circuit for cases of this nature.[10]

91.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Co-Lead Counsel respectfully submit that the requested fee award is fair and reasonable and should be approved. As discussed in the Attorneys' Fee Motion, a 33⅓% fee award is well within the range of percentages awarded in securities class actions with comparable settlements in this Circuit.

### 1. The Outcome Achieved is the Result of the Significant Time and Labor That Co-Lead Counsel Devoted to the Action

92.    As described in greater detail above, Co-Lead Counsel devoted substantial time to the prosecution of the Action. Among other things, the work that Co-Lead Counsel performed in this Action included: (a) filing an initial complaint based on review and analysis of (i) filings with the SEC by both Grab and AGC; (ii) public reports, news articles, and research reports prepared by securities and financial analysts concerning Grab and AGC; (iii) transcripts of investor calls conducted by Grab's management; and (iv) press releases issued by and about Grab

---

[10] As discussed in the Notice (Ex. 1-B p.2 n.4), Pomerantz intends to share a portion of any attorneys' fees awarded by the Court with Bronstein, Gewirtz & Grossman, LLC ("BGG"). As stated in the Notice, "[a]ny attorneys' fee awarded by the Court will be divided pursuant to fee sharing agreements as follows: Levi & Korsinsky (50%); Pomerantz (45%); BGG (5%). BGG is not seeking reimbursement of expenses." *Id.*

and AGC; (b) following appointment as Co-Lead Counsel, conducting a further, extensive international investigation into the claims asserted in the Action, consulting with an expert in market efficiency, loss causation and damages, and working with private investigators both in the United States and in Asia to interview former Grab employees, drivers, merchants, local regulators, and conduct in-depth investigation of Grab's business in the countries in which it operated in Southeast Asia; (c) drafting and filing a detailed Amended Complaint based on that investigation, which included: (i) new evidence based on information obtained through the use of private investigators, including through witness interviews and in-depth investigation of Grab's operations throughout Southeast Asia as well as in the United States; (ii) allegations against eleven additional defendants; (iii) an expanded class period; (iv) additional false statements; (v) new theories concerning the falsity behind Defendants' statements; (vi) two additional substantive claims, for liability under Section 11 of the Securities Act and Section 14(a) of the Exchange Act; and (vii) allegations based on additional SEC filings, in particular those incorporated into the allegedly defective proxy/registration statement on Form 425 that Defendants filed with the SEC in connection with Grab's "de-SPAC" transaction; (d) briefing and opposing Defendants' joint motion to dismiss; (e) presenting oral argument on Defendants' motion to dismiss, and participating in other court conferences; (f) engaging in substantial discovery which entailed, *inter alia*: (i) exchanging initial disclosures; exchanging and responding to Party requests for the production of documents, and participating in multiple meet-and-confer sessions thereon; (ii) serving ten subpoenas on third parties and negotiating document productions therefrom; (iii) negotiating an ESI and search protocol with Defendants, pursuant to which Defendants and third parties produced nearly 300,000 pages of documents that Co-Lead Counsel reviewed and analyzed; (iv) producing more than 900 pages of documents from Lead Plaintiffs; and (v) causing

to be issued letters rogatory commanding production of information in certain foreign countries; (g) consulting extensively throughout the litigation with experts and consultants in loss causation, damages, and market efficiency; (h) engaging in two full-day mediation sessions with Mr. Murphy, which involved an exchange of two detailed mediation submissions concerning the facts of the case, liability, and damages; (i) prepared a motion for class certification and memorandum in support thereof, along with a motion to lift the discovery stay, which Co-Lead Counsel were ready to file in case a settlement agreement was not reached; and (j) engaged in months of follow-up negotiations with Mr. Murphy and Defendants' Counsel following the initial mediation session, which ultimately resulted in the Settlement.

93.     Throughout the litigation, Co-Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action.  As lead attorneys on the case, we personally monitored and maintained control of the work performed by other lawyers at Pomerantz and Levi & Korsinsky throughout the litigation.  Other experienced attorneys at our two firms were also involved in the drafting, reviewing and/or editing of pleadings, motion papers and other significant court filings, court appearances including oral argument, the mediation process, the settlement negotiations and in negotiating the terms of the Stipulation, and other matters.  More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

94.     Attached hereto as Exhibits 3A and 3B are declarations in support of Co-Lead Counsel's motion for attorneys' fees on behalf of each of our two Co-Lead Counsel firms, Pomerantz and Levi & Korsinsky (the "Fee Declarations").  Each of the Fee Declarations includes a schedule summarizing the lodestar of the firm.  The Fee Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the

lodestar calculations based on their current hourly rates.  The Fee Declarations were prepared from contemporaneous daily time records regularly maintained and prepared by the respective firms.  The first page of Exhibit 3 is a chart that summarizes the information set forth in the Fee Declarations, listing the total hours expended and lodestar amounts for each Plaintiffs' Co-Lead Counsel firm and totals for the numbers provided.

95.      As set forth in Exhibit 3, Co-Lead Counsel collectively expended a total of 16091.16 hours in the investigation and prosecution of the Action.  The resulting lodestar is $9,832,161. The requested fee of 33⅓% of the Settlement Fund thus represents a multiplier of approximately 2.71 to Co-Lead Counsel's lodestar.

96.      The above amounts do not include the additional time that Co-Lead Counsel will devote overseeing and assisting in the administration of the Settlement, for which Co-Lead Counsel will not be paid.  This work will include answering questions posed by Settlement Class Members about the Settlement and the distribution of the Settlement proceeds, overseeing the work performed by the Claims Administrator, addressing any questions or disputes raised by Settlement Class Members about the allocation of the Settlement proceeds, and drafting and filing motions for distribution of the Net Settlement Fund.

97.      As discussed in further detail in the Fee Memorandum, the requested multiplier is in the middle of the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere, and is particularly appropriate under the circumstances of this case.

### 2.  The Significant Risks Borne by Co-Lead Counsel

98.      This prosecution was undertaken by Co-Lead Counsel on an entirely contingent-fee basis.  As discussed above in connection with the litigation risks supporting approval of this

Settlement, from the outset, this Action was an especially difficult, complex and highly uncertain securities case. There was no guarantee that Co-Lead Counsel would ever be compensated for the substantial investment of time and money the case would require, especially as the named Defendants and the focus of discovery was located overseas, scattered across several countries in Southeast Asia. In undertaking that responsibility, Co-Lead Counsel were obligated to ensure that sufficient resources were dedicated to the investigation and prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a complex, internationally-focused case like this one, which presented formidable discovery challenges including in seeking, obtaining, and facilitating translation of foreign discovery, were covered. Moreover, with an average lag time of many years for complex cases like this to conclude—putting aside the additional lag time and complexities of foreign discovery—the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Co-Lead Counsel have received no compensation since the initiation of this Action more than three years ago, and Co-Lead Counsel have incurred $224,744.92 in hard out-of-pocket litigation-related expenses in prosecuting the Action.

99. Additionally, Lead Plaintiffs and Co-Lead Counsel developed and alleged their claims in the Complaint without information gained through government or regulatory actions, and were hindered by the PSLRA's automatic discovery stay and the fact that much of their investigation for the Complaint was required to be conducted abroad.

100. Finally, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured and the risks are high. As noted above in the discussion of litigation risks in this case favoring Settlement approval, Co-Lead Counsel know from experience that the commencement of a class action does not guarantee a settlement, whether on

35

a motion to dismiss, at summary judgment, at trial, or even on post-trial appeals. *See In re Tesla*, 2023 WL 4032010 (defendants prevailed at trial despite summary judgment for plaintiffs on falsity and scienter, and SEC settlement based on same alleged conduct); *see also In re Mylan N.V. Sec. Litig.*, 2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023) (defendants prevailed on summary judgment despite DOJ and state Attorney General prosecutions); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict reversed on appeal and judgment entered for defendant).

101.    Co-Lead Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of the hard work and the result achieved, we respectfully submit that the requested fee is reasonable and should be approved.

### 3.    The Experience and Standing of Plaintiffs' Counsel and the Standing and Caliber of Defendants' Counsel

102.    Co-Lead Counsel's firm resumes are attached as Exhibits 3A-1 and 3B-1.  Both firms are among the nation's preeminent and most-experienced and most-successful firms specializing in securities class action litigation.

103.    As indicated in its firm resume, Pomerantz, founded in 1936, is the oldest law firm in the world dedicated to representing defrauded investors.  Pomerantz has recovered billions of dollars on behalf of defrauded investors, with many settlements breaking previously-held records. Pomerantz has been recognized as a top-tier firm by industry publications such as *The Legal 500*, *Benchmark Litigation*, and *Chambers USA*, among others.  In 2020, Pomerantz was named the Plaintiff Firm of the Year by *Benchmark Litigation* and honored with *European Pensions'* inaugural Thought Leadership Award.  Courts across the country have noted the quality of Pomerantz's legal work, and Pomerantz attorneys regularly receive praise from their peers.  The

2024 *Benchmark Litigation* guide describes Pomerantz's "prodigious capacity for cases and its tenacity to keep pursuing them" as well as the Firm's work on litigation "with more meaningful angles." As also reflected in its firm resume, Pomerantz has obtained numerous significant settlements. For example, in 2018, Pomerantz, as sole Lead Counsel for the class, achieved a total $3 billion settlement with Petróleo Brasileiro S.A. ("Petrobras") and its auditors. *In re Petrobras Sec. Litig.*, No. 14-cv-9662 (S.D.N.Y. 2018). In 2024, Pomerantz secured a $97 million settlement in *Roofers Pension Fund v. Joseph C. Papa, et. al*., Case No. 1:16-CV-02805 (RMB) (LDW) (D.N.J). Pomerantz also secured a $225 million class recovery in *In re Comverse Technology, Inc. Sec. Litig.*, No. 06-CV-1825 (E.D.N.Y.); a $135 million class recovery in which Pomerantz was Co-Lead Counsel in *Kaplan v. S.A.C. Capital Advisors, L.P.*, No. 12-cv-9350 (S.D.N.Y. 2017); and a $110 million class recovery in which Pomerantz was Lead Counsel in *Pirnik v. Fiat Chrysler Automobiles N.V. et al.*, No. 1:15-cv-07199-JMF (S.D.N.Y), among others.

104. As demonstrated by its firm resume, Levi & Korsinsky is also among the most experienced and successful securities class action law firms in the country. Over the last few years, Levi & Korsinsky has been lead or co-lead counsel in more than 50 securities class actions that have resulted in over $200 million in recoveries for investors. Since 2020, Levi & Korsinsky has consistently ranked in the Top 10 in terms of number of settlements achieved for shareholders each year, according to reports published by *ISS*. Levi & Korsinsky was also ranked as one of the Top 5 Securities Firms for the period from 2018 to 2020 in *Lex Machina's* Securities Litigation Report. Recent class recoveries include a $47.5 million recovery in *In re QuantumScape Securities Class Action*, No. 3:21-cv-00058-WHO (N.D. Cal.); a $40 million recovery in *In re U.S. Steel Consolidated Cases*, No. 2:17- 579-CB (W.D. Pa.); and $24.6 million

recovery in *Kohl v. Loma Negra Industrial Argentina Sociedad Argentina*, Index, No. 653114/2018 (Sup. Ct., N.Y. Cty.).  Other notable recoveries include a $79 million recovery in *E-Trade Financial Corp. Sec. Litig.*, No. 07-cv-8538 (S.D.N.Y); and a $522 million recovery for shareholders in *In re Google Inc. Class C Shareholder Litigation*, C.A. No. 7469-CS (Del. Ch.).

105.    We believe that Pomerantz's and Levi & Korsinsky's extensive experience in the field, and the wide-ranging skills of our attorneys, added valuable leverage during the litigation and settlement negotiations.

106.    Further, the quality of the work performed by Co-Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by Skadden Arps, Slate, Meagher, & Flom LLP, and Ropes & Gray LLP, both among the most prestigious and well-respected defense firms in the country, who vigorously and ably defended the Action at every turn.  In the face of this experienced and formidable opposition, Co-Lead Counsel were able to develop strong claims, litigate and prosecute them successfully, and negotiate with Defendants to settle the case on terms that are extremely favorable to the Settlement Class.

### 4.    Public Policy Interests, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Case

107.    Courts consistently recognize that it is in the public interest to have experienced and able counsel available to enforce the securities laws and regulations governing the duties of officers and directors of public companies.  For this important public policy to be realized in practice, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks such counsel undertake in prosecuting a securities class action on a contingent-fee basis.  Relatedly, it is long-recognized public policy that settlements are to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who

38

bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements on behalf of litigants who—absent the class action mechanism—would be economically unable to prosecute such actions.

### 5. The Reaction of the Settlement Class Supports Co-Lead Counsel's Fee Request

108. As noted above, notice has been provided to at least 70,229 potential Settlement Class Members or their nominees informing them that Co-Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund plus a proportionate amount of interest accrued while the Settlement Fund has been held in Escrow. A.B. Data Decl. ¶12, Exs. A (Postcard Notice), B (Notice) thereto. In addition, the Court-approved Summary Notice has been published and transmitted over *PR Newswire* and *Business Wire*. A.B. Data Decl. at ¶13, Exs. D, E (confirmation of Summary Notice publication). To date, no objections to the indicated attorneys' fees request set forth in the Postcard Notice and Notice have been received or entered on this Court's docket. Any objections received after the date of this filing will be addressed in Co-Lead Counsel's reply papers to be filed by May 8, 2025. Moreover, each of the Lead Plaintiffs supports the requested fee award. *See* SLG Cloudbank Decl. ¶11-12; Si Fan Decl. ¶¶10-11; and Amit Batra Decl. ¶¶10-11 (Exs. 4A-4C).

## B. Reimbursement of the Requested Litigation Expenses is Fair and Reasonable

109. Co-Lead Counsel seek a total of $224,744.92 in reimbursement of out-of-pocket litigation expenses reasonably and necessarily incurred by Co-Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action, to be paid from the Settlement Fund. *See* Ex. 3, 3A-3B (summary chart, and listed by category).

110. The Postcard Notice and long-form Notice informed potential Settlement Class Members that Co-Lead Counsel would be seeking reimbursement of litigation expenses in an

amount not to exceed $400,000. The total amount requested by Co-Lead Counsel thus falls well below the $400,000 that Settlement Class Members were advised could be sought. The Notice also advised that this figure did not include Notice and Administration Costs, which were estimated to be "$300,000 to $490,000 through the initial distribution." Ex.1-B (Notice), p.5. To date, no objections have been raised as to the expenses set forth in the Postcard Notice and Notice. If any objection to the request for reimbursement of litigation (or any other) expenses is made after the date of this filing, Co-Lead Counsel will address it in their reply papers.

111. From the outset of the Action, Co-Lead Counsel were aware that they might not recover any of their out-of-pocket expenses and, even in the event of a recovery, would not recover any such expenditures until such time as the Action might be successfully resolved. Co-Lead Counsel also understood that, even assuming that the case was ultimately successful, a subsequent award of expenses would not compensate them for the lost use of the funds advanced by them to prosecute the Action. Accordingly, Co-Lead Counsel were motivated to, and did, take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

112. The largest component of expenses, $69,192.50, was incurred in mediation service fees paid to Phillips ADR Enterprises for the services Mr. Murphy provided in connection with the multi-day mediation and subsequent negotiations of the Settlement. This expense constituted approximately 30.8% of the total out-of-pocket expenses.

113. The next-highest expenditure, $41,481.00, or approximately 18.5% of the total out-of-pocket expenses, was incurred for the retention of experts in the fields of market efficiency, loss causation and damages. These experts were consulted at different points throughout the litigation, including on matters related to the preparation of the Complaint, the opposition to

40

Defendants' motion to dismiss, reports on damages, on matters relating to the preparation of the mediation submissions and responses thereto, negotiation of the Settlement, and on the preparation of the proposed Plan of Allocation and review of the Claim Form.

114. Additionally, Co-Lead Counsel paid $30,264.40 to JND eDiscovery, a division of JND Legal Administration, for hosting the document database for documents produced in this Action for approximately ten months, which is approximately 13.5% of the total expenses out-of-pocket incurred.

115. Co-Lead Counsel paid $15,000 to Grapevine Asia Partners Limited, a private investigator service, for international investigation services that were critical to the development of the facts alleged in the Complaint. Co-Lead Counsel also paid $4,702.50 to On Point Investigation, a private investigator service, for investigation services in the United States that likewise were critical to the development of the facts alleged in the Complaint.

116. Co-Lead Counsel further paid $14,976.83 to Quahe Woo & Palmer LLC, of Singapore, for local/outside counsel services in connection with the issuance of Letters Rogatory in Southeast Asia.

117. Co-Lead Counsel also paid a total of $7,073.21 for process service fees, which in this case were more extensive than usual since some of the service of process was effected internationally.

118. The other litigation expenses for which Co-Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These litigation expenses included, among other things, court fees, court reporting fees, travel costs, postage and delivery expenses, and the costs of online research, including Westlaw, LEXIS, and/or Bloomberg Law.

41

119.    All of the litigation expenses incurred by Co-Lead Counsel were reasonable and necessary to the successful litigation of the Action and have been approved by the Lead Plaintiffs. *See* SLG Cloudbank Decl. ¶13; Si Fan Decl. ¶12; and Amit Batra Decl. ¶12 (Exs. 4A-4C). Moreover, as noted, all potential Settlement Class Members were told in the Postcard Notice and Notice that Co-Lead Counsel would seek up to $400,000 in reimbursement of their out-of-pocket litigation expenses, and to date there have been no objections.

**C. The Lead Plaintiff Awards are Fair and Reasonable and Should Be Approved**

120.    Finally, Lead Plaintiffs seek reimbursement of the reasonable costs that they incurred directly in connection with their representation of the Settlement Class.  Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum.  Specifically, each Lead Plaintiff seeks an award of $15,000 (totaling $45,000), which we believe is modest in comparison to their efforts and the size of the Settlement they were able to obtain for the Settlement Class.  *See, e.g., Pearlstein v. BlackBerry Ltd.*, 2022 WL 4554858, at *11 (S.D.N.Y. Sept. 29, 2022) ("Plaintiffs' requested awards are commensurate with the level of their involvement in the Action, and, further, the awards only represent approximately 0.3% of the total settlement amount.").

121.    As detailed in their respective declarations (*see* Exs. 4A-4C), each of the Lead Plaintiffs were highly involved in the litigation and communicated regularly with Co-Lead Counsel.  Each made themselves freely available to perform their representative functions, including often speaking and emailing with Co-Lead Counsel. The tasks performed by them in executing their duties and responsibilities as Lead Plaintiffs in this Action included, among others: (a) reviewing the relevant court papers in the case; (b) communicating with Co-Lead Counsel via email and telephone about case developments and litigation strategy; (c) providing documents

42

and responses to Defendants' discovery requests; (d) preparing for the mediation sessions, including discussing with Co-Lead Counsel the Parties' mediation statements, as well as mediation strategy; (e) considering the mediator's recommendation, conferring with counsel, and ultimately approving the Settlement; and (f) communicating with counsel regarding the process of finalizing the Settlement.

122.    In addition, Lead Plaintiff SLG Cloudbank attended both the first and the second mediation sessions via videoconference, and engaged in extensive discussions of damages and mediation strategy with Co-Lead Counsel, including analysis of damages calculations and possible defenses, on the merits, as well as on class certification, and on damages, in preparation for mediation.

123.    A true and correct copy of each Lead Plaintiff's Declaration attesting to these facts is attached hereto as Exhibits 4A to 4C.  To date, no objections to the Lead Plaintiff Awards, which were also specifically disclosed in the Notice, have been received.

## VII.    CONCLUSION

124.    For all the reasons set forth above, Lead Plaintiffs and Co-Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Co-Lead Counsel further submit that the requested fee in the amount of 33⅓% of the Settlement Fund plus interest accrued thereon while said amount was in escrow should be approved as fair and reasonable, and the request for reimbursement of Co-Lead Counsel's out-of-pocket litigation expenses in the amount of $224,744.92 plus interest, and the Lead Plaintiff Award, in the amount of $15,000 for each of the three Lead Plaintiffs, should also be approved.

We declare, under penalty of perjury, that the foregoing is true and correct.

43

Dated:  April 10, 2025

_/s/ Shannon L. Hopkins_                                 /s/ Brian P. O'Connell_    
Shannon L. Hopkins                                       Brian P. O'Connell